| | |
|---|---|
| RYAN DILLON-CAPPS<br><br>**Plaintiff-Appellant,**<br><br>vs.<br><br>OHANA GROWTH PARTNERS, LLC *et al*<br><br>**Defendants-Appellees.** | No. **25-1162**<br><br><br>On Appeal from the U.S. District Court<br>Northern District of Maryland<br>No. 1:24-CV-3744 |

## AFFIDAVIT OF RYAN DILLON-CAPPS IN SUPPORT OF INJUNCTION PENDING APPEAL

I, **Ryan Dillon-Capps (née Wagner)**, the **Appellant**, being over the age of eighteen (18), competent to testify, and having personal knowledge of the facts contained herein, declare under penalty of perjury pursuant to **28 U.S.C. § 1746** that the following is true and correct.

## Table of Contents

AFFIDAVIT OF RYAN DILLON-CAPPS IN SUPPORT OF INJUNCTION PENDING APPEAL.................................1

TABLE OF CONTENTS.................................................................................................................1

INTRODUCTION .......................................................................................................................2

FACTUAL BACKGROUND .........................................................................................................3

A BEFORE REPORTING ACCOUNTING IRREGULARITIES ................................................................3
B PLANET FITNESS ..................................................................................................................4
C JOSHUA BEYER .....................................................................................................................5
1.   Steve Goodwin's Termination .........................................................................................5
2.   Casey Willard's Discovery ..............................................................................................7
D ACCOUNTING IRREGULARITIES ............................................................................................8
1.   Avoiding an Investigation .............................................................................................10
2.   Auding IT Records .......................................................................................................11
E WHISTLEBLOWER RETALIATION ..........................................................................................12
F FRAUD INVESTIGATION ......................................................................................................14
G REQUESTING TIME OFF ......................................................................................................16

EMPLOYER & FORMER EMPLOYEE .........................................................................................16

HELP DESK (CONTRACTUAL SERVICES THROUGH CIELO IT) ....................................................17
SECURITY OPERATIONS (CONTRACTUAL SERVICES THROUGH CERDANT).....................................18
NETWORK & COMMUNICATIONS (CONTRACTUAL SERVICES THROUGH FUSED TECHNOLOGIES) .........18
CLOUD & SYSTEM ADMINISTRATION (CONTRACTUAL SERVICES THROUGH BALTIMORE CONSULTING)..............18
CROSS-TEAM COORDINATION..................................................................................................18

BUSINESS INTELLIGENCE ...................................................................................................... 19
TECHNICAL PROJECT MANAGEMENT & INSTALLATIONS (CONTRACTUAL SERVICES THROUGH CIELO IT) ........... 19

**STATEMENT OF FACTS** ...................................................................................................... **19**

A FMLA & ADA ........................................................................................................................ 19
B SIX MONTHS OF INTERFERENCE & RETALIATION ...................................................................... 20
1.   Investigation Used as Excuse to Interfere with FMLA Leave ...................................... 20
2.   Loss of Promotion ......................................................................................................... 21
3.   More Restrictive Policies .............................................................................................. 21
4.   Removed from Position ................................................................................................. 21
C TARGETING OTHERS – ESCALATION TO LABOR DISPUTE ........................................................... 23
1.   Changed Annual Review Process ................................................................................. 23
2.   Frivolous Help Desk Tickets ......................................................................................... 24
3.   Darren Koritzka ............................................................................................................. 24
4.   Negotiating the terms and conditions of employment ................................................. 25
D JUNE 13, 2024: SUSPENSION ............................................................................................... 27
E JULY 30, 2024: TERMINATION ............................................................................................... 29
F FRAUDULENT LAWSUIT ......................................................................................................... 29
1.   No Notice Ex Parte TRO ................................................................................................ 30
2.   Denied Modify/Dissolve Hearing ................................................................................. 31
3.   Show Cause Hearing Granted ...................................................................................... 31
4.   Show Cause/Preliminary Injunction ............................................................................ 31
5.   Premature Default Order .............................................................................................. 31
6.   Ryan Dillon-Capps Victory ........................................................................................... 32
7.   Filing Remanded Case .................................................................................................. 32
G NOTICES ............................................................................................................................. 32
H MENTAL AND PHYSICAL HARM ............................................................................................. 33
I FINANCIAL HARM .................................................................................................................. 37
J UNPAID COMPENSATION ....................................................................................................... 40

**EXHIBITS** ........................................................................................................................... **42**

**DECLARATION OF AFFIRMATION** .......................................................................................... **44**

## INTRODUCTION

I find myself depleted of the mental acuity that once defined me, now reliant on my wife as my caregiver—a consequence of the intentional and malicious acts of my former employer, Ohana Growth Partners, LLC, and other Appellees. Their actions have not only exacerbated my PTSD but have also induced a catastrophic, life-threatening condition known as malignant catatonia. Their conduct appears driven by a singular goal: to keep their unlawful actions beyond the reach of administrative, legal, and judicial scrutiny. In pursuit of this, they have stripped away my

income and access to medical care, drained my financial resources, and forced me into financial default.

Without injunctive relief pending appeal, I face immediate and devastating consequences: the disconnection of my utilities, the termination of my phone and internet access, the closure of my bank account, the loss of email access, and the looming threat of foreclosure—all before this Court has the opportunity to rule on the merits of my case.

## FACTUAL BACKGROUND

### A  Before Reporting Accounting Irregularities

In 2013, I was diagnosed with posttraumatic stress disorder (PTSD) and panic disorder with agoraphobia.  My symptoms were severe and at times required emergency medical care, and from April 2014 to 2019 I relied on my service dog, Bumi, 24/7.  By the time I accepted my position with Ohana Growth Partners, LLC, I did not need to rely on my service animal throughout the workday. When Bumi passed away in December 2022, I no longer needed a service animal, medication, or regular treatments.

I moved to Maryland after accepting the job offer from Ohana Growth Partners, LLC. I worked for Ohana Growth Partners, LLC from February 10, 2020, until July 30, 2024, as the Vice President of Information Technology. I had remarkable success as the executive department head of the Information Technology department and was going to be promoted and join the C-Suite. The other C-level executives were aware of my the fourth-coming announcement of my promotion, and other employees were aware that the Information Technology department was expanding and taking on more responsibilities.

On October 16, 2023, accounting irregularities were reported to Glenn Norris (CFO) by the senior accounting and me. At the end of November and early December 2023, I reported to

Justin Drummond that I had been made aware of the unauthorized used of my identity in the filing of formal compliance documents and had discovered fabricated emails that portrayed me as unresponsive. All these discoveries are found in connection with members of Ohana Growth Partners, LLC Development (construction) department and the Development department vendor who does IT & Entertainment installation work for them.

## B  Planet Fitness

In 2023 Glenn Norris began leading efforts on Ohana Growth Partners, LLC refinancing of its debt, and the sale of company equity to Alaris Equity Partners (Canadian), who operates as Alaris Equity Partners USA in the states.

The refinancing completes in Q3 of 2024, with Ohana Growth Partners, LLC equity partners extracting liquidated capital out of the deal. Followed by a coordinated purchasing of roughly 1.5 billion in Planet Fitness Inc. – CL A voting shares by multiple partes. One of those parties performs their purchases on September 30, 2024, through T. Rowe Price Associates, Inc. (Price Investment Management) which is located at 100 E. Pratt Street, Baltimore, Maryland 21202: (1) Sole Voting Power: 2,2369,880/Sole Dispositive Power: 2,386,011, (2) Sole Voting Power: 5,330,749/Sole Dispositive Power: 5,340,255. The transactions overlap with the replacement of Planet Fitness CFO.

In 2019, a coordination of Planet Fitness franchisees formed the largest Planet Fitness franchise group called the Planet Fitness Independent Franchisee Counsel (PFIFC). The event similarly correlates with Alaris Equity Partners with Ohana Growth Partners, LLC refinancing. The PFIFC forms a Board of Directors, holds their own annual convention separate from the Planet Fitness convention, and their stated vision is *"to be the catalyst for sustainable growth of the PF Brand"* with the mission statement *"to preserve and enhance the business interest of all Planet Fitness*

*franchisees and to collaborate with the franchisor to improve brand equity for all stakeholders"*. The PFIFC has several committees, which include Club Operations, Enterprise Value, Marketing, Member Engagement, Store Development, Technology, and Vendor Management. PFIFC has an unusually high amount of control over Planet Fitness when compared to other Franchisee to Franchisor relationships. Victor Brick, CEO and majority equity owner, of Ohana Growth Partners, LLC had the power to select his own committed and Ohana Growth Partners, LLC continues to place and remove people from the committees.

C    <u>Joshua Beyer</u>

Prior to the 2019 formation of the PFIFC, Joshua Beyer, former Vice President of Real Estate and Development for Planet Fitness, was hired by Ohana Growth Partners, LLC as Chief Development Officer (CDO) in June 2018 and is the current executive department head of the Development department at Ohana Growth Partners, LLC.

