12      On November 7, 2024, I provided notice to Ohana Growth Partners, LLC through their legal counsel of my intention to file my claim in the United Stated District Court for the District of Maryland. See ECF 32-2, at 62-65.

Sometime between December 3, 2024, and January 11, 2025, the Circuit Court of Baltimore County record for C-03-CV-24-002264 was updated to reflect no counsel for Ohana Growth Partners, LLC. Robert Brennen, Holly Butler, Steven Frenkil, Victoria Hoffberger, Jessica Duval, and Miles & Stockbridge P.C. are all named in the District Court complaint. Additional relevant information has been filed under a Motion to Seal in the District Court, which remains pending a ruling. While I have no reason to believe that Ohana Growth Partners, LLC did not receive proper notice, I am treating them as unrepresented in these proceedings until a Notice of Appearance is filed.

To the best of my knowledge, the District Court has not issued summons for any Appellee. Proposed summons and U.S. Marshal personal service forms are already part of the Court record. On January 8, 2025, Judge Hurson granted my In Forma Pauperis status, and this status has not been revoked on appeal (*See ECF 37-0*).

### H   Mental and Physical Harm

From January to May 2024, in response to the hostile work environment at Ohana Growth Partners, LLC, my mental health continued to decline.

Beginning on May 21, 2024, Glenn Norris and Victor Brick started issuing threats against my employment standing. In response, I configured my phone to notify callers that all calls would be recorded before allowing them to proceed, and I would verbally notify callers a second time before beginning any conversation. Glenn Norris was upset, but this step prevented him from

continuing his abusive behavior unchecked, ensuring that a record existed of what transpired during calls.

Around this time, Richard Hartman and Glenn Norris began directing employees in the Accounting and Human Resources departments to engage in retaliatory harassment toward Darren Koritzka and members of the Help Desk team. I frequently intervened to redirect the improper conduct back toward me, but by this point, months of harassment had taken their toll. In the weeks that followed, relentless abuse left me mentally and emotionally depleted, prompting me to seek out the contact information of legal representation to negotiate employment terms and conditions.

On June 11, 2024, at 12:00 PM, I offered Glenn Norris and Justin Drummond an unrecorded phone call in an effort to reach a resolution on the remaining labor dispute (*See ECF 16-0, at 12-13*). Later that afternoon, shortly after 3:00 PM, I had my final phone call with Glenn Norris and Justin Drummond. During this conversation, I effectively offered to resign under reasonable conditions, provided that the outcome would be favorable for others involved in the labor dispute.

I explicitly told Glenn Norris and Justin Drummond that the months of increasing hostility had become unbearable and that I was reaching my breaking point. I informed them that their actions over the past few weeks had significantly worsened my health and that my condition had deteriorated as a direct result of their conduct.

An affidavit providing expert eyewitness testimony from Caroline Dillon was filed in state court, stating that by the end of May, I had begun experiencing catatonic episodes in response to the increased hostility at work and that we had started discussing hospitalization (*See ECF 16-3, at 30-32*). These discussions were a driving force behind my offer to resign in exchange for a fair

resolution of the labor dispute. The affidavit was filed on July 1, 2024, but contained a clerical error on the signature page, which was incorrectly dated July 29, 2024, instead of June 29, 2024.

On June 13, 2024, I was subjected to a 12-hour gaslit pretext that led me to believe that Richard Hartman had become dangerous, especially after he lashed out at Darren Koritzka. Concerned for employee safety, I instructed Mareann Piñera to work from home for the remainder of the day. Later that same day, I was inexplicably suspended, which heightened my concerns. Fearing that Richard Hartman had lost control and that he might become violent once he realized the legal consequences of his actions, my wife and I fled our home, spending the next two days in hotels out of genuine fear for our safety.

I was personally served with the pleadings on June 17, 2024, after a no-notice Ex Parte Temporary Restraining Order (TRO) was issued.

Shortly before 10:30 PM on June 17, 2024, I emailed Robert Brennen and was notified that the TRO had already been issued and was active. I immediately forwarded this information to the attorney I had retained just days before my suspension and the lawsuit. However, my attorney had recently experienced a death in his family, and after reviewing the pleadings and the issued TRO, he returned my retainer and fees, citing bereavement and an upcoming conference the following week.

