| RYAN DILLON-CAPPS  *Plaintiff-Appellant,* vs. OHANA GROWTH PARTNERS, LLC *et al* *Defendants-Appellees.* | No. **25-1162** On Appeal from the U.S. District Court Northern District of Maryland No. 1:24-CV-3744-BAH |
|---|---|

## INFORMAL BRIEF: APPENDIX E – FRAUDULENT LAWSUIT

The June 13 communications directly contradict the decisions to place Darren Koritzka on involuntary leave, suspend Ryan Dillon-Capps, and initiate the subsequent lawsuit. The employer's stated pretext is internally inconsistent and irreconcilable with the documented events of June 13. District ECF 16-0, at 23-41, 45-65 (June 13 texts); District ECF 16-0, at 15-26 (9 AM email thread); District ECF 16-0, at 14 (7 AM notice of use for company approved intermittent FMLA leave).

State Pleading:

(1) The employer simultaneously asserted that Ryan Dillon-Capps posed a security threat unfit for IT system access while demanding he access those same systems—without safeguards—under threat of a $2,500 daily fine and possible incarceration. Richard Hartman claimed the directive was his. (See generally District ECF Series 23);
(2) The employer offered conflicting claims to who issued the directive:

1

(a) Justin Drummond stated: "At my direction, on June 13, 2024, at 9:01 [] Richard Hartman sent an email to Dillon-Capps directing [him]" (District ECF 23-6, at 2);

(b) Richard Hartman asserted: "[Dillon-Capps was] refusing to comply with my directive" (District ECF 23-5, at 4–5);

(c) The June 13 email confirms the directive originated from Glenn Norris: "Glenn has signed an agreement [] with Hartman Executive Advisors (HEA) and demands that [Ryan Dillon-Capps]" (District ECF 23-5, at 14);

(3) The employer's filings—including affidavits, the suspension letter, and the TRO motion—allege noncompliance on June 13, yet attach to Richard Hartman's affidavit the June 13 email showing full compliance: "Notification of Request for Confirmation. Please be aware that I have requested Hartman Executive Advisors, including Phil Leadore and Dan Levett, to confirm their qualifications and involvement in the PCI DSS v4 review" (District ECF 23-4, at 11);

(a) Part of the exhibits attached to the "Letter to Judge Truffer" on June 18 are same-day text messages confirming not just compliance and willingness, but Ryan Dillon-Capps being the only one trying to give them access and asking Justin Drummond for assistance to give them access:

(a)(1) "I wish they would [respond], I want them to be backup right [n]ow",

(a)(2) "phil and dan would have responded by now, who told you about their status, ask them, if they say sure...have them email me back so we can get started",

(a)(3) "I am the one who wants help" (District ECF 16-0, at 49, 57-58);

(4) The same June 13 email (District ECF 23-5, at 14) both:

(a) acknowledges Dillon-Capps's approved intermittent FMLA leave—"Your communication yesterday about your need for FMLA time off, to which you are entitled"; and

(b) simultaneously interferes with it—"we require a simple acknowledgment that you will follow the directive or not and then do so immediately by 3:00 pm today. Failure to acknowledge this directive and to add Phil Leadore as a

2

Global Administrator by 3:00 pm today will require the company to take appropriate action".

(5) In District ECF 23-5:
   (a) The suspension letter cites noncompliance as the basis for discipline—"you are suspended from your employment with Ohana Growth Partners until further notice. This is due to your insubordination and failure to comply with directives from superiors" (p. 14); and
   (b) Hartman's affidavit acknowledges the suspension was retaliatory— "retaliation against Dillon-Capps for requesting family and medical leave" (p. 4).

(6) The hyperlink provided by the employer (https://learn.microsoft.com/en-us/microsoft-365/admin/add-users/about-admin-roles?view=o365-worldwide) contradicts the language quoted in their filing:
   (a) They claimed: "[a] Global Admin may inadvertently lock their account and require a password reset, . . .[Microsoft] recommend[s] [Ohana] have at least **either one more Global Admin**" (District ECF 23-5, at 2; District ECF 23-4, at 3),
   (b) From the hyperlink: "[a] Global Admin may inadvertently lock their account and require a password reset,…[Microsoft] recommend[s] [Ohana] have at least **a Privileged Authentication administrator in the event a Global administrator is locked out of their account**"

(7) The pleading shows that notice was sent exclusively to Ryan Dillon-Capps's work email, which he was expressly prohibited from accessing:
   (a) The Certificate of Notice for the TRO states that the notice was sent via email to Dillon-Capps Ohana work email address. (District ECF 23-9, at 1).
   (b) The suspension letter, attached to Richard Hartman's affidavit, explicitly instructs Dillon-Capps not to access any company IT systems. (District ECF 23-5, at 18).
   (c) Hartman's affidavit confirms that the "Ohana MS 365 Account, and by extension Ohana's employee email accounts," fall under those prohibited systems. (District ECF 23-5, at 5).

3

(8) Richard Hartman's statements are internally inconsistent regarding access to personnel records:
   (a) Hartman claims he was unable "to access any of Ohana's personnel records" (District ECF 23-5, at 4);
   (b) Yet, attached to the same affidavit is what is purported to be Ryan Dillon-Capps's employment agreement, allegedly obtained from his personnel file (District ECF 23-5, at 6)[1];
(9) The employment agreement submitted by Ohana is facially defective and reflects tampering.
   (a) The first page ends mid-sentence in Section 5 with: "associate use for the,
   (b) while the second page abruptly begins with Section 7: "Non-Disparagement…"—indicating that an entire section is missing (District ECF 23-5, at 6)[2];
(10) Contradictory Affidavit Statements on Access Loss:
   (a) Richard Hartman's affidavit states: "As of 2:05 p.m. on June 13, 2024, I was unable to send or receive emails through my Ohana company email account. At 5 p.m. on June 13, 2024, I attempted to log into the Ohana Microsoft Teams account and was unable to do so." These two consecutive sentences

---

[1] Ohana, as of June 13, was using Paycom for the majority of personnel records, which Richard Hartman was the administrator of, and IT did not have access to it.

[2] As of June 13, 2024, Ohana stored employment agreements in Paycom or Microsoft Teams as PDF files. Still experiencing memory issues, Ryan Dillon-Capps has limited recall of specific details, but during the fraud investigation which began in December 2023, emails were uncovered showing Richard Hartman discussing unilateral alterations to employee agreements to remove or replace disfavored clauses. One such email, dated February 10, 2020, directly referenced Ryan Dillon-Capps's signed employment agreement. No alternative agreement was presented for signature, and the other emails suggest other employees also did not sign revised agreements. On June 14, Hartman lacked access to his email and would have relied solely on stored digital records. Unable to determine whether Dillon-Capps could later present a conflicting version, the only solution was to produce a version that omitted the altered provisions.

4

directly contradict one another by asserting two different times for loss of access to the same account. (District ECF 23-5, at 4).
(b) Justin Drummond, fully aware this refers to the same Microsoft 365 account, asserts that he was "advised by Richard Hartman" and affirms the same false timeline, thereby corroborating the inconsistency. (District ECF 23-6, at 2).
(11) Contradiction Between Affidavit Assertions and Attached Evidence:
(a) Justin Drummond's affidavit asserts that Dillon-Capps "falsely claimed that [he] was acting upon [Drummond's] authority." (District ECF 23-6, at 3);
(b) Richard Hartman's affidavit similarly states that Dillon-Capps "falsely claimed that [he] was acting upon the authority of Ohana President Justin Drummond." (District ECF 23-5, at 4);
(c) However, both affidavits attach the June 13 email thread they reference, which expressly states: "Lynne and Victor have empowered Justin with full authority to handle this situation." (District ECF 23-5, at 15; District ECF 23-6, at 5).
(12) Count III Is Refuted by Legislative History and Misstates the Applicable Law:
(a) The employer's own attached legislative materials undermine Count III. The House Bill notes explicitly explain that in the case of Briggs v. State, the Maryland courts found that "[t]he statute makes no reference... If the legislature intended... it could have done so explicitly," confirming that the General Assembly carefully drafted the statute to apply narrowly and precisely. (District ECF 23-7, at 13);
(b) Despite this, Count III relies on § 7-302(c) of the Maryland Criminal Law Article, which mirrors the 1998 House Bill. The statute, both historically and presently, includes no reference to refusal or insubordination—only intentional, unauthorized access or manipulation of computer systems.

The purpose of Count III appears to have been pretextual, functioning as a precursor to discovery aimed at suppressing access to evidence—specifically, to ensure that backups of Ohana's internal databases, including its financial systems,

5

could not later be used against the employer and attorney defendants in civil or criminal proceedings. Maryland Criminal Law § 7-302(c)(1)(ii) criminalizes conduct involving unauthorized access and the intent to "copy, attempt to copy, possess, or attempt to possess the contents of all or part of a computer database accessed in violation" of the statute.

Importantly, Ryan Dillon-Capps fully complied with both legal requirements and company directives by removing all company-issued equipment and key fobs from his possession before the June 26–27 hearing. However, due to the deterioration of his health—exacerbated by the defendants' actions—he experienced cognitive and memory impairments, which prevented him from identifying the precise location of the items during the hearing. Had he retained possession or been able to recall their location, those facts would almost certainly have been exploited by the employer as a basis to artificially support Count III.

Defendant Barranco disregarded alternative solutions, exhibits, and testimony from Ryan Dillon-Capps, Caroline Dillon-Capps, and Randall Romes (Ohana's expert) in favor of a rigid path that claims compliance is met only through:

(13)   Violating the conflicting injunction order: "**Provide** [Admin Rights] for [Microsoft &Go Daddy] account to [Ohana's Agent That Doesn't Respond] AND **cease and desist the use of any of access to or use of** [Microsoft & Go Daddy] account and related [systems and records]. Compliance was impossible:

6

providing access required logging in, which the order prohibited, and working with the agent was impossible because the agent never responded. (District ECF 23-8, at 2);

(14) Violating counter III under §7-302(c)(3)(i): "A person may not intentionally, willfully, and without authorization: possess, identify, or attempt to identify a valid access code".

(15) Consistent with this statutory prohibition, the employer's June 13 suspension letter expressly stated: "During this period of suspension, you are…not authorized to…have any electronic, internet, physical, or other access to or connection with any company property or systems, including but not limited to company IT systems and equipment".

As part of legal manipulation to support the pretext, any possession or use of credentials, or company equipment, would have violated both the suspension directive and Maryland criminal law.

After reading the TRO and realizing compliance was logistically impossible, Ryan Dillon-Capps asked Robert Brennen, "Can someone elaborate on how to comply with the order to give access to Mr. Leadore? Logistically speaking. With sincerity, can someone provide a breakdown of how this would occur?" Robert Brennen replied, "I will provide you with instructions as to how you can comply with the Order." (District ECF 16-14, at 10).

The next morning, at approximately 8:39 AM, Brennen emailed Dillon-Capps, refusing to engage in any negotiations to resolve the issue until "compliance" with the TRO had occurred, and the instructions were a recitation of steps that did not address the logistics problem (District ECF 16-14, at 11). In

7

response, Dillon-Capps filed the "Letter to Judge Truffer," which has since been replaced with an altered version in the court record. See District ECF 40-1, at 6–14, or more details on the altered court record "Letter to Judge Truffer".

RESPECTFULLY SUBMITTED

| | |
|---|---|
| **April 16, 2025** | 1334 Maple Avenue |
| | Essex, Maryland 21221 |
|   /s/ Ryan Dillon-Capps | ryan@mxt3.com |
| **Ryan Dillon-Capps** | 703-303-1113 |