No. 25-11621

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

RYAN DILLON-CAPPS

*Plaintiff-Appellant,*

v.

OHANA GROWTH PARTNERS, LLC *et al*

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

NO. 1:24-CV-03744-BAH

FIRST AMENDED INFORMAL BRIEF

FOR RYAN DILLON-CAPPS AS APPELLANT

Ryan Dillon-Capps
Pro-Se

1334 Maple Avenue
Essex Maryland 21221
(703) 303-1113
ryan@mxt3.com

## LOCAL RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and Fourth Circuit Local Rule 26.1, Ryan Dillon-Capps is proceeding in forma pauperis and exempt from filing disclosure statement under 4th Circ. R. 26.1(a)(1)(A).

**Signature: /S/ Ryan Dillon-Capps_____(Pro Se) Date: April 16, 2025**

## Table of Contents

LOCAL RULE 26.1 DISCLOSURE STATEMENT ..........................................1
Table of Contents ........................................................................................1
Table of Authorities ....................................................................................4
Jurisdiction .................................................................................................8
Introductory Issues Statement....................................................................9
[Issue 1]      Procedural Due Process and Irreconcilable Contradictions.........10
  I          Federal Rules of Civil Procedures .......................................16
  II         Undocketed Exhibits............................................................17
    *Exhibit List* ...........................................................................*17*
    *Undocketed signed physical CD* ..........................................*18*
    *Undocketed PDF documents*..................................................*18*
  III        Incorporated and Attached....................................................20
  IV        Undocketed Resubmission and Replacement Filings............21
  V         Formal Allegations – Brendan A. Hurson ............................23
    *A        Intentionally Misrepresented Filings*....................*26*
    *B        Wet Signatures* .....................................................*30*
    *C        Original Filing from December 27, 2024*................*33*
    *Original Filing Conclusion*....................................................*39*
  VI        Plausibility of Conspiracy....................................................40
    *A        Self-Contained Irreconcilable Contradiction*.......*41*
    *B        Standard for Allegations*.......................................*44*

1

| | | | |
|---|---|---|---|
| C | *Independent Validation of Claims* | | *45* |
| D | *Meritorious Conclusions* | | *49* |
| VII | Judge Hurson's Mandatory Disqualification | | 51 |
| A | *Federal Board Association – Maryland Chapter (Exhibit 201)* | | *51* |
| B | *University of Maryland Francis King Carey School of Law (Exhibit 202)* | | *53* |
| | *Mandatory Disqualification* | | *54* |
| VIII | Maryland Judicial Election Process | | 55 |
| A | *Barranco and DeSimone Jr.* | | *56* |
| B | *Rob Daniels* | | *59* |
| C | *Marylin Pierre* | | *60* |
| D | *2024 Preliminary* | | *63* |
| E | *2024 Judicial Election & Unconstitutional Judicial Elections* | | *64* |
| IX | District v State | | 72 |
| A | *District v State - Procedural Abuse* | | *72* |
| B | *District v State – Protecting Defendants* | | *74* |
| C | *District v State – Diminutive & Minimizing Language* | | *76* |
| D | *District v State - Illusion of Consideration* | | *77* |
| E | *District v State – Selective Interpretation* | | *81* |
| X | Testing Sufficiency of a Complaint | | 83 |
| | *District Court's Selective Citation* | | *84* |
| | *Substance over Form* | | *85* |
| | Standard of Review | | 86 |

**[Issue 2]     Rooker-Feldman - Complete Absence of Jurisdiction ................. 87**

Conclusion 1: Rooker-Feldman Doctrine Does Not Apply ................................ 88
Conclusion 2: Judge Hurson -Complete Absence of Jurisdiction ..................... 88
Standard of Review ........................................................................................... 90

**[Issue 3]     Non-Judicial Ultra Vires Acts ................................................ 90**

Conclusion 1: Subject Matter Jurisdiction Required .......................................... 92
Conclusion 2: Judge Hurson – Ultra Vires Acts ............................................... 92
District v State - Jurisdiction ............................................................................ 94
Standard of Review ........................................................................................... 95

**[Issue 4]     Dismissal of Maryland and De Facto Dismissal of Claims ......... 95**

| I | Employer | | 96 |
|---|---|---|---|
| A | *District v State - Gender* | | *98* |
| B | *Gender & Disability Discrimination: Hostile Work Environment* | | *98* |
| C | *Employer: FMLA, ADA, and Rehabilitation Act* | | *102* |
| I | June 26-27 Hearing | | 105 |

2

 A  *Affidavit of Harm* ....................................................................*108*
I   Denied Reasonable Accommodations & Obstructing Evidence ..........110
II   ADA Reasonable Accommodations Letter .........................................111
III   Expert Eye-Witness Affidavit..........................................................112
IV   Statute ...........................................................................................113
 A  *Family and Medical Leave (FMLA)* ....................................*113*
 B  *ADA* ................................................................................*119*
V   Waiver of Eleventh Amendment Immunity .........................................119
 A  *Jurisprudence of Eleventh Amendment Immunity* ................*119*
 B  *Federal Jurisdiction Waiver on June 26, 2024* ....................*120*
 C  *Federal Jurisdiction Waiver on February 20, 2025*............*125*
VI   Fourteenth Amendment Abrogation of Sovereign Immunity .............126
 A  *ADA Title II Abrogates Sovereign Immunity*.......................*126*
 B  *FMLA Abrogates Sovereign Immunity* .................................*128*
 C  *Summary ADA and FMLA* ....................................................*128*
 D  *Excessive Fines* ..................................................................*130*
   Standard of Review ........................................................................130

**[Issue 5]  Denial of Court Appointed Counsel ........................130**

 VII  Standard of Review .......................................................................132

**[Issue 6]  Denial of Conditional Permissive Joinders ...................133**

 VIII  Standard of Review .......................................................................136

**[Issue 7]  Judicial and Quasi-Judicial Immunity and Conspiracy.............136**

 I   Labor Dispute................................................................................136
  A  *Beyond Reasonable Dispute* ................................................*139*
  B  *Maryland Anti-Injunction Act* .............................................*141*
  C  *Clearly Lacked Jurisdiction*................................................*142*
 IX  Maryland Unclean Hands Doctrine .................................................143
 X   Maryland's Standing, Ripeness, and Mootness...................................145
  *Controversy* ...............................................................................*146*
  *Standing* .....................................................................................*149*
  *Ripeness* .....................................................................................*149*
  *Mootness* ....................................................................................*150*
 XI  Non-Judicial Acts .........................................................................151
 XII  Jurisdiction is Judicial Power and Authority .....................................151
 XIII  Federal Court Jurisdiction & Venue ................................................152
 XIV  42 U.S.C. § 1983 ..........................................................................152
   Standard of Relief ........................................................................154

**Conclusion & Relief** ...........................................................................**155**

   Structural Defects,  Reversable Error, and Reassignment ................................155

     *Structural Defects*.............................................................................*155*

     *Reversable Error* ..............................................................................*155*

     *Reassignment*....................................................................................*156*

   Issue 1: Procedural Due Process and Irreconcilable Contradictions ................157

   Issue 2: Rooker Feldman - Complete Absence of Jurisdiction.........................158

   Issue 3: Non-Judicial Ultra Vire Acts.............................................................159

   Issue 4: Dismissal of Maryland and De Facto Dismissal of Claims.................159

   Issue 5: Denial of Court Appointed Counsel ...................................................160

   Issue 6: Denial of Conditional Permissive Joinders .........................................160

   Issue 7: Judicial and Quasi-Judicial Immunity and Conspiracy.......................161

   Relief ...............................................................................................................161

**Oral Arguments**...........................................................................**163**

**Respectfully Submitted**...............................................................**164**

## TABLE OF AUTHORITIES

### CASES

Adams v. Bain, 697 F.2d 1213 (4th Cir. 1982)------------------------------------89

Ademiluyi v. Maryland State Bd. of Elections, 458 Md. 1 (2018)----------66, 67, 68

Aleman v. Chugach Support Servs., Inc., 485 F.3d 206 (4th Cir. 2007)---------- 134

American Communications Ass'n, CIO v. Douds, 1948 WL 47107 (U.S., 2006)141

Anderson v. Celebrezze, 460 U.S. 780 (1983) ------------------------------------69

Att'y Grievance Comm'n of Maryland v. Pierre, 485 Md. 56 (2023)----------------63

Baltimore & Ohio R. Co. v. Equitable Bank, N.A., 77 Md. App. 320 (1988)------87

Beaudett v. City of Hampton, 775 F.2d 1274 (4th Cir. 1985) ------------------------89

Borkowski v. Baltimore County, Maryland, Complaint, No. 1:18-cv-2809, 2018

    WL 4443253  (D. Md. filed Sept. 10, 2018) ------------------------------------ 151

Clark v. Barnard, 108 U.S. 436 (1883) ------------------------------------------- 119

Cowgill v. First Data Techs., Inc., 41 F.4th 370 (4th Cir. 2022)------------------- 102

Erickson v. Pardus, 551 U.S. 89 (2007) --------------------------------------------21

Field v. Berman, 526 F. App'x 287 (4th Cir. 2013)---------------------------- passim

Fitzpatrick v. Bitzer, 427 U.S. 445 (1976) --------------------------------------- 126

Gibson v. Goldston, 85 F.4th 218 (4th Cir. 2023) --------------------------------- 152

Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159 (4th Cir. 2016)------------- 83, 84

4

Goldman v. Brink, 41 F.4th 366 (4th Cir. 2022) --------------------------------------91

Habtemariam v. Neda, No. 0134, Sept.term,2020, 2021 WL 1038276 (Md. Ct. Spec. App. Mar. 18, 2021) (appeal dismissed as moot) (unreported) ------------87

Hatt v. Anderson, 297 Md. 42 (1983)------------------------------------------------ 146

Heyer v. United States Bureau of Prisons, 984 F.3d 347 (4th Cir. 2021)-----------87

Hicks v. Gilbert, 135 Md. App. 394 (2000)------------------------------------------- 145

In re Murchison, 349 U.S. 133 (1955)------------------------------------------------ 156

Jackson v. Lightsey, 775 F.3d 170 (4th Cir. 2014) -----------------------------------21

Jenkins v. Woodard, 109 F.4th 242 (4th Cir. 2024) --------------------------------- 132

Jiminez v. Mary Washington Coll., 57 F.3d 369 (4th Cir. 1995) ---------------------87

Johnson v. Johnson, 199 Md. 329, 339, 86 A.2d 520 (1952)----------------------- 143

Kadan v. Bd. of Sup'rs of Elections of Baltimore Cnty., 273 Md. 406 (1974) -----68

Lapides v. Bd. of Regents of Univ. Sys. of Georgia, 535 U.S. 613 (2002)-123, 124, 126

Lehigh Min. & Mfg. Co. v. Kelly, 160 U.S. 327 (1895) -------------------------------91

Lettieri v. Equant, 478 F.3d 640 (4th Cir. 2007) ------------------------------------ 102

Liteky v. United States, 510 U.S. 540 (1994)----------------------------------------- 157

Moses Enterprises, LLC v. Lexington Ins. Co., 66 F.4th 523 (4th Cir. 2023) ---132, 136

Nat. Union of Hosp. & Health Care Emp., Div. of R.W.D.S.U., AFL-CIO v. Johns Hopkins Hosp., 293 Md. 343 (1982)------------------------------------------------ 142

Nevada Dep't of Hum. Res. v. Hibbs, 538 U.S. 721 (2003) ------------------------ 128

Pizza di Joey, LLC v. Mayor of Baltimore, 470 Md. 308 (2020) ------------ 145, 146

Price Waterhouse v. Hopkins, 490 U.S. 228 (1989) --------------------------------- 129

Pulliam v. Allen, 466 U.S. 522 (1984) ----------------------------------------------- 153

Reed v. Goertz, 598 U.S. 230 (2023) --------------------------------------------------91

Rita v. United States, 551 U.S. 338 (2007) ------------------------------------------ 156

Rohan v. Networks Presentations LLC, 375 F.3d 266 (4th Cir. 2004)------------- 102

Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923) ----------------------------------92

State Center, LLC v. Lexington Charles Ltd. P'ship, 438 Md. 451 (2014) ------- 149

State Center, LLC v. Lexington Charles Ltd. P'ship, 438 Md. 451 (2014). ------ 149

Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998) -------------- 151

Steel Co. v. Citizens for a Better Env't, 523 U.S. 83 (1998)--------------------- 91, 93

Tennessee v. Lane, 541 U.S. 509 (2004)------------------------------------------ 126, 127

Tidewater Exp. Lines, Inc. v. Freight Drivers & Helpers Loc. Union No. 557, 230 Md. 450 (1963) ------------------------------------------------------------------ 142

Timbs v. Indiana, 586 U.S. 146 (2019)----------------------------------------------- 130

United States v. Blue, 877 F.3d 513 (4th Cir. 2017)--------------------------------- 156

United States v. Gonzalez-Lopez, 548 U.S. 140 (2006)----------------------------- 155

United States v. Lentz, 383 F.3d 191 (4th Cir. 2004)-------------------------------- 156

5

United States v. Lynn, 592 F.3d 572 (4th Cir. 2010) -------------------------------- 156
Wells v. Shriners Hosp., 109 F.3d 198 (4th Cir. 1997)-------------------------------17
Whisenant v. Yuam, 739 F.2d 160 (4th Cir. 1984) -------------------------------- 132
Wilson v. Dollar Gen. Corp., 717 F.3d 337 (4th Cir. 2013) ----------------------- 102
Wisconsin Dep't of Corr. v. Schacht, 524 U.S. 381 (1998) ----------------------- 126

STATUTES


18 U.S.C. § 1001 ------------------------------------------------------------- 24, 40
18 U.S.C. § 1503 -------------------------------------------------------------------24
18 U.S.C. § 1512 -------------------------------------------------------------------24
18 U.S.C. § 1519 ------------------------------------------------------------- 25, 40
18 U.S.C. § 1621 -------------------------------------------------------------------24
18 U.S.C. § 2071 -----------------------------------------------------------24, 25, 40
26 U.S.C. § 5000 ---------------------------------------------------------------- 117
28 U.S.C. § 1331 ---------------------------------------------------------------- 152
28 U.S.C. § 1367 ---------------------------------------------------------------- 152
28 U.S.C. § 1391 ---------------------------------------------------------------- 152
28 U.S.C. § 1915 ---------------------------------------------------------------74, 75, 90
28 U.S.C. § 351-------------------------------------------------------------------24
28 U.S.C. § 453----------------------------------------------------------------------25
28 U.S.C. § 455----------------------------------------------------------------------54
29 U.S.C. § 1002 ---------------------------------------------------------------- 115
29 U.S.C. § 142---------------------------------------------------------------- 114
29 U.S.C. § 203-------------------------------------------------------------- 113, 114
29 U.S.C. § 2611 ---------------------------------------------------------- 113, 114, 115
29 U.S.C. § 2612 ---------------------------------------------------------------- 115
29 U.S.C. § 2613 ---------------------------------------------------------------- 116
29 U.S.C. § 2614 ---------------------------------------------------------------- 116
29 U.S.C. § 2615 ---------------------------------------------------------------- 117
29 U.S.C. § 2617 ---------------------------------------------------------------- 118
29 U.S.C. § 2651 ---------------------------------------------------------------- 119
42 U.S.C. § 12101 -------------------------------------------------------------- 119
42 U.S.C. § 12132 -------------------------------------------------------------- 119
42 U.S.C. § 12202-------------------------------------------------------------- 119
42 U.S.C. § 1983 ------------------------------------------------------ 49, 95, 152, 153
42 U.S.C. § 1985 ------------------------------------------------------------- 41, 50
42 U.S.C. § 1986 ------------------------------------------------------------ passim
42 U.S.C. § 1988 -------------------------------------------------------------- 153
Md. Code Ann., Elec. Law § 12-202 -----------------------------------------------68

6

Md. Code Ann., Lab. & Empl. § 4-307----------------------------------------------- 142
Md. Code Ann., Lab. & Empl. § 4-310----------------------------------------------- 142

OTHER AUTHORITIES

13 M.L.E. Judges § 3 ----------------------------------------------------------------65
4 Fed. Prac. & Proc. Civ. § 1052 (4th ed. 2022).-------------------------------------16
77 Eng. Rep. 1027 (Star Chamber 1612)---------------------------------------------93
Floyd v. Barker, 77 Eng. Rep. 1305 (Star Chamber 1607) ---------------------------93
Gil Seinfeld, Waiver-in-Litigation: Eleventh Amendment Immunity and the
    Voluntariness Question, 63 Ohio St. L.J. 871 (2002)---------------------------- 120
John A. Lynch, Jr. & Richard W. Bourne, Modern Maryland Civil Procedure 2–3
    (2d ed. 2004, 2014 supp.))----------------------------------------------------- 146
John J. Gibbons, The Eleventh Amendment and State Sovereign Immunity: A
    Reinterpretation, 83 Colum. L. Rev. 1889 (1983)--------------------------------- 120
Md. Code, Cts. & Jud. Proc. § 3-409(a)(1) (1973, 2013 Repl. Vol.) -- 146, 149, 150
William A. Fletcher, A Historical Interpretation of the Eleventh Amendment: A
    Narrow Construction of an Affirmative Grant of Jurisdiction Rather Than A
    Prohibition Against Jurisdiction, 35 Stan. L. Rev. 1033, 1038–39 (1983)----- 120

RULES

FRCP 10 -----------------------------------------------------------------------21, 22, 83
FRCP 12 ----------------------------------------------------------- 90, 92, 130, 154
FRCP 26 -------------------------------------------------------------------------------11
FRCP 3--------------------------------------------------------------------------------16
FRCP 4--------------------------------------------------------------------------------75
FRCP 5--------------------------------------------------------------------------------16
FRCP 6--------------------------------------------------------------------------------11
FRCP 65 ------------------------------------------------------------------11, 29, 30
FRCP 79 -------------------------------------------------------------------------------16
Maryland Rule 15-206------------------------------------------------------------ 106
Maryland Rule 15-504------------------------------------------------------------ 106
Maryland Rule 19-703 ----------------------------------------------------------------45
Maryland Rule 19-711 ----------------------------------------------------------- 45, 46
Maryland Rule 19-732 ----------------------------------------------------------------48
Maryland Rule 2-506 ------------------------------------------------------------87, 122

On Friday, December 27, 2024, Ryan Dillon-Capps personally filed civil action 1:24-cv-3744-BAH at the United States District Court for the District of Maryland, Northern Division, located at 101 West Lombard Street, Baltimore, Maryland 21201.

**This is Ryan Dillon-Capps first appeal, and is appealing the following:**

(1)    The missing and undocketed portions of the original December 27, 2024, filing, which the District Court directed the Clerk of Court not to docket without a court order;

(2)    District ECF 18-0 (January 8, 2025):

    (a) the dismissal with prejudice of:

        (i)    All state-employed defendants: Desimone Jr., Truffer, Barranco, Alexander, Battista, Mayer, Stringer, Robinson Jr., Ensor, DaGonia II, Bernstein, and the State of Maryland;

        (ii)    Claims described as "conspiracy claim[s] under any of the federal statutes or state common law doctrines";

        (iii)    Claims described as "claims contesting the rulings in the state action," though no such claims were brought;

        (iv)    Additional "remaining claims" connected to dismissed defendants, for which the District Court made "no findings," effectively resulting in de facto dismissal.

    (b) The denial of motions identified as ECF 3, 4, 5, and 6;

    (c) The "otherwise" denied portions of ECF 2;

(3)    District ECF 22-0 (January 29, 2025): Denial of the motion for reconsideration of the January 8 memorandum and order;

(4)    District ECF 27-0 (February 12, 2025): Denial of the Temporary Restraining Order and Preliminary Injunction without a hearing. A motion for

8

reconsideration was filed on February 13, 2025, and remains pending without a ruling.

INTRODUCTORY ISSUES STATEMENT

Corruption is the betrayal of trust. It requires nothing more than a person acting for the benefit of a wrongdoer, often at the expense of duty, law, or the public interest. When such conduct is tolerated or replicated across institutions, it evolves into systemic corruption, where misconduct is no longer isolated but embedded within the structure of authority itself.

Self-preservation fuels the escalation of wrongdoing. It breeds aggression and animosity toward those perceived as threats, culminating in malicious and vindictive efforts to eliminate truth-tellers.

In District ECF 18-0, Judge Hurson's assertion that Ryan Dillon-Capps "is not the first and surely not the last litigant to come away from contentious litigation unhappy" (p. 17) is untethered from reality. It reinforces Hurson's self-serving and objectively false characterization of the state action.

Ryan Dillon-Capps is the prevailing party, having successfully vitiated the state case and favorably altered the legal relationship between himself and the state plaintiff. This result was achieved while litigating against eight state court judges—who were simultaneously the very individuals adjudicating the case—assisted by the clerk, Bar Counsel, and Director of Investigations.

9

Moreover, Mr. Dillon-Capps accomplished this while ensuring that judicial, Eleventh Amendment, sovereign, corporate, and all other forms of immunity were either overcome or rendered inapplicable as to every defendant. The insides of a courthouse are not detached from the world outside; they are inextricably intertwined. Recognizing this reality helps explain how Mr. Dillon-Capps was able to prevail in the state proceedings—and why Judge Hurson's misconduct in the District Court so clearly underscores the systemic issues at stake.

To suggest that Mr. Dillon-Capps is "unhappy" after securing a sweeping legal and procedural victory against coordinated institutional resistance is not just inaccurate—it is irreconcilable and "suffers a number of deficiencies which are described more fully"(p.2) herein.

**[Issue 1]      Procedural Due Process and Irreconcilable Contradictions**

On Friday, December 27, 2024, Ryan Dillon-Capps personally filed civil action 1:24-cv-3744-BAH at the United States District Court for the District of Maryland, Northern Division, located at 101 West Lombard Street, Baltimore, Maryland 21201. At the time of filing, the Court Clerk informed him that, because he was not a Maryland-barred attorney, all digitally certified and signed documents required a "wet ink" signature. Accordingly, Mr. Dillon-Capps signed all documents in the presence of the Clerk.

The Clerk further explained that the District of Maryland does not permit pro se litigants to use their PACER accounts for filing purposes. To receive notices electronically, Mr. Dillon-Capps was required to complete the "Consent by Self-Represented Litigant to Receive Notices of Electronic Filing" form (District ECF 8-0), which he completed, signed, and filed at that time.

Under the District of Maryland's procedures, self-represented parties in civil cases may submit documents using one of three methods: (1) by mail, (2) in person at the courthouse, or (3) electronically through the Electronic Document Submission System (EDSS). The Court's guidance explicitly uses the term "submission" to distinguish the act of uploading documents through EDSS from formal "filing," which is completed only upon review and docketing by the Clerk's Office.

Represented parties, as well as self-represented incarcerated litigants, are not permitted to use EDSS. Additionally, all new civil cases must be initiated either by mail or in person at the courthouse and cannot be submitted through EDSS. These procedures are set forth in the Electronic Document Submission System (EDSS) Administrative Procedures, as referenced on the Court's EDSS webpage.

After filing, Mr. Dillon-Capps remained at the courthouse in anticipation of an emergency ex parte hearing "pursuant to FRCP 65(b), FRCP 26(c), and FRCP 6(c)(1)(C)," seeking:

11

(1)   "an [in-camera review] to secure testimony and evidence under seal [with a Magistrate Judge] due to the sensitive nature of the information involved";

(2)   appointment of a special master, proposed "Timony E. Allen," to "investigate systemic misconduct and ensure transparency," and who "should meet with [Ryan Dillon-Capps] and a Magistrate Judge" within 48 hours to "review a proposed investigative process [and] facilitate necessary orders to support the investigation";

(3)   a temporary restraining order:

   (a) "notifying all Maryland courts, clerks, and the Judicial Information Systems (JIS) department to halt all non-emergency maintenance and preserve all records [to] ensure comprehensive discovery and prevent inadvertent destruction of evidence",

   (b) "Removing [court record] access for [judge, clerk, DeGonia II, and Bernstein defendants to] preserve all related records", and

   (c) "bar [judge, clerk, DeGonia II, and Bernstein defendants] from acting under color of state authority"; and

(4)   the initiation of "State-level negotiations to address and rectify systemic injustices, ensuring collaborative good faith efforts to restore rule of law".

See District ECF 6-0; District ECF 3-3; see also District ECF 1-11 (Timony E. Allen); 3-1 (meet & confer letter). However, no hearing was held before the courthouse closed for the day, and the emergency request remained unaddressed.

On Monday, December 30, 2024, Ryan Dillon-Capps followed up with the Court Clerk after observing that nothing had yet been docketed in PACER, which permits pro se litigants to view and download documents but not to file them. The Clerk informed him that "the judge has everything" and stated that the Clerk's Office was still working on processing the filing.

Later that day, the Clerk's Office docketed District ECF entries 1 through 8, along with deficiency notices filed as District ECF 9 through 13, and a Clerk's Office letter providing case information as District ECF 14. The deficiencies noted in District ECF 10 through 13 were based on alleged missing signatures. Mr. Dillon-Capps contacted the Clerk's Office to explain that he had signed all documents in person on December 27, 2024, and that the accepting Clerk had confirmed at the time that all required signatures were present. Upon review, the Clerk's Office located and confirmed the existence of the original "wet ink" signatures for all documents and accordingly voided the deficiency notices in District ECF 10 through 13.

13

District ECF 9 pertained to a missing U.S. Marshals Service Form (Form USM-285) for defendant Victoria Hoffberger. Mr. Dillon-Capps submitted the completed form the same day, and it was docketed as District ECF 15-1.

Following the initial filing, Ryan Dillon-Capps contacted the Court Clerk daily to inquire about the status of the emergency ex parte hearing. Several of these calls also addressed concerns regarding missing portions of the original December 27, 2024, filing. In each instance, the Clerk responded that "the judge has everything" and indicated that no further action could be taken at that time.

On January 2 or 3, 2025, Mr. Dillon-Capps asked the Clerk whether there was anything he—or anyone else—could do to move the matter forward. The Clerk responded, "Ryan Dillon-Capps could file something, but no one else can do anything." Acting on that advice, Mr. Dillon-Capps filed a "Notice of Urgency" on Friday, January 3, 2025 (District ECF 17-0). During a follow-up call, the Clerk informed him that the notice was being denied due to a claim that it lacked a "wet signature." The call was transferred to the Clerk's supervisor, who confirmed that the document had, in fact, been properly signed.

Before Mr. Dillon-Capps was able to log in to PACER to check the status of the notice, District ECF series 16 (exhibits) and 17 (Notice of Urgency) were docketed, each bearing the docket date of January 3, 2025. However, the

14

documents comprising District ECF series 16 were originally filed on December 27, 2024, as exhibits attached to the initial complaint.

During a follow-up call between Friday, January 3 and Tuesday, January 7, Case Administrator Baylee Wilson informed Mr. Dillon-Capps that "the judge"—understood from context to be Judge Hurson—had directed the Clerk's Office not to docket the remainder of the original December 27, 2024, filing, specifically the signed physical CD and the thousands of pages of exhibits in PDF format contained on that CD. The Clerk continued to state that "the judge has everything" and reiterated that there was nothing further the Clerk's Office could do.

On January 8, 2025, the District Court granted Mr. Dillon-Capps leave to proceed in forma pauperis but denied all other requested relief—without addressing the request for copy services or acknowledging the exclusion of the signed physical CD and its contents. No order has been docketed explaining or authorizing the omission of the CD or the materials it contained. See District ECF 18-0, at 2, 21 (denial); District ECF 2, at 2 (copy services request).

This sequence indicates that the Clerk's Office found no procedural deficiency with the undocketed exhibits submitted as part of the original December 27, 2024, filing. If the District Court believed that any portion of the submission was deficient or improper, it was required to issue and docket an order stating as much. The Clerk's Office has repeatedly stated that it could not take further action,

15

and this appeal presents the first opportunity for the issue to be formally reviewed and addressed.

## I Federal Rules of Civil Procedures

FRCP 3 provides that "[a] civil action is commenced by filing a complaint with the court." FRCP 5(d)(2)(A) further defines the "filing" of a paper not filed electronically as accomplished "by delivering it to the clerk," while FRCP 5(d)(4) mandates that "[t]he clerk must not refuse to file a paper solely because it is not in the form prescribed by these rules or by a local rule or practice." FRCP 5(d)(3)(B)(ii) also provides that an unrepresented person may be required to file electronically "only by court order, or by a local rule that includes reasonable exceptions."

As explained in Wright & Miller, "[t]he first step in a civil action in a United States district court is the filing of the complaint with the clerk or the judge. Filing a complaint requires nothing more than delivery of the document to a court officer authorized to receive it." *4 Fed. Prac. & Proc. Civ.* § 1052 (4th ed. 2022).

The Court Clerk's duties are governed by FRCP 79 (a)(2), which requires that filings "must be marked with the file number and entered chronologically in the docket," including: (A) papers filed with the clerk; and (C) appearances, orders, verdicts, and judgments. The integrity of the docket is not discretionary.

16

As the Fourth Circuit has explained, "[w]ithin ten days of receiving a copy of the order," a party must act to preserve a claim of error, and "[s]everal courts have held that a party must comply with this statutory provision in order to preserve a claim of error." *Wells v. Shriners Hosp.*, 109 F.3d 198, 200 (4th Cir. 1997).

Instructing the Clerk's Office not to docket portions of the original December 27, 2024, filing—specifically, the signed physical CD and thousands of pages of exhibits—and failing to issue any order justifying or authorizing that directive is not a ministerial or non-judicial act. The omission has caused significant procedural uncertainty and irreparable harm, including the permanent loss of a vehicle. Without a docketed order explaining or formalizing the exclusion, there was no ruling to respond to, and therefore no procedural mechanism by which to "preserve a claim of error."

## II  Undocketed Exhibits

Exhibit List

District ECF 1-12 is a Table of Exhibits. The District Court acknowledged this in District ECF 18-0, at 2: "and what appears to be a list of exhibits, ECF. 1-12".

17

## Undocketed signed physical CD

The signed physical CD contained digital files in PDF format that could not be docketed exclusively through conventional electronic filing procedures without risking the loss of materially relevant metadata and embedded digital elements. These digital properties cannot be fully evaluated or preserved simply by opening or viewing the files; their evidentiary value depends on maintaining the integrity of the original digital structure.

Because standard docketing procedures inherently alter metadata and may strip embedded content, these materials must be preserved and treated as a physical exhibit under appropriate evidentiary safeguards. Mr. Dillon-Capps informed the Court Clerk at the time of filing that the signed physical CD constituted a physical exhibit attached to the complaint and that it needed to be docketed accordingly.

## Undocketed PDF documents

As noted in District ECF 2, at 2 ¶ 4, Mr. Dillon-Capps requested copy services to ensure the completeness of the complaint and its bilaterally incorporated motions. This request was made in conjunction with his motion to proceed in forma pauperis, as he was financially unable to provide a full paper copy of the thousands of pages of exhibits included on the physical CD submitted on December 27, 2024.

18

Although the District Court granted in forma pauperis status, it denied all other relief without addressing the request for copy services. See District ECF 18-0, at 2, 21. As a result, the exhibits contained on the signed physical CD were not included in the traditional electronic docket, despite being submitted as part of the original filing.

Mr. Dillon-Capps informed the Court Clerk at the time of the filing that his in forma pauperis motion included a request for copy services and explained that the signed physical CD contained both digital duplicates of paper-filed materials and additional exhibits that could not be submitted in print form due to financial hardship. The thousands of additional pages in PDF format were submitted as exhibits attached to the complaint.

The Court Clerk acknowledged and accepted the signed physical CD as an exhibit and confirmed that the digital exhibits it contained were considered part of the original filing. Subsequent phone calls with the Clerk's Office further confirmed that the CD had been received and was understood to contain exhibits submitted as attachments to the complaint.

The de facto denial of copy services was part of the District Court's broader ruling, which also dismissed all state defendants, claims, and motions. The ruling references them by name and cites portions of the filing, but the rulings are directed at a court-constructed adaptation—an interpretation that departs from

objective reality and the intended meaning of the filing—as though the Court had inadvertently issued a ruling meant for a different case.

### III Incorporated and Attached

Everything filed on December 27, 2024, by pro se plaintiff Ryan Dillon-Capps constitutes a complete complaint and its bilaterally incorporated motions. The leading document of the complaint, District ECF 1-0, explicitly incorporates by reference numerous additional filings (see pp. 2, 6, 9, 17, 21, 24–27), and expressly incorporates them on page 2. Additionally, District ECF 1-4, 1-5, 1-6, 1-7, 1-10, 3-1, 3-3, 4-1, 4-2, 5-2, and 6-0 each begin with a clear statement of bilateral incorporation.

Each of these documents contains language to the effect of: "Plaintiff incorporates all subsequent sections and attachments herein by reference as though fully stated in this main document." The term "main document" refers to the filing titled "Complaint" (District ECF 1-0), and the other documents—except District ECF 3-1 (the Meet and Confer Letter)—are titled "Complaint Integrated Appendix," reflecting their functional and legal integration into the complaint. This structure also establishes bilateral incorporation, ensuring that the complaint and accompanying motions would be reviewed together, as a unified submission encompassing all materials filed on December 27, 2024.

20

Additionally, District ECF 1-12 is a table of exhibits, providing a structured index of the submitted materials. It identifies each exhibit by number and includes a summary statement for each, further reinforcing the organizational coherence and completeness of the original filing.

Under FRCP 10(c), "[a] statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion. A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."  Like the petitioner in *Erickson v. Pardus*, 551 U.S. 89, 94–95 (2007), Ryan Dillon-Capps has been litigating without counsel since the outset of litigation and regardless of how inartfully pleaded, it must be held to a less stringent standard and interpreted to effectuate their intended legal function. A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. See also *Jackson v. Lightsey*, 775 F.3d 170, 176 n.2 (4th Cir. 2014).

## IV Undocketed Resubmission and Replacement Filings

The District Court acknowledged the material relevance of the state court record that was not docketed: "The court record stands as a body of evidence reflecting bias against the Plaintiff and favoritism toward the law firm and employer." (District ECF 1-0, at 19 ¶ 72; cited in District ECF 18-0, at 8).

21

In District ECF 1-0, at 9, State Court Record Event and Document Files are incorporated pursuant to FRCP 10(c) as Exhibit 160 and 161. Transcripts from the hearing on June 26-27, 2024, are incorporated as Exhibit 163. These were not docketed with the December 27, 2024 filing.

Yet, In District ECF 18-0, the District Court's ruling determined that the "complaint suffers from a number of deficiencies" (p. 3), while simultaneously acknowledging the material relevance of the undocketed portions of the pleading through repeated expressions of uncertainty—using language such as "can piece together" (p. 3); "appears" (pp. 3, 12, 13); "appear to stem" (p. 11); "unclear" (p. 12); "difficult to discern" (p. 18); and "unable to tease apart" (p. 16).

District ECF Series 23 consists of the resubmission of key documents from the state court record, including the June 14, 2024, state court pleading (District ECF 23-1 through 23-7 and 23-9), the June 17 ex parte order (District ECF 23-8), the process server's affidavit documenting personal service of the pleading on June 17 (District ECF 23-10), and the Miles & Stockbridge version of the June 26–27 hearing transcripts (District ECF 23-11 and 23-12). District ECF 24-0 is a supplemental affidavit submitted to replace other filings that were never docketed.

These filings are necessary to support District ECF Series 25, which includes the motion for a temporary restraining order and preliminary injunction

against Ohana Growth Partners, LLC, seeking to restore the status quo in light of undisputed FMLA violations.

District ECF Series 38 and 40 includes affidavits submitted to supplement for other undocketed filings and were filed with the resubmission of a 707-page exhibit from the state court record.

## V  Formal Allegations – Brendan A. Hurson

Ryan Dillon-Capps respectfully informs this Court that previously noted discrepancies have now been reconciled, and what began as serious concerns have developed into formal allegations. Upon remand, Mr. Dillon-Capps intends to amend the complaint to include Brendan A. Hurson as a named defendant. This request is based on newly confirmed facts that raise significant questions about the integrity of the District Court proceedings and the docketed record.

In support of this position, Mr. Dillon-Capps notes that the original in-paper filing and the signed physical CD were both created in duplicate. One full set was submitted to the District Court on December 27, 2024, while the duplicated backup remains in Mr. Dillon-Capps's possession. Both signed physical CDs were created from a ZIP file, which retains a verifiable date and time stamp, as illustrated in Figure 1-1.

23

Figure 1-1:



| USDM-20241226-2037-READY.zip | | ✓ | 12/26/2024 8:37 PM | ZIP File | 1,687,621 KB |
| --- | --- | --- | --- | --- | --- |
| | Size: | 1.60 GB (1,728,123,360 bytes) | | | |
| | Size on disk: | 1.60 GB (1,728,126,976 bytes) | | | |
| | Created: | Thursday, December 26, 2024, 8:37:05 PM | | | |
| | Modified: | Thursday, December 26, 2024, 8:37:31 PM | | | |

These materials are available for review and can be authenticated through both physical and digital means. Mr. Dillon-Capps respectfully requests that this Court take judicial notice of these facts and stands ready to provide the ZIP file to the Court promptly, should the Court permit and provide instructions for its transmission.

The allegations presented in this section implicate serious violations of federal law, combining elements of Obstruction of Justice under 18 U.S.C. §§ 1503 and 1512, and Judicial Misconduct under 28 U.S.C. § 351, based on the following acts:

(5)  Falsifying the official docket by altering the contents of the court record, in violation of 18 U.S.C. § 2071;

(6)  Falsifying the official docket by introducing materials recovered from a trash receptacle into the court record, in violation of 18 U.S.C. § 1001;

(7)  Intentionally making materially false statements in judicial orders that misrepresented facts, procedural history, and claims, in violation of 18 U.S.C. § 1621;

24

(8)     Directly manipulating the court record by instructing the Clerk's Office to

omit properly submitted filings from the docket without a court order, in further

violation of 18 U.S.C. § 2071;

(9)     Destroying, altering, or falsifying court records with the intent to impede or

obstruct the commencement of investigations into the concealment of systemic

corruption, in violation of 18 U.S.C. § 1519.

Each of these acts, standing alone, constitutes a grave breach of judicial

duty. Taken together, they reveal a pattern of misconduct that fundamentally

compromises the integrity of the judicial process and require automatic reversal.

Additionally, under 28 U.S.C. § 453, the Judicial Oath obligates every

Article III judge to "administer justice without respect to persons, and do equal

right to the poor and to the rich," and to "faithfully and impartially discharge and

perform all the duties incumbent upon me [...] under the Constitution and laws of

the United States."

As established in other arguments, the first act requiring subject-matter

jurisdiction was the effective reversal of the state court's vitiation of the

employer's claims—an action taken in the complete absence of jurisdiction. After

issuing that reversal, the Court then relied on it to declare that it lacked subject-

matter jurisdiction over the case as a whole. By definition, all subsequent actions

taken in reliance on that ruling were ultra vires, as they were performed without

25

lawful judicial authority. Moreover, the actions that occurred prior to that ruling were non-judicial in nature and fell far outside the scope of any legitimate judicial function. For these reasons alone, Brendan A. Hurson is not entitled to judicial immunity.

## A  Intentionally Misrepresented Filings

In District ECF 18-0, at page 18, the District Court denied the motion for interlocutory summary judgment (District ECF 4-2) and demonstrated a nuanced understanding of the state court proceedings by referencing a "declination to rule on the motion in that case." In the original brief, Ryan Dillon-Capps was unable to identify the source of this statement within District ECF series 1 through 8. However, upon further review following the filing, he noticed that the previous paragraph in the District Court's ruling specifically cited District ECF 4-2, at 3 ¶6, which was quoted as:

> "In conclusion, the timeline of filings and procedural actions, as detailed in Exhibit 110, conclusively demonstrates that the Defendants were provided sufficient notice and opportunity to respond. Their voluntary dismissal following months of delays and procedural stalling further emphasizes their intent to evade accountability. Based on these findings, the Court should determine that the requirements for adequate notice have been met and grant interlocutory partial summary judgment for the Plaintiff."

Exhibit 110 was docketed as District ECF 16-13 and contains multiple filings from the state court record. When docketed, pages 29–65 were filed in front

26

of the exhibit, resulting in a split that occurs in the middle of the <u>Motion for</u>

<u>Directed Verdict</u>—the very document the District Court refers to as "the motion."

## 1   Relief Sought "difficult to discern"

In District ECF 18-0, the District Court claimed it was "difficult to discern"

the relief sought—immediately after quoting from District ECF 4-2, at 3. However,

in District ECF 4-2, the quoted passage is directly followed by a detailed section

(pp. 3–5) presenting arguments in support of judgment as a matter of law. Page 4

explicitly references "Exhibits 100 through 110, multiple ZIP files, Exhibits 160

through 163, and two additional affidavits." Pages 6–9 break down the individual

counts, indicating whether Ryan Dillon-Capps believes each count is ready for

judgment, and identifying the relevant defendants when applicable. Pages 10–18

provide argumentation addressing defenses and procedural obstacles. Page 19

concludes the document with a reference to the *Complaint Integrated Appendix:*

*Counts* (District ECF 1-7).

In District ECF 18-0, the District Court explicitly references "Complaint

Integrated Appendix: Counts, ECF 1-7" on page 3 and asserts: "The Counts

appendix lists twenty-two counts, most of which contain sub-counts. See ECF 1-7.

Plaintiff appears to number one hundred seventy-one (171) sub-counts. See id. at

71. The causes of action include violations of [seven lines of text listing

violations]. See generally id." (citations from original).

Judge Hurson's language clearly indicates that the Court had reviewed District ECF 1-7 in detail. District ECF 1-7 plainly identifies each count and sub-count, includes prima facie statements supporting the cited legal basis, and specifies the relief sought with corresponding legal authority. Accordingly, Judge Hurson's assertion on page 3 of District ECF 18-0—that the relief sought was "difficult to discern"—constitutes an irreconcilable contradiction. It was an intentional misrepresentation made to support a conclusion that is contrary to objective reality, the factual allegations, and the supporting evidence.

## 2  Procedural Requirements

According to Ms. Wilson, "the Judge" had possession of all exhibits. Based on the context, Ryan Dillon-Capps reasonably believes that Ms. Wilson was referring to Judge Hurson. Dillon-Capps therefore has a credible basis to believe that Judge Hurson had access to all exhibits, including Exhibit 110, which was docketed as District ECF 16-13—with pages 29–65 incorrectly filed as pages 1–37. Dillon-Capps corrected this docketing error by refiling the document as District ECF 32-2.

District ECF 32-2, at 1, titled <u>Request for Prehearing Conference to Discuss Injunctive Relief,</u> features clear red-text declarations at the top of the filing:

1) Defendants were notified in advance of our intent to seek injunction.
2) Defendants had refused numerous attempts for them to produce any material evidence to refute our evidence based statements of fact.

3) Defendants were notified of our intent and desire for an Ex Parte Hearing – to adjudicate our facts and then…
4) Seek judgement based on the facts because the Defendants had been provided months of opportunity and have failed to offer up any material evidence.
5) Defendants have explicitly been told the Federal Maryland District court was the venue, and they have spent their time fabricating a court record to what was the court record.
RDC has completed the requirements for an Ex Parte Hearing seeking injunctive relief and partial judgement on numerous counts.

Additional support for the declarations in District ECF 32-2 can be found in the subsequent pages, which include additional state court filings: (2) Request for Mandatory Judicial Notice Hearing on Material Facts; (3) Motion for Directed Verdict, Memorandum of Law in Support of Established Facts and Claims; (4) Affidavit of Factual Basis; and (5) Motion to Preserve Court Record.

In District ECF 18-0, at 20, The District Court denied the "Emergency Ex Parte Hearing", asserting: "[Ryan Dillon-Capps] motion fails because [he] has not provided the procedural prerequisites under FRCP 65(b)(1)".

In District ECF 27-0, at 1, The District Court denied Ryan Dillon-Capps Emergency Motion for Temporary Restraining Order and Preliminary Injunction (District ECF 25-2), and asserted: "The Court has previously denied a motion for a TRO filed by [Ryan Dillon-Capps], finding that [Ryan Dillon-Capps] had not provided the procedural prerequisites necessary for the Court to issue an ex parte TRO"

Judge Hurson's rulings are not only selectively descriptive but also strategically generalized and conclusory. As the author of these rulings the rulings

29

are crafted under his exclusive control, and thereby his omissions and framing reflect his intentions. Judge Hurson's pattern of vague and conclusory findings results in evading direct engagement with specific and contradictory evidence. Mirroring tactics repeatedly used by the other defendants for their similarly shared motive.

Judge Hurson's assertion that Ryan Dillon-Capps failed to meet the procedural requirements under FRCP 65(b)(1) is not only inaccurate, but an intentional and irreconcilable contradiction. The underlying record plainly shows that the necessary elements and factual support were presented, and his refusal to acknowledge them constitutes a deliberate misrepresentation of the record.

## B  Wet Signatures

On December 30, 2024, when Ryan Dillon-Capps challenged deficiency notices that claimed a lack of "wet signature," Baylee Wilson placed him on hold and later returned to confirm that Ryan Dillon-Capps has signed everything in the presence of the receiving Clerk, and those notices were voided. Later that same day, when the U.S. Marshal form for Victoria Hoffberger (District ECF 15-1) was filed, Ms. Wilson placed Ryan Dillon-Capps on hold and later returned to confirm it would be docketed.

On January 3, 2025, the Notice of Urgency was similarly flagged for lacking a "wet signature." This time, Ms. Wilson, unprompted, suggested that Mr. Dillon-

Capps speak with her supervisor. He accepted the offer and made clear during the conversation that he had no issue with Ms. Wilson's conduct. After Ryan Dillon-Capps explained to Ms. Wilson's supervisor that the filing did have a signature, she placed him on hold and returned to confirm the filing did have a signature. In explaining the repeating issue, Ms. Wilson's supervisor's explanation referenced the removability of signatures.

At the time, Mr. Dillon-Capps interpreted this explanation in a favorable light, believing it reflected a proactive effort to maintain the integrity of court records. In hindsight, however, the supervisor's comments were factually neutral and equally support potential misconduct. Following that interaction, Mr. Dillon-Capps began intentionally "smudging" his signatures and flattening digital files in alignment with his interpretation of the explanation.

Shortly after the phone call with Ms. Wilson's supervisor ended, Ryan Dillon-Capps logged into Pacer and found District ECF series 16 containing Exhibits 100-110 and 164-165 docketed with the notice of urgency docketed with the proposed order as District ECF 17-1 and 17-2.

Afterwards, Ryan Dillon-Capps did not experience similar issues, and the docketing of Judge Hurson's ruling on January 8 appears to be the last irregular entry in the District Court's record with respect to the Court Clerk's procedures. The January 8, 2025, ruling was not entered directly by Judge Hurson; instead, it

31

appears as a black-and-white scanned memorandum and order, supporting the conclusion that Judge Hurson was required to submit the ruling to the Court Clerk for docketing. Additionally, Ryan Dillon-Capps's *Notice of Appeal* was processed on the same day by Court Clerk Stephanie Savoy. See District ECF 36 and 37.

All known information available to Ryan Dillon-Capps uniformly supports the conclusion that the Court Clerks were attempting to lawfully fulfill their duties, and that these efforts were in conflict with the actions of another party. Mr. Dillon-Capps does not recall any explicit identification of that party. However, the only individuals known to have been involved at the relevant time are the receiving clerk, Baylee Wilson, Ms. Wilson's supervisor, Ms. Savoy, and Judge Hurson.

The Court Clerks' actions consistently support a conclusion that is incompatible with obstruction. In contrast, Judge Hurson's directive to Ms. Wilson not to docket the entire filing—without issuing an accompanying order—constitutes obstruction. Similarly, the invocation of "wet signature" deficiencies was used to obstruct the docketing of Ryan Dillon-Capps's filings. The reasonable conclusion is that Judge Hurson was likewise involved in the "wet signature" obstruction effort.

District v State – Deficient Filings

In District ECF 18-0, at 11-12, Judge Hurson misrepresented defendant Ensor's use of deficiency notices to intentionally obstruct specific exhibits and a

32

hearing, and at the same time was using "wet signatures" to similarly obstruct filings.

## C  Original Filing from December 27, 2024

## 1  Ordering Clerks to Omit Filings

Baylee Wilson informed Ryan Dillon-Capps that the decision not to docket the remainder of the December 27, 2024, filing came from "the judge." No formal order was ever docketed to reflect this decision. The only reasonable conclusion to be drawn from the absence of a docketed order is that the intent was to deprive Ryan Dillon-Capps of a meaningful opportunity to respond. There is nothing judicial about this act.

District v State - False Procedural Record

In District ECF 18-0, at 16, Judge Hurson dismissed the conspiracy claims while asserting it was "upon reviewing the complaint and all of its attachments". This is objectively misleading and creates a false procedural record.

In the state court proceedings, the employer's pleadings were used to dismantle the employer's case, and after two more filings the employer and attorney defendants had conceded that they had no standing. This didn't stop them from pursuing the lawsuit for months with conclusionary statements rejecting objective facts, supporting evidence, and applicable law and relying on the defendant Barranco's proclaimed outcome of the June 26-27 hearing. An outcome

33

that similarly contradicted the procedural record. See Appendix D – False Procedural Record.

## 2  District ECF series 1 and 3-8

Every docket entry in District ECF Series 1 and 3–8 has been individually analyzed and categorized into four columns, representing the method by which the documents were added to the Court record:

(1)   Documents scanned using a black-and-white multifunction copier/scanner in the Court Clerk's Office;

(2)   Documents scanned using a color multifunction copier/scanner believed to be operated by Judge Hurson;

(3)   Documents uploaded by Baylee Wilson from the signed physical CD submitted with the original filing;

(4)   Documents retrieved from a small trash bin, located in the Court Clerk's Office, and subsequently scanned using the same color multifunction copier/scanner believed to be used by Judge Hurson.

| | ECF | B/W Paper Scanned | Color Paper Scanned | (CD) Uploaded | From Trash |
|---|---|---|---|---|---|
| Complaint | 1-0 | 12:22 PM | | | |
| Cover Sheet | 1-1 | 12:22 PM | | | |
| Summons | 1-2 | | | X | |
| Personal Service | 1-3 | X | | | |
| Pretext | 1-4 | | | X | |
| Parties | 1-5 | | | X | |
| Coverup | 1-6 | | | X | |
| Counts | 1-7 | | | X | |
| Defendants | 1-8 | | | X | |
| Causes of Action | 1-9 | | | X | |
| M.Oppose Immunity | 1-10 | | | X | |
| Timonthy Allen | 1-11 | | | X | |
| Table Exhibits | 1-12 | | | X | |

34

| | | | | | |
|---|---|---|---|---|---|
| Meet & Confer | 3-1 | | | X | |
| Negotiate PO | 3-2 | | | X | |
| Negotiate (OLD) | 3-3 | | | | 1:20 PM BAH & AV |
| M.Support Judgement | 4-1 | | | X | |
| Judgement | 4-2 | | 1:22 PM | | |
| Judgement (OLD) STRIKEN | 4-3 | | | | X BAH |
| Joinder PO | 5-1 | | | X | |
| Joinder | 5-2 | | 1:21 PM | | |
| Hearing | 6-0 | 1:03 PM | | | |
| Hearing PO | 6-1 | 1:03 PM | | | |
| Affidavit CDC | 7-1 | | X | | |
| Affidavit RDC | 7-2 | | | X | |
| Affidavit Notice | 7-3 | | X | | |
| Electronic Notice | 8-0 | 2:29 PM | | | |

The objective facts, when aggregated with firsthand observations and document analysis, establish the following:

**Fact 1:** The black-and-white docketing timestamps range from 12:22 PM to 1:03 PM. This aligns with Ryan Dillon-Capps's direct observation of the receiving clerk scanning and docketing all items at that time.

**Fact 2:** The color-scanned docketing timestamps appear approximately 20 minutes after the initial black-and-white docketing was completed. These include documents submitted to the Court Clerk and others that were discarded in the Clerk's Office trash can.

**Fact 3:** The items retrieved from the trash can were nearly docketed during the process of providing "wet signatures." District ECF 3-3 bears no signature but does show a Court Clerk mark, while ECF 4-3 has a signature but no such mark. This supports the recollection of Ryan Dillon-Capps and the receiving clerk recognizing that older versions were about to be signed and docketed in place of their updated counterparts—prompting the decision to discard the outdated versions. Both discarded documents, ECF 3-3 and 4-3, bear Judge Hurson's case stamp ("BAH"), a logistical impossibility unless the documents had been retrieved from the trash and later scanned.

**FACT 4:** After the docketing process, the Court Clerk returned to his desk while Ryan Dillon-Capps waited for a hearing. At approximately the same time, both stood up. The Clerk, unprompted, told Ryan Dillon-Capps that he was "working on it" as he moved briskly in the direction of what appeared to be a judge's chambers. However, after the Clerk returned, the earlier sense of urgency and reassurance had vanished. Instead, his tone shifted, and he stated that he did not know if—or when—a hearing would take place that day.

**FACT 5:** The 2:29 PM timestamp on the <u>Consent by Self-Represented Litigant to Receive Notices of Electronic Filing</u> (District ECF 8) corresponds with a subsequent conversation between Ryan Dillon-Capps and the Court Clerk, during which the form was provided, completed, signed, and separately docketed.

36

**Fact 6:** On Monday, December 30, Baylee Wilson reviewed the court record and began docketing the following exhibits from the signed physical CD: ECF 1-2, 1-4 through 1-12, 3-1 through 3-2, 4-1, 5-1, and 7-2. These entries resulted in deficiency notices for ECF 3, 4, 5, and 7 (see District ECF 11–13). All of these were previously filed in paper form, and the receiving clerk had already processed them. Therefore, their absence from the record on December 30 is a logical impossibility—one that can only be explained by unauthorized alterations to the court record prior to that date.

## 3   District ECF series 16

Filed on December 27, 2024, but shown as docketed and dated January 3, 2025, the exhibits contained in District ECF Series 16 reflect significant discrepancies that strongly support the conclusion of intentional alteration. District ECF 1-12 (Table of Exhibits) provides corroborating support to the findings first derived from the physical and digital backup records:

(1)    **District ECF 16-0 (Exhibit 100):** Page 119 is missing, and page 118 is largely illegible;

(2)    **District ECF 16-8 (Exhibit 107):** While 226 pages were docketed, the original exhibit contained 268 pages. This exhibit includes several state court filings, and breakdowns are as follows:

    (a) Amended Affidavit of Plaintiff's Abusive Use of the Judicial System:

        (i)    Original: pp. 1–36; Exhibit B: pp. 37–48

        (ii)    Docketed: pp. 58–93; Exhibit B: pp. 215–226

    (b) Affidavit of Unauthorized Contractual Modifications:

       (i)      Original: pp. 49–84

       (ii)     Docketed: pp. 180–214

(c) <u>Affidavit of Bad Faith:</u>

       (i)      Original: pp. 85–145

       (ii)     Docketed: pp. 1–57 (missing pp. 34, 54, and 57–58)

(d) <u>Amended Affidavit for Motion to Assert Rights and Request for Immediate Rulings:</u>

       (i)      Original: pp. 146–159

       (ii)     Docketed: pp. 166–179

(e) <u>Motion to Assert Rights and Request for Immediate Rulings:</u>

       (i)      Original: pp. 160–203

       (ii)     Docketed: pp. 122–165

(f) <u>Affidavit for Sanctions with Exhibits 1–5:</u>

       (i)      Original: pp. 204–231

       (ii)     Docketed: pp. 94–121

(g) <u>Deposition Request for Agents of Ohana Growth Partners:</u>

       (i)      Original: pp. 232–268

       (ii)     Not docketed;

(3)   **District ECF 16-12 (Exhibit 109):** Pages 71, 116, 117, 118, and 119 are missing. This exhibit was refiled as *District ECF 31-2* on February 13, 2025;

(4)   **District ECF 16-13 (Exhibit 110):** Pages 29–65 were filed as pages 1–37, resulting in a misordered document. This error was corrected and refiled as *District ECF 32-2* on February 13, 2025; and

(5)   **District ECF 16-14 (Exhibit 164):** Pages 39 and 40 are missing.

      It is significant that District ECF Series 16 did not appear on the docket until after Ryan Dillon-Capps spoke with Court Clerk Baylee Wilson's supervisor on January 3, 2025. Furthermore, the docketed exhibits appear heavily degraded in quality—visibly distinct from the paper and digital backups. The degradation

appears consistent with intentional adjustments to brightness and contrast settings on the color scanner.

This discrepancy is even more pronounced when compared to previous filings scanned in full color, which did not exhibit these distortions. The selective extraction of certain pages, in combination with these alterations, leads to the inescapable conclusion that the changes were deliberate.

The court records show stamps from the receiving clerk and Judge Hurson. Notably, one of the documents retrieved from the trash does not bear the clerk's identifying stamp, but does include the stamp "BAH"—the initials of the Brendan A. Hurson. Furthermore, Baylee Wilson specifically identified "the judge" as the person who gave instructions not to docket the complete filing.

Accordingly, and consistent with the weight of all available evidence, Ryan Dillon-Capps reasonably concludes that Judge Brendan A. Hurson is responsible for the intentional alteration of documents submitted to the District Court on December 27, 2024.

Original Filing Conclusion

Regardless of whether portions of the filing were never added to the digital docket or were later removed, the distinction is immaterial. Once a filing is submitted to the Clerk and accepted for docketing, it becomes part of the official court record. Any act of preventing that filing from being entered into the digital

docket—or removing it after acceptance—constitutes an unlawful alteration of the court record in violation of 18 U.S.C. § 2071, which prohibits the concealment, removal, or mutilation of court records.

The introduction of documents retrieved from a trash receptacle into the official court record constitutes a knowingly false entry in violation of 18 U.S.C. § 1001, which prohibits making materially false statements or using false documents in matters within the jurisdiction of the federal government.

Moreover, the introduction of those discarded documents was not merely false but was done in furtherance of concealing or replacing the original filings. As such, this conduct constitutes a violation of 18 U.S.C. § 1519, which criminalizes knowingly falsifying or creating a document or record with the intent to obstruct, impede, or influence the investigation or proper administration of any matter within the jurisdiction of a federal agency or the courts. If the original documents and CD cannot be produced, this is further evidence of criminal misconduct under § 1519.

## VI Plausibility of Conspiracy

Ryan Dillon-Capps respectfully requests that this Court deny the motion to seal filed under District ECF 41-0. Moving forward, Mr. Dillon-Capps will reference District ECF 41-2.

## A  Self-Contained Irreconcilable Contradiction

In *District ECF 18-0*, Judge Hurson acknowledges the conspiracy claims multiple times across pages 14–16, stating that they are brought "against all defendants" and further identifying specific defendants while evaluating the plausibility of those claims. Yet, in the prior section addressing DaGonia II and Bernstine (pp. 12–13), the Court asserts that the causes of action against them are "unclear." This contradiction is immediately evident one page later (p. 14), where the Court states: "[Plaintiff] repeatedly references 'ongoing violations,' [but] these allegations are conclusory," followed by a direct quotation from Mr. Dillon-Capps describing "extensive efforts to notify Maryland officials and agencies of ongoing violations through formal submissions, email correspondence, and detailed documentation of procedural failure."

On that same page, the Court transitions into its analysis of the conspiracy claims, beginning with the statement: "[Plaintiff] alleges both federal and state conspiracy claims against all the defendants."

Over the course of just two pages, Judge Hurson shifts from asserting that the causes of action against DaGonia II and Bernstine are unclear, to making merit-based determinations about those same parties—quoting factual allegations that support claims under 42 U.S.C. §§ 1985 and 1986, and incorporating those individuals into the analysis of the broader conspiracy claims. Yet, barely two

41

pages later, Judge Hurson summarily dismisses all "conspiracy claim[s] under any of the federal statutes or state common law doctrines asserted" against a list of defendants that includes "professional ethics bodies." Notably, the dismissal of DaGonia II and Bernstine begins with the Court explicitly identifying their roles at the Attorney Grievance Commission and the Commission on Judicial Disabilities. See District ECF 18-0, at 12. The ruling is a self-contained irreconcilable contradiction.

Supporting statements for DaGonia II and Bernstein are found in and around District ECF 1-0, ¶¶ 59 and 80; District ECF 1-5, at 20-22; District ECF 1-6 contains a timeline of events surrounding the coverup; District ECF 1-7, at 63-68; See also Appendix B – AGC v Pierre; Appendix J – Civil Rights Conspiracy.

## 1  Judge Hurson's Plausibility

The District Court's ruling effectively rejected and vacated the state court's order granting the employer's voluntary dismissal, which had vitiated the underlying state action, and then recast Ryan Dillon-Capps as the state court loser. The Court engaged in a quasi-appellate review of the state court's decision— without having been asked to do so and despite lacking jurisdiction—and concluded that its reversal was more "plausible" than the objective record, which includes thousands of pages of evidence and the following well-pleaded factual allegations:

42

(10)   That the employer, attorneys, judges, court clerk, bar counsel, and the

director of investigation conspired to secure a mutually beneficial outcome

motivated by institutional self-preservation; and

(11)   That these actors effectuated this outcome by granting the employer's notice

of voluntary dismissal without prejudice, then altering the court record to

ensure that the official record no longer supported the substantive allegations.

## 2   New Venue, Old Tricks

The only material evidence submitted throughout five months of litigation

supports Ryan Dillon-Capps. The state court's rulings relied on conclusionary

rulings and procedural abuse, reciting boilerplate language such as: "based on

insufficient basis for relief," "insufficient legal or factual basis for the [r]elief

requested," "not a sufficient legal or factual basis for [the] relief requested," and

"[the] argument that there is 'no truth' to the [employer's] claims and that the

[employer's] suit is fraudulent… is contrary to the conclusions of the [June 26–27

hearing]." See District ECF 16-5, at 19, 54, 56–58, 65.

When Defendant Stringer's ruling to grant voluntary dismissal was docketed

on November 6, 2024, the state action was vitiated under Maryland law,

eliminating any legal basis for further rulings by Stringer or Robinson Jr.

Nonetheless, they continued issuing rulings into December. See Appendix E –

Fraudulent Lawsuit. Similarly, Judge Hurson declared that he lacked subject matter

43

jurisdiction, yet also continued to issue rulings. Hurson and the defendants' rulings are not about their legal value; they are about the self-serving words they wrote down, and all they have done is add to the thousands of pages of evidence against them. Judge Hurson's contribution will now result in him joining the defendants' list with a fast track to an orange jumpsuit.

## B  Standard for Allegations

The methodology used by Ryan Dillon-Capps to identify Bernstine and the Office of Bar Counsel as defendants also deliberately excluded other state actors who were not named, as the original complaint focused exclusively on active participants. As reflected throughout this amended informal brief, Mr. Dillon-Capps applies decades of experience in deductive reasoning and logical analysis to follow the factual record to its natural conclusions.

The standard that Ryan Dillon-Capps applies to making a formal allegation requires more than a sufficiently supported conclusion of wrongdoing. Before making any allegations, Ryan Dillon-Capps looks for malice to be factually supported in those conclusions—requiring that a person was well-informed in the performance of their actions or inactions. Everyone makes mistakes, and there is no justice to be found in the logical fallacy of "an eye for an eye."

As demonstrated in District ECF 1-8, at 2, additional §1986 defendants are identified under the designation "State of Maryland," though not named

44

individually. Some of these individuals are identified by name in Exhibit 16-6, at pages 1 through 27. Their failure to take action to prevent the ongoing conspiracy to interfere with Ryan Dillon-Capps's civil and federal rights provides clear support for their inclusion under §1986 claims. In addition, 2025 communications with the Maryland Attorney General's Office introduce another individual by name and offer further support for the §1986 claims against both the Maryland Office of the Attorney General and the Attorney General of Maryland—claims that continue to be reserved in the hope that state-level negotiations may offer an alternative path. See Appendix F – State Level Negotiations; Appendix G – Special Master and Magistrate Judge; Appendix I – State of Maryland;

## C  Independent Validation of Claims

### 1  Maryland Rules for Bar Counsel

Maryland Rule 19-703(a), "Appointment. Subject to the supervision and approval, if required, of the Commission". Maryland Rule 19-703(b), "Powers and Duties. Subject to the supervision and approval, if required, of the Commission, Bar Counsel has the powers and duties to": "(1) investigate professional misconduct or incapacity on the part of an attorney"; and "(8) initiate, intervene in, and prosecute actions to enjoin the unauthorized practice of law".

Maryland Rule 19-711(b)(1)-(2) "Bar Counsel shall make an inquiry concerning every complaint that is not facially frivolous, unfounded, or

45

duplicative" and "If Bar Counsel concludes that a complaint is without merit, does not allege facts which, if true, would demonstrate either professional misconduct or incapacity, or is duplicative, Bar Counsel shall decline the complaint and notify the complainant".

Maryland Rule 19-711(b)(6) "If Bar Counsel concludes that a civil [] action involving material allegations against the attorney substantially similar or related to those alleged in the complaint is pending in any court of record in the United States… Bar Counsel, with the approval of the Commission, may defer action on the complaint pending a determination of those allegations in the pending action []. Bar Counsel shall notify the complainant of that decision".

Maryland Rules are clear that the Bar Counsel:
(1)     has powers and duties pursuant to their appointment;
(2)     has a duty to investigate attorney misconduct;
(3)     is required to make an inquiry into every complaint that is not frivolous;
(4)     is required to decline complaints that lack merit and notify the complainant that it has been declined; and
(5)     has discretionary power to defer action on the complaint, with approval of the Commission, when the material allegations are substantially similar or related to the allegations of the complaint and are now involved in a Civil Action in court of record in the United States.

## 2   Formal Complaints with Professional Ethics Bodies

Separate complaints were filed just days apart with the Attorney Grievance Commission and the Commission on Judicial Disabilities. The substance of both

46

complaints centered on the first two interrelated conspiracies. The result of those filings led to the formation of a third conspiracy. The filing of this federal lawsuit has now revealed a fourth:

**Conspiracy 1:** The employer and attorney-defendants conspired to file a fraudulent lawsuit against Mr. Dillon-Capps in an effort to shield themselves from liability for individual and collective misconduct.

**Conspiracy 2:** The attorney, judge, and clerk defendants conspired to deprive Mr. Dillon-Capps of his civil and federal rights in furtherance of the employer-led conspiracy.

**Conspiracy 3:** The Bar Counsel and Director of Investigations conspired with the County Administrative Judge—and the County Administrative Judge further conspired with the judge and clerk defendants—to cover up the misconduct of the other defendants and shield themselves from accountability.

Director Bernstein

From District ECF 16-6, at 28–31, it is evident that Tanya C. Bernstein received Mr. Dillon-Capps's formal complaint to the Maryland Commission on Judicial Disabilities, submitted on October 8, 2024. In her response dated October 11, 2024, Director Bernstein concluded that the allegations against an "unknown judge" did not "constitute a meritorious complaint that should be pursued because

47

they are factually unfounded." However, Bernstein's letter is irreconcilably flawed for several reasons:

(1)     The complaint explicitly references "each judge," whereas Bernstein's letter improperly narrows the allegations to a single "unknown judge";
(2)     It is a logical impossibility to make a meritorious determination about an "unknown" individual;
(3)     The referenced <u>Motion to Compel</u> contains a table listing each judge by name, as shown in District ECF 16-6, at 3–6, where the table is also included in an email to another agency.

<u>Bar Counsel DaGonia II</u>

On October 4, 2024, Ryan Dillon-Capps filled in a formal complaint with the Maryland Attorney Grievance Commission. District ECF 16-6m at 34-37.

On October 7, 2024, The Office of Bar Counsel notified Ryan Dillon-Capps they were processing the complaint. District ECF 16-6, at 38.

On October 23, 28, and November 4, Ryan Dillon-Capps replied to the email thread, which included several attachments to provide additional information and a plea for DaGonia II to use his injunctive power under Maryland Rule 19-732(g). District ECF 16-6, at 39-42.

On January 22, 2025, Assistant Bar Counsel, W. Hunter Daley confirmed receipt of the three unanswered emails, and attached letters for the investigation into defendants Duvall, Frenkil, Butler, and Hoffberger. (not docketed)

On February 20, 2025, Assistant Bar Counsel W. Hunter Daley informed Ryan Dillon-Capps that counsel for defendants Brennen, Duvall, Frenkil, Butler,

48

and Hoffberger had submitted responses to the complaint, and that the Office of Bar Counsel was deferring its investigation pending the outcome of District Court Case No. 24-CV-3744-BAH. The complaints remain open, with no further action to be taken until Ryan Dillon-Capps and counsel for the defendants notify the Office of Bar Counsel that the District Court litigation has concluded. District ECF 4-2.

Applying the applicable Maryland Rules governing Bar Counsel, the Office of Bar Counsel has taken the official position that—after investigating the complaint and affording the attorney-defendants an opportunity to respond—it determined that the complaint remains meritorious. While the next step would ordinarily be formal proceedings before the Attorney Grievance Commission, the Bar Counsel has chosen to defer further action pending the outcome of the litigation in this District Court.

## D  Meritorious Conclusions

This section does not present an exhaustive account of all facts and allegations. However, taken together, the facts presented support the following claims under the federal civil rights statutes:

Claims under **42 U.S.C. § 1983** against the employer, attorney, clerk, and judge defendants. All conspirators acting on the belief that they could achieve their objectives by depriving Ryan Dillon-Capps of his civil and federal rights;

49

Claims under **42 U.S.C. § 1985** for conspiracy against the employer, attorney, clerk, judge defendants, and Bernstine. All conspirators are members of a coordinated effort to interfere with Ryan Dillon-Capps's civil and federal rights; and

Claims under **42 U.S.C. § 1986** for failure to prevent civil rights violations, asserted against the attorney, clerk, and judge-defendants, DaGonia II, and Bernstine. All conspirators had knowledge of a conspiracy to interfere with Ryan Dillon-Capps's civil and federal rights, and either had the power to prevent it or the power to aid in its prevention, yet failed to act.

Furthermore, District ECF 1-8, at 2, references additional § 1986 defendants under the designation "State of Maryland." Several of these individuals are named in Exhibit 16-6 (pp. 1–27). Their failure to act to prevent the ongoing conspiracy constitutes further evidence supporting § 1986 liability. Communications with the Maryland Attorney General's Office in 2025 also identified additional individuals whose involvement supports § 1986 claims against both the Office of the Attorney General and the Attorney General of Maryland.

Accordingly, Judge Hurson's dismissal of the conspiracy claims as "implausible" (District ECF 18-0, at 14–17)—and his assertion that the allegations "do not plausibly rise to the level" of a conspiracy—stand in irreconcilable contradiction to the investigative findings of the Office of Bar Counsel and to the

50

factual record as a whole. These statements reflect not only self-serving conclusions but also an intentional misrepresentation of the legal and factual issues raised in this case.

It is neither reasonable nor legally sufficient to assume the misconduct has ceased or will cease absent an injunction. See Appendix J – Civil Rights Conspiracy; See also District ECF 1-6 (timeline); 1-5 (parties); 1-7 (counts); 16-5 (rulings); and 16-6, at 28-33 (communications).

## VII    Judge Hurson's Mandatory Disqualification

After conclusively establishing Judge Hurson's misconduct through the evidence and arguments presented, Ryan Dillon-Capps turned to identifying the structural and relational factors that necessitated Hurson's disqualification from the outset. The following section presents publicly documented affiliations and relationships that—when measured against federal standards—require mandatory judicial disqualification. The evidence provided herein establishes, beyond any reasonable question, that Judge Hurson was legally and ethically obligated to recuse himself from this case and was barred from proceeding by waiver.

## A  Federal Board Association – Maryland Chapter (Exhibit 201)

As shown in Exhibit 201:

(1)     Robert S. Brennen served as President-Elect of the Federal Bar Association

        (FBA) – Maryland Chapter for the 2022–2023 term and was the Editor of its

        newsletter (p.1);

(2)     District Judge Stephanie A. Gallagher served as a Board Member of the

        same chapter and participated on a three-person panel focused on discovery and

        electronically stored information (p.1, 14);

(3)     Then-Magistrate Judge Brendan A. Hurson participated in the "Fireside

        Chat" series hosted by former FBA Chapter President Gatewood (p.16);

(4)     On September 25, 2021, the Maryland Chapter was honored at the FBA

        Convention, where Robert "Bob" Brennen accepted two awards on the

        Chapter's behalf: the Chapter Activity Presidential Achievement Award and the

        Meritorious Newsletter Award (p.17);

(5)     On May 20, 2022, at the FBA Maryland Chapter's Annual Luncheon, Judge

        Hurson was listed among the honorees, and photographs show Brennen

        welcoming and celebrating attendees (p.16, 18).

(6)     On May 19, 2023, while serving as FBA Maryland Chapter President,

        Robert Brennen honored James P. Ulwick of Kramon & Graham during that

        year's annual luncheon (p.20–21);

(7)     On October 11, 2023, Brendan A. Hurson was sworn in as a United States

        District Judge for the District of Maryland and assigned to the Baltimore

52

courthouse, following March 21 nomination, October 4 confirmation, and October 6 commission earlier that year (p.37);

(8)     On March 1, 2024, Brennen—by then the "immediate past president" of the Chapter—served as master of ceremonies for the Annual Introductions to Federal Practice Program (p.25). Judge Hurson presided over the admission ceremony for newly admitted members of the District's bar (p.26), and a photograph from the event shows Brennen engaging with attendees(p.26);

(9)     On April 12, 2025, a photograph posted to Robert Brennen's LinkedIn profile from the 2025 Annual Luncheon depicts Brennen standing with Ezra Gollogly of Kramon & Graham. The post describes Gollogly as the "immediate past chapter president" and Brennen as the "immediate past immediate past chapter president" (p.36).

**B  University of Maryland Francis King Carey School of Law (Exhibit 202)**
    As reflected in Exhibit 202,

(1)     **Defendant Marc A. DeSimone Jr.** graduated from the University of Maryland Francis King Carey School of Law in 2004. Since 2007, he has served as an adjunct professor and lecturer of law. He was appointed to the Baltimore County Circuit Court in December 2023 (pp. 1–2);

(2)     **Defendant Holly Drumheller Butler** graduated from the same institution in 1997 and currently serves as an adjunct professor (pp. 3–4). She was named to

53

the *Daily Record*'s 2023 Top 100 Women in Maryland list in March 2023 (p. 6);

(3)    **Defendant Michael S. Barranco** earned his law degree from the University of Maryland Francis King Carey School of Law in 1985 and was appointed to the Baltimore County Circuit Court in September 2022 (p. 5);

(4)    **Defendant Dennis M. Robinson** earned his law degree from the University of Maryland Francis King Carey School of Law in 2002, appointed to the Baltimore County Circuit Court in 2016, and then appointed to County Administrative Judge for the Circuit Court for Baltimore County in 2023 by Chief Justice Fader (pp. 9-10); and

(5)    **Judge Brendan A. Hurson** graduated from the University of Maryland Francis King Carey School of Law in 2005. He was nominated to serve on the United States District Court for the District of Maryland in March 2023 and delivered the keynote address at the law school's 2024 commencement (p. 9).

Mandatory Disqualification

Under 28 U.S.C. § 455, Judge Hurson was not only required to disqualify himself due to the appearance of partiality, but was also statutorily prohibited from continuing the case by waiver. His failure to recuse constitutes a clear violation of judicial ethics and a fundamental breach of due process. While his overlapping institutional affiliations alone would warrant disqualification, the record goes

54

further—establishing direct, ongoing, and professionally intertwined relationships between Judge Hurson and key defendants, most notably Robert S. Brennen. These relationships are not incidental; they reflect mutual visibility, shared leadership roles, and recurring collaboration within professional networks that are central to the facts of this case. As a result, Judge Hurson's impartiality is not merely in question—it is irreparably compromised.

Given the pervasive nature of these entanglements, it is unlikely that any judge within the Northern or Southern Divisions of the District of Maryland would remain untainted by similar conflicts. This reality further underscores the need for immediate intervention, reassignment to an unconflicted district, and corrective action to restore the integrity of these proceedings.

## VIII   Maryland Judicial Election Process

Based on recently discovered evidence, Ryan Dillon-Capps believes that he may need to expand the scope of the allegations to claims potentially arising under the First, Fourteenth, and Twenty-Sixth Amendments to the United States Constitution for the defendants' violations of his voting rights.

The State of Maryland's interpretation of Article IV of the Maryland Constitution is depriving registered voters of their federal and state constitutional rights. It appears to be directly connected to the same underlying systemic corruption that the Office of Bar Counsel has found to be meritorious, and which

55

Judge Hurson has so aptly demonstrated is not confined to the state judiciary and professional oversight bodies.

## A  Barranco and DeSimone Jr.

<u>Maryland State Bar Association</u>

On January 1, 2023, the Maryland State Bar Association (MSBA) reaffirmed its endorsement of sitting judges, including Michael S. Barranco and Marc A. DeSimone, Jr., for the upcoming November 5, 2024, general election. The MSBA asserted that its endorsement was "based on merit" and "grounded in its commitment to a judiciary comprising individuals of outstanding character, integrity, judicial temperament, and expertise" (Exhibit 200, at 1–2).

However, as the facts established in this case demonstrate, the MSBA's endorsement of Defendants Barranco and DeSimone Jr. was not based on merit. Issuing such an endorsement nearly two years before the election, and prior to meaningful public evaluation of their judicial performance, cannot reasonably be concluded to have been done for a legitimate purpose.

Former graduates of University of Maryland Francis Kink Carey School of Law and Maryland State Bar Association leaders include:

(1)    Dennis M. Robinson Jr.('02) is a former co-chair of the MSBA Judicial Appointment Committee (Exhibit 202, at 10-11).

(2)   M. Natalie McSherry('74) became the 125th President of the MSBA on June

11, 2021, served on the Maryland Bar Foundation since 1984, and served on the

foundation's Board of Directors from 2011 to 2021 (Exhibit 200, at 51-52).

## Barranco and DeSimone Jr. Campaign Website

Defendants Barranco and DeSimone Jr.'s campaign website begins by

posing the question: "People often wonder why these judges are running for an

election." It then answers by attributing their candidacy to exceptional standards of

legal aptitude and a determination that they are "most distinguished for integrity,

wisdom, and sound legal knowledge, as dictated by the Maryland Constitution" (p.

4).

## Michael S. Barranco

Judge Barranco's campaign profile claims that he has a "proven track record

on the bench" (Exhibit 200, at 5), highlights his 37 years as an accomplished

litigator (Exhibit 200, at 6), and cites accolades such as the 2021 J. Earle Plumhoff

Award for integrity, dignity, and civility, as well as his election as a lifetime

Fellow of the Maryland Bar Foundation for demonstrating outstanding dedication

to the honor and integrity of the legal profession (Exhibit 200, at 6). The profile

further asserts that he merits voter support because he was appointed by the

governor (Exhibit 200, at 7). However, as this case demonstrates, while Judge

57

Barranco may indeed have a proven track record on the bench, it is not for the qualities he claims to embody.

## Marc A. DeSimone Jr.

DeSimone Jr.'s profile says he went to Maryland Carey Law School, is a lecturer of law and director of the moot court program for Maryland Carey Law School, was recognized as Adjunct Professor of the Year for Maryland Carey Law School, and was named Best Oralist for the 2003 Morris B. Meyrowitz Moot Court Competition. Defendant DeSimone Jr. was also recognized as the Volunteer of the Year by United Cerebral Palsy of Central Maryland, received Baltimore's Dr. Martin Luther King, Jr. Diversity Recognition Award from the University of Maryland, and was the recipient of the Benjamin L. Cardin '67 Public Service Award from Maryland Carey Law (Exhibit 200, at 9–10).

One of DeSimone Jr.'s victims has Cerebral Palsy, but he does appear to be very popular with the University of Maryland Francis King Carey School of Law.

## One Too Many Candidates

The AFRO's political writer published an article about the 2024 election cycle which, after naming defendants Barranco and DeSimone Jr. in the opening sentence, proceeds for the next three pages without offering a single favorable remark about either of them. The May 1, 2024, article provides multiple reasons for endorsing the two other candidates in the race and ultimately concludes by

58

noting that judicial races are typically uncontested—but this year, the fifth candidate, Robert Daniels, is one more than there are seats available. (Exhibit 200, at 12)

## B  Rob Daniels

"The running joke in Baltimore County is that sitting judges on the Circuit Court have no judicial challengers" (Exhibit 200, at 13). This is because partisan primary elections are being used to reduce the number of nominees to match the number of available seats in the general election, after which the judges are "elected" to 15-year terms (Exhibit 200, at 14–15).

Daniels points out that the Baltimore County Sitting Judges Campaign Committee's phrase "the experience we need to keep" and the claim that they possess "the judgment we can trust" are being applied to DeSimone Jr. and two other sitting judges who had only been elevated to the bench a little over three months prior to the May 2024 article (Exhibit 200, at 16). Daniels, by contrast, has over 20 years of legal experience—more than DeSimone Jr. and more than the two candidates endorsed by AFRO's political writer—and he further notes that, for the first time in more than 20 years, none of the four judges are being endorsed by the Baltimore County police officers (Exhibit 200, at 16–17).

The Republican Women of Baltimore County's article describes Daniels's campaign as being supported by grassroots organizations and substantive

59

messaging. It also asserts that the campaign literature produced by the Baltimore County Sitting Judges Campaign Committee has been described as "cartoonish." Nevertheless, the committee provided the four judges with approximately $400,000 in campaign funds, of which about $360,000 remained available as of January 2024 (Exhibit 200, at 19). Daniels and the Republican Women of Baltimore County are relying on Governor West's bold promises that the 2025 General Assembly will introduce legislation to reform the judicial nomination process (Exhibit 200, at 20).

## C  Marylin Pierre

Ms. Pierre ran in the 2018 and 2022 primaries but did not receive enough votes to advance to the general election. However, in 2020, she secured sufficient support to be placed on the general election ballot—a de facto win in Maryland, where general elections for judgeships are incapable of yielding an alternative outcome (Exhibit 200, at 21).

Subsequently, a Republican Party chairman "revealed" that Pierre had courted and donated to the GOP, despite running as a progressive in September. A month later, a campaign volunteer "inaccurately claimed" that she was a judge. In response to this "inaccurate claim," the sitting judges obtained a temporary restraining order against Pierre. Pierre, in turn, accused the sitting judges of attempting to smear her. In order to legitimize their abuse of the injunction, the

60

former Bar Counsel received a complaint, and a year after the general election, the Attorney Grievance Commission of Maryland filed a petition for disciplinary action against Ms. Pierre on November 30, 2021 (Exhibit 200, at 21–22).

After a year-long "investigation," they identified a 1999 application for admission to the New York Bar containing a good faith error. The issue stemmed from a failure to appear in response to a summons due to hospitalization, which Ms. Pierre later addressed without any further action being taken. The Bar Counsel also cited a campaign tweet in which Ms. Pierre described the sitting judges as "an in-group," noting that most had worked at the same law firms, attended the same churches, or were related by marriage (Exhibit 200, at 22–25). See also Exhibit 200, at 26–29.

Ryan Dillon-Capps cannot confirm whether the defendants attend the same church, but notes that Michael Barranco stated he had lived in Maryland his entire life, and that both he and his father volunteered with the Lutherville Volunteer Fire Department (Exhibit 200, at 5–7). Lutherville is not a large area, and Defendant Norris is approximately one year older than Barranco. Ryan Dillon-Capps recalls Norris stating that his childhood home was in the same general area. If Ms. Pierre's claim is that there is "an in-group" with longstanding familial and community ties, then that assertion appears far more plausible than the Supreme Court of Maryland's decision to support both the injunction and the Bar Counsel's petition.

61

Endorsed by Progressive Maryland, Progressive Neighbors, Progressive Legacy, NARAL Pro-Choice Maryland PAC, the Association of Black Democrats of Montgomery County, Our Revolution Maryland, Our Revolution MoCo, MoCo Students for Change, and Mayor Jeffrey Slavin, Ms. Pierre brought 30 years of experience to her campaign. She is a three-time recipient of Maryland's Top 100 Women Award and the winner of numerous other community service and pro bono honors. Ms. Pierre publicly asserted that her opponents repeatedly attempted to smear her. She also stated that no one contacted her campaign to inform them that a volunteer had misspoken, and instead chose to weaponize litigation as a tool of harassment and intimidation (Exhibit 200, at 26-27). To the best of Ryan Dillon-Capps's knowledge, these claims have never been refuted.

By the time the case reached the Supreme Court of Maryland, the former Bar Counsel claimed that Ms. Pierre had misrepresented her experience. However, the court records were internally inconsistent, and the burden of proof was improperly shifted to Ms. Pierre—despite the absence of any contradictory fact supported by evidence. Just before oral arguments in 2023, the state courts suddenly produced material that supported the Attorney Grievance Commission's claims, and this case provides a plausible explanation for how that transformation of the court record may have occurred. See Appendix B – AGC v. Pierre.

Attorney Goodell DeVries's publishes <u>AGC v Pierre: The Ethics of Election Interference</u> on October 25, 2023, with a professionally tempered opinion adverse to the Maryland Supreme Court reprimand of Marylin Pierre and the former Bar Counsel's handling of a complaint filed two months prior to the 2020 election by one of the sitting judges (Exhibit 200, at 30-31). See also Att'y Grievance Comm'n of Maryland v. Pierre, 485 Md. 56 (2023), cert. denied, 144 S. Ct. 824, 218 L. Ed. 2d 31 (2024).

## D  2024 Preliminary

Ms. Pierre's 2020 electoral victory resulted in a three-year smear campaign. Robert Daniels's 2024 campaign turned out like Ms. Pierre's 2018 and 2022 campaigns, and the general election was held with four candidates for four seats (Exhibit 200, at 32–40). Mr. Daniels spent months pushing for Governor West's promises in the form of Senate Bill 630 and House Bill 778, adding to over seventy-five previous bills that had been introduced since the 1980s. The House and Senate hearings acknowledged a former judge who had won the judgeship and replaced the sitting judge, but who was removed from the bench three years later for "egregious misconduct." Hours later, Claudia Barber testified that the judicial nomination committee and the legal establishment are clubby, political, and cliquish. Barber has firsthand experience, having run for a judgeship in 2016, 2018, and 2024 in the Anne Arundel Circuit Court (Exhibit 200, at 41–44).

Anne Arundel County Administrative Judge Shaem C.P. Spencer was appointed in 2022 by Chief Justice Matthew Fader, and also graduated from the University of Maryland School of Law, Class of 1997 (Exhibit 200, at 53-54).

The Maryland Supreme Court Chief Justice, Matthew Fader, stated that the bills were intended to increase public trust and confidence in the judiciary (Exhibit 200, at 46–47). However, just a month later, the Senate decided to simply "put it in the drawer," and without a corresponding Senate bill, the House version was similarly "tucked away for now" (Exhibit 200, at 48). Had the legislation advanced, the measures would have appeared on the 2026 ballot, giving voters the opportunity to decide whether they wanted a judicial electoral process designed to enhance transparency and accountability through contested elections (Exhibit 200, at 48–49).

## E  2024 Judicial Election & Unconstitutional Judicial Elections

<u>Judicial elections; term of office; retirement</u>

> **Md. Const. art. IV, § 3,** in relative part: [T]he Judges of the several Courts, subject to the provisions of Section 5 of this Article of the Constitution, be elected in Baltimore City and in each county, by the qualified voters of the city and of each county, respectively, all of the said Judges to be elected at the general election to be held on the Tuesday after the first Monday in November, as now provided for in the Constitution. Each of the said Judges shall hold the office for the term of fifteen years from the time of the election, and until the Judge's successor is elected and qualified, or until the Judge shall have attained the age of seventy years, whichever may first happen, and be reeligible thereto until the Judge shall have attained the age of seventy years, and not after.

## Vacancy in Office of Circuit Court Judge

> **Md. Const. art. IV, § 5:** Upon every occurrence or recurrence of a vacancy through death, resignation, removal, disqualification by reason of age or otherwise, or expiration of the term of fifteen years of any judge of a circuit court, or creation of the office of any such judge, or in any other way, the Governor shall appoint a person duly qualified to fill said office, who shall hold the same until the election and qualification of his successor. His successor shall be elected at the first biennial general election for Representatives in Congress after the expiration of the term of fifteen years (if the vacancy occurred in that way) or the first such general election after one year after the occurrence of the vacancy in any other way than through expiration of such term. Except in case of reappointment of a judge upon expiration of his term of fifteen years, no person shall be appointed who will become disqualified by reason of age and thereby unable to continue to hold office until the prescribed time when his successor would have been elected.

## Judicial Qualification

> **Md. Const. art. IV, § 2** The Judges of all of the said Courts shall be citizens of the State of Maryland, and qualified voters under this Constitution, and shall have resided therein not less than five years, and not less than six months next preceding their election, or appointment, as the case may be, in the city, county, district, judicial circuit, intermediate appellate judicial circuit or appellate judicial circuit for which they may be, respectively, elected or appointed. They shall be not less than thirty years of age at the time of their election or appointment, and shall be selected from those who have been admitted to practice Law in this State, and who are most distinguished for integrity, wisdom and sound legal knowledge.

> **13 M.L.E. Judges § 3:** Judges under the State Constitution must be citizens of the State of Maryland, qualified voters under the Constitution, and residents in the state for not less than five years, and a resident in the judicial circuit for which they are elected or appointed for not less than six months before their election or appointment.

Justices of the Court of Appeals must be residents of their respective appellate judicial circuits, one judge of the court of special appeals must be a resident respectively of each of the appellate judicial circuits, while a judge of a circuit court must be a resident of the county in which the judge holds office. If a circuit court judge changes residence to a county resulting in the failure to satisfy the residency requirement of the State Constitution, the judge's actions are as valid and effectual as if the judge were an officer de jure until the judge's title to the office is judged insufficient, where the judge's actions concern the public or the rights of third persons.

As to the Court of Special Appeals, the qualified voters of each judicial circuit are entitled to elect one judge each who is a resident of their circuit, with the remaining judges to be elected from residents of the entire state by its qualified voters.

Judges under the State Constitution must be not less than 30 years of age at the time of their election or appointment and are to be selected from those who have been admitted to practice law in the state who are most distinguished for integrity, wisdom, and sound legal knowledge. The constitutional provision requiring that a judicial candidate be "admitted to practice Law in this State" requires only that a judicial candidate be a member of the Bar of Maryland. Judges must be United States citizens.

In Ademiluyi v. Maryland State Bd. of Elections, 458 Md. 1 (2018), the

Maryland Court's held

(1)    **Id., at 45-56:** "Art. IV, § 5's use of the phrase "duly qualified" refers to the

individual's eligibility for judicial office and whether that individual satisfies

the requirements set forth in Art. IV, § 2, whereas Art. IV, § 5's use of the word

"qualification" means taking the oath of office, and does not mean determining

whether the individual meets the applicable eligibility requirements.";

(2)    **Id., at 10:** "Generally speaking, a "commission" is "[a] warrant or authority,

from the government or a court, that empowers the person named to execute

official acts[.]" *Commission*, Black's Law Dictionary (10th ed. 2014). Art. IV, §

66

11 of the Constitution of Maryland, concerning certification of judicial election results, provides, in pertinent part, that "[t]he election for Judges ... shall be certified, and the returns made ... to the Governor, who shall issue commissions to the different persons for the offices to which they shall have been, respectively, elected[.]" Thus, in Maryland, the Governor issues a commission to an individual who is elected to the position of judge, which empowers that individual to serve as a judge."

(3)   **Id., at 13:** "The Commission is empowered to, among other things, "[i]nvestigate complaints against any judge of" any Maryland court. Md. Const., Art. IV, § 4B(a)(1)(i). A judge commits "sanctionable conduct" where the judge engages in "misconduct while in office, the persistent failure by a judge to perform the duties of the judge's office, or conduct prejudicial to the proper administration of justice[,]" or where the judge violates "any of the provisions of the Maryland Code of Judicial Conduct[.]" Md. R. 18–401(j)(1)";

(4)   **Id., 30:** EL § 12–202(b) provides "a statutory limitations period" in which an election claim must be filed. Id. at 485, 153 A.3d at 154. The purpose of EL § 12–202(b), the statute of limitations for election claims, is to ensure that "any claim against a [S]tate electoral procedure [is] expressed expeditiously, [and] without unreasonable delay, so as to not cause prejudice to the defendant."

67

Liddy v. Lamone, 398 Md. 233, 245, 919 A.2d 1276, 1284 (2007) (cleaned up)."

> **Md. Code Ann., Elec. Law § 12-202:** (a) If no other timely and adequate remedy is provided by this article, a registered voter may seek judicial relief from any act or omission relating to an election, whether or not the election has been held, on the grounds that the act or omission: (1) is inconsistent with this article or other law applicable to the elections process; and (2) may change or has changed the outcome of the election. (b) A registered voter may seek judicial relief under this section in the appropriate circuit court within the earlier of: (1) 10 days after the act or omission or the date the act or omission became known to the petitioner; or (2) 7 days after the election results are certified, unless the election was a gubernatorial primary or special primary election, in which case 3 days after the election results are certified.

## 1  Judicial Election Claim

It cannot be said that Ryan Dillon-Capps failed to raise concerns regarding the actions of Barranco and DeSimone Jr. in the Circuit Court for Baltimore County, including challenges to their lack of integrity, wisdom, and sound legal judgment. In Ademiluyi v. Maryland State Bd. of Elections, 458 Md. 1, 46 (2018), the Maryland Court held that there was nothing to establish that the judge engaged in wrongful conduct that prevented the appellant from asserting her election claims. This case exists precisely because of the wrongful conduct that prevented Ryan Dillon-Capps from having his claims adjudicated in a timely manner.

## 2  Unconstitutional Judicial Elections Claim

In Kadan v. Bd. of Sup'rs of Elections of Baltimore Cnty., 273 Md. 406, 413–14, 329 A.2d 702, 706–07 (1974), the Maryland Court held:

68

It is stated in 16 Am.Jur.2d Constitutional Law s 64 (1964): The fundamental principle of constitutional construction is that effect must be given to the intent of the framers of the organic law and of the people adopting it. This is the polestar in the construction of constitutions. A constitutional clause must be construed reasonably to carry out the intention of the framers, and should not be construed so as to defeat the obvious intent if another construction equally in accordance with the words and sense may be adopted which will enforce and carry out the intent. The intent must be gathered from both the letter and spirit of the document, the rule being that a written constitution is to be interpreted in the same spirit in which it was produced. The court should put itself as nearly as possible in the position of the men who framed the instrument.

'Wherever the purpose of the framers of a constitution is clearly expressed, it will be followed by the courts. If the terms of a constitutional provision are not entirely free from doubt, they must be interpreted as nearly as possible in consonance with the objects and purposes in contemplation at the time of their adoption, because in construing a constitutional provision, its general scope and object should be considered.'

The Maryland Court has clearly held that it understands what qualified means when applied to judicial elections, and how the Maryland Constitution should be interpreted.

In Anderson v. Celebrezze, 460 U.S. 780, 788–90 (1983), the Supreme Court held that substantial regulations of elections are a practical necessity to ensure a fair and honest democratic process, and that States enact comprehensive election codes to achieve those objectives. These regulations may inevitably affect an individual's right to vote, but such burdens are generally justified as nondiscriminatory. Thus, constitutional challenges cannot be resolved by a litmus-paper test, but instead require an analytical process similar to ordinary litigation—first examining the character and magnitude of the injury to First and Fourteenth

69

Amendment rights, then identifying and evaluating the precise state interests asserted as justification. "In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional." (language paraphrased and reordered, internal quotation marks and alterations omitted).

The State of Maryland has enacted House Bill 44 during the 2025 legislative sessions and goes into effect on October 1, 2025. The bill is a preemptive defense to challenges against the intentional blocking of independent voters by allowing independent voters to participate in future primary judicial elections, but this is a cosmetic change that has no genuine effect on the final outcome of judicial elections.

As shown in Exhibit 200 on page 55, The Maryland State Board of Elections webpage on primary elections says:

> **What is a party primary election?** The Democratic and Republican Parties are required to use primary elections to choose their candidates for the general election. Although it is up to the parties to decide who may vote in their primaries, generally only registered voters affiliated with the Democratic or Republican Parties may vote in that party's primary election.
> **Can I vote in a party primary election?** Generally, you must be registered with either the Democratic or Republican Party to vote in the primary election. If there are non-partisan offices that are elected in a primary election (i.e., school board), any voter can vote for these offices. Contact your elections.

70

> **May I change political parties?** local board of Yes, except after the close of advanced voter registration, until voter registration opens up again after an election. To change your party affiliation, use submit a new Maryland's Online Voter Registration System (OLVR) or voter registration application or a written request to your elections.
>
> **Do I have to affiliate with a political party?** local board of No, you do not. If you do not select a political party on your voter registration application, you will be "unaffiliated" with any political party. This means that you will generally not be able to vote in party primary elections, but you will be able to vote in any nonpartisan primary elections held in your jurisdiction, such as a primary election to select nominees for the board of education.

However, The Baltimore County Maryland website only has the election results: Michael S. Barranco: 2024;  Marc A. DeSimone Jr.: 2024; Judith C. Ensor: 2022 (Judge and Clerk); Stacey A. Mayer: 2022; Andrew Martin Battista: 2020; Dennis Robinson Jr.: 2018; and Keith R. Truffer: 2016. The website lacks anything that would provide registered voters information related to judicial elections.

This case establishes—beyond any reasonable dispute—that the judge and clerk defendants are not qualified candidates under the Maryland Constitution and have actively conspired to deprive Ryan Dillon-Capps of his civil and other constitutionally protected rights. Those entrusted with the duty to prevent such abuses have instead aided and abetted these efforts.

The constitutional challenges to the 2024 judicial election, including the unconstitutional use of the preliminary election process to exclude qualified candidates from the general election ballot, will be addressed in full upon remand.

71

At that point, the State of Maryland will have the opportunity to assert its justifications, and the merits will be resolved through adversarial litigation.

However, it bears repeating: if the defendants had a legitimate legal defense, Judge Hurson's misconduct would have been unnecessary. The present and future actions of the defendants rest on a strategy of attrition—deliberately obstructing due process in order to delay, exhaust, and ultimately deny Mr. Dillon-Capps any meaningful relief. The result of this ongoing obstruction is not speculative: it is causing ongoing and irreparable harm that, if not remedied, will ultimately result in Mr. Dillon-Capps becoming homeless—and may cost him his life.

## IX  District v State

## A  District v State - Procedural Abuse

In District ECF 18-0, at page 16, Judge Hurson "directed [Ryan Dillon-Capps] to file an amended complaint that does not include the causes of action or defendants the Court dismisses herein," while simultaneously asserting that he was "unable to tease apart the remaining claims against the remaining defendants" and that he was "mak[ing] no finding as to the viability of any remaining claims." He further claimed to be "remind[ing] [Ryan Dillon-Capps] that the amended complaint will replace the current complaint."

As previously discussed, Judge Hurson has demonstrated a nuanced understanding of the filings—an understanding that stands in irreconcilable

72

contradiction to his claim of being unable to discern the nature of the remaining claims. This contradiction compels us to examine the purpose behind such false assertions. The de facto effect is the dismissal of claims against previously dismissed defendants—claims that were procedurally eliminated through deliberate manipulation rather than judicial review.

The timeline of the state action itself can be broken down into two periods of active litigation: from June 14 to August 20 (67 days), and from October 16 to October 24 (8 days), totaling just 75 days of meaningful litigation. The time between these periods, and following them, reflects procedural gaps caused by a vacated premature default judgment and the later filing of a notice of voluntary dismissal.

During this time, Ryan Dillon-Capps had only a half dozen filings ruled on with actual docketed responses. Over 30 filings occurred outside the period of active litigation, with more than a dozen others left entirely unaddressed. A substantial portion of these filings were made during the core litigation window and were subject to intentional delay—strategically avoided to prevent their impact on the proceedings. Examples of moot rulings being used this way: District ECF 16-5, at 26, 30, 46, 53, 60–64.

On November 7, 2024, defendant Robinson Jr. denied a motion requesting enforcement of a hearing that had been granted on October 11, 2024, by Judge

73

Finifter. In doing so, he stated that the motion was "denied – insufficient legal or factual basis for the [r]elief requested," and further noted that "a voluntary dismissal was filed [on October 24] and that the case is closed" (District ECF 16-5, at 54). This was (1) unnecessary because the state action was vitiated; (2) rendered without subject-matter jurisdiction because their own position was there was nothing to adjudicate; and (3) was self-serving procedural abuse to put words on a page.

## B  District v State  – Protecting Defendants

On January 8, 2025, Judge Hurson granted Ryan Dillon-Capps leave to proceed in forma pauperis (In District 18-0, at 2 and 21), and the Court Clerk accepted and docketed the summonses (District ECF 1-2) and U.S. Marshals personal service forms (District ECF 1-3; 15-1) for all defendants. On February 12, 2025,  Hurson denied the temporary restraining order and preliminary injunction asserting it was "prior to any defendants having been served with process" (District ECF 27-0, at 4).

Complaint Integrated Appendix: In Forma Pauperis Relief with Limited Attorney Designation (District ECF 2) contains a request for U.S. Marshall Services on page 2 ¶ 3: "Pursuant to 28 U.S.C. § 1915(d), an IFP Plaintiff is entitled to service of process by the U.S. Marshals. Given the Plaintiff's financial constraints and the need for proper service upon the Defendants, the Plaintiff

74

requests that the Court order the U.S. Marshals to serve all necessary pleadings, motions, and subpoenas in this matter. "

Under FRCP 4(c)(3), in relevant part: Summon Services "[b]y a Marshal or Someone Specially Appointed. At the plaintiff's request, [...] The court must so order if the plaintiff is authorized to proceed in forma pauperis under 28 U.S.C. § 1915." The District Court is responsible for issuing the summonses and forwarding them, along with the personal service forms, to the U.S. Marshals Service.

Defendant Stringer denied a motion to have attorneys Butler and Frenkil formally added as counsel of record, asserting that "[e]ach party has a right to choose its own counsel" (District ECF 16-5, at 32). However, both Butler and Frenkil had previously communicated with Ryan Dillon-Capps using his personal email address and phone number—methods that contradicted the employer and attorney defendants' exclusive reliance on a work email account, which Mr. Dillon-Capps was prohibited from accessing, as a valid method for providing notice for the ex parte TRO. In response to this denial, Mr. Dillon-Capps pointed out that Frenkil had been listed on the filings since the original June 14 submission,

75

and then Frenkil was silently added to the case on the evening of November 8, 2024. See District ECF 16-1, at 9 (Sept. 28 ledger), 28 (Nov. 8 ledger).[1]

Hurson and Stringer engaged in parallel misconduct, each shielding the defendants by reframing Mr. Dillon-Capps's proper procedural requests as improper or unauthorized. In both instances, the denial of relief was not grounded in law or fact, but in a deliberate distortion of the record—calculated to obstruct accountability and protect institutional actors from exposure.

## C  District v State  – Diminutive & Minimizing Language

In District ECF 18-0, Judge Hurson clearly acknowledges his understanding that Ryan Dillon-Capps was requesting the "appointing [of] a special master to investigate the Maryland Judiciary." Seven lines later—on the same page—Hurson directly contradicts this acknowledgment and employs dismissive framing, reducing it to the "request of a pro se litigant, to essentially take over the Maryland Judiciary."

This pattern of distortion mirrors the conduct in District ECF 16-5, at 51, where Defendant Barranco uses pejorative language to describe the Motion to Assert Rights and Request for Immediate Rulings (District ECF 16-8, at 122–165)

---

[1] If Ryan Dillon-Capps had accessed his email and received notice, at the TRO hearing the opposing counsel would have said that receiving notice was proof that Ryan Dillon-Capps had violated COUNT III because it was unauthorized access.

as "entirely incoherent and unintelligible." Similarly, in District ECF 18-0, at 7, Hurson offers a belittling summarization, minimizing the filing by stating that Ryan Dillon-Capps "attempts to frame the factual allegations as amounting to a vast conspiracy to violate their constitutional rights."

The status-based minimization and contradictory reframing employed by both Hurson and Barranco serve their personal interests by shifting focus away from the substantive and well-supported allegations—filings they perceived as a threat due to the seriousness of the claims and the evidence presented.

## D  District v State - Illusion of Consideration

Employer Injunctive Relief

Judge Hurson quoted the requested relief, which explicitly detailed all essential elements of employment, yet nevertheless concluded that Ryan Dillon-Capps "does not appear to seek reinstatement of their job, only their pay and benefits," and that he "sought an award of monetary damages prior to a judgment." Additionally, Hurson's fact-finding—based on its citation to Ryan Dillon-Capps's affidavit, which quoted the July 30 termination letter referencing the January 8, 2020 employment agreement—was that it was "clear" Ryan Dillon-Capps "has not been employed […] for at least six months." Hurson relied on both of these errors in determining that Ryan Dillon-Capps was seeking a mandatory preliminary

injunction to alter the status quo, and denied the TRO and preliminary injunction without a hearing, stating that "it wasn't necessary."

The first line of reasoning is akin to ordering a sandwich, fries, and a drink at a drive-thru, only to be told you didn't order a "combo meal." Both rationales misrepresent the nature of the prohibitory injunctive relief sought—to restore, and maintain, the status quo during the pendency of the litigation.

In addition to the previously docketed filings, Judge Hurson's claim that he reviewed the materials was made while asserting that he had reviewed:

(1)    District ECF 7-2: <u>Affidavit of Ryan Dillon-Capps Financial Harm</u>;
(2)    District ECF 7-1: <u>Affidavit of Caroline Dillon-Capps</u> (Physical and Mental Harm);
(3)    District ECF 24-0: <u>Affidavit of Ryan Dillon-Capps Amended Complaint Statement of Facts</u>;
(4)    District ECF 25-0: <u>Plaintiff's Emergency Motion for Temporary Restraining Order and Preliminary Injunction</u>;
(5)    District ECF 25-1: <u>Memorandum of Law in Support of Plaintiff's Temporary Restraining Order and Preliminary Injunction</u>;

<u>Expert Eyewitness</u>

In District ECF 18-0, Judge Hurson itemizes each document in ECF Series 1, from 1-1 through 1-12 (pp. 1–2), citing them specifically. In contrast, all other docket entries referenced in the introduction—ECF 2, 3, 4, 5, 6, 7, and 17—are cited only by their primary ECF number. For example, Hurson states "two affidavits, ECF 7" (p. 2) and later cites "ECF 7-1" in the conclusion. However, this

78

citation misrepresents the record: ECF 3 contains three documents, ECF 4 contains three documents (one of which was stricken by motion), ECF 5 contains two, ECF 6 contains two, and ECF 7 contains three.

Additionally, on page 20, Judge Hurson references Caroline Dillon-Capps's affidavit (District ECF 7-1) and asserts that he "will not repeat [the affidavit's expert eyewitness account of Ryan Dillon-Capps's well-being] here but has thoroughly reviewed [it]." However, on page 4, Hurson selectively quotes District ECF 1-0, at 15 ¶56: "Turning a civil lawsuit into a series of systemic human rights abuses that induced dissociative episodes and dissociative amnesia"—a statement directly supported by the affidavit of Caroline Dillon-Capps, a licensed clinical social worker (LCSW-C) with eight years of outpatient therapy experience.

Beginning on page 2, Judge Hurson introduces boilerplate language and concludes the paragraph on page 3 with, "the complaint suffers a number of deficiencies which are described more fully below." From there, Hurson proceeds to construct a narrative by stringing together carefully selected quotes and out-of-context excerpts that fabricate a fundamentally different case—presenting the illusion of an unsupported, conclusory complaint lacking plausibility. More importantly, this creates the false appearance that the memorandum and order accurately reflect the record.

79

At the state level, Defendant Barranco allowed Caroline Dillon-Capps to testify, only to immediately assert, "I haven't heard any testimony from any mental health professional" (District ECF 23-12, at 56). Her testimony was used solely to create the illusion that her expert, eyewitness, sworn statements were meaningfully considered.[2]

Hurson leveraged his own deceptive citation of Caroline Dillon-Capps's affidavit in denying the temporary restraining order and preliminary injunction against the employer, framing the harm asserted by Ryan Dillon-Capps as merely financial. See District ECF 27-0. Additionally, Judge Hurson severely minimized the financial harm, equating it to a routine consequence of job loss. By referencing "two affidavits," he created the false impression that District ECF 7-2—which details a catastrophic financial collapse and the complete destruction of Mr. Dillon-Capps's creditworthiness—was meaningfully considered.

Medical Emergency

To be absolutely clear for this Court: the harm suffered by Ryan Dillon-Capps is physically life-threatening, directly caused by the defendants, and constitutes a genuine medical emergency. Judge Hurson and the defendants are

---

[2] Insincere expressions of concern were similarly employed by both Barranco and Hurson. See District ECF 23-11, at 68, 88; District ECF 18-0, at 20–21.

intentionally obstructing access to relief that could preserve Mr. Dillon-Capps's life. The longer he remains without necessary treatment, the lower his chances of long-term survival become. See District ECF 7-1 (expert eyewitness affidavit); 28-3 (published case report).

## E  District v State – Selective Interpretation

<u>Hurson v Bernstein</u>

In District ECF 18-0, Judge Hurson asserts that Ryan Dillon-Capps is requesting an investigation into the Maryland Judiciary, the removal of "a number of state judges and clerks," a halt to all nonemergency maintenance of the Maryland Judicial Information Systems, and an order directing the preservation of all judicial records (p. 17). It is unreasonable to conclude that Judge Hurson does not understand the nature of injunctive relief.

Articulating the elements of injunctive relief while simultaneously asserting that Mr. Dillon-Capps failed to cite "any authority," and that the Court "seriously doubts" such authority exists to preserve court records, is an irreconcilable contradiction (p. 17). Moreover, the assertion that no authority was cited directly conflicts with Judge Hurson's own earlier statement—just seven pages prior—that "judges are immune from liability under 42 U.S.C. § 1983" in the section titled "Judicial Immunity" (pp. 9–10). This inconsistency renders the Court's reasoning

81

internally contradictory and constitutes a deliberate misrepresentation of the record.

Director Bernstein's letter distorted the phrase "each judge" into "unknown judge" (District ECF 16-6, at 31), while Judge Hurson similarly misrepresented "Clerk of the Circuit Court for Baltimore County" (p. 11) as "clerks." Where Bernstein minimized the allegations to justify dismissing the complaint, Hurson exaggerated the requested relief to support a false portrayal of the motion as seeking "a drastic remedy," thereby manufacturing a basis for denial (p. 17).

Hurson v Alexander

Defendant Alexander's clarification to her prior ruling stated that "[Ryan Dillon-Capps] claims counsel unexpectedly resigned from case yet record reflects no counsel ever entered appearance to represent [him]" (District ECF 16-5, at 18–19). This assertion was selectively extracted from a filing that explained the attorney's inability to appear due to "family bereavement and scheduling conflicts," and was misapplied to deny a motion requesting additional time to secure representation.

Likewise, Judge Hurson quoted, "Therefore, the State of Maryland should immediately pay for all monetary relief and everyone else should become a debtor to the State of Maryland" (District ECF 18-0, at 13). This language was pulled

from a broader argument concerning equitable relief and specifically addressed the responsibility of "everyone else," not the State.

In both rulings, Hurson and Alexander responded to mischaracterized arguments that were never actually made. Alexander disregarded the clear and substantiated basis in the filing supporting the extension of time, while Hurson ignored the legal foundation set forth for monetary relief under Congressional abrogation and Maryland's waiver of sovereign immunity. See Also Appendix F – State Level Negotiations; Appendix G – Special Master and Magistrate Judge; Appendix H – Equitable Relief; Appendix I – State of Maryland

## X  Testing Sufficiency of a Complaint

The evaluation used by this Court for testing the sufficiency of a complaint is generally limited to a review of the allegations of the complaint itself and includes consideration of documents that are explicitly or expressly incorporated into the complaint by reference with those attached to complaint as exhibits. However, courts may consider a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity. See *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016).

When evaluating exhibits, This Court applies the Exhibit-Prevails rule standard and recognizes that FRCP 10(c) does not require a plaintiff to adopt every

word in an exhibit as true merely because it is attached to the complaint in support of an alleged fact. Before the courts treat the contents of an attached or incorporated document as true, the district court should consider why the plaintiff attached or incorporated the document, such as who authored it and its reliability. This includes documents incorporated for purposes other than the truth of its contents, which are inappropriate to treat as being adopted as true. Documents prepared by a third party and attached to show how the plaintiff became aware of certain facts are not automatically adopted, in whole or part, as true. Documents prepared by or for the defendants may contain self-serving statements, and automatically treating its contents as true would undermine the pleading standards. See *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 167–68 (4th Cir. 2016).

District Court's Selective Citation

In District ECF 18-0, the District Court listed the portions of the December 27, 2024, filing that were docketed (pp. 1–2), acknowledged that District ECF series 16 contains over 2,000 pages of exhibits, and noted that ECF 1-7 includes counts and sub-counts designated as "causes of action" (pp. 2–3). The January 8 ruling contains a total of just 25 citations across the 265-page complaint and integrated motions: ECF 1-0 is cited fourteen times (pp. 3, 4, 7, 8, 10, 11); ECF 1-5 five times (pp. 5, 12–14); ECF 1-10 once (p. 14); ECF 3-3 once (p. 17); ECF 4-2

84

once (p. 18); ECF 5-2 once (p. 18); ECF 6-0 once (p. 19); and ECF 7-1 is referenced only in the conclusion (p. 20).

There is not a single citation to the more than 2,000 pages of exhibits contained in District ECF series 16, nor any reference to the counts, statements of fact, or requested relief set forth in District ECF 1-7. The only mention of Caroline Dillon-Capps's affidavit (District ECF 7-1) appears in the conclusion of the ruling and is not applied to any legal or factual determination. The District Court's ruling also omits entirely any reference to District ECF 4-1 (Memorandum in Support of the Interlocutory Judgment), District ECF 1-4 (Appendix: Pretext – Statement of Facts Timeline), District ECF 1-6 (Appendix: Coverup – Statement of Facts Timeline), District ECF 7-2 (Affidavit of Ryan Dillon-Capps – Financial Harm), and District ECF 3-1 (Meet and Confer Letter).

The District Court selectively extracted summary statements from a comprehensive record of factual allegations and exhibits, portraying the filing as conclusory and implausible. However, the resulting memorandum and order are irreconcilably contradictory—both internally and in relation to the undisputed contents of the record.

Substance over Form

For the past nine months, Mr. Dillon-Capps lacked access to a legal research platform capable of producing consistently accurate citations. However, citation

error does not nullify the applicability of the correct legal standard, nor does it justify judicial mischaracterization of the filing's substance. Both the state and District Court rulings reflect a pattern of selectively construing the record, disregarding unrebutted evidence, and distorting the plain meaning of filings to fit preordained outcomes. Misstating the law or a party's argument does not erase the objective truth reflected in the factual record.

Additional Information: Appendix F – State Level Negotiations; Appendix G – Special Master and Magistrate Judge; Appendix H – Equitable Relief; Appendix I – State of Maryland

## **Standard of Review**

This Court reviews legal conclusions de novo and fact findings as clear error. Clear error review is a deferential standard that does not disturb the district court's fact finding when they are "plausible in light of the record viewed in its entirety".

This Court has held that clear error review is deferential, not toothless, because factual findings made by the district courts are not "so sacrosanct as to evade review," and this Court may reverse those findings when it is definitively and firmly convinced the district courts were mistaken. The District Court has deprived this Court of a full record to review. While still incomplete, the refiled exhibits and supplemental affidavits should be sufficient for this Court to see that the District Court's errors are plainly wrong and are replete with self-contained,

irreconcilable contradictions that are only presented as being grounded on credibility determinations. See *Heyer v. United States Bureau of Prisons*, 984 F.3d 347, 355 (4th Cir. 2021); *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378–79 (4th Cir. 1995).

**[Issue 2]     Rooker-Feldman - Complete Absence of Jurisdiction**

Ohana Growth Partners, LLC filed a civil action in the Circuit Court for Baltimore County, and it was voluntarily dismissed without prejudice on November 6th. District ECF 1, at 2. In District ECF 18-0, The District Court determined (1) that the "now-closed state civil action" (p.3); (2) "was voluntarily dismissed sometime in October or November 2024" (p.4).

**State Court Case is Void:** Maryland law is clear that "a voluntary dismissal vitiates and annuls all prior proceedings and orders in a case". *Baltimore & Ohio R. Co. v. Equitable Bank*, N.A., 77 Md. App. 320, 328 (1988); See also *Habtemariam v. Neda*, No. 0134, Sept.term,2020, 2021 WL 1038276, at *2 (Md. Ct. Spec. App. Mar. 18, 2021) (appeal dismissed as moot) (unreported).

This Court has also held that when a State Court Case is void it has no effect. *Field v. Berman*, 526 F. App'x 287, 288 (4th Cir. 2013).

**Prevailing Party:** The order granting the employer's voluntary dismissal without prejudice did not include any stipulation regarding attorney's fees. (District ECF 16-5, at 55). Under Maryland Rule 2-506(e), the dismissing party is

responsible for all costs unless otherwise provided by stipulation or court order. As the prevailing defendant, Ryan Dillon-Capps is entitled to recover attorney's fees.

The state court action brought by Ohana Growth Partners, LLC is void under Maryland law and carries no legal effect. As the prevailing party in that proceeding, Ryan Dillon-Capps is entitled to compensation from the losing party.

**Conclusion 1:** Rooker-Feldman Doctrine Does Not Apply

The Rooker-Feldman doctrine does not apply in this context for multiple independent reasons: (1) it applies only to state-court losers, not prevailing parties; (2) a void judgment cannot support Rooker-Feldman or any other preclusion doctrine;  (3) it is not reasonable to suggest that a prevailing party would attempt to overturn a favorable outcome, especially when doing so would result in a less favorable legal position; and (4) the doctrine does not apply when the state fails to provide due process.

**Conclusion 2:** Judge Hurson -Complete Absence of Jurisdiction

Ryan Dillon-Capps's claims did not require Judge Hurson to review or invalidate the state court's rulings, and Judge Hurson lacked jurisdiction to do so. In District ECF 18-0, at 5–12, Judge Hurson repeatedly asserted that it lacked jurisdiction to perform a quasi-appeal, while simultaneously ruling to vacate the state court's vitiation of the state action.

This Court has held that the burden of establishing subject matter jurisdiction rests on the party invoking it. Here, Judge Hurson acted unilaterally to review and reject the state court's grant of the employer's voluntary dismissal without prejudice. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).

Ryan Dillon-Capps filed a motion for reconsideration, respectfully informing Judge Hurson that its ruling resulted in manifest injustice (District ECF 19-0). Judge Hurson expressly acknowledged its understanding of the motion, stating: "[Ryan Dillon-Capps] essentially argues that reconsideration is warranted because Hurson made a clear error resulting in manifest injustice." Specifically, he argues "that the Court improperly applied the Rooker-Feldman doctrine" (District ECF 22-0, at 2).

Instead of correcting the error, Hurson misrepresented its dismissal with prejudice as a non-final order, asserting that it was "not subject to the strict standards applicable to motions for reconsideration of a final judgment" (p. 1). It then denied the motion for reconsideration, concluding: "Having reviewed [Ryan Dillon-Capps's] motion to reconsider and its attachments, Hurson finds that reconsideration is not warranted" (p. 2).

Judge Hurson acted in contradiction to the factual allegations and supporting evidence when it chose to "conjure up questions never presented to them." *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985).

89

As this Court held in *Field v. Berman*, 526 F. App'x 287, 292 (4th Cir. 2013), "in the context of the Rooker–Feldman doctrine, the term 'state-court judgments' is used in its broadest sense to include all final decisions of state judicial proceedings." This necessarily includes the state court's grant of the employer's voluntary dismissal, which vitiated the underlying state action.

Judge Hurson lacked subject matter jurisdiction to overturn the state action, and every subsequent decision was predicated on that fundamental error. As a result, Judge Hurson is not entitled to judicial immunity.

**Standard of Review**

This Court reviews a FRCP 12(b)(1) dismissal of a claim in a complaint for lack of subject matter jurisdiction de novo. *Field v. Berman*, 526 F. App'x 287, 291 (4th Cir. 2013)(citing *Pitt Cnty. v. Hotels.com*, L.P., 553 F.3d 308, 311 (4th Cir.2009)).

**[Issue 3]     Non-Judicial Ultra Vires Acts**

In District ECF 18-0, The District Court granted Ryan Dillon-Capps motion to proceed in forma pauperis (p.2, 21), performed an initial screening of the complaint pursuant to 28 U.S.C. § 1915(e)(2)(B) (p.2), concluded it lacked subject matter jurisdiction under the Rooker-Feldman doctrine (pp.5, 7-9), and "directed [Ryan Dillon-Capps] to file an amended complaint that does not include the causes of action or defendants the Court dismisses herein" (p.16).

90

**Dismiss Without Prejudice:** This Court has held that "a dismissal based on a defect in subject matter jurisdiction must be one without prejudice, because a court that lacks jurisdiction has no power to adjudicate and dispose of a claim on the merits". *Goldman v. Brink*, 41 F.4th 366, 369 (4th Cir. 2022) (cleaned up);

The Supreme Court concurs and held that a dismissal with prejudice for lack of subject matter jurisdiction is only proper when the claim is "so insubstantial, implausible, foreclosed by prior decisions of [the Supreme Court], or otherwise completely devoid of merit as to not involve a federal controversy". *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 7 Wall. 506, 514 (1868)).

**Jurisdiction:** The presumption is that a federal court lacks jurisdiction in a particular case unless it is demonstrated that jurisdiction exists. In *Lehigh Min. & Mfg. Co. v. Kelly*, 160 U.S. 327, 336-37 (1895).

Deciding cause of action before resolving whether the court has Article III jurisdiction, the doctrine of "hypothetical jurisdiction", carries a federal court "beyond [the] bounds of authorized judicial action and thus offend[s] fundamental principles of separation of powers" and is nothing more than an "advisory opinion". *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101(1998).

**Article III Standing:** The Supreme Court held in *Reed v. Goertz*, 598 U.S. 230, 242 (2023) that Article III standing and the Rooker-Feldman doctrine are two

intertwined principles of federal jurisdiction divided by original and appellate jurisdiction. "The jurisdiction possessed by the District Courts is strictly original." *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 416 (1923).

**FRCP 12:** Lack of Subject-Matter Jurisdiction. If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.

## Conclusion 1: Subject Matter Jurisdiction Required

If the District Court had not already determined that it lacked subject matter jurisdiction—or if it had instead concluded that it had original jurisdiction over at least one claim—then it may have been permitted to assess Eleventh Amendment immunity or judicial immunity as part of determining whether subject matter jurisdiction existed.

However, that determination would have ultimately been favorable to Ryan Dillon-Capps because the original filing already satisfies the jurisdictional prerequisites for both forms of immunity.

The District Court lacked subject matter jurisdiction and is unable to rule on the merits without it.

## Conclusion 2: Judge Hurson – Ultra Vires Acts

Judge Hurson conclusion that the Rooker-Feldman doctrine applied amounts to a determination that appellate jurisdiction was required to proceed. It is therefore an irreconcilable contradiction for Judge Hurson to have proceeded further, as

92

doing so would necessarily require original jurisdiction under Article III—

jurisdiction Hurshon had already disclaimed. At no point in the subsequent rulings

did Judge Hurson provide any basis for belief that it found Article III standing, and

"[f]or a court to pronounce upon the meaning or the constitutionality of a state or

federal law when it has no jurisdiction to do so is, by very definition, for a court to

act ultra vires." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–02

(1998).

The Supreme Court precedents that give shape to American judicial

immunity can be traced back to Lord Coke's three foundational principles: (1) the

need for finality; (2) the need to maintain public confidence in the justice system;

and (3) the need to preserve judicial independence. *Floyd v. Barker*, 77 Eng. Rep.

1305 (Star Chamber 1607).

Lord Coke later refined the doctrine in The Marshalsea, 77 Eng. Rep. 1027

(Star Chamber 1612), which held that actions taken by a court lacking subject

matter jurisdiction were coram non judice—before a person who was not a judge.

By asserting that it lacked subject matter jurisdiction, the District Court effectively

marked the point at which its proceedings ceased to be judicial in nature.

Judge Hurson's actions were non-judicial ultra vires acts, and he does not

benefit from judicial immunity.

93

## District v State - Jurisdiction

In District ECF 18-0, at 9, Judge Hurson concluded that it lacked subject matter jurisdiction to review the state court's granting of injunctive relief, yet immediately proceeded to engage in a merit-based evaluation—determining that the injunction did not concern a labor dispute—and, based on that evaluation, concluded that the state court did not act outside its jurisdiction.

Similarly, in the state court proceedings, during the June 26–27 hearing, defendant Barranco responded to arguments raised by Ryan Dillon-Capps, including:

(1)    A reference to another individual involved in the labor dispute—IT Coordinator Darren Koritzka—who had been placed on involuntary leave. In response, Barranco stated, "That has nothing to do with why we're here today" (District ECF 23-11, at 17); and

(2)    Jurisdiction challenges to the state action. Barranco summarily dismissed the issue, stating: "Even if there were federal defenses, I'm not sure the case is removable 'cause it doesn't—the complaint doesn't, on its face, state any federal claim, it hasn't been removed to federal court. The Court has jurisdiction over the claim, so that's not an argument, I'm just telling you right now" (District ECF 23-11, at 56).

94

## Standard of Review

We review the Rule 12(b)(1) dismissal of a claim in a complaint for lack of subject matter jurisdiction de novo. *Field v. Berman*, 526 F. App'x 287, 291 (4th Cir. 2013)(citing *Pitt Cnty. v. Hotels.com, L.P.*, 553 F.3d 308, 311 (4th Cir.2009)).

### [Issue 4]    Dismissal of Maryland and De Facto Dismissal of Claims

In District ECF 18-0, at 14,

(1)    "Under the Eleventh Amendment of the United States Constitution, a state, its agencies, and its departments are immune from citizen suits in federal court absent state consent or congressional action" (p.13);

(1)    "The State of Maryland has not waived such immunity for claims of constitutional violations brought under §1983" (p.13);

(2)    "The claim for damages is barred by Eleventh Amendment sovereign immunity" (p.14);

(3)    "Plaintiff has not plausibly alleged ongoing violations of federal law that can be properly redressed through prospective injunctive relief and would permit this action to proceed against the State of Maryland"(p.14); and

(4)    "Accordingly, the State of Maryland must be dismissed as a defendant" (p.14).

The District Court dismissed the State of Maryland from the action with respect to the claim for injunctive relief under 42 U.S.C. § 1983. However, the State of Maryland is not a "person" under § 1983, and such claims are properly directed at state actors. In the context of judicial immunity, the appropriate target of such claims would be the judge as a representative of the state court institution.

95

The District Court further concluded that any claim for damages was barred by Eleventh Amendment immunity. It then declined to address the remaining claims on the basis that "[t]he Court is unable to tease apart the remaining claims against the remaining defendants," and clarified that it made "no finding as to the viability of any remaining claims." District ECF 18-0, at 16.

However, in its reconsideration order, the District Court stated it was not applying the strict standards of final judgment review, suggesting that its prior order was interlocutory. See District ECF 22-0, at 1. Yet, the January 8 order directed Ryan Dillon-Capps to file an amended complaint "that does not include the causes of action or defendants the Court dismisses herein" (District ECF 18-0, at 16). This instruction had the practical effect of converting the ruling into a final order as to those claims and parties, resulting in the de facto dismissal of multiple claims.

The original filing, however, included arguments addressing both the waiver of sovereign immunity by the State of Maryland and congressional abrogation through valid enforcement legislation. These arguments are set forth in the memorandum opposing immunity (District ECF 1-10) and the appendix of counts (District ECF 1-7).

**I   Employer**

The Following comes from District ECF 16-3:

(1)     The FMLA Notice of Eligibility, issued by the employer on January 8, 2024, confirms that Ryan Dillon-Capps was eligible for FMLA leave for his own serious health condition. The employer:

    (a) Requested healthcare provider certification and enclosed the appropriate form;

    (b) Classified Ryan Dillon-Capps as a "key employee," but indicated his leave could not be denied;

    (c) Determined that restoring his employment after the conclusion of his FMLA leave would not cause the company substantial or grievous economic harm;

    (d) Indicated that paid leave would be applied concurrently with the FMLA-designated leave;

    (e) Included a certification due date that was initially shorter than allowed by law but later corrected;

    (f) Initially stated that monthly certifications would be required, but later informed Ryan Dillon-Capps that such certifications would not be necessary, in compliance with applicable regulations for his condition. (pp. 4–7)

(5)     The employer attempted to enforce a more restrictive leave policy that contradicted its own employee handbook (which was cited in the FMLA Notice of Eligibility) and deviated from the treatment of other employees. Ryan Dillon-Capps documented this discrepancy in an email sent to the employer on January 10, 2024. (pp. 8–9)

(6)     Ryan Dillon-Capps's healthcare provider completed the certification form on January 22 and again on March 12. In response to the employer's request for clarification regarding the January 22 form, the provider submitted a follow-up letter dated January 31, 2024, which was accepted without further requests for information. (pp. 10–21)

    (g) The certification and the January 31 letter confirmed that Ryan Dillon-Capps has a permanent and chronic condition that necessitates intermittent leave for regular treatment. His condition causes unpredictable "flare-ups" of varying severity, which at times impair his ability to perform routine daily activities. Although capable of working intermittently, he required the reasonable accommodation of working from home due to the hostile work

97

environment created by the employer. Importantly, his long-term objective remained a return to in-office work.

## A  District v State - Gender

In District ECF 27-0, at 3, Judge Hurson, unprompted and without necessity, inserted a footnote mid-order that was entirely dedicated to discussing Ryan Dillon-Capps's gender pronouns.

Richard Hartman's affidavit included an equally unprompted and unnecessary statement—also inserted mid-affidavit—entirely focused on Mr. Dillon-Capps's gender pronouns. In District ECF 23-5, at 2, Hartman falsely stated: "As of at least June 2, 2024, Dillon-Capps asked to be referred to using plural pronouns."

The District Court's footnote prompted Mr. Dillon-Capps to spend nearly two pages responding in order to "explain" his gender and pronouns. See District ECF 28-0, at 2–3.

## B  Gender & Disability Discrimination: Hostile Work Environment

What is not explicitly stated is that the hostile work environment included years of gender-based discrimination by another executive, Josh Gerber. Defendant Glenn Norris had, over time, become increasingly responsive to Ryan Dillon-Capps's concerns regarding this conduct. However, after Ryan Dillon-Capps and the senior accountant reported accounting irregularities to Glenn Norris on October 16, 2023, all prior improvements in Josh Gerber's behavior were immediately

98

undone—reverting to the discriminatory conditions present when Ryan Dillon-Capps began his employment on February 10, 2020.

For years, Ryan Dillon-Capps had observed slow but steady improvements due to Glenn Norris's attempts to address the gender-based harassment. As a result, he did not escalate the matter to a formal HR complaint until the regression occurred following the report of financial misconduct. In November 2023, Ryan Dillon-Capps filed a formal HR complaint against Josh Gerber for gender discrimination, and against three additional individuals whose involvement was later connected to unethical and unlawful conduct uncovered during the internal fraud investigation, which began in December 2023.The years of gender-based discrimination explains why Richard Hartman's affidavit asserted that Ryan Dillon-Capps had only "recently" indicated a pronoun preference. Ryan Dillon-Capps is unable to identify any legitimate basis for the District Court similarly drawing attention to pronoun usage. See District ECF 23-5, at 2; see also District ECF 28-0, at 2–3.

The retaliation and events that followed the October 2023 report of accounting irregularities severely impacted Ryan Dillon-Capps's health, ultimately requiring him to take protected FMLA leave. The employer agreed to the ADA accommodation, and Ryan Dillon-Capps worked from home throughout 2024. Ryan Dillon-Capps requested that the employer provide a record of how much

99

time they had attributed to intermittent FMLA leave, but none was ever produced. However, the amount of time must be nominal because the employer interrupted every attempt to use intermittent FMLA leave. The two most notable instances occurred on June 12 and June 13.

On June 12, 2024, at 7:00 AM, Ryan Dillon-Capps notified his employer that he was utilizing his intermittent FMLA leave for the day (p.115). Undocketed emails show that Glenn Norris interrupted Ryan's leave and demanded he complete the same task that was later reassigned on June 13. Also undocketed are emails Ryan sent on June 12 to the same individuals he contacted the following day—none of whom responded. One of those recipients was defendant Daniel Levett. In an affidavit dated July 3, 2024 (District ECF 16-15, at 57-64) Levett stated: "[On] June 12, 2024, HEA was retained by Ohana Growth Partners, LLC ('Ohana') […] since that time I have been involved." This statement either constitutes perjury or affirms that Levett knowingly failed to respond—conduct later used as a defense in the state court proceedings under the doctrine of estoppel by silence.

Following the June 12 interference with his FMLA leave and a subsequent email exchange in which the employer's position was effectively, "I disagree," Ryan Dillon-Capps sent another message to his employer (p.109), stating:

100

> "[I]formally request information regarding the legal representation retained by Ohana Growth Partners LLC concerning any and all matters that may involve or pertain to me. This includes, but is not limited to, the following issues:
> • Accounting irregularities
> • Unauthorized use of my name to attest compliance documents
> • Fabricated or altered emails/documents
> • Any other matters related to my employment
> • Any matters where I might be named or involved
> Specifically, I would like to know the name and contact information of the attorneys or law firms representing the company in these matters. This information is pertinent as I am seeking to engage in direct negotiations to resolve these issues amicably and efficiently. I believe that open communication can help us reach a mutually agreeable solution and prevent the need for more formal proceedings. Therefore, I would appreciate your prompt response to this request"

On June 13, 2024, at 7:12 AM, Ryan Dillon-Capps notified his employer that he would be unavailable for at least a few hours and would provide an update upon his return. He expressly stated that the absence was for FMLA leave, with the duration contingent upon "how well things go today" (p.14). Approximately two hours later, the employer acknowledged that Mr. Dillon-Capps was entitled to utilize his intermittent FMLA leave, while simultaneously demanding that he complete a work assignment by 3:00 PM that same day (p.25). At noon, Mr. Dillon-Capps responded, confirming his compliance and indicating that he was awaiting a response from the relevant party. In the same communication, he also asserted his rights through a cease-and-desist notice (p.21). The remainder of the day escalated following a 2:05 PM communication to company ownership. In response, the employer placed Darren Koritzka—an employee unrelated to Mr. Dillon-Capps's FMLA request—on involuntary leave.

After the employer placed Darren Koritzka on involuntary leave, Ryan Dillon-Capps spent several hours in fear for his own safety, his wife's, and that of other employees involved in the labor dispute that had arisen from the employer's hostile work environment—an environment that had steadily deteriorated over the eight months following the October 16, 2023, report to Glenn Norris (pp. 27–65).

## C  Employer: FMLA, ADA, and Rehabilitation Act

In *Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 379-380 (4th Cir. 2022), this Court held that a prima facia case of disability discrimination, a plaintiff must show (i) [they were] disabled, (ii) [they were] discharged, (iii) [they were] fulfilling her employer's legitimate expectations when she was discharged, and (iv) the circumstances of [their] discharge raise a reasonable inference of unlawful discrimination. *Rohan v. Networks Presentations LLC*, 375 F.3d 266, 272 n.9 (4th Cir. 2004).  If the employee makes this showing, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Lettieri v. Equant*, 478 F.3d 640, 646 (4th Cir. 2007). To satisfy the fourth element of a disability discrimination claim, a plaintiff must show that the adverse action occurred under circumstances that raise a reasonable inference of unlawful discrimination. *Rohan*, 375 F.3d at 272 n.9.

In *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013), this Court held that a prima facie case against his employer for failure to accommodate

under the ADA, the plaintiff must show: " '(1) that [they were] an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position ...; and (4) that the [employer] refused to make such accommodations.

The employer granted a reasonable accommodation to Ryan Dillon-Capps to work from home in connection with his FMLA leave for an ADA-qualifying disability. The employer does not dispute its interference with his FMLA leave. Ryan Dillon-Capps was complying with the employer's pretext-based demands and communicated his compliance. Nevertheless, he was suspended the same day, allegedly for failure to comply—an assertion contradicted by contemporaneous emails and text messages. The only reasonable conclusion is that the suspension during active FMLA leave and the failure to honor the reasonable accommodation for leave tied to an ADA-qualifying condition are not genuinely disputed.

The employer's lawsuit was based on this same pretext, and Richard Hartman's affidavit explicitly invoked Ryan Dillon-Capps's gender pronouns as a material fact, expressly demonstrating that the employer's actions were motivated by Ryan Dillon-Capps's gender.

On June 18, Ryan Dillon-Capps asserted his right to FMLA leave in correspondence with the employer's legal counsel, stating: "Technically, since I

103

said I would tell them when I was back, my FMLA leave is still active […] please inform them that as a result of the escalated hostility, I will be on FMLA leave until further notice." He also asked whether he could provide additional access to the employer's Help Desk Manager, Dante Martinez, because Phil Leadore and Daniel Levett remained unresponsive.[3] District ECF 16-0, at 123-124.

Instead of accepting this offer, the employer and attorney defendants continued to rely on their pretextual refusal, and their legal counsel ultimately asserted that the employer had intentionally violated Ryan Dillon-Capps's FMLA rights. Ryan Dillon-Capps was terminated on July 30, after it had already been established that the employer's Help Desk Manager, Dante Martinez, possessed sufficient administrative access to retrieve the email of accounts with Global Administrator privileges, use that access to complete the password self-reset process, and subsequently log in to assign Global Administrator roles to other users. The termination letter provided no explanation or justification for the termination. See District ECF 16-0, at 142–43 (termination letter); see also Appendix E – Fraudulent Lawsuit.

---

[3] Ryan Dillon-Capps had forgotten that he made this request on June 18 until preparing this filing. Based on the known timeline of events from June 13 to June 18, he cannot determine whether the company equipment and security key fobs were removed during or after this email. All that is known is that, at the time he was writing to Phil Leadore and Robert Brennen on June 18, he believed he still had them.

104

## I   June 26-27 Hearing

The authenticity of the June 26–27 transcripts is disputed due to textual irregularities and inconsistencies with fragmented memories of the hearings. However, because Ryan Dillon-Capps's memory from those two days remains incomplete, he cannot verify the discrepancies with full certainty.

In District ECF 23-11, The June 26 hearing began with Ryan Dillon-Capps informing Judge Barranco that he had "been asking to speak to the employer's attorney for weeks," and explaining that his employer had interfered with his use of FMLA leave on June 12 and 13 by forcing him to work on both days. Pleading with Barranco, "please let me have my FMLA time." Barranco dismissed the matter as irrelevant. (pp.4-5) Later in the hearing, Ryan Dillon-Capps stated that on June 13 he "was fearful for [his] life"[4] after Richard Hartman responded to a 2:05 PM email by placing Darren Koritzka, the IT Coordinator, on involuntary leave. (p.45).

---

[4] Ryan and Caroline Dillon-Capps fled their home because they believed Richard Hartman to be dangerous, especially after realizing the broader consequences of his actions, which extended well beyond the events of June 13. As shown in District ECF 16-7, at 8–9, they made hotel reservations at a different location each night. Given the extraordinary efforts the employer has taken to protect Victor Brick's brother-in-law, Richard Hartman, and others involved in the preceding events, this level of precaution appears to have been entirely prudent.

In District ECF 23-11, June 21 transcript, Barranco explicitly acknowledging the show cause was granted by defendant Truffer on June 21, after Ryan Dillon-Capps said he "did not have a chance to defend" himself and had submitted the letter to Truffer. Barranco trying to legitimize the hearing by saying he was "actually surprised at how quickly -- often times after a TRO is entered the Assignment Office isn't always able to schedule a preliminary injunction hearing so promptly, and the TRO's are often extended either by consent or by motion, and then, it gets scheduled, but in this case it seems to me that it was scheduled, as it should be, I guess, prompt – fairly promptly before the TRO expired". District ECF 23-11, at 8, 11, 13.

Under Maryland Rule 15-206(c)(2), a show cause hearing must be scheduled with a minimum of 20 days' notice to ensure "a reasonable time for the preparation of a defense." The June 26 hearing began with Judge Barranco disregarding the fact that the no-notice ex parte order had been challenged under Maryland Rule 15-504(f), which mandates a hearing to dissolve or modify such orders. Instead of scheduling the required hearing for Ryan Dillon-Capps and requiring the employer to meet its burden to justify continuation, that motion was denied. A show cause hearing was instead scheduled just 4 days after the June 21 ruling—16 days short of the statutory minimum—despite the only notice being sent to Ryan Dillon-

Capps's work email, which Judge Barranco knew he no longer had access to. See District ECF 16-5, at 9.

In District ECF 23-11, Dillon-Capps described Hartman's conduct as erratic and stated that the employer's claims were entirely false. He specifically told Barranco: "They have an entire Help Desk team that are user admins, exchange admins. [They are] fully functional […] Their harm is not established, that's—it's a lie." In response to Barranco's comment that the employer claimed to have no admin access, Dillon-Capps replied, "They don't even understand what a global administrator is and what it does."(p.45) Moments later, Brennen acknowledged on the record that the FMLA interference and the employer's conduct on June 12 and 13 were true, not disputed, and established in the record. (p. 48)

In District ECF 23-11 and 23-12, the June 26–27 hearing transcripts demonstrate Ryan Dillon-Capps's consistent candor—openly providing the information he could recall, while honestly acknowledging what he could not "remember" or did not "know." See District ECF 23-11, at 6, 43, 75, 98; District ECF 23-12, at 7, 8, 9, 14, 19, 22, 26, 27, 31, 34, 36–40, 42–43, 50. He repeatedly informed defendant Barranco of his memory and cognitive challenges throughout the proceedings. See District ECF 23-11, at 73, 88; District ECF 23-12, at 7, 15, 19–20, 23, 41. He told Barranco that he was "not even able to cognitively explain to [Barranco]" that he was "doing the best [he could]," noting that he used to rely

107

on a "service dog [he had] for six years" and previously "couldn't even go outside without [him]." Ryan Dillon-Capps also stated he was "not capable [of] representing [himself] effectively" in a hearing for which he had only a few days' notice. See District ECF 23-12, at 16, 19. See also District ECF 16-3, at 3 (Service Dog ID)

## A Affidavit of Harm

Retaining the emphasis from District ECF 16-7, Ryan Dillon-Capps describes his experience during the June 26–27 hearing.

From pages 1 and 2, under the heading <u>Due Process Denied</u>, he writes:

"**During the June 26th and 27th hearings, Judge Barranco** informally evaluated my **mental health** and concluded that I was **not sufficiently disabled**, disregarding the complexity of my condition. As I continue to review the **transcripts** of these hearings, it is clear that my **memory of that day** is incomplete and fragmented. In fact, reading the transcript feels more like reading about someone else's experience rather than recalling something I lived through, illustrating the depth of my **cognitive impairments.** This lack of **full recollection** underscores the fact that I was not in a condition to effectively participate in the hearings. The court's failure to recognize or accommodate my mental state during these proceedings is a clear violation of my **due process rights. Due process**, as guaranteed by the **Fourteenth Amendment,** ensures that parties have the right to fully participate in legal proceedings. In **Mathews v. Eldridge,** 424 U.S. 319 (1976), the **U.S. Supreme Court** ruled that due process requires meaningful participation, which was denied to me due to the court's failure to properly address my condition By continuing the proceedings without appropriate accommodations for my mental health, the court failed to uphold its obligations under the **Americans with Disabilities Act (ADA).** The **ADA** requires that individuals with disabilities be provided reasonable accommodations to ensure equal access to justice. In my case, the court neither acknowledged my condition nor provided the necessary accommodations, further contributing to my inability to fully engage with the legal process."

108

On page 3, Dillon-Capps further describes his treatment by defendant

Barranco:

> "Furthermore, when **Judge Barranco** attempted to evaluate my health on **June 26th and 27th**, it was clear that such a determination was made without the necessary training or expertise to properly assess the state of my mental health. This underscores a larger systemic issue: how many others have been denied basic rights and recognition of harm due to a similar lack of understanding about the human brain? It is crucial to remember that under **Titles I, II, and III of the ADA**, the question of disability and the need for accommodation are **not the court's decision** to make without proper medical evidence. Judges are not tasked with determining disability; the law already provides clear guidelines, removing the burden of such determinations from them. In my case, **medical documentation** was submitted to **Judge Truffer** on **June 18th,** and by **June 26th and 27th,** no further inquiry into my health was warranted. Yet I was subjected to an inquisition, as was my wife, who had to testify about witnessing my struggles. The pain I felt listening to her account was profound, and while the record captures only my words-"**I'm sorry"**-that moment held much more."

In the June 27 transcript, defendant Barranco stated that his fact-finding was

based on his own observations. On page 4, Ryan Dillon-Capps describes what

Barranco was observing under the header <u>Twitching, Shaking, and Winning:</u>

> "I walked into the courtroom on that day, carrying bags of papers, and I remember consciously trying to **look less injured.** I was trying to minimize the tremor-like shaking in my hands and arms as I clenched and stretched my fingers, seeking some futile relief. As my neck pulled, manifesting a tick-like twitch, my focus would shift from my hands to the courtroom around me, wondering if anyone was watching. I was embarrassed, but l forced myself not to show it."

On page 5, Ryan Dillon-Capps recaps three reasons he offered as

jurisdictional challenges to defendant Barranco for removing the case to federal

court:

> "There were **three different reasons** for the case to be moved to **federal court:** the **Family and Medical Leave Act (FMLA),** as I had given advance notice before any action was taken against me; the **Americans with Disabilities Act (ADA),** since taking a day off for health reasons is more than reasonable; and finally, **FTC v. Wyndham** [Multi-State Jurisdictional], which provides clear precedent for security and compliance issues."

## I   Denied Reasonable Accommodations & Obstructing Evidence

In District ECF 16-7, Ryan Dillon-Capps emailed defendant Barranco's chambers on June 26, 2024, requesting a copy of the hearing transcript from earlier that same day, stating he was struggling to remember what had been said. (p.14). The following morning, around 7:30 AM, the email was forwarded to the Digital Recording Office, and Sharon L. Elligson responded to Mr. Dillon-Capps, stating that an audio link would cost $25.00, and that the transcript would cost approximately $300.00. (p.13)

On June 28, 2024, Mr. Dillon-Capps emailed defendant Brennen, writing: "My wife said you asked for [a] transcript during court yesterday. Do you have a transcript of any of the last two hearings? Could you email them to me?" Brennen subsequently provided the June 27 transcript. (p.44).

On July 1, 2024, Mr. Dillon-Capps followed up with Brennen, writing: "Thank you for the 27th. I show in the filings that there is one for the 26th. Do you have the one from the 26th?" At that time, Mr. Dillon-Capps did not have access to view or download the contents of the court record—he could only see an entry indicating that the June 26 transcript had been docketed.

In response, Brennen wrote: "The filings also show that you now owe Ohana $12,500 in fines. Have you paid any of that? I think I can get authority to provide the transcript that Ohana paid for if you provide me the password for administrative control of Ohana's GoDaddy account, which Ohana also paid for." (p.45). Brennen had requested the June 26 transcript on the same day of the hearing. Before Ryan Dillon-Capps was granted access to view the court record, the transcripts were removed from the state court docket and were never re-entered. Miles & Stockbridge P.C. withheld the June 26 transcript until September 30 (p.65).

See also District ECF 16-3, at 23-28 (ADA Coordinator emails; 30-32 (Caroline Dillon-Capps June 29, 2024, state court affidavit); 29 & 33 (defendant Meyer denying all meaning full accommodations under form the ADA form); District ECF 16-6, at 14 (email to Judge Barranco chambers requesting transcripts as ADA accommodation).

## II  ADA Reasonable Accommodations Letter

In District ECF 16-3, at 22, Ryan Dillon-Capps (f/k/a 'Wagner') November 23, 2013, healthcare provider letter says "[Ryan Dillon-Capps] needs reasonable accommodations under the ADA or the Rehabilitation Act of 1990 and its subsequent 2008 amendment".

111

## III Expert Eye-Witness Affidavit

In District ECF 7-1, Caroline Dillon-Capps, a licensed clinical social worker (LCSW-C), submitted an expert eyewitness affidavit describing the severity of Ryan Dillon-Capps's mental and physical condition. She explained that "among the symptoms observed, several align with malignant catatonia, which is recognized as a medical emergency requiring immediate intervention." During severe panic attacks—which she noted can "last for hours"—he becomes "unresponsive to external stimuli" and displays "psychomotor inhibition, dissociation, freezing, body rigidity, and erratic breathing patterns."

She further observed episodes resembling "delirium and acute disorientation," during which he "displays repetitive speech patterns and circular reasoning." Caroline also noted that Ryan has exhibited "signs of excoriation (skin picking), which we have documented in photographs" (see District ECF 16-7, at 11–16). According to her, "these symptoms strongly suggest a trauma-based response requiring urgent and critical intervention." She warned that delays in care could "lead to significant complications, including more frequent episodes" and "intensified experiences of depersonalization, derealization, and other dissociative phenomena." Without timely treatment, she stated, she "fear[s] losing [her] husband to this overwhelming situation," emphasizing that "he needs medical intervention" or "his condition may become increasingly resistant to treatment,

potentially necessitating long-term therapy or inpatient care and heightening the

risk of severe, life-threatening consequences."

## IV Statute

## A  Family and Medical Leave (FMLA)

**29 U.S.C. § 2611(4)(A)Employer:** In general the term "employer"—
(i) means any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year;
(ii) includes— (I) any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer; and (II) any successor in interest of an employer;
(iii) includes any "public agency", as defined in section 203(x) of this title;

> **29 U.S.C. § 203(d) "Employer"** includes any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency, but does not include any labor organization (other than when acting as an employer) or anyone acting in the capacity of officer or agent of such labor organization.

> **29 U.S.C. § 203(x) "Public agency":** means the Government of the United States; the government of a State or political subdivision thereof; any agency of the United States (including the United States Postal Service and Postal Regulatory Commission), a State, or a political subdivision of a State; or any interstate governmental agency.

> > **29 U.S.C. § 203(c) "State"** means any State of the United States or the District of Columbia or any Territory or possession of the United States.

> **29 U.S.C. § 2611(8) Person:** The term "person" has the same meaning given such term in section 203(a) of this title.

> > **29 U.S.C. § 203(a) "Person"** means an individual, partnership, association, corporation, business trust, legal representative, or any organized group of persons.

113

**29 U.S.C. § 2611(1) Commerce** The terms "commerce" and "industry or activity affecting commerce" mean any activity, business, or industry in commerce or in which a labor dispute would hinder or obstruct commerce or the free flow of commerce, and include "commerce" and any "industry affecting commerce", as defined in paragraphs (1) and (3) of section 142 of this title.

> **29 U.S.C. § 142 When used in this chapter--**
> **(1)** The term "industry affecting commerce" means any industry or activity in commerce or in which a labor dispute would burden or obstruct commerce or tend to burden or obstruct commerce or the free flow of commerce.
> **(3)** The terms "commerce", "labor disputes", "employer", "employee", "labor organization", "representative", "person", and "supervisor" shall have the same meaning as when used in subchapter II of this chapter.

**29 U.S.C. § 2611(2) Eligible employee**
(A) In general The term "eligible employee" means an employee who has been employed--
    (i) for at least 12 months by the employer with respect to whom leave is requested under section 2612 of this title; and
    (ii) for at least 1,250 hours of service with such employer during the previous 12-month period.
(B) Exclusions: The term "eligible employee" does not include--
    (ii) any employee of an employer who is employed at a worksite at which such employer employs less than 50 employees if the total number of employees employed by that employer within 75 miles of that worksite is less than 50.
(C) Determination: For purposes of determining whether an employee meets the hours of service requirement specified in subparagraph (A)(ii), the legal standards established under section 207 of this title shall apply.

**29 U.S.C. § 203(e)(1) the term "employee"** means any individual employed by an employer.
**(g) "Employ"** includes to suffer or permit to work.

**29 U.S.C. § 2611(3) Employ; employee; State** The terms "employ", "employee", and "State" have the same meanings given such terms in subsections (c), (e), and (g) of section 203 of this title.

114

**29 U.S.C. § 2611(5) The term "employment benefits"** means all benefits provided or made available to employees by an employer, including group life insurance, health insurance, disability insurance, sick leave, annual leave, educational benefits, and pensions, regardless of whether such benefits are provided by a practice or written policy of an employer or through an "employee benefit plan", as defined in section 1002(3) of this title.

> **29 U.S.C. § 1002(3) The term "employee benefit plan" or "plan"** means an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan.

> **29 U.S.C. § 2612(2) Substitution of paid leave (B) Serious health condition** An eligible employee may elect, or an employer may require the employee, to substitute any of the accrued paid vacation leave, personal leave, or medical or sick leave of the employee for leave provided under subparagraph (D) of subsection (a)(1) for any part of the 12-week period of such leave under such subsection, except that nothing in this subchapter shall require an employer to provide paid sick leave or paid medical leave in any situation in which such employer would not normally provide any such paid leave.

**29 U.S.C. § 2612(1) Entitlement to leave** Subject to section 2613 of this title an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following: (D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee. (b) leave under subparagraph (D) of subsection (a)(1) may be taken intermittently or on a reduced leave schedule when medically necessary. The taking of leave intermittently or on a reduced leave schedule pursuant to this paragraph shall not result in a reduction in the total amount of leave to which the employee is entitled under subsection (a) beyond the amount of leave actually taken.

**29 U.S.C. § 2611(11) Serious health condition** The term "serious health condition" means an illness, injury, impairment, or physical or mental condition that involves--**(B)** continuing treatment by a health care provider.

> **29 U.S.C. § 2611(6)The term "health care provider"** means--**(B)** any other person determined by the Secretary to be capable of providing health care services.

**29 U.S.C. § 2613(a) In General** An employer may require that a request for leave under subparagraph (D) of paragraph (1) of section 2612(a) of this title be supported by a certification issued by the health care provider of the eligible employee. The employee shall provide, in a timely manner, a copy of such certification to the employer.

**(b) Sufficient certification** Certification provided under subsection (a) shall be sufficient if it states-- **(1)** the date on which the serious health condition commenced; **(2)** the probable duration of the condition;**(3)** the appropriate medical facts within the knowledge of the health care provider regarding the condition; **(B)** for purposes of leave under section 2612(a)(1)(D) of this title, a statement that the employee is unable to perform the functions of the position of the employee; **(6)** in the case of certification for intermittent leave, or leave on a reduced leave schedule, under section 2612(a)(1)(D) of this title, a statement of the medical necessity for the intermittent leave or leave on a reduced leave schedule, and the expected duration of the intermittent leave or reduced leave schedule;

**29 U.S.C. § 2614(a) Restoration to position (1) In general** Except as provided in subsection (b), any eligible employee who takes leave under section 2612 of this title for the intended purpose of the leave shall be entitled, on return from such leave-- **(A)** to be restored by the employer to the position of employment held by the employee when the leave commenced; or **(B)** to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment. **(2) Loss of benefits** The taking of leave under section 2612 of this title shall not result in the loss of any employment benefit accrued prior to the date on which the leave commenced. **(3) Limitations** Nothing in this section shall be construed to entitle any restored employee to--**(A)** the accrual of any seniority or employment benefits during any period of leave; or **(B)** any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave. **(4) Certification** As a condition of restoration under paragraph (1) for an employee who has taken leave under section 2612(a)(1)(D) of this title, the employer may have a uniformly applied practice or policy that requires each such employee to receive certification from the health care provider of the employee that the employee is able to resume work, except that nothing in this paragraph shall supersede a valid State or local law or a collective bargaining agreement that governs the return to work of such employees.

**29 U.S.C. § 2614(b) Exemption concerning certain highly compensated employees Denial of restoration** An employer may deny restoration under subsection (a) to any eligible employee described in paragraph (2) if-- **(A)**

such denial is necessary to prevent substantial and grievous economic injury to the operations of the employer; **(B)** the employer notifies the employee of the intent of the employer to deny restoration on such basis at the time the employer determines that such injury would occur; **(2) Affected employees** An eligible employee described in paragraph (1) is a salaried eligible employee who is among the highest paid 10 percent of the employees employed by the employer within 75 miles of the facility at which the employee is employed.(c) Maintenance of health benefits (1) Coverage. Except as provided in paragraph (2), during any period that an eligible employee takes leave under section 2612 of this title, the employer shall maintain coverage under any "group health plan" (as defined in section 5000(b)(1) of Title 26) for the duration of such leave at the level and under the conditions coverage would have been provided if the employee had continued in employment continuously for the duration of such leave. (2) Failure to return from leave The employer may recover the premium that the employer paid for maintaining coverage for the employee under such group health plan during any period of unpaid leave under section 2612 of this title if-- (A) the employee fails to return from leave under section 2612 of this title after the period of leave to which the employee is entitled has expired; and (B) the employee fails to return to work for a reason other than--(i) the continuation, recurrence, or onset of a serious health condition that entitles the employee to leave under subparagraph (D) of section 2612(a)(1) of this title; or (ii) other circumstances beyond the control of the employee.

**26 U.S.C. § 5000(b)(1) Group health plan.**--The term "group health plan" means a plan (including a self-insured plan) of, or contributed to by, an employer (including a self-employed person) or employee organization to provide health care (directly or otherwise) to the employees, former employees, the employer, others associated or formerly associated with the employer in a business relationship, or their families.

**29 U.S.C. § 2615(a) Interference with rights**
(1) Exercise of rights: It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.
(2) Discrimination: It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

117

(b) Interference with proceedings or inquiries: It shall be unlawful for any person to discharge or in any other manner discriminate against any individual because such individual--

(1) has filed any charge, or has instituted or caused to be instituted any proceeding, under or related to this subchapter;

(2) has given, or is about to give, any information in connection with any inquiry or proceeding relating to any right provided under this subchapter; or

(3) has testified, or is about to testify, in any inquiry or proceeding relating to any right provided under this subchapter.

## 29 U.S.C. § 2617(a) Civil action by employees

(1) Liability: Any employer who violates section 2615 of this title shall be liable to any eligible employee affected--

(A) for damages equal to--

(i) the amount of--

(I) any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation; or

(II) in a case in which wages, salary, employment benefits, or other compensation have not been denied or lost to the employee, any actual monetary losses sustained by the employee as a direct result of the violation, such as the cost of providing care, up to a sum equal to 12 weeks of wages or salary for the employee;

(ii) the interest on the amount described in clause (i) calculated at the prevailing rate; and

(iii) an additional amount as liquidated damages equal to the sum of the amount described in clause (i) and the interest described in clause (ii), except that if an employer who has violated section 2615 of this title proves to the satisfaction of the court that the act or omission which violated section 2615 of this title was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of section 2615 of this title, such court may, in the discretion of the court, reduce the amount of the liability to the amount and interest determined under clauses (i) and (ii), respectively; and

(B) for such equitable relief as may be appropriate, including employment, reinstatement, and promotion.

(2) Right of action: An action to recover the damages or equitable relief prescribed in paragraph (1) may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of--

(A) the employees; or

(B) the employees and other employees similarly situated.

(3) Fees and costs

118

The court in such an action shall, in addition to any judgment awarded to the plaintiff, allow a reasonable attorney's fee, reasonable expert witness fees, and other costs of the action to be paid by the defendant.

**29 U.S.C. § 2651(b) State and local laws** Nothing in this Act or any amendment made by this Act shall be construed to supersede any provision of any State or local law that provides greater family or medical leave rights than the rights established under this Act or any amendment made by this Act.

## B   ADA

**42 U.S.C. § 12101**
**(1)** physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society, yet many people with physical or mental disabilities have been precluded from doing so because of discrimination; others who have a record of a disability or are regarded as having a disability also have been subjected to discrimination;
**(3)** discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services;

**42 U.S.C. § 12202** A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in1 Federal or State court of competent jurisdiction for a violation of this chapter. In any action against a State for a violation of the requirements of this chapter, remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in an action against any public or private entity other than a State.

**42 U.S.C. § 12132** "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation or denied the benefits of the services, programs or activities of a public entity"

## V   Waiver of Eleventh Amendment Immunity

## A   Jurisprudence of Eleventh Amendment Immunity

Eleventh Amendment Immunity "is a personal privilege which [the State of Maryland] may waive at [its] pleasure". See *Clark v. Barnard*, 108 U.S. 436, 447 (1883). The current view of Eleventh Amendment and then ultimately Sovereign

Immunity is about barring suits, and this case represents eligible statutory claims and multiple waivers. This is a question for adverse litigation because the question has moved past the bar to suit.

See William A. Fletcher, A Historical Interpretation of the Eleventh Amendment: A Narrow Construction of an Affirmative Grant of Jurisdiction Rather Than A Prohibition Against Jurisdiction, 35 Stan. L. Rev. 1033, 1038–39 (1983); John J. Gibbons, The Eleventh Amendment and State Sovereign Immunity: A Reinterpretation, 83 Colum. L. Rev. 1889, 1891 (1983); and Gil Seinfeld, Waiver-in-Litigation: Eleventh Amendment Immunity and the Voluntariness Question, 63 Ohio St. L.J. 871, 930 (2002)

## B  Federal Jurisdiction Waiver on June 26, 2024

On June 26, 2024, Ryan Dillon-Capps attempted to present oral arguments in the Circuit Court contesting both subject-matter and equity jurisdiction. During the hearing, Judge Michael S. Barranco interrupted and made two notable statements: (1) "The Court has jurisdiction over the [state plaintiff claim], so that's not an argument, I'm just telling you right now"; and (2) "You can go to federal court and file a [...] private cause of action for violation of the FMLA." Although the reference was framed around the FMLA, these statements came in direct response to repeated jurisdictional objections, including arguments based on the

120

employer's undisputed FMLA interference. See District ECF 1-0, at 4 (quoting District ECF 16-0, at 159–160).

Neither Ryan Dillon-Capps nor the employer, attorney, or judge defendants treated any portion of the hearing as asserting a counterclaim or third-party claim. All parties understood that Ryan Dillon-Capps was raising jurisdictional challenges. During the hearing, Judge Michael S. Barranco explicitly told Dillon-Capps that "if he contends that [the employer defendants] were violating the law," then he should pursue his claim "administratively or by law," further stating that he was "not making any such finding" because he "[didn't] even need to hear about [it]." Barranco directed Dillon-Capps to "go down to federal court and file [...] a private cause of action," and concluded that such issues were "not a defense to the claims here." See District ECF 23-11, at 56.

The statements made by Barranco make clear that he was denying jurisdictional objections to the Circuit Court's authority and explicitly stated that he was not adjudicating the merits of the claims referenced in those objections.

The attorney and judge defendants likewise concluded that the motions seeking sanctions, injunctive, declaratory, and equitable relief were not counterclaims or third-party claims against the employer, attorney, judge, or clerk defendants. In the state court filing titled *Opposition to Defendant's Motion to*

121

*Strike Notice of Voluntary Dismissal*[5] (District ECF 16-15, at 143), the state

plaintiff argued:

(1)     "Dillon-Capps has never filed an Answer to the Complaint";

(7)     under Maryland Rule 2-506(a), Ohana retained the right to voluntarily
        dismiss the action without leave of court at any time before an answer is filed
        and in the absence of a counterclaim or third-party claim; and

(8)     none of Dillon-Capps's filings qualified as such claims. The plaintiff further
        requested that all outstanding motions be deemed moot and denied. Although
        the court did not strike the motion, it proceeded to grant the requested relief by
        denying nearly all remaining filings as moot or denied—many with explicit
        statements that the denial was based, in whole or in part, on the voluntary
        dismissal which resulted in the state case being closed. The remaining filings
        were simply ignored without ruling.

There is no dismissal or ruling on any of Ryan Dillon-Capps's claims

because the state court concluded that none had been filed, and it granted the

employer's voluntary dismissal without prejudice. Judge Barranco received

multiple jurisdictional challenges tied to federal violations and explicitly directed

Dillon-Capps to pursue those claims in federal court—thereby voluntarily invoking

federal jurisdiction for their adjudication. This case does exactly that.

---

[5] Ryan Dillon-Capps citing the wrong cases for arguments occurred twice, the first
was in the Motion to Strike and then another filing repeated the same wrong
citation. Opposing counsel quickly identified the error and used it to oppose the
motion to strike, and Ryan Dillon-Capps acknowledged the error and provided
replacement cases that supported the argument even better. The other filing was
opposed similarly. See District ECF 16-15, at 148-150. Ryan Dillon-Capps did not
have previous access to Westlaw, and this is the first filing to benefit from it.

The Supreme Court has "consistently found waiver when a state attorney general, authorized to bring a case in federal court, has voluntarily invoked that court's jurisdiction. More importantly, in large part the rule governing voluntary invocations of federal jurisdiction has rested upon the inconsistency and unfairness that a contrary rule would create". *Lapides v. Bd. of Regents of Univ. Sys. of Georgia*, 535 U.S. 613, 614 (2002).

*Lapides* does not rest on a singular set of circumstances but rather addresses a specific scenario within a broader principle. The Supreme Court held that, in the context of the case, a state attorney general's voluntary invocation of federal jurisdiction constitutes a waiver of Eleventh Amendment immunity. The Court reasoned that "it would seem anomalous or inconsistent for a State both (1) to invoke federal jurisdiction, thereby contending that the 'Judicial power of the United States' extends to the case at hand, and (2) to claim Eleventh Amendment immunity, thereby denying that the 'Judicial power of the United States' extends to the case at hand". *Lapides v. Bd. of Regents of Univ. Sys. of Georgia*, 535 U.S. 613, 619 (2002).

It is immaterial whether the judge personally possessed the authority to waive immunity. As a state-licensed attorney and sitting Circuit Court judge presiding over a hearing in the Circuit Court for Baltimore County, he acts as an instrument of the State of Maryland. The Supreme Court affirmed this principle in

123

*Lapides*, which compared multiple cases and cited with approval the holding that "removal waives immunity regardless of attorney general's state-law waiver authority." *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 618 (2002) (citing *McLaughlin v. Bd. of Trustees of State Colleges of Colo.*, 215 F.3d 1168, 1171 (10th Cir. 2000)).

The Supreme Court establishes binding precedent through case-specific adjudications that crystallize into *stare decisis*. In *Lapides*, the Court's holding is not merely a reflection of that case's unique facts, but a precedent grounded in broader constitutional principles. Specifically, the Court made clear that "an interpretation of the Eleventh Amendment that finds waiver in the litigation context rests upon the Amendment's presumed recognition of the judicial need to avoid inconsistency, anomaly, and unfairness, and not upon a State's actual preference or desire, which might, after all, favor selective use of 'immunity' to achieve litigation advantages." *Lapides v. Bd. of Regents of Univ. Sys. of Georgia*, 535 U.S. 613, 620 (2002).

This case exemplifies the very concerns addressed in *Lapides*, and it is plainly evident that Judge Barranco voluntarily invoked federal jurisdiction to adjudicate claims that directly challenged the jurisdiction of the state court. As the District Court itself acknowledged as "constitutional claims that are inextricably

intertwined with a state court decision" (quotations omitted). (District ECF 18-0, at 5).

However, the decision at issue is not an appeal of the employer's voluntarily dismissed state action—which, under Maryland law, "vitiates and annuls all prior proceedings and orders in a case"—but rather the action of a sitting judge of the Circuit Court for Baltimore County who voluntarily invoked federal jurisdiction to adjudicate claims that he independently extracted from jurisdictional objections raised against the state proceedings themselves. In doing so, the judge simultaneously violated fundamental constitutional protections that are now "inextricably intertwined" with the voided state court proceedings, including: (1) the right to petition the government for redress; (2) the right to an impartial tribunal; (3) the right to equal protection under the law; and (4) the right to due process.

## C  Federal Jurisdiction Waiver on February 20, 2025

District ECF Series 41 contains February 20, 2025, communication from a State of Maryland attorney indicating that the State has deferred its own internal process in favor of the ongoing federal proceedings. This deferral constitutes a waiver of the State's process and an express invocation of federal adjudication, thereby operating as a waiver of Eleventh Amendment immunity. In doing so, the attorney effectively acknowledges that the allegations against the attorney

defendants have merit and lends significant weight to the § 1986 claims, which, notably, appear to be undisputed (See arguments concerning DeGonia II).

The Eleventh Amendment "does not automatically destroy original jurisdiction. Rather, it grants the State a legal power to assert a sovereign immunity defense should it choose to do so. The State can waive the defense." *Wisconsin Dep't of Corr. v. Schacht*, 524 U.S. 381, 389 (1998). As the Supreme Court noted in *Lapides*, "[a] benign motive ... cannot make the critical difference[…] Motives are difficult to evaluate, while jurisdictional rules should be clear". *Lapides v. Bd. of Regents of Univ. Sys. of Georgia*, 535 U.S. 613, 614 (2002).

This second waiver of Eleventh Amendment immunity occurred nearly two months after December 27, 2024, filing in District Court and explicitly referenced the federal proceedings as the basis for invoking jurisdiction, thereby reaffirming the State's voluntary submission to federal adjudication. District ECF series 41.

## VI Fourteenth Amendment Abrogation of Sovereign Immunity

In *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976), the Supreme Court held: "The Eleventh Amendment, and the principle of state sovereignty which it embodies, are necessarily limited by the enforcement provisions of §5 of the Fourteenth Amendment" (citations removed).

## A  ADA Title II Abrogates Sovereign Immunity

In Tennessee v. Lane, 541 U.S. 509 (2004), the Supreme Court held:

126

(1)   **Id., at 517:** "Title II, §§ 12131–12134, prohibits any public entity from discriminating against "qualified" persons with disabilities in the provision or operation of public services, programs, or activities. The Act defines the term "public entity" to include state and local governments, as well as their agencies and instrumentalities. § 12131(1). Persons with disabilities are "qualified" if they, "with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, mee[t] the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." § 12131(2). Title II's enforcement provision incorporates by reference § 505 of the Rehabilitation Act of 1973, 92 Stat. 2982, as added, 29 U.S.C. § 794a, which authorizes private citizens to bring suits for money damages. 42 U.S.C. § 12133";

(2)   **Id., 522–23:** "Title II seeks to enforce irrational disability discrimination, but also "seeks to enforce a variety of other basic constitutional guarantees" Those include rights "protected by the Due Process Clause of the Fourteenth Amendment".  Including the "right of access to the Courts" and "meaningful opportunity to be heard" by removing obstacles to their full participation in judicial proceedings";

(3)   **Id., 532:** "Duty to accommodate is perfectly consistent with the well-established due process principle that, within the limits of practicability, a State must afford to all individuals a meaningful opportunity to be heard in its courts";

(4)   **Id., 533:** "Title II's affirmative obligation to accommodate persons with disabilities in the administration of justice cannot be said to be "so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." It is, rather, a reasonable prophylactic measure, reasonably targeted to a legitimate end" (citations removed); and

(5)   **Id., 533-534:** "Title II, as it applies to the class of cases implicating the fundamental right of access to the courts, constitutes a valid exercise of

127

Congress' § 5 authority to enforce the guarantees of the Fourteenth Amendment".

## B    FMLA Abrogates Sovereign Immunity

In *Nevada Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 726 (2003), the

Supreme Court held:

(1)    **Id., 726:** "Congress may [] abrogate [Eleventh Amendment] immunity in federal court if it makes its intention to abrogate unmistakably clear in the language of the statute and acts pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment. The clarity of Congress' intent [in the Family and Medical Leave Act of 1993] is not fairly debatable. The Act enables employees to seek damages "against any employer (including a public agency) in any Federal or State court of competent jurisdiction," 29 U.S.C. § 2617(a)(2), and Congress has defined "public agency" to include both "the government of a State or political subdivision thereof" and "any agency of ... a State, or a political subdivision of a State" (citations removed); and

(2)    **Id., 735:** "States' record of unconstitutional participation in, and fostering of, gender-based discrimination in the administration of leave benefits is weighty enough to justify the enactment of prophylactic § 5 legislation".

## C   Summary ADA and FMLA

The events that led Ryan Dillon-Capps to take FMLA leave were

inextricably linked to the gender-based discrimination he experienced from Josh

Gerber. The employer and attorney defendants filed the state court pleading

asserting that Ryan Dillon-Capps's gender was a material fact. Similarly, the

District Court's ruling denying the temporary restraining order and preliminary

injunction also treated Ryan Dillon-Capps's gender as a material fact. Defendant

128

Barranco and the attorney defendants used discriminatory language in their filings—language that Ryan Dillon-Capps directly addressed and condemned as both gender and disability discrimination. However, at no point did Ryan Dillon-Capps assert that the use of gendered pronouns was itself an issue; rather it was their attacks on Ryan Dillon-Capps communication style.

In *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), the Supreme Court addressed similar conduct where Ann Hopkins was told she needed to "talk more femininely"(Id., 235). The Court found such remarks to be evidence of impermissible sex stereotyping under Title VII. There is no legitimate basis for instructing a person to "talk more femininely," nor is there any legitimate justification for treating an individual's communication style or gender identity as a material fact in employment or judicial decision-making. Yet, both the District Court and Richard Hartman raised Ryan Dillon-Capps's gender—veiled through references to pronoun usage—as a material fact. This conduct reflects the very essence of gender-based discrimination: when characteristics associated with a person's gender become determinative factors in the decision-maker's process.

During the June 26–27 hearing, Defendant Barranco repeatedly critiqued Ryan Dillon-Capps's communication style and directly linked those critiques to his conclusions—conclusions that stand in irreconcilable contradiction to the proceedings, the evidence, and the objective facts. At no point during the state

proceedings was there any question about Ryan Dillon-Capps rights being violated, and the state court's actions deprived Ryan Dillon-Capps of his Fourteenth Amendment rights of due process and meaningful opportunity to be heard, and his right for reasonable accommodations under the ADA. Additionally, the state court, as both a public agency and as an agent of the employer under the FMLA, acted in the interest of the employer in violating Ryan Dillon-Capps FMLA leave rights.

## D  Excessive Fines

The Supreme Court held that the Fourteenth Amendment incorporates the Eighth Amendment protections against excessive fines, and the incorporated Bill of Rights guarantees are "enforced against States under the Fourteenth Amendment according to the same standards that protect personal rights against federal encroachment". *Timbs v. Indiana*, 586 U.S. 146, 150–51 (2019).

## Standard of Review

We review the FRCP 12(b)(1) dismissal of a claim in a complaint for lack of subject matter jurisdiction de novo. *Field v. Berman*, 526 F. App'x 287, 291 (4th Cir. 2013)(citing *Pitt Cnty. v. Hotels.com, L.P.*, 553 F.3d 308, 311 (4th Cir.2009)).

## [Issue 5]    Denial of Court Appointed Counsel

In District ECF 2, Ryan Dillon-Capps requested to proceed in forma pauperis, and attached the requisite IFP form with additional supporting information in Exhibit 106 (p.1). The motion also requested appointment of IFP

counsel because "This case's extraordinary complexity, involving systemic misconduct, procedural irregularities, and significant financial and procedural barriers, necessitates the immediate appointment of IFP counsel" (pp.2-3).

In District ECF 18-0, the District Court granted Ryan Dillon-Capps's motion to proceed in forma pauperis (pp. 2, 21), but "otherwise denied" the remainder of the motion without addressing the request for the appointment of counsel or applying the Whisenant standard (pp. 2, 21). The Court dismissed some of the claims and defendants with prejudice, while directing Ryan Dillon-Capps to file an amended complaint excluding the dismissed portions (pp. 16, 21) and expressly made "no finding as to the viability of any remaining claims" because "the Court is unable to tease apart the remaining claims against the remaining defendants" (p. 16). The District Court's ruling also determined the "complaint suffers from a number of deficiencies" (p. 3), and repeatedly expressed uncertainty—using language such as "can piece together" (p. 3), "appears" (pp. 3, 12, 13), "appear to stem" (p. 11), "unclear" (p. 12), "difficult to discern" (p. 18), and "unable to tease apart" (p. 16).

The Notice of Appeal (District ECF 36-0) was immediately followed by the Appeal Transmittal Sheet (District ECF 37-0), which affirmed IFP status on appeal.

131

This Court's Whisenant standard requires district courts to determine: (1) whether the plaintiff "has a colorable claim"; and (2) whether the case presents "exceptional circumstances." This Court has clarified that a claim is colorable when "the plaintiff asserts a claim that is not frivolous," and that exceptional circumstances are present when either: (a) the legal or factual issues are objectively complex or difficult; or (b) the plaintiff is subjectively "ill-equipped" to present the claims, based on the skill required and the plaintiff's own abilities.

A failure to make these required assessments constitutes legal error, and a failure to appoint counsel for an indigent plaintiff in the presence of exceptional circumstances amounts to an abuse of discretion. *Jenkins v. Woodard*, 109 F.4th 242, 247-48, 251 (4th Cir. 2024); *Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir. 1984)

The District Court's rulings demonstrate the court determined that: (1) this case is not frivolous; and (2) Ryan Dillon-Capps is an indigent plaintiff who is ill equipped to present the claims. The District Court failed to apply this Court's standard and grant counsel.

## VII  Standard of Review

This Court reviews abuse of discretion legal conclusions de novo, and its factual findings for clear error. *Moses Enterprises, LLC v. Lexington Ins. Co.*, 66 F.4th 523, 526 (4th Cir. 2023).

**[Issue 6]     Denial of Conditional Permissive Joinders**

The identified plaintiff joinders are (1) Darren Koritzka; (2) Caroline Dillon-Capps; (3) Jordan Chisholm; and (4) MXT3, LLC.

Ryan Dillon-Capps requested all joinders be allowed to benefit from court appointed counsel, and to allow Ryan Dillon-Capps not to be divested from his own litigation completely or from MXT3, LLC litigation either. See District ECF 5-2;  2-0, at 3 ¶ 7-8.

Dillon-Capps acknowledges that ¶ 8 could be misinterpreted. "MXT3" has served as a general identifier for various ventures, while MXT3, LLC was registered in Maryland in 2023 as a placeholder for a forthcoming business initiative. The venture was intended to launch in 2024 as a separately registered entity, representing over a decade of planning, with initial funding channeled through MXT3, LLC. Investor introductions were in progress, coordinated by a business associate. As a result of the defendants' actions, the seed capital was lost, investor access was severed, and MXT3, LLC has since entered financial default. See District ECF 16-7, at 52-65, for additional information on MXT3.

From Case No. 1:24-CV-0192-SAG: In Chrisholm ECF 22-0, the District Court dismissed the case without prejudice on November 18, 2024, and granted Chisholm until January 17, 2025—60 days from the date of dismissal—to file a motion for leave to amend along with a proposed amended complaint.

133

On January 8, 2025, the District Court denied the request for Chisholm's conditional permissive joinder, stating that: (1) the case had been closed as of November 18; (2) pro se litigants may not represent others in federal court; and (3) Chisholm did not appear to know Ryan Dillon-Capps or be aware of the request. See District ECF 18-0, at 18–19. See also Informal Brief: Appendix C – Jordan Chrisholm.

This Court has held that Rule 20 (1) gives courts wide discretion concerning the permissive joinder of parties; and (2) purpose is to (a) promote trial convenience, (b) expedite the final determination of disputes, and (c) prevent multiple lawsuits. District courts have discretion to deny when (1) Rule 20 will not foster the objectives of the rule, and (2) will result in prejudice, expense, or delay. *Aleman v. Chugach Support Servs., Inc.,* 485 F.3d 206, 218 (4th Cir. 2007) (citing *Saval v. BL, Ltd.,* 710 F.2d 1027, 1031 (4th Cir.1983) (quoting *Mosley v. General Motors Corp.,* 497 F.2d 1330, 1332 (8th Cir.1974)); 7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1652 (3d ed.2001)).

Darren Koritzka, Caroline Dillon-Capps, and MXT3, LLC all share: (1) a common set of underlying events; (2) overlapping causes of action; and (3) the same defendants named in this case. Jordan Chisholm also shares the same employer defendant, the same causes of action, and a timeline that overlaps with

the events at issue—satisfying both this Court's standard and the objectives of Rule 20.

The District Court's ruling: (1) prejudiced Jordan Chisholm, who still had time remaining to amend his complaint; (2) delayed final determination and relief for all proposed joinders; (3) has already increased the litigation costs in this case; and (4) compels the filing of multiple lawsuits, which will require duplicative discovery, depositions, and court proceedings.

The District Court made no mention of Koritzka, Dillon-Capps, or MXT3, LLC. Furthermore, its ruling on Chisholm fails to reflect this Court's permissive joinder standard, either in substance or in language. The District Court should have applied the proper standard and granted conditional permissive joinder, subject to each individual's acceptance or declination.

See District ECF 16-8, at 20, for a list of cases involving the employer in the Circuit Court that stood out to Ryan Dillon-Capps. Two notable examples from that list include:

Daniels, Shantel Denise, a cancer survivor, was sued by the employer over a matter involving approximately $300. After she lost the lawsuit and Ohana obtained what it wanted from her—which was not the $300—the company proceeded to publicly celebrate her recovery from cancer.

Barry Tiedeman had collected a series of emails which, when viewed in context, appear to have been adverse to Ohana. These emails were subsequently deleted from his account, and there were only three people who could have done it. Upon discovering the deletion, he confronted Human Resources—two of those three individuals—and was summarily terminated. Everyone was told a stated pretext; however, if that pretext were true, two other employees would have been fired that same year for doing the exact same thing.

## VIII  Standard of Review

This Court reviews abuse of discretion legal conclusions de novo, and its factual findings for clear error. *Moses Enterprises, LLC v. Lexington Ins. Co*., 66 F.4th 523, 526 (4th Cir. 2023).

## [Issue 7]    Judicial and Quasi-Judicial Immunity and Conspiracy

In District ECF 18-0, at 10-11, After the District Court determined that it lacked subject matter jurisdiction it performed a merit-based evaluation regarding the state court injunction: "While the Norris-La Guardia Act's applicability here is otherwise doubtful as the underlying injunction does not concern organized labor, it plainly does not apply to the state court that issued the rulings".

## I  Labor Dispute

In District ECF 16-0, the evidentiary record includes the following documents related to Darren Koritzka: (1) an involuntary leave letter dated June

13, 2024 (pp. 15, 27–29); (2) a termination letter dated August 2, 2024 (pp. 146–147); (3) termination notice and related severance communications (pp. 144–145); and (4) a severance offer (pp. 148–156).

The severance agreement cites multiple federal statutes that also appear in the counts set forth in the complaint (District ECF 1-7), including, within the waiver and release of rights at § 4: (1) the Family and Medical Leave Act of 1993 ("FMLA"); (2) the Fair Labor Standards Act ("FLSA"); and (3) National Labor Relations Board or other federal, state, or local government agencies (pp. 149–150).

Following the involuntary leave of IT Coordinator Darren Koritzka at approximately 2:20 PM, text message records show that Ryan Dillon-Capps immediately responded to Richard Hartman's retaliatory conduct and expressed concern for the safety of Mareann Piñera (pp. 30–31), as well as for himself and his wife. In the hours that followed, Dillon-Capps sought assistance through multiple communication channels, including: (1) direct messages to Victor and Lynne Brick individually (pp. 32–33); (2) a group chat with Director of Member Services Karen Cepress and Director of Northeast Operations Allyson Ratliff (pp. 34–38); (3) a group chat with Victor and Lynne Brick and Justin Drummond (pp. 39–41); and (4) direct messages with Justin Drummond (pp. 45–65).

The final two text messages from Justin Drummond directed Ryan Dillon-Capps to stop texting and wait (pp. 56, 60). Hours later, Richard Hartman issued a suspension notice to Ryan Dillon-Capps (p. 158). In response, Dillon-Capps texted Drummond at 8:51 PM, stating, "please tell me you have spoken to Rich and suspended him" (p. 64), followed by, "We are [filing] for a protective order against Rich" at 9:09 PM (p. 64). Minutes before 10:00 PM, Drummond confirmed that the suspension was, in fact, real.

The fraudulent lawsuit was filed the next day, on June 14, 2024, at 12:18 PM, under the pretext that Ryan Dillon-Capps had engaged in a "repeated refusal to comply with Ohana's directives" and sought injunctive relief to "require [Ryan Dillon-Capps] to [comply with Ohana's directives]." See District ECF 23-1, at 7–8. The pleading reflected a rushed effort focused on omitting any mention of Darren Koritzka and the labor dispute which resulted in the plethora of other errors. Clearly attempting to fabricate a pretext that would contradict a protective/peace order that focused entirely on the labor dispute and rushed because the first to file is presumed to be more creditable. See Appendix E – Fraudulent Lawsuit.

In District ECF 16-14, at 20, Ryan Dillon-Capps email to Robert Brennen on June 18 says: (1) "there have been two formal written request for [Ohana's Legal Counsel] information"; (2) "when not targeting [Ryan Dillon-Capps], they go after

138

Darren, Ann, and the help desk; (3) "[Ryan Dillon] would greatly appreciate anything [Ohana's Legal Counsel] could do to help us negotiate [an] end to [the labor dispute]; (4) "the only condition that is not acceptable is that [Darren, Ann, and the Help Desk] is left un protected"; and (5) "it has been clearly documented in writing that [Glenn Norris & Richard Hartman] are also targeting Ann, Darren, and [the Help Desk]".

## A  Beyond Reasonable Dispute

Omitting Ohana's responsive filings, the employer and attorney defendants submitted the following:

(1)    the original June 14 filing, docketed as District ECF 23-1 through 23-7 and 23-9;
(2)    a June 20 Petition to Show Cause for Constructive Civil Contempt;
(3)    a June 25 affidavit from Defendant Randall J. Romes;
(4)    a July 3 affidavit from Defendant Daniel J. Levett;
(5)    a June 25 Petition to Show Cause for Constructive Civil Contempt Seeking Incarceration, later voluntarily withdrawn;
(6)    a July 23 Entry of Appearance for Jessica Duvall;
(7)    an August 20 second affidavit from Richard Hartman, attaching a Military Record of Service exhibit filed under the wrong name;
(8)    an August 20 Petition for Default, granted and subsequently vacated; and
(9)    an October 24 Notice of Voluntary Withdrawal, granted and docketed November 6.
(10)   Notably absent is a motion seeking a scheduling conference in closed chambers with a judge defendant—the only filing submitted by the state plaintiff that was denied—but the opposition to that motion is reflected on the record.

Ryan Dillon-Capps docketed filings on approximately 50 occasions, totaling around 200 submissions and including thousands of pages of supporting exhibits and affidavits. The state court granted all but one of Ohana's filings, while Dillon-Capps was denied all but two—one of which was later ruled moot. See District ECF 16-5 (Rulings), at 30 (granting motion to vacate default) and 39 (granting hearing, later deemed moot). Ryan Dillon-Capps successfully defended himself and the state action is voided.

See also Exhibit 108, parts 1-3, filed in the District Court as District ECF 16-9 (82 pages- sanctions); 16-10 (329 pages-Memo for Mandatory hearing of Adjudicated Facts); 16-11 (109 pages-factual allegations and legal citations supporting allegations of claims – filed as a reply to employers opposition to expedited discovery).

These are objective facts and factual conclusions that are beyond reasonable dispute:

(1)     Ryan Dillon-Capps is
    (a) the prevailing party in the state court proceedings, and
    (b) the only party with materially relevant supporting evidence;
(2)     The state court proceedings
    (a) started nine months ago, and
    (b) are now vitiated;
(3)     The allegations against the attorneys have been
    (a) investigated by the Office of the Bar Counsel, and
    (b) found to have merit by the Office of the Bar Counsel;
(4)     The employer has affirmed that the FMLA interference is not disputed, and

140

(5)     After months of state court litigation, the employer, attorney, judge, and
        clerk defendants have been provided with
        (a) information on what the allegations against them are,
        (b) opportunities to produce contradictory evidence,
        (c) opportunities to resolve issues,
        (d) notice for injunctions, evidentiary hearings, and that Ryan Dillon-Capps is
            ready to seek judgement as a matter of law, and
(6)     Both state and district court ruling are irreconcilable contradictions of fact
        and law.

Ryan Dillon-Capps doesn't assert procedural proficiency, and the District Court

has stated "[he] has not provided the procedural prerequisites". However, the

Supreme Court has held "[t]he Constitution deals with substance, and not shadows.

In matters affecting basic constitutional guaranties, this Court will look to

substance, not form, and will not suffer their abridgement by indirection".

*American Communications Ass'n, CIO v. Douds*, 1948 WL 47107 (U.S., 2006).

Ryan Dillon-Capps respectfully requests that this Court's decision be driven by the

case's substance.

## B  Maryland Anti-Injunction Act

        Enacted in 1935, The Maryland Anti-Injunction Act was modeled after the

Norris-LaGuardia Act, designed to prevent courts from issuing injunctions in labor

disputes, and enacted in direct response to the overuse of injunctive relief—

particularly ex parte orders—which were seen as tools that "unduly hamper[] the

141

labor movements" of the 1930s. The Act recognized that ex parte injunctions, by their nature, "necessarily alter[] the status quo in a labor dispute."

See *Nat. Union of Hosp. & Health Care Emp., Div. of R.W.D.S.U., AFL-CIO v. Johns Hopkins Hosp.*, 293 Md. 343, 345 (1982) (citations omitted).

**The Maryland Anti-Injunction Act Statute, in relevant parts:**

**Md. Code Ann., Lab. & Empl. § 4-307(West):** A court does not have jurisdiction to grant injunctive relief that specifically or generally:

> (1) prohibits a person from ceasing or refusing to perform work or to remain in a relation of employment, regardless of a promise to do the work or to remain in the relation;
>
> (4) prohibits a person from helping, by lawful means, another person to bring or defend against an action in a court of any state or the United States.

**Md. Code Ann., Lab. & Empl. § 4-310:** A case shall be held to involve or grow out of a labor dispute when the case involves:

> (1) persons who are engaged in a single industry, trade, craft, or occupation, employees of the same employer, or members of the same or an affiliated organization of employees or employers, regardless of whether the dispute is between:
>> [i] 1 or more employees or associations of employees and 1 or more employers or associations of employers.

## C  Clearly Lacked Jurisdiction

The employer's pleading was filed as injunctive relief, seeking injunctive relief and ancillary costs related to litigation. Maryland and federal courts reject this position. In *Tidewater Exp. Lines, Inc. v. Freight Drivers & Helpers Loc. Union No. 557*, 230 Md. 450, 456 (1963), the Court held: "We take the view that

142

the only relief asked which would appropriately support the jurisdiction of equity was the praying of an injunction. Since the court clearly lacked jurisdiction and power to grant this relief, the bill was, in effect, an effort to obtain damages for breach of contract. The fact that a declaration that the contract had been breached was asked would not, of itself, give jurisdiction to equity." See also *Johnson v. Johnson*, 199 Md. 329, 339, 86 A.2d 520, 524 (1952) (no jurisdiction can survive as to matters purely ancillary to that object)

## IX Maryland Unclean Hands Doctrine

District ECF 38-1, at 3–15, establishes that Glenn Norris and Richard Hartman's proffered pretext directly conflicted with Ohana's contractual obligations under its Franchise Disclosure Document, which mandated PCI compliance. Their justification was rendered unlawful by Glenn Norris's intentional withholding of required compliance information. The alleged justification centered on Ryan Brooks, who was not a party to the state court litigation. This pretext constitutes an overt attempt to: (1) commit multi-state intentional breaches of contract under the Franchise Disclosure Document's PCI compliance provisions; (2) violate multi-state consumer protection laws related to the safeguarding of protected consumer data; and (3) engage in deceptive and unfair trade practices by intentionally breaching PCI compliance obligations.

Justin Drummond requested Global Administrator access, despite having no legitimate business need for such elevated permissions as President of the company. In response, Ryan Dillon-Capps proposed a "break-fix" workaround account for which he would serve as custodian. This proposal was presented to Drummond on June 7, and he accepted. However, on June 10 and 11, Drummond evaded implementation of the agreement, instead misleading Dillon-Capps by indicating that he would follow through the following week. This conduct constitutes: (4) Breach of Accord, based on the June 7 agreement; and (5) Equitable Estoppel, as Drummond's evasive behavior and misrepresentations induced reasonable reliance to Dillon-Capps's detriment.

After Darren Koritzka was placed on involuntary leave by Richard Hartman, (6) Justin Drummond engaged in equitable estoppel by misleading Ryan Dillon-Capps into believing that the matter was being addressed and that someone from HEA would follow up. At the same time, Daniel Levett submitted a sworn affidavit in July claiming continuous involvement throughout the events in question. (7) Levett either committed perjury by misrepresenting his involvement or engaged in estoppel by silence by failing to respond to multiple emails offering him access— communications that, if he were involved as claimed, would have required action or clarification.

144

Maryland has applied the unclean hands doctrine to "refuse recognition and relief from the court to those guilty of unlawful or inequitable conduct pertaining to the matter in which relief is sought" to "protect[] the integrity of the court and the judicial process by denying relief to those persons whose very presence before a court is the result of some fraud or inequity" *Hicks v. Gilbert*, 135 Md. App. 394, 400 (2000)

These seven examples invoke Maryland's Unclean Hands Doctrine, which bars a party from obtaining equitable relief when acting inequitably. In District ECF 40-1, at 22–24, 68 perjured material statements from the June 14 pleading are itemized—limited to only three lies. The Unclean Hands Doctrine became Ryan Dillon-Capps's primary defense in the state court proceeding, ultimately resulting in a successful defense. The unclean hands doctrine is typically a defense which prevents relief, and in Maryland without relief the court lacked jurisdiction.

## X  Maryland's Standing, Ripeness, and Mootness

"We are called upon in this case, seminally, to address justiciability, which has been defined as, '[t]he quality, state, or condition of being appropriate or suitable for adjudication by a court.' *Pizza di Joey, LLC v. Mayor of Baltimore*, 470 Md. 308, 373 (2020) (citing Black's Law Dictionary 997 (10th ed. 2014)).

When a court believes a litigant's claim is somehow unfit for judicial determination, it dismisses the claim under the rubric of justiciability.' The

145

rationale for the doctrine is that 'addressing non-justiciable issues would place courts in the position of rendering purely advisory opinions, a long-forbidden practice in this State.' *Pizza di Joey, LLC v. Mayor of Baltimore*, 470 Md. 308, 373 (2020) (citing State Center, LLC, 438 Md. at 591, 92 A.3d at 483–84 (internal quotation marks omitted); John A. Lynch, Jr. & Richard W. Bourne, Modern Maryland Civil Procedure 2–3 (2d ed. 2004, 2014 supp.))

Controversy

"A court may grant a declaratory judgment or decree in a civil case, if it will serve to terminate the uncertainty or controversy giving rise to the proceedings, and if ... [a]n actual controversy exists between contending parties". Md. Code, Cts. & Jud. Proc. § 3-409(a)(1) (1973, 2013 Repl. Vol.):

"[T]he existence of a justiciable controversy is an absolute prerequisite to the maintenance of a declaratory judgment action.". *Hatt v. Anderson*, 297 Md. 42, 45 (1983).

The lawsuit was built on a fabricated pretext and supported by perjured material statements, filed entirely in the absence of any actual controversy. By mid-July, even Ohana effectively conceded as much by withdrawing its second Petition for Show Cause, which had sought incarceration.

After Ryan Dillon-Capps requested court-appointed counsel, Robert Brennen extended a single opportunity to demonstrate compliance—on June 17, at

146

6:26 AM—demanding a response to a verification code expected between 8:00 and 8:30 AM. Dillon-Capps waited silently for the verification code and then immediately sent it to Robert Brennen. This act dismantled the employer and attorney defendants' effort to manufacture a refusal and have Dillon-Capps "jailed without access to [his] cellphone and other devices until [he is] ready to comply." See District ECF 16-0, at 140–41.

The material relevance of the phone and "other devices" is indirectly discussed in the Count III information under "Fraudulent Lawsuit". The phone and "other devices" are a pretext to uncover whether Ryan Dillon-Capps possessed evidence of misconduct, particularly those connected to financial crimes. Ryan Dillon-Capps used a baited defense to attack the cited law, and as expected the emotionally reactive Brennen misrepresented the statute before adding an unnecessary second footnote which confirmed they were targeting the databases. The next page, filed on October 11, says " seek judgment against Dillon-Capps in an amount equal to the contempt fines accrued against him, as well as legal fees, consultant fees and other expenses". District ECF 16-15, at 109-110. As clearly stated by defendant Brennen, the employer's case was purely injunctive relief. See Appendix E – Fraudulent Lawsuit for more information connected to state court's Count III.

Proceeding in a Case without Controversy

(1)     **July 17, 2024** – Ohana withdraws the second Show Cause Petition, signaling that the controversy was no longer live or justiciable;

(2)     **August 20, 2024** – 34 days later, Ohana files for default judgment, prematurely, as preliminary motions had automatically extended the time to answer;

(3)     **August 20, 2024** – Ryan Dillon-Capps files an opposition to the default judgment**;**

(4)     **September 20, 2024** – Dillon-Capps files a motion to vacate the default judgment;

(5)     **October 10, 2024** – While Robinson Jr. was away, Judge Finifter grants the "third request for administrative judge hearing" and orders the Clerk to docket the "Motion for Urgent Hearing to Address Violation of Constitutional Rights and Rule 1-201," filed October 8, to the motions judge for ruling. (District ECF 16-5, at 39);

(6)     **October 16, 2024** – The Court vacates the default judgment. The order says "granted," but the only relief granted was the vacatur. (District ECF 16-5, at 29);

(7)     **October 18, 2024** – Opposition to the default judgment is ruled moot. (District ECF 16-5, at 30);

(8)     **October 18, 2024** – Ohana threatens to pursue collection of the $2,500-per-day fine. (Filing absent from December clone of state court records);

(9)     **October 22–23, 2024** – With Ohana having filed no supporting evidence, Dillon-Capps moves to compel production or face sanctions at the hearing granted by Judge Finifter**;**

(10)   **October 24, 2024** – Ohana files a Notice of Voluntary Dismissal;

(11)   **October 25, 2024** – Dillon-Capps files a Motion to Strike the notice; opposition is filed on October 30;

(12)   **October 30, 2024** – The previously granted hearing is ruled moot: "plaintiff has filed a voluntary dismissal of case." (District ECF 16-5, at 53); and

(13)   **November 6, 2024** – The Court grants the voluntary dismissal without prejudice, vitiating the entire action. (District ECF 16-5, at 55).

148

Standing

"Standing "refers to whether the plaintiff has shown that he or she is entitled to invoke the judicial process in a particular instance" *State Center, LLC v. Lexington Charles Ltd. P'ship*, 438 Md. 451, 502 (2014).

The House Bill included with the pleading confirms that Count III was filed without standing. The claim for breach of the duty of loyalty fails due to the email thread showing that the employer first violated its own reciprocal obligation. The breach of contract claim relied on an employment agreement that appears to have been tampered with—omitting key pages from the middle of a digital document. Each of the underlying claims suffers from critical prima facie deficiencies, resulting in an absence of standing and, consequently, a failure to invoke the court's jurisdiction. See District ECF 23-1 to 23-6.

Ripeness

"[A] claim for declaratory relief lacks ripeness if it involves a request that the court declare the rights of parties upon a state of facts which has not yet arisen, or upon a matter which is future, contingent and uncertain." Md. Code, Cts. & Jud. Proc. § 3-409(a)(1) (1973, 2013 Repl. Vol).. See also *State Center, LLC v. Lexington Charles Ltd. P'ship*, 438 Md. 451, 591 (2014).

Ohana's pleading lacked ripeness because it was premised on speculative harm—alleging that Ryan Dillon-Capps might, at some future point, engage in

149

wrongful conduct—without any factual basis to support that assertion. All objective evidence contradicted this theory. A claim that rests solely on hypothetical future injury is not ripe for adjudication, and as such fails to invoke the court's subject-matter jurisdiction. District ECF Series 23-1 to 23-6.

Mootness

The purpose of the Declaratory Judgments Act is not to decide theoretical questions or questions that may never arise, or questions which have become moot, or merely abstract questions. Md. Code, Cts. & Jud. Proc. § 3-409(a)(1) (1973, 2013 Repl. Vol.)

As reflected in District ECF 16-1, two distinct periods demonstrate rulings made in the absence of jurisdiction under Maryland's adoption of the mootness doctrine: August 20 to October 10, and after October 24 (or later may be argued November 6). During these timeframes, the state court acknowledged it lacked jurisdiction by correctly issuing moot rulings but simultaneously denied other motions—an act beyond its authority. Once jurisdiction is lost due to mootness, any further substantive rulings, including denials, are ultra vires and legally void. See also District ECF 16-1, at 28-64 (Nov 8 ledger); District ECF 16-1, at 65-104 (Dec. 15 ledger); Undocketed Exhibit 162 (manual record match source).

Exhibit 162 exists in a paper form that a manual matching of records has been performed to identify relevant records for adverse litigation; Matching events

150

and document files with Tylertech eFiling emails and odyssey file & serve receipts. See also Appendix B - AGC v Pierre; *Borkowski v. Baltimore County*, Maryland, Complaint, No. 1:18-cv-2809, 2018 WL 4443253, at *21 (D. Md. filed Sept. 10, 2018) (referencing four cases in the Circuit Court for Baltimore County noting procedural irregularities in Borkowski's cases between 2019 and 2021).

## XI Non-Judicial Acts

Here are two notable examples of specific acts that are also non-judicial: (1) fabrication of the replacement Letter to Judge Truffer and adding it to the court record; and (2) Robinson Jr meeting with Bernstein to form the conspiracy and conferring with Stringer and Mayer afterwards.

## XII    Jurisdiction is Judicial Power and Authority

**U.S. Constitution, Article VI, Clause 2 — The Supremacy Clause:** "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby…"

**Jurisdictional Authority:** "Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."—*Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1869)).

**Judicial Immunity and Its Limits:** "Judges are not protected if they act in the clear absence of all jurisdiction over the subject matter or when they engage in nonjudicial acts."—*Gibson v. Goldston*, 85 F.4th 218, 223 (4th Cir. 2023) (citing *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335 (1872); *Stump v. Sparkman*, 435 U.S. 349, 360 (1978)).

## XIII   Federal Court Jurisdiction & Venue

The District Court has subject matter jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367. The complaint (District ECF 1-0, at 10) was filed on December 27, 2024, and designated under Nature of Suit Code 751, Family and Medical Leave Act (FMLA), in the civil cover sheet (District ECF 1-1).

In District ECF 1-0, at 10, the Complaint states: "Venue is proper under 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to these claims occurred in the Circuit Court for Baltimore County ( 40 I Bosley Ave, Towson, MD 21204), as a labor dispute where Ohana Growth Partners, LLC (212 W Padonia Rd, Timonium, MD 21093) and Miles & Stockbridge, P.C. (100 Light St, Baltimore, MD 21201) [filed the state civil action]".

## XIV   42 U.S.C. § 1983

**From District ECF 16-5, at 55:** Defendant Stringer granted the employer's Notice of Voluntary Dismissal, and his ruling was docketed on November 6, 2024.

This vitiated the state action and rendered injunctive and declaratory relief unavailable.

**42 U.S.C. § 1983:** "...shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress... judicial officer…injunctive relief shall not be granted unless a… declaratory relief was unavailable".

**In District ECF 18-0, the District Court:**

(1)    Dismissed the judge defendants on the grounds that judges are immune from liability in civil actions, including those brought under 42 U.S.C. § 1983 (pp. 9–10);

(2)    Denied injunctive relief under § 1983 on the grounds that "Plaintiff has not pointed the Court to any authority (and the Court seriously doubts any exists)" (p. 17);

(3)    Cited "ECF 1-10, at 9 ¶ 6" in connection with the State of Maryland without acknowledging that the same page cited *Pulliam v. Allen*, 466 U.S. 522 (1984) (p. 14);

(a) The memorandum of law in opposition to immunity (District ECF 1-10, at 3, 9–10, 13) does cite Pulliam—albeit imprecisely—and presents supporting factual allegations throughout the December 27, 2024 filing. See Pulliam, 466 U.S. at 536–43 (suit for prospective injunctive relief); id. at 543–44 (suit for attorney's fees authorized by statute);

(b) In District ECF 1-7, attorney fees: 42 U.S.C. § 1988: "Recovery of reasonable attorney's fees for prevailing parties in civil rights cases under Section 1983" (p.40).

(c) In District ECF 3-3, the injunctive relief to maintain the status quo: "Remove access" and "preserving all records" to "prevent spoliation of evidence" (pp.2-3);

(4)    Cited "ECF 1-7" and acknowledged that it contains counts and sub-counts presented as "causes of action" (pp. 3–4).

153

**In District ECF 1-7, the declarative relief includes:**

(1)    "Declaration that termination was pretextual and violated the FMLA" (p.11);

(2)    "Judicial declaration affirming the Plaintiff's First Amendment rights and condemning retaliatory judicial or employer actions" (p.26);

(3)    "Declaration affirming the Plaintiff's Fifth Amendment rights and condemning violations such as denial of notice or pre-deprivation hearings" (p.29);

(4)    "Declaration affirming the Plaintiff's Sixth Amendment rights and condemning violations, such as denial of counsel and cross-examination opportunities" (p.32);

(5)    "Declaration that $2,500 daily fines and punitive measures imposed by judicial actors violated the Plaintiff's Eighth Amendment protections" (p.34);

(6)    "Judicial declaration affirming the Plaintiff's right to FMLA leave and prohibiting further interference or retaliatory actions" (p.36);

(7)    "Judicial declaration prohibiting the use of coercive measures to compel labor, including punitive fines or threats of imprisonment" (p.38);

(8)    "Declaration that the Defendants' actions violated the Plaintiff's Fourteenth Amendment rights to due process and equal protection" (p.40); and

(9)    "Declaration that the plaintiff's rights to access courts, due process, and equal protection were violated" (p.60).

## Standard of Relief

We review the FRCP 12(b)(1) dismissal of a claim in a complaint for lack of subject matter jurisdiction de novo. *Field v. Berman*, 526 F. App'x 287, 291 (4th Cir. 2013)(citing *Pitt Cnty. v. Hotels.com, L.P.,* 553 F.3d 308, 311 (4th Cir.2009)).

154

<u>CONCLUSION & RELIEF</u>

**<u>Structural Defects, Reversable Error, and Reassignment</u>**

<u>Structural Defects</u>

  In *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148, 150, 159 (2006), the Supreme Court held that structural defects defy analysis under "harmless-error" standards because their consequences are necessarily unquantifiable and indeterminate. The touchstone of structural error is fundamental unfairness and unreliability. Automatic reversal is "strong medicine" that should be reserved for constitutional errors that "always" or "necessarily" produce such unfairness.

<u>Reversable Error</u>

  In the context of criminal sentencing, this Court has determined that a District Court's (1) explanation is inadequate, where the same statements could have been made in support of a different sentence; (2) failure to acknowledge or address non-frivolous arguments is procedurally unreasonable; and (3) must make some "individualized assessment" to justify the sentence imposed and rejection of argument for higher or lower sentence. Under Appellate Review, this Court looks to determine if the District Court (1) understood the defendant's arguments; (2) had reasons for rejecting those arguments; and (3) can demonstrate that the error was harmless (did not have a substantial and injurious effect or influence on the result). The District Court fails to avoid reversal for non-constitutional and non-

155

structural errors if it fails to meet the burden of persuasion and is reversable error and abuse of discretion. *United States v. Blue*, 877 F.3d 513, 519 (4th Cir. 2017); *United States v. Lynn*, 592 F.3d 572, 584–85 (4th Cir. 2010); See also *Rita v. United States*, 551 U.S. 338, 338–40 (2007)

<u>Reassignment</u>

In *United States v. Lentz*, 383 F.3d 191, 221–22 (4th Cir. 2004), this Court held "is appropriate in unusual circumstances where both for the judge's sake and the appearance of justice an assignment to a different judge is salutary and in the public interest, especially as it minimizes even a suspicion of partiality", and considered: (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously expressed views or findings determined to be erroneous or based on evidence that must be rejected; (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

A "fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases." *In re Murchison*, 349 U.S. 133, 136 (1955). A favorable or unfavorable predisposition can also deserve to be characterized as "bias" or "prejudice" because, even though it springs from the facts adduced or the events occurring at trial, it is so extreme as to display

clear inability to render fair judgment. *Liteky v. United States*, 510 U.S. 540, 551(1994).

## ISSUE 1: PROCEDURAL DUE PROCESS AND IRRECONCILABLE CONTRADICTIONS

It is plausible for a federal court to conduct a limited review of an original filing to determine whether it has jurisdiction and to issue summons when warranted. However, under this Court's standards and the applicable statutory requirements, the District Court could not properly conclude that it lacked jurisdiction in this case. The underlying state action is void, and no form of preclusion, whether claim or issue preclusion, can apply. The claims and requested relief meet both the statutory and constitutional requirements for bringing suit against the named defendants, and personal jurisdiction is properly established under federal and local rules.

Ryan Dillon-Capps cannot adequately convey the difficulty of being both the victim of these events and the individual required to relive and reconstruct them as a pro se litigant. The state court record already contained months of detailed factual statements, legal citations, supporting evidence, formal notices, and hundreds of pages documenting sanctionable conduct and tortious violations. The structure and form of the original federal filing reflected, in every meaningful way, a reasonable accommodation.

157

The defendants have no substantive basis upon which to present a defense and have relied exclusively on procedural abuse for more than nine months. Whether the District Court's reproduction of elements from the state court proceedings was intentional or inadvertent is immaterial to the defendants. Confronted with the prospect of civil accountability, potentially resulting in class action litigation and criminal charges, the defendants will undoubtedly attempt to exploit the District Court's rulings to cast their conduct in a more favorable light.

In addition to requesting complete docketing of the December 27, 2024, filing, Mr. Dillon-Capps respectfully asks this Court to recognize that the framework of the District Court proceedings was fundamentally marred by structural errors and subject to automatic reversal.

## ISSUE 2: ROOKER FELDMAN - COMPLETE ABSENCE OF JURISDICTION

Ryan Dillon-Capps worked approximately 3,000 hours, against unimaginable odds, to secure his position as the prevailing party in a vitiated state action. The District Court, however, acted in the complete absence of subject matter jurisdiction. Mr. Dillon-Capps respectfully requests that this Court declare the District Court's actions void ab initio and subject to automatic reversal, find that the Rooker-Feldman doctrine does not apply to his case, and hold that the District Court lacked jurisdiction to overturn the rulings of the state court.

## ISSUE 3: NON-JUDICIAL ULTRA VIRE ACTS

The District Court's rulings occurred after it had already determined that it lacked subject matter jurisdiction under the Rooker-Feldman doctrine, rendering those actions, by definition, non-judicial ultra vires acts. At a minimum, all denials should be reversed, and all dismissals modified from "with prejudice" to "without prejudice." However, the proceedings were conducted in violation of procedural due process and were fundamentally marred by structural errors, resulting in an additional three months of irreparable harm, including the permanent loss of a vehicle. At the end of April, Caroline Dillon-Capps' lease will expire, leaving them without transportation and no viable means of securing a replacement vehicle due to the complete destruction of Ryan Dillon-Capps's creditworthiness. Ryan Dillon-Capps respectfully requests that this Court declare the District Court's actions to be non-judicial ultra vires acts, void ab initio, and subject to automatic reversal.

## ISSUE 4: DISMISSAL OF MARYLAND AND DE FACTO DISMISSAL OF CLAIMS

The District Court's dismissal of the State of Maryland was based on a claim that does not apply to the entity, while simultaneously dismissing applicable claims and legal arguments without addressing them. This occurred after the District Court concluded it lacked subject matter jurisdiction under the Rooker-Feldman doctrine and amid substantial procedural inconsistencies. At a minimum, this should have resulted in a dismissal without prejudice, as the Court declared it

159

lacked jurisdiction. However, because the dismissal was directed at an inapplicable claim and failed to engage with the relevant ones, Ryan Dillon-Capps respectfully requests that this Court reverse the dismissal of the State of Maryland.

## ISSUE 5: DENIAL OF COURT APPOINTED COUNSEL

The District Court denied the request for court-appointed counsel without applying the correct legal standard. At a minimum, this constitutes an abuse of discretion and is a reversible error. However, under the standard established by this Court, the appointment of counsel was warranted. Ryan Dillon-Capps respectfully requests that this Court grant the appointment of counsel in accordance with applicable precedent.

## ISSUE 6: DENIAL OF CONDITIONAL PERMISSIVE JOINDERS

The District Court denied all joinders without considering approximately 75% of the joinder motions and failed to apply the applicable legal standard to the single joinder it did address. At a minimum, this constitutes an abuse of discretion and is a reversible error. However, under the correct standard for permissive joinder, the motions should have been granted. Ryan Dillon-Capps respectfully requests that this Court grant the conditional permissive joinders and permit the joined parties to similarly benefit from appointed counsel.

ISSUE 7: JUDICIAL AND QUASI-JUDICIAL IMMUNITY AND CONSPIRACY

The District Court misrepresented the claims and arguments, and its conclusions were both factually and legally erroneous. At a minimum, the dismissal should have been without prejudice, as the Court explicitly declared it lacked jurisdiction. Yet the dismissals contradicted the evidence, contained irreconcilable inconsistencies, improperly rejected the labor dispute when applying the federal Anti-Injunction Act, and dismissed DaGonia II, Bernstein, and Ensor without addressing any of Ryan Dillon-Capps's legal arguments. Accordingly, Mr. Dillon-Capps respectfully requests that this Court reverse the dismissals as to the judges, clerk, DaGonia II, Bernstein, and the conspiracy claims.

RELIEF

Judge Hurson was required to recuse himself, and it now appears that recusal may be warranted for the entire District of Maryland. His conduct is not only unconstitutional but also criminal. Accordingly, Ryan Dillon-Capps respectfully requests that this Court implement the safeguards necessary to protect the integrity of judicial proceedings and to preserve public confidence in the judiciary.

However, due to the extent of the misconduct, Mr. Dillon-Capps is unable to articulate a form of relief that would not further prejudice his position. Even re-docketing the original complaint would result in citation discrepancies and procedural confusion. Mr. Dillon-Capps is facing imminent, life-altering

161

consequences—including the loss of Caroline Dillon-Capps's vehicle within two weeks and the onset of foreclosure proceedings—making expedited and equitable relief imperative.

WHEREFORE, Mr. Dillon-Capps respectfully requests the following relief:

(1) Remand and reassign this matter to a District Court outside the State of Maryland, beyond the active or reputational influence of the defendants, with instructions to:

(a) Preserve the existing docket as evidence and provide Mr. Dillon-Capps with a complete certified copy;

(b) Vacate District ECF 18-0, 22-0, and 27-0;

(c) Restore the original December 27, 2024, filing, including all attachments and exhibits, docketed with the correct date;

(i) Replace District ECF series 1 through 7 and series 16 with versions sourced from an untainted and verifiable backup; and

(ii) Docket all unfiled materials as a continuation of series 16;

(d) Conduct an expedited hearing before a magistrate judge to allow in-camera review with testimony and a ruling on the pending motion to seal;

(e) Conduct an expedited hearing to adjudicate the relevant facts and issue interlocutory judgments as a matter of law;

162

(f) Deny District ECF 41's motion to seal and order that the referenced exhibit be publicly docketed; and

(g) Strike the amended complaint (District ECF 26-0), and hold issuance of summonses for District ECF 26-4, 29-0, 29-1, 29-2, and 29-3 pending the filing of an amended complaint.

(2) Grant a Temporary Restraining Order against Ohana Growth Partners, LLC, or alternatively, remand with instructions to expedite consideration;

(3) Grant a Temporary Restraining Order against the state defendants, or alternatively, remand with instructions to expedite consideration;

(4) Grant the request for appointment of a Special Master, or alternatively, remand with instructions to expedite consideration;

(5) Make no findings on the request for state-level negotiations;

(6) Grant leave to amend the complaint and related filings, with the benefit of court-appointed counsel;

(7) Grant joinder of necessary parties, with instructions to ensure that each is provided, or benefits from, court-appointed counsel where appropriate; and

(8) Grant such further or alternative relief as this Court deems just and necessary under the circumstances.

## ORAL ARGUMENTS

Ryan Dillon-Capps submits oral arguments would aid the Court in this case.

<u>RESPECTFULLY SUBMITTED</u>

**April 21, 2025**

1334 Maple Avenue
Essex, Maryland 21221
ryan@mxt3.com
703-303-1113

_/s/_ Ryan Dillon-Capps
**Ryan Dillon-Capps**

164

2025-04-21 || 165/165