# IN THE
# UNITED STATES DISTRICT COURT
# FOR THE
# DISTRICT OF MARYLAND

| | |
|---|---|
| RYAN DILLON-CAPPS | ) |
| | )    Civil Action |
| ***Plaintiff,*** | )    No. _____ |
| vs. | ) |
| | )    Hon. _____ |
| | ) |
| OHANA GROWTH PARTNERS, LLC et *al* | ) |
| | ) |
| ***Defendants*** | ) |
| | ) ) |

---

## COMPLAINT INTEGRATED APPENDIX: PARTIES

Plaintiff incorporates all subsequent sections and attachments herein by reference as though fully stated in this main document.

## 1. EQUITY OWNERS

### VICTOR BRICK, GLENN NORRIS, EARLY IHLE, STACEY R. WITTELSBERGER, CHARLES A. BRYAN

1    The equity owners of Ohana Growth Partners, LLC (OGP) played a pivotal role in enabling, perpetuating, and benefitting from systemic misconduct, retaliation, and procedural manipulation that directly harmed Plaintiff Ryan Dillon-Capps (RDC). Despite their oversight responsibilities and participation in key strategic discussions, the equity owners failed to take meaningful action to address or mitigate ongoing misconduct within the organization. Their collective inaction, coupled with their financial and operational decisions, allowed a hostile workplace culture and unlawful practices to flourish unchecked.

2    As participants in weekly strategy meetings with executives and department heads, the equity owners were fully aware of systemic risks, allegations of retaliation, and ongoing misconduct. However, instead of intervening, they facilitated and approved strategies that normalized harassment, defamation, and retaliation. Their decisions and lack of accountability directly contributed to the harm suffered by RDC and others. Despite repeated warnings and documented evidence of unlawful practices, the equity owners refused to act, enabling OGP leadership to continue their retaliatory practices without consequence.

3    The equity owners directly and indirectly benefitted from these practices, leveraging shareholder distributions and operational growth sustained by systemic violations of legal and contractual obligations. Their actions included supporting strategies tied to consumer protection violations, FMLA interference\retaliation, and whistleblower retaliation. Additionally, their involvement in multiple rounds of equity recapitalization and debt

refinancing, such as those co-advised by Charles A. Bryan of Bengur Bryan and Stacey R. Wittelsberger of Exeter Street Capital Partners. Through multiple equity recapitalizations, the co-advisors directly benefited financially while failing to address or mitigate the documented risks associated with retaliation and misconduct.

4    Victor and Lynne Brick, as founders and equity owners, not only benefitted from shareholder distributions but also participated in strategic decisions that enabled systemic violations. Glenn Norris, in his role as CFO and equity owner, contributed directly to implementing and perpetuating practices that advanced retaliation, fraud, and procedural obstruction.

5    The equity owners' failure to intervene and their active support for litigation strategies, including fabricated claims and spoliation of evidence, further compounded the harm suffered by RDC. By enabling retaliatory lawsuits and procedural manipulation, they suppressed whistleblowing efforts and obscured systemic misconduct within OGP. Their refusal to act, combined with their financial support of retaliatory practices, highlights their disregard for legal and ethical standards.

6    Through their participation in strategic decisions and financial backing of unlawful practices, the equity owners fostered a culture of retaliation and harassment within OGP. By prioritizing financial gain over accountability, they normalized misconduct and perpetuated the systemic violations that harmed RDC. Their actions and inaction not only demonstrate complicity in these practices but also a shared responsibility for the unlawful treatment of RDC and the broader organizational misconduct.

## 2.  VICTOR BRICK

7    Victor Brick, as Chief Executive Officer of Ohana Growth Partners, LLC (OGP), played a central role in escalating retaliatory actions and enabling systemic misconduct that directly harmed Plaintiff Ryan Dillon-Capps (RDC). His actions demonstrate a calculated disregard for legal, contractual, and ethical obligations, actively contributing to the hostile workplace environment and coordinated retaliation against RDC.

8    In the past year, RDC reached out to Victor Brick multiple times with the last times in May and June 2024. In May 2024,  Victor was notified of the abusive conduct of CFO Glenn Norris that is directly connected to the first catatonic episode, and then again on June 13, 2024, after Richard Hartman retaliated against Darren Koriztka.

9    In response to these escalations seeking assistance, the CEO issued a coercive threat to RDC in May, suggesting severe employment consequences for non-compliance of Glenn Norris' abusive demands to violate contractual obligations and consumer protection laws across six jurisdictions.  A pretext, as revealed through President Justin Drummonds intentionally evading satisfaction of the June 7th accord to receive the access associated with the coercive threats. The participation in the pretext, and on June 13, 2024, Brick further escalated the retaliatory campaign by engaging in conduct amounting to estoppel. He deliberately obstructed RDC's ability to meet fabricated expectations and exploited these conditions to justify additional retaliatory

measures. Brick's actions on this date were pivotal in legitimizing OGP's fabricated claims and setting the stage for the fraudulent lawsuit initiated against RDC.

10    Despite holding oversight authority during weekly strategy meetings—where policies enabling misconduct, harassment, and retaliation were discussed and approved—Brick failed to intervene or address systemic violations. His inaction following repeated warnings and evidence of wrongdoing emboldened others within OGP, normalizing retaliatory practices and fostering a culture of misconduct.

11    Victor Brick's active roles in May and June demonstrates an active leader of the enterprise. As CEO and Majority equity owner he directly and indirectly benefited from the retaliatory and coercive acts carried out by subordinates. His refusal to act on documented concerns and his active participation in escalating retaliatory measures made him complicit in the broader campaign of misconduct. Brick's actions, including issuing coercive threats, obstructing compliance, and neglecting to address systemic issues, significantly contributed to the harm suffered by RDC and perpetuated the unlawful practices that defined OGP's leadership.

### 3.  GLENN NORRIS

12    Glenn Norris, as Chief Financial Officer of Ohana Growth Partners, LLC (OGP), played a pivotal role in orchestrating coercive and retaliatory actions against Plaintiff Ryan Dillon-Capps (RDC). His actions served as a pretext for the fraudulent lawsuit initiated by OGP and reflected a deliberate disregard for legal, contractual, and ethical standards. In May 2024, Norris issued multiple coercive threats to RDC and is directly responsible for the Plaintiff PTSD being exacerbated in May, demanding actions that would knowingly violate contractual obligations for maintaining PCI DSS compliance as outlined in the Franchise Disclosure Documents (FDD) from Planet Fitness (NYSE:PLNT). These compliance requirements were critical to adhering to consumer protection laws across multiple jurisdictions, including Washington, California, Tennessee, Florida, Maryland, and the District of Columbia. As CFO, Norris was fully aware of the Franchisor's merchant agreement and its responsibility for compliance with federal oversight tied to Planet Fitness's status as a publicly traded company.

13    On June 13, 2024, Norris directed Richard Hartman to send the 9:00 AM email interfering with RDC's protected FMLA leave. This marked a deliberate escalation in the campaign of retaliation, culminating in a 12-hour session later that day, known as the "gauntlet," during which fabricated allegations were crafted to support the retaliatory lawsuit. Norris also engaged in defamatory conduct, spreading false and harmful statements about RDC to damage their professional reputation and create a narrative that justified OGP's adverse actions.

14    Beyond his coercive and retaliatory actions, Norris actively obstructed investigations into financial misconduct reported in October 2023, involving accounting irregularities tied to Onsite Solutions. Rather than addressing the discrepancies transparently, Norris requested fraudulent invoices to obscure the misconduct, generating falsified records to resolve the issues superficially. These actions demonstrated a pattern of shielding systemic fraud while suppressing whistleblowing efforts by RDC. Norris further undermined RDC's position by

stripping them of supervisory authority, sabotaging IT operations, and disseminating misinformation to harm RDC's credibility.

15 Norris's role in spoliation was equally significant. He withheld, altered, and destroyed evidence related to misconduct, obstructing justice and protecting OGP's leadership from accountability. His actions directly contributed to the systemic harassment of RDC, normalizing a workplace culture of retaliation and misconduct. During May 2024, Norris leveraged financial and reputational threats to coerce RDC into symbolic acts of submission, escalating pressures that led to five months of malicious prosecution.

16 Norris's conduct, including coercive threats, spoliation of evidence, defamation, and obstruction of investigations, is directly tied to numerous counts of misconduct. These include violations of FMLA protections, consumer protection laws, whistleblower retaliation statutes, and contractual obligations. His deliberate actions reflect a pattern of suppressing lawful reporting, shielding systemic fraud, and enabling systemic retaliation within OGP. By fostering a hostile workplace and advancing the retaliatory campaign against RDC, Norris was instrumental in perpetuating the culture of misconduct that defined OGP's leadership.

## 4. RICHARD HARTMAN

17 Richard Hartman, as Vice President of Human Resources for Ohana Growth Partners, LLC (OGP), played a central role in systemic misconduct, retaliation, and harassment against Plaintiff Ryan Dillon-Capps (RDC). Hartman's actions reflect deliberate manipulation of processes, evidence tampering, and active participation in fostering a hostile work environment, contributing significantly to the harm experienced by RDC and others.

18 On June 13, 2024, Hartman sent the 9:00 AM email directed by CFO Glenn Norris, which contained coercive demands and interfered with RDC's protected FMLA leave. This email marked a critical escalation in the retaliatory campaign against RDC, culminating in a 12-hour session that day designed to fabricate allegations and support OGP's fraudulent lawsuit. Hartman also collaborated closely with Norris and Miles & Stockbridge to direct retaliatory actions against both RDC and Darren Koritzka, using his authority to mislead others into engaging in harassment and retaliation.

19 Hartman submitted a perjured affidavit on June 14, 2024, that included multiple false statements to support OGP's fabricated claims. These statements falsely asserted that OGP lacked administrative or Global Admin (GA) access. Hartman also fabricated two false narratives about lost access on June 13, first claiming access was lost at 2:05 and then falsely claiming access was lost to the Paycom system. This and every other material statement made by Hartman, Drummond, and Robert Brennen have been shown to be a perjured statement. Additionally, Hartman altered contractual evidence, removing key pages from RDC's employment contract before submitting it in litigation to hide previous contractual manipulation.

20 Further, Hartman engaged in spoliation of evidence by destroying or altering critical FMLA documents, signed contracts, and other materials to shield OGP leadership from accountability. He manipulated text from a webpage, taking it out of context and misquoting its contents to misrepresent facts and support OGP's narrative.

Hartman also spread false and defamatory statements about RDC, including fabricating claims regarding pronoun preferences, to harm RDC's credibility and reputation.

21    Throughout his actions, Hartman actively fostered a hostile work environment, normalizing systemic retaliation and undermining RDC's position within the organization. By tampering with evidence, submitting false statements, and leveraging his authority to direct others into misconduct, Hartman significantly contributed to the coordinated effort to harm RDC and obscure OGP's internal misconduct. His deliberate actions demonstrate a calculated effort to manipulate processes, suppress whistleblowing, and obstruct justice.

## 5.  JUSTIN DRUMMOND

22    Justin Drummond, as President of Ohana Growth Partners, LLC (OGP), played a pivotal role in enabling and executing retaliatory actions and systemic misconduct that directly harmed Plaintiff Ryan Dillon-Capps (RDC). Drummond's actions demonstrated a deliberate pattern of evasion, false statements, and complicity in advancing the retaliatory conduct orchestrated by OGP's leadership. His decisions and inaction not only escalated tensions but also legitimized systemic retaliation and harassment, contributing significantly to the harm suffered by RDC.

23    On June 7, 2024, Drummond entered into a written accord with RDC, agreeing to accept access on behalf company leadership. However, on June 10 and 11, 2024, he intentionally evaded the accord's terms, failing to fulfill its conditions. By June 14, 2024, Drummond had breached the agreement entirely, using fabricated claims of "non-compliance" as a pretext for RDC's suspension. This breach was preceded by the retaliatory campaign against RDC and Drummond's estoppel.  Drummond knowingly obstructed RDC's ability to comply with demands while exploiting the fabricated conditions to justify further adverse actions.

24    On June 14, 2024, Drummond filed an affidavit containing multiple perjured statements to support OGP's retaliatory litigation against RDC. These statements falsely claimed that RDC had refused to provide Drummond with access and failed to provide updates regarding HEA access. Drummond also falsely asserted that he had personally ordered the June 13 email, omitting the involvement of CFO Glenn Norris in the same retaliatory session. Furthermore, the affidavit falsely claimed that OGP lacked administrative or Global Admin (GA) access, despite clear evidence to the contrary. These misrepresentations were central to justifying the retaliatory measures taken against RDC and concealing the systemic misconduct within OGP.

25    In December 2023, Drummond failed to support RDC's efforts to expose fraud involving vendors such as Onsite Solutions. Despite RDC's repeated requests for assistance in preparing for a third-party fraud investigation. His inaction prevented critical investigations, shielded fraudulent practices, and emboldened others within OGP to perpetuate systemic retaliation.

26    Throughout these events, Drummond misrepresented his personal knowledge of technical and procedural matters, presenting himself as informed and authoritative while lacking substantive understanding. This deliberate misrepresentation further obstructed justice and shielded OGP leadership from accountability. By failing to act

and actively participating in systemic retaliation, Drummond legitimized a workplace culture that normalized harassment and misconduct. His actions reflect a clear disregard for ethical and legal standards, significantly contributing to the harm suffered by RDC and enabling the broader misconduct orchestrated by OGP.

### 6. HOLLY BUTLER

27     Holly Butler, as a principal at Miles & Stockbridge, P.C. (M&S), played a central role in the pretext conspiracy orchestrated by Ohana Growth Partners, LLC (OGP). Her actions reflect a deliberate pattern of deception, manipulation, and collusion aimed at enabling retaliatory actions against Plaintiff Ryan Dillon-Capps (RDC) while shielding OGP leadership from accountability. Butler misrepresented herself as an impartial investigator between December 2023 and March 2024, representing herself as the 3rd party fraud investigator RDC requested. Under the guise of neutrality, she engaged RDC in discussions to obtain sensitive information, intended to later weaponized to undermine RDC's credibility and protect OGP executives. By withholding OGP's adverse position and portraying herself as independent, Butler obstructed RDC's ability to seek legal protections and build an informed defense against retaliatory measures.

28     In June 2024, Butler refused to clarify Miles & Stockbridge, P.C. representational role, deliberately concealing whether she was actively representing OGP in its retaliatory lawsuit. This concealment was to prevent prelitigation negotiations.

29     By failing to disclose this critical information, Butler violated ethical obligations and prevented RDC from understanding the legal landscape or securing effective legal counsel.

30     Butler's participation in fabricating narratives to discredit RDC intended to advance OGP's broader retaliatory strategy. She worked closely with OGP executives, including Glenn Norris, Richard Hartman, and Justin Drummond, in creating the first attempt of creating a pretext in Mach. Her alignment with OGP's leadership underscores her pivotal role in enabling retaliation while shielding systemic misconduct from accountability.

31     Holly Butler's actions as a principal at M&S directly supported OGP's retaliatory efforts. By misrepresenting her role and advancing false narratives, she strengthened OGP's ability to retaliate against RDC and silence whistleblowing. Her deliberate misuse of legal authority and collaboration with OGP leadership exemplifies the critical role M&S played in perpetuating misconduct and insulating its client from exposure. Butler's conduct demonstrates her active participation in a conspiracy to suppress dissent and protect OGP's leadership, further compounding the harm inflicted upon RDC.

### 7. STEPHEN FRENKIL

32     Stephen Frenkil, a principal at Miles & Stockbridge, P.C. (M&S), played a key role in the procedural manipulation and pretext conspiracy targeting Plaintiff Ryan Dillon-Capps (RDC). Frenkil's involvement dates back to December 2023, six months before the retaliatory litigation formally began, when he received RDC's

personal email address and mobile contact information. Despite this early engagement, M&S and the presiding judges actively sought to obscure Frenkil's role by resisting efforts to formally add him to the court record. This concealment directly supported the law firm's broader efforts to suppress whistleblowing and shield Ohana Growth Partners, LLC (OGP) leadership from accountability.

33    The intentionality of this concealment became evident during the no-notice ex parte Temporary Restraining Order (TRO) hearing, which included RDC's prohibited work email address in the filings. This address was inaccessible to RDC following their suspension, further ensuring their exclusion from the process. The fact that Frenkil had been provided personal email and mobile information in December 2023 underscores that the use of the work email was deliberate and designed to obstruct RDC's ability to respond effectively. The ex parte TRO hearing, held without notice to RDC, directly violated procedural fairness and exemplified the misuse of judicial processes in support of OGP's retaliatory campaign. Judge Truffer's denial of the rehearing and granting of the show cause hearing giving the Plaintiff a 2 day notice further supports the collusion between law firm and ruling judges.

34    RDC repeatedly sought to have Frenkil and fellow M&S principal Holly Butler formally added to the court record, citing their active involvement in filings, including Frenkil's signature appearing on attorney listings as early as June 14, 2024. However, these motions were systematically denied, including a denial by Judge Stringer, despite clear evidence of Frenkil's presence on filings. This consistent refusal to acknowledge Frenkil's role served to suppress evidence of his contributions to the procedural abuses, further implicating the judiciary in the conspiracy.

35    On November 8, 2024, the court record was updated after hours to include Frenkil's name. This update came only after RDC pointed out his presence on filings in response to Judge Stringer's denial to add him formally. Circumstantial evidence suggests that County Administrative Judge Robinson Jr., who had received an email from RDC earlier that day, may have facilitated this secretive update. The timing and nature of this addition raise significant concerns about collusion between M&S and the judiciary to obscure Frenkil's involvement and shield him from scrutiny.

36    The coordinated efforts to keep Frenkil off the record, combined with his documented involvement in the no-notice ex parte TRO hearing and the deliberate use of an inaccessible email address, directly tie M&S to the broader conspiracy targeting RDC. These actions exemplify how procedural manipulation was weaponized to suppress whistleblowing, protect OGP leadership, and advance retaliatory litigation. Frenkil's conduct demonstrates a deliberate misuse of legal authority and procedural processes to obstruct justice and harm RDC, further implicating M&S in the systemic misconduct that defined this case.

## 8.  ROBERT BRENNEN

37    As lead counsel for Ohana Growth Partners, LLC (OGP) and a principal at Miles & Stockbridge, P.C. (M&S), Robert Brennen manipulated judicial outcomes to shield OGP's leadership and M&S from

accountability. Brennen leveraged perjured affidavits, judicial complicity, and procedural manipulation to suppress whistleblowing and protect his co-conspirators, despite the clearly fraudulent nature of the lawsuit. His actions included filing affidavits with perjured statements on June 14, 2024, and seeking a Petition for Civil Contempt on July 3, 2024, to incarcerate RDC based on fabricated claims and contradictory affidavits.

38     Brennen's strategy weaponized the judicial system to financially devastate RDC, destroy their reputation, and exacerbate preexisting medical vulnerabilities, inducing malignant catatonia, a life-threatening condition. Despite full knowledge of these risks, Brennen intensified harm by orchestrating the denial of utilities and necessities during a medical crisis, ensuring RDC's suffering.

39     The case, sustained through judicial corruption, unraveled as RDC exposed conspiracies involving Brennen, OGP, and M&S. Although Brennen attempted to secure a premature default judgment on August 20, 2024, and reassert $2,500-per-day contempt fines, his reliance on fabricated claims and judicial complicity became apparent.

40     In October 2024, RDC's counterclaims revealed whistleblower retaliation, judicial collusion, and abuse of process. Brennen dismissed these efforts as "baseless" and "frivolous" while filing a notice of voluntary dismissal to retreat from mounting scrutiny.

41     The harm inflicted on RDC was catastrophic—financial ruin, irreparable reputational damage, and life-threatening physical harm. Brennen's actions reflect a gross misuse of legal authority, aligning M&S, OGP, and judicial actors in a conspiracy to silence dissent and perpetuate systemic misconduct.

## 9.  RANDALL ROMES

42     Randall Romes, of Clifton Larson Allen LLC, played a central role in advancing the retaliatory litigation campaign against RDC through his affidavit, which contained significant issues regarding its credibility and content. Evidence suggests Romes relied on incomplete or altered documents, and there are doubts about whether he authored all or part of the affidavit. The affidavit claimed that Romes reviewed a June 18, 2024, letter documenting PCI Compliance Requirements provided to the Employer, yet Romes affidavit states the letter did not have specific requirements being provided.  Suggesting Romes did not receive the entirety of the letter and its attachments.

43     Further raising credibility concerns, email evidence from Robert Brennen to Judge Truffer suggests deliberate attempts to circumvent procedural requirements. These efforts included replacing an unsigned affidavit page with a signed version, casting doubt on whether Romes was fully aware of the affidavit's final contents. These revisions occurring on or around June 25th, indicate external influence aimed at aligning Romes's testimony with the Employer's narrative. These manipulations highlight Judge Truffer's collusion with Robert Brennan.

44     During the hearings on June 26–27, 2024, Judge Barranco blocked RDC from cross-examining Romes, preventing any challenge to the affidavit's discrepancies or its role in advancing false claims. This obstruction

deprived RDC of the opportunity to expose procedural misconduct and scrutinize Romes's testimony, further entrenching the fabricated evidence used to inflict harm on the Plaintiff. The blocked cross-examination also shielded key details about the affidavit's preparation, including its reliance on unauthenticated evidence and the full extent of Romes's involvement.

45    As a senior professional at Clifton Larson Allen LLC, a company registered to conduct compliance audits of PCI compliance. Romes's involvement raises questions about his ethical responsibilities, and CLA's business practices. His statements align with remarks he made in professional speaking engagements, where he discussed compliance and technical standards, perjured material statements addressed in the affidavit on Ohana's legal obligations. It remains critical to determine who hired Romes, what materials were provided to him, and the extent of his involvement in preparing the affidavit, including whether coercion or undue influence played a role.

46    The affidavit was strategically used to advance retaliatory litigation and inflict harm on RDC. Its contradictions, including the misrepresentation of administrative access and PCI compliance obligations, were central to the Employer's efforts to establish estoppel and pursue punitive actions such as the show cause order seeking RDC's incarceration. Robert Brennen repeating these rulings and events in nearly every filing made by Miles & Stockbridge, P.C. By advancing false technical validations, Romes played a key role in facilitating the objectives of a RICO enterprise, which relied on fabricated evidence to achieve its retaliatory goals.

47    Romes and Clifton Larson Allen LLC are implicated as a Defendant due to their active participation in fabricating and endorsing false claims, obstructing justice, and perpetuating harm against RDC. The affidavit prepared by Romes served as a cornerstone for punitive measures, and the blocked cross-examination underscores the coordinated effort to suppress RDC's defense and enable the broader conspiracy. These actions demonstrate their complicity in perpetuating a retaliatory campaign that inflicted financial, reputational, and personal harm on RDC.

## 10. DANIEL LEVETT

48    The affidavit submitted by **Daniel Levett**, Senior Director at Hartman Executive Advisors, contains significant inconsistencies and contradictions, raising questions about its validity and his role in the litigation. While the affidavit reflects Levett's technical competence to expose Hartman and Drummond's perjured statements, the language suggests influence from non-technical individuals, casting doubt on its independence. Evidence confirms that Levett was actively involved in the events of June 26–27, 2024, making him a material participant in advancing retaliatory actions against RDC.

49    Levett's affidavit played a key role in attempts to establish estoppel and further fraudulent claims against RDC. However, Levett's admission that administrative access existed through the Help Desk Manager directly contradicted prior assertions by Ohana Growth Partners (OGP). These inconsistencies expose Levett's involvement in supporting false narratives that facilitated punitive actions, including the show cause order seeking incarceration.

50    A June 11, 2024, phone call between Norris, Justin Drummond, and RDC, included  Norris referencing Hartman Executive Advisors in a way that implied a personal connection or referral. The extent of Levett's knowledge about Hartman Executive Advisors' broader involvement remains a critical issue for discovery.

51    Levett's affidavit was attached to the contempt seeking incarceration against RDC, further entrenching retaliatory litigation. Despite Levett's technical expertise, his participation aligned with the objectives of a coordinated campaign to suppress whistleblowing and inflict harm on RDC. His role in the litigation demonstrates complicity in advancing the retaliatory and obstructive actions led by Ohana Growth Partners and its legal counsel.

52    Levett's involvement, particularly in providing technical validations for contradictory claims, underscores his role in perpetuating harm. His affidavit supported retaliatory measures, obstructed justice, and contributed to the broader objectives of a RICO enterprise targeting RDC. Levett's inclusion as a Defendant is justified due to his material participation in fabricating and endorsing claims that inflicted financial, reputational, and personal harm on RDC.
Levett's July 3, 2024, exposed the Employer's misrepresentation of access to the Global Administrator role. Screenshots provided by the Employer's own expert confirm that members of the Help Desk Department could readily access these accounts, contradicting Levett's and the Employer's claims. This evidence reinforces the assertion that Levett's affidavit was strategically crafted to obscure material facts while advancing a narrative that aligned with the Employer's retaliatory objectives.

53    The Plaintiff intends to investigate Hartman Executive Advisors' connections to Glenn Norris, as well as the role of Phil Leadore, who is listed on the  9 am email, suspension , and TRO orders until the hearing where it was switched.  The canceled June meeting, initiated by Phil Leadore shortly after communications with Glenn Norris and Justin Drummond, raises concerns about the firm's involvement in coordinating retaliatory actions. Leadore's avoidance of direct participation and the ambiguous explanations offered in subsequent communications warrant closer scrutiny. These interactions suggest a coordinated strategy to insulate key actors from accountability while enabling Levett to act as a conduit for advancing conspiratorial objectives.

54    The timing and content of Levett's affidavit also suggest its use as a tool to support punitive measures, including the show cause order seeking RDC's incarceration. Levett's role as a Senior Director places him in a position of authority, and evidence surrounding Levett's role further implicates Hartman Executive Advisors as an entity. The Plaintiff intends to subpoena internal communications and technical logs to uncover potential links between Levett, Norris, and other conspirator in the systemic misconduct targeting the Plaintiff.

## 11. JUDGE DESIMONE JR.

55    Judge DeSimone Jr. played a central role in advancing the retaliatory litigation against RDC by issuing an **Ex Parte Temporary Restraining Order (TRO)** that violates the Norris-LaGuardia Act . The initial filing by Ohana Growth Partners, LLC, and Miles & Stockbridge, P.C., included admissions by Richard Hartman of

interfering with and retaliating against RDC's FMLA leave, as well as glaring inconsistencies and fabrications. Despite these red flags, Judge DeSimone Jr. granted the unlawful TRO  and doing so without notice to RDC.

56    Additional Red flags included a suspension email and letter from June 13, 2024, which confirmed retaliation and explicitly prohibited RDC from accessing work systems, including their work email. Despite this, the Certificate of Notification for the TRO listed only RDC's inaccessible work email, ensuring RDC would not receive proper notice of the hearing. This deliberate oversight denied RDC the ability to participate in the proceedings, challenge the legality of the TRO, or challenge the retaliatory actions.

57    The allegations presented in the initial filing were speculative, lacked evidence of harm, and failed to explain why RDC would want to harm Ohana Growth Partners. Additionally, email communications from Brennen revealed that even if the work email had been accessible, RDC was given only 30 minutes' notice for the hearing. Hyperlink references within the filing further demonstrated doctored evidence, including patchworked quotes that contradicted the original content when reviewed on the linked webpages.

58    Despite these glaring issues, Judge DeSimone Jr. issued the unlawful TRO with orders containing conflicting clauses, further invalidating the TRO, the ruling, and the entire lawsuit which is filed as an injunction seeking RDC to be compelled to work.

59     Moreover, the case record for this hearing was riddled with procedural misconduct, including the absence of a transcript, hearing sheet, or any formal record of the proceedings. The decision to issue the TRO without notice or proper recordkeeping reflects a deliberate bypass of due process and systemic corruption within the court. The filing itself,  plus the numerous deficiencies, should have been rejected outright, pointing to collusion within the clerk's office. Judge DeSimone Jr.'s ruling exemplifies how Brennen relied on this pre-existing corruption to establish the foundation of the litigation conspiracy and to perpetuate harm against RDC.

60    Issuing an injunction for the claim of "refusing" to comply with a work request constitutes a clear violation of **29 U.S.C. §§ 101–115 (Norris-LaGuardia Act)**, which prohibits courts from granting injunctions in labor disputes involving terms or conditions of employment. Such an injunction was not only unnecessary but also unlawful, setting a precedent for subsequent rulings that reflect a broader pattern of judicial overreach. This action underscores the conspiracy to misuse judicial authority, systematically disadvantaging RDC and shielding the retaliatory actions of the opposing parties.

## 12. JUDGE TRUFFER

61    Judge Truffer's rulings demonstrate a consistent pattern of procedural manipulation that obstructed RDC's access to justice while advancing the retaliatory objectives of Ohana Growth Partners and Miles & Stockbridge. On June 18, 2024, RDC filed a letter requesting an Ex Parte Rehearing under § 15-504(f), which required a mandatory hearing. On June 21, 2024, instead of granting the rehearing, Judge Truffer issued a denial and simultaneously granted a Petition for Show Cause: Constructive Civil Contempt on the unlawful injunction that violated the Norris-LaGuardia Act.

62    Additionally, RDC was not informed of the denial until June 24, 2024, when they were notified of a combined Preliminary Injunction and Show Cause hearing scheduled to occur in two days. This scheduling violated procedural rules requiring a pre-hearing and a minimum of 20 days' notice under 15-206(c)(2), further compounding the denial of RDC's due process rights.

63    Between July 1 and July 12, 2024, clerical actions and rulings from Judge Truffer worked in concert to obstruct RDC's ability to challenge the fraudulent litigation. RDC's submissions were repeatedly flagged with deficiency notices despite being prepared according to instructions provided by court personnel. Each time RDC reorganized and re-sorted the same files, they were rejected again. These actions reflect an intentional policy of creating barriers to court access, disproportionately impacting RDC and obstructing their ability to present substantive claims.

64    On July 5, 2024, Judge Truffer denied RDC's Motion to Reconsider Continuance, before the clerk granted the Plaintiff permission to participate in the judicial process.  Truffer's premature ruling also disregarded  the line filling with supplemental filings with supporting motions, errata, and evidence to addressed prior procedural issues. This denial, delayed until its entry on July 12, reflects a deliberate tactic to exhaust RDC's resources and prevent them from meaningfully pursuing relief. These events highlight Clerk Ensor's direct involvement and collusion with the ruling judges.

65    Judge Truffer's actions reveal a deliberate bypassing of statutory requirements and mandatory processes. Denying the Ex Parte Rehearing while granting the Show Cause Petition on the same day prioritized punitive measures instead of due process and suppressed RDC's ability to challenge the procedural deficiencies of the Ex Parte Temporary Restraining Order. The scheduling of a Preliminary Injunction hearing in violation of procedural rules, coupled with the systematic use of deficiency notices, further entrenched barriers to justice.

66    Through these rulings and procedural tactics, Judge Truffer directly advanced the objectives of the litigation conspiracy: silencing RDC, shielding the Defendants, and suppressing evidence of systemic misconduct. Their role in denying RDC access to mandatory legal processes underscores the judicial complicity that sustained the broader retaliatory campaign.

## 13. JUDGE BARRANCO

67    Judge Barranco's conduct reveals a deliberate pattern of constitutional violations and judicial overreach, demonstrating active participation in a litigation enterprise conspiracy. By interfering with the plaintiff's rights under the **Family and Medical Leave Act (FMLA)**—explicitly refusing the plaintiff's plea to use their FMLA leave—and retaliating against the plaintiff for asserting those rights, Barranco directly violated federal law and the **Ninth Amendment**, which protects unenumerated rights such as those established by the FMLA. Additionally, the injunction issued by Barranco effectively demanded forced labor by requiring compliance with employment-related actions under threat of contempt, directly violating the **Thirteenth Amendment**'s prohibition on involuntary servitude.

68    Barranco further disregarded federal supremacy by denying motions related to jurisdictional challenges, including those involving multi-state issues, the **Federal Trade Commission Act**, and the FMLA/ADA claims. These motions, which sought to change venue and address violations spanning six jurisdictions and multiple contracts, were summarily denied without sufficient consideration. The denial of the plaintiff's Motion for Continuance, which was requested to allow time to secure legal representation, left the plaintiff without adequate counsel. This denial, followed by the imposition of excessive daily fines despite the plaintiff's lack of income, constitutes clear violations of the **Fifth and Sixth Amendments**, depriving the plaintiff of due process and the right to meaningful legal representation.

69    Throughout these proceedings, Barranco prevented cross-examination, forced leading questions to elicit misleading answers, and relied on those answers to justify rulings that advanced the retaliatory objectives of the opposing parties. His rulings—including the granting of injunctive relief in violation of the **Norris-LaGuardia Act (29 U.S.C. §§ 101–115)**—ignored procedural safeguards and conflicted with numerous federal and state consumer protection laws. These actions culminated in excessive penalties, discriminatory practices, and a systemic denial of the plaintiff's constitutional rights under the **First, Fifth, Sixth, Eighth, Ninth, Thirteenth, and Fourteenth Amendments**.

70    Later, the emotionally charged Judge Barranco would write a page long opinion that focused on launching personal attacks at the Plaintiff and labeling the Plaintiff's accusations targeting Judge Barranco in order to discredit the Plaintiff.

71    As a key participant in the litigation enterprise conspiracy, Barranco's complicity passes liability to all other members of the conspiracy. His rulings directly enabled the retaliatory objectives of the opposing parties and shielded their misconduct, making him vicariously liable for the broader scheme's unlawful actions. This shared conspiracy liability nullifies any claim to **Eleventh Amendment immunity** not only for Barranco but for all others who participated in, benefited from, or perpetuated the unlawful acts. His actions underscore the depth of judicial overreach and the collective accountability of all involved in the scheme to deprive the plaintiff of their rights.

72    On numerous occasions, the Plaintiff warned Judge Barranco and the other ruling judges

## 14. JUDGE ALEXANDER

73    Judge Alexander's handling of the plaintiff's motions demonstrates a disregard for procedural fairness and due process rights. The **Motion for Extension of Time**, filed on **July 8**, was denied the following day on **July 9**, but the opinion was withheld until **July 22**, depriving the plaintiff of timely clarity on the court's reasoning and further obstructing their ability to respond effectively. Despite the **Notice of Line Filing** supporting the request, the motion was denied without adequate consideration. The plaintiff was not provided sufficient notice or opportunity to be heard, violating fundamental due process principles. Additionally, equitable principles that should have supported a procedural extension were ignored, compounding the procedural denial of fairness.

74    When the **Motion for Clarification on the Denied Motion for Extension of Time** was addressed, Judge Alexander's opinion reflected no ruling on the due process violations raised. Instead, the opinion cited the unrelated argument that the attorney had failed to formally announce themselves before withdrawing. This rationale entirely sidestepped the plaintiff's valid concerns about the lack of notice and the prejudicial denial of time. The attorney's withdrawal, which occurred after reviewing the fraudulent lawsuit complaint and June 17th TRO, was based on the erroneous presumption that the plaintiff, rather than the system working against them, was engaged in misconduct. This critical misunderstanding left the plaintiff unsupported during a time of significant mental health deterioration.

75    Shortly after these events, and under the strain of the lawsuit, TRO, and the attorney's abrupt departure, the plaintiff experienced a severe psychotic break, marked by dissociative amnesia and their first dissociative episode. Judge Alexander's failure to address or mitigate these cascading harms, coupled with the unreasonable delay in issuing the July 9 opinion, reflects a lack of judicial attentiveness to the procedural and equitable needs of the plaintiff, further exacerbating their vulnerability within the litigation process.

## 15. JUDGE BATTISTA

76    Judge Battista's premature granting of a **Request for Default** initiated a cascade of procedural and substantive harm to the plaintiff, with subsequent actions by Judge Stringer and County Administrator Judge Robinson Jr. solidifying the conspiratorial intent to inflict maximum harm. Battista's decision on **August 20**, granting default just **four hours after it was filed**—despite the **August 26 deadline from automatic extensions and weekend rollovers**—ignored procedural safeguards and denied the plaintiff an opportunity to have their opposition fairly considered. While the plaintiff's opposition was filed the same day, Stringer's **September 17 denial of the opposition** compounded the harm caused by Battista's premature ruling.

77    On **October 10**, Judge Stringer ruled to vacate the default but ignored every other argument raised in the motion, sidestepping critical issues of procedural violations and the systemic harm inflicted by the conspirators. This narrowly tailored ruling was issued in sync with County Administrator Judge Robinson Jr.'s return from a meeting with **Director of Investigation Bernstein** of the disability commission, signaling a pivotal moment in the litigation enterprise conspiracy. The **October 16 entry of the vacate ruling** officially marked the transition from the **2nd conspiracy**, led by Brennan, to the **3rd conspiracy**, now directed by Robinson and involving new conspirators. The coordination between Stringer's ruling and Robinson's actions provides further evidence of the shifting leadership within the conspiratorial enterprise.

78    This transition solidified the conspirators' intent to exploit procedural delays as a weapon to inflict irreparable harm. During this period, from August 20 to October 16, the plaintiff escalated concerns to oversight bodies and state agencies, raising alarms about the approaching financial default and its devastating impact. The conspirators' deliberate slow-walking of the case during this time maximized harm, targeting not only the plaintiff but also their vulnerable dependents, including a disabled brother, an elderly mother, and a wife with

cerebral palsy. By focusing on procedural delays after recognizing the financial and emotional toll they caused, the conspirators demonstrated a calculated intent to exacerbate harm.

79    While Stringer's eventual vacate ruling addressed the default in form, it failed to address the substantive issues raised, allowing the systemic harm to persist. The coordination between Battista's initial ruling, Stringer's limited vacate order, and Robinson's assumption of leadership underscores the interconnected nature of the conspiracies. This sequence of events not only facilitated harm but also demonstrated the deliberate and evolving strategies of the conspirators to suppress the plaintiff and perpetuate systemic misconduct.

## 16. JUDGE MAYER

80    Judge Mayer's rulings consistently reflect a pattern of judicial avoidance and coordination with other conspirators to suppress substantive challenges and protect the interests of Ohana and Miles & Stockbridge (M&S). In denying the **Motion to Vacate the Temporary Restraining Order (TRO)** on **August 21, 2024**, Mayer ignored compelling evidence and arguments demonstrating that the events of **June 13** were neither an emergency nor legitimate, but rather a manufactured incident intended to justify retaliatory litigation. The plaintiff argued the TRO was obtained without proper notice, a fundamental procedural violation, yet Mayer dismissed these points, further entrenching the systemic abuse.

81    On the same day, Mayer deemed the **Motion to Vacate the Show Cause Order of June 21, 2024**, as moot, improperly using mootness to sidestep a ruling on the substantive issues at the core of the case. The motion demonstrated that the show cause order was directly tied to the improperly issued TRO and therefore invalid. Despite this, the law firm representing Ohana and M&S subsequently filed oppositions that reasserted their intention to enforce the fines associated with the show cause order. These filings included direct threats to deter the plaintiff from pursuing further challenges, weaponizing the fines as a coercive tool. Mayer's reliance on mootness to avoid ruling on substantive issues enabled this strategy, leaving the plaintiff vulnerable to continued abuse and intimidation. This reflects the same coordinated strategy seen across the rulings of Battista, Stringer, and Robinson, as this order was connected to the default judgment.

82    Mayer's denial of the **Motion for Special Assignment** on **October 22, 2024**, underscores the systemic corruption. Mayer justified the denial with vague assertions that the procedural history and court file showed that pending matters were ruled on "effectively and efficiently." However, this language mirrors similar justifications used by Stringer and Robinson, reflecting a coordinated strategy to dismiss procedural concerns and shield the ongoing enterprise conspiracy. This was one of the only rulings against Ohana and M&S during this period, further highlighting the systemic bias at play.

83    Mayer also denied the **Motion for Expedited Discovery** on **October 22, 2024**, signaling a clear intent to obstruct the plaintiff's ability to uncover evidence critical to their claims. The denial appeared aimed at closing the case quickly and avoiding any exposure of procedural or substantive flaws in the underlying rulings. Similarly, the plaintiff's **Request for a Scheduling Conference**, ruled moot on **October 25, 2024**, and not

entered until **November 15, 2024**, reflects the same pattern of deliberate delay and avoidance to prevent the plaintiff from addressing critical case management issues.

84    From **October 16, 2024**, onward, the rulings of Mayer, Stringer, and Robinson share nearly identical language and strategies, demonstrating a coordinated effort to suppress substantive challenges and obscure the systemic corruption underpinning the case. These rulings, with rare exceptions like the vacate order and the denial of the special assignment, consistently favored Ohana and M&S, showcasing the depth of judicial complicity. Mayer's rulings, particularly the misuse of mootness, procedural delays, and the enabling of threats and coercion through the law firm's filings, further evidence the coordinated efforts of the conspirators to harm the plaintiff and conceal the enterprise conspiracy.

## 17. JUDGE STRINGER

85    Senior Judge Stringer's rulings demonstrate a pivotal role in the coordinated effort to suppress the plaintiff's claims and shield the misconduct of Ohana Growth Partners and Miles & Stockbridge. Stringer became the **leading ruling judge** after the **Motion for Extension of Time** and its subsequent **Request for Clarification**, but his alignment with the directives of Robert Brennen and later County Administrator Judge Robinson Jr. highlights his unique role as the bridge between the **2nd conspiracy**, led by Brennen and involving Judges Barranco, DeSimons, and Truffer, and the **3rd conspiracy**, which Robinson Jr. assumed control over. Stringer began covering for these judges **before any external parties were made aware of the coordinated actions**, demonstrating his complicity in protecting the earlier rulings while facilitating the transition to Robinson's oversight.

86    On September 17, 2024, Stringer denied the Opposition to Request for Entry of Order of Default Against Defendant Ryan Dillon-Capps, despite procedural and substantive issues surrounding the entry of default. Although a subsequent Motion to Vacate Order of Default was granted on October 16, 2024, the ruling narrowly addressed the default while ignoring associated sanctions and related procedural violations, failing to provide full relief to the plaintiff. This limited ruling reflected Stringer's strategy: issuing selective decisions under pressure while insulating the actions of Brennen and the earlier rulings from Barranco, DeSimons, and Truffer, whose decisions formed the foundation of the 2nd conspiracy.

87    Stringer consistently relied on procedural arguments to dismiss critical motions as moot, a tactic designed to silence substantive challenges and shield prior rulings from scrutiny. For instance, the **Motion to Vacate TRO/PI**, filed on **October 22**, was denied as moot on **November 15**, with Stringer asserting that the TRO expired post-dismissal—ignoring the broader implications of the order and its associated permanent injunction. Similarly, motions addressing ethical violations, wrongful termination, injunctive relief, and declaratory relief were systematically dismissed as moot, even as the former employer and law firm continued threatening enforcement of parts of the expired orders. These dismissals emboldened the opposing parties to maintain their campaign of intimidation while stripping the plaintiff of meaningful recourse.

88 Stringer's denial of the **Motion for Sanctions** on **October 22**, without providing any reasoning, further demonstrates his role in shielding misconduct and protecting both the 2nd conspiracy under Brennen's leadership and the emerging 3rd conspiracy led by Robinson Jr. By refusing to engage with motions tied to counterclaims, Stringer ensured that allegations of bad faith, ethical violations, and procedural abuses remained unaddressed. Similarly, his denial of the **Motion of Referral for Criminal and Ethical Investigations** on **November 15**, without explanation, disregarded 46 counts of alleged crimes and ethical breaches, allowing further harm to the plaintiff while suppressing accountability for conspiratorial actions.

89 The dismissal of the plaintiff's counterclaims on **November 15** was similarly rooted in procedural avoidance. By deeming motions tied to sanctions, discovery, and injunctive relief as moot, Stringer echoed the refrain of "case closed" to preclude any substantive examination of the plaintiff's arguments. This dismissal, despite 26 pending motions and counterclaims, highlights Stringer's role in protecting the defendants and the prior rulings of Barranco, DeSimons, and Truffer. Simultaneously, Stringer worked to support Robinson Jr. in consolidating control of the 3rd conspiracy, ensuring the continuity of the retaliatory campaign.

90 Stringer's unique position as the bridge between Brennen's leadership of the 2nd conspiracy and Robinson Jr.'s control of the 3rd conspiracy underscores his central role in the litigation enterprise. By actively shielding the rulings of the earlier judges while aligning with Robinson's directives, Stringer ensured the seamless continuation of coordinated efforts to suppress the plaintiff's claims and perpetuate systemic harm. His deliberate actions reveal his complicity in concealing judicial misconduct, advancing the conspirators' objectives, and maintaining the retaliatory campaign against the plaintiff.

91 enior Judge Stringer's decisions reflected a deliberate strategy to insulate co-conspirators and perpetuate procedural abuses. By consistently denying motions that addressed substantive violations, Stringer upheld a pattern of judicial alignment with the defendants. For example, his denial of motions to strike bad faith filings and for sanctions, despite clear evidence of procedural misconduct, reinforced the broader conspiracy. These rulings allowed unethical practices to persist while systematically obstructing the plaintiff's access to fair adjudication.

92 Stringer frequently relied on "moot" rulings to bypass substantive review, exemplifying his role in procedural manipulation. This tactic was particularly evident in his refusal to address injunctive relief motions tied to ADA and FMLA rights, further exacerbating harm to the plaintiff. These dismissals not only denied the plaintiff procedural fairness but also shielded systemic violations from scrutiny. His repeated use of this mechanism underscored his commitment to enabling structural inequities within the judicial process.

93 Stringer's rulings perpetuated a judicial environment that obstructed ADA and RA50-mandated accommodations, preventing the plaintiff from meaningfully participating in proceedings. By allowing misleading and unauthenticated evidence, such as hyperlink-based submissions, to stand, he directly undermined the plaintiff's rights to equal access and accommodations under federal law. These decisions had a cascading effect, obstructing the plaintiff's ability to enforce employment-related protections and pursue justice.

94     Through selective denials and avoidance of injunctive relief requests, Stringer reinforced the conspirators'
agenda to suppress claims of misconduct. His refusal to intervene in procedural abuses, such as the manipulation
of evidence affecting FMLA rights, enabled the defense's coordinated efforts to weaken the plaintiff's case.
Stringer's actions reflected not only judicial bias but also a willful disregard for the plaintiff's federally
guaranteed rights.

95     By collaborating with County Administrative Judge Robinson Jr. and other conspirators, Stringer played a
critical role in sustaining systemic corruption. His alignment with judicial customs that disproportionately
impacted Pro Se litigants and individuals with disabilities exemplified a broader pattern of institutional bias. This
complicity further entrenched structural inequities, ensuring that the plaintiff's claims remained obstructed at
every stage.

## 18. JUDGE ROBINSON JR.

96     Judge Robinson's rulings demonstrate a deliberate pattern of procedural abuse, obstruction, and
coordination to suppress the plaintiff's claims while shielding other judges and court actors from scrutiny. The
**Motion to Expedite Hearing**, submitted on **October 15, 2024**, and initially granted by Judge Finifter,
underscores the systemic efforts to obstruct administrative review and the apparent retaliation against those
attempting to allow due process. The motion, initially marked deficient by Clerk Endor, was part of a series
directed to the Administrative Judge's Office, submitted during a period when Judge Robinson is believed to
have been meeting with the **Director of Investigations**. It is during this time that a formal agreement to cover up
misconduct is reflected in subsequent rulings.

97     Although Judge Finifter's granting of the hearing reflected their commitment to judicial integrity, their
subsequent schedule changes and the ultimate reversal of their ruling after Judge Robinson's return reflect
possible retaliation for their decision. Judge Robinson's denial of the **Request for Reconsideration to Enforce
Administrative Judge Ruling** on **November 7, 2024**, echoed earlier responses, using matching language and
avoiding substantive engagement with the issues raised. This alignment with prior denials reflects a coordinated
effort to nullify Finifter's decision and suppress administrative oversight.

98     Similarly, the **Request for Emergency Administrative Review**, submitted on **October 30, 2024**, was
denied on **November 7, 2024**, with language that mirrored earlier rulings: "Denied – insufficient legal or factual
basis for the relief requested. The Court also notes that a voluntary dismissal was filed recently, and that the case
is closed." These inconsistencies in granting, expediting, and then ruling the requests moot reflect a deliberate
abuse of process to delay or prevent meaningful review. The procedural reversals and echoed language reflect a
coordinated strategy to ensure administrative oversight was stymied.

99     The issuance of the **Order Barring Contact with the County Administrative Judge**, filed on **November
14, 2024**, further highlights Robinson's effort to obstruct accountability. This order, which threatened sanctions
for contacting the Administrative Judge, cited prior "filings" that consisted of emailed complaints and notices of

filings. Notably, the final email referenced, sent on **November 8, 2024**, was followed by an email to the Director of Investigations on **November 10, 2024**, in which it was claimed the plaintiff would escalate their concerns the following Monday. However, no activity occurred on Monday, yet the order was backdated to **November 12, 2024**, and not filed until the 14th—coinciding with a Clerk Deficiency Notice issued the same day. These actions reflect the coordination between Robinson and the Director of Investigations, who is supposed to provide oversight, but instead actively conspired with Robinson to suppress the plaintiff's claims and retaliate against their attempts to seek accountability.

100    Following the issuance of this order, rulings resumed at a hastened pace, further reflecting a coordinated effort to expedite dismissals and procedural denials while avoiding meaningful engagement with the issues raised. Robinson's rulings, combined with procedural irregularities and mirrored language in denials, reflect a pattern of judicial misconduct and abuse of process. The collaboration with the Director of Investigations reflects the systemic nature of this conspiracy, further isolating the plaintiff and ensuring that avenues for oversight and redress were effectively blocked.

**Robinson's Systematic Suppression of Administrative Oversight**

In addition to his rulings, Robinson manipulated the administrative framework to further suppress the Plaintiff's claims. Procedural policies under his purview were leveraged to block the inclusion of critical filings, such as financial disclosures necessary to address counterclaims tied to PCI compliance and consumer protections. These filings, accepted and scheduled by Judge Finifter, were later obstructed and nullified following Robinson's return, ensuring their substantive merits were never reviewed.

101    **Targeted Suppression of Counterclaims**

Robinson's dismissal of the Plaintiff's counterclaims on November 7, 2024, not only obstructed the Plaintiff's pursuit of contractual rights but also left critical compliance issues unresolved. These counterclaims directly impacted public interest by addressing systemic noncompliance with Franchise Disclosure Document (FDD) contracts, consumer protections, and PCI standards spanning multiple jurisdictions. This dismissal reflects a judicial strategy to shield systemic misconduct from exposure and accountability.

102    **Retaliatory Issuance of Sanction Orders**

Robinson's November 14, 2024, Order Barring Contact with the Administrative Judge serves as a glaring example of his retaliatory practices. This order threatened sanctions for filing procedural objections or contacting oversight authorities. Backdated to November 12 but filed two days later, the order coincided with a Clerk Deficiency Notice, reinforcing suspicions of coordination between Robinson and the Clerk's Office. This tactic not only suppressed the Plaintiff's right to redress but also insulated systemic misconduct from scrutiny.

103    **Hindrance of Protected Leave and Accommodations**

Robinson systematically denied the Plaintiff's protected leave claims under the FMLA, rejecting accommodations that were critical for equitable participation in the legal process. These denials directly interfered with the Plaintiff's ability to fulfill professional obligations tied to PCI compliance and contractual

duties. On October 16 and November 6, 2024, Robinson dismissed ADA accommodation requests without substantive review, exacerbating the Plaintiff's financial and professional harm.

104 **Collusion with Judicial and Administrative Actors**

Evidence of collusion between Robinson and other judicial actors, including Clerk Julie Ensor, underscores his central role in a broader conspiracy to obstruct justice. Procedural tools like mootness and deficiency notices were weaponized to delay or deny the Plaintiff's motions, ensuring outcomes aligned with systemic misconduct. This alignment reveals a coordinated effort to neutralize challenges to entrenched judicial corruption while isolating the Plaintiff from avenues of oversight and redress.

## 19. DIRECTOR OF INVESTIGATIONS: TANYA C. BERNSTEIN

105    From **October 7 to November 8, 2024**, Tanya C. Bernstein, Director and Investigative Counsel for the Maryland Commission on Judicial Disabilities, demonstrated a deliberate failure to uphold her duties as an impartial overseer of judicial conduct. Instead, Bernstein actively participated in a conspiracy to shield judicial officers, including Judge Robinson and others, from accountability for their misconduct. Her involvement directly influenced procedural outcomes in the plaintiff's case, ensuring that complaints and oversight efforts were suppressed.

106    The turning point came on **October 16, 2024**, when Judge Robinson returned to his role as County Administrative Judge after a meeting with Bernstein, the **Director of Investigations**. Following this meeting, rulings from Robinson and other judges began to closely mirror language found in Bernstein's **October 11, 2024,** letter. This shift marked the beginning of coordinated efforts to suppress the plaintiff's case through procedural manipulation and selective enforcement. Tracked changes in lawsuit records, materialized later that evening, reflect direct interference following Robinson's return, implicating him and Bernstein in orchestrated actions to suppress the plaintiff's claims.

107    On **November 8, 2024**, the plaintiff sent an email to Robinson designed to provoke an induced response. That same evening, lawsuit records were again altered after business hours. The observed pattern of coordinated responses between Bernstein and Robinson confirms their alignment. On **November 10, 2024**, Bernstein received another email in the early hours, where the plaintiff outlined an intended action for **November 11, 2024**. This email triggered a predictable sequence of events:

108    **Monday, November 11**: A complete halt in judicial activity, ostensibly to assess whether the plaintiff's implied action would attract additional scrutiny.

109    **Tuesday, November 12**: Judge Robinson signed a retaliatory order but delayed its filing until Thursday.

110    **Wednesday, November 13**: The Clerk marked a filing as procedurally deficient, an inconspicuous action designed to test the plaintiff's reaction.

111    **Thursday, November 14**: Robinson formally filed the retaliatory order.

112    **Friday, November 15**: Judicial activity resumed at a rapid pace, denying motions and declaring them moot in an effort to suppress the plaintiff's claims and shift focus toward an anticipated appeal.

113    Bernstein's involvement as Director of Investigations enabled this orchestrated response. Her failure to address legitimate complaints and alignment with Robinson and other conspirators ensured that oversight mechanisms were weaponized against the plaintiff rather than used to hold judicial actors accountable. Bernstein's role reflects a deliberate obstruction of oversight, depriving the plaintiff of due process and transparency.

## 20. BAR COUNSEL: THOMAS DEGONIA II

114    As Bar Counsel for the Attorney Grievance Commission of Maryland, Thomas DeGonia II is responsible for ensuring ethical accountability among attorneys. However, from **October 7 to November 8, 2024**, DeGonia selectively enforced disciplinary measures, disregarded verified complaints, and reinforced retaliatory actions taken against the plaintiff. His deliberate inaction and coordination with judicial conspirators obstructed the plaintiff's access to impartial grievance processes.

115    The plaintiff's **October 4, 2024,** complaint to the Attorney Grievance Commission triggered an immediate change in Robinson Jr. schedule. On **October 7, 2024, at 6:13 AM**, a filing titled **"Affidavit of Harm"** was reviewed, at **12:50 PM** the **Notice of Hypothesis of Crayons** and at 1:01:35 PM the Bar Counsel emails "Thank you for your email. Your correspondence was received and is being processed as a new complaint. Should we need any additional information from you, we will contact you in writing." The following morning Ensor does everything she can to prevent anything else from being filed until Robinson Jr. returns.

116    **October 15-16, 2024**, return of Judge Robinson marked a key inflection point where Bar Counsel's involvement began to align more closely with judicial conspirators. On **October 22, 2024**, the plaintiff submitted critical evidence to Bar Counsel, including hearing transcripts and counterclaims. Rather than addressing the evidence, DeGonia aligned with judicial actors by ensuring procedural outcomes favored the defendants. Shortly after this submission, the law firm representing Ohana Growth Partners filed a **notice of voluntary dismissal**, further implicating coordination between Bar Counsel and judicial actors to suppress the plaintiff's claims.

117    On **October 28, 2024**, the plaintiff submitted an **"Amended Affidavit of Abusive Use of the Judicial System"** to DeGonia, outlining retaliatory measures and procedural abuses. Despite compelling evidence and urgency, DeGonia took no action, reinforcing the coordinated suppression of the plaintiff's rights.

118    DeGonia's selective enforcement, deliberate inaction, and alignment with Bernstein and Robinson obstructed the plaintiff's access to fair adjudication. His refusal to investigate legitimate complaints, coupled with his role in shielding conspirators, further entrenched the coordinated conspiracy's objectives. Together, Bernstein

and DeGonia's actions reflect a systemic failure of Maryland's oversight institutions to protect against judicial and professional misconduct.

## 21. CLERK ENSOR

119   **Julie Ensor**, the Clerk of the Circuit Court, played a central role in a coordinated effort to suppress the Plaintiff's claims and shield systemic misconduct. By leveraging her authority over **case filings**, **public records**, and **court procedures**, Ensor actively obstructed the Plaintiff's access to justice while aligning her actions with **judicial conspirators**. Ostensibly tasked with ensuring **transparency** and **accessibility**, Ensor instead weaponized **procedural policies**—most notably deficiency notices—to create unnecessary barriers, delay rulings, and exclude critical evidence from the record. These actions directly contributed to a broader conspiracy to deny due process and perpetuate systemic corruption.

120   Under Ensor's leadership, the Clerk's Office repeatedly flagged the plaintiff's filings as deficient, creating unnecessary barriers. From **July 1 to July 8, 2024**, filings related to the **Reconsideration for Continuance** were rejected multiple times on pretextual grounds, delaying their acceptance until after Judge Truffer ruled against the motion on **July 5, 2024**. These delays forced the plaintiff to refile identical documents, further exacerbating procedural disadvantages. Even when filings were accepted, rulings were strategically delayed, as evidenced by the **July 12 ruling**, which was held back until after the plaintiff's procedural rights had been undermined. These actions represent a targeted effort to obstruct the plaintiff's access to justice, coordinated with early rulings by Judges Barranco, DeSimons, and Truffer.

121   Between **July 1 and July 8, 2024**, Ensor's office repeatedly rejected filings related to the Plaintiff's **Reconsideration for Continuance** on pretextual grounds, delaying their acceptance until after **Judge Truffer** ruled against the motion on **July 5, 2024**. Even when filings were eventually accepted, rulings were strategically delayed, as demonstrated by the **July 12 ruling**, which further eroded the Plaintiff's procedural rights. Similarly, between **October 8 and October 11, 2024**, during **Judge Robinson's absence**, Ensor's office blocked critical **financial filings**, requiring the Plaintiff to engage additional parties to overcome the obstruction. Despite **Judge Finifter's ruling** in favor of including these filings, Ensor collaborated with Robinson upon his return to prevent the scheduling and enforcement of that decision. On **November 8, 2024**, lawsuit records were altered after business hours, and by **November 13, 2024**, key submissions—including **affidavit exhibits**—were labeled deficient or rejected, ensuring the exclusion of essential evidence. On November 14, 2024, Ensor issued a deficiency notice coinciding with a retaliatory order by Judge Robinson, underscoring their coordinated efforts.

122   Ensor systematically fabricated **deficiencies** modified **procedural tools**, and selectively enforced **court policies** to obstruct the Plaintiff's filings while expediting submissions from opposing parties. This included altering **Form CC-DC-094 (Rev. 01/2024)** to fabricate reasons for rejecting valid filings, further obstructing justice. By manipulating the **court record** to align with conspirators' objectives, Ensor created records that misrepresented reality, ensuring procedural advantages for judicial collaborators while concealing systemic

misconduct. Her actions not only created an **uneven procedural environment** but also fundamentally undermined the integrity of the judicial process, perpetuating systemic abuse of power.

123    **Julie Ensor's actions** caused extensive harm by obstructing the Plaintiff's **access to justice**, resulting in severe **financial losses**, **procedural disadvantages**, and intensified **retaliatory measures**. Her deliberate suppression of evidence, rejection of filings, and alteration of records created insurmountable procedural barriers that directly undermined the Plaintiff's claims and shielded systemic corruption from accountability. These actions not only denied the Plaintiff **due process** but also emboldened conspirators to escalate retaliatory conduct. By fostering delays, dismissals, and administrative obstructions, Ensor inflicted profound harm on the Plaintiff while enabling judicial and administrative corruption to thrive unchecked.

124    **Julie Ensor's conduct** as **Clerk of the Circuit Court** epitomizes the institutionalization of **systemic corruption**, transforming procedural manipulation into a deliberate **policy framework**. Her actions do not suggest a singular vendetta against Plaintiff **Ryan Dillon-Capps** but instead reveal a broader strategy of reinforcing **systemic inequities** and suppressing **evidence** to deny equitable access to justice. Ensor's alignment with **judicial conspirators** underscores a calculated agenda to subordinate the court's **impartiality** to her personal **convictions** and policy-driven objectives.

125    These actions mirror historical patterns of discriminatory practices, where procedural tools were weaponized to exclude marginalized groups, now expanded to include Pro Se litigants and individuals with disabilities. Ensor's office ensured that the plaintiff's filings faced repeated and targeted obstacles, reinforcing systemic discrimination and exacerbating harm.

126    Ensor's coordination with Judge Robinson Jr. and other conspirators places her at the center of procedural manipulation. Her office's actions facilitated the concealment of judicial misconduct and ensured that delays and dismissals aligned with the objectives of the conspiracies. By selectively flagging filings, delaying rulings, and enabling the abuse of mootness, Ensor's leadership directly contributed to the plaintiff's deprivation of due process. These actions reveal a deliberate and systemic obstruction of justice under the guise of administrative oversight.

127    Through these coordinated efforts, Ensor's office became a crucial enabler of judicial corruption. The selective enforcement of policies, manipulation of records, and weaponization of procedural tools like mootness and deficiency notices ensured that the plaintiff's case was systematically undermined. Ensor's actions exemplify the institutionalization of systemic corruption, where administrative power was misused to shield conspirators and perpetuate injustice within Baltimore County's judicial system.

128    Ensor's leadership as Clerk of the Circuit Court places her at the nexus of judicial and administrative power. Despite her public advocacy for transparency and access to justice for Pro Se litigants, her office's actions demonstrate a pattern of discriminatory enforcement, procedural manipulation, and systemic obstruction. This duality underscores the broader structural inequities perpetuated under her tenure. The selective flagging of filings, contradictions in communications with JIS, and the vacating of premature default orders reveal both

active participation in systemic corruption and willful disregard for her stated responsibilities.

Insights into **Ensor's mindset**, as revealed in the **July-August episode of The Advocate's article In Chambers**, illuminate the ideological underpinnings of her leadership. She described the **2000 Gore-Bush election controversy** as the catalyst for her commitment to "being part of the solution," reflecting a personal drive to reshape **judicial processes** based on her sense of **fairness**. However, her approach often blurs the line between **impartial justice** and **subjective judgment**. For example, she admitted that her most difficult day as a judge was issuing a **"not guilty" verdict** for someone she believed guilty, revealing an inherent tension between personal beliefs and the **judicial impartiality** her role demands. Further, her reliance on **religious principles** and her flawed acceptance of **outcome-driven reasoning**—asserting that desired results justify any means—expose a troubling disregard for **ethical** and **systemic considerations**.

129     These admissions highlight a **leader** whose personal **convictions** frequently override **reason**, **logic**, and the **objective standards of justice**. Ensor's frustration with past events that failed to align with her **worldview** seems to fuel a leadership style centered on **control** and **conformity**. This mindset correlates directly with the **procedural abuses** under her administration, where **systemic inequities** are perpetuated through the calculated misuse of **procedural tools**. Deficiency notices, **delays**, and selective enforcement of **court policies** reflect a policy of suppressing **dissent** and **evidence** to align outcomes with her **subjective ideals**, rather than upholding the **impartial rule of law**.

130     In this context, **Ensor's administration** represents more than **individual misconduct**; it embodies a **systemic approach** to consolidating **power** and suppressing **accountability**. By prioritizing her personal **vision** over the **principles of justice**, she has institutionalized **corruption** as a **policy**, ensuring that procedural **barriers** and **inequities** are not anomalies but integral features of a broader agenda to control the **judicial narrative**.

## 22. ASSOCIATES HOFFBERGER AND DUVALL

131     Victoria K. Hoffberger and Jessica L. Duvall, attorneys from **Miles & Stockbridge**, are named as participants in the litigation due to their direct involvement in the proceedings and failure to uphold their ethical obligations to prevent fraudulent and malicious prosecution. As representatives of the law firm, their active participation and inaction in the face of clear evidence of misconduct reflect a breach of their professional responsibilities.

132     Hoffberger attended the hearings on **June 26 and 27, 2024**, where retaliatory filings by **Robert Brennen** were advanced. These filings included discriminatory remarks and acknowledged awareness of the plaintiff's reporting to oversight bodies, further solidifying their retaliatory and malicious intent. Despite being present for these proceedings and having access to the filings, Hoffberger failed to act on her ethical obligation to address the apparent fraud and abuse being perpetrated through the judicial system.

133     Duvall took on an active role in subsequent motions following Brennen's retaliatory actions. When the plaintiff directly called out the discriminatory nature of Brennen's filings and the retaliatory context surrounding

them, Duvall continued to participate in advancing the firm's position rather than taking appropriate action to intervene. Her involvement in motions and filings demonstrates a willful disregard for the fraudulent and retaliatory nature of the litigation, prioritizing her client's objectives over the ethical standards required by her role as an officer of the court.

134    Both Hoffberger and Duvall, as attorneys with access to the case record, were fully aware of the plaintiff's assertions of fraud, the retaliatory filings, and the discriminatory remarks made by Brennen. Their duty under the **Maryland Rules of Professional Conduct**, specifically Rule 3.1 (Meritorious Claims and Contentions), Rule 3.3 (Candor Toward the Tribunal), and Rule 8.4 (Misconduct), required them to take action to prevent the continuation of fraudulent and malicious litigation. However, they failed to do so, instead facilitating the misconduct through active participation and silence.

135    The record shows that both attorneys reviewed filings and motions, including those evidencing clear retaliatory and discriminatory intent, yet they did not act to halt or mitigate the abuse of the judicial process. Their failure to address these issues constitutes complicity in the malicious prosecution and retaliation against the plaintiff, further exacerbating the harm caused by the litigation. By neglecting their professional and ethical responsibilities, Hoffberger and Duvall aligned themselves with the systemic misconduct that defined the case.

136    Hoffberger and Duvall's inaction in the face of evident fraud and malicious prosecution underscores their role in perpetuating the abuse. As attorneys representing Miles & Stockbridge, their conduct reflects not only individual failures but also the firm's broader participation in the systemic corruption and retaliatory litigation that harmed the plaintiff. Their decisions to prioritize their client's objectives over their ethical obligations reinforce the pattern of complicity and abuse seen throughout the case.

## 23. STATE OF MARYLAND

137    The **State of Maryland** is named as a direct defendant in this case due to the systemic actions and omissions of its agencies, representatives, and officials, who collectively facilitated and perpetuated abuses of power. These failures resulted in significant harm to the plaintiff, depriving them of their rights, protections, and access to justice. The widespread negligence and complicity of Maryland's judicial officers, court staff, commissions, and administrative entities reflect a systemic pattern of corruption that ties liability directly to the State.

138    The following departments and agencies, acting within their official capacities, are attributed to the State for their collective role in this systemic misconduct: Baltimore County Circuit Court Judges and staff, including Judges Barranco and Truffer, who engaged in discriminatory practices, denied accommodations, and provided special treatment to opposing counsel. Staff members witnessed the June 26 and 27, 2024, hearings, where procedural violations and retaliatory actions occurred, yet failed to intervene.

139    Under Julie Ensor's leadership, the Clerk of the Circuit Court weaponized procedural policies such as deficiency notices to obstruct filings, delay rulings, and facilitate judicial misconduct. These actions included

blocking or delaying critical financial filings and collaborating with ruling judges to perpetuate procedural injustices. Judicial Information Systems staff coordinated with judicial conspirators, as evidenced by language mirroring that of Judge Robinson Jr. and Clerk Ensor.

140     Despite their administrative role, JIS failed to investigate anomalies or address concerns raised by the plaintiff, aligning themselves with the broader misconduct.

141     The Maryland Commission on Judicial Disabilities, tasked with overseeing judicial accountability, failed to act on evidence of judicial misconduct. Attorneys and staff within the Commission ignored clear violations, enabling retaliatory and discriminatory practices to persist.

142     The Attorney Grievance Commission of Maryland and its Bar Counsel ignored complaints and evidence of ethical violations by attorneys representing opposing parties. Their refusal to investigate reflects selective enforcement of professional standards and a failure to hold legal practitioners accountable.

143     Despite receiving direct communications and evidence of systemic violations, the Office of the Maryland Attorney General, including its Civil Rights Division, took no meaningful action. This inaction represents a dereliction of duty in safeguarding civil rights and upholding the rule of law for Maryland citizens.

144     The Office of Administrative Hearings, including the Chief Law Judge and other law judges, though indirectly connected, was made aware of violations and received additional filings clearly documenting systemic misconduct. Their failure to escalate or address these concerns reflects an abdication of their ethical responsibilities.

145     The plaintiff made extensive efforts to notify Maryland officials and agencies of ongoing violations through formal submissions, email correspondence, and detailed documentation of procedural failures. Despite these efforts, filings were obstructed, ignored, or dismissed, often under pretextual deficiency notices or mootness declarations. Communications to oversight bodies, including the Attorney Grievance Commission and the Maryland Commission on Judicial Disabilities, yielded no substantive response. Evidence of fraud, discrimination, and procedural violations was disregarded, enabling ongoing harm. The lack of sufficient response from these entities underscores a culture of systemic inaction and negligence, allowing retaliatory litigation and discriminatory practices to persist unchecked.

146     Under Maryland Code § 12-304, the Attorney General's office is tasked with representing the implicated agencies and officials. The volume of individuals and entities involved—spanning judges, clerks, administrative staff, and oversight commissions—makes this representation politically and institutionally untenable. Should the Attorney General decline to provide collective defense, these individuals could face personal liability, resulting in significant institutional fallout for the State. As a courtesy, these individuals are not named personally as defendants in this case. However, their collective failure to uphold ethical and legal responsibilities ties their liability directly to the State.

147     The State of Maryland bears ultimate responsibility for the harm caused to the plaintiff through its representatives' actions and omissions. From denying accommodations and obstructing filings to failing to investigate clear evidence of fraud and discrimination, the State's agents acted with willful disregard for their ethical and legal responsibilities. These omissions are not merely failures of individuals but evidence of a systemic abuse of power that has deprived the plaintiff of justice. This lawsuit seeks to address the institutionalized corruption that undermined the plaintiff's rights and ensure accountability for the agencies and officials whose actions and omissions contributed to these violations.

148     The systemic failures detailed herein are further compounded by the Plaintiff's documented efforts to alert State entities of ongoing violations. Formal submissions to the **Attorney Grievance Commission**, **Maryland Commission on Judicial Disabilities**, and other oversight bodies provided evidence of procedural misconduct, fraud, and retaliation. These submissions, combined with direct emails and detailed documentation, sought to expose violations of the Plaintiff's FMLA rights, ADA accommodations, and whistleblower protections. Despite receiving these communications, State agencies failed to act, with responses either delayed, dismissed without substantive review, or obstructed under pretextual procedural deficiencies. The Plaintiff's inability to obtain timely intervention highlights a systemic pattern of negligence and selective enforcement, reinforcing the liability of the State of Maryland under **Md. Code § 12-304 et seq.** for the harm inflicted by its representatives and administrative entities.

## HIGH-LEVEL SUMMARY FOR ATTORNEY GENERAL

**Accountability:** The Plaintiff reserves the right to provide additional information to the Attorney General during discovery and depositions to support claims against these agencies and officials.

**Judicial Efficiency:** This approach prevents unnecessary expenditure of judicial resources and focuses litigation on systemic failure rather than duplicative claims against individual agency staff.

RESPECTFULLY SUBMITTED

**December 23, 2024**                                                                          1334 Maple Avenue
                                                                                                              Essex, Maryland 21221
                   /s/ Ryan Dillon-Capps                                           ryan@mxt3.com
                   **Ryan Dillon-Capps**                                           703-303-1113