1.   <u>Steve Goodwin's Termination</u>

During Ohana Growth Partners, LLC 2018 Christmas party, Steve Goodwin (23-year tenured employe who was former department head of the Information Technology department[1]) and Joshua Beyer had a disagreement which resulted in Richard Hartman of Human Resources becoming involved. Richard Hartman placed Steve Goodwin on a leave of absence, created a

---

[1] In January 1996, Steve Goodwin started with Ohana Growth Partners, LLC (Ohana Growth Partners) joint organization Brick Bodies Fitness Services (Brick Bodies); Brick Bodies is Victor and Lynne Brick's namesake Health Club/Gym brand they founded in 1986. Brick Bodies and Ohana Growth Partners corporate headquarters is at 212 West Padonia Road, Timonium, Maryland 21093; The first Brick Bodies gym location. When Ohana Growth Partners was founded in 2008 it leveraged existing department employees, including those in the accounting, marketing, and information technology departments. Ohana Growth Partners marketing and accounting department split off before 2020, and Ohana Growth Partners accounting department began providing payroll and accounting functionality to Brick Bodies in the years following COVID. When I was hired in 2020, the Information Technology department supported Brick Bodies and Ohana Growth Partners equally, and over my tenure I worked to segment the two companies with Brick Bodies information technology support handled by Baltimore Consulting by the end of 2023. Brick Bodies reporting was still being supported by Ohana Growth Partners Business Intelligence department, a sub-department of the Information Technology department, and there were on-going efforts being made to separate the two organizations reporting.

form, and had Steve Goodwin complete the form to "document Steve Goodwin's version of the events". Steve Goodwin was terminated sometime in January/February 2019.

Ryan Brooks (principle of a Managed Service Provider named Baltimore Consulting) organized travel for Steven Goodwin and Mrs. Goodwin on at least two separate occasions to facilitate Steve Goodwin meeting with Ohana Growth Partners, LLC. The result appears to be a settlement agreement between Steve Goodwin and Ohana Growth Partners, LLC.

In 2023, Allyson Ratliff filed a complaint against a project manager in the Development department, and met with Richard Hartman at the corporate headquarters to discuss the complaint that she filed with HR. I ran into her as she was exiting that meeting, and she was visibly disconcerted but did not expand on what was wrong.

In November, I filed a complaint against 3 members of the development department: Joshua Beyer (CDO), Bill Flax (Director of Construction), and Jared Flax (Manager of Development Project Managers). When I met with Richard Hartman (VP of HR), and Karen Debus (HR Generalist) they refused to accept my written complaint and when I attempted to read it to them, they repeatedly interrupted, asked a not materially relevant question, and when I answer their question, they cited the irrelevance of the answer to the complaint. The meeting ended without the first page of the complaint being read and repeated their refusal to accept my written complaint. Richard Hartman informed me that HR would create a form for me to complete. Later, I would discover that my predecessor's mailbox was missing roughly four months of emails, but emails that were still recoverable informed me that he had a similar experience from Richard Hartman.

Considering the fraud investigation that began in December, Justin Drummond and I agreed to have the HR investigation into my complaint suspended until after the fraud investigation. In

March of 2024, the HR investigation was closed out without anyone speaking to the witness that I provided to HR.

2. Casey Willard's Discovery

During the pre-hiring process, Joshua Beyer sent Planet Fitness internal documents to Glenn Norris by way of Joshua Beyers Planet Fitness work email to Joshua Beyers personal yahoo email to Glenn Norris' work email.

After Joshua Beyer was hired by Ohana Growth Partners, LLC, a discovery request was sent to Ohana Growth Partners, LLC by Casey Willard's legal team in connection with a sexual harassment lawsuit filed against Planet Fitness with Joshua Beyer named because Joshua Beyer had initiated an inappropriate sexual relationship with Casey Willard while he was the Vice President of Real Estate and Development for Planet Fitness.

Glenn Norris (CFO), Richard Hartman (VP of HR), and Ryan Brooks (principle of a Managed Service Provider named Baltimore Consulting) coordinated efforts to provide a response to Casey Willard's discovery request with an abnormal focus to providing the bare minimum. They decided to first initiate an impromptu migration from their on-premises exchange email server to Microsoft 365 with the work performed by Ryan Brooks, and after only completing some of the work Ryan Brooks notified Glenn Norris and Richard Hartman that a download satisfying the discovery request was ready for download. A significant portion of the migration to the Microsoft cloud, inclusive of some mailboxes, remained incomplete until September 2023 when I led efforts to decommission all the servers still located at the corporate headquarters and move everything into Ohana Growth Partners, LLC Microsoft cloud infrastructure.

### D   Accounting Irregularities

From February 10, 2020, until October 16, 2023, my panic attacks became less frequent each year, and my social life flourished. In 2021, I met my wife, and in 2023, I proposed to her. We legally married in July 2023, with a formal wedding planned for April 4, 2024. Professionally, I was excited about my upcoming promotion, which was pending a formal agreement after spending months negotiating the terms with Glenn Norris throughout 2023.

When news of my promotion was privately disclosed, Joshua Beyer (CDO) and Josh Gerber (CMO) responded negatively. Joshua Beyer lost executive control over IT and Entertainment installation to me, and Josh Gerber took the termination of his self-proclaimed "best friend," Steve Goodwin, poorly. Gerber had engaged in gender-based discrimination against me since my hiring, and Beyer had received a very negative annual review from Victor Brick in 2023, which directed him to correct both his own behavior and that of his department due to compliance issues and negligence problems that my department had uncovered regarding the IT and Entertainment installation vendor that Bill and Jared Flax (father and son) had insisted on exclusively using.

Similarly, Josh Gerber had previously been told by Glenn Norris that his gender-based discriminatory conduct toward me was inappropriate and must stop immediately. Numerous employee complaints about Gerber's workplace conduct led some employees to refer to him as "a bully."[2]

The vendor that Bill and Jared Flax had insisted on exclusively using was Onsite Solutions, Inc. When they learned that I was assuming oversight of IT and Entertainment installation and had decided to replace Andrew Dinh (founder of Onsite Solutions, Inc.) and his company, they

---

[2] Josh Gerber was terminated by Ohana Growth Partners, LLC in August 2024.

became extremely upset. In response, they refused to provide any information or past invoices, obstructing my ability to conduct a cost analysis and finalize the 2024 budget for IT and Entertainment installations.

Glenn Norris, aware of their obstruction, directed me to retrieve the necessary information from the company's accounting system records and other internal resources, including email and file repositories. Through this process, I determined that when comparing the total known work performed by Onsite Solutions, Inc. to the total payments recorded in the company's accounting system, there was a discrepancy of approximately four million dollars ($4,000,000) in unpaid work that Onsite Solutions, Inc. had not invoiced to Ohana Growth Partners, LLC. The senior accountant at Ohana Growth Partners, LLC confirmed the reports were generated correctly, and the accounts payable department manager verified that no records existed indicating that these payments had been processed under any other account or vendor entry.

The accounting irregularity was a cumulative deficiency spanning several years, which was easily overlooked during annual audits due to the Development department's repeated failure to meet deadlines. New club projects and other work were frequently carried over into subsequent years, allowing auditors to classify the carry-over amounts as non-final, incomplete work rather than identifying them as outstanding liabilities.

The Development department also tracked "pre-paid" expenses without the same specificity as other standard accounting practices, where invoices were issued, and payments were made for exact amounts. This system allowed Bill and Jared Flax to authorize unspecified payments, while Andrew Dinh's under-invoicing concealed the actual costs of work performed. As a result, the total reported expenses for Development work consistently fell within acceptable thresholds, preventing auditors from flagging discrepancies.

Over time, the misallocated funds can be accounted for in various ways, including fabricated or altered invoices that are then filed to account for the pre-paid amounts which require no payments made by accounting which would raise no flags when distributed properly because it would require someone to systematically go through every single invoice and contact the originating company to discover a discrepancy. This structure made the scheme nearly impossible to detect without a deep understanding of Onsite Solutions, Inc.'s work history and the specific costs associated with their projects.

Based on everything that I have reviewed, I believe that Bill Flax[3] discovered Andrew Dinh's scheme, possibly through Bill Flax auditing something that Andrew Dinh submitted, and confronted Andrew Dinh. The two of them then came to a formal agreement and Bill Flax had all the Development department's invoices directed to him personally. Bill Flax making payments with Andrew Dinh being the vendor who is the middleman between originating providers and payments. Andrew Dinh capable of turning the body of an email to look like it contained an email with the invoices file name. The fabricated email with the invoice to be paid is forwarded to Bill Flax, or Andrew Dinh attaches the invoice to be paid to a different email and sends it to Bill Flax for payment. The originating providers received their payment, and the difference becomes money Bill Flax and Andrew Dinh have gained without Ohana Growth Partners, LLC or the IRS knowing about the money.

1. Avoiding an Investigation

Upon learning of the accounting irregularities, Glenn Norris directed Accounts Payable Manager Leeann Hartman—who is the wife of Richard Hartman and sister of Lynne Brick—to instruct Bill Flax to reach out to Andrew Dinh for any unsubmitted invoices for the 2023 fiscal year. In

---

[3] William "Bill" Flax is a barred attorney in the state of Maryland.

response, Andrew Dinh sent invoices to Leeann Hartman, but these invoices bore no resemblance to any of his prior invoices and were generated using a completely different application than what he had previously used.

When questioned, Andrew Dinh claimed the invoices were generated from a new accounting system they were testing. However, when Leeann Hartman showed me the irregular invoices, I immediately recognized the unique numbering and formatting as being identical to a ticketing system I was familiar with. The supposed invoice numbers followed a pattern where the first portion was the date the entry was made into the ticketing system, and the second portion was the sequential order of the entry. Clearly showing that these "invoices" were generated only after Andrew Dinh had been asked to submit any missing invoices, casting doubt on their legitimacy. Leeann Hartman also found the invoices suspicious, and Glenn Norris requested that Andrew Dinh resubmit them. Eventually, the revised invoices began to resemble actual invoices, and a six-figure amount in previously unsubmitted invoices—covering January through October 2023—were processed and paid by Ohana Growth Partners, LLC. After this, Glenn Norris prohibited any further investigation into accounting discrepancies from prior years, effectively blocking any effort to uncover additional deficiencies predating 2023.

2. Auding IT Records

Within days of the senior accountant and me informing Glenn Norris of the accounting irregularities, Glenn Norris sent an email to Matt Norris (his son and VP of Finance) stating that he was initiating an audit of me and the IT Department records. The only plausible reason for this email was to form a written record, as it was inconsistent with Glenn Norris's typical practice of handling important matters through in-person discussions or phone calls.

Just weeks before initiating the audit, Glenn Norris had immediately approved a completely new budgetary cost with contractual obligations within minutes of my unannounced phone call. He

had no follow-up questions to my brief explanation of its purpose and my assurance that I would evaluate whether to continue with it before the next renewal. He approved the expenditure without hesitation and even reminded me to include it in the 2024 budget.

This stark contrast in behavior—his prior willingness to approve financial commitments without scrutiny, followed by an abrupt decision to audit me and the IT Department after I reported accounting irregularities connected to the Development department.

### E  Whistleblower Retaliation

After I reported the accounting irregularities connected to Onsite Solutions, Inc. and the Development department to Glenn Norris, he began inviting Justin Drummond to join our meetings. When present, Justin Drummond was highly antagonistic and accusatory, repeatedly shifting his criticisms. First, he claimed he never received updated budgets. When that was disproven, he then claimed that the budget wasn't in the correct format. Next, he insisted that the budget cover 15 months instead of the standard 12 months, then demanded a 10-year budget with increasingly complex forecasting requirements. These included: (1) incorporating the new club build schedule, (2) accounting for fluctuating costs over time, and (3) aligning projected expenses with evolving technology deployments in clubs and at the corporate level based on the IT roadmap.

Each new demand came with unrealistic deadlines. Initial revisions had to be completed by the next day, while the multi-year forecasting budget—which involved a complex, dynamic financial model—was expected within days. Meeting these demands required me to write a series of Visual Basic macros to automate intricate calculations in Excel, accounting for factors such as: (1) Different invoicing frequencies, (2) Variable invoice distributions across locations, (3) Invoices with different location-specific rates, (4) Renewal terms that varied by region or

location, (5) Technology implementation schedules that altered invoice structures and renewal terms, (6) Fluctuations in costs of goods, (7) New club openings, (8) Two distinct re-equipment schedules, (9) Multiple remodel schedules, (10) and numerous other complex financial conditions.

I completed something that would otherwise have required a team of people months or longer to build in roughly a week. The completed "budget builder", successfully implementing verification checks to ensure accurate calculations, and had required me to integrate a simplified version of advanced banking formulas designed to mitigate compound rounding errors in financial models.

Rather than accepting the validated budget analysis, Glenn Norris claimed that the Development department had reported IT and Entertainment installation costs that were half the industry standard—far lower than amounts paid by every other Planet Fitness franchise group and independent expert installers. Glenn Norris informed me that he was submitting the number from the Development department to the bank for the refinancing and that he was going to use the same number for the 2024 budget. This led to multiple reviews, each one increasing in granularity. Culminating in an invoice-by-invoice verification of actual recent club installation costs.

To complete this verification, I had to manually search through tens of thousands of emails, locating invoices, receipts, and supporting documentation to construct a line-item cost breakdown. This process accounted for every individual expense, including minor details such as the per-unit cost of terminators extracted from bulk purchases.

Despite the exhaustive analysis, which unequivocally confirmed that my figures aligned with those of industry experts, other Planet Fitness franchise groups, and our own prior club

installations under Andrew Dinh, Glenn Norris showed no interest in reviewing the findings. Without so much as glancing at the screen or examining the supporting data, he summarily accepted the results without engaging in any meaningful review of the work he had previously harshly criticized and repeatedly rejected at various stages of escalating granularity.

These events overlapped with other increasingly complex and unnecessary assignments with equally unrealistic deadlines.

## F   Fraud Investigation

During the escalating demand for granular detail of new club It and Entertainment Installation work, I uncovered an email from Andrew Dinh in which he claimed to have sent me an unsigned contract for approval and signature approximately six months after Bill Flax had already signed the agreement. The email thread falsely suggested that I had been unresponsive, culminating in a final email from Andrew Dinh on the same day he forwarded a signed contract to the accounting department. However, the signed contract he provided had been executed six months prior to the email in which he was claiming I had failed to respond, exposing a clear contradiction in the timeline and raising concerns about the legitimacy of the email's assertions.  Forensic analysis of the email headers/metadata showed that the number of emails shown were more than the emails transmitted.

This discovery came immediately after Andrew Dinh admitted to having completed a new club cybersecurity compliance report, despite the report itself falsely stating that I had filed it.

Given the sudden deterioration in my working relationship with Glenn Norris, I presented these findings to Justin Drummond and initiated an initial fraud investigation to determine whether these incidents were part of a larger pattern of misconduct that could expose the company to significant liability. Through this process, I uncovered a series of intentional acts by Bill Flax,

Jared Flax, Joshua Beyer, Andrew Dinh, and Josh Gerber, all aimed at damaging the reputation of Cielo IT and myself.

The apparent conflict of interest necessitated the involvement of a third-party independent investigator. I took these findings particularly hard, as they exposed a coordinated effort to undermine Cielo IT and my reputation with no legitimate basis, aside from Cielo IT replacing Andrew Dinh's company as the provider for IT and Entertainment installation work.

The culmination of accounting irregularities, identity theft, fraud, and ongoing efforts to damage the reputation of Cielo IT and myself, all traced back to the same group of individuals, prompted me to request a formal review meeting with Victor Brick, Glenn Norris, and Justin Drummond. Victor Brick accepted the request, and I was informed that the four of us would meet after the Q4 strategy session, which was scheduled to take place on December 21, 2023. However, on December 20, 2023, the day before the meeting, Justin Drummond sent an announcement stating that Victor Brick had canceled his trip and that the strategy session would be rescheduled, effectively postponing the meeting indefinitely.

I found the cancellation of the meeting with Victor Brick alarming and immediately began reaching out to law firms for legal representation. One of the firms I contacted was Miles & Stockbridge P.C. At 2:28 PM, I sent an email from my personal email account, which included my mobile phone number, seeking legal counsel.

A few hours later, at 5:11 PM, Steven Frenkil responded, informing me that Miles & Stockbridge had a conflict of interest. His email also contained a disclaimer, stating that the communication was a unilateral exchange of information without a reasonable expectation of an attorney-client relationship.

I prepared a collection of the findings related to the fraud investigation and emailed it to Glenn Norris and Justin Drummond with a notice that I was taking time off and wanted nothing to do with the investigation in the morning of December 21, 2023.

Justin Drummond sent me an email that notified me of the upcoming communication that came from Miles & Stockbridge P.C. Principal Attorney Holly Butler via text message at 10:52 AM on December 22, 2023. Being introduced as the person who would perform the independent investigation that I had requested. I directed her to obtain relevant information from Ohana Growth Partners, LLC Microsoft cloud systems logging, and eDiscovery holds that I had put in place to facilitate the investigation and preserve the chain of evidence.

## G  Requesting Time Off

Following my October 16, 2023, report of accounting irregularities to Glenn Norris, the work environment at Ohana Growth Partners, LLC became increasingly hostile, leading to a steady decline in my mental health. My panic attacks grew more frequent, and by the time I received Justin Drummond's email notifying me that Victor Brick had canceled his trip and our scheduled meeting, I was experiencing multiple panic attacks per day.

After taking time off on December 21, 2023, Glenn Norris continued to make ongoing demands for my attention, preventing me from fully disengaging. As a result, my panic attacks intensified in severity, duration, and frequency, further exacerbating my declining mental health.

## EMPLOYER & FORMER EMPLOYEE

Ohana Growth Partners, LLC is a Maryland limited liability company with its principal place of business located at 212 West Padonia Road, Timonium, Baltimore County, Maryland 21093. I am a citizen of the State of Maryland who resides at 1334 Maple Avenue, Essex, Baltimore County, Maryland 21221. *See ECF 23-1, at 2 ¶ 2-3.*

Ohana Growth Partners, LLC ("Ohana") is a Planet Fitness ("PF") franchisee that owns and operates over 80 Planet Fitness health clubs across California, Washington, Tennessee, Florida, the District of Columbia, and Maryland. The company's corporate headquarters is in Baltimore County, Maryland, at 212 West Padonia Road, Timonium, MD 21093. Ohana employs approximately 1,500 people, with nearly half of its locations and workforce based in Maryland. *See ECF 23-1, at 2 ¶ 7.*

Ohana's majority equity co-owners, Victor and Lynne Brick, are also the founders and owners of Brick Bodies Fitness Services (a Maryland-based health club brand), the John W. Brick Foundation (a non-profit organization), and Down Under Growth Partners (a joint venture franchisee of Planet Fitness in Australia). Other equity owners include Glenn Norris (CFO), Earl Ihle, Stacey R. Wittelsberger, Charles A. Bryan, and Alaris Equity Partners USA (primarily a Canadian company). Richard Hartman is the executive department head of Human Resources, and Justin Drummond is the President.

After relocating to Maryland, I began working for Ohana Growth Partners, LLC on February 10, 2020, at their corporate headquarters as the Vice President of Information Technology (*See ECF 23-1, at 3*). In this role, I served as the executive department head overseeing the Business Intelligence and IT Support Departments, managing a combination of direct hires and contracted staff across multiple functional areas.

Help Desk (Contractual Services Through Cielo It)

The Help Desk was entirely contracted through Cielo IT and functioned as the central hub for IT support, working with all other IT support teams. The Help Desk structure was as follows: (1) Director of Delivery Operations: Rolando Pedraza, responsible for overseeing Help Desk services. (2) Help Desk Manager: Dante Martinez, reported to the Director of Delivery Operations but was also directly managed and mentored by me; he was scheduled to become a

direct hire in 2024. (3) Help Desk Agents (Tier 1, Tier 2, and Tier 3): Aldo Torres, Esteban

Teran, Josue Sanchez, Rogelio Ramirez, and Ronaldo Rosales, all of whom reported to the Help

Desk Manager.

I worked closely with the Help Desk Manager on day-to-day operations and collaborated with

the Director of Delivery Operations as needed, particularly for Help Desk analytics and

performance data.

Security Operations (Contractual Services Through Cerdant)

The Security Operations Engineers were provided through Cerdant. I worked primarily with their

account manager and an internal director for security operations. Planet Fitness mandated this

vendor to ensure PCI Compliance across all Planet Fitness health clubs.

Network & Communications (Contractual Services Through Fused Technologies)

The Network and Communications Engineer, Marc Radik, was the owner of Fused

Technologies, Inc. I worked directly with him on network infrastructure and communications

systems. He was scheduled to be replaced in 2024 by a direct hire.

Cloud & System Administration (Contractual Services Through Baltimore Consulting)

The Cloud/System Administrator, Ryan Brooks, was the principal of an independent consulting

company. I worked directly with him, and he had additional support staff who assisted as needed.

He was scheduled to be replaced in 2024 by a direct hire.

Cross-Team Coordination

The IT Coordinator, Darren Koritzka, worked across both support and project teams, providing

operational support and reporting directly to me. He was scheduled to transition into the internal

IT & Entertainment Installation team in 2024.

The Data Analyst, Mareann Piñera, worked within the Business Intelligence team, handling data-driven insights and reporting. She normally would have reported to the Director of Business Intelligence, but the position was vacant at the time and reported to me.

Technical Project Management & Installations (Contractual Services Through Cielo It)

The Technical Project Manager, John Hartman, was contracted through the same company that provided Help Desk services, but under a different division. He managed a team of technical installers, and I worked directly with him on infrastructure and deployment projects. He was a candidate for the Director of IT & Entertainment Installation team that was forming in 2024.

## STATEMENT OF FACTS

I will be citing exhibits that contain perjured statements, and the Court should exercise caution when reviewing portions unrelated to the specific intent of each citation. This case is deeply entangled with perjury, fraud on the court, insurance fraud, falsification of court records, mail fraud, wire fraud, identity theft, forgery, and other serious legal violations that create a high risk of misinterpretation.

Despite the court record containing over 2,000 pages of exhibits, this appeal arises from a gross misinterpretation of the facts and evidence by the district court, which denied multiple motions and requests for an evidentiary hearing before ruling and misapplied controlling statutes, legal doctrine, and precedent.

### A   FMLA & ADA

I requested intermittent FMLA leave on January 4, 2024. On January 8, 2024, Ohana Growth Partners, LLC notified me that (1) Under the FMLA I was considered a key employee and that my FMLA leave could not be denied. (2) Restoring my employment at the conclusion of FMLA

leave will not cause substantial or grievous harm to them. (3) Requested health care provider certification. *See ECF 16-3, at 4-7.*

My health care provider provided certification on January 22, 2024 (*See ECF 16-3, at 10-13*) and March 12, 2024 (*See ECF 16-3, at 18-21*), and a follow-up letter on January 31, 2024 (*See ECF 16-3, at 17*). In those documents, my health care provider stated it was necessary for Ohana Growth Partners, LLC to allow me to work from home as a reasonable accommodation because of Ohana Growth Partners, LLC hostile workplace environment. Ohana Growth Partners, LLC granted my reasonable accommodation, and I exclusively worked from home in 2024.

A 2013 letter from the health care provider who diagnosed me with posttraumatic stress disorder (PTSD) and panic disorder with agoraphobia, explicit states that my impairments sometimes require emergency medical care and qualifies me for reasonable accommodations under the ADA or Rehabilitation Act of 1990 and its subsequent 2008 amendment. See ECF 16-3, at 22. Between 2014 and 2019, I relied on my service dog, Bumi, 24/7 (*See ECF 16-3, at 3*). Following his passing in 2022, I no longer required the assistance of a service animal, medication, or regular medical treatment.

## B  Six Months of Interference & Retaliation

### 1.  Investigation Used as Excuse to Interfere with FMLA Leave

On December 22, 2023, Holly Butler of Miles & Stockbridge P.C. introduced herself as having been hired by Ohana Growth Partners, LLC to conduct an independent investigation (*See ECF 16-0, at 1-5*). Instead of utilizing the IT Department's resources, she engaged in harassment rather than conducting an impartial investigation. Despite the availability of other IT personnel, she insisted that I personally review over thirty terabytes of data and compile additional information for the investigation. Her ongoing demands directly interfered with my ability to

take FMLA leave, as each time I needed and had the opportunity to use my leave, she pressured me to continue working.

## 2. Loss of Promotion

Prior to my October 2023 report to Glenn Norris, I had achieved remarkable success in leading the IT Department (*See ECF 34-0, at 31-34*), leading to discussions regarding a soon-to-be-announced promotion to the C-Suite. Other C-level executives were aware of this anticipated promotion, and employees had knowledge of upcoming structural changes, as my department was expected to expand and take on additional responsibilities. I had been negotiating with Glenn Norris regarding the terms of my promotion, with my expected compensation increasing to $507,200.00 (*See ECF 34-0, at 35*).

However, after my October 2023 report to Glenn Norris, circumstances within the company took a dramatic turn. On December 21, 2023, I requested time off, which ultimately led to my FMLA request (*See ECF 16-3, at 1*).

## 3. More Restrictive Policies

After I went on FMLA leave, Richard Hartman attempted to impose more restrictive leave policies on me than those applied to other employees and even more restrictive than the policies that had governed my leave prior to FMLA. For Example, On January 10, 2024, he attempted to prevent me from working at all whiles on intermittent FMLA leave. I took a screenshot of his text message and provided him with evidence that the official written policies contained no such restriction (*See ECF 16-3, at 8-9*).

## 4. Removed from Position

After going on FMLA leave, Glenn Norris immediately took control of the IT Department and began sabotaging years of success.

Glenn Norris dismantled the procurement process I had established, removed my budgetary oversight, and mandated that all IT Department purchases be processed exclusively through the Accounts Payable Supervisor. This change was applied solely to the IT Department and did not affect any other departments

Without my knowledge or input, Glenn Norris personally vetted and hired a new Data Analyst. I was only made aware of this hiring when Darren Koritzka informed me that a new IT Department employee was starting the next day. Since joining the company, I had personally hired every IT Department member, yet in this instance, I was neither consulted nor notified before the decision was made. When I inquired why I had been excluded, Glenn Norris stated he was "helping out" while I was on intermittent FMLA leave. Later conversations made it evident that Glenn Norris was attempting to replace Mareann Piñera, an outstanding Data Analyst and excellent employee, solely because of her strong professional regard for me.

Glenn Norris began meeting regularly with IT Department employees, personally managing them, assigning tasks, and effectively preventing me from exercising any supervisory control over the department.

Glenn Norris assumed oversight of all key IT projects and barred me from attending nearly all project meetings. He chastised me for accepting a meeting request with a vendor involved in a critical project and explicitly instructed me that I was no longer allowed to have meetings with certain vendors.

Glenn Norris directed me to remove all but a few select individuals from meetings and insisted that I communicate exclusively with designated employees who would then relay information to others in the company "on my behalf."

Glenn Norris further restricted my role by dictating that I should only perform IT work that he deemed a good use of my time and that I should rely on others for all remaining IT responsibilities.

<h2 style="text-align:center">C    Targeting Others – Escalation to Labor Dispute</h2>

Glenn Norris, in coordination with Richard Hartman, directed personnel in the Accounting and Human Resources departments to submit fabricated Help Desk tickets and exaggerate minor technical issues. Their intent was to harass the Help Desk team and create a false narrative that the department was ineffective. These efforts were specifically targeted at Cielo IT, a third-party provider with whom I had maintained a long-standing and successful professional relationship.

### 1. Changed Annual Review Process

Richard Hartman instructed a person in the HR department to change the annual review process, which was being customized for every single department, the notice was given to me immediately before the process was scheduled to begin.

At first, I was told that I had days to provide a completely new set of questions with new job descriptions. I responded promptly and provided job descriptions and proposed the use of the same objective data driven performance-based metric system that I had implemented into the department's monthly reviews in 2023.

The person assigned the task was being directed in what to say, and some of the emails were clearly not written by them. HR rejected the objective annual review process and said that it had to be a subjective based one and was told that HR had selected the subjective questions that would be used for Darren Koritzka and Mareann Piñera, and when I read the questions, they selected it was clear that the entire process was designed to use the annual review process to frame them poorly.

## 2.  Frivolous Help Desk Tickets

Darren Koritzka received a support request for a new team member of the accounting department.  The ticket was about a small application which one of Ohana Growth Partners, LLC banks required to improve security in the communications, and the accounting department had previously provided training to the IT department so that we understood what it was and how it worked to troubleshoot other issues better.  Suddenly, the accounting department had no idea how it worked and believed it had to be installed on a remote system which was subsequently proven to be incorrect and that what had been done already was correct.  There was no issue.

Karen Debus (HR Generalist) filed a ticket where she claimed to have no idea who a person was, despite having had prior contact with this person, and wanted the Help Desk to treat it as a suspicious email to be investigated.  There was no issue.

1        Karen Debus (HR Generalist) filed a ticket where she claimed to need a piece of software to view a security video from a club. When the Help Desk provided her a link to facilitate her requested, she claimed that the link went to a totally different website.  When additional assistance was offered to address the issue, she made wild claims about the Help Desk being useless and that she would figure it out by herself.  There was no issue.

## 3.  Darren Koritzka

Darren Koritzka had endured significant personal hardships throughout 2022-2023, including taking FMLA leave due to familial health issues and later being involved in a serious car accident. These challenges affected his mental health, but by the end of 2023, he was making a strong recovery. I was actively mentoring him to reconnect with his passion for hands-on IT work and had planned to transition him into a role where he could excel in technical tasks that he enjoyed. As he regained stability, he began to see work as a safe and supportive environment.

However, Glenn Norris and Richard Hartman began targeting him specifically because of his professional relationship with me.

**Reduction of KPI Bonus by Glenn Norris:** Despite going above and beyond for the company in the same week, Glenn Norris attempted to reduce Darren Koritzka's monthly KPI bonus based on alleged events from months prior, without justifiable cause.

**Inappropriate Write-Up by Richard Hartman:** Richard Hartman issued a formal write-up against Darren Koritzka. I protested the write-up, stating that it was inappropriate, yet my objections were ignored.

**Immediate Retaliation Following My Assertion of FMLA Rights:** On June 13, 2024, at 2:05 PM, I sent an email asserting my FMLA leave rights and formally requested intervention from the ownership team to stop the harassment by Glenn Norris and Richard Hartman. At 2:20 PM (just 15 minutes later), Richard Hartman placed Darren Koritzka on a forced leave of absence, in clear retaliation for my intervention (*See ECF 16-0, at 27*). I was unlawfully suspended later that evening.

2       **Wrongful Termination:** On August 2, 2024, Richard Hartman wrongfully terminated Darren Koritzka citing the elimination of his position resulting from department review and subsequent restructuring (*See ECF 16-0, at 146-147*). This occurred days after I was wrongfully terminated on July 30, 2024 (*See ECF 16-0, at 142-143*).

4.  Negotiating the terms and conditions of employment

3       I intervened regularly to have the improper conduct redirected back to me, but this occurred after months of harassment and the subsequent weeks was relentless abuse which had depleted me, and I had begun trying to obtain the contract information of the legal representation to negotiate the employment terms and conditions.

On June 5, 2024, I emailed Holly Butler to inquire if she was still representing Ohana Growth Partners, LLC so that I could negotiate for the terms and conditions of employment for those affected by the labor dispute, including myself, Darren Koritzka, Mareann Piñera, and members of the Help Desk (CieloIT). Holly Butler refused to confirm the status of representation between Miles & Stockbridge P.C. and Ohana Growth Partners, LLC.

Between June 5 and June 18, 2024, I made several more attempts to acquire the information of Ohana Growth Partners, LLC legal representation to negotiate from the company. No one ever responded with the information.

Glenn Norris, Justin Drummond, and I had our final phone call a little after 3 PM on June 11, 2024. During the phone call, I asked for the following terms:

1. The contact information of their legal counsel to facilitate the negotiations of the labor dispute.

2. That the only terms non-negotiable are that all hostilities directed toward Darren Koritzka, Ann Pinera, and the Cielo IT based Help Desk team would cease immediately

3. The final terms of the negotiations needed to ensure favorable employment terms and conditions for all 3.

4. That Cielo IT's financial obligations to Ohana Growth Partners, LLC could not result in premature termination of their agreement and subsequent collection of the difference.

4    I left the June 11, 2024, meeting under the firm belief that Glenn Norris and Justin Drummond had agreed to the terms discussed and that the labor dispute was nearing an end.

After the lawsuit was filed on June 14, 2024, I emailed Robert Brennen on June 18, 2024, at 5:30 PM, and requested that Robert Brennen help negotiate an end to the labor dispute (*See ECF 16-0, at 123*).

On June 13, 2024, at 7:12 AM, I informed Glenn Norris, Richard Hartman, and Justin Drummond that I was using my FMLA leave for the day and would let them know when I was back (*See ECF 16-0, at 14*).

On June 13, 2024, at 9:01 AM, Richard Hartman emails a coercive demand that says (1) I am entitled to use my FMLA time to take time off. (2) Glenn Norris signed an agreement with a new vendor named Hartman Executive Advisors (HEA) and demands that I provide Phil Leadore from HEA Global Administrator access by 3 pm today.  (3) If I fail to comply with this demand by 3 pm hat the company will take "appropriate actions. See ECF 16-0, at 25-26.  The email falsely states:

**False Statement:** I was refusing to obey management's directives (to provide Global Administrative access).  **Truth:** On July 7, 2024, at 5:35, I texted Justin Drummond to provide him with access to an emergency Global Administrator account, and Justin Drummond agreed to meet with me on June 10-11, 2024, to receive access (*See ECF 16-0, at 42-43*).  Justin Drummond said he was unable to meet with me on June 10-11, 2024, and mislead me into believing that we would meet the following week.

**False Statement:** I was the only person with access to the Global Administrator accounts.

**Truth:** The Help Desk Agents and Help Desk Manager had multiple administrative roles assigned to their accounts. Through these roles, they were able to access the emergency Global Administrator account's mailbox, submit a self-managed password reset request, and use the email verification process to reset the Global Administrator account password, thereby gaining access (*See ECF 38-2, at 519-520*). On July 15, 2024, at 9:10 AM, Robert Brennen emailed me to confirm that he had successfully accessed my account and that Ohana Growth Partners, LLC had "regained" Global Administrator account access (*See ECF 16-14, at 51*).

On June 13, 2024, at 12:02 PM, I responded to Richard Hartman's coercive demand letter with a cease-and-desist email, asserting my protected right to use FMLA leave without interference. In this email, I informed Richard Hartman that I had also contacted Hartman Executive Advisors, Phil Leadore and Dan Levett, to confirm whether they were still involved (*See ECF 16-0, at 21*). Phil Leadore first emailed me on June 11, 2024, sending a meeting invite during a time that conflicted with a regularly scheduled meeting. I asked him to reschedule the meeting, but on June 12, 2024, he canceled it and stated that Glenn Norris would provide further information. Despite my attempts to reach Phil Leadore—including one email on June 12, 2024, two emails on June 13, 2024, and another on June 17, 2024—he never responded to receive access.

On June 13, 2024, at 2:05 PM, I escalated the issue to Ohana Growth Partners, LLC citing other violations associated with Richard Hartman and Glenn Norris and informing them of their legal duty to stop harassment (*See ECF 16-0, at 17-20*).

At 2:20 PM (just 15 minutes later), Richard Hartman placed Darren Koritzka on a forced leave of absence, in clear retaliation for my intervention (*See ECF 16-0, at 27*).

Over the next few hours, I contacted Mareann Piñera to have her work from home, texted Victor and Lynne Brick, emailed the owners, notified the Help Desk, notified two senior directors, and had a long conversation with Justin Drummond where I was told to wait and led to believe it was being taken care of.

When Richard Hartman suspended me at 8:47 PM it was in complete contradiction to the events of the day, and I forwarded the email to Justin Drummond who responded at 9:54 PM to inform me that Richard Hartman's email was real. The suspension letter said that I was suspended without pay because I failed to comply with the coercive demand sent to me by Richard Hartman (See ECF 16-0, at 120).

### E   July 30, 2024: Termination

On June 18, 2024, at 5:40 PM, I emailed Robert Brennen and informed him that I would be on

FMLA leave until further notice (*See ECF 16-0, at 123*). When I was terminated on July 30,

2024, (*See ECF 16-0, at 26-27*) I still had approximately six weeks of FMLA leave remaining.

Due to constant interference with my ability to take FMLA leave throughout 2024, I had been

prevented from fully utilizing my protected leave, leaving me with unused leave time at the time

of my termination.

### F   Fraudulent Lawsuit

On July 14, 2024, at 12:18 PM, Robert Brennen, Steven Frenkil, and Victoria Hoffberger of

Miles & Stockbridge P.C. filed a lawsuit on behalf of Ohana Growth Partners, LLC to the Circuit

Court of Baltimore County (C-03-CV-24-002264).  In addition to other counts of perjury, the

complaint, motion for tro/pi, memorandum in support of the tro, Richard Hartman's affidavit,

and Justin Drummond's affidavit contain 68 perjured statements about Ohana Growth Partners,

LLC having no access to M365 global admin accounts/access, Ohana Growth Partners, LLC has

no other admins/I had exclusive access/I had removed everyone's access, and that I was refusing

to provide access (*See ECF 40-1, at 22-24*).

The Court record contains three affidavits that address a plethora of legal violations that is much

more granular in statement to exhibit format: ECF 34-0, ECF 38-1, ECF 40-1.  These were

created in response to the district Court's misunderstanding of the exhibits and how the facts

statements matched to thousands of pages of exhibits.

1. <u>No Notice Ex Parte TRO</u>

I was personally served with the pleadings on June 17, 2024, after a no-notice Ex Parte

Temporary Restraining Order (TRO) was issued by Judge DeSimone Jr. The pleadings

demonstrated multiple procedural and substantive irregularities, including:

1.     I had no access to my work email, yet the only attempt to provide notice was sent to that inaccessible email account, meaning I received no notice before the TRO was issued.

2.     Richard Hartman's affidavit admitted to violating my FMLA rights. His 9:01 AM email confirmed that I was entitled to FMLA leave, and my cease-and-desist response demonstrated that I was actively asserting my FMLA rights. As a result, the unclean hands doctrine barred their equitable request for injunctive relief.

3.     My cease-and-desist letter also confirmed that I had not refused to comply, contradicting the pleadings and suspension letter that falsely claimed otherwise.

4.     The pleadings included a misquoted excerpt from a Microsoft website that, when compared to the actual hyperlink, proved to be a perjured statement.

5.     Justin Drummond and Richard Hartman's affidavits both claimed that their 9:00 AM coercive demand originated from them, while the actual email stated that Glenn Norris had issued the demand.

6.     The employment contract presented in the pleadings skipped directly from Section 5 to Section 7, with section 5 ending with "the", and clearly reflecting of an incomplete contract.

7.     Richard Hartman and Justin Drummond's affidavits contained conflicting statements about Richard Hartman's loss of access to the same account at two different times. Additionally, Justin Drummond's affidavit acknowledged that email was part of the broader Microsoft 365 account, further confirming the presence of perjured statements.

The orders that Judge DeSimone Jr. granted were conflicting and instructed me to not access the

same system where I was simultaneously being instructed to access the same system.

### 2. Denied Modify/Dissolve Hearing

On June 18, 2024, I filed a letter to Judge Truffer in person to the Civil Clerk's office. Judge Truffer's denied the motion to modify/dissolve the ex parte TRO, exceeding his judicial discretion because it violated Md. Rule 15-504(f) which mandates a hearing when a party effected by the TRO files to dissolve or modify the TRO within 2 days.

### 3. Show Cause Hearing Granted

At the same time that was denying my motion on June 21, 2024, Judge Truffer granted a show cause on civil contempt hearing on June 26, 2024, exceeding his judicial discretion because it violated the scheduling requirements set forth in Md. Rule 15-206(c)(2) which requires a minimum of 20 days after a prehearing conference.

### 4. Show Cause/Preliminary Injunction

5       The two-day, June 26-27, 2024, Show Cause Hearing and Preliminary Injunction has too many violations to condense all of them. The many violations include denying a motion without hearing arguments, litigating on behalf of Miles & Stockbridge P.C., punitive fines, and issuing the preliminary injunction (knowing it was barred from unclean hands). The hearing was adjudicated by Judge Barranco who remanded my case from the Circuit Court of Baltimore County to federal Court on June 26, 2024 (*See ECF 16-0, at 160*).  Judge Barranco would grant a show cause seeking incarceration a few weeks later.

### 5. Premature Default Order

6       On August 20, 2024, Judge Battista granted a premature default order which failed to recognize the preliminary motions which had extended the date to answer; it was vacated on October 10, 2024, because it exceeded judicial discretion.

### 6. Ryan Dillon-Capps Victory

7       The lawsuit began on June 14, 2024, and continued until Ohana Growth Partners, LLC

lawsuit filed a Notice for Voluntary Withdrawal on October 24, 2024. I filed my answer through

motions, inclusive of a line-by-line redaction of the complaint in September and opposed the

dismissal without prejudice.  I also had filed numerous counterclaims, including those against the

attorneys who represented Ohana Growth Partners, LLC and members of the Maryland

Judiciary.

 Ohana Growth Partners case was dismissed without prejudice on November 2, 2024, with the

ruling docketed on November 6, 2024 (*See ECF 16-5, at 55*).

The previous remanding to federal court and granting of the dismissal post answer with

opposition, by Maryland statute and U.S. Supreme Court precedent, makes all my claims free

and clear for independent adjudication in federal court.

### 7. Filing Remanded Case

8       I filed my case on December 27, 2024, in the United Stated District Court for the District

of Maryland.

### G   Notices

9       On November 1, 2024, I provided notice to Ohana Growth Partners, LLC through their

legal counsel of my intention to seek Injunctive Relief. See ECF 32-2, at 1-7.

10      On November 1, 2024, I provided notice to Ohana Growth Partners, LLC through their

legal counsel of my intention to seek a hearing, which could be Ex Parte, to review the evidence

and adjudicate the facts of the case with the Court. See ECF 32-2, at 8-15.

11      On November 1, 2024, I provided notice to Ohana Growth Partners, LLC through their

legal counsel of my intention to seek Judgement against them. See ECF 16-40.

12      On November 7, 2024, I provided notice to Ohana Growth Partners, LLC through their legal counsel of my intention to file my claim in the United Stated District Court for the District of Maryland. See ECF 32-2, at 62-65.

Sometime between December 3, 2024, and January 11, 2025, the Circuit Court of Baltimore County record for C-03-CV-24-002264 was updated to reflect no counsel for Ohana Growth Partners, LLC. Robert Brennen, Holly Butler, Steven Frenkil, Victoria Hoffberger, Jessica Duval, and Miles & Stockbridge P.C. are all named in the District Court complaint. Additional relevant information has been filed under a Motion to Seal in the District Court, which remains pending a ruling. While I have no reason to believe that Ohana Growth Partners, LLC did not receive proper notice, I am treating them as unrepresented in these proceedings until a Notice of Appearance is filed.

To the best of my knowledge, the District Court has not issued summons for any Appellee. Proposed summons and U.S. Marshal personal service forms are already part of the Court record. On January 8, 2025, Judge Hurson granted my In Forma Pauperis status, and this status has not been revoked on appeal (*See ECF 37-0*).

## H   Mental and Physical Harm

From January to May 2024, in response to the hostile work environment at Ohana Growth Partners, LLC, my mental health continued to decline.

Beginning on May 21, 2024, Glenn Norris and Victor Brick started issuing threats against my employment standing. In response, I configured my phone to notify callers that all calls would be recorded before allowing them to proceed, and I would verbally notify callers a second time before beginning any conversation. Glenn Norris was upset, but this step prevented him from

continuing his abusive behavior unchecked, ensuring that a record existed of what transpired during calls.

Around this time, Richard Hartman and Glenn Norris began directing employees in the Accounting and Human Resources departments to engage in retaliatory harassment toward Darren Koritzka and members of the Help Desk team. I frequently intervened to redirect the improper conduct back toward me, but by this point, months of harassment had taken their toll. In the weeks that followed, relentless abuse left me mentally and emotionally depleted, prompting me to seek out the contact information of legal representation to negotiate employment terms and conditions.

On June 11, 2024, at 12:00 PM, I offered Glenn Norris and Justin Drummond an unrecorded phone call in an effort to reach a resolution on the remaining labor dispute (*See ECF 16-0, at 12-13*). Later that afternoon, shortly after 3:00 PM, I had my final phone call with Glenn Norris and Justin Drummond. During this conversation, I effectively offered to resign under reasonable conditions, provided that the outcome would be favorable for others involved in the labor dispute.

I explicitly told Glenn Norris and Justin Drummond that the months of increasing hostility had become unbearable and that I was reaching my breaking point. I informed them that their actions over the past few weeks had significantly worsened my health and that my condition had deteriorated as a direct result of their conduct.

An affidavit providing expert eyewitness testimony from Caroline Dillon was filed in state court, stating that by the end of May, I had begun experiencing catatonic episodes in response to the increased hostility at work and that we had started discussing hospitalization (*See ECF 16-3, at 30-32*). These discussions were a driving force behind my offer to resign in exchange for a fair

resolution of the labor dispute. The affidavit was filed on July 1, 2024, but contained a clerical error on the signature page, which was incorrectly dated July 29, 2024, instead of June 29, 2024.

On June 13, 2024, I was subjected to a 12-hour gaslit pretext that led me to believe that Richard Hartman had become dangerous, especially after he lashed out at Darren Koritzka. Concerned for employee safety, I instructed Mareann Piñera to work from home for the remainder of the day. Later that same day, I was inexplicably suspended, which heightened my concerns. Fearing that Richard Hartman had lost control and that he might become violent once he realized the legal consequences of his actions, my wife and I fled our home, spending the next two days in hotels out of genuine fear for our safety.

I was personally served with the pleadings on June 17, 2024, after a no-notice Ex Parte Temporary Restraining Order (TRO) was issued.

Shortly before 10:30 PM on June 17, 2024, I emailed Robert Brennen and was notified that the TRO had already been issued and was active. I immediately forwarded this information to the attorney I had retained just days before my suspension and the lawsuit. However, my attorney had recently experienced a death in his family, and after reviewing the pleadings and the issued TRO, he returned my retainer and fees, citing bereavement and an upcoming conference the following week.

I believe my attorney may have assumed that I had misrepresented the facts to him, rather than recognizing that my employer and their law firm had submitted perjured statements and that the judge had exceeded judicial discretion in a case absent jurisdiction.

Shortly after my former attorney withdrew, at midnight between June 17 and 18, 2024, I experienced my first dissociative episode. Caroline Dillon-Capps found me hiding under a table, repeating that I was safe there, expressing confusion about whether the situation was real or a

dream, and repeatedly asking my wife if she was a ghost. When she answered, I repeated the same questions and then became even more distressed when she responded the same way each time (*See ECF 16-2, at 176*).

As the Circuit Court case progressed, my symptoms continued to worsen. At times, I would realize that days had passed without any comprehensible memory of what had happened, sometimes losing track of four, five, or even nine-day stretches.

The catatonia became life-threatening one night when my body temperature dropped rapidly, indicating that the condition had worsened into malignant catatonia, which constitutes a medical emergency (*See ECF 7-1, at 1-2*). Caroline Dillon-Capps was unsure how to respond because Ohana Growth Partners, LLC had deprived us of our financial stability and medical insurance. If I were hospitalized, the result would have almost certainly been the loss of my lawsuit in state court due to my inability to litigate.

Struggling to continue litigation while experiencing severe panic attacks (*See ECF 7-1, at 2*), delirium, and acute disorientation (*See ECF 7-1, at 3*), I frequently forwent sleep, food, and other basic needs (*See ECF 7-1, at 4*) to use whatever lucid time I had to work on my case. Caroline Dillon-Capps noticed exposed wounds on my chest, stomach, arms, and shoulders caused by unconscious skin-picking (*See ECF 7-1, at 3*). Often unaware that I was doing it, she had to physically intervene to redirect and stop the excoriation (*See ECF 7-1, at 3*).

Now exceeding eight months of litigation, Caroline Dillon-Capps has spent nearly this entire period as my full-time caregiver. Emotionally drained and unable to continue treating other patients, she has ceased seeing clients altogether in the past month because it became too difficult to focus on work, maintain her own well-being, and care for me (*See ECF 7-1, at 3*).

Malignant Catatonia, formerly known as lethal catatonia (*See ECF 28-3, at 1*), carries a risk of fatality as it disrupts autonomic function and other critical bodily systems (*See ECF 28-3, at 3*), meaning that I could suffer a sudden medical crisis and die with little to no warning or opportunity to seek emergency treatment. While proper treatment can improve my condition rapidly (*See ECF 28-3, at 3*), the risk of life-threatening complications from comorbid conditions (*See ECF 28-3, at 3*) will persist for years and requires immediate, uninterrupted medical care (*See ECF 28-3, at 2-3*). Until this Court provides relief and resolution, the catastrophic harm of financial default will continue to obstruct access to the treatment necessary to mitigate this ongoing life-threatening condition.

## I  [Financial Harm]

On February 17, 2024, my vehicle was assigned for repossession. See screenshot below labeled as Figure FH:1.  It was repossessed on February 18, 2024.

---

**Figure FH:1**

**Account Ending In:** 57401
**Vehicle:** 2017 Chrysler 300
**Total Amount Due:** $1,077.00
**Regular Payment Amount:** $359.00

Ryan,

Your account is past due.

**Payment is needed on or before 02/17/2025 to prevent your vehicle from being assigned for repossession.**

We may be able to help you avoid this if you're currently experiencing a financial hardship. Contact us at 800-967-8526 to discuss your options, or log in to your account at Bridgecrest.com to make a payment.

---

My primary checking account is facing closure because of a negative balance. See screenshot below labeled as Figure FH:2

**Figure FH:2**

> Unfortunately, your account has a negative balance — please make a deposit right away to avoid having your account closed.

My electric is at risk of being disconnected.  See screenshot below labeled Figure FH:3.

**Figure FH:3**

> To avoid late payment charges or termination, please remit payment as soon as possible. To view this payment or submit another payment online, please sign in to your BGE online account.
>
> Please note that any payment made after the indicated due date, or for less than the total amount due, may result in your service being disconnected.

Including myself and Caroline Dillon-Capps, my disabled brother and my elderly mother's mobile service is overdue and at risk of being disconnected.  See screenshot below labeled Figure FH:4.

**Figure FH:4**

> Past Due Amount: **$337.94**
> Total Amount Due: $337.94
> Account Number: 4974
> Date:                   02/04/2025
>
> Hello,
>
> This is a friendly reminder that your wireless bill is now due. If you've already paid or made a payment arrangement, then you're all set. To check your balance or to make or schedule a payment today:

My revolving credit accounts are being closed.  See screenshot below labeled Figure FH:5.

**Figure FH:5**

> Change:          Account Closed
>
> Company:       CITICARDS CBNA
>
> Reported by:   Experian

On March 4, 2025, I will lose access to my email account. See screenshot below labeled Figure FH:6

**Figure FH:6**

Please update your payment information by Mar 4, 2025 or you will not be able to use MXT3 Mail and other Google Workspace services.

On June 7, 2024, my credit score with Equifax was 746, and by October the score had dropped to 651 (*See ECF 16-7, at 133*).

Data captured in October 2024, after expending most of the available credit and facing default, the supporting evidence showed that I had a 100% payment history, no derogatory marks, and only 1 hard inquiry (*See ECF 16-7, at 150*).

I had used savings to pay for an expensive wedding in April 2024. The lack of income and the high cost of litigation forced me to rely on credit more quickly than I would have had otherwise. Forcing my revolving and debt unrelated to assets to soar to $194,996 (*See ECF 16-7, at 134*).

In November, the effects of financial default caused my credit score to drop down to 597 (*See ECF 16-7, at 154*).

In December, the effects of financial default caused my credit score to drop down to 477 (*See ECF 16-7, at 198*).

On February 6, 2024, a day before the motion seeking injunctive relief with the district Court, the effects of the financial default caused my credit score to drop down to 389.

On February 12, 2025, the district Court denied my motion for TRO without a hearing.

As of February 16, 2024, the effects of financial default have caused my credit score to drop down to 355 . See screenshot below labeled as Figure CRC:1.

**Figure CRC:1**



J Unpaid Compensation

**13** On June 13, 2024, at 8:47 PM, Richard Hartman suspended Ryan Dillon-Capps without pay (*See ECF 16-0, at 120*).

14 On July 30, 2024, Richard Hartman terminated Ryan Dillon-Capps, and did not pay out his unpaid leave (*See ECF 16-0, at 142-143*).

15 Ohana Growth Partners, LLC completed their refinancing in Q3 2024, and paid out an additional bonus. Ryan Dillon-Capps was deprived of his $100,000 bonus. See screenshot below labeled as Figure UC:1.

**Figure UC:1**

| Employee Bonuses | | | 1.45% Medicare Tax | 5.56.2% Tax | Total |
|---|---|---|---|---|---|
| Justin D | President | 750,000 | 10,875.00 | N/A | 760,875 |
| Josh G | CMO | 500,000 | 7,250.00 | N/A | 507,250 |
| Josh B | CDO | 200,000 | 2,900.00 | N/A | 202,900 |
| Matt N | VP Finance | 150,000 | 2,175.00 | N/A | 152,175 |
| Rich H | HR | 150,000 | 2,175.00 | N/A | 152,175 |
| Alyson Ratcliffe | Operations | 150,000 | 2,175.00 | N/A | 152,175 |
| Bill Flax | | 100,000 | 1,450.00 | N/A | 101,450 |
| Karen | Data Analytic | 100,000 | 1,450.00 | N/A | 101,450 |
| Andrew P | | 100,000 | 1,450.00 | N/A | 101,450 |
| Ryan Wagner | | 100,000 | 1,450.00 | N/A | 101,450 |
| Merrill Brick | | 100,000 | 1,450.00 | 6,200.000 | 107,650 |
| Sara Cheek | | 100,000 | 1,450.00 | 6,200.000 | 107,650 |
| Merlowe | | 50,000 | 725.00 | 3,100.000 | 53,825 |
| Leeann | | 50,000 | 725.00 | 3,100.000 | 53,825 |
| Brian Chang | | 10,000 | 145.00 | 620.000 | 10,765 |
| Jared Flax | | 10,000 | 145.00 | 620.000 | 10,765 |
| Jeremy Snoot | | 10,000 | 145.00 | 620.000 | 10,765 |
| 9 Regionals – $10,000 each | | 90,000 | 1,305.00 | 5,580.000 | 96,885 |
| 75 GMS - $1k each | | 75,000 | 1,087.50 | 4,650.000 | 80,738 |
| 2 Marketing Assts – $500 each | | 1,000 | 14.50 | 62.000 | 1,077 |
| 20 Office Staff – $1000 each | | 20,000 | 290.00 | 1,240.000 | 21,530 |
| 50 AGMs – $500 each | | 25,000 | 362.50 | 1,550.000 | 26,913 |
| 6 FTSMs – $1000 each | | 6,000 | 87.00 | 372.000 | 6,459 |
| Reduction | | (800,000) | | | (800,000) |
| **Total** | | **2,047,000** | **41,282** | **33,914** | **2,122,196** |
| | | | **% of Equity Value** | | **1.0%** |

16      Ohana Growth Partners, LLC did not pay out Ryan Dillon-Capps leave as is customary for the company.  On July 1, 2024, Ohana Growth Partners, LLC final pay stub to Ryan Dillon-Capps shows he had 50.47 Vacation, 16.00 Floating Holiday, and 11.00 Mental Well Being Hours to pay out.  Representing an underpayment of 77.47 Hours or approximately one full pay period of pay worth roughly $5,508.92. See screenshot below. See screenshot below labeled as Figure UC:2.

**Figure UC:2**

| Employee Benefits, Allowances, and Other | Current Period | Year To Date | YTD Taken | Available |
|---|---|---|---|---|
| Employer Medical Contribution * | 621.39 | 7456.68 | *Memo Only | |
| Health Savings Match * | 20.00 | 240.00 | *Memo Only | |
| Floating Holiday Hours | 0.00 | 16.00 | 0.00 | 16.00 |
| Mental Well Being Hours | 0.00 | 11.00 | 0.00 | 11.00 |
| Sick Full Time Hours | 0.00 | 40.00 | 8.00 | 32.00 |
| Vacation Hours | 0.00 | 114.47 | 64.00 | 50.47 |

17      Ohana Growth Partners, LLC was supposed to pay Ryan Dillon-Capps $5,688.83 per pay period (twice per month) (*See ECF-16-2, at 184*). On July 1, 2024, Ohana Growth Partners,

LLC, final pay stub to Ryan Dillon-Capps shows he had been paid $60,506.18 for 11 pay periods. Representing a $2070.95 underpayment of base pay.

2        Ohana Growth Partners, LLC was supposed to pay Ryan Dillon-Capps $1,100 every month for his KPI bonus. On July 1, 2024, Ohana Growth Partners, LLC final paystub to Ryan Dillon-Capps showed he had been paid $2,780.00 of his monthly KPI Bonus. Representing a $3,820.00 underpayment of monthly KPI Bonus. See screenshot below labeled as Figure UC:3.

| **Figure UC:3** | | | |
|---|---|---|---|
| | Rate Hours / Units | Current Period | Year To Date |
| **Earnings** | | | |
| Regular | | 2655.05 | 60506.18 |
| Sick - Salary | | 0.00 | 525.10 |
| Vacation | | 0.00 | 4200.82 |
| Bonus - KPI Bonus | | 0.00 | 2780.00 |

18       Ohana Growth Partners, LLC applies annual raises to the August 1 paycheck. From 2022 to 2023, Ryan Dillon-Capps base pay went up 10% from 124,120.00 to 136,532.00. Monthly Bonus went up by 10% from 1,000 to $1,100. Annual Bonus went up 100% from $6,000 to $12,000. Monthly Phone reimbursement stayed at $150.00 per month (*See ECF 16-2, at 183-184*).

### EXHIBITS

ECF 7-1: Affidavit of eyewitness expert testimony of mental and physical harm by Caroline Dillon-Capps;
ECF 7-2: Affidavit of financial harm by Ryan Dillon-Capps;
ECF 16-0:
- 1-5: Holly Butler Intro Text Conversation;
- 12-13: Justin Drummond, Glenn Norris, and Justin Drummond arranging final phone call on June 11, 2024;
- 14: June 13, 2024, 7:12 AM FMLA Notice to Ohana Growth Partners, LLC;
- 15-26: June 13, 2024, email thread starting with 9:01 Coercive Demand email at 25-26. Cease-and-Desist Reply 20-25. 2:05 PM Escalation to Ownership at 17-20. Notice of Richard Hartman's retaliation placing Darren Koritzka on leave of absence at 15-17;

- 27: Darren Kortizka's 2:20 PM text to Ryan Dillon-Capps about being placed on a leave of absence;
- 42-43: Ryan Dillon-Capps arranging to provide Justin Drummond Global Administrator access;
- 120: Ryan Dillon-Capps suspension letter from June 13, 2024;
- 123: Ryan Dillon-Capps email to Robert Brennen on June 18, 2024: Seeking to Negotiate Labor Dispute and Notice to remain on FMLA leave until further notice;
- 142-43: Ryan Dillon-Capps termination letter from July 30, 2024;
- 146-147: Darren Koritzka termination letter from August 2, 2024;
- 160: June 26, 2024, transcript showing Judge Barranco remanding Ryan Dillon-Capps claims to federal court.

ECF 16-2:

- 164: Email from Andrew Dansicker withdrawing as Ryan Dillon-Capps attorney between June 17-18 at Midnight (after receiving email informing Ryan Dillon-Capps was under the effects of the no notice ex parte TRO);
- 183-185: Ryan Dillon-Capps 2022 and 2023 Employment Agreement Addendums;

ECF 16-3:

- 1-2: Ryan Dillon-Capps January 4, 2024, email requesting FMLA leave;
- 3: Ryan Dillon-Capps Service Dog ID Tag;
- 4-7: FMLA Form WH-381 – Ohana Growth Partners, LLC notifying Ryan Dillon-Capps of his eligibility (which cannot be denied) and Ohana Growth Partners, LLC has determined that they will not suffer substantial or grievous economic harm to restore employment;
- 8-9: Richard Hartman applying more restricting leave/FMLA leave policies to Ryan Dillon-Capps;
- 10-13: January 22, 2024, health care provider completed FMLA form WH-380-E stating hostile work environment was influencing factor and reasonable accommodation was needed in the form of working from home;
- 17: January 31, 2024, health care provider letter to Richard Hartman;
- 18-21: March 12, 2024, health care provider recertification FMLA form WH-380-E;
- 22: November 23, 2013, health care provider letter stating Ryan Dillon-Capps has PTSD and panic disorder with agoraphobia, condition requires emergency medical care at times, and qualifies for reasonable accommodations under the ADA;
- 30-32: Caroling Dillon-Capps June 29, 2024, affidavit stating dissociative episodes began in late March 2024 (in conjunction with the coercive threats);

ECF 16-5, at 55: Dismissal of Ohana Growth Partners, LLC claim in state court;
ECF 16-7:

- 10-16: Photographic evidence of physical harm being suffered by Ryan Dillon-Capps;
- 132-198: Evidence of financial harm being suffered by Ryan Dillon-Capps;

ECF 16-14, at 50: Robert Brennen telling Ryan Dillon-Capps that Ohana Growth partners assigned Global Rights using Ryan Dillon-Capps account.;
ECF 23-1, at 2-3: from state complaint
ECF 24-0: Amended Complaint Affidavit

ECF 25-0: Emergency Motion TRO/PI
ECF 25-1: Memorandum for TRO/PI
ECF 27-0: District Court Denial of TRO/PI
ECF 28-3: Published Case Report on Malignant Catatonia
ECF 32-2: (Refiled due to a District Court clerical error where physical pages were uploaded incorrect order)

- 1-7: November 1, 2024 - Notice Seeking Injunctive Relief;
- 8-15: November 1, 2024 – Notice Seeking Evidentiary Hearing/Ex Parte/Adjudication of Facts;
- 16-40: November 1, 2024 – Notice Seeking Judgement;
- 62-65: November 7, 2024 – Notice Filing Claims in United States District Court for the District of Maryland;

ECF 34-0: Affidavit Reconsideration of TRO/PI Denial (Notice of Line Filed to Reconsideration)
ECF 37-0: Notice of Appeal Order
ECF 38-1: Affidavit of Consumer Rights and Unfair Business Practices (Notice of Line Filed to Reconsideration)
ECF 38-2, at 519-520: Help Desk team members – evidence of other administrators
ECF 39-0: District Court stay of action pending appeal
ECF 40-1: Affidavit of Abusive Use of the Judicial System (Notice of Line Filed to Reconsideration & filed before Notice of Stay)

## DECLARATION OF AFFIRMATION

I solemnly declare and affirm under penalty of perjury, based on my personal knowledge, that the contents of the foregoing affidavit and all accompanying exhibits are true and correct to the best of my knowledge.

**February 24, 2025**

1334 Maple Avenue
Essex, Maryland 21221
ryan@mxt3.com
703-303-1113

/s/ Ryan Dillon-Capps
**Ryan Dillon-Capps**