I believe my attorney may have assumed that I had misrepresented the facts to him, rather than recognizing that my employer and their law firm had submitted perjured statements and that the judge had exceeded judicial discretion in a case absent jurisdiction.

Shortly after my former attorney withdrew, at midnight between June 17 and 18, 2024, I experienced my first dissociative episode. Caroline Dillon-Capps found me hiding under a table, repeating that I was safe there, expressing confusion about whether the situation was real or a

dream, and repeatedly asking my wife if she was a ghost. When she answered, I repeated the same questions and then became even more distressed when she responded the same way each time (*See ECF 16-2, at 176*).

As the Circuit Court case progressed, my symptoms continued to worsen. At times, I would realize that days had passed without any comprehensible memory of what had happened, sometimes losing track of four, five, or even nine-day stretches.

The catatonia became life-threatening one night when my body temperature dropped rapidly, indicating that the condition had worsened into malignant catatonia, which constitutes a medical emergency (*See ECF 7-1, at 1-2*). Caroline Dillon-Capps was unsure how to respond because Ohana Growth Partners, LLC had deprived us of our financial stability and medical insurance. If I were hospitalized, the result would have almost certainly been the loss of my lawsuit in state court due to my inability to litigate.

Struggling to continue litigation while experiencing severe panic attacks (*See ECF 7-1, at 2*), delirium, and acute disorientation (*See ECF 7-1, at 3*), I frequently forwent sleep, food, and other basic needs (*See ECF 7-1, at 4*) to use whatever lucid time I had to work on my case. Caroline Dillon-Capps noticed exposed wounds on my chest, stomach, arms, and shoulders caused by unconscious skin-picking (*See ECF 7-1, at 3*). Often unaware that I was doing it, she had to physically intervene to redirect and stop the excoriation (*See ECF 7-1, at 3*).

Now exceeding eight months of litigation, Caroline Dillon-Capps has spent nearly this entire period as my full-time caregiver. Emotionally drained and unable to continue treating other patients, she has ceased seeing clients altogether in the past month because it became too difficult to focus on work, maintain her own well-being, and care for me (*See ECF 7-1, at 3*).

Malignant Catatonia, formerly known as lethal catatonia (*See ECF 28-3, at 1*), carries a risk of fatality as it disrupts autonomic function and other critical bodily systems (*See ECF 28-3, at 3*), meaning that I could suffer a sudden medical crisis and die with little to no warning or opportunity to seek emergency treatment. While proper treatment can improve my condition rapidly (*See ECF 28-3, at 3*), the risk of life-threatening complications from comorbid conditions (*See ECF 28-3, at 3*) will persist for years and requires immediate, uninterrupted medical care (*See ECF 28-3, at 2-3*). Until this Court provides relief and resolution, the catastrophic harm of financial default will continue to obstruct access to the treatment necessary to mitigate this ongoing life-threatening condition.

I   Financial Harm

On February 17, 2024, my vehicle was assigned for repossession. See screenshot below labeled as Figure FH:1.  It was repossessed on February 18, 2024.

**Figure FH:1**

Account Ending In: 57401
Vehicle: 2017 Chrysler 300
Total Amount Due: $1,077.00
Regular Payment Amount: $359.00

Ryan,

Your account is past due.

**Payment is needed on or before 02/17/2025 to prevent your vehicle from being assigned for repossession.**

We may be able to help you avoid this if you're currently experiencing a financial hardship. Contact us at 800-967-8526 to discuss your options, or log in to your account at Bridgecrest.com to make a payment.

My primary checking account is facing closure because of a negative balance. See screenshot below labeled as Figure FH:2

**Figure FH:2**

> Unfortunately, your account has a negative balance — please make a deposit right away to avoid having your account closed.

My electric is at risk of being disconnected. See screenshot below labeled Figure FH:3.

**Figure FH:3**

> To avoid late payment charges or termination, please remit payment as soon as possible. To view this payment or submit another payment online, please sign in to your BGE online account.
>
> Please note that any payment made after the indicated due date, or for less than the total amount due, may result in your service being **disconnected**.

Including myself and Caroline Dillon-Capps, my disabled brother and my elderly mother's mobile service is overdue and at risk of being disconnected. See screenshot below labeled Figure FH:4.

**Figure FH:4**

> Past Due Amount: **$337.94**
> Total Amount Due: $337.94
> Account Number: 4974
> Date: 02/04/2025
>
> Hello,
>
> This is a friendly reminder that your wireless bill is now due. If you've already paid or made a payment arrangement, then you're all set. To check your balance or to make or schedule a payment today:

My revolving credit accounts are being closed. See screenshot below labeled Figure FH:5.

**Figure FH:5**

> Change:        Account **Closed**
>
> Company:       CITICARDS CBNA
>
> Reported by:   Experian

On March 4, 2025, I will lose access to my email account. See screenshot below labeled Figure FH:6

**Figure FH:6**

Please update your payment information by Mar 4, 2025 or you will not be able to use MXT3 Mail and other Google Workspace services.

On June 7, 2024, my credit score with Equifax was 746, and by October the score had dropped to 651 (*See ECF 16-7, at 133*).

Data captured in October 2024, after expending most of the available credit and facing default, the supporting evidence showed that I had a 100% payment history, no derogatory marks, and only 1 hard inquiry (*See ECF 16-7, at 150*).

I had used savings to pay for an expensive wedding in April 2024. The lack of income and the high cost of litigation forced me to rely on credit more quickly than I would have had otherwise. Forcing my revolving and debt unrelated to assets to soar to $194,996 (*See ECF 16-7, at 134*).

In November, the effects of financial default caused my credit score to drop down to 597 (*See ECF 16-7, at 154*).

In December, the effects of financial default caused my credit score to drop down to 477 (*See ECF 16-7, at 198*).

On February 6, 2024, a day before the motion seeking injunctive relief with the district Court, the effects of the financial default caused my credit score to drop down to 389.

On February 12, 2025, the district Court denied my motion for TRO without a hearing.

As of February 16, 2024, the effects of financial default have caused my credit score to drop down to 355 . See screenshot below labeled as Figure CRC:1.

**Figure CRC:1**



J   Unpaid Compensation

**13**    On June 13, 2024, at 8:47 PM, Richard Hartman suspended Ryan Dillon-Capps without pay (*See ECF 16-0, at 120*).

14    On July 30, 2024, Richard Hartman terminated Ryan Dillon-Capps, and did not pay out his unpaid leave (*See ECF 16-0, at 142-143*).

15    Ohana Growth Partners, LLC completed their refinancing in Q3 2024, and paid out an additional bonus.  Ryan Dillon-Capps was deprived of his $100,000 bonus. See screenshot below labeled as Figure UC:1.

**Figure UC:1**

| Employee Bonuses | | | 1.45% Medicare Tax | 5.56.2% Tax | Total |
|---|---|---|---|---|---|
| Justin D | President | 750,000 | 10,875.00 | N/A | 760,875 |
| Josh G | CMO | 500,000 | 7,250.00 | N/A | 507,250 |
| Josh B | CDO | 200,000 | 2,900.00 | N/A | 202,900 |
| Matt N | VP Finance | 150,000 | 2,175.00 | N/A | 152,175 |
| Rich H | HR | 150,000 | 2,175.00 | N/A | 152,175 |
| Alyson Ratcliffe | Operations | 150,000 | 2,175.00 | N/A | 152,175 |
| Bill Flax | | 100,000 | 1,450.00 | N/A | 101,450 |
| Karen | Data Analytic | 100,000 | 1,450.00 | N/A | 101,450 |
| Andrew P | | 100,000 | 1,450.00 | N/A | 101,450 |
| Ryan Wagner | | 100,000 | 1,450.00 | N/A | 101,450 |
| Merrill Brick | | 100,000 | 1,450.00 | 6,200.000 | 107,650 |
| Sara Cheek | | 100,000 | 1,450.00 | 6,200.000 | 107,650 |
| Merlowe | | 50,000 | 725.00 | 3,100.000 | 53,825 |
| Leeann | | 50,000 | 725.00 | 3,100.000 | 53,825 |
| Brian Chang | | 10,000 | 145.00 | 620.000 | 10,765 |
| Jared Flax | | 10,000 | 145.00 | 620.000 | 10,765 |
| Jeremy Snoot | | 10,000 | 145.00 | 620.000 | 10,765 |
| 9 Regionals – $10,000 each | | 90,000 | 1,305.00 | 5,580.000 | 96,885 |
| 75 GMS – $1k each | | 75,000 | 1,087.50 | 4,650.000 | 80,738 |
| 2 Marketing Assts – $500 each | | 1,000 | 14.50 | 62.000 | 1,077 |
| 20 Office Staff – $1000 each | | 20,000 | 290.00 | 1,240.000 | 21,530 |
| 50 AGMs – $500 each | | 25,000 | 362.50 | 1,550.000 | 26,913 |
| 6 FTSMs – $1000 each | | 6,000 | 87.00 | 372.000 | 6,459 |
| Reduction | | (800,000) | | | (800,000) |
| Total | | 2,047,000 | 41,282 | 33,914 | 2,122,196 |
| | | | % of Equity Value | | 1.0% |

16      Ohana Growth Partners, LLC did not pay out Ryan Dillon-Capps leave as is customary for the company.  On July 1, 2024, Ohana Growth Partners, LLC final pay stub to Ryan Dillon-Capps shows he had 50.47 Vacation, 16.00 Floating Holiday, and 11.00 Mental Well Being Hours to pay out.  Representing an underpayment of 77.47 Hours or approximately one full pay period of pay worth roughly $5,508.92. See screenshot below. See screenshot below labeled as Figure UC:2.

**Figure UC:2**

| Employee Benefits, Allowances, and Other | Current Period | Year To Date | YTD Taken | Available |
|---|---|---|---|---|
| Employer Medical Contribution * | 621.39 | 7456.68 | *Memo Only | |
| Health Savings Match * | 20.00 | 240.00 | *Memo Only | |
| Floating Holiday Hours | 0.00 | 16.00 | 0.00 | 16.00 |
| Mental Well Being Hours | 0.00 | 11.00 | 0.00 | 11.00 |
| Sick Full Time Hours | 0.00 | 40.00 | 8.00 | 32.00 |
| Vacation Hours | 0.00 | 114.47 | 64.00 | 50.47 |

17      Ohana Growth Partners, LLC was supposed to pay Ryan Dillon-Capps $5,688.83 per pay period (twice per month) (*See ECF-16-2, at 184*). On July 1, 2024, Ohana Growth Partners,

LLC, final pay stub to Ryan Dillon-Capps shows he had been paid $60,506.18 for 11 pay periods. Representing a $2070.95 underpayment of base pay.

2      Ohana Growth Partners, LLC was supposed to pay Ryan Dillon-Capps $1,100 every month for his KPI bonus. On July 1, 2024, Ohana Growth Partners, LLC final paystub to Ryan Dillon-Capps showed he had been paid $2,780.00 of his monthly KPI Bonus. Representing a $3,820.00 underpayment of monthly KPI Bonus. See screenshot below labeled as Figure UC:3.

**Figure UC:3**

| Earnings | Rate Hours / Units | Current Period | Year To Date |
|---|---|---|---|
| Regular | | 2655.05 | 60506.18 |
| Sick - Salary | | 0.00 | 525.10 |
| Vacation | | 0.00 | 4200.82 |
| Bonus - KPI Bonus | | 0.00 | 2780.00 |

18     Ohana Growth Partners, LLC applies annual raises to the August 1 paycheck. From 2022 to 2023, Ryan Dillon-Capps base pay went up 10% from 124,120.00 to 136,532.00. Monthly Bonus went up by 10% from 1,000 to $1,100. Annual Bonus went up 100% from $6,000 to $12,000. Monthly Phone reimbursement stayed at $150.00 per month (*See ECF 16-2, at 183-184*).

EXHIBITS

ECF 7-1: Affidavit of eyewitness expert testimony of mental and physical harm by Caroline Dillon-Capps;
ECF 7-2: Affidavit of financial harm by Ryan Dillon-Capps;
ECF 16-0:
- 1-5: Holly Butler Intro Text Conversation;
- 12-13: Justin Drummond, Glenn Norris, and Justin Drummond arranging final phone call on June 11, 2024;
- 14: June 13, 2024, 7:12 AM FMLA Notice to Ohana Growth Partners, LLC;
- 15-26: June 13, 2024, email thread starting with 9:01 Coercive Demand email at 25-26. Cease-and-Desist Reply 20-25. 2:05 PM Escalation to Ownership at 17-20. Notice of Richard Hartman's retaliation placing Darren Koritzka on leave of absence at 15-17.;