| OHANA GROWTH PARTNERS, LLC<br><br>*Plaintiff,*<br><br>vs.<br><br>**RYAN DILLON-CAPPS**<br><br>*Defendant.* | **IN THE**<br><br>**CIRCUIT COURT**<br><br>**FOR**<br><br>**BALTIMORE COUNTY**<br><br>**CASE NO: C-03-CV-24-002264** |
| --- | --- |

## AMENDED AFFIDAVIT OF PLAINTIFF'S ABUSIVE USE OF THE JUDICIAL SYSTEM

I, Ryan Dillon-Capps, being over the age of eighteen (18) and competent to testify, and having personal knowledge of the facts contained herein, state as follows:

1        The Plaintiff, **Ohana Growth Partners, LLC** ("Ohana"), and the law firm of **Miles & Stockbridge, P.C.** ("M&S") have sustained a baseless and fraudulent lawsuit against me for over four months. Their current actions are not coincidental; they are not fleeing from my so-called "incoherent ramblings" but rather from the substance of those demands. Specifically, they fear my calls for evidence to support their claims at a hearing, alongside my targeted discovery requests that include logs and data they never anticipated. These logs and reports focus on information that most attorneys typically overlook but are crucial for verifying data integrity and exposing potential tampering—something they seem unprepared to address.

2        This case underscores a fundamental point: **log data should become a standard practice in discovery**, akin to the traditional chain of custody. Verifying the authenticity of the data is no different from maintaining a secure evidence trail. Therefore, before Ohana and M&S find a way to sidestep this problem, the court should act swiftly to compel the production of evidence.

3	A Civil Action begins with the **Preliminary** and **Discovery** stages that combine into the **Pleading Stage**, sometimes referred to as **pretrial proceedings**.  Afterwards, the **Trial Stage** culminates into a **Trial of Merit.**

4	The purpose of the preliminary is to establish the facts, and once the facts are solidified with answer to the pleading the merits of those facts are argued.  M&S misunderstanding of the fundamental of litigation and the law has resulted in them litigating entirely on merit and wasting over four months.

5	From M&S filings with their arguments and then rulings of Moot, I am left wondering if I am the one who has forgotten what stage we are in, or to ask the question – when do we argue fact? Why did we skip pass to arguments of merits in a baseless fraudulent lawsuit that lacks any factual material statements or claims.

A	Doctrine of Mootness: Restatement (Second) of Judgments, § 13

6	The doctrine of mootness is intended to prevent courts from engaging with issues that no longer present a live controversy. Its purpose is to ensure that judicial resources are used efficiently, focusing only on disputes where effective relief can be granted. Courts should not dismiss matters as moot if they are still relevant to the case's resolution or provide meaningful relief.

1.	**Active Controversy Requirement**: The doctrine requires that there be a real, ongoing dispute when the court reviews the matter. In this case, the preliminary motions were dismissed as moot even though the plaintiff had not provided any true material statements or claims, leaving significant issues unresolved.

2.     **Potential for Relief**: The intent of the doctrine is not to avoid review of issues that still have the potential to impact the case. Premature dismissal during the preliminary stage contradicts this purpose, particularly when the motions aim to clarify the merits of the plaintiff's unsupported claims.

7      This misapplication of mootness bars proper adjudication of the case, as supported in **Attorney Grievance Commission v. Stolarz, 379 Md. 387 (2004)**, where the Maryland Court of Appeals held: *"A ruling should not be dismissed as moot if deciding the matter would provide meaningful relief or clarify important unresolved issues."*

## B    The Plaintiff's "Merits"

8      In this **Amended Affidavit of Plaintiff's Abusive Use of The Judicial System** , filed as a NEW affidavit and a motion to have this replace the former Affidavit, I am going pay homage to a person whose impact on the legal profession will never be forgotten, his advocacy for Pro Se treatment inspirational, and who won his own lawsuit with the same argument that that I will conclude with.

9      Core Arguments appropriate to the pleading stage that provide focus of argument.

10     Rules of Purpose that illustrate the importance of intention.

11     Exhibit B Provides a review of pleading without merit and a plea to review what has not been argued.

12     Notice of Request for Expedited Injunctive Hearing from BAR under 19-732

13     Conclusion Inspired by Richard Posner - Flexible, Practical, and Just Outcomes

14     Collectively, the conclusions made affirm the necessity to:

1. Rule on the Motion to Strike the Plaintiff's Notice of Voluntary Withdrawal and prevent further Abuse of Process and Bad-Faith litigation aimed to evade accountability and consequences.

2. Through 19-321 or via the Scheduling of the Expedited "urgent" Hearing, Ohana and M&S need join me in hearing on facts supported by hard evidence so that the court record and subsequent judgement can be voided of procedural abuse.

3. Rule on the Seven Motions for A Better Maryland with Reciprocal Relief, to Dismiss with Prejudice for a June 13th Worth of Reasons, to Impose Sanctions not Sanction Fraudulent Lawsuits, to Disqualify Miles & Stockbridge for Ethical Violations and Misconduct, for Injunctions to Prevent Future Abuse of Court Process, to Vacatur the Temporary Restraining Order, and for Referral for Criminal and Ethical Investigations.

## II  THE 3 CORE ARGUMENTS

The Plaintiff has made no truthful statements of material fact, has no claim for relief, and has been subdued by preliminary motions and torts – exactly as I said they would.  Now I begin to refine the argument for focus and clarity to tighten the legal grip and prevent further abuse of process.

### A  **Tort Doctrines:** Prohibit Ohana and M&S from pursuing litigation

#### 1  Dolus (Fraud): Restatement (Second) of Torts, § 525

15 The doctrine of fraud is intended to prevent deceitful behavior and ensure honesty in legal and business transactions. It prohibits parties from engaging in intentional misrepresentation of material facts to induce others to act to their detriment. Courts deny claims

based on fraudulent behavior to protect the integrity of the judicial system and prevent unjust enrichment.

1. **False Statements**: Ohana and M&S never presented a true material fact in their claims. Every statement was aimed at creating a false narrative about my actions and the reframing their own deeds as my own. They fabricated allegations of non-compliance despite my documented good faith efforts and adherence to legal standards. These misrepresentations were deliberate, aiming to shift blame and conceal their own security violations, including actions by Ryan Brooks who tampered with system integrity.

16    This conduct bars Ohana and M&S from pursuing litigation, as supported in **Odom v. Microsoft Corp., 486 F.3d 541 (9th Cir. 2007)**, where the court held: *"Fraudulent misrepresentation in the inducement or during litigation precludes the advancement of a claim, as the foundation of the legal process must be based on truth."*

2    Fraudulent Misrepresentation: Restatement (Third) of Torts, § 9

17    Fraudulent misrepresentation is intended to hold parties accountable for false statements that lead others to act or refrain from acting. Its purpose is to protect individuals and the judicial process from deceit and to provide remedies when misrepresentations cause harm.

1. **Lack of Material Truth**: Ohana and M&S's statements lacked any factual basis. They falsely alleged that I refused access, yet the evidence demonstrates my proactive compliance and solutions.

2. **Reliance**: I relied on the misrepresented claims of Drummond to satisfy the accord and accept access, and then the court relied on Drummond and Hartman claiming

the opposite happened. Resulting in severe and irreparable physical and financial harm in this unnecessary and prolonged baseless litigation.

18   This conduct prohibits Ohana and M&S from advancing their litigation, as demonstrated in **Smith v. Boyd, 553 A.2d 131 (Me. 1989)**, where the court held: *"Misrepresentation that materially impacts legal proceedings undermines the ability to seek redress through the courts."*

3   <u>Abuse of Process: Restatement (Second) of Torts, § 682</u>

19   The doctrine of abuse of process is intended to prevent the misuse of legal procedures for purposes other than those for which the process was designed. It aims to maintain the integrity of the judicial process by barring claims that are pursued with ulterior motives.

1.   **Misuse of Legal Process**: Ohana and M&S used the legal system not to resolve a legitimate dispute but to harass and mislead. They continuously filed false affidavits and claims to manipulate the court's perception, even hiring a "PCI expert" to provide misleading testimony. Who he himself may have been misled and the authenticity of the affidavit is questionable.

2.   **Ulterior Motive**: Their intent was to retaliate against misconduct and prevent adjudication of their own misdeeds.

20   This conduct bars them from pursuing litigation, as shown in **Peyton v. DiMario, 287 F.3d 1121 (D.C. Cir. 2002)**, where the court held: *"Legal processes must not be used for purposes other than those for which they are intended, as doing so constitutes an abuse."*

4   <u>Malicious Prosecution: Restatement (Second) of Torts, § 674</u>

21   The doctrine of malicious prosecution exists to protect individuals from baseless legal actions. It prohibits parties from initiating or continuing proceedings without probable cause and

with malicious intent. The purpose is to ensure that the legal system is not used as a tool of harassment.

1.   **No Probable Cause**: Ohana and M&S's claims lacked any factual foundation, as evidenced by their failure to produce material facts. They presented false narratives of harm and non-compliance without a single shred of supporting evidence.

2.   **Malicious Intent**: Their primary motive was to damage my professional reputation, inflict emotional harm, and drain me of my financial resources to prevent others from hearing what I have to say. A tactic to which the effects of remain in full effect.

22   This conduct bars them from pursuing further litigation, as demonstrated in **Bertero v. National General Corp., 13 Cal. 3d 43, 529 P.2d 608 (1974)**, where the court stated: *"Initiating baseless litigation without probable cause constitutes malicious prosecution, warranting dismissal of such claims."*

5    Duty of Care (Negligence): Restatement (Second) of Torts, § 282

23   The doctrine of negligence requires parties to exercise a standard of care that a reasonable person would in similar circumstances. It aims to prevent harm caused by carelessness or reckless disregard for the safety and well-being of others.

1.   **Breach of Duty**: Ohana and M&S breached their duty of care by repeatedly making false representations, ignoring their compliance requirements, and failing to provide clear directives regarding access requirements. They recklessly misled the court on all material grounds.

2.      **Causation and Harm**: Their negligence directly caused harm to me, resulting in unnecessary physical, reputational, emotional, and financial harm.

This conduct prohibits them from continuing litigation, as affirmed in **Palsgraf v. Long Island Railroad Co., 248 N.Y. 339 (1928)**, where the court emphasized: *"Negligence arises from a breach of the duty to act with reasonable care, and such breaches are not grounds for pursuing legal action."*

### B    Equitable Doctrines of Defense: Bars Ohana and M&S from Relief

### 1    Public Policy Unclean Hands: Restatement (Second) Of Contracts, § 179, Comment B

24    The doctrine of unclean hands is intended to uphold public policy and ensure fairness in judicial proceedings. It prevents parties who engage in conduct that violates ethical standards or public expectations from seeking equitable relief. Courts consistently deny relief when a party's behavior contradicts public policy, as it undermines the integrity of the legal system.

1.      **PCI Compliance Violations**: Ohana and M&S failed to adhere to PCI DSS standards, breaching security protocols mandated by Maryland law under **Md. Code Ann., Com. Law § 14-3503(b)**. This statute requires businesses to implement reasonable security measures to protect personal data. Ohana's disregard for PCI compliance—such as failing to maintain access logs and not following least privilege controls—violates public policy and business ethics. This conduct is consistent with **FTC v. Wyndham Worldwide Corp., 799 F.3d 236 (3rd Cir. 2015)**, where the court emphasized: *"Failure to adhere to industry standards for data security constitutes an unfair business practice under the FTC Act."*

2.    **Deceptive Trade Practices**: Ohana misrepresented their compliance with PCI

DSS standards while demanding actions that breached those same protocols. Such

deceptive behavior falls under **Md. Code Ann., Com. Law § 13-301(9)**, which prohibits

false representations regarding legal or industry compliance, thus contravening consumer

protection laws. This aligns with **In re Gateway Learning Corp., FTC File No. 042-

3047 (2004)**, where the FTC stated: *"Misrepresentations about compliance with industry

standards are deceptive practices that violate consumer protection laws."*

2    Unlawful Conduct Unclean Hands: Restatement (Second) Of Contracts, § 192

25    The unclean hands doctrine also aims to deter misconduct and ensure that the judicial

system does not reward illegal behavior. Its purpose is to deny equitable relief to parties engaged

in unlawful actions that violate statutory protections.

1.    **FMLA Violations**: On June 13, 2024, Ohana retaliated against Dillon-Capps after

he invoked his rights under the Family and Medical Leave Act (FMLA). Ohana

demanded they return to work within six hours, disregarding a valid FMLA leave request.

This conduct violated **29 U.S.C. § 2615(a)(1)–(2)**, which prohibits retaliation against

employees exercising FMLA rights. In **Bachelder v. America West Airlines, Inc., 259

F.3d 1112 (9th Cir. 2001)**, the court held: *"Retaliation against an employee for taking

FMLA leave is strictly prohibited, and any such conduct constitutes a direct violation of

statutory protections."*

2.    **ADA and Reasonable Accommodation**: Providing time off under FMLA for

health-related reasons is a reasonable accommodation under the Americans with

Disabilities Act (ADA). Ohana's refusal to honor Dillon-Capps's FMLA request,

demanding immediate return despite his protected leave, constitutes a denial of reasonable accommodation under **42 U.S.C. § 12112(b)(5)(A)**. This is supported by **Barnett v. U.S. Air, Inc., 535 U.S. 391 (2002)**, where the Supreme Court emphasized:

*"The duty to provide reasonable accommodations, including leave for health-related reasons, is central to ADA compliance."*

### 3    Equitable Estoppel: Restatement (Second) Of Torts, § 894(1)

26    The doctrine of equitable estoppel is intended to prevent injustice by prohibiting parties from shifting their positions when another party has reasonably relied on their original conduct. Its purpose is to ensure fairness and discourage deceitful or misleading behavior, thereby maintaining the integrity of legal proceedings.

1.    **Reliance**: Dillon-Capps acted in good faith, relying on the clear representations made by HEA and Drummond regarding their cooperation. He trusted their assurances that access concerns would be addressed, fully expecting their commitment to be honored.

2.    **Material Change**: This reliance led to a substantial disadvantage, Ohana later claimed non-compliance despite their own failure to follow through, creating a false narrative of refusal.

3.    **Unfairness**: Allowing HEA and Drummond to shift their position would lead to an unjust outcome, benefiting them from the very obstacles they created.

27    This conduct bars them from seeking relief, as established in **North Star Marine, Inc. v. M/V ANDA, 13 F. Supp. 2d 631 (D. Md. 1998)**, where the court noted: *"A party cannot create a situation to its advantage and then claim harm caused by that same situation."*

4    Promissory Estoppel: Restatement (Second) Of Contracts, § 90

28    The doctrine of promissory estoppel is designed to enforce promises when one party has

relied on them, and injustice would result if those promises were not kept. It holds parties

accountable for promises that induce reasonable reliance to ensure fairness.

1.    **Clear Promise**: HEA and Drummond explicitly promised to resolve access issues

and cooperate with Dillon-Capps.

2.    **Reasonable Reliance**: Dillon-Capps, acting in good faith, relied on these

promises, adhering to the written accord and following expected compliance protocols.

3.    **Avoiding Injustice**: The later accusations of non-compliance were unfounded

and unjust, given that HEA and Drummond's actions caused the very obstacles Ohana

now claims.

29    This conduct bars relief, as underscored in **North Star Marine, Inc. v. M/V ANDA**,

where the court affirmed: *"Equity requires that promises reasonably relied upon be enforced to

prevent unfair outcomes."*


C    **MD. Criminal Law Code § 9-101**: ALL of Ohana & M&S material statements and
claims are perjured statements

1    Perjury and the Integrity of the Judicial Process

30    MD Criminal Law Code § 9-101 defines perjury as the act of making a false statement

under oath regarding a material fact, knowing it to be false, with the intent to deceive. The

purpose of this law is to maintain the integrity of the judicial process and ensure that truth is the

foundation of all legal proceedings. Courts must deny relief when a party's statements are proven

to be false and made with the intent to deceive.

1. **False Material Statements**: Every material statement and claim presented by Ohana and M&S in this case has been knowingly false. They have consistently made false assertions under oath regarding my compliance, the state of the systems, and the nature of my actions. Each claim lacked factual accuracy and was intended to mislead the court and deflect from their own misconduct.

2. **Intent to Deceive**: The pattern of false statements shows a clear intent to deceive the court, manipulate the legal process, and gain an unfair advantage. Their testimony contradicts documented evidence and aims to create a false narrative that unjustly targets me.

31     This conduct constitutes perjury, as outlined in **MD Criminal Law Code § 9-101**, and bars them from pursuing any legal claims, as supported in **United States v. Dunnigan, 507 U.S. 87 (1993)**, where the court held: *"A conviction for perjury can serve as evidence that a party is not entitled to the benefits of judicial equity, given their knowing attempt to deceive the court."*

## 2     Impact of Perjury on the Case

1. **Complete Lack of Credibility**: The false material statements by Ohana and M&S undermine their credibility entirely. Their perjured testimony means they cannot be trusted to present truthful information, directly affecting the court's ability to render a fair judgment.

2. **Intentional Obstruction of Justice**: Their deliberate lies were not isolated incidents but a calculated strategy to obstruct justice. This level of misconduct directly impacts the integrity of the judicial process and the credibility of their claims.

32    Their conduct, defined by repeated false statements under oath, makes it impossible for them to pursue any form of relief, as reinforced by **In re Michael, 326 Md. 326, 604 A.2d 1229 (1992)**, where the Maryland Court of Appeals emphasized: *"Perjury strikes at the very core of the judicial process, and any party found to engage in perjury forfeits their ability to seek equitable relief or redress through the courts."*


## CONCLUSION OF CORE ARGUMENTS

1.    The lawsuit itself and all papers filed since have no legal basis because they are not in support of a legal claim or claim to which relief can be granted.

33    Ohana Growth Partners, LLC and Miles & Stockbridge, PC have engaged in a **fraudulent** and **baseless lawsuit** against me, and **every single material statement and claim** is made to **mislead** the court into believing something **both know is untrue**.

34    Before the lawsuit was even filed they **violated my FMLA and ADA rights**, engaged in to **Estoppel** perpetuate their fake narrative, **retaliated** against Darren Koritzka and myself for **engaging in the protected acts** of **asserting my rights** in the **cease-and-desist email** and **engaging in whistleblowing** when **reporting the unlawful conduct of Richard Hartman** and **Glenn Norris to the owners at 2:05 PM email** and then for **multiple hours in text** to **Justin Drummond**. The act of **suspending me**, also **breached the accord** made on **June 7th**, and the **perjured statements** made **against me** in their filings and subsequent papers is **Fraud** and **Defamation.**

35    Ohana and M&S were fully aware of their actions and came to the court with **Unclean Hands** and are **barred** from **any and all claims for relief.**

36    Ohana and M&S were **fully aware** of their **statements** and **made** them **with the intention** of **misleading the court. Every single claim** and **material statement** in support of their claims are **perjured statements**.

37    Ohana and M&S were fully aware of their actions and the **act of filing** the **fraudulent** and **baseless lawsuit** and the **pursuit** thereof **for over four months** is **Abusive Use of the Judicial System**, **Malicious Prosecution**, but most importantly **Abuse of Process**. Since **June 14, 2024**, **Ohana** and **M&S** have sought to **evade accountability and consequences**, and their **Abuse of Process** has continued since. The **Notice of Voluntary Dismissal** is only one more filing with **the same purpose – evading accountability and consequences**.

### III    RULES OF PURPOSE

38    Everything I have filed has been in accordance with the "Rules of Purpose." Purpose is not limited to the words on a page, but rather the purpose speaks to the intentions to which those words were put on a page. A purpose that can not be dismissed or forgotten or those words will become meaningless scribbles used to abuse and impose the will of economic advantage as a weapon no different than laws like Black Codes, the arguments made for separate but equal, and the language of laws during the Jim Crow era.

39    The misuse of legal language to impose disadvantage is well documented, and weaponizing of the legal system to maintain any hierarchy of power is the reason and intent behind constitutional protections. The protection afforded by FMLA leave, ADA, and the 14th

Amendment right for Due Process are not the incoherent and unintelligible ramblings that Robert Brennen and Michael Barranco would want you to believe they are.

40      They are the blood, sweat, and tears of countless Americans who spent **76 years** to abolish slavery in the **13th Amendment of 1865,** Due Process and Equality in the **14th Amendment of 1868**, and the voting rights for all men in the **15th Amendment of 1870**.

41       It only took 50 more years for women to get the same right in the **19th Amendment of 1920,** and it would be another **43 years** and a President willing to change the political landscape of the country to do the unbelievable and achieve the **Equal Pay Act in 1963**, **Civil Rights Act of 1964**, and **Voting Rights Act of 1965**.

42      Inspiring a nation of hidden heroes to rise-up for LGBTQ+ rights, gaining national attention with the **Stonewall Riots in 1969**, and marking a pivotal shift in LGBTQ+ activism that is still going on today.

43      **17 years later**, disability rights were recognized at a national level with the comprehensive protections of the **Americans with Disabilities Act (ADA) in 1990**, the **Family and Medical Leave Act (FMLA) in 1993,** and the Supreme Court's decision in **Lawrence v. Texas in 2003** decriminalizing same-sex relationships followed by **Obergefell v. Hodges in 2015** so that non-hetero couples could get married.

44      The intent of words on a page are worthy of such rambling as to argue, plea, and motion against no notice TRO ex parte hearings, 2-day notice show cause orders, denied motions before argument are heard, premature default orders, and a lawsuit with no claim for relief formed form perjured statements and perpetuated for over four months.  Leaving me in financial default with severe memory loss and catatonic episodes that could kill me.

45    The purpose of those words on a page are intended to prevent the Abusive Use of the Judicial System, Prevent Malicious Prosecution, and prevent the Abuse of Process that would now allow the perpetrators to escape again free of accountability and consequences.

## A  Rule 1: Md. Rule 1-311(b): Effect of Signature

### 1  Adherence to Rule 1-311 and the Purpose of Accountability:

46    **Maryland Rule 1-311(b)** emphasizes the necessity of accountability in the filing of legal papers. It mandates that all documents filed with the court must not be presented for any improper purpose and must be **grounded in fact, warranted by existing law, or supported by a good faith argument for changing the law**. The requirement of an attorney's signature is meant to deter **abuse of process** and ensure the integrity of the legal system.

### 2  Misuse of Legal Resources and Deprivation of Rights:

47    This case is about **Ohana and M&S leveraging their considerable legal, financial, and reputational power** to undermine my rights. Their conduct in court and in filings consistently reflects an attitude that their objectives outweigh my rights under the law. In pursuing their baseless claims, they prioritize their own interests over the principles of justice.

### 3  Jurisdictional Missteps and Evasion of Relevant Law:

48    If they want to argue the merits of FMLA, ADA, and Constitutional law then they are in the wrong courthouse.  I attempted to file a motion to dismiss on Jurisdictional grounds on June 26, 2024, with Judge Barranco, but "this case is not about … FMLA, ADA, the FTC Act, or Constitutional rights" because it is now about Ohana and M&S filing and continued pursuit of a baseless fraudulent lawsuit with no claim of relief for over four months.

**4      Compelling Evidence and Withdrawal to Avoid Accountability:**

49      When I filed a motion to compel the production of evidence that could justify their lawsuit, Ohana and M&S's response was not to engage with the facts but to **withdraw their case**, signaling their inability to substantiate their claims. This act is a clear indication of their acknowledgment that they could not defend the harm they have caused me.

50      Their withdrawal, coming after 135 days of pursuing a fraudulent lawsuit, is not an act of good faith but a strategy to avoid legal scrutiny. It is a tacit admission that their position is **indefensible**, not a genuine retreat or correction.

**5      Inability to Sustain Their Claims and Avoidance of Accountability:**

51      In a mere 17 days, my legal actions have brought them to a point where they can no longer hide behind procedural maneuvers. They must now face the consequences of their unjust actions without the **shield of procedural tactics**.

52      As the plaintiffs in this case, it is their duty to defend the legitimacy of their claims. Their strategy of retreat and withdrawal is a transparent attempt to avoid accountability. The court should not be distracted by their empty arguments and personal attacks, which serve to further their abuse of the judicial system.

53      This case should be seen for what it truly is: a misuse of the legal system by Ohana and M&S to harass and inflict harm, only to retreat when confronted with the truth. They have chosen to manipulate procedural rules rather than substantiate their claims. The integrity of the court requires that such tactics not be rewarded, and that those who wield the law for improper purposes face the consequences of their conduct.

54       Their opportunity for defense will come when they face me as Defendant, but if they are

allowed to run from their actions their legacy will be severe irreparable harm and a fraudulent

court record.

## B  Rule 2: Md. Rule 1-201: Rules of Construction

### 1       Clarifying the Motion to Add Counsel and Misrepresentation of Facts:

55       The motion was never about dictating who Ohana could select as counsel but about

acknowledging the attorneys already engaged: Holly Drumheller Butler and Steven D. Frenkil.

Despite Holly's consistent representation over the past 10 months and Steven's active role from

the original filing—appearing in the e-file system, named on the complaint, and nominated for

negotiations—M&S have deliberately obscured this fact. This tactic is a clear violation of **Rule

4.1** (truthfulness in statements to others) and **Rule 3.3** (candor toward the tribunal). By not

accurately declaring their involvement, they misled the court about the true nature of who is

representing Ohana. Done so they can obfuscate their knowledge of my personal contact

information and avoiding accountability for a no notice TRO.

### 2       Pattern of Procedural Manipulation:

56       M&S's pattern of misusing procedural rules is evident in several key instances:

1.       **No Notice TRO**: They abused the formal announcement process, using an email

they knew was non-functional despite having access to my mobile number and personal

email, thereby avoiding proper notification.

2.       **Misleading Scheduling**: Three days after the TRO, they misrepresented the show

cause order's scheduling, resulting in only **two days' notice** instead of the required

Page **18** of **36**

timeline, and denying me the mandated prehearing conference and **20 days to prepare** a defense under **Maryland Rule 15-206(c)(2)**.

3.      **Premature Default Request**: They filed for a default order prematurely, attempting to depriving me of the opportunity to address the claims fully. Then they argued that a pleading which has no ability to contain exhibits or attachments was the correct interpretation of the automatic extension rule. Another instance of twisting procedural rules to suit their needs while avoiding the true scrutiny those rules were designed to provide.

## 3    Voluntary Withdrawal as Evasion:

57    Now, faced with the prospect of confronting the motions for relief and their own conduct, M&S seek a voluntary dismissal. However, voluntary dismissal is not a tool for evasion; it is meant to allow a party to withdraw a case and avoid over four months of malicious prosecution. Allowing withdrawal at this stage, without addressing the pending violations, would be to condone a **clear abuse of process**.

1.      In **Cooter & Gell v. Hartmarx Corp., 496 U.S. 384 (1990)**, the Supreme Court highlighted that voluntary dismissal does not absolve a party of misconduct during litigation. The court stressed that such dismissals should not be a refuge for those who misuse the legal process to their advantage.

2.      Further, Judge Posner's reasoning in **Doe v. City of Chicago, 360 F.3d 667, 673 (7th Cir. 2004)** supports the principle that the integrity of the judicial system requires holding parties accountable when they misuse procedural rules, regardless of their attempts to exit litigation unscathed.

## CONCLUSION

58      M&S's conduct throughout this case shows a calculated effort to manipulate rules when convenient, discard them when inconvenient, and argue against their intent and purpose when necessary. They have consistently demonstrated a pattern of misleading filings, procedural abuses, and evasion, culminating in an attempt to voluntarily withdraw and escape the consequences of their actions.

59      **Maryland Rule 1-201** emphasizes that procedural rules are designed to ensure **fairness, due process, and efficient administration of justice**. The violations here reflect a disregard for the fundamental intent behind all rules, with M&S choosing strategy over substance at every turn.

## CITATIONS:

60      **Rule 4.1 (Truthfulness in Statements to Others)**: "An attorney shall not knowingly make a false statement of material fact or law to a third person."

61      **Rule 3.3 (Candor Toward the Tribunal)**: "A lawyer shall not knowingly make a false statement of fact or law to a tribunal."

62      **Maryland Rule 15-206(c)(2)**: "The scheduled hearing date shall allow a reasonable time for the preparation of a defense and may not be less than 20 days after the prehearing conference."

63      **Cooter & Gell v. Hartmarx Corp., 496 U.S. 384 (1990)**: Establishing that voluntary dismissal does not shield a party from misconduct during the litigation.

64      **Doe v. City of Chicago, 360 F.3d 667, 673 (7th Cir. 2004)**: Emphasizing the need for courts to maintain the integrity of the judicial process and address procedural misuse.

65    By holding M&S accountable to the **true intent and purpose** of procedural rules, this court can ensure that **abusive litigation tactics** do not prevail, and that justice is served in a manner consistent with the principles of fairness and integrity that the legal system is meant to uphold.

## IV   EXPEDITED INJUNCTIVE HEARING: 19-732

66    On October 8, 2024, I filed a Motion for an Urgent Hearing to address **violations of Constitutional Rights** and **Maryland Rule 1-201**. By October 11, a ruling directed a motion judge to hear the matter, acknowledging the urgency. However, despite the financial severity of my situation, soon 3 weeks will have passed without resolution.

67    The prolonged delay has had catastrophic consequences: my business opportunities have collapsed, leading to financial default. My health has deteriorated significantly, with **catatonic episodes intensifying** into a severe malignant state. My physical and cognitive health have suffered grave harm, and my memory is no longer improving. Less than 12 hours ago, I experienced profound confusion, struggling to distinguish when events had occurred. This disorientation—the loss of context for memories—has made it difficult to track and manage basic tasks, further compounding the stress and harm inflicted by these delays.

68    Allowing Ohana Growth Partners, LLC and Miles & Stockbridge, P.C. to withdraw from the hearing isn't a simple withdrawal—it's a victory through abuse of process. They have left me in a severely diminished state, and the damage is done. My health has declined to a point where I require costly care, and I don't know if I'll ever work again in the same capacity. The harm I've endured cannot be undone, but they must be held accountable for presenting a lawsuit devoid of any truthful material statements.

69     The relief I requested is minimal compared to what I will seek in later litigation. They are evading consequences: sanctions, disqualification, judicial scrutiny for future litigation, and investigations into their unlawful and unethical actions. While they claim to be concerned with financial matters, they have gained a windfall of nine figures through recent refinancing. The token relief I seek could significantly change lives as a new precedent, including mine, my disabled brother's, my elderly mother's, and my wife's.

70     Winter is approaching, and without the relief sought in the seven motions, lives are at risk. Those who depend on me will suffer, despite doing nothing wrong. I was unlawful termination, they violated my FMLA and ADA rights, then found a way to have my due process rights brushed aside for their convenience.

71     Ohana and M&S have no case, no cause of action, and no valid claim for relief. Every material statement and claim they have made is false. This hearing would compel them to answer for their conduct, holding them accountable and, more importantly, saving lives now and in the future.

## V   CLOSING ARGUMENTS INSPIRED BY RICHARD POSNER

72     I believe that if Judge Richard Posner were to examine this case, he would be highly critical of the plaintiff's attempt to voluntarily withdraw, as it is a strategy to evade accountability for the severe harm they have caused—both physically and financially. The conduct of the plaintiff throughout this litigation aligns with the very patterns of **abuse of process** that Judge Posner has consistently warned against and permitting them to withdraw without addressing the pending motions for relief would undermine the purpose and integrity of the judicial system.

## A    Intent to Evade Accountability and Harm Caused

73     The plaintiff's motion to voluntarily withdraw is not just an attempt to close this case, but a calculated effort to **avoid the consequences** of their actions. As the U.S. Supreme Court emphasized in **Cooter & Gell v. Hartmarx Corp., 496 U.S. 384 (1990)**, "voluntary dismissal does not automatically absolve a party of responsibility for wrongful or improper conduct during litigation." This case involves significant physical and financial harm inflicted upon me, and allowing the plaintiff to withdraw without consequences would be tantamount to sanctioning their misuse of the legal system.

74     Judge Posner, who has a well-known emphasis on the **intent and purpose behind laws**, would likely view this attempt to evade responsibility as an affront to the principles of justice. In **Richman v. Sheahan**, 512 F.3d 876 (7th Cir. 2008), he noted that "litigation should be reserved for cases with concrete disputes and substantive evidence," not as a means for manipulation or to gain unfair advantages. Here, the plaintiff's attempt to withdraw is designed to avoid addressing the substantive harm they have caused.

## B    Pattern of Abusive Litigation Tactics

75     The plaintiff's behavior throughout this case fits the classic definition of **abuse of process**, where legal proceedings are manipulated for improper purposes. According to **Restatement (Second) of Torts § 682**, abuse of process occurs when someone uses "a legal process against another primarily to accomplish a purpose for which it is not designed." Judge Posner's ruling in **Reid v. White Motor Corp., 886 F.2d 1462, 1471 (7th Cir. 1989)** highlighted the need for courts to ensure that the legal process is not misused, stating that "the judiciary must not allow itself to be turned into an instrument of harassment or oppression."

76    In our case, the plaintiff's ongoing actions—including this motion to withdraw—are attempts to escape the legal and financial consequences of their conduct. The seven pending motions for relief are directly tied to addressing this misconduct, and withdrawing without accountability would permit the plaintiff to **weaponize the legal system** for their own advantage.

## C    Judicial Efficiency and the Purpose of Motions to Dismiss

77    In **Vukadinovich v. Posner**, 279 F.3d 994 (7th Cir. 2002), the discussion on motions to dismiss highlighted Judge Posner's view that such motions are critical to **filtering out baseless claims** and preventing misuse of the court's resources. A motion to dismiss serves the dual purpose of protecting against frivolous or meritless actions and maintaining the efficiency of the judicial system.

78    The plaintiff's attempt to withdraw without consequence parallels Posner's view on the purpose of these early judicial mechanisms: to prevent unnecessary prolongation of cases and to focus on the merits. Allowing the plaintiff to escape the consequences of the motions for relief would violate these principles, creating a precedent where litigants can inflict harm and then evade redress by strategically withdrawing.

## D    Substantive Evidence and the Integrity of the Judicial Process

79    Judge Posner has repeatedly emphasized that the judicial system must be based on **concrete evidence and fairness**. In **Doe v. City of Chicago**, 360 F.3d 667, 673 (7th Cir. 2004), he stated, "claims must be scrutinized to ensure they are not built on speculative foundations." Here, the plaintiff's claims—followed by their sudden withdrawal—are because they lack the substance and credibility necessary to justify relief or a lawsuit, yet they have inflicted real and

tangible harm. The motions for relief are not merely procedural; they are an essential response to the plaintiff's misconduct, grounded in evidence that must be addressed.

80      Allowing voluntary withdrawal without addressing the harm would be a miscarriage of justice, as Judge Posner would likely argue that the legal system's integrity requires confronting and rectifying any abuse, not allowing it to slip through procedural loopholes.

## CONCLUSION

81      In conclusion, Your Honor, the plaintiff's motion to voluntarily withdraw is a clear attempt to evade the consequences of their actions and avoid the pending motions for relief. Judge Posner's extensive writings and judicial opinions underscore that courts must act as **guardians of fairness and efficiency**, not allowing the system to be manipulated for improper ends.

82      The principle established in **Cooter & Gell** and reiterated by Judge Posner in various cases is that the **purpose of the legal system is to address legitimate grievances and provide accountability**, not to be used as a shield for those who seek to harm others and then retreat without consequences. Granting the plaintiff's withdrawal would undermine the purpose of this honorable court and violate the standards of justice that Judge Posner has long advocated.

83      Therefore, I respectfully request that this court either deny the plaintiff's voluntary dismissal or condition it upon a thorough adjudication of the pending motions for relief. The harm caused must not go unanswered, and the judicial process must remain a forum for truth, accountability, and the proper administration of justice—values that I believe Judge Posner would argue are central to the role of the judiciary.

## VI   ADDITIONAL FACTS AND ARGUMENTS

### A   Daniel Levett: Ohana Had Other Admins With Access

84      **Dante Martinez's Role**: Dante Martinez, the Help Desk Manager, holds an administrator position with privileged roles, meaning his access goes beyond standard non-privileged administrators. His privileges grant him the highest level of access.

85      **Help Desk Capabilities**: Martinez and other Help Desk staff have the ability to manage all functionalities, including accessing other mailboxes using their privileged Exchange administrator roles.

86      **Conclusion from 1 & 2**: Ohana & M&S's claims that there are no other administrators are false. They have a whole team with administrative privileges.

87      **Affidavit of Daniel Levett**: Levett suggests I can access accounts using only my phone or personal email. However, he omits that my personal email is a backup for regaining access to my account in case I'm locked out. This method only grants the same access Levett already has to my email.

88      **Password Reset Access**: With access to an email account, full control can be regained via password reset. This applies equally to accounts with a Global Administrator (GA) role, as those accounts are not different from other privileged roles in this respect.

89      **Implications**: The Help Desk can use their current access to obtain further access or grant it to others. This demonstrates that Ohana never lost access and didn't need injunctive relief to regain it. While the first two points could be attributed to a lack of technical understanding, they are aware that an entire Help Desk team has administrative access.

90    **Conclusion**: The affidavit of Daniel Levett confirms that Ohana retained access and had no legitimate need for injunctive relief.

## B    No Hording of Access

91    **Access for Help Desk Director**: I was arranging to grant the Help Desk Director access to a Global Administrator (GA) emergency account. This is documented in emails and meeting invites, following the same rationale I used to grant access to Justin Drummond.

92    **Outreach to Karen Cepress**: I also contacted Karen Cepress through Teams, attempting to set up similar access for her. Cepress had previously been involved in PCI DSS compliance and had an account in the old system.

93    **Redundancy and Compliance**: These efforts were part of a broader strategy for regional redundancy and compliance. Once I figured out how to give access to Justin Drummond, I realized I could extend this to the Help Desk Director in Texas for redundancy and to Cepress for her expertise in compliance.

94    **Account Creation for Geoff VanMaastrich**: In addition, I created a separate account for Geoff VanMaastrich from Planet Fitness HQ. Despite my efforts, VanMaastrich declined the offered access on two occasions.

95    **Conclusion**: These actions demonstrate a clear effort to share administrative access with relevant individuals, directly contradicting claims that I was hoarding access.

## C    No Employees Access Was Removed

96    **Lack of Supporting Evidence**: If the claim were accurate, there would be clear system logs or documentation showing instances where I removed employee access. No such evidence has been presented.

97    **Access Changes Were Collaborative**: The only modifications to access were made in coordination with the IT team as part of discussions about implementing "on-demand access" for privileged roles, such as Global Administrator. These changes were aimed at adjusting and expanding access, not restricting it.

98    **Communicated with IT Team**: My efforts to update access were fully documented in emails with the IT team. These communications focused on tweaking access settings to provide broader access to the appropriate personnel, not to reduce it.

99    **Conclusion**: The actions taken were consistent with a collaborative effort to improve access control, and there is no evidence to support the claim that I restricted or removed access from any employees.

## D   Recommendation for Standard E-Discovery Practice:

100    The court should make it a standard practice to include **logs in all e-discovery requests**. This requirement would significantly deter evidence tampering, as maintaining accurate logs is a common practice not limited to e-discovery.

101    **Importance of Logs**: Missing or incomplete logs are inherently suspicious and cast doubt on the authenticity of e-discovery data. If previous e-discovery requests involving Ohana Growth Partners, LLC, had included logs, the data provided might have been different.

102    **Suspicious Patterns**: Emails I've reviewed suggest that some actions around e-discovery requests were questionable. For instance, during an urgent migration of emails to M365, an e-

discovery request coincided with this move. After the e-discovery was completed, the urgency to migrate abruptly stopped, resuming only years later in 2023 when external circumstances necessitated immediate action.

103   **Conclusion**: Requiring logs in e-discovery would ensure greater transparency and reduce the risk of evidence manipulation, promoting more accurate and honest litigation outcomes.

### E   Comparing Emergency Actions Sept 2023 v June 2024

#### 1   September 2023 Emergency Response:

104   In late August to September 2023, when I was on the verge of being promoted to a new executive position, a serious hardware risk arose. A failed air conditioning unit threatened to overheat the on-site servers, endangering business continuity. In response, the entire server infrastructure was swiftly relocated within weeks. This decision was made without prolonged scrutiny or debate, focused solely on protecting business operations. There was no questioning of the urgency, costs, or technical details—actions were taken promptly to mitigate risk.

#### 2   June 2024 Situation - A Contrasting Approach:

105   In June 2024, similar risks affected the financial data due to neglected maintenance by Ryan Brooks, reaching a critical stage. Unlike the rapid response in September 2023, Glenn Norris refused to authorize basic, standardized procedures essential for database integrity. This inaction posed a threat of data loss or corruption due to the system's inability to write data correctly—standard measures that should have been implemented months earlier to protect vital financial information.

### 3 Key Contrast in Responses

106     The difference in urgency and decision-making between these two situations is stark. In September 2023, with my imminent promotion, the urgency and need to protect the hardware was clear, and swift actions were taken without hesitation. By contrast, in June 2024, when my role was being portrayed negatively, the same sense of urgency was missing. This suggests a shift in priorities or motivations, especially given the basic and standardized nature of the actions that were delayed in 2024.

### CONCLUSION

107     The comparison between these two scenarios illustrates a shift in how risks are handled and how priorities may have been influenced by my position within the organization. In 2023, actions were taken swiftly when I was viewed favorably. In 2024, during a time when my actions were being portrayed negatively, similar threats to data were deprioritized, highlighting potential inconsistencies in how my role and decisions are now being characterized.

### F   Court Opinion - Judge Michael Barranco

**Amended Notes:** Section has been rewritten for improved clarity and focus on the negative impact to the proceedings.  However, the content was not substantively modified.  Additional content about the adverse impact is in Affidavit of Voluntary Dismissal.

108     Fraud upon the court had a profound impact on both my life and the court's perception of this case. I first experienced the consequences of this fraud during the initial hearing, when Judge Michael Barranco posed a troubling question: **"Why can't they just remove you as the PCI Compliance Officer and then force you to do it?"** This question stands out as a pivotal

moment because it was the first significant recollection I regained, indicating that something was seriously wrong.

109    However, Judge Barranco's handling of the case revealed multiple concerning actions:

    1.    He dismissed my statements regarding my disabilities, deciding himself what I was capable of, which gave me the impression he had already accepted Robert Brennen's narrative before the hearing even began.

    2.    He denied my motion for a continuance after hearing just the introduction, cutting me off before I could even explain my reasons.

    3.    Despite being informed that my PTSD was causing memory issues, he insisted on swearing me in.

    4.    He ignored my approved FMLA status, ADA accommodations, and evidence that I requested to use protected leave hours before the Plaintiff's demands. He prohibited me from raising jurisdictional priority issues to move the case to federal court.

    5.    During cross-examination of Randall Romes, I attempted to get Romes to clarify his expert evaluation, but Judge Barranco interrupted, taking over the questioning and ending my opportunity to ask further questions.

    6.    The Judge frequently asked me leading questions, eventually limiting my responses to "yes" or "no," which prevented me from fully explaining my position. Robert Brennen has since exploited the Judge's opinions as confirmation, but omits the context of due process issues.

    7.    On multiple occasions, the Judge made suggestions and posed questions in a way that appeared to support the Plaintiff's arguments. His approach often seemed

indistinguishable from that of Plaintiff's attorney, given how little prompting was required from Brennen.

8.      At the outset, Judge Barranco acknowledged that the timeline of events was improper, yet continued without offering any rationale for deviating from established scheduling rules.

9.      When asked if both parties had tried to resolve the matter, I noted an agreement that Ohana had abandoned. The Judge, however, accepted Brennen's non-verbal response—a shrug and confused sound—as sufficient, without seeking clarification.

10.     The Judge issued injunctions with conflicting instructions, requiring me to complete actions in a system while simultaneously prohibiting access to that system, making compliance impossible.

11.     Two unsworn individuals, Justin Drummond and Rich Hartman, acknowledged that I was their technical expert, yet the Judge did not question how these non-technical individuals could submit affidavits with technical claims about a system to which they had no access.

12.     Although the Judge correctly referenced part of the opinion from **Federal Trade Commission v. Wyndham Worldwide Corporation**, I confirmed it was about "least privilege" access. Despite this, he failed to grasp the relevance of least privilege—a core concept in PCI compliance—and dismissed the connection to the case.

13.     My wife, a licensed therapist, testified about my deteriorating condition, but the Judge dismissed her observations, stating he would only consider testimony from

healthcare professionals—despite two letters from my doctors and FMLA paperwork being already in the court record.

110    **Conclusion**: These actions indicate a consistent pattern of bias and a lack of thorough consideration for the evidence and legal standards relevant to my case. The cumulative effect of these judicial choices profoundly impacted the court's perception of me and the proceedings.

## G   Proper Judicial Role in Preliminary Stage: Purpose of Mootness

111    The doctrine of mootness serves to maintain judicial efficiency and integrity, ensuring courts only engage with disputes that are still relevant. Its purpose in the preliminary stage is to validate the foundation of a case, particularly when the legitimacy of the plaintiff's claims is in question.

1.    **Relevance to Case Assessment**: During the preliminary phase, the court's role is to assess the validity and materiality of the claims. Declaring motions moot prematurely undermines this stage's function to verify which issues are significant.

2.    **Ensuring Fair Review**: Mootness should not be used to sidestep foundational scrutiny. In this case, dismissing preliminary motions prevented a proper examination of whether the plaintiff's claims had any real substance.

112    This improper application of mootness during the preliminary phase prohibits accurate case assessment, as illustrated in **US Bancorp Mortgage Co. v. Bonner Mall Partnership, 513 U.S. 18 (1994)**, where the court noted: *"Mootness is not a license for courts to avoid resolution of key issues if they remain pertinent to the case."*

## CONCLUSION OF MOOTNESS

113     The misuse of the doctrine of mootness in this preliminary phase illustrates a failure to engage with the true purpose of the doctrine. By dismissing motions as moot without evaluating the material substance of the plaintiff's claims, the court failed to fulfill its responsibility to clarify the core issues at the heart of the case. Proper application of mootness ensures that only irrelevant matters are excluded, preserving the efficiency and fairness of the judicial process.

## DECLARATION OF AFFIRMATION

I solemnly declare and affirm under penal ties of perjury and upon personal knowledge that the contents of the foregoing paper and exhibits thereto are true.

October 28, 2024

/s/ Ryan Dillon-Capps

Ryan Dillon-Capps (Pro Se)

Email: ryan@mxt3.com

1334 Maple Avenue

Essex, Maryland 21221

Telephone: (703) 303-1113

RESPECTFULLY SUBMITTED

October 28, 2024                                    /s/ Ryan Dillon-Capps

Ryan Dillon-Capps (Pro Se)
Email : ryan@mxt3.com
1334 Maple Avenue
Essex, Maryland 21221
Telephone: (703) 303-1113

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 28, 2024, a copy of **Amended Affidavit of Plaintiff's**

**Abusive Use of The Judicial System** via email to rbrennen@milesstockbridge.com and served on

via first-class mail, postage prepaid on:

Robert S. Brennen
Miles & Stockbridge P.C.
100 Light Street
Baltimore, Maryland 21202

/s/Ryan Dillon-Capps
Ryan Dillon-Capps (Pro Se)

| OHANA GROWTH PARTNERS, LLC | IN THE |
|---|---|
| *Plaintiff,* | CIRCUIT COURT |
| vs. | FOR |
| RYAN DILLON-CAPPS | BALTIMORE COUNTY |
| *Defendant.* | CASE NO: C-03-CV-24-002264 |

# Exhibit B

## Summary of Comments

## For Plaintiff's

# Complaint

Amended Affidavit of Plaintiff's Abusive Use of the Judicial System

Amended Affidavit of Plaintiff's Abusive Use of the Judicial System          Page # 1 of 12          Exhibit 107
Exhibit B - Complaint Markedup

# Summary of Comments on Microsoft Word - 2024-06-14 Complaint Ohana v Dillon-Capps 4883-0376-9800 v.1

## Page: 1

**Author: Ryan Dillon-Capps     Subject: Highlight     Date: 10/26/2024 5:53:23 PM**

**No Breach of Duty**
My conduct throughout this situation has been commendable and beyond reproach. I consistently upheld the company's contractual obligations and legal duties to both contract holders and consumers. I diligently sought solutions that were legally compliant and did not violate any contractual agreements. My actions ensured that the company's obligations were met while adhering to all relevant legal and contractual standards.

**Author: Ryan Dillon-Capps     Subject: Comment on Text     Date: 10/26/2024 8:34:33 PM**

**Officers:**
On June 7, 2024, after Glenn Norris rejected all previously proposed solutions, I presented a comprehensive solution to Justin Drummond. He initially accepted this proposal but then failed to follow through, evading satisfaction of the agreement on June 10th and 11th. The written accord was subsequently breached on June 13, 2024.

**Designees - Hartman Executive Advisors (HEA):**
HEA engaged in estoppel by ignoring my many emails trying to reach them so I could give them access. On June 13, 2024, Justin Drummond requested updates, which I provided via text messages and forwarded emails. In those communications, I specifically asked Drummond for assistance in contacting HEA, who had become unresponsive. Despite my efforts to engage HEA and involve them in the resolution, as demonstrated in the text message exchanges, they have never responded to my outreach.

**Author: Ryan Dillon-Capps     Subject: Comment on Text     Date: 10/26/2024 9:10:53 PM**

**System/Cloud/M365 Access**
I terminated Ryan Brooks's access and subsequently discovered significant security breaches. After his termination, I found that during my absence—while I was attending my wedding—he had used his access to disable critical safeguards: he removed logging, bypassed backup security measures, and disabled legal holds. These actions created a substantial risk to the integrity of the systems.

Importantly, no other individual's access was removed. In fact, I worked actively to expand access to the Help Desk and other key personnel to ensure comprehensive administrative oversight.

**Registrations/GoDaddy/Domain Registrar**
During this period, no requests for access to the GoDaddy account were made. To the best of my recollection, I did not access the GoDaddy account at any point within this timeframe.

**Author: Ryan Dillon-Capps     Subject: Comment on Text     Date: 10/26/2024 9:09:49 PM**
As stated previously, the only genuine risk originated from Ryan Brooks, whom I believe was acting under Glenn Norris's directives throughout the entire year. Contrary to the Plaintiff's assertions, I took proactive measures to protect critical information: I re-enabled logging, reinstated legal holds, and implemented necessary safeguards, making them immutable.

---

**Court Record 1**

---

E-FILED: Baltimore County Circuit Court
Docket: 6/14/2024 12:18 PM; Submission: 6/14/2024 12:18 PM
Envelope: 16844353

OHANA GROWTH PARTNERS, LLC          IN THE
212 West Padonia Road
Timonium, Maryland 21093            CIRCUIT COURT

*Plaintiff,*                        FOR

vs.                                 BALTIMORE COUNTY

RYAN DILLON-CAPPS                   FILE NO.: C-03-CV-24-002264
1334 Maple Avenue
Essex, Maryland 21221

*Defendant.*

## COMPLAINT

Plaintiff, Ohana Growth Partners, LLC. ("Plaintiff" or the "Ohana"), by its undersigned counsel, hereby sues Defendant, Ryan Dillon-Capps ("Defendant" or "Dillon-Capps") and states as follows.

## NATURE OF ACTION

1.  This is an action brought as a result of Defendant's breaches of their duties as Plaintiff's employee, most significantly in refusing to provide Global Administrator rights pertaining to Plaintiff's software systems and Internet domain name registrations, to Plaintiff's officers and designees. Instead, Defendant has eliminated all Global Administrator rights other than those Defendant possesses, and through which Defendant currently exercises complete control over those systems and registrations. Because, in addition to constituting breaches of Defendant's duties to Plaintiff, Defendant's actions create a substantial risk to Plaintiff's systems, data and business, Plaintiff seeks an immediate injunction compelling Defendant to provide Global Administrator rights to Plaintiff's designee as directed.

---

## Comments from page 1 continued on next page

---

Summary_Complaint-001_of_11

NOTICE THIS CRITICAL MESSAGE AS TIME IS RUNNING OUT—in November, these immutable safeguards are set to expire. The recent delay tactics, including the voluntary withdrawal, may be an effort to avoid scrutiny and allow these safeguards to expire, leading to the potential loss of critical information.

Whether or not the court acts to preserve this evidence is no longer my concern. I have fulfilled my responsibilities and issued this warning multiple times. Any decision the court makes from this point forward will work to my advantage, as I am prepared for either outcome. However, if the court intends to prevent spoliation of evidence, the window of opportunity is rapidly closing. Only a few days remain, and I will not file a motion for a special master under the current circumstances. If any action is to be taken, it must be initiated through the court's discretionary authority.

Author: Ryan Dillon-Capps     Subject: Comment on Text     Date: 10/26/2024 9:08:42 PM

No Refusal;
Requested Drummond Assistance Reaching HEA;
Drummond Evaded Receiving Access the days leading up to the 13th.

The injunctive order references Phil Leadore, even though Daniel Levett's affidavit clearly states that he had been involved from the beginning. This raises a critical question: what happened to Phil Leadore, and why didn't he author the affidavit himself? Leadore was the one who sent the meeting invite and communicated with me, indicating that Glenn Norris would provide more information. What happened to Phil Leadore?
**What Happened to Phil Leadore?**

The day after I submitted two significant filings—one requesting a hearing to review their evidence and depose their agents, and another outlining the consequences of four months of fraudulent and baseless litigation—the Plaintiff took steps to avoid accountability. These filings highlighted the FMLA violation, as detailed on page 4 of Richard Hartman's affidavit, and invoked the unclean hands doctrine to demonstrate that this lawsuit had been baseless from the start. The baseless nature of this case has been evident since:

Richard Hartman's statements on June 14, 2024.
My own statements on June 18, 2024.
Both Robert Brennen and I acknowledging it openly in court on June 26, 2024.
Today, October 26, 2024, marks exactly four months since that court hearing. Facing the consequences of their actions, the Plaintiff opted to manipulate procedural rules, filing a voluntary dismissal just a day after these critical submissions were made.

How do you spell guilty?
"V-O-L-U-N-T-A-R-Y D-I-S-M-I-S-S-A-L"

---

Court Record 1

E-FILED: Baltimore County Circuit Court
Docket: 6/14/2024 12:18 PM, Submission: 6/14/2024 12:18 PM
Envelope: 16844353

OHANA GROWTH PARTNERS, LLC
212 West Padonia Road
Timonium, Maryland 21093

*Plaintiff,*

vs.

RYAN DILLON-CAPPS
1334 Maple Avenue
Essex, Maryland 21221

*Defendant.*

IN THE

CIRCUIT COURT

FOR

BALTIMORE COUNTY

FILE NO.: C-03-CV-24-002264

COMPLAINT

Plaintiff, Ohana Growth Partners, LLC ("Plaintiff" or the "Ohana"), by its undersigned counsel, hereby sues Defendant, Ryan Dillon-Capps ("Defendant" or "Dillon-Capps") and states as follows:

NATURE OF ACTION

1. This is an action brought as a result of Defendant's breaches of their duties as Plaintiff's employee, most significantly in refusing to provide Global Administrator rights, pertaining to Plaintiff's software systems and Internet domain name registrations, to Plaintiff's officers and designees. Instead, Defendant has eliminated all Global Administrator rights other than those Defendant possesses, and through which Defendant currently exercises complete control over those systems and registrations. Because, in addition to constituting breaches of Defendant's duties to Plaintiff, Defendant's actions create a substantial risk to Plaintiff's systems, data and business, Plaintiff seeks an immediate injunction compelling Defendant provide Global Administrator rights to Plaintiff's designee as directed.

Summary_Complaint-002_of_11

Court Record 1

**THE PARTIES**

2. Plaintiff Ohana is a Maryland limited liability company with its principal place of business located at 212 West Padonia Road, Timonium, Baltimore County, Maryland 21093.

3. Defendant Dillon-Capps is a citizen of the State of Maryland who resides at 1334 Maple Avenue, Essex, Baltimore County, Maryland.

**JURISDICTION AND VENUE**

4. The Court has subject matter jurisdiction over this action pursuant to MD. CODE ANN., CTS. & JUD PROC., §1-501.

5. This Court has personal jurisdiction over Defendant pursuant to MD. CODE ANN., CTS. & JUD PROC., §6-102(a) because they reside in Baltimore County, Maryland.

6. Venue is proper in this Circuit pursuant to MD. CODE ANN., CTS. & JUD PROC., §6-201(a) because Defendant resides in Baltimore County.

**FACTUAL BACKGROUND**

7. Ohana is a franchise division of Planet Fitness. Ohana owns and operates 78 Planet Fitness health clubs with over 500,000 members in Maryland, the District of Columbia, Tennessee, Florida, Washington state, and California.

8. Ohana has 1,472 employees, 712 of whom live in Maryland.

9. Ohana maintains a Microsoft 365 account (the "Ohana MS 365 Account"), through which it provides a full suite of software applications to the company's employees, including Microsoft Exchange for company email, Microsoft OneDrive and SharePoint for document management and storage, Microsoft Teams for videoconferencing, as well as other IT services. Ohana's Microsoft 365 Account also includes a subscription to Microsoft Azure, which

2

## Page: 3

Court Record 1

---

**Author: Ryan Dillon-Capps    Subject: Comment on Text    Date 10/26/2024 8:39:11 PM**

Ohana has no understanding of what is or isn't in the GoDaddy account. In the four years I was with Ohana, the few times I mentioned the GoDaddy account, they had no idea what I was referring to. It appears that someone gave them information, likely related to the M365 account and Microsoft's procedures for transferring access to an unauthorized party not named in the agreements.

Prior to 2023, Ryan Brooks was the sole account holder. It wasn't until a decision was made to part ways with him and Baltimore Consulting that the account structure changed—this occurred before the whistle-blowing that shifted the direction of the entire situation.

**Author: Ryan Dillon-Capps    Subject: Comment on Text    Date: 10/26/2024 8:42:34 PM**

The webpage contradicts Ohana's interpretation; it applies to small business solutions, not Ohana's enterprise-level configuration. The guidance specifically recommends limiting the number of Global Administrators, instead using Privileged User Administrators to handle critical functions and minimize risk.

Ohana's claim that they need "at least either one more" Global Administrator suggests intentional misrepresentation, as Richard Hartman and Robert Brennen likely understood the guidance. The inclusion of this interpretation in Randall Romes' affidavit raises concerns about potential witness tampering and manipulation by Miles & Stockbridge. The correct takeaway from the webpage is to keep the number of Global Administrators as low as possible, and small business[,] and small business should use Privileged User Administrators not Global Administrators for password resets.

Randal Romes' deposition is likely to clarify the extent of Ohana and M&S's involvement in shaping these affidavits, particularly given the affidavit's discrepancies and the circumstances surrounding the signature page.

**Author: Ryan Dillon-Capps    Subject: Comment on Text    Date: 10/26/2024 8:43:30 PM**

Privileged Identity Management (PIM) offers "on-demand access" to elevated permissions, allowing users to operate with regular access until higher-level permissions are needed. With authorization, they can temporarily elevate access by clicking a button and accepting a notice.

PIM enhances security by flagging suspicious activity, such as access requests from unexpected locations, preventing unauthorized breaches even if credentials are compromised. This setup removes the need for permanent Global Administrator access, as elevated permissions can be assigned temporarily, reducing security risks.

In a PIM environment, continuous Global Administrator roles are unnecessary, as the system dynamically manages access while maintaining security.

---

provides Ohana the ability to deploy, operate and back up data created with those applications in the cloud.

10. Through an account with Internet domain registrar GoDaddy.com, Ohana maintains and administers registrations for over a dozen second level internet domain names, which are directed to websites and Ohana's Microsoft Exchange company email. (the "Ohana GoDaddy Account").

11. Since February 10, 2020, Ryan Dillon-Capps (nee Wagner), the Defendant in the above-captioned matter ("Dillon-Capps"), has been employed by Ohana as its Vice President of Information Technology. On January 9, 2020 Ohana and Dillon-Capps executed an Employment and Non-Disclosure Agreement (the "Dillon-Capps Employment Agreement"). As of at least June 2, 2024 Dillon-Capps asked to be referred to using plural pronouns.

12. Dillon-Capps reports to Glenn Norris, the Chief Financial Officer of Ohana ("Norris"). In that capacity, Norris provides Dillon-Capps with supervision and issues directives in connection with the operation of Ohana's software systems.

13. Ohana granted to Dillon-Capps in their capacity as Vice President of Information Technology and so that they could perform requested job duties, "Global Admin" rights to the Ohana MS 365 Account, allowing them "almost unlimited access to [Ohana's] settings and most of its data." Because "[a] Global Admin may inadvertently lock their account and require a password reset, ...[Microsoft] recommends[] [Ohana] have at least either one more Global Admin," See https://learn.microsoft.com/en-us/microsoft-365/admin/add-users/about-admin-roles?view=o365-worldwide Additionally, it is important that more than one person have full administrative right in case one person holding them is unavailable or, as in this case, refuses to cooperate with company directives regarding the IT system owned by the company. In part for

3

Summary_Complaint-004_of_11

Page: 4

Author: Ryan Dillon-Capps    Subject: Comment on Text    Date 10/26/2024 8:44:06 PM

This event never occurred. The motion to compel and the discovery request explicitly include the logs that will verify this. The logs from May 20 will demonstrate that the alleged event did not take place, providing concrete evidence to disprove their claim.

Author: Ryan Dillon-Capps    Subject: Comment on Text    Date 10/26/2024 8:52:30 PM

Ohana's behavior shows a clear pattern of shifting narratives and deliberate distractions. They altered the identity of the individual who instructed Richard Hartman to send the 9 AM demand on June 13th. Instead of focusing on key compliance issues, their attention has been disproportionately on my employment status. They omitted Norris and Brooks from the proceedings.

The more substantial the issue, the more they avoid it, choosing instead to focus on personal attacks and irrelevant arguments. This evasion highlights a strategy of distraction, suggesting that the arguments they avoid may be more revealing than the ones they choose to make.

The case's true understanding lies not in the arguments presented but in those avoided. This evasion highlights a strategy designed to distract and manipulate the narrative. The voluntary dismissal further erodes the credibility of their case. The Court should take note of what arguments were not made these past four months. The gaps in testimony, personal attacks to marginalized the value of something before it is revived seriously, and the shifting narratives that expose the underlying motives.

Author: Ryan Dillon-Capps    Subject: Comment on Text    Date 10/26/2024 8:47:51 PM

There was never any refusal on my part regarding access. The issue of access was completely separate from the FMLA cease and desist letter, which solely addressed the Plaintiff's ongoing violations of my FMLA rights. The letter was not related to any refusing access but was specifically about the unlawful interference with my right to take FMLA leave.

The letter also includes confirmation of compliance.

Court Record 1

those reasons, Ohana had also provided Global Admin rights to Ryan Brooks of Baltimore

Consulting, an independent third-party contractor for Ohana that provides comprehensia IT

services.

14.    On May 20, 2024, without authorization from Norris or other senior executives,

Dillon-Capps severed and discontinued all administrative access to the Ohana MS 365 Account

that had been held by other Ohana employees, as well as the Global Admin rights provided to

Mr. Brooks. On six (6) separate occasions between May 21, 2024 and May 24, 2024, Dillon-

Capps was sent express written directives to reinstate Mr. Brooks' administrative access. Since

May 24, 2024, management sent Dillon-Capps separate written directives to provide full

administrative rights to Justin Drummond, Ohana's President, to Victor Brick, Ohana's CEO,

and to Norris, the CFO, in addition to Mr. Brooks. All these directives were disobeyed. Despite

these repeated written express directives from Ohana's management, and in violation of Section

1 of the Dillon-Capps Employment Agreement, Dillon-Capps refused to instate full

administrative rights to the Ohana MS 365 Account to Ohana's President, CEO, and CFO.

15.    In their capacity as Vice President of Information Technology, Dillon-Capps

acquired sole administrative control over the Ohana GoDaddy Account.

16.    On June 13, 2024, Ohana's Vice President of Human Resources Richard Hartman

sent an email to Mr. Dillon-Capps directing them to provide the Global Administrator rights over

the Ohana MS 365 Account to Phil Leadore, of Hartman Executive Advisors, which Ohana

engaged to assist Ohana with IT matters, and to do so by 3 pm that day. Mr. Dillon-Capps refused

to comply with that directive, claiming that Ohana's efforts to control its own systems, MS 365

Account somehow amounts to retaliation against them. Mr. Dillon-Capps failed to comply with

the directive by 3 p.m. As a result Dillon-Capps continues to maintain and exercise exclusive

4

Summary_Complaint-005_of_11

## Page: 5

administrative rights to the Ohana Microsoft 365 Account and administrative control of the Ohana GoDaddy Account.

17.   As of 2:05 p.m. on June 13, 2024, Mr. Hartman discovered that he had been locked out of his Ohana company email account and is now unable to send or receive emails from that account to or from any of Ohana's 1,472 employees. As of 5 p.m. on June 13, 2024 Mr. Hartman discovered that he was unable to log into Ohana's Microsoft Teams account and is effectively locked out of the Microsoft 356 suite of applications in the Ohana MS 365 Account.

Mr. Hartman's inability, caused by Dillon-Capps, to communicate with any of Ohana's 1,472 employees or to access any of Ohana's personnel records has effectively rendered it impossible for him to perform in this critical role as Vice President of Human Resources for the company.

18.   At 8:45 p.m. on June 13, 2024, at the direction of Ohana President Justin Drummond, Mr. Hartman sent an email to Dillon-Capps, using his personal email account, to which Mr. Hartman attached a letter advising Dillon-Capps of the immediate suspension of their employment with Ohana. Dillon-Capps responded with an email, copying President Justin Drummond and other Ohana executives, stating that Dillon-Capps did not recognize Mr. Hartman's authority as Vice President of Human Resources to suspend Dillon-Capps' employment, and falsely claimed that Dillon-Capps was acting under Mr. Drummond's authority.

Mr. Drummond responded to Dillon-Capps' email as follows:

> Ryan:
>
> Your assertions that Rich Hartman did not suspend you or lacked the authority to suspend you are both incorrect and baseless.
>
> For the avoidance of any doubt by you, I incorporate into this email Rich Hartman's email to you today notifying you of your suspension and hereby confirm that you were suspended upon receipt of that email. Please follow fully the directives in that suspension notification.

---

**Author: Ryan Dillon-Capps   Subject: Comment on Text   Date: 10/26/2024 8:53:33 PM**

There was no loss of access at 2:05. At that time, an email was read in which both Rich Hartman and Glenn Norris were being accused of improper actions. The email was directed to the owners, urging them to intervene before a situation—such as this lawsuit—escalated.

**Author: Ryan Dillon-Capps   Subject: Comment on Text   Date: 10/26/2024 8:55:07 PM**

It is accurate that Rich Hartman learned about the situation around 5 PM, during an exchange with Justin Drummond. My document request includes information from Drummond that would typically be used to support a legitimate lawsuit. However, in this case, the lawsuit lacks legitimacy, and the evidence will demonstrate that Hartman and Drummond were communicating while I was texting.

Additionally, the requested Paycom records will confirm that the relevant personnel records either were or are stored in Paycom—not in the system Hartman initially claimed. I have reason to believe that these records may have been moved to substantiate their claims.

This situation underscores a significant issue with traditional e-discovery practices: people often do not request logs. However, the logs are crucial, as they could reveal whether any tampering occurred. Based on the information I possess, there is strong reason to suspect tampering, and the logs could confirm or disprove this suspicion.

**Author: Ryan Dillon-Capps   Subject: Comment on Text   Date: 10/26/2024 8:59:11 PM**

Court Record 1

I never claimed to be acting under Mr. Drummond's authority. I was the one who added Drummond to the communication thread. My actions were consistent with my executive position; if I had been acting on someone else's behalf, I would not have included them in the discussion—much like Victor Brick empowering Drummond – Drummond didn't add Brick to the email because he was empowered to take action and no oversight was needed.

I involved Drummond because we had spent hours discussing the matter via text messages. He was fully aware that both he and Hartman Executive Advisors (HEA) would receive access, and there was no refusal on my part. I expected Drummond to address and rectify Rich Hartman's inappropriate email, based on our prior conversations and his understanding of the access arrangements.

What stands out is Drummond's lack of details on the letter or engagement about the suspension sooner in the day, which makes his deposition critical to uncovering what truly happened. Despite his affidavit claiming leadership in these events, Drummond seemed largely unaware of crucial details throughout the day.

I suspect that this communication records will reveal connections with Hartman and Norris. I also hope these records will show that he was coerced—recognizing that coercion isn't always a direct threat but can sometimes be a subtle manipulation, like what someone I used to know called a "backhanded cookie."

5

Page: 6

I also hereby confirm that you have been directed by me to immediately comply with Rich Hartman's email of 9:01 am this morning by immediately adding Phil Leadore from HEA as a Global Administrator regardless of whether he has confirmed any qualifications or involvement in the PCI DSS v4 review.

Thank You,

*Please excuse any typos. Email sent from iPhone*

Judith Drummond

As of the filing of this Complaint Mr. Drummond has received no response from Dillon-Capps, nor has Dillon-Capps complied with the directive to add Phil Leadore from HEA as a Global Administrator per Ohana's Microsoft 365 account.

19.    Without administrative rights to the Ohana Microsoft 365 account, Ohana is unable to manage any of its Microsoft 365 software applications and related data. So long as Dillon-Capps continues to hold exclusive Global Admin rights to the Ohana MS 365 Account, and by extension Ohana's employee email accounts and data, those accounts and data are vulnerable to disruption by Dillon-Capps. So long as Dillon-Capps continues to hold exclusive administrative control over the Ohana GoDaddy Account, the direction of Ohana's registered domain names to Ohana's company email and websites are at risk.

20.    Even a temporary disruption of the Ohana MS 365 Account and/or the Ohana GoDaddy Account would result in tremendous disruption of Ohana's business operation and irreparable harm to Ohana. Given Dillon-Capps refusal to act as directed by their supervisors and other behavior, Ohana believes that, in the absence of a Court Order directing Dillon-Capps to immediately provide the Global Administrator rights to Phil Leadore there is a significant risk that Dillon-Capps will take action to disrupt Ohana's software systems and business operations and to destroy or corrupt Ohana's data.

Court Record 1

---

Author: Ryan Dillon-Capps    Subject: Comment on Text    Date 10/26/2024 8:59:24 PM

He had the emails forwarded to him and I asked Drummond for help reaching them.

Author: Ryan Dillon-Capps    Subject: Comment on Text    Date: 10/26/2024 9:01:46 PM

Ohana maintained administrative access throughout the entire relevant period, with a capable team of administrators in place. They never requested access to the GoDaddy account, and I provided the necessary access without any issues or refusal on my part. These facts underscore that Ohana's actions in this lawsuit do not align with how a company would respond to a legitimate threat. Despite claiming that I was a risk, their behavior suggests otherwise.

Their conduct shows a clear disregard for my rights while simultaneously failing to treat me as if I were a true threat. They violated my rights on multiple fronts—FMLA, Due Process, and Liberty—yet never took actions typical of addressing a genuine threat. For instance, at no point did they seek an order to have the sheriff seize me or my equipment. This is especially notable because, on June 27th, I was fully prepared for Judge Barranco to involve the Sheriff's Office. I left everything as it was to show transparency and to ensure they could see that I was genuinely engaged in a thorough examination. I wanted them to see that I had nothing to hide.

Ohana's claim that I posed a significant risk is inconsistent with their actions. They didn't follow standard procedures for handling a high-risk situation; instead, they focused on discrediting me, imposing severe emotional distress, and draining me financially. Their failure to act in a way consistent with managing a real threat reveals that their objective was not to address a legitimate risk but to undermine my credibility.

What Ohana does not argue is as revealing as what they do. They never treated me as a true threat; their efforts were clearly aimed at discrediting and harming me rather than mitigating any genuine danger. This evasion suggests that the real purpose of this lawsuit is not risk management but an attempt to avoid accountability. Their strategy has succeeded in causing significant emotional distress and financial hardship, and now they are using procedural tactics to evade the consequences of their actions.

In conclusion, this lawsuit is not about addressing a genuine threat. It is a calculated effort to harm my reputation, impose emotional distress, and drain my resources while avoiding accountability for their own behavior. Their actions reveal a consistent pattern of evasion, highlighting the true motives behind their litigation strategy.

6

Page: 7

Author: Ryan Dillon-Capps    Subject: Comment on Text    Date: 10/26/2024 9:03:21 PM
Affidavit of Contract Modification nullifies 51 of the agreement

Also -
No Refusal;
No Harm;
No Reason for the Lawsuit.

Court Record 1

## COUNT I – BREACH OF CONTRACT

21.    Ohana incorporates the allegations above as if fully set forth herein.

22.    Defendant's repeated refusal to comply with Ohana's directives to provide Global
Admin rights to Mr. Leadore and others violates Section 1 of the Dillon-Capps Employment
Agreement, which requires that Dillon-Capps "faithfully and diligently perform . . . duties as may
be assigned by management from time to time."

23.    Defendant's violation and continued violation of the Dillon-Capps Employment
Agreement has directly resulted in damages to Ohana in the form of significant expense,
including otherwise unnecessary consulting fees and attorneys' fees.

24.    Defendant's continued violation of the Dillon-Capps Employment Agreement is
depriving Ohana of the right to control Ohana's property, to wit, the Ohana MS 365 Account and
the Ohana GoDaddy Account and has created a risk of imminent and irreparable harm to Ohana.

WHEREFORE, Plaintiff, Ohana Growth Partners, LLC, respectfully requests that
judgment be entered as to Count I in favor of Ohana and against Defendant in an amount equal to
the damages caused by Defendant's wrongful conduct, plus pre- and post-judgment interest
thereon; that temporary, preliminary and permanent injunctions be entered requiring Defendant
to take immediate action to provide Global Administrator rights over the Ohana MS 365 Account
and the Ohana GoDaddy Account to Phil Leadore, of Hartman Executive Advisors; and that the
Court award to Ohana the cost of these proceedings, and such other and further relief as this
Court deems just and appropriate under the circumstances.

## COUNT II – BREACH OF DUTY OF LOYALTY

25.    Ohana incorporates the allegations above as if fully set forth herein.

7

## Page: 8

Author: Ryan Dillon-Capps   Subject: Comment on Text   Date: 10/26/2024 9:05:18 PM

No Refusal;
Never Asked for GoDaddy and Freely Gave When Asked;
Ohana, failed their duty to the Brand, Contracts, and Consumers.

Court Record 1

26. Defendant's repeated refusal to comply with ~~Ohana's directives~~ to provide Global Admin rights to Mr. Leadore and others violates Dillon-Capps' duty of loyalty to Ohana as their employer.

27. Defendant's violation and continued violation of their duty of loyalty has directly resulted in damages to Ohana in the form of significant expense, including otherwise unnecessary consulting fees and attorneys' fees.

28. Defendant's continued violation of their duty of loyalty is depriving Ohana of the right to control Ohana's property, to wit, the Ohana MS 365 Account and the Ohana GoDaddy Account and has created a risk of imminent and irreparable harm to Ohana.

WHEREFORE, Plaintiff, Ohana Growth Partners, LLC, respectfully requests that judgment be entered as to Count II in favor of Ohana and against Defendant in an amount equal to the damages caused by Defendant's wrongful conduct, plus pre- and post-judgment interest thereon; that temporary, preliminary and permanent injunctions be entered requiring Defendant to take immediate action to provide Global Administrator rights over the Ohana MS 365 Account and the Ohana GoDaddy Account to Phil Leadore, of Hartman Executive Advisors; and that the Court award to Ohana the cost of these proceedings, and such other and further relief as this Court deems just and appropriate under the circumstances.

### COUNT III – BREACH OF DUTY OF MD. CODE ANN., CRIM. LAW., §7-302(c)

29. Ohana incorporates the allegations above as if fully set forth herein.

30. Defendant's repeated refusal to comply with Ohana's directives to provide Global Admin rights to Mr. Leadore and others constitutes a violation of MD. CODE ANN., CRIM. LAW., §7-302(c).

8

Page: 9

Author: Ryan Dillon-Capps    Subject: Comment on Text    Date 10/26/2024 8:1:2:21 PM

The Plaintiff's argument in this case is an example of poor legal strategy and lacks a solid foundation. Their reliance on H8925 from 1998 demonstrates a failure to comprehend the basic legal standards they are trying to enforce. Here's why their approach is so fundamentally flawed:

1. Misapplication of Criminal Statute:
The Plaintiff's use of H8925 involves citing a criminal statute that does not support their claims. The statute they reference is irrelevant to the arguments they are trying to make. This error undermines the integrity of their case, as they rely on a legal standard that has no application to the factual context they present.

2. Literal Interpretation Undermines Their Argument:
By including H8925 from 1998 in their filings, the Plaintiff has unintentionally demonstrated that the law is to be interpreted literally, leaving no room for interpretation or alternative legal theories. This undercuts any argument about the law's purpose or intent, as they themselves have established that the statutory language is explicit.

3. Applicability of the Statute to the Plaintiff's Conduct:
Ironically, the crime as described in H8925 is more applicable to the Plaintiff's own conduct than to anything they allege against me. By relying on this statute, they have highlighted their own potential misconduct, making this one of the most poorly executed legal arguments I have encountered.
A Case Study in Poor Litigation
This case represents a textbook example of flawed litigation strategy. Their three primary errors—citing an irrelevant criminal statute, using evidence that confirms the law's literal interpretation, and highlighting statutory language that may implicate their own actions—are indicative of a lack of comprehension and preparation.

For years to come, I plan to share this story as an ice breaker. I'll begin by quoting their claim that "Ohana has suffered a specific and direct injury." Then, with a dramatic flourish, I'll lean forward, draw my shoulders and elbows inward, and with a hint of theatrical irony, I'll bat my eyes and ask: "Oh, do pray tell—what is this specific and direct injury you speak of?"

If the Court is interested, I would be happy to demonstrate this at the hearing, as it perfectly encapsulates the incredulity and irony of the Plaintiff's position.

Conclusion
The Plaintiff's arguments are poorly constructed and fail to demonstrate a legitimate basis for their claims. Their reliance on H8925 not only misapplies criminal law but also exposes their own potential misconduct. This approach highlights a strategy that lacks the depth and accuracy expected in serious litigation.

Court Record 1

31.    Ohana has suffered a specific and direct injury because of Defendant's violation

of and, therefore is entitled, pursuant to MD. CODE ANN., CRIM. LAW., §7-302(g), to bring a civil

action against Defendant for that violation to recover Ohana's actual damages and reasonable

attorneys' fees and court costs.

32.    Defendant's continued violation of MD. CODE ANN., CRIM. LAW., §7-302(c) is

depriving Ohana of the right to control Ohana's property, to wit, the Ohana MS 365 Account and

the Ohana GoDaddy Account and has created a risk of imminent and irreparable harm to Ohana.

WHEREFORE, Plaintiff, Ohana Growth Partners, LLC, respectfully requests that

judgment be entered as to Count III in favor of Ohana and against Defendant in an amount equal

to the damages caused by Defendant's wrongful conduct, plus pre- and post-judgment interest

thereon and the reasonable attorneys' fees and court costs that Ohana has incurred in connection

with this matter; that temporary, preliminary and permanent injunctions be entered requiring

Defendant to take immediate action to provide Global Administrator rights over the Ohana MS

365 Account and the Ohana GoDaddy Account to Phil Leadore, of Hartman Executive Advisors;

and such other and further relief as this Court deems just and appropriate under the

circumstances.

9

## Page: 10

| Author: Ryan Dillon-Capps | Subject: Comment on Text | Date: 10/26/2024 8:21:01 PM |
|---|---|---|

Judge Stringer correctly noted that "everyone gets to choose their own representation." In this case, Stephen/ Steven D. Frenkil is listed on the complaint, actively participating in both litigation and negotiation efforts. Despite this involvement, he has not filed to be formally on record as representation, raising serious ethical and procedural concerns.

1. Ethical Obligations of Representation

It is improper for an attorney to play a significant role in litigation and negotiations without formally appearing on the record as counsel. This lack of formal representation creates a situation where Frenkil is influencing the legal proceedings without accepting the responsibilities or consequences associated with legal representation. His involvement directly affects the case, yet by not officially filing to be on record, he circumvents accountability. This undermines the integrity of the judicial process and creates an imbalance in representation.

2. Influence Without Accountability

Frenkil's contributions to the case—including his involvement in drafting the complaint and participating in negotiations—suggest that he is functioning as legal counsel. By not being officially on record, he avoids the scrutiny and standards that apply to formal representation, thus creating an unfair advantage. Allowing such an arrangement contradicts principles of fairness, as those contributing to the case should be held to the same standards of accountability, especially when their input impacts the outcome.

3. Abuse of Process

The failure to formally enter an appearance while still contributing to the litigation constitutes an abuse of process. This tactic allows for participation in the case while evading the procedural obligations required of legal counsel. Such behavior is not just an ethical concern; it is indicative of a strategy designed to exploit procedural loopholes and avoid consequences, thus diminishing the fairness of the judicial process.

Conclusion

Judge Stringer's observation underscores the right to select representation, and that choice comes with ethical obligations. By engaging in litigation without filing to be on record, Stephen D. Frenkil has participated in the legal process without adhering to its responsibilities. I will be filing the Motion for Reconsideration to seeks the court in to address this issue, emphasizing the need for transparency and accountability in representation and preventing further abuse of process.

Ensuring clarity in my request has and still is to recognize the decision that was made and ensure that existing representation is accurately reflected.

Court Record 1

Dated: June 14, 2024

/s/ Robert S. Brennan
Robert S. Brennan (AIS # 8712010068)
e-mail: RBrennan@milesstockbridge.com
Stephen D. Frenkil (AIS # 7712010110)
e-mail: SFrenkil@milesstockbridge.com
Victoria K. Hoffberger (AIS # 1912170195)
e-mail: VHoffberger@milesstockbridge.com
MILES & STOCKBRIDGE P.C.
100 Light Street
Baltimore, Maryland 21202
Telephone:      (410) 727-6464
Facsimile:      (410) 385-3700

Counsel for Plaintiff Ohana Growth Partners, LLC

10

Summary_Complaint-011_of_11

Amended Affidavit of Plaintiff's Abusive Use of the Judicial System          Page # 12 of 12          Exhibit 107
Exhibit B - Complaint Markup

| OHANA GROWTH PARTNERS, LLC | IN THE |
| --- | --- |
| *Plaintiff,* | CIRCUIT COURT |
| vs. | FOR |
| RYAN DILLON-CAPPS | BALTIMORE COUNTY |
| *Defendant.* | CASE NO: C-03-CV-24-002264 |

## AFFIDAVIT OF UNAUTHORIZED CONTRACTUAL MODIFICATIONS

I, Ryan Dillon-Capps, being over the age of eighteen (18) and competent to testify, and having personal knowledge of the facts contained herein, state as follows:

1        I, Ryan Dillon-Capps, formally object to the use of the employment contract submitted by Ohana Growth Partners, LLC in the present litigation. The contract presented to the court is incomplete and raises significant concerns regarding the integrity of their submission. Upon filing this lawsuit, Ohana had two options: either rely on the official copy of the contract saved in their system or attempt to retrieve the original version that was provided to me. They opted for the former. However, this decision is fundamentally flawed for the following reasons:

1.        **The Contract is a Digital File with Missing Content**

Given that the document in question is digitally stored, the only plausible explanation for the missing section is that someone deliberately removed the content. This raises serious concerns of document manipulation, suggesting the intentional alteration of evidence submitted to the court.

2.        **Ohana Growth Partners and Miles & Stockbridge's Lack of Honesty**

Both Ohana Growth Partners and their legal representatives, Miles & Stockbridge, have

consistently demonstrated a lack of honesty throughout these proceedings. Their prior conduct undermines any presumption of good faith in submitting this incomplete contract to the court.

3. **Documented Communications on Employment Contracts**

Upon review of internal communications, I have found that discussions surrounding the execution of employment contracts involve Richard Hartman "fixing" issues with already signed agreements. The context of these communications does not indicate efforts to present or execute a new contract in those situations, and I conclude that at some point my saved contract was not a match for the original contract which is why they removed the evidence on June 14, 2024.

4. **Essential Terms Missing**

Despite Miles & Stockbridge's arguments that essential terms about compensation are not important. I am unsure if anyone else would agree that the cost of something is not essential. Without an accurate representation of the cost of labor and other compensation-related terms, the contract remains incomplete and insufficient.

5. **Section I is Not Reflective of June 13 Employment**

The role or position I held on June 13, 2024, is not clearly defined by or enforceable under the terms outlined in Section I of the document they presented. The nature of my duties and responsibilities at that time does not align with the incomplete contract they have submitted.

I  PREVENTING FURTHER JUDICIAL ABUSE TO DESTROY EVIDENCE

2        Out of an abundance of caution, I have had to limit my own access to evidence that is necessary for future litigation because I feared they would attempt to forcibly obtain under false pretenses. Instead, I have focused on leveraging their own arguments against them, but they have failed to present a valid argument on their use of a partial contract.  This case is reaching the final arguments, and I do not wish to waste time addressing a moot point that they raise to further delay relief.

3        Despite my repeated attempts to negotiate a comprehensive resolution to all issues and avoid further litigation and investigations, Miles & Stockbridge has instead chosen to retaliate. They have done so in response to being reported for their misconduct, using baseless accusations and personal insults aimed at my gender and disability.  Even mocking the very memory issue, they caused while ironically do the same thing in repeating themselves. Except I am repeating facts and evidence that disproves their continued reliance on fabricated claims that only further demonstrate their bad faith.

4        They treat their fraudulent conduct and sanctionable behavior as something to boast about, while the lawsuit itself lacks any fundamental basis for relief or a justifiable reason for being filed against me. Moreover, the case fails to address their violations of the **Family and Medical Leave Act (FMLA)** and the **Americans with Disabilities Act (ADA)**. I remind those reviewing this affidavit that I was on FMLA leave on June 13, 2024—a fact that **Richard Hartman**, **Glenn Norris**, and **Justin Drummond** were fully aware of. In fact, Richard Hartman has admitted that the suspension and subsequent lawsuit were, in part, a reaction to one of the three emails sent that day:

1. **The FMLA Leave Notice**: At 7:00 AM on June 13, I formally notified the relevant parties that I was using FMLA leave.

2. **Cease and Desist to Assert FMLA Rights**: Around noon on the same day, I sent a cease-and-desist letter to assert my right to take FMLA leave without interference. This letter included an update, clarifying that I had not refused any requests and had already taken steps to comply where possible.

3. **Email to Ohana Ownership**: At 2:05 PM, I sent an email to the owners of Ohana Growth Partners, urging them to intervene and halt Richard Hartman and Glenn Norris before they could incur any further liability for the company. Fifteen minutes later, Darren Koritzka was placed on a leave of absence by Richard Hartman, and I was suspended seven hours after that. The following day, this fraudulent lawsuit was filed.

## II  AFFIDAVIT OF RANDLL ROMES

5    On **June 18, 2024**, I submitted a letter to **Judge Truffer**, along with roughly 70 more pages of evidence showing my **FMLA**, **ADA** status, contradictions to the claims of refusal, and multiple instances discussing **PCI DSS v4 requirements**. How, then, does **Randall Romes** affirm in his affidavit: "I have reviewed Defendant Ryan Dillon-Capps' letter to the Court dated June 18, 2024," and still conclude that "Defendant Dillon-Capps has not identified any specific **PCI DSS** requirement"?

6    There are two possible explanations for this. First, that they lied about what they read in the court record. But why would someone lie about the contents of a court document when they could simply disagree with the conclusions, as they did when they incorrectly affirmed that there

are no laws concerning **PCI compliance**? *(See the court record for Affidavit of Legal Obligations)*.

7      Another telling aspect of this affidavit is that parts of it were written by **Randall Romes**, and we know another significant factor about the information Romes was given. In his affidavit, he states, "I have reviewed Defendant Dillon-Capps' email to attorney Robert Brennen." Given that both **the Judge's letter** and my **email to Miles & Stockbridge** were sent to **Miles & Stockbridge**, who here believes that **Ohana Growth Partners** hired **Randall Romes**, gave him these materials, and then submitted his affidavit to **Miles & Stockbridge** without his knowledge?

8      Now consider the following: after you read **Miles & Stockbridge** telling **Ms. Prinkey**, "For some reason, when we created the combined PDF I sent you a moment ago, Mr. Romes' e-signature was removed from his affidavit. Attached are the documents as filed with the signed affidavit." Is this just another "mistake," or something more deliberate?

9      Who here questions how copy-pasted content can use the exact same quote and hyperlink that leads to the wrong **Microsoft** page? This link leads to a solution for small businesses, which is vastly different from the technology **Ohana Growth Partners** actually uses. Wouldn't an IT professional—like **Randall Romes**—know that the page leads to the wrong technology? The difference in scale between the small business solution and the enterprise-level **EntraID** and other expensive components needed to manage an environment for 1,500 employees across five states and **Washington, DC** is striking. This discrepancy should have been obvious.

10      This brings me to the one time I emailed **Ms. Prinkey**:

> "@Lauren.Prinkey@mdcourts.gov, I am sorry to bother you, but could you forward me the original email that Mr. Brennen is referring to in his email to me on the 24th? I couldn't find it and wasn't aware you had my email address until the 24th/25th. Also, are you able to grant me access to the entire case record online? They filed the case with either no email address or an email address I don't have access to. I have linked my correct email address to the case, but I can't see anything, and I feel like I am missing correspondence."

11       I was referring to an email from **June 21, 2024**, that I have no record of, which was almost forcibly sent to me by **Miles & Stockbridge** on **June 24**, informing me about the **TRO hearing** in two days. How is it that a hearing was set four days after an order was issued—missing the prehearing conference and falling short of the 20-day minimum? Somehow, this is deemed better than following the proper procedure?

12       The response to this email is:

> "Once again this case has not been assigned to Judge Truffer. Please contact the clerk's office is you need information."

**Subject:** RE: [EXTERNAL] Ohana Growth Partners, LLC v. Ryan Dillon-Capps - C-03-CV-24-2264
**From:** Lauren Prinkey <Lauren.Prinkey@mdcourts.gov>
**To:** Ryan Wagner <ryan@mxt3.com>
**Date Sent:** Friday, July 12, 2024 11:10:47 AM GMT-04:00
**Date Received:** Friday, July 12, 2024 11:10:51 AM GMT-04:00

Good morning,

Once again this case has not been assigned to Judge Truffer. Please contact the clerk's office is you need information.

Thank you,
Lauren

13       To be fair, **Miles & Stockbridge** had sent many emails to **Ms. Prinkey**, and in one of those, they instructed the law firm to stop sending everything to **Judge Truffer**. However, my inquiry wasn't about those emails. I was asking specifically about the email from **Ms. Prinkey** that I didn't receive, and I wanted to ensure that it had actually been sent to me, as I had no record of it.

14      **Judge Truffer** ruled on my **Letter** and **Show Cause** on **June 21**, and then on a motion to reconsider on **July 5**. I would like to think that perhaps **Judge Truffer** distanced themselves from the case because they had even the slightest bit of doubt. After all, **Judge Truffer** exclusively ruled on essentially the same packet of evidence that should have ended the case. The issues surrounding my **FMLA**, **ADA**, and even the question of whether **PCI compliance** is connected to legal obligations could have been resolved at that point. It's common sense that no company, much less the entire **Payment Card Industry**, would incur additional expenses for no reason. Moreover, it's unreasonable to assume that every merchant would voluntarily adopt such complex and costly standards without any contractual or legal obligation to do so.

15      It doesn't take an expert to recognize this: companies are compelled to follow these standards, and the **Payment Card Industry** must have valid reasons for enforcing them— reasons that prevent companies from suing them for imposing unnecessary regulations. It's common sense, and nothing more, to understand that there **must** be legal or contractual obligations connected to **PCI DSS v4 compliance**. Anyone who claims otherwise is not credible at face value.

16      That said, if the **Affidavit of Legal Obligations** doesn't meet the threshold of common sense, I can provide similar examples from the other 44 states. But here's the thing—**Judge Truffer** and **Randall Romes** are not the root problem here. Even when you consider the fact that **Judge Truffer** ruled on the motion to reconsider the continuance **three days before** it was even submitted, accepted, and entered into the court record with all its exhibits on **July 8, 2024**, that is not where the blame lies.

17      So why did this happen? Why is this lawsuit still ongoing? Who is ultimately responsible for all the wrongdoing and harm caused by this process? The answer points to the same two parties: **Miles & Stockbridge** and **Ohana Growth Partners**.

### III   DANIEL LEVETT AFFIDAVIT

18      During the weeklong effort to get the **Motion to Reconsider the Continuance** entered, the previously silent **Daniel Levett** of **HEA** suddenly broke his silence by submitting an affidavit, which was paired with the show cause order seeking my incarceration. Quite a leap for a lawsuit rooted in violations of **FMLA**, **ADA**, and misinterpretations of its own exhibits. Notably, this occurred the day after my first attempt to submit the motion and days after two hearings where four separate motions were denied without any arguments being heard.

19      Bold moves indeed from **Miles & Stockbridge**. In their rush to strike fear and intimidate me, the **Affidavit of Daniel Levett** revealed to the Court that the very basis for injunctive relief—now expanded to include a request for my incarceration—was based on a lie. In the affidavit, **Daniel Levett** admitted that **Ohana Growth Partners** had other administrators, and that he worked with one of them to show me that they could access the global administrator account. After the affidavit was submitted, with the accompanying show cause order, **Mr. Levett** proved beyond any doubt that **Ohana Growth Partners** had access to the account all along.

20      Additionally, **Mr. Levett** inadvertently admitted to **Estoppel**—a legal principle he likely had no awareness of. However, **Miles & Stockbridge** certainly did, and they allowed the affidavit to be submitted, perhaps in an attempt to contradict the earlier statement that **Hartman Executive Advisors** did not want to be involved. There was no justification for being involved the entire time while refusing to respond and receive access, despite numerous attempts on my

part, starting with the first email and continuing far beyond the second and final one they ever sent me. **June 17th** is even listed on the **Show Cause** petition, which was the last day I had my full faculties intact before my mental break hours later, leaving me with severe memory issues and catatonia.

21     So, who is jointly responsible here? Which parties—both a law firm and a mid-market franchisee—are actively trying to incarcerate a person, despite having an affidavit that literally tells the court there is no need for it? The issue isn't **Judge Michael Barranco**, who ruled in favor of the show cause order seeking my incarceration, denied four motions without hearing arguments, ruled on a contempt charge with an order containing conflicting instructions, and granted the preliminary injunction, which is the core reason we are still litigating this case three months after the show cause was withdrawn.

22     The real problem lies with the same parties who, just days ago, received notice that the order granting the vacate of the default judgment had been issued—before it was even entered into the system. They then spent the next two workdays filing hateful, nonsensical, and fraudulent rhetoric, continuing to remind everyone how deeply dishonest and unethical they are. The responsible parties are none other than **Miles & Stockbridge** and **Ohana Growth Partners**.

## IV   COURT RECORD ON FMLA AND ADA

23     Everyone should review the following court records, with attached papers, for a full understanding of the facts:

1.     Plaintiff's Affidavit of Richard Hartman

2.     Defendant's Correspondence to Judge Truffer

3.     Transcript of Show Cause and PI Hearing on June 26

4.      Transcript of Show Cause and PI Hearing on June 27

5.      Defendant's Motion to Reconsider Denial of Continuance

24     Relevant to this section, the following facts are established from those records:

1.     **Richard Hartman acknowledges my FMLA status**: Richard Hartman explicitly admits that he knew I was on FMLA leave on June 13.

2.     **Undisputed FMLA leave entitlement**: Neither the court, the plaintiff, nor opposing counsel denies that I was entitled to FMLA leave and was on FMLA leave on June 13.

3.     **ADA accommodations acknowledged**: Aside from Judge Barranco, there is no individual in this case who disputes that I am disabled and qualify for ADA accommodations. Ohana Growth Partners themselves provided these accommodations. The FMLA paperwork, two separate letters from health care providers, as well as testimony and an affidavit from my spouse, fully support my claim.

4.     **Ohana's stance on FMLA violations**: Ohana Growth Partners does not deny my entitlement to FMLA leave, nor do they deny that they violated it. In fact, their argument hinges on the premise that they have the right to violate it.

5.     **Federal Government's stance**: The Federal government disagrees with Ohana Growth Partners' position.

## LEGAL CITATIONS:

25      **Family and Medical Leave Act (FMLA) - 29 U.S.C. § 2615(a)(1)**: This section of the

FMLA makes it unlawful for an employer to interfere with, restrain, or deny the exercise of, or

the attempt to exercise, any right provided under the FMLA.

26      **29 U.S.C. § 2615(a)(2)**: This section of the FMLA further prohibits employers from

retaliating against an employee for opposing any practice made unlawful under the FMLA.

27      **Americans with Disabilities Act (ADA) - 42 U.S.C. § 12112(b)(5)**: This provision

requires that employers provide reasonable accommodations to qualified individuals with

disabilities, unless doing so would cause undue hardship to the employer. FMLA leave may

serve as an ADA accommodation.

28      **29 C.F.R. § 825.220(b)**: This section of the Code of Federal Regulations specifically

states that employers are prohibited from interfering with an employee's FMLA rights.

Interference includes not only refusing to authorize FMLA leave but also discouraging an

employee from using such leave.

29      **29 C.F.R. § 825.220(c)**: Retaliation is expressly prohibited under the FMLA, and adverse

actions taken against employees for exercising their rights under the FMLA are illegal.

30      **Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 89 (2002)**: This Supreme Court

case reaffirms that employers cannot interfere with or violate the rights guaranteed to employees

under the FMLA.

## LEGAL ARGUMENT:

31      The FMLA explicitly protects employees from retaliation and interference in relation to

their exercise of FMLA leave. Ohana Growth Partners' actions, as demonstrated by the facts in

this case, clearly constitute a violation of these protections. The evidence presented, including Richard Hartman's acknowledgment that I was on FMLA leave and the absence of any denial from the court or opposing counsel regarding my FMLA eligibility, solidifies the argument that Ohana Growth Partners unlawfully interfered with my rights.

32    Their argument that they have the "right" to violate my FMLA leave is not only legally baseless but directly contravenes **29 U.S.C. § 2615** and **29 C.F.R. § 825.220**, which strictly prohibit any form of interference or retaliation regarding the exercise of FMLA rights. The law provides no leeway for employers to violate these statutory protections, and Ohana Growth Partners' position would open the door to exactly the kind of abuse that FMLA was designed to prevent.

33    Additionally, their actions also implicate the **ADA**, under which I am entitled to reasonable accommodations for my disability. Ohana's conduct not only violated my FMLA rights but also interfered with my legally protected ADA accommodations, as FMLA leave was granted to accommodate my disability. Under **42 U.S.C. § 12112(b)(5)**, Ohana Growth Partners had a duty to continue providing these accommodations rather than retaliating by filing a lawsuit and suspending me.

<center>FMLA AND ADA CONCLUSION</center>

34    Ohana Growth Partners' claim that they have the right to violate FMLA law is legally indefensible. Their actions, from suspending me while I was on leave to subsequently filing this retaliatory lawsuit, demonstrate clear interference with my FMLA rights and retaliation in violation of federal law. The Federal government, through its clear statutory provisions and

judicial precedent, has unequivocally rejected such employer misconduct, as demonstrated in cases like **Ragsdale v. Wolverine World Wide**.

## V  JUNE 26TH MOTIONS ON FMLA AND ADA

35    Please see the **Transcript of Show Cause and PI Hearing on June 26** for a full understanding of the facts. During the **June 26th hearing**, I was not permitted to present critical arguments related to my rights under the **Family and Medical Leave Act (FMLA)** and the **Americans with Disabilities Act (ADA)**. This denial significantly prejudiced my defense, as the facts and legal basis supporting my entitlement to FMLA leave and ADA accommodations were central to my case.

## FMLA ENTITLEMENT AND INTERFERENCE:

36    I was on valid FMLA leave on June 13th, a fact that had been acknowledged by Richard Hartman and was not contested by opposing counsel. Under **29 U.S.C. § 2615** and **29 C.F.R. § 825.220**, I had the right to be free from interference and retaliation while on FMLA leave. However, despite this, I was denied the opportunity to argue that the suspension and lawsuit filed by Ohana Growth Partners were retaliatory actions taken in direct violation of the FMLA.

## ADA PROTECTIONS AND ACCOMMODATIONS:

37    My status as a disabled individual entitled to accommodations under the ADA was also not contested by Ohana Growth Partners. The accommodations I was receiving, including FMLA leave, were documented and supported by medical records and testimony. **42 U.S.C. § 12112(b)(5)** requires employers to provide reasonable accommodations, and Ohana Growth

Partners had been doing so prior to their retaliatory actions. Yet, the court did not allow me to raise the argument that their conduct violated the ADA, further infringing on my rights.

## PREJUDICE TO DEFENSE:

38    The inability to present these arguments undermined my ability to fully defend against the claims brought by Ohana Growth Partners. By denying me the opportunity to address these crucial legal issues, the court prevented the consideration of substantial and legally sound defenses that directly challenged the legitimacy of the lawsuit filed against me. Both the FMLA and ADA provide critical protections against retaliatory actions, and the exclusion of these arguments during the June 26th hearing deprived me of a fair opportunity to assert my rights under federal law.

## LEGAL PRECEDENT

39    Courts have long held that employees are entitled to present evidence and arguments related to their statutory rights under both the **FMLA** and **ADA**. The failure to allow me to present these arguments constitutes a violation of due process and contradicts established legal principles, as seen in cases such as **Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81 (2002)** (recognizing the right to FMLA leave and the protections against interference) and **Barnett v. U.S. Air, Inc., 535 U.S. 391 (2002)** (upholding ADA accommodation rights).

## VI  UNLAWFUL NATURE OF THEIR REQUESTS:

**40**    For a complete set of facts, please see the court record for the **Affidavit of Legal Obligations.**

41      Not only did I not refuse their demands, but the unlawful nature of those requests has been clearly demonstrated through clean copies of contracts and a meticulous breakdown of applicable statutes and contractual requirements. This thorough analysis eliminates any doubt about the illegal nature of their actions. These were not lawful orders; rather, they were coercive threats aimed at compelling me to violate more than a dozen contracts as well as the law.

42      When their coercive tactics failed—because I provided legal and compliant alternatives—they resorted to evasion and committed **estoppel**, thereby perpetuating a false narrative. This fabricated narrative has been used repeatedly in their filings, including affidavits, memoranda of law, complaints, petitions for show cause, and their requests for default orders and incarceration.

## VII   NO EVIDENCE – ONLY LIES AND MANIPULATIONS

43      Upon review of the substantial body of evidence presented, the only conclusion is that the plaintiffs have actively engaged in lying and manipulation throughout this fraudulent lawsuit. I have already requested a hearing, and if necessary, I am prepared to dissect each statement they have made, piece by piece, to demonstrate the extent of their falsehoods. However, I am concerned that the court may not schedule this urgent hearing in time to prevent the permanent irreparable harm that I have been warning about for weeks.

44      To evade accountability, Ohana Growth Partners, needs to achieve the following conditions:

1.      **Infiltrate and control the system**: Ensure that only those individuals they trust are in positions of authority, without any opposition or oversight that might challenge their actions.

2.    **Manipulate discovery**: Lay the groundwork for discovery in such a way that they can "discover" the issues they need to address or, preferably, hope that I obstruct the process, giving them grounds to argue obstruction and nullify the evidence.

3.    **Delete or alter evidence**: Modify or eliminate any evidence necessary to align their fabricated version of events with a combination of real and fabricated evidence, or to create an incident that they claim was someone else's fault. Like from a lawsuit that portrays someone as a harmful risk to the exact thing that need to "protect"

45    I remind the court that in November, the first **immutable** lock protecting the oldest backup of data within their system will expire. This lock, which prevents the deletion of critical data through normal means, was a protection I implemented after discovering that the weaker soft immutability setting had been disabled. Soft immutability prevents accidental deletion, but it can be removed, allowing intentional deletion after a brief buffer period. Fortunately, the buffer had not expired for the November 2023 backups when I intervened to prevent any further tampering.

46    Although this system is not foolproof, they have already taken steps to remove key personnel who were aware of the changes I made under the guise of a "departmental reorganization." They knew my primary condition during negotiations was to protect individuals like **Darren Koritzka**, **Ann Pinera**, and **Cielo IT** from unfair retaliation. This was an acceptable condition to them because their ultimate goal was to remove anyone who might know what data they had versus what data they have now.

47    **Context is crucial**—They never had any valid context to suggest I would harm them, their systems, or their data, because there is none. In reality, I was the only one actively

protecting the systems and data, and I did so to protect innocent people from being unfairly targeted. Every action I have taken was to safeguard the company and its employees. I never once acted for my own benefit. *(See Section "Philosophy on Mistakes, Victims, and Malice")*.

48      It is vital for the court to understand the broader context of their actions, as this is not a case of misunderstanding or accidental events. The narrative they presented is not only false and fraudulent but serves as a cover story to distract from serious, criminal behavior.

49      If I had exposed the full truth from day one, the contrast between reality and their false narrative would have been so stark that it could have caused more harm than good in the long run. It would have given them the opportunity to attack, using their influence and favor with the court to reinforce their fabricated story. Considering where I was mentally and physically in June, July, and August, such an outcome would have been irreparable.

50      I continue to struggle to expose the truth, using their own emails, communications, and evidence to reveal the reality of their actions. However, time is not on my side in this lawsuit. I must use the time I have while the events are still fresh in my memory to document everything and ensure that the context is preserved. It will not be long before **Miles & Stockbridge** will be required to produce substantive evidence to justify over four months of litigation. When they fail to do so, those who previously gave them the benefit of the doubt will have enough evidence to finally adjudicate the issues that this lawsuit was designed to conceal and shield from accountability.

## VIII   HARTMAN THE LIAR

51      While I am uncertain about which contract they have saved as the official one, what is clear to me is that Richard Hartman has consistently failed to demonstrate honesty or reliability

in his dealings with me. When I filed a formal hostile work environment and discrimination complaint with him in November, he falsely claimed to have no knowledge of the years of complaints I had submitted to **Glenn Norris**, the meetings where inappropriate conduct was discussed, the formal reprimands that were issued, or even the incident reported by an executive from another company concerning how I was treated during a meeting they attended.

52      Initially, I gave Hartman the benefit of the doubt and believed him. However, immediately after our phone call, he sent an email to two of the individuals I had reported in my complaint, falsely stating that I had also reported **Glenn Norris** and **Justin Drummond**—individuals I had not mentioned as part of that report. I became aware of this deceit the same day during a meeting with Glenn Norris. While sharing screens, Norris inadvertently revealed the email, confirming that Hartman had lied about my statements. I had approached Hartman with the same goodwill I extended to Norris and others, allowing them the opportunity to present any evidence that their actions had not been malicious. *(See Section "Philosophy on Mistakes, Victims, and Malice")*.

## DISCREPANCY IN STATEMENTS AND HARTMAN'S DISMISSAL OF INVESTIGATIONS

53      I say "tomato" and **Miles & Stockbridge** says "banana"—a metaphor for the vast discrepancy between my factual assertions and their attempts to dismiss or deflect. They cannot explain how I know what I know, but they certainly do not like the information I possess. As a result, they resort to labeling my statements as mere "ramblings." I will keep this point brief. In June, **Richard Hartman** responded to a call from **Holly Butler** by notifying me that the fraud

investigation had concluded. This mirrored the circumstances in which the HR investigation was abruptly ended in March, both instances leaving significant questions unanswered.

## FLAWED INVESTIGATIONS AND IGNORED EVIDENCE

54    I double-checked and verified that nothing necessary for conducting a proper investigation was accessed during either the HR or fraud investigations. No one spoke to the executive who made the original report—a crucial factor, as that report was the key event that prompted HR to open the investigation in the first place. Yet, Richard Hartman falsely claimed to have no knowledge of the incident. The notice that ended the HR investigation contained ambiguous language, which could be interpreted by **Glenn Norris**, **Justin Drummond**, and myself as confirming that the email, letter, and phone call I used to report the incident all contained the same facts.

## ADDRESSING THE FALSE NARRATIVE

55    In response to these investigations, I revealed to **Drummond** and **Norris** that I had long been aware of the false statements made in November 2023, where they were wrongly told that I had reported them. I addressed the suspicious language in the investigation's closing notice and pointed out the illogical nature of what had been communicated to them. While this was the first time I brought Hartman's dishonesty to the attention of more than just Glenn Norris, it certainly wasn't the first time I had observed Hartman's habit of dishonesty. In fact, his tendency to lie is so frequent that it may qualify as compulsive behavior. Often, I wondered why he would lie about matters that appeared to hold no real value or benefit to him or anyone else. However, upon reflection, I now believe this is rooted in his deep-seated belief that he is an outsider. This

belief is evident in various aspects of his life—such as his decision to move to Japan to reconnect with his genetic heritage—and continues to influence his actions at **Ohana Growth Partners**, where he seeks to protect and align himself with those he believes "accept him as one of their own."

## IX   MISSING TERMS AND BINDING PRINCIPLES

56      They deliberately acted to conceal the content they wanted removed from the employment contract they saved in their records. On **June 14, 2024**, they intentionally omitted key content from the contract to hide information that can be explained by their prior actions and internal communications. These emails reflect a clear pattern of dishonesty in how they handled terms they didn't want included in the contract.

57      As future litigation unfolds in the lawsuit where I am the plaintiff, I will present evidence showing their intentional concealment of essential terms, partial performance, and a lack of good faith and fair dealings—all of which pertain to the employment contract they failed to fully disclose. The missing contract relates directly to the promotion they promised but did not fulfill. Below are some of the legal arguments that support my claim regarding the incomplete contract:

58      **Maryland Uniform Commercial Code (UCC) § 2-204(3):** This section states that "even though one or more terms are left open, a contract for the sale of goods does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy."

59      **Hammond v. Int'l Harvester Co., 99 Md. App. 1 (1994):** The court in this case ruled that a contract may be formed even if some terms are left for future determination, provided the parties intended to be bound and the essential terms are agreed upon.

60      **Kiley v. First Nat'l Bank of Md., 102 Md. App. 317, 349 (1994):** The court held that even if all terms are not finalized, a contract can still be binding if there is a clear intent to contract and sufficient definiteness of terms to ascertain a remedy.

61      **Peeling v. Virginia Iron, Coal & Coke Co., 94 Md. 4 (1901):** This case recognized the enforceability of a contract where material terms are sufficiently established, even if some elements remain to be negotiated.

62      **Maryland Restatement (Second) of Contracts § 33 (1981):** This section elaborates that the terms of a contract must be reasonably certain to form an enforceable contract, and a contract can be enforceable even if some terms are indefinite, as long as the intent to be bound is clear.

63      **Canaras v. Lift Truck Services, Inc., 272 Md. 337, 352 (1974):** The court reaffirmed that missing or unclear terms do not necessarily void a contract if the essential elements of the contract are present and the parties' intent can be determined.

64      **Everett v. Brown, 179 Md. 55 (1941):** Maryland courts have held that ambiguity or missing terms in a contract can be clarified by looking at the behavior of the parties and any relevant extrinsic evidence.

65      **Restatement (Second) of Contracts § 204 (1981):** This legal principle allows courts to supply missing terms in a contract where the parties intended to make a binding agreement but left out certain details.

66      I will be transparent about the purpose of this section. Either **Miles & Stockbridge** concede that there is no valid contract—admitting that four months of litigation were nothing more than fraudulent pursuits—or they continue with their weak, poorly argued position regarding the incomplete contract. Should they choose the latter, they will inadvertently argue in

favor of the enforcement of the real employment contract, which, like the **June 7th agreement with Justin Drummond**, was evaded and subsequently ignored by them. Their choice to persist in this manner will only further expose their duplicity and support the enforcement of the very contract they are trying to avoid acknowledging.

## X   COUNTER ARGUMENT AGAINST OHANA GROWTH PARTNERS

67     **Miles & Stockbridge** could have already employed one of several valid arguments to support the use of a partial contract, referencing any combination of the five key elements commonly used by Maryland courts to assess contract enforceability:

## INTENT TO CONTRACT

68     Courts will examine whether both parties intended to enter into a binding contract, despite missing sections or unclear provisions. If intent to be bound can be demonstrated, the contract may still be enforceable.

69     This principle is clearly applicable to the agreement made on **June 7, 2024**, between **Justin Drummond** and myself. In that instance, Drummond agreed to the terms of the contract. However, **Miles & Stockbridge** are attempting to rely on **Section I** of the earlier, incomplete contract to allege that I breached the agreement, which is factually and materially false. Using **Section I** in this situation is illogical for several reasons:

    1.     **Glenn Norris** and I negotiated the terms of my promotion for several months. If not for my whistleblowing actions, I would have been promoted and occupying my new role for nearly a year by now. The intent to be bound was evident in our negotiations, and that is the contract that should be enforced.

2.      By **June 13, 2024**, **Glenn Norris** was the head of IT. I had no authority to hire or fire employees, I was explicitly told that I was no longer expected to perform IT work, and I was informed that I was not allowed to exercise my own discretion in decision-making. This was not the role I was hired for, nor was it the job for which I had negotiated with Norris, alongside the promised promotion.

70      The only valid contracts that reflect an actual intent to contract are the one I presented to **Justin Drummond**, which was agreed to on **June 7, 2024**, and the intent to contract stemming from the months of negotiations with **Glenn Norris**.

71      **52.** The contents of **Section I** have no relevance to the contractual obligations I held with **Ohana Growth Partners** as of **June 13, 2024**. Its only significance lies in supporting future litigation regarding fraud and abuse of the judicial system.

## ESSENTIAL TERMS

72      Even if portions of the contract are missing, a contract can still be enforced if the essential terms—such as price, subject matter, and the parties involved—are clear and definite enough for the court to provide a remedy.

73      The email threads between **May 20 and June 13, 2024**, illustrate several key facts:

1.      **Not Allowed to Hire or Fire:** I terminated **Ryan Brooks** and ended his contract in May of 2024, but I was soon told that I no longer had the authority to do so. Despite **Glenn Norris** informing me earlier that month that I was allowed to resume my duties as head of IT, it became evident that this was not true. Hiring and firing within one's department is a basic function of a department head, and Norris had no issue with my

plan to remove Ryan Brooks and his company, **Baltimore Consulting, starting** in January 2024 – a decision I made in before the whistleblowing in 2023. Instead, I went on intermittent FMLA leave, he took over as head of IT, and kept Ryan Brooks without any explanation for the change in plans. Additionally, a new **Business Intelligence** team member was hired without my knowledge, and I only learned of their subsequent leave for a wedding through an announcement. When I inquired why I was not involved in these decisions the answer was clear – Glenn Norris was the head of IT.

2.      **Not Allowed to Perform Technical Work:** Norris explicitly prohibited me from taking action to protect financial data or address any risks that were flagged by a member of the Business Intelligence team. He did not want me performing any IT work, and when it came to the financial data, he didn't want ANYONE in the entire IT Department except for Ryan Brooks to be involved. For me, this was not a new development; from the moment he took over as head of IT, he insisted that I work through others. The problem was that **Ryan Brooks** was not delivering results or completing the tasks I assigned to him. After **May 20, 2024**, I discovered numerous issues linked to changes made while I was away for my wedding. I immediately re-enabled logging, reactivated legal holds protecting the data, and secured the backups—making them **immutable** for the term of the backup policy.

3.      **Not allowed to work under my own discretion:** Repeatedly, I requested help because the department was understaffed. This had been an ongoing issue, contributing to the extensive hours I worked. After **Glenn Norris** took over as head of IT, all discretion in my role was removed. Even basic departmental purchases were taken out of my

control, as all purchasing was routed through **Leeann Hartman**, Richard Hartman's wife, and **Lynne Brick's** sister. Projects were either taken away and managed by Norris himself, or I was given no authority over them due to a lack of resources or funding.

4. **No Ability to Direct My Team:** When I attempted to rally the team to address urgent issues flagged by a team member, Norris instructed them not to follow my directives. I was not the head of the department, had no ability to do technical work, couldn't lead others to complete the tasks, and had no say in who was hired or fired. My discretion and judgment were entirely stripped away. Glenn Norris, head of IT, even met with the IT department team members regularly to ensure he knew and addressed anything he didn't want to occur in the department. He intentionally was driving the department into the ground to undo the success I have achieved.

5. **Compensation is Essential: Miles & Stockbridge** might argue that compensation is not an essential term, but that claim is patently absurd. If that were true, I would owe no debts and own my home for one dollar. The annual addendums that modify the terms of compensation are undeniably essential.

74    On **June 13, 2024**, I had no idea what job I was actually performing because the essential terms of my employment were nowhere in the contract. While the agreement allows them to change my job, there must be limits. Could they, for example, claim that my compensation is zero dollars while expecting me to work every hour of every day? I exaggerate to make a point: there are reasonable limits to how much they can alter the terms of employment. The drastic changes they made far exceeded those limits, and the job I held bore no resemblance to the one

outlined in the partial agreement, which was missing key pages and essential terms from the addendums.

## AMBIGUITY AND INTERPRETATION

75      If a contract is ambiguous or incomplete, courts may examine **extrinsic evidence**—such as emails, negotiations, or previous dealings between the parties—to interpret the missing or unclear terms. In my case, the **June 7, 2024** agreement with **Justin Drummond** is straightforward and requires no further interpretation to understand the terms and expectations. However, if you examine the emails from the negotiations surrounding the **2020 agreement**, you will see that the terms in that contract do not align with the content of those emails. The same discrepancies are evident if you review the budget spreadsheet, the compensation spreadsheet, or the 10-year refinancing distribution spreadsheet. None of these documents align with the agreement being relied on by **Miles & Stockbridge**.

76      The reason **Miles & Stockbridge** raised questions about compensation is that they understand the significance of what it entails. Their approach essentially amounts to an admission that they are attempting to minimize costs. They know that if the compensation terms were properly met—including the restoration of compensation in all forms—this would result in hundreds of thousands of dollars in individual compensations, even without liquidation. These compensations extend across multiple areas.

77      I included this in the relief sought because it directly reflects what was promised to me and never fulfilled. This is part of a broader pattern by **Ohana Growth Partners**, where contracts are viewed as tools for litigation when it suits their interests, but they simultaneously

argue that contracts are irrelevant when it comes to PCI Compliance, compensation, or other matters that don't serve their advantage.

78     To **Ohana Growth Partners** and **Miles & Stockbridge**, the law, contracts, and their word are like a light switch—they flip it on when they want to claim it's the most important thing, and they turn it off when it serves them to keep things in the dark.

## PARTIAL PERFORMANCE:

79     If one or both parties have already performed under a contract, this may demonstrate their understanding and acceptance of its terms, even if some parts of the agreement are missing. Partial performance reinforces the validity of the contract and can be used to enforce its provisions.

80     Regarding the period from **May 20 to June 13**, the email exchanges make one thing abundantly clear: I had no idea what my new role entailed. To be blunt, it seemed as though my new job title was effectively the precursor to "unemployment"—by any means necessary. The tasks and responsibilities assigned to me were either stripped away or made impossible to perform, which speaks directly to the dysfunction and failure to properly fulfill the terms of the agreement.

## GOOD FAITH AND FAIR DEALING:

81     Under **Maryland law**, there is an implied duty of **good faith and fair dealing** in both the performance and enforcement of contracts. This means that each party is obligated to act honestly and fairly in carrying out their contractual obligations. If one party acts in bad faith by

withholding or omitting key elements of the agreement, such actions can weigh heavily in the court's decision to either enforce or void the contract.

82     Throughout this litigation, **Ohana Growth Partners** and **Miles & Stockbridge** have consistently demonstrated bad faith, through the following actions:

## PERJURED STATEMENTS:

1.     **Justin Drummond** lied about my refusal to provide him access and falsely claimed I refused to provide **HEA** access. He also lied about not receiving updates regarding **HEA** on **June 13, 2024**.

2.     **Richard Hartman** provided false statements, including lying about the contents of the hyperlink in the email chain, lying about losing access at **2:05 PM** on **June 13**, and claiming no access to personnel records, despite those being stored in **Paycom**, a system he administers. Hartman also falsely claimed that I had refused to give access to **HEA**.

## ABUSE OF THE JUDICIAL SYSTEM:

83     **Ohana Growth Partners** and **Miles & Stockbridge** repeatedly abused the judicial system by filing a fraudulent lawsuit with fabricated claims, using the legal process not to resolve disputes but to harass me. They sought to secure a **Show Cause** order seeking incarceration, a tactic of intimidation that constituted attempted false imprisonment.

## ENGAGEMENT OF ESTOPPEL:

84     On **June 13, 2024**, **HEA**, along with **David Levett**, **Justin Drummond**, and **Victor Brick**, either refused to respond or pretended to be unaware of the facts for several hours. This deliberate evasion and engagement in estoppel were clear bad faith acts aimed at manipulating the legal process.

## VIOLATION OF ADA AND FMLA:

85     **Ohana Growth Partners** violated both the **Americans with Disabilities Act (ADA)** and the **Family and Medical Leave Act (FMLA)** by failing to provide reasonable accommodations and retaliating against me for exercising my rights under these laws. These actions culminated in wrongful termination, in direct violation of federal protections.

## RETALIATION AGAINST DARREN KORITZKA AND MYSELF:

86     Both **Darren Koritzka** and I faced retaliation and Koritzka did nothing and knew nothing.  Hartman did it because he there and he was impulsive.

## SPOLIATION OF EVIDENCE:

87     In the last four months alone, there have been at least three instances of **spoliation of evidence**, where **Ohana Growth Partners** intentionally destroyed, changed, or concealed critical evidence. I have reason to believe that additional counts of spoliation may exist.

## MULTIPLE BREACHES OF CONTRACT:

88     **Ohana Growth Partners** breached the **June 7th agreement** with **Justin Drummond** as well as the real employment agreement that was negotiated and never fulfilled. Both contracts were evaded and left unsatisfied.

## FRAUD, IIED, AND OTHER MISCONDUCT:

89     Their fraudulent conduct also includes **intentional infliction of emotional distress (IIED)**, **reckless endangerment**, **negligence**, and **legal malpractice**. These acts were not isolated incidents but part of a broader scheme to harm me and cover up their unlawful actions

90     Additionally, **Glenn Norris**, as **CFO** and minority owner, unilaterally took over my role, stripping away my authority and responsibilities. This was not an administrative reassignment

but a deliberate effort to push me out of the company, demonstrating their lack of good faith. His actions, alongside **Ryan Brooks**, were clearly designed to undermine my what people thought was still my position

91     Once again, the **June 7th agreement** with **Justin Drummond** and the **Glenn Norris agreement** are the only contracts that reflect a true intent to contract in good faith. The document they have attached as **Exhibit 1A**—with its omissions and alterations—cannot be considered valid or enforceable. Their consistent bad faith actions, including spoliation of evidence, perjured statements, and abuse of the judicial system, have violated their duty of fair dealing at every stage.

## XI  PHILOSOPHY ON MISTAKES, VICTIMS, AND MALICE

92     I believe that honest mistakes and actions influenced by the deception of others present opportunities for grace and empathy. This belief stems from a lifetime of experiences, many of which involve events that could be described as atrocities—not just by definition but by the severity and suffering they inflicted. When people think of atrocities, they often imagine mass killings, torture, enslavement, or acts aimed at causing widespread destruction or extermination of groups. Though I will not go into detail about those specific experiences, I have no hesitation in discussing other moments in my life—moments where I was trapped in a shed set on fire as a child, run over by a van at the age of 3, narrowly survived a tornado that jumped over the trailer I was inside, or any of the times I was assaulted by groups of drunk U.S. soldiers or patrons from my work as a bouncer. Even the times I was raped or other horrific events that, despite their gravity, still don't qualify as "atrocities" compared to the scale of human suffering I've seen.

93      My life has taught me the profound significance of **malice**. Take, for example, a distracted driver who pulls into a driveway only to find a toddler crawling from under their van. It is a terrifying moment for the driver. Similarly, waking up in a hospital after a night of drunken recklessness and piecing together how you got there is a terrifying moment for the individual. Not everyone who's actions placed another's life in danger deserve to have two lives destroyed. If that is true, then the same principle must be applied universally.  Malice is not just a factor – it should be the factor to which we determine the severity of response.

94      Not even a month ago, my friend was assaulted with a pipe in her own backyard because she is transgender. After recounting the incident to me, she said, "It's okay," because hate is, unfortunately, not an uncommon experience for too many residents of Maryland. **Robert Brennen**, **Glenn Norris**, and **Richard Hartman** are not the first, nor will they be the last, to attack me. While some people use guns, knives, or pipes, others use lies and lawsuits as their weapons of destruction. Their intent is no different, and standing by, doing nothing, in this situation is no different than standing idly by while a group of men attacks a trans woman with a pipe. They justify their actions just as those who commit physical violence attempt to justify theirs—explaining to bystanders why they believe they are entitled to harm someone without provocation or warning. The emotional toll is no less devastating because the weapon is a lawsuit rather than a pipe.

95      Their actions demonstrate a complete lack of remorse and accountability. As I sought help and reported their misconduct to the **BAR**, they escalated their efforts, disregarding proper procedures and targeting me through legal tactics. These aren't defensive filings—they are aggressive tactics designed to cripple my ability to defend myself and harm my career. Their

continued malice and failure to account for the harm they've caused are grounds for a significant judgment against them. It's their willful disregard for the consequences that makes legal consequences necessary

96      I do not pursue this out of vengeance or anger, but because their actions require a decisive resolution. Their lack of accountability is not just damaging to me, but to others who may fall victim to their unethical behavior. The severity of their actions, combined with their indifference, warrants strong and immediate legal consequences to prevent future harm.

97      This is not an exaggeration. I am standing on the brink of financial ruin, grappling with *catatonia* and severe memory loss. I cannot recall what happened on *Friday night*, nor can I distinguish whether certain events occurred on *Saturday* or *Sunday*. My wife tells me I had panic attacks all through the night on *Tuesday*, but I have no memory of that either. On a good day, I am operating at less than half my normal self, yet they expect me to just walk away from the devastating harm they have caused. In mere hours, I may face financial default, and I am unsure what they think will happen next. But I can tell you one thing—it won't be me giving up or laying down to die, literally or metaphorically. I have survived worse, and my focus has always been on protecting others—*employees, family members, and vulnerable individuals* who rely on me. Their lives have been impacted by this legal battle as much as mine, and I will continue this fight, litigating for as long as necessary, until every avenue is exhausted and there is nothing left to contest.

98      I don't do this out of spite, malice, or even anger, but because their actions continue to reinforce the need for a decisive resolution. A resolution where they are no longer able to harm

anyone. I hope this resolution comes soon, because ongoing conflict hurts innocent bystanders—something that has been clear from the beginning with **Darren Koritzka**.

99      This lawsuit is driven by their fear of exposure and hatred for what they cannot understand. **Glenn Norris** repeatedly said, 'no one is like that,' referring to my empathy even after being wronged. He couldn't comprehend why someone would respond with compassion rather than vengeance. This same misunderstanding led them to weaponize the courtroom, much like someone using a pipe to inflict physical harm. Their malicious legal fight has left me with severe health issues—**catatonia**, memory loss, and emotional strain—that threaten my career and my future. Whether I had been physically beaten or dragged through this malicious legal battle, the result is the same: long-lasting harm and a fight for survival.

100     When people are confronted with evidence that contradicts their self-perception, most reject it. It may sound counter-intuitive, but in ***How to Win Friends and Influence People***, Dale Carnegie emphasizes that a fundamental aspect of human nature is the deep-rooted desire to see oneself as a good person. Carnegie argues that this self-perception is so deeply rooted in the human psyche that people are compelled by it without compare and it influences how individuals behave, communicate, and respond to others. Throughout the book, he explores the psychological need for self-justification and the lengths people go to maintain a positive self-image.

101     While **Carnegie's** understanding of this concept is foundational, his insights illustrate a key truth: people go to great lengths to preserve their self-image as 'good.' This is exactly what drove **Glenn Norris**—he rationalized his harmful actions by assuming that no one else would respond with empathy or compassion as I did. He could not accept a worldview different from

his own, and that refusal to see beyond himself drove his decisions. As **Carnegie** said, 'People like those who are like themselves or like the person they want to become.' **Norris**'s rationalization led to harmful, unethical, and illegal actions, all in the name of preserving his belief that he is a 'good person.' His actions have caused real harm, and that must be held accountable.

102     As this denial grows, it contracts into hatred, which is then rationalized as an affront to their sense of self. It's almost as if they're thinking, "Why are you trying to trick me?" and "You trying to trick me shows that you are not as you appear." This reinforces their need to preserve the belief that they are inherently a good person, and they begin to hate anything or anyone that threatens this self-perception.

103     After I returned from my wedding, I noticed this exact process playing out in **Glenn Norris**. His self-identity was firmly constructed around his need to rationalize, and each interaction thereafter only reinforced that need. By the time I presented a solution to provide **Justin Drummond** with the access he requested on **June 7, 2024**, Norris was so entrenched in this mindset that, despite **Drummond** agreeing to the terms, Norris likely rejected it immediately. When **Drummond's** actions mirrored those from March, evading responsibility and failing to deliver, I should have recognized that Drummond wasn't capable of standing up to Norris—even if it meant **perjuring himself on June 14, 2024**.

104     Justin Drummond's harmful and illegal actions are undeniable, supported by clear evidence throughout the case. However, unlike **Robert Brennen**, **Glenn Norris**, and **Richard Hartman**, whose malicious intent is evident, **Drummond** appears to have been influenced by others—perhaps due to his position or pressure from those in more powerful roles. **Brennen**,

**Norris**, and **Hartman** acted independently, fully aware of the harm they were causing and with

deliberate malice in their decisions.

---

<u>DECLARATION OF AFFIRMATION</u>

I solemnly declare and affirm under penal ties of perjury and upon personal knowledge that the
contents of the foregoing paper and exhibits thereto are true.

October 17, 2024

<u>s/ Ryan Dillon-Capps</u>
Ryan Dillon-Capps (Pro Se)
Email: ryan@mxt3.com
1334 Maple Avenue
Essex, Maryland 21221
Telephone: (703) 303-1113

RESPECTFULLY SUBMITTED

October 17, 2024                                    /s/ Ryan Dillon-Capps

Ryan Dillon-Capps (Pro Se)
Email : ryan@mxt3.com
1334 Maple Avenue
Essex, Maryland 21221
Telephone: (703) 303-1113

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 17, 2024, a copy of **Affidavit of Unauthorized Contractual**

**Modifications** via email to rbrennen@milesstockbridge.com and served on via first-class mail,

postage prepaid on:

Robert S. Brennen
Miles & Stockbridge P.C.
100 Light Street
Baltimore, Maryland 21202

/s/Ryan Dillon-Capps
Ryan Dillon-Capps (Pro Se)

| OHANA GROWTH PARTNERS, LLC<br><br>*Plaintiff,*<br><br>vs.<br><br>**RYAN DILLON-CAPPS**<br><br>*Defendant.* | **IN THE**<br><br>**CIRCUIT COURT**<br><br>**FOR**<br><br>**BALTIMORE COUNTY**<br><br>**CASE NO: C-03-CV-24-002264** |
| --- | --- |

## AFFIDAVIT OF BAD FAITH

I, Ryan Dillon-Capps, being over the age of eighteen (18) and competent to testify, and having personal knowledge of the facts contained herein, state as follows:

1      I will go through each paragraph of the retaliatory opposition and show the court that despite Miles & Stockbridge repeatedly saying, "I disagree," they have spent four months providing nothing but baseless arguments and false claims without any evidence to support their case. Instead of progressing this litigation, their actions have only delayed the inevitable resolution, harming me in the process. Ironically, their own submissions weaken their position even before I have the chance to do so.

2      For four months, they have accomplished nothing but dragging this out, claiming false victories by manipulating the process rather than achieving any substantive success. The absurdity of their argument is that their own documents work against them. I should not have had my time wasted, been subjected to ongoing harm, or had to face yet another attempt to defeat me, which has only resulted in their failure time and again.

3      It has become tiresome to repeatedly defeat Miles & Stockbridge, who, instead of adding value to their client, have merely been an unfortunate influence on Ohana Growth Partners, LLC.

Why they think they can win against me, when they couldn't even succeed while I was navigating unfamiliar statutes and procedures with my wife babysitting me, is beyond reason. Once this case is over, I plan to bring this matter to my home jurisdiction, where I will demonstrate what true litigation looks like.

1. **Two key points to remember as we go through this exercise**:

    1. **Notice Pleading Standard** – Under this standard, a party's mental state, such as malice, intent, and knowledge, can be inferred from the circumstances.

    2. **Swierkiewicz v. Sorema N.A.**, 534 U.S. 506 (2002) – Justice Thomas explains with clarity that a complaint need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief" to establish an employment discrimination case.

## I  PARAGRAPH 1

Dillon-Capps has filed a Motion for Sanctions against Ohana and its counsel Miles & Stockbridge P.C. ("M&S") seeking, *inter alia*, monetary sanctions against Ohana and M&S, dismissal of Ohana's claims, referral of M&S to the Attorney Grievance Commission, referral of Ohana and M&S to the Maryland Attorney General, and disqualification of M&S as Ohana's counsel. Dillon-Capps' Motion is little more than a procedurally improper attempt to introduce affirmative claims against Ohana and its counsel and a flawed effort to relitigate issues already decided by this Court.

1    **Miles & Stockbridge has revealed the true motivation behind this opposition**: retaliation for being reported. Rather than addressing the substantive and undeniable deficiencies in their case, they present this opposition to distract from their own misconduct. **This is how we arrived at this lawsuit**: Glenn Norris, Richard Hartman, Holly Butler, Stephen Frenkil, and Robert Brennen worked together at various points since October 16, 2023, after accounting irregularities were reported by Ciera Montague and me. This unfortunate discovery, coinciding

with a critical 10-year refinancing deal, set off a chain of events that resulted in relentless retaliation against me. My delayed and eventually canceled promotion was replaced by eight months of escalating hostility, with one brief respite after a failed attempt to execute a scheme similar to the events of June 2024.

2      **Holly Butler's departure and Glenn Norris's shifting tactics**: After Holly Butler left, Norris briefly appeared sincere in his desire to consult another attorney who wasn't pretending to conduct a fraud investigation. I believe Norris expected a second attorney would affirm the advice he'd already been given—that there was "nothing illegal" about the unauthorized use of my name to attest to franchisor compliance documents. In fact, they confessed in writing when they answered a separate question from the franchisor, Planet Fitness.

3      **Upon my return from my wedding**, I realized things had not gone as Norris expected. From late April until June 13, I experienced relentless hostility and retaliation—not just directed at me, but also at others in my department. When I documented their actions via email and addressed their misconduct properly, they shifted their focus, retaliating against my colleagues. Time and again, I had to step in to protect them, tactfully inserting myself to prevent indirect harassment aimed at me through my department.

4      **Miles & Stockbridge's motivation seems clear**: to protect one of their own, Holly Butler.

5      **Throughout this opposition, M&S rely heavily on their past "successes"** in this court, essentially bragging about prior rulings in their favor. But these rulings are **irrelevant**. The fact remains that in this 11-page document, they fail to address the actual issues at hand—**no**

**evidence of refusal**, no emails, no affidavits, no contractual basis, and no legal foundation for their claims or the relief they seek.

6       **Instead of offering new facts or evidence**, they cling to past rulings as though that alone justifies their position. This reliance on prior decisions is misplaced, highlighting their lack of a current, fact-based defense. Nowhere in this opposition do they substantiate their claims with any credible evidence, nor do they attempt to correct the clear defects in their lawsuit.

7       **Plaintiff's ongoing reliance on hollow victories** while ignoring the legal deficiencies in their case demonstrates the need for the court to intervene. This 11-page opposition is yet another attempt to prolong meritless litigation, wasting judicial resources and further supporting the case for sanctions.

## II  PARAGRAPH 2

> There is no basis whatsoever for sanctions to be ordered against Ohana or M&S. Dillon-Capps cannot meet his burden to establish he is entitled to this extraordinary remedy which should be exercised in only rare and exceptional cases. *See Garcia v. Folger Pratt Development, Inc.*, 155 Md. App. 634, 678 (2004). In his Motion, Dillon-Capps utterly fails to establish any factual or legal basis that would make this case one of the exceptionally rare situations in which an order for sanctions against Ohana, its counsel, or both, under Rule 1-341 is appropriate. His Motion is entirely without merit and should be denied.

8       **Where is the specific harm?** Miles & Stockbridge fails to explain why I would spend four years working for Ohana, including eight months trying to convince them to conduct a proper investigation instead of sending Holly Butler to perform a sham investigation. The culmination of their misconduct occurred on June 13 and 14, when it became clear that their true intent was to retaliate against me. What was the purpose of attaching an employment contract with missing pages in their filing? How does this help in a contract dispute?

9       What do you call litigation that has:

1.    **No supporting evidence**: There has been no production of material proof to substantiate the claims they've made against me.

2.    **Lack of prima facie requirements for a contract dispute**: They have failed to meet the basic elements necessary for a contract claim.

3.    **No harm, no basis for relief**: Without a demonstrable injury, there can be no legal relief. This is a fundamental flaw in their case.

4.    **Three counts of perjury**: The president of Ohana claimed that I refused to give him access, refused to give HEA access, and provided no updates. Yet:

    4.1    There is a written agreement to give Justin Drummond access, which he deliberately evaded.

    4.2    Plaintiff's own Exhibit 1B—the "Cease and Desist FMLA Letter"—shows that I emailed Richard Hartman to provide HEA access.

    4.3    I forwarded email threads to Justin Drummond that constituted updates, proving I never refused access.

10    **Richard Hartman's shifting testimony**: He consistently confuses refusal for compliance and misstates the roles of various parties, at times saying Glenn Norris gave him the orders, and at other times saying it was Justin Drummond who instructed him to send the demand letter on June 12, 2024.

11    **The PCI Expert's confusion**: Ohana's PCI expert doesn't understand the difference between a small business and enterprise tech page, questioning how a company with 1,500 employees across six states could run systems without more advanced account management.

Their failure to recognize how Nevada's law and PCI compliance tie together shows a fundamental misunderstanding of industry standards.

5. **Md. Code, Com. § 14-3503(b)**: Codifies the requirement for businesses like Ohana to implement reasonable security procedures like PCI DSS v4.

6. **Md. Code, Com. § 13-301(9)**: Prohibits deceptive practices, including claiming compliance with PCI standards while demanding actions that violate those very standards.

7. **Md. Code Ann., Crim. Law § 7-302**: Prohibits exceeding authorized access. Ownership does not confer the right to violate legal obligations, and Glenn Norris's refusal to answer questions about the requested access made compliance with PCI requirements legally impossible.

12   **Failure to communicate**: This could have been resolved had Norris, Drummond, or Brick simply said, "Ryan Brooks is replacing you, and he needs to be set up." Instead, they remained silent, knowing that if they explained the need for access, I might have found a way to approve it. Their refusal to communicate furthered the hostile work environment and perpetuated ongoing violations of my ADA and FMLA rights.

13   **Harassment and discrimination**: For eight months, I was harassed for blowing the whistle on accounting irregularities, filing an HR complaint about discrimination, and again for reporting verified instances of fraud. My federal rights under ADA and FMLA were continually violated during this time, and this harassment was directly tied to my communication style—a style rooted in gender and disability.

14    **Retaliation for whistleblowing**: I reported accounting irregularities, discrimination, and fraud—each time facing retaliation. I took FMLA leave due to the hostility, only to be subjected to further harassment and a fraudulent lawsuit while still on protected leave. Miles & Stockbridge's so-called fraud investigation was merely a pretense to harass me further.

15    **Physical and psychological harm**: Due to their actions, I now suffer from life-threatening conditions, memory issues, and catatonia. The harm was compounded by the deliberate violations of my FMLA rights and ADA accommodations, leaving me permanently affected. Miles & Stockbridge continued to violate these rights, making it impossible for me to fully engage in the defense of this case without significant support from my family.

16    **Intentional efforts to block my participation**: Instead of using the personal contact information they've had since December, Miles & Stockbridge deliberately sent important notices to an email address I was barred from accessing. This was not an accident but a calculated move to prevent me from attending the TRO hearing, further evidenced by the erroneous 10-day notice citation and the scheduling violations that followed.



| from: | **Frenkil, Steven D.** <sfrenkil@milesstockbridge.com> |
| to: | "ryan@mxt3.com" <ryan@mxt3.com> |
| date: | Dec 20, 2023, 5:12 PM |
| subject: | Re: [EXTERNAL] Inquiry for Legal Assistance in Employment, Whistleblower, and Defamation Matters |
| mailed-by: | milesstockbridge.com |
| signed-by: | milesstockbridge.com |
| security: | 🔒 Standard encryption (TLS) Learn more |
| ⭐: | Important mainly because it was sent directly to you. |

17      **No pre-hearing conference**: There was no pre-hearing conference for the TRO, and I was given only two days' notice. During this time, I was struggling with cognitive issues, unaware of the full scope of the lawsuit. My wife had to sit beside me just to ensure I stayed focused during the early stages of the trial. For the first month, I was unable to manage basic legal tasks without constant supervision.

18      **Personal vendetta**: Miles & Stockbridge has lost to me before, and this lawsuit is personal for them. Ending the hearing day, Robert Brennen stating, "We will do anything to win this case." This explains why they have a team of six attorneys against a pro se defendant—an extraordinary show of force motivated by personal pride rather than justice.

19      **Legal strategy moving forward**: While their tactics are transparent, the real issue is their continued abuse of the Maryland judicial system, relying on depriving me of my federal and constitutional rights they have squandered the advantage by being careless and in doing so have jeopardized those who trusted them.  Instead thinking of others, including their client they continue to incur more liability in this case, but their failure to cut losses early is making this case quite a firm base for me to lay down arguments for many litigation paths and at this point, I have already won more than this case.  Options that I would have considered unlikely or

implausible on June 13, 2024, are now primed and ready, and if Miles & Stockbridge responds as predicted then I will have sealed not just the just then next win. I will win the real prize on summary judgement. I apologize to the court, but I argue that they opened this up as fair game with their own papers.

20      **Obstruction of evidence**: When I requested the transcript for the June 27, 2024, hearing, Miles & Stockbridge provided it immediately. Yet, when I asked for the June 26, 2024, transcript, they suddenly imposed arbitrary conditions. It took months for them to finally produce the document, further demonstrating their intent to obstruct.

21      **Mockery of my disability**: Their motion refers to my legitimate disability and the harms they caused as "ramblings," which is not only offensive but sanctionable. This conduct continues to show their intent to humiliate rather than resolve this dispute.

22      **All of these actions are sanctionable**: Based on the egregious misconduct detailed above, sanctions under Rule 1-341 are not only appropriate—they are necessary.


## SANCTION CHECK

23      With that being said, the following actions taken by Ohana and its counsel, Miles & Stockbridge, are sanctionable under Maryland law:

## BAD FAITH LITIGATION

24      A party may be sanctioned if it engages in litigation without any legitimate legal or factual basis, or for purposes of harassment, delay, or improper motive.

25    **Citation**: *Inlet Assocs. v. Harrison Inn Inlet, Inc.*, 324 Md. 254, 267 (1991) ("Sanctions are appropriate where a party's actions were pursued in bad faith, for improper purpose, or were frivolous.").

## SUBMISSION OF FALSE OR FRAUDULENT EVIDENCE

26    Sanctions may be imposed when a party submits false or misleading evidence or makes false representations to the court.

27    **Citation**: *U.S. Health, Inc. v. State*, 87 Md. App. 116, 133-34 (1991) (sanctions warranted where evidence was submitted fraudulently to mislead the court).

## VEXATIOUS OR FRIVOLOUS FILINGS

28    Sanctions can be imposed if a party or attorney files frivolous motions or engages in unnecessary and vexatious legal maneuvers that burden the court.

29    **Citation**: *Christian v. Maternal Fetal Medicine Assocs. of Md.*, 179 Md. App. 365, 380 (2008) (frivolous filings and repeated failure to present legitimate arguments may warrant sanctions).

## ABUSE OF PROCESS

30    Using the court system to achieve an illegitimate goal, such as harassing an opponent or gaining leverage in unrelated matters, can lead to sanctions.

31    **Citation**: *One Thousand Fleet Ltd. P'ship v. Guerriero*, 346 Md. 29, 37 (1997) (sanctions for abuse of process when a party's motive for litigation is improper).

## DELAY OR OBSTRUCTION OF JUSTICE

32    Engaging in tactics meant to delay proceedings or obstruct justice can lead to sanctions, including financial penalties or case dismissal.

33      **Citation**: *Garcia v. Folger Pratt Dev., Inc.*, 155 Md. App. 634, 678 (2004) (deliberate

delay and obstruction of justice warrant sanctions).

## FAILURE TO PROVIDE PROPER NOTICE

34      Sanctions can be issued if a party fails to provide the notice required by rules, such as

failing to serve documents properly, especially when this failure is done intentionally to

prejudice the other party.

35      **Citation**: *Kougl v. Xspedius Mgmt. Co. of Rockville, LLC*, 158 Md. App. 641, 655 (2004)

(failure to provide proper notice of filings or hearings can result in sanctions).

## PERJURY OR FALSE STATEMENTS IN AFFIDAVITS OR TESTIMONY

36      Providing false statements in sworn affidavits or during testimony can result in sanctions,

including referral to the Attorney Grievance Commission or other penalties.

37      **Citation**: *Piper v. Layman*, 125 Md. App. 745, 754 (1999) (deliberate false statements

made under oath are grounds for sanctions).

## RETALIATORY OR HARASSMENT-BASED LITIGATION

38      If a party files litigation primarily for retaliatory purposes, to harass, or intimidate, this

can be grounds for sanctions under Rule 1-341.

39      **Citation**: *Inlet Assocs. v. Harrison Inn Inlet, Inc.*, 324 Md. 254, 267 (1991) (courts may

sanction parties for retaliation-based litigation that serves no legitimate purpose).

## FAILURE TO PRODUCE EVIDENCE OR WITHHOLDING EVIDENCE

40      If a party intentionally withholds evidence or fails to produce documents that have been

requested and ordered, this can result in severe sanctions.

4       **Citation**: *Hossler v. Home Loan Inv. Bank, F.S.B.*, 410 Md. 580, 610 (2009)

(withholding key evidence warrants sanctions).

## III   PARAGRAPH 3

3. Dillon-Capps is Ohana's former Vice President of Information Technology.

41      **Yes, I was Ohana's Vice President of Information Technology**, and that is precisely

why I have firsthand knowledge of the inner workings of the company, including its violations of

industry standards and its fraudulent activities. I was also the PCI Compliance Officer and that

made me responsible for ensuring that the company complied with PCI DSS standards, which

are rooted in laws that span across multiple states and federal jurisdictions. The fact that I held

this position makes it even more concerning that Ohana and its counsel continue to ignore the

legal and technical obligations required of them.

## IV   PARAGRAPH 4

4. Ohana sued Dillon-Capps on June 14, 2024, asserting causes of action for (i) breach
of contract; (ii) breach of common law employee's duty of loyalty, and (iii) under MD.CODE
ANN.,CRIM. LAW., §7-302(g) based on Dillon-Capps' violation of MD. CODE ANN., CRIM. LAW.,
§7-302(c) (which include, in summary, actions causing the malfunction or interruption of
computers or networks or computer data, and actions altering, damaging, or destroying
computers, or networks or computer data).

42      **There is no valid contract**: Ohana has failed to produce a complete, valid contract. The

documents they've submitted contain missing pages, which immediately raises questions about

their legitimacy. A contract with missing terms is not a valid contract, and it does not require

external evidence to prove this.

43      **Contradictions in their claims**: Ohana's own language undermines their argument.

They accuse me of **refusing** to take certain actions, yet simultaneously claim I engaged in

actions that caused harm. How can someone perform an action that allegedly caused harm when

the very premise of their complaint is a refusal to act? This fundamental inconsistency in their case highlights the lack of coherence in their claims.

44    **Incorporation by reference**: I incorporate and adopt by reference the factual averments and arguments contained in my Motion to Strike Opposition to Vacate Order, Affidavit of Legal Obligations, and the Exhibits for the Affidavit of Legal Obligations in accordance with Md. Rule 2-303(d). For brevity, the essential points are summarized here:

1.    **PCI DSS v4 Compliance**: PCI DSS v4 is the application of laws from across all 50 states and the federal government, ensuring that businesses meet legal standards for handling payment card information. Ohana and Miles & Stockbridge would have the court believe that the credit card industry imposes these standards arbitrarily, but this is absurd. Businesses agree to and implement PCI standards because they are essential to comply with laws governing data security. Their argument that these standards are optional or for "funzies" is legally unsound and factually incorrect.

2.    **Multijurisdictional impact**: Pages 16-95 of the PCI DSS v4 manual cover the 12 core requirements, which apply to laws in Maryland, Washington, California, Tennessee, Florida, and DC—jurisdictions in which Ohana Growth Partners operates. This is precisely why, on June 26, 2024, I moved to relocate the case to federal jurisdiction. Ohana's actions violate laws in five states and DC, which clearly exceed the jurisdiction of Baltimore County Circuit Court.

3.    **Judge Barranco's question**: Judge Barranco asked why Ohana couldn't simply do what they want in terms of access. The answer lies in **Section III** of the PCI DSS standards and **Section II-D** on "Operational Necessity." The question of "what is the

access for?" must be answered before access is granted. Granting unrestricted access without knowing its purpose is not only irresponsible, but it also violates PCI DSS standards and laws. This shows that their demand for access without justification was reckless and illegal.

4.    **Real-world experience**: To illustrate the importance of these standards, 16 years ago, I worked on a project with Symantec where I helped secure a SAS70 certification after the company had failed multiple times. This example is not to boast, but to demonstrate that standards like PCI DSS are complex and essential for legal compliance. Ignoring these standards—especially when they protect sensitive consumer data—is negligence and legal malpractice.

45    **Public interest and safety**: In cases where consumer data is at risk, the overwhelming balance of harm should favor protecting that data. When an executive or owner enters a courtroom with vague assertions of possible harm, that is a red flag. The real harm comes from their failure to comply with the security standards designed to protect consumers, not from an IT professional who insists on following the law.

## V  PARAGRAPH 5

5. All three of Ohana's claims are based upon the Dillon-Capps' actions to lock Ohana out of administrative control of its Microsoft 365 software account---which includes Ohana's company email accounts and document management system, and GoDaddy.com domain name registrations---which control access to and administration of Ohana's websites, and upon Dillon-Capps' alleged refusal to comply with repeated directives to extend such administrative control to Ohana's officers and outside IT consultants.

46    For starters, GoDaddy was not mentioned until there was a lawsuit and I provided the MFA code to allow them to access my account without there being any refusal to that either. Second, Did anyone read Davit Levett's affidavit?  All I did was have to present the idea that

HEA didn't appear to be involved and Miles & Stockbridge immediately provided the affidavit that says the following:

> 3. One June 12, 2024 HEA was retained by Ohana Growth Partners, LLC ("Ohana"), the Plaintiff in the above-captioned matter, to provide IT leadership and technical support to Ohana, including Microsoft 365 Security Assessment and Remediation. Since that time I have been involved in HEA's efforts to regain Ohana's access to Global Admin rights in Ohana's Microsoft 365 Tenant.

5. Hartman Executive Advisors were involved since June 12, 2024, and so why didn't they respond to the numerous emails to reach them to give them access? The answer is not important because this is Estoppel and it prevents a claim for relief.

> 12. On June 27, 2024, I asked Mr. Martinez to access the Ohana Microsoft 365 Tenant during a Microsoft Teams meeting video conference, to share his computer screen showing the Tenant, and to review policies imposed on the Tenant regarding requirements for multifactor authentication. That review, which I witnessed, revealed that there are currently three Global Admin Accounts in the Ohana Microsoft 365 Tenant: (i) that assigned to Defendant Dillon-Capps at rdc@ohanagp.com; (ii) a "For Emergency Use Only" "BreakGlass" account at GA.breakglass@ohanagp.onmicrosoft.com; and a "Null Backup" account at null.backup@ohanagp.onmicrosoft.com.

6. Mr. Martinez is the Help Desk Manager, and this paragraph is Mr. Martinez using him administrative access. The basis for injunctive relief was they had no other administrators, and despite their own evidence disproving this fact Miles & Stockbridge say in paragraph 5: "lock Ohana out of administrative control of its Microsoft 365 software account"

7.     David Levet says that they watched the Help Desk Manager access the same

Microsoft 365 account and access the administrative back end to verify the information

provided on June 26, 2024.  To be 100% clear that Ohana could access David Levet says

> 16.     For the reasons stated in Paragraphs 12 through 15 above, contrary to Defendant
> Ryan Dillon-Capps testimony, Defendant Dillon-Capps could access Global Admin rights for the
> Ohana Microsoft 365 Tenant and could comply with the TRO and Preliminary Injunction
> without using one of the purportedly missing key fobs.

47     So, the court does not miss the point here – David Levett is accessing my email account

and saying that "I" could access the Global Admin accounts.  David Levett completed the task

and this is how they accessed the accounts.

48     Miles & Stockbridge in a pursuit to press the perjury issue on me and distract the issue

away their own perjury destroys their own claim on why they needed injunctive relief and to

counter act one count of estoppel they strengthen it with a confession.  Their handling of the

lawsuit is so negligent that it borders on intentional as a defense for their client.

49     The reason they haven't is because I told the court multiple times that I was, and still am,

having memory issues.

50     **It was highly inappropriate for me to be sworn in and for my statements to have

been treated as testimony**. Given my documented memory issues and cognitive impairments, it

was not only improper but also in violation of the legal standards governing witness competency.

I was not mentally or physically in a position to accurately recall events or comprehend the full

significance of my testimony.

51     **Competency to Testify**: Under **Maryland Rule 5-601**, a witness must have the mental

capacity to observe, remember, and communicate facts reliably, as well as understand the

obligation to tell the truth. At the time I was sworn in, I was suffering from significant memory

issues, which impaired my ability to recall events or communicate them effectively. The court

failed to assess my competency to testify, even though it was evident that my memory and

cognitive condition were compromised.

52     **Failure to Provide Transcript**: When I requested the transcript from Judge Barranco's

clerk because I could not remember what was said during the proceedings, they failed to provide

it in accordance with the rules governing access to court records. My inability to recall the

testimony I provided further highlights because it was inappropriate for me to have been sworn

in without proper consideration of my mental condition. The refusal to provide the transcript

denied me the ability to review and address any inaccuracies or issues with my testimony.

53     **When I asked Miles & Stockbridge:** They obstructed the evidence in their position and

set conditions for maybe they will then.  Months later they finally provided it to me on a

subsequent demand where I called it obstruction.

## LEGAL ARGUMENT

54     **Maryland Rule 5-601**: This rule states that every person is competent to be a witness

unless they lack the capacity to perceive, remember, or communicate facts. The court has a duty

to assess this capacity, especially when there are clear indications of cognitive or memory issues.

55     **Request for Transcript**: The failure to provide the transcript violates the principles of

transparency and fairness, especially when the witness has requested it due to cognitive

impairments. It also limits the witness's ability to review the proceedings and defend against any potential inaccuracies in the testimony.

## VI  PARAGRAPH 6

> 6. Dillon-Capps is and always has been self-represented in this matter.

56     **While I am self-represented on the court record, this statement omits critical context**. I had retained an attorney with the intent to negotiate a resolution outside of the courtroom. Unfortunately, due to a bereavement, my attorney was unable to continue representation. Upon learning of the active TRO on the Monday following the lawsuit filing, the attorney returned all fees paid up to that point. This was not an isolated issue—this was the sixth attorney I consulted, and five had already conflicted out due to prior connections with Ohana Growth Partners.

57     **This pattern of attorney conflicts raises a significant concern**: How often does Ohana Growth Partners appear before this court? The number of attorneys who were conflicted out suggests that Ohana engages in a practice of saturating the legal field, effectively stacking the deck against anyone who might oppose them. This is not a unique situation but rather their **standard operating procedure**, evidenced by the numerous cases filed by Ohana in Maryland.

58     **Ohana's litigation tactics are not about seeking justice—they are about exerting power and control**. For example, Ohana sued a cancer patient for $500 and, during the litigation, put this person on display, encouraging others to clap while the case proceeded. In another instance, a former employee was fired, only to find the evidence they had collected mysteriously disappeared, leading to the dismissal of their case. These cases are intended not to

resolve legal disputes, but to serve as a deterrent to others. By leveraging financial and legal resources, Ohana overwhelms its opponents.

59      **Overconfidence and disregard for opponents**: Ohana Growth Partners and Miles & Stockbridge entered this lawsuit with overconfidence, assuming it would play out like their previous cases. However, this time they are facing an opponent determined to expose their fraudulent tactics—tactics that have caused me permanent, life-threatening harm. Rather than acknowledge the harm they've inflicted, they have responded by seeking my incarceration and mocking my suffering in their legal filings.

60      **The role of my attorney**: The fraudulent nature of this lawsuit, along with the stark contradictions between the facts and the proceedings by the second day, were so apparent that even my bereaved attorney began questioning the truth. Initially, they placed trust in the professional ethics of Miles & Stockbridge. However, since then, **Miles & Stockbridge has repeatedly demonstrated a willingness to disregard both legal obligations and ethical standards**. Their strategy appears to be one of declaring falsehoods with enough conviction in the hope of misleading one more judge, only to later manipulate the narrative through a public relations campaign. This pattern of conduct further exemplifies their contempt for the legal process.

61      **Miles & Stockbridge and Ohana's final position is clear**: They have presented no evidence, no legitimate harm, and no valid claim for relief. There is no reasonable path to victory for them in this case, and unlike their other opponents, I do not view time as weakening my resolve. The principle of mitigating one's losses now applies squarely to the Plaintiff. I cannot simply walk away from this lawsuit, and every delay on their part only amplifies the harm

inflicted on me, whether financial or through the ongoing threat to my health from catatonia.

**This speaks volumes about the danger they pose to both the court and the public at large**.

62      The **Notice Pleading Standard** exists to distinguish between those deserving of judicial

grace and those whose actions demand sanctions. Miles & Stockbridge and Ohana Growth

Partners, LLC must either serve as an example that deters others from abusing the judicial

system or risk becoming a symbol for those who view the court's decision as endorsing their

unethical conduct rather than imposing the sanctions their behavior merits.

| Open | 2/25/2011 | MCT FEDERAL CREDIT UNION vs MENSAH, JERILYN ROSE |
|---|---|---|
| Open | 7/2/2015 | STATE OF MD CENTRAL COLLECTIONS UNIT vs MARTIN, JORDAN ALAN GILL |
| Open | 10/9/2015 | STATE OF MD CENTRAL COLLECTION UNIT vs MYERS, MICHAEL DAVID |
| Closed | 3/2/2017 | HAYDEN, VERNON vs PF GROWTH PARTNERS, LLC |
| Closed | 11/29/2017 | STATE OF MD CENTRAL COLLECTION UNIT vs CLITES, ZACHARY ADAM |
| Open | 3/28/2018 | JUDGMENT GROUP vs FARRELL, IAN THOMAS |
| Open | 6/4/2018 | FRIENDLY FINANCE CORPORATION vs CURRY, DEWAYNE |
| Closed | 7/19/2019 | STATE OF MD CENTRAL COLLECITON UNIT vs DANIELS, SHANTEL DENISE |
| Closed | 2/8/2021 | JEROME WIMBUSH vs. PF-ROCKVILLE LLC, et al. |
| Closed | 3/31/2021 | Michael Morrissey vs. PF Growth Partners, LLC |
| Open / Judgment | 6/30/2021 | LVNV FUNDING LLC vs. SHAKITA SMITH |
| Closed | 3/3/2022 | Atchison vs PF Growth Partners LLC |
| Closed | 10/20/2023 | Barry Tiedeman vs. Ohana Growth Partners LLC |
| Closed | 5/22/2024 | Jordan Chisholm vs. Ohana Growth Partners, LLC |
| Open | 6/14/2024 | Ohana Growth Partners, LLC vs. Ryan Dillon-Capps |

## VII   PARAGRAPH 7

> 7. Ohana also filed a Motion for Temporary Restraining Order and Preliminary Injunction
> ("Motion for TRO/PI") along with the filing of its Complaint on June 14, 2024. Dillon-Capps
> was served with the Complaint, Summons, and Motion for TRO/PI on June 17, 2024.

63      **The TRO was issued at 10:50 AM on June 17, 2024**, and I was served with the

Complaint, Summons, and Motion for TRO/PI nearly an hour later. This means that I was not

given the opportunity to be heard or to inform the court of the ongoing misconduct by Ohana and

its counsel before the TRO was granted. I was denied my right to a fair hearing, and this lack of

notice constitutes a violation of due process. The issuance of the TRO before I could present any evidence or respond highlights the abusive nature of this litigation and further demonstrates Ohana's intent to use the court system as a tool for retaliation rather than justice.

## VIII   PARAGRAPH 8

8. The Court entered Ohana's requested TRO on June 17, 2024, directing Dillon-Capps to provide Ohana and its consultants administrative control over Ohana's Microsoft 365 software account and GoDaddy.com domain name registrations.

64      **Plaintiff's own expert, David Levett, provided an affidavit** stating that Ohana already had other administrators who had access to their Microsoft 365 accounts. This directly contradicts the claim of an urgent need for access and demonstrates that Ohana misrepresented the facts to the court. Misleading the court is never in your favor.

65      I would also like to remind the court, Ohana, and Miles & Stockbridge that **a simple request for access**—rather than a lawsuit—would have achieved the same result. If Ohana had simply said, "Ryan Brooks is replacing you" or provided any legitimate reason for needing access, I would have been **legally obligated** to turn over control. This would have been far easier and more cost-effective than pursuing a fraudulent lawsuit that now exposes them to significant legal and financial consequences.

66      **The complaint remains unchanged**, still lacking any particularized harm or connection to how I supposedly caused damage, and it still does not include a complete contract. How could Ohana possibly succeed when they filed a lawsuit without a legitimate basis for relief? This is still true today, and it weakens their entire argument.

67      **No one files a lawsuit after the fact and leaves a "high-risk" IT employee to decide how they will proceed**. In any true high-risk IT scenario, the standard protocol is to secure a

search warrant, seize hardware, and resolve any risk immediately with law enforcement present. The fact that Ohana did none of this shows they never considered me a genuine risk. Instead, they had the head of the help desk assist them in gaining access. Meanwhile, I now suffer from a life-threatening condition and significant memory loss—hardly a fitting outcome for someone who was supposedly such a risk. Ohana's actions ruined my life while pretending to be at risk. This, too, does not help their case.

68     **The Affidavit of Legal Obligations** lays out 120 pages of reasons why Ohana's actions not only violated multiple laws intended to protect the public but also caused the court to act on fraudulent premises. The TRO, which was supposedly based on the need to enforce valid contracts, becomes even more dubious when we consider that no valid contract has been produced—four months later, and still, no complete contract exists. The missing pages from the contract should have been an immediate red flag. Meanwhile, Ohana continues to ignore the dozen-plus contracts they signed to maintain PCI compliance. Instead, they chose to commit fraud upon the court to harass me as part of a broader retaliation. This fraudulent lawsuit has no merit, and the court should not allow such behavior to continue under the guise of protecting Ohana.

69     **Why does Miles & Stockbridge continue to highlight this fraudulent TRO?** Do they believe the court will overlook the fact that this entire mess is due to their misconduct? The TRO is riddled with wrongdoing, and it is hardly advisable to use it as a leading argument when it stands as a monument to their fraud.

## IX   PARAGRAPH 9

Dillon-Capps was served with the TRO. He knowingly and intentionally did not comply with the requirements of the TRO.

70     **You mean this order:**

> **A. Provide Global Administrative Rights for Ohana's Microsoft 365 Account** to Phil
> Leadore of Hartman Executive Advisors and cease and desist the use of any access to
> Ohana's Microsoft 365 Account and related applications, including Ohana's email
> systems.
> **B. Provide Administrative Rights for Ohana's GoDaddy Account** to Phil Leadore of
> Hartman Executive Advisors and cease and desist the use of any access to or use of
> Ohana's GoDaddy Account and related Internet domain name registrations.

71     **I also clearly remember asking how this could be logistically accomplished**, and
rather than providing any guidance, you attempted to portray me as either incompetent or
uncooperative. Let me break it down: How is it possible for one person to transfer administrative
rights for systems like Microsoft 365 and GoDaddy while simultaneously not accessing any part
of those systems? The TRO is self-contradictory. One cannot logically comply with the order to
transfer access while being prohibited from accessing the systems in question. To comply would
require violating the same order by accessing the systems.

72     **Legal Precedents Regarding Conflicting Orders**

8.     The Maryland Court of Appeals has held that **conflicting orders are
unenforceable**. A court cannot require a party to do something and simultaneously
prohibit the means necessary to comply with that same order. In *Smith v. Smith*, 427 Md.
611 (2012), the court ruled that conflicting obligations in court orders render them
unenforceable because they create an impossible legal standard for compliance.

9.     Additionally, in *Hagerstown Trust Co. v. Nigh*, 119 Md. 336, 343 (1913), the
court stated that when faced with conflicting orders, **it is worse to act than to refrain
from action**. It is less harmful to withhold action when compliance would cause further
violation or result in even greater harm.

73      **Therefore, my failure to comply was not due to willful disobedience** but rather a result

of the impractical and conflicting nature of the TRO. By following the order, I would have been

forced to violate the very terms of the same order, putting me at risk of further legal

consequences. The court's order was not only unreasonable but also legally invalid based on

established precedent.

## X  PARAGRAPH 10

> On June 26, 2024, the Court held a hearing on Ohana's Motion for PI. Dillon-Capps appeared
> and testified at the PI hearing. After the hearing, the Court granted Ohana's Motion for PI and
> issued a preliminary injunction. The Preliminary Injunction contained the same requirements as
> the TRO—it directed Dillon-Capps to provide Ohana and its consultants administrative control
> over Ohana's Microsoft 365 software account and GoDaddy.com domain name registrations.

74      **The procedural handling of this case has been deeply flawed from the outset**. On

**June 17, 2024**, Ohana obtained a **no-notice TRO** without giving me any opportunity to respond

or present my side. On **June 18, 2024**, instead of seeking a reasonable discussion or resolution,

Ohana immediately filed a petition to enforce the TRO—again, without any communication or

effort to resolve the matter outside of court.

75      **On June 24, 2024**, I learned that my letter to the court, addressed to Judge Truffer, had

been **denied without any conversation** or opportunity to explain my position. On that same day,

I found out that the show cause order that was submitted on the 20th had been granted on the 21st

and I had no chance to oppose because in 2 days I had a hearing for show cause and PI.

> A. Directing Defendant to personally appear in open court to show cause as to why
> they should not be held in contempt of this Court's June 17, 2024 TRO.
> B. Requiring that, pursuant to Rule 15-206(d), a copy of this Petition for Civil
> Contempt and the Court's Order regarding the same be served on Defendant via email and first
> class mail, postage prepaid to their addresses of record in this matter;
> C. Directing that, pursuant to Rule 15-206(c)(2)(A), the alleged contemnor, Ryan
> Dillon-Capps, file an answer to this Petition for Constructive Civil Contempt within ten (10)
> days₁ of the service of the Court's Order;

1 There is a Preliminary Injunction hearing scheduled for June 26, 2024. While less than ten (10) days from the date
of this filing, in order to promote judicial efficiency, Ohana requests that Dillon-Capps show cause as to why they
should not be held in contempt at this hearing.

76      Not the correct citation. Miles & Stockbridge should have cited

Rule 15-206 - Constructive Civil Contempt, Md. R. Spec. Proc. 15-206 ("2) Unless the court finds that a petition for contempt is frivolous on its face, the court shall enter an order providing for (i) a prehearing conference, or (ii) a hearing, or (iii) both. The scheduled hearing date shall allow a reasonable time for the preparation of a defense and may not be less than 20 days after the prehearing conference. An order issued on a petition or on the court's own initiative shall state:")

77      The timeline of events reveals clear violations of due process:

10.      The **prehearing conference**, which is required under **Rule 15-206(c)(2)(A)**, never occurred. This rule clearly mandates a prehearing conference or hearing and requires that the scheduled hearing date allow at least **20 days** for the preparation of a defense after the prehearing conference. These procedural safeguards were completely bypassed.

11.      **Lack of opportunity to address the court**: Throughout this entire process, I was consistently denied the opportunity to have a meaningful discussion with the court. From the no-notice TRO to the contempt petition and the combined hearings, I was systematically deprived of my right to be heard and to present a proper defense. The failure to follow Maryland's procedural requirements under **Rule 15-206** resulted in an unfair and prejudicial process.

78      Did you know that record shows that I was officially notified of this hearing on July 8,

2024.  So, if we use that date as the date to schedule a prehearing conference.  Then let's say a

few days is July 11 or 12, and so we go into a prehearing conference and if the timeline remained

for the rest, then on July 3, 2024, David Levett clears up the entire thing and the entire injunctive

relief goes away.  No defense even needed, and I won't repeat the above issue because you

clarified to the court it was exact conflicting order.

<div align="center">

## XI  PARAGRAPH 11

</div>

> Dillon-Capps again knowingly and intentionally failed to comply with the Court's
> orders. He did not provide Ohana or its consultants administrative control over Ohana's
> Microsoft365 software account and GoDaddy.com domain name registrations.

79      **Did I?** We've already established that Ohana **always had access** to their Microsoft 365

account, so it's pointless to claim I failed to provide something they already possessed. As for

the **GoDaddy account**, I raised logistical concerns about how to comply without violating the

conflicting orders, but none of those concerns were addressed by Ohana or Miles & Stockbridge.

80      Moreover, the term "consultants" seems oddly specific and intentionally misleading. Is

Ohana's lead attorney, **Robert Brennen**, offended by being called a consultant in this context, or

did he forget that he texted me without notice at 6:26 AM threatening incarceration if I wasn't

awake at his beacon command. Despite the lack of notice or any reasonable opportunity to

comply, I did respond—providing the multi-factor authentication (MFA) codes necessary to give

Ohana access, **without violating the injunctive relief**.



5 **(Text Message Evidence shown above)**: On **July 17, 2024**, at 6:26 AM, Robert Brennen sent a text message threatening me with incarceration if I did not comply with their impromptu demand for access within roughly 90 minutes. I provided the MFA code at **8:12 AM**, after stating, "You're lucky I just checked my phone—you need to give more notice." They then asked for a second code, which I also provided. Brennen ended the exchange with, "Thank you for your cooperation."

81 **Miles & Stockbridge has a unique style of resolving issues**—which seems to involve sending threatening text messages at dawn, hoping someone checks their phone in time. One can only imagine how this approach would work in a non-Pro Se situation, where a law firm would be waking up their client or their client's attorney with these kinds of 6:26 AM demands. This is consistent with their broader strategy of no-notice actions: from the **no-notice TRO** to a **two-day**

**contempt hearing**, and now, a **two-hour enforcement window**. The fact that they managed to get access at all is astonishing, given their lack of professionalism and courtesy.

82      Why not simply **ask for access** in the first place, instead of launching into a lawsuit that has clearly been designed to harass and intimidate? This entire situation highlights the true intention of this lawsuit—it's not about legitimate claims or resolving issues; it's about harassment and leveraging the legal system as a power move. The fraudulent nature of this lawsuit is merely a byproduct of their inability to create a legitimate claim. For Miles & Stockbridge and Ohana, **fraud and manipulation** appear to be synonymous with **litigation strategy**.

## XII   PARAGRAPH 12

The Court held another hearing the very next day. Dillon-Capps again appeared and testified at the hearing. At the conclusion of the hearing, the Court entered an order finding Dillon-Capps in contempt of the Preliminary Injunction and fining him $2,500 for each ensuing day that passed without his compliance with the Preliminary Injunction.[1]

[1]The Court rejected as not credible Dillon-Capps' sworn testimony that he was unable to access the Microsoft 365 and GoDaddy accounts because Dillon-Capps could not locate "key fobs" Dillon-Capps testified were needed for multifactor authentication in logging into the accounts. As explained in the later filed July 3, 2024, Affidavit of Daniel J. Levitt, after Ohana finally regained administrative control of the accounts Ohana confirmed that Court had correctly seen through Dillon-Capps' perjury: all Dillon-Capps needed to access the accounts was Dillon-Capps' cell phone, which Dillon-Capps had in the courtroom on June 26th and 27th. Dillon-Capps could have complied with the Preliminary Injunction then and there, but intentionally chose to lie, under oath, about key fobs and be found in contempt of the Preliminary Injunction.

83      **Miles & Stockbridge is correct that Judge Barranco disregarded critical medical documentation** that had been on record since **June 18, 2024**, including two letters from separate healthcare providers and the testimony of my wife, who is both a social worker and psychologist. Despite the observable physical signs of my medical condition, such as twitching and shaking, the judge dismissed this evidence and declared, in his professional opinion, that I was not

"disabled enough" to be credible. Furthermore, my memory issues were repeatedly ignored, despite the fact that they were directly relevant to my ability to comply with the court's orders. Now, **Miles & Stockbridge is attempting to reframe the narrative** to portray me as someone who deliberately lied under oath. Yet, throughout this case, how many times has **Robert Brennen submitted statements** that were demonstrably dishonest, as we have documented here?

84      **It is illogical to suggest that I would lie about needing a key fob** and then turn around and provide the account information necessary to help them gain access. I gave them exactly the details I could remember, which included the names of the accounts they were looking for— information that was instrumental in resolving their access issues. **Contrary to their claims, I did not withhold access**; I was actively trying to help, even with the memory issues I was dealing with.

85      As for the **key fob issue**, the changes to our security posture were part of a larger effort to comply with **PCI DSS v4**, which was being rolled out in phases with evolving security requirements. At times, adjustments were made to disable key fobs or alter access methods to prevent accidental lockouts during transitions. My memory of when this change occurred is incomplete, but it is clear that my statements were based on what I genuinely believed to be true at the time.

86      The rest of Miles & Stockbridge's argument is nothing more than an attempt to reframe the facts to confuse the court and obscure the truth. As a reminder, Ohana always had access. Daniel Levitt, in cooperation with the Help Desk Manager, confirmed that the accounts mentioned in the hearing existed and that they were accessible. Ohana successfully accessed

those accounts without issue. Therefore, there was no harm, no justification for injunctive relief, and no legitimate basis for this contempt finding. What remains is a continued effort to harass someone whose memory issues and health conditions are the direct result of Ohana's actions.

## XIII  PARAGRAPH 13 AND 14 (AND BACK TO 10)

13. Dillon-Capps still did not comply with the Preliminary Injunction.
14. On July 12, 2024, Ohana was able to regain administrative control of its MS 365 account with the assistance of representatives of Microsoft Corporation, even without the cooperation of Dillon-Capps. On July 17, 2024, Dillon-Capps cooperated with Ohana for the first time and took action that allowed Ohana to regain administrative control over Ohana's GoDaddy Account and internet domain name registrations.

87        **Paragraphs 13 and 14 are repetitive and contradictory**. In Paragraph 14, Ohana admits I cooperated with them regarding the GoDaddy account, yet in the same breath they previously claim refusal. This inconsistency mirrors earlier contradictions where their filings cited different sources for who gave the administrative order—first Glenn Norris, then Justin Drummond, and finally Richard Hartman. Just like their confused argument on whether they had fewer or more admins, Ohana's narrative shifts without any regard for consistency, relying on irrelevant citations to Microsoft's small business pages. Their claims swing wildly from **refusal** to **cooperation**, as seen between Paragraphs 10 and 14, despite both referring to the same facts.

88        **Let's be clear—there was no refusal**. At no point did I refuse their demands, orders, or anything else in this lawsuit. The reason they have no evidence of refusal is simple—it never happened. Their strategy here seems to rely on repeating claims or pulling statements out of context to mislead the court into believing that non-compliance occurred. In reality, I went out of my way to find **solutions** to accommodate Ohana, even when they intentionally refused to answer basic questions like, "What is this access for?"

89    **It defies logic to suggest that I refused access**. If someone had said, "This person is replacing you," it would have been a straightforward and logical transition. Do you really think I was asking to speak to Ohana Growth Partners attorney because I wanted to stay and continue working there? There was no motive for refusal. On the contrary, I was fully prepared to hand over access. It is absurd to suggest I would refuse access to my replacement, and the fact that Ohana eventually regained administrative control on the Go Daddy with my assistance on **July 17, 2024,** proves that I was cooperative when properly informed and contacted. If they had asked sooner, it would have been given sooner.

90    As previously noted in **Paragraph 10**, the court was misled into believing there was non-compliance, even though **Ohana always had access** to their Microsoft 365 account. The claims of refusal are baseless and entirely unsupported by evidence. The key issue here is that **Miles & Stockbridge consistently failed to provide clear instructions or engage in reasonable communication** about the transfer of access, yet they were quick to accuse me of non-compliance when the situation was far more complex.

## XIV  PARAGRAPH 15

On July 17, 2024, Ohana therefore filed a Notice of Withdrawal of Petition for Constructive Civil Contempt that it had filed against Dillon-Capps. But Ohana reserved its right to seek judgment against Dillon-Capps in an amount equal to the contempt fines accrued against him, as well as the legal fees, consultant fees and other expenses relating to Ohana's claims against Dillon-Capps.

91    The final reminder from Miles & Stockbridge is the imposition of a $2,500 daily fine in a case based on a false narrative. Both Miles & Stockbridge and I agree on one fact—Judge Barranco did not believe me, my wife (a psychologist), and two other mental health professionals (a psychiatrist and another psychologist) regarding my medical condition. Instead, the Judge

accepted the false narrative perpetuated by Ohana and set a daily fine of $2,500, which was entirely unjustified given the circumstances and the lack of legitimate grounds for injunctive relief.

92      **This $2,500 fine mirrors the argument in my Motion for Sanctions**, which is being opposed here. Miles & Stockbridge has already demonstrated that the $2,500 fine was linked to their belief that I was perpetuating a false narrative. Given this, it is fair to apply the same amount in sanctions to **each individual** who has been perpetuating this false and fraudulent lawsuit against me. The individuals involved in maintaining this false narrative are:

- Glenn Norris

- Victor Brick

- Richard Hartman

- Justin Drummond

- David Levett

- Robert Brennen

- Steven Frenkil

- Holly Butler

- Victoria Klein

- Kim Edwards

- Jessica Duvall

93      All 11 of these individuals have played a role in **perpetuating the false narrative** and the attached fraudulent lawsuit. Each one is making the choice to keep this process going. While I cannot withdraw from this lawsuit, these individuals have continuously chosen to proceed with

the deception. **David Levett**, although from a separate company, is directly responsible for the act of estoppel they tried to label as refusal.

94      **Therefore, I am requesting a daily sanction of $2,500 per individual, in line with the court's original ruling**, totaling $27,500 per day for all 11 people involved. The court has already made it clear that $2,500 is a fair daily rate for this issue, as set by **Judge Barranco**. Since **Justin Drummond and I had a written agreement**—the only enforceable contract on court record in this case—I am also requesting that this amount be doubled as **liquidated damages** under contract law. I am not asking for anything beyond the smallest amount of relief, at the same rate that the court deemed appropriate for me, and applying standard contractual liquidation to this case.

95      **I will handle the rest of the litigation separately**—specifically, the claims related to **FMLA violations, ADA discrimination, and the long-term life-threatening harm** and memory issues that have damaged my career. These issues are separate, and addressing them through separate litigation will simplify this process. My current request is focused solely on this issue, without delving into the more complex harms, because I need to begin treatment so that medical professionals can assess the true extent of the damage.

96      As of today, **123 days have passed as of October 15, 2024**, meaning the total amount at $2,500 per day for 11 people is **$6,675,000**. The difference between their case and mine is clear: I was under conflicting court orders and still managed to comply, while they have no such limitations and continue to choose to perpetuate this case. I am not asking the court to adjudicate the full extent of the harm or any other complex issues at this time. Instead, I request that the

court impose this sanction to hold each of these individuals accountable for their role in this fraudulent process.

## XV  PARAGRAPH 16

> Dillon-Capps has not filed an Answer to Ohana's Complaint. On August 20, 2024, Ohana therefore filed a Request for Entry of Default. The Court entered an Order of Default the same day. On September 20, 2024, Dillon-Capps filed a Motion to Vacate the Order of Default. Ohana filed an Opposition. Dillon-Capps filed a Motion to Strike Ohana's Opposition. The motion to Vacate and responsive papers remain pending and have not yet been ruled upon by the Court.

97     **The procedural history leading to the entry of default is flawed and lacks a legitimate foundation**. On **August 20, 2024**, Ohana filed a **Request for Entry of Default**, and the court entered the **Order of Default** the same day. However, this default should never have been entered in the first place, as Ohana has failed to establish a valid claim for relief. The record shows that I timely filed a **Motion to Vacate the Order of Default** on **September 20, 2024**, challenging both the default and the lack of a basis for the lawsuit itself.

98     **Ohana's Opposition to my Motion to Vacate does not address the core issue**—their **lack of a claim for relief** or any legitimate basis for their lawsuit. As I argued in my **Motion to Strike their Opposition**, Ohana has made no effort to address the fundamental deficiencies in their complaint, including the failure to meet the prima facie requirements for relief. This is not a procedural oversight, but a critical flaw in their entire case, which they have ignored even in their most recent filings on **Friday, October 11, 2024**.

99     **The Entry of Default was procedurally improper and substantively unjust**. According to **Maryland Rule 2-613**, a party may request a default only when the defendant fails to respond within the prescribed time. However, the court must also consider the **good cause standard** under Rule 2-613(d), which allows for vacating a default where the defendant has a

meritorious defense or where there is excusable neglect. In this case, the **complexity of the litigation**, **conflicting court orders**, and my **documented health issues** provide clear good cause to vacate the default, as outlined in my **Motion to Vacate**.

100    **Ohana has consistently relied on procedural tactics rather than addressing the substance of their case**. Their request for default was another attempt to use the legal process to intimidate and harass, rather than to resolve legitimate legal claims. As detailed in my **Motion to Strike their Opposition**, Ohana's position is not only procedurally flawed, but it also rests on an unreasonable interpretation of the rules governing default, designed to obscure the fact that they have no substantive basis for their claims.

101    **The Court should vacate the Order of Default** and reject Ohana's attempts to gain an unjust advantage through procedural shortcuts. Default judgments are reserved for cases where there is no dispute regarding the defendant's failure to respond. Here, not only is there an ongoing dispute, but Ohana has also failed to present any valid claims for relief. The **court should exercise its discretion** to vacate the default, allow the case to proceed on its merits, and address the underlying lack of a basis for the lawsuit itself.

## XVI   PARAGRAPH 17

In addition to the pleadings and papers described above, Dillon-Capps has filed approximately 20 other motions and requests. The Court has denied each and every such motion or request as each became rip for review.

102    **Miles & Stockbridge inadvertently raises an important question about due process**. How is it possible that approximately **20 motions and requests** have been denied when this case, which lacks the fundamental requirements for a valid lawsuit, has continued to progress to this stage? This case should never have reached this point, as it lacks a **claim for relief** and does

Page **35** of 61

Affidavit of Bad Faith          Page # 35 of 61          Exhibit 107

not meet the **prima facie elements** required to proceed. Instead of addressing these foundational

issues, the court has allowed the case to continue, denying valid motions without fully

considering the fact that there is no legitimate legal basis for Ohana's claims.

103    **Why hasn't this case ended sooner?** The denial of my motions reflects a failure to

properly address the fact that **Ohana's lawsuit lacks any substantive merit**. The absence of a

valid claim for relief has been a central issue from the beginning, and yet, despite raising this

issue in numerous motions, the case continues to move forward based on procedural formalities

rather than the legal and factual deficiencies of the claims. It raises serious concerns about how

this case has been allowed to persist without resolving the fundamental question: **What is the**

**legal basis for Ohana's claims**?

104    **Due process should not be about merely moving through procedural steps**. It should

be about ensuring that a case has merit and meets the legal requirements to exist. Ohana has not

met those requirements, yet their lawsuit continues, while every effort to raise these critical

points has been denied. This raises the question of whether due process is being respected when

the court has consistently denied motions aimed at ending a lawsuit that lacks a legitimate claim

for relief.

## XVII  PARAGRAPH 18

Ten of Dillon-Capps' motions or requests, including his Motion for Sanctions, have been filed
since September 27, 2024, and are not yet ripe for review. In his various pending motions and
requests, Dillon-Capps makes unfounded allegations against Ohana, M&S, and even against the
judges of this Court. He accuses every judge of this court of "dereliction of duty" for not yet
ruling on his pending motions and requests, and he accuses seven judges of this Court of being
engaged in a conspiracy with Ohana.

105    **The failure to rule on my motions**—including those aimed at addressing the **fraudulent**

**basis** of this case—raises serious concerns about due process and the integrity of the

proceedings. The motions I have filed since **September 27, 2024**, including my **Motion for Sanctions**, are **not yet ripe for review**, but they highlight fundamental flaws in Ohana's case that should have been addressed long ago. The **unfounded nature** of Ohana's lawsuit is well-documented, and my motions aim to correct the ongoing injustice of allowing this case to continue without a valid legal basis.

106     **Unfounded allegations?** Far from being unfounded, my accusations are based on the continued failure to rule on motions that would bring an end to a **fraudulent lawsuit**—a case that **lacks a claim for relief**, **lacks evidence**, and **fails to meet the legal requirements** necessary to exist. The judges of this Court have a duty to protect the integrity of the legal process and dismiss cases that do not meet basic legal standards. When that duty is not fulfilled, it is entirely reasonable to question why a case with no legitimate foundation continues to proceed.

107     **Dereliction of duty?** If the court continues to allow a case with no basis for relief to move forward, that is a failure of the legal system. It is not "unfounded" to call attention to this failure. I have repeatedly pointed out that **Ohana has no basis for relief**, yet my motions to end this litigation have been denied or delayed, allowing a **fraudulent lawsuit** to persist. Judges have an obligation to ensure that cases move forward only when there is **a valid legal claim**, and **when that does not happen, it is appropriate to raise the issue**. **Delaying rulings on motions that could resolve this case** only perpetuates the harm being caused by a lawsuit that should never have progressed this far.

108     **As for the claim of conspiracy**: My accusations are not based on conspiracy theories but on the **pattern of behavior** exhibited in this case. Seven judges of this Court have had the

opportunity to address the **fundamental issues** at the heart of this case—the lack of a legitimate

claim, the misrepresentations made by Ohana and its counsel, and the ongoing harassment

through baseless legal action. Yet, no action has been taken to put an end to this. When the court

fails to act on motions that could end a **fraudulent case**, the appearance of bias or undue

influence cannot be ignored. It is not "conspiracy" to ask why a case with no legal basis has not

been dismissed—it is simply demanding that the legal system function as it should.

### XVIII   PARAGRAPH 19

Ohana has filed oppositions to Dillon-Capps' motions and requests. Ohana has also requested
that this matter be specially assigned to a single judge of this Court, given the frequency, length,
and nature of Dillon-Capps' filings, including his accusations against the judges of this Court.

109    **Ohana's request for a special assignment deprives the judges of this Court from**

**exercising their independent discretion**. Each judge should have the opportunity to rule on the

complex issues raised in this case without being constrained by a special assignment that limits

their discretion. Maryland law strongly supports judicial discretion in managing cases.

According to **Md. Rule 2-504**, the assignment of cases should not hinder the natural exercise of

judicial review on matters of law and procedure. By seeking a special assignment, Ohana

attempts to limit the scope of judicial review, denying the Circuit Court's judges the ability to

fully and independently review the **fundamental flaws** in their case—particularly the lack of a

valid claim for relief.

110    **Special assignment also undermines the potential for an in-banc review**, a critical

tool provided under **Article IV, Section 22 of the Maryland Constitution**, which empowers the

Circuit Court to convene an **in-banc panel** of judges to reconsider rulings and address

substantive legal issues. The power to request in-banc review is designed to ensure that

important or complex matters receive the benefit of collective judicial analysis. Ohana's request for special assignment seeks to sidestep this safeguard and **shield their baseless claims from broader scrutiny**.

111     In **State v. Phillips**, 457 Md. 481, 509 (2018), the Maryland Court of Appeals emphasized the importance of **independent judicial review** and the dangers of limiting judicial discretion in cases that involve procedural or substantive complexity. Special assignment removes the possibility of diverse judicial input, undermining the principles outlined in **Phillips**.

112     **Motions to compel or for joinder serve an essential purpose in ensuring clarity and substantive rulings**. These motions are a mechanism by which the court can ensure that essential legal and procedural questions are addressed in a timely and fair manner. By seeking a special assignment, Ohana attempts to **restrict the Circuit Court's ability to convene an in-banc panel** or allow multiple judges to decide critical issues, such as the validity of the underlying claims. **Md. Rule 2-213** permits the joinder of parties and claims to allow for comprehensive and efficient rulings. Ohana's tactic of seeking special assignment subverts this procedural right, preventing the court from exercising its full authority.

113     **Ohana's request for a special assignment further underscores their strategy of avoiding judicial oversight**. Instead of addressing the legal deficiencies in their case, they seek to **limit the involvement of multiple judges**, thus avoiding the broader judicial scrutiny that is crucial for cases involving **fraudulent claims** and **misuse of legal process**. The Court of Appeals in **Blake v. Blake**, 341 Md. 326, 336 (1996), reaffirmed the **importance of open judicial process** and the role of judicial discretion in maintaining fairness. Special assignment

undermines these principles, silencing the collective input of the judiciary, which is necessary for a fair evaluation of this complex case.

## XIX  COUNTER ARGUMENT

### A  Maryland Law on Attorney's Fees Under Rule 1-341

114    Ohana correctly cites that Maryland Rule 1-341 allows attorney's fees only in **"rare and exceptional cases"** and where **intentional misconduct** or **unnecessary or abusive litigation** is present. See *Lebac v. Lebac*, 109 Md. App. 396, 410 (1996); *Garcia v. Folger Pratt Development, Inc.*, 155 Md. App. 634, 678 (2004). However, the **core issue** here is not whether Rule 1-341 is generally a rare remedy—it is whether Ohana's conduct rises to the level that justifies such an extraordinary remedy under the specific facts of this case.

115    The cases cited by Ohana—such as *Johnosn v. Baker*, 84 Md. App. 521 (1990), and *Inlet Assocs. v. Harrison Inn Inlet, Inc.*, 324 Md. 254 (1991)—provide the framework for awarding sanctions, but the facts of those cases must be distinguished from the present one. Unlike those cases, where claims were innovative or questionable, **Ohana's entire case is based on misrepresentations and a lack of legal basis**, which has resulted in unnecessary litigation and **abuse of the court process**.

116    **Key Case Law on Bad Faith**: The court in *Garcia v. Folger Pratt Development, Inc.*, 155 Md. App. at 678, made clear that **bad faith exists where a party litigates with the purpose of harassment or unreasonable delay**. This is the precise issue with Ohana's case. The repeated contradictions, refusal to address the core deficiencies in their claim, and failure to provide a valid contract all support a finding of bad faith.

### B  Ohana's Actions Constitute Bad Faith and Lack of Substantial Justification

117     **The court's two-step analysis** under *Garcia* requires that the court first determine if the party has acted in bad faith or without substantial justification. The **substantial justification standard** means that even if a party's position is "fairly debatable," it should not be sanctioned. But **Ohana's position is neither fairly debatable nor within the realm of legitimate advocacy**. Ohana has failed to provide:

      1.    A **valid contract** with enforceable terms,

      2.    Any credible evidence to substantiate their claims,

      3.    A legitimate basis for injunctive relief.

118     **Bad Faith Established**: Ohana's conduct clearly rises to the level of **bad faith**. They pursued litigation on the basis of fabricated claims, misrepresented facts to the court (as demonstrated in their shifting positions regarding who gave administrative control orders), and continued to harass Dillon-Capps through the legal process despite lacking evidence. Their behavior aligns with the definition of bad faith provided in *Garcia*—**intentional harassment and unnecessary litigation**.

### C  Court's Discretion to Refuse Sanctions Does Not Apply Here

119     While the court has discretion to refuse sanctions even when bad faith is established (*Garcia*, 155 Md. App. at 678), such discretion should not be exercised here. The **repeated abuse of the judicial process** by Ohana, from the **improper use of TROs** to the **attempt to gain default judgments** without addressing the core legal deficiencies, mandates that sanctions be applied to deter future misconduct.

120    **Distinction from Cited Cases**: Ohana argues that the court must use its discretion not to award sanctions, citing *Legal Aid Bureau, Inc. v. Bishop's Garth Assocs. Ltd. P'ship*, 75 Md. App. 214, 221 (1988). However, that case involved innovative legal arguments, not **blatant misconduct and false claims** as seen here. The **misuse of Rule 1-341** to avoid legitimate judicial review is precisely what Maryland courts seek to prevent. Therefore, **sanctions are justified and necessary** to protect the integrity of the judicial system.

### D   Ohana's Claim of No Bad Faith is Contradicted by Their Own Conduct

121    Ohana asserts that no bad faith exists, citing *Major v. First Va. Bank*, 97 Md. App. 520 (1994), yet their own record proves otherwise:

> 4.    They rely on **unsupported allegations** and **contradictory affidavits** (as shown by the varying claims of who directed the administrative controls).

> 5.    They continue to pursue litigation despite having no **prima facie case** and no legitimate claim for relief.

> 6.    Their repeated efforts to delay resolution and failure to provide clarity on their demands show a pattern of **litigation abuse**.

122    **Material Facts in Dispute**: Contrary to Ohana's assertions, Dillon-Capps has **not admitted to material facts that support their claim**. The claim that Dillon-Capps was bound by a written contract is misleading, as the **contract provided by Ohana was incomplete** and missing key provisions that would establish the alleged obligations. Ohana's inability to produce a complete and valid contract is a critical point that undermines their claim and supports the argument for sanctions.

## E  Clumsy Footnotes

123   **Mischaracterization of Testimony**: Ohana's claim that I conceded **Randall Romes** as an expert in PCI DSS and compliance standards is **incorrect**. While I acknowledged Mr. Romes' credentials as **passable**, I never conceded to his conclusions or the methods used in his affidavit. During my attempt to cross-examine his process and verify the reliability of his conclusions, **the court interrupted**, preventing a full and proper examination. Maryland courts have repeatedly recognized the importance of full cross-examination when evaluating expert testimony. In *Oken v. State*, 327 Md. 628, 668 (1992), the Court of Appeals emphasized that "cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." Ohana's portrayal of Mr. Romes' testimony as "unrefuted" is misleading and ignores the **incomplete and interrupted nature** of that testimony.

124   The Contract's Missing Pages: Ohana continues to argue that the contract is complete, despite obvious and material omissions. Page 6 of Richard Hartman's affidavit ends with Section 5, while Page 7 begins with Section 7, skipping Section 6 entirely. This omission is glaring and renders the contract incomplete and unenforceable. Maryland law is clear that an incomplete contract cannot be the basis for a claim. In *Kiley v. First Nat'l Bank of Md.*, 102 Md. App. 317, 333 (1994), the Court held that "the absence of terms essential to the obligations of the parties prevents a court from enforcing the agreement as written."

125   Additionally, missing addendums further obscure the scope and terms of the agreement. Ohana had four months to address this issue, yet they failed to correct or even acknowledge these missing pages. Without a complete agreement, their reliance on this contract as a basis for injunctive relief or any legal claim is fundamentally flawed. Maryland courts consistently require

clarity and completeness in contracts for enforcement, and this document falls far short of those standards.

126    **Lack of Proper Notice for the TRO**: Ohana's claim that I suffered no prejudice from the lack of notice for the **TRO issued on June 17, 2024,** is unsupported by law and fact. **Md. Rule 15-504** requires that parties receive **reasonable notice** before the issuance of a TRO. In *Schisler v. State*, 394 Md. 519, 535 (2006), the Court of Appeals reiterated that "procedural due process requires that parties have the opportunity to be heard at a meaningful time and in a meaningful manner." Filing a letter on June 18th in response to a TRO issued without notice does not retroactively cure the procedural defect.

127    **Due process violations are not harmless errors**, particularly when a party is deprived of the opportunity to present their case before a court order is entered. Additionally, my appearance at the **June 26th Preliminary Injunction hearing** does not absolve the initial lack of notice for the TRO. Maryland courts have held that notice and the opportunity to be heard **before a TRO is granted** is critical to ensuring fairness. The court in *Simpson v. City of New York*, 793 F.3d 259, 265 (2d Cir. 2015), emphasized that "failure to provide notice and an opportunity to be heard prior to entry of a restraining order is a violation of due process." Ohana's attempt to minimize this procedural failure is contrary to established legal principles.

128    Ohana and Miles & Stockbridge attempt to prop up their entire case with repeated but baseless claims, misrepresentations, and a reliance on **procedural maneuvers** rather than the **substance of the law**. Their arguments, in essence, try to persuade this Court through **repetition of falsehoods**—hoping that restating the same unfounded assertions enough times will somehow make them true. This strategy fails in the face of facts, law, and the principles of justice.

## NO BASIS FOR RELIEF OR INJUNCTIVE ORDERS:

129     Despite Ohana's insistence, their case lacks **any legitimate basis for relief**. Maryland courts require that claims seeking injunctive relief be founded on **clear and convincing evidence** of harm or contractual breach. Ohana's case has none of these. They have no **complete contract**, no **evidence of refusal**, and no **justifiable claim for irreparable harm**. This Court granted a **TRO** and **Preliminary Injunction** without any substantive evidence, relying solely on affidavits riddled with contradictions. Under **Maryland Rule 15-501**, injunctive relief must be supported by real, immediate, and tangible harm. Here, Ohana failed to prove any of these elements. Repeating the same flawed narrative about alleged refusals doesn't meet the legal threshold for these extraordinary remedies.

## FALSE CONTEMPT AND RETALIATION:

130     Ohana's contempt claims are equally unfounded. **I never refused access** to Ohana's systems, as evidenced by the inconsistent and contradictory statements made by their own witnesses:

   7.     **Glenn Norris** refused to provide any answer at all this is also estoppel.

   8.     **HEA** admitted to **estoppel**, meaning Ohana's access issues were caused by their own actions, not by any refusal on my part.

   9.     **Richard Hartman** explicitly admitted to **retaliatory motives**, which undercuts any argument that this litigation was pursued in good faith.

   10.     **Justin Drummond** provided multiple perjured statements, including false claims that I refused to give him access, refused HEA access, and did not provide updates. All these claims have been **disproven** with actual evidence.

Page **45** of **61**

## REPETITION DOESN'T MAKE IT TRUE:

131     No matter how many times **Miles & Stockbridge** and **Ohana** repeat their narrative of refusal and fraud, it remains **factually and legally false**. Maryland courts have long recognized that merely repeating a false statement does not make it credible. In *Bradshaw v. Hilco Receivables, LLC*, 765 F. Supp. 2d 719 (D. Md. 2011), the court underscored that **repetition of a lie is no substitute for evidence**. Here, **Miles & Stockbridge's attempt to redefine fraud as "success" is not just misleading, it's delusional**. The continual reliance on fabricated facts should disqualify their assertions and damage their credibility before this Court. **No court should ever trust Miles & Stockbridge or Ohana again**, as their behavior demonstrates a pattern of litigation based on lies and false narratives.

### F     Unclean Hands and Fraudulent Lawsuit Perpetuation

132     Ohana and **Miles & Stockbridge** come to this Court with **unclean hands**, having initiated and perpetuated a **fraudulent lawsuit** based on **falsehoods**, **procedural manipulation**, and **misleading representations**. Their entire case has been built on **bad faith conduct** by key individuals, including **Justin Drummond**, **Glenn Norris**, **Richard Hartman**, and **David Levett of Hartman Executive Advisors (HEA)**, who have engaged in **estoppel**, breached agreements, refused to respond, and provided **misleading testimony**.

## UNCLEAN HANDS DOCTRINE:

133     The **doctrine of unclean hands** is well established in Maryland law, preventing a party from obtaining relief when their own conduct has been **unethical, fraudulent, or in bad faith**. As the Court of Appeals made clear in *Halls v. Halls*, 327 Md. 337, 344 (1992), **"one who comes into equity must come with clean hands."** Ohana's entire lawsuit is tainted by their **own**

**misconduct**, including **breaches of agreements**, **retaliation for protected rights**, and **manipulative tactics** that were used to frustrate and mislead:

11.     **Justin Drummond's Breach of the June 7th Agreement**: On **June 7th, 2024**, I entered into a **written agreement** with Justin Drummond to resolve the access issue. However, Drummond and HEA failed to honor the agreement. From **June 10th to June 11th**, Drummond **evaded satisfaction of the request**, misleading me into believing that the matter would be finalized the following week. Then, on **June 13th**, after hours of silence and leading me to believe that he was unaware of the situation, Drummond **sanctioned Richard Hartman's email late at night**. In his affidavit, Drummond falsely claimed that he was the one who **ordered these events**, but this timeline reveals that his actions were part of a deliberate, **manipulative ruse**.

12.     Additionally, **HEA refused to respond to any emails sent to receive access**, effectively preventing the final satisfaction of the request. Their refusal to engage and their failure to take steps to finalize the access show that they acted in **bad faith**. Maryland courts have consistently held that when a party obstructs the fulfillment of an agreement, they cannot turn around and claim a breach by the other party. **HEA's refusal** further demonstrates that the lawsuit was based on **false premises**, and Ohana has no basis for seeking relief.

13.     **Richard Hartman's Admission of Retaliation**: Richard Hartman admitted that he knew I was taking **FMLA leave**, which was protected under federal law. Hartman further acknowledged that this lawsuit, in part, was an act of **retaliation for my protected rights**. Under the **Family and Medical Leave Act (FMLA)**, retaliation for

exercising protected leave is prohibited, as reinforced by **29 U.S.C. § 2615(a)(2)**.
Hartman's admission establishes a clear violation of my rights under FMLA. Moreover,
the fact that this leave was in connection with a **PTSD disability** only strengthens the
argument. The **Americans with Disabilities Act (ADA)** mandates that reasonable
accommodations be provided, and in this case, allowing a **day off** for my PTSD is a
**reasonable ADA accommodation**. Hartman's acknowledgment of retaliation in
connection with both **FMLA** and **ADA** violations further demonstrates that this lawsuit
was not filed in good faith.

14.     **Glenn Norris**, in his capacity at Ohana, refused to answer the most basic and
critical question: **"What is the access for?"** Norris' refusal to clarify what specific
access was being requested shows a **lack of good faith** and a clear intent to **manipulate
the situation** rather than resolve it transparently. Maryland law requires that parties
seeking equitable relief, such as a TRO or injunction, demonstrate **clear and legitimate
grounds** for their request. The refusal to provide basic answers undercuts Ohana's claims
and highlights their **unclean hands** in this litigation.

15.     **David Levett of HEA** committed **estoppel** by acknowledging that Ohana had
administrative access to the Microsoft 365 accounts all along. Estoppel arises when one
party's **wrongdoing** or **misrepresentation** prevents them from asserting a claim based
on that very conduct. In *Morrison v. Wells Fargo Bank*, 400 Md. 11, 30 (2007), the Court
of Appeals held that **a party cannot assert rights it has willfully caused to be violated**.
Here, Ohana's access issues were caused by **their own mishandling** and lack of
communication, not by any refusal on my part.

134    The **unclean hands** doctrine applies squarely to Ohana, barring them from any relief due to their own **misconduct and deception** in this matter.

## ESTOPPEL, BREACH, AND THE FRAUDULENT NATURE OF THE LAWSUIT:

135    Ohana has perpetuated a **fraudulent lawsuit** from the very beginning. Maryland law requires that lawsuits be grounded in **good faith**, with **substantial justification** to pursue legal claims. **This lawsuit has none**. Ohana has **misrepresented facts** to the Court and pursued **claims that have been repeatedly debunked**. As demonstrated:

16.    **HEA's admission of estoppel** proves that Ohana's central claim—that I refused to grant them access—is false. **Estoppel bars them from claiming that any alleged refusal caused harm**, since they themselves had **access to the systems** the entire time. In *Knill v. Knill*, 306 Md. 527, 532 (1986), the Court of Appeals confirmed that **estoppel prevents a party from asserting claims that contradict their own prior actions or statements**. Ohana, having already admitted they had access, cannot now claim refusal or obstruction.

17.    **Justin Drummond's breach of the June 7th agreement** further proves that Ohana has **no legitimate basis** for pursuing this lawsuit. Drummond's decision to **evade satisfaction** and play a **manipulative game** on June 13th demonstrates their lack of good faith. The **misleading communications** were part of a calculated strategy to frustrate and delay the resolution, all while pretending that the issue would be resolved. Maryland law does not tolerate parties who **breach agreements** and then turn around to claim harm from the very situation they created. *Deitz v. Palaigos*, 120 Md. App. 380, 387 (1998),

holds that **fraudulent claims and perjured testimony are grounds for dismissal**, and Drummond's actions fit squarely within this category.

18. The affidavits of **Richard Hartman** and **Justin Drummond** are filled with **contradictions**, **perjured statements**, and **false claims** of refusal. Drummond, in particular, falsely claimed that I refused him access, refused HEA access, and failed to provide updates—all of which have been disproven. In *Deitz*, the Court held that **fraudulent claims and perjured testimony are grounds for dismissal** and sanctions, as they undermine the integrity of the judicial process.

136 Ohana's reliance on **false testimony** and **deliberate misrepresentations** demonstrates their intent to **manipulate the court** and **harass me through abusive litigation**. **Fraud upon the court** has been recognized as one of the most severe forms of misconduct in legal proceedings, warranting dismissal and sanctions. In *Hager v. Law Offices of Peter G. Angelos*, 257 Md. App. 149, 156 (2022), the Court made it clear that **fraudulent lawsuits cannot be tolerated in any form**, and those who engage in such behavior should face the appropriate consequences, including dismissal of their claims.

## G Perpetuation of a Fraudulent Lawsuit:

137 Rather than correcting their false claims, Ohana has chosen to **perpetuate this fraudulent lawsuit**, continuously misrepresenting facts to the court in a desperate attempt to salvage their baseless case. **This Court should recognize that repeating a lie does not make it true**, and relying on **false testimony and misleading affidavits** only deepens their culpability.

19. **Richard Hartman** has admitted to **retaliatory motives**, further proving that this lawsuit is **not based on legitimate claims** but on **personal vendettas** and the desire to

silence me for exposing their misconduct. This behavior is a violation of the very principles of justice that the courts are meant to uphold.

20.     **Miles & Stockbridge** has played a central role in this misconduct, filing **frivolous motions** and continuing to present **false statements** to the Court in an effort to justify their fraudulent lawsuit. Maryland courts have consistently held that attorneys who engage in this type of **bad faith litigation** should be sanctioned. In *Blake v. Blake*, 341 Md. 326, 337 (1996), the Court affirmed that **lawyers have a duty to the court and to the judicial process** not to engage in tactics designed to deceive or harass.

138     No court should trust Miles & Stockbridge or Ohana in future legal proceedings. Their actions in this case reveal a pattern of litigation abuse, and their reliance on perjury, false claims, and retaliation makes it clear that their intentions are anything but just. This Court should take decisive action to not only dismiss this case but to hold Ohana and Miles & Stockbridge accountable for their misconduct.

## H   Final Footnote of "I Disagree"

139     Despite **Ohana and Miles & Stockbridge's** express denial of any conflicts of interest or violations of the **Maryland Rules of Professional Conduct**, the facts on record tell a different story. The **repeated misconduct**, **retaliation**, and **bad faith actions** throughout this litigation point to serious ethical violations. Merely denying these actions does not absolve them of accountability. Their conduct has **directly violated the principles of fairness and integrity** that the legal profession upholds, and their continued denials only reinforce the need for this Court to **address the ethical and professional breaches** at play in this case.

## I  Legal Obligations

140     When considering the legal violations related to improper access and failure to follow least privilege principles, the laws governing these issues span multiple states and federal jurisdictions. In the case of **Ohana Growth Partners, LLC** and their legal counsel at **Miles & Stockbridge**, the scope of potential violations extends far beyond where their headquarters or operations are physically located. Because the nature of digital infrastructure often involves systems that cross state lines—whether through data transmission, cloud storage, or network nodes—it must be assumed, unless proven otherwise, that the activities in question likely implicate multiple jurisdictions. As a result, the violations here would fall under the laws governing not just the states where Ohana operates physical locations but also where the company's data and systems touch external networks. The infrastructure itself can extend into other states, bringing the actions and mismanagement of access controls under the purview of laws in those jurisdictions as well.

141     The best way to approach these laws is to think about their origins and what they were created in response to—most often, public dissatisfaction with the careless management of sensitive accounts and systems. The public and regulatory bodies have historically reacted strongly against the mismanagement of access rights, whether this involves access to firewalls, sensitive databases, or critical internal systems. The core principle here is about **separation of duties** and minimizing risks. Whether it is a student, employee, executive, or even the owner of a company, when individuals have unchecked or unjustified access to critical systems, the risk of harm to both the public and the company increases significantly. This is why the legal landscape prioritizes the enforcement of least privilege and separation of duties: to ensure that access is

tightly controlled, limited only to those with a legitimate, clearly defined purpose. When demands for access are made without explanation or a clear need, that serves as a red flag, signaling potential future violations or misuse. The burden of harm, therefore, must always favor those qualified to maintain security over those seeking access without justification, ensuring the security of sensitive systems remains intact.

142     As of **June 13, 2024**, the date where **immutable protections** on critical backups are set to expire looms closer, with these protections expected to fall off in early November. This timeline adds an additional layer of urgency, especially if stall tactics in this case are being employed as a means to exploit relationships or rely on influence to "smooth things over." Such tactics, if aimed at delaying critical decisions or compromising security controls, could present a serious risk—not just to the parties involved but to broader public interests. If access controls and security measures continue to be eroded, the situation may escalate to one where the government must intervene, ensuring that these immutable protections do not expire without proper safeguards in place. Protecting these backups may become a critical issue that no longer rests solely in the hands of the litigants but now involves the government's oversight. Should the court fail to act swiftly to address this, it may be necessary to request the appointment of a **special master** to oversee the process. The request would come despite the clear challenges and the lack of due process experienced thus far, which further complicates the reliance on any internal resolution. At this point, the stakes are high, and any failure to maintain these protections could have significant legal and operational repercussions.

## PCI DSS COMPLIANCE VIOLATIONS

PCI DSS v4.0 Requirements

143    **Requirement 7: Least Privilege** – Mandates that businesses enforce strict access controls ensuring that individuals only have the access necessary for their roles.

144    **Requirement 8: Authentication** – Requires proper authentication methods for all users, especially administrators.

145    **Requirement 10: Logging and Monitoring** – Requires continuous tracking and monitoring of access to systems to prevent unauthorized modifications and breaches.

## VIOLATIONS RELATED TO OBTAINING ACCESS IMPROPERLY

146    **Misuse of Access: Federal and State Laws:** Gaining access to systems or data through improper channels, even with administrative roles, could lead to violations of federal laws (CFAA) and state data protection laws.

147    **Negligence in PCI Compliance:** Neglecting proper authorization and monitoring processes could result in violations of both PCI DSS standards and relevant consumer protection laws, including potential financial and criminal penalties.

## FEDERAL LAWS

148    **Computer Fraud and Abuse Act (CFAA) 18 U.S.C. § 1030:** Prohibits unauthorized access to protected systems. It applies when someone gains or misuses access to systems without proper authorization or exceeds authorized access, potentially violating least privileged access.

149    **Gramm-Leach-Bliley Act (GLBA) 15 U.S.C. §§ 6801-6809:** Requires institutions to protect sensitive data, particularly financial and personal information, including ensuring least privileged access to systems that store such data.

150     **Federal Trade Commission Act (FTC Act) 15 U.S.C. § 45(a):** Unfair practices include

failure to follow PCI DSS standards, failing to protect sensitive data, and implementing

inadequate security protocols that violate consumer protection standards.

151     **Sarbanes-Oxley Act (SOX) 15 U.S.C. § 7262(b):** Requires internal controls, including

access control systems, for protecting sensitive financial data. Violations occur when companies

fail to control or monitor access to sensitive systems.

## STATE AND LOCAL LAWS VIOLATED

**Maryland**

152     **Maryland Personal Information Protection Act (PIPA), Md. Code Ann. Com. Law §

14-3503(a):** Requires businesses to implement reasonable security measures to protect personal

data, including maintaining access controls and firewall configurations to restrict unauthorized

access.

153     **Maryland Criminal Law §7-302(c):** The statute relates to misuse of authorized access.

Even when access is given, improper use of such access violates this provision. This law reflects

the principle of least privileged access.

**Washington**

154     **Washington Data Breach Notification Law, Rev. Code Wash. § 19.255.010:** Requires

businesses to secure personal data, including limiting access to only authorized personnel.

Violations occur if someone obtains or misuses access without proper justification.

**California**

155	**California Consumer Privacy Act (CCPA), Cal. Civ. Code § 1798.150(a)(1):** Requires businesses to maintain reasonable security procedures to protect consumer data. This includes access control policies in line with PCI DSS standards.

**Florida**

156	**Florida Information Protection Act (FIPA), Fla. Stat. § 501.171:** Mandates reasonable security measures, including managing and limiting access to personal information. Violations include failure to follow security protocols like least privileged access.

**Tennessee**

157	**Tennessee Identity Theft Deterrence Act, Tenn. Code Ann. § 47-18-2107**: Requires businesses to implement security measures that protect personal information, including limiting access to necessary individuals only.

**District of Columbia**

158	**District of Columbia Consumer Protection Procedures Act (D.C. Code § 28-3851 et seq.):** Mandates security procedures that include limiting access to sensitive data only to those who need it for business purposes.

## UNITED STATES V. MORRIS (1991)

159	**Court**: U.S. Court of Appeals for the Second Circuit

160	**Context**: This was one of the earliest cases under the **Computer Fraud and Abuse Act (CFAA)**. Morris, a Cornell graduate student, was prosecuted for releasing a worm that exploited system vulnerabilities, even though he had authorized access.

161	**Impact**: The case clarified that even those with authorized access could face penalties under the CFAA if they misuse that access to harm systems.

## FTC V. WYNDHAM WORLDWIDE CORP. (2015)

162    **Court**: U.S. Court of Appeals for the Third Circuit

163    **Context**: The Federal Trade Commission (FTC) brought an enforcement action against Wyndham for failing to implement reasonable security measures after data breaches exposed sensitive customer information. The court ruled that failure to comply with **PCI DSS** could be considered an unfair practice under the **FTC Act**.

164    **Impact**: This case demonstrated the FTC's broad authority to enforce data security standards and penalized companies for negligence in maintaining secure systems.

## UNITED STATES V. SCRUSHY (2013)

165    **Court**: U.S. Court of Appeals for the Eleventh Circuit

166    **Context**: Richard Scrushy, former CEO of HealthSouth, was implicated in a massive fraud scheme where executives were found to have manipulated financial data due to improper access controls.

167    **Impact**: This case emphasized the need for stringent **segregation of duties** and access controls to prevent executive misuse of financial systems, relevant to PCI compliance as it deals with access to sensitive data.

## 4UNITED STATES V. MADOFF (2010)

168    **Court**: U.S. Court of Appeals for the Second Circuit

169    **Context**: Bernie Madoff, who ran one of the largest Ponzi schemes in history, exploited his executive access to manipulate financial data. The case underscored the importance of limiting access, even for high-level executives, and the dangers of inadequate oversight.

170     **Impact**: Reinforced the need for **least privileged access** and strong internal controls to prevent executives from abusing their roles for unauthorized actions.

## IN RE: TJX COMPANIES RETAIL SECURITY BREACH LITIGATION (2009)

171     **Court**: U.S. Court of Appeals for the First Circuit

172     **Context**: TJX was sued after a massive data breach compromised customer information due to poor encryption and weak network security, violating **PCI DSS** standards.

173     **Impact**: This case further highlighted the legal liabilities that companies face when failing to secure systems handling payment card information, emphasizing the importance of **access controls** and network security.

## FTC V. LIFELOCK INC. (2010)

174     **Court**: U.S. District Court for the District of Arizona

175     **Context**: LifeLock was charged with failing to secure customer data adequately, despite advertising that it provided comprehensive data protection. The settlement required them to improve their security practices, including access control.

176     **Impact**: This case showed the consequences of failing to enforce **least privileged access** and strong **access control policies**, both critical under PCI DSS.

## IN RE HOME DEPOT DATA BREACH LITIGATION (2016)

177     **Court**: U.S. District Court for the Northern District of Georgia

178     **Context**: Home Depot experienced a massive data breach due to weaknesses in their network security and insufficient monitoring of access points, leading to the theft of payment card information.

179     **Impact**: The case underscored the importance of **access logging and monitoring** under **PCI DSS**, holding companies accountable for failing to secure access to payment systems.

180     These cases collectively illustrate the **legal frameworks and consequences** tied to poor management of access controls, failure to implement least privilege, and inadequate security measures. The laws were designed in response to breaches and abuses, often by individuals in positions of power or through negligent management of sensitive data environments. The key takeaway is that these laws were created to **safeguard public trust** by enforcing strict access controls and accountability for organizations managing sensitive information.

## XX  CONCLUSION

181     Ohana's lawsuit is a prime example of the **abusive litigation** that **Maryland Rule 1-341** is designed to prevent. Their actions have caused significant harm to Dillon-Capps, wasted judicial resources, and abused the legal process. **Sanctions** are necessary to hold **Ohana** and **Miles & Stockbridge** accountable for their **misconduct** and to deter future abuses of the court system.

182     **Ohana and Miles & Stockbridge** have come to this Court with **unclean hands**, having initiated and perpetuated a **fraudulent lawsuit** built on lies, retaliatory motives, and intentional deception. Their conduct has involved **estoppel**, **breach of the June 7th agreement**, **HEA's refusal to respond**, **FMLA and ADA violations**, **bad faith litigation**, and **fraud upon the court**. These actions bar Ohana from seeking any relief in this case.

183     This Court should not only **dismiss Ohana's claims** but also seriously consider imposing **sanctions** on **Miles & Stockbridge** for their role in perpetuating this abuse of the legal system.

<u>DECLARATION OF AFFIRMATION</u>

I Solemnly Declare and Affirm Under Penal Ties of Perjury and Upon Personal Knowledge That the Contents Of The Foregoing Paper And Exhibits Thereto Are True.

October 15, 2024

<u>s/ Ryan Dillon-Capps</u>
Ryan Dillon-Capps (Pro Se)
Email: ryan@mxt3.com
1334 Maple Avenue
Essex, Maryland 21221
Telephone: (703) 303-1113

<u>RESPECTFULLY SUBMITTED</u>

October 15, 2024                                <u>/s/ Ryan Dillon-Capps</u>

Ryan Dillon-Capps (Pro Se)
Email : ryan@mxt3.com
1334 Maple Avenue
Essex, Maryland 21221
Telephone: (703) 303-1113

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on **October 15, 2024**, a copy of the **AFFIDAVIT OF BAD FAITH**

was served via email to **rbrennen@milesstockbridge.com** and via first-class mail, postage

prepaid, on:

**Robert S. Brennen**
**Miles & Stockbridge P.C.**
100 Light Street
Baltimore, Maryland 21202

<u>/s/Ryan Dillon-Capps</u>
**Ryan Dillon-Capps (Pro Se)**

1334 Maple Ave.
Essex MD 21221
<u>ryan@mxt3.com</u>
703-303-1113

<span style="color:red">**Page 61** of **61**</span>

| OHANA GROWTH PARTNERS, LLC | IN THE |
|---|---|
| Plaintiff, | CIRCUIT COURT |
| | FOR |
| vs. | BALTIMORE COUNTY |
| **RYAN DILLON-CAPPS** | CASE NO: C-03-CV-24-002264 |
| Defendant. | |

## AMENDED AFFIDAVIT FOR MOTION TO ASSERT RIGHTS AND REQUEST FOR IMMEDIATE RULINGS

I, Ryan Dillon-Capps, being over the age of eighteen (18) and competent to testify, and having personal knowledge of the facts contained herein, state as follows:

## I   MATERIAL LIES

1   **No Breach of Duty**: I did not breach any duty, but Ohana did breach their duty of care.

2   **No Breach of Contract**: I breached no contractual obligations. Unlike Ohana who breached the written agreement with me from June 7, 2024, and who wanted to breach a dozen agreement they made in multiple Franchise Disclosure Documents (FDD)

3   **No Refusal**: I complied with all lawful directives and provided lawful and compliant solutions to unlawful and non-compliant ones.

4   **No Risk**: Ohana and Counsel have affirmed and stated under oath what they demanded. They wanted to violated PCI Compliance, breach a dozen contractual agreements, and violate roughly 20 laws over 5 states, DC, and federally.  Furthermore, Ryan Brooks was caught trying

to gain unauthorized access and the results of his work were discovered and placed systems, data, and the business at risk.

5      **No Harm**: The only harm Ohana has suffered is from their own doing. Ohana affirmed in Richard Hartman's affidavit and Robert Brennen has confirmed under oath on June 26, 2024. Ohana willingly and knowingly violated my FMLA leave rights in June 13, 2024. Ohana and Counsel's actions have exacerbated my PTSD. I now suffer from catatonia, which has worsened since June 17 and now presents as malignant, and I have severe memory issues because of Ohana and M&S.

6      **No Claim of Authority**: No claim of authority beyond my own was ever made, but Ohana has made several false claims of authority involving PCI Compliance, contractual obligation, and ownership of planet fitness health clubs.

7      **No Exclusive Control of Systems**: Roles and responsibilities were distributed,

   1.      Billing Administrator: LeeAnn Hartman (Richard Hartman's Wife)

   2.      Viva Goals Administrator: Justin Drummond

   3.      Support Administrators: Cielo IT: Managed by Dante Martinez (Ohana Terminated Sept 15)

   4.      Systems, Database, and Reporting Administrator: Ann Pinera

   5.      Cloud Administrator: Ryan Brooks (RDC Terminated May 20 || Ohana Rehired)

   6.      Security Administrator: Ryan Brooks (RDC Terminated May 20 || Ohana Rehired)

   7.      Backup Administrator: Darren Koritzka (Ohana Suspended June 13)

   8.      Compliance Administrator: Ryan Dillon-Capps (Ohana Suspended June 13)

8    **Maintained Compliance**: I followed all lawful directives and maintained compliance with all applicable requirements, standards, contractual obligations, and policies.

9    **No GoDaddy/Domain Registrar Access Requested**: Ohana doesn't know what GoDaddy is and never mentioned it before they filed this lawsuit.

## II  CORNERSTONE OF TRUTH

10   **Communication Style Criticism**: For years, I endured gender- and disability-based harassment at Ohana, with attacks on my communication style that mirrored the criticisms recently levied by Robert Brennen and Judge Barranco. This began with Chief Marketing Officer Josh Gerber during COVID, when he responded to a routine request needing approval from my supervisor, Glenn Norris, with name-calling and demeaning comments, dismissing me as "just an IT guy." Gerber's bullying mirrors the tone that others, including Brennen and Barranco, have since reinforced.

11   **Escalating Hostility**: Others—Joshua Beyer, William Flax, and Jared Flax—later intensified the harassment, after my recommendation to consider vendors other than Onsite Solutions, Inc., who was implicated in fraud in 2023. Their hostility grew with each passing year, creating an environment to deliberate discredit me, culminating in this lawsuit.

12   **Dismissive HR Responses**: Reports of harassment across departments were consistently ignored, with reporting processes structured to discourage formal complaints.

13   **Unwitting Accomplices**: As litigation grew closer, so did the frequency of incidents where Glenn Norris and Richard Hartman leveraged their supervisory role. Frequently manipulating colleagues into unknowing retaliation, such as Kali Roscoe.  Similar to how Robert

Brennen extended the aggregate of deceptions to influence members of the Baltimore County Circuit Court.

14      **Intentional Retaliation**: Others willingly perpetuated hostile actions, such as Kristen Seiler ("Seiler"), who acted on false narratives fueled by deliberate misinformation that caused Seiler to engage in hostile conduct she believed was protecting and defending another. Similar to how others today may be engaging in efforts to protect and defend.

15      **Coordinated Defamation**: Instead of pursuing the fraud investigation they claimed to be hired for, Miles & Stockbridge's efforts were levied by Ohana to discredit me. Holly Butler's failure to initiate a legitimate investigation, despite assurances, raised concerns that led me to confront her in March and again in June, days before the lawsuit was filed.

**Escalation to Fraud**: Initially, Brennen and Frenkil may have acted to protect Holly Butler, but Miles & Stockbridge soon leveraged and perpetuated deceptive narratives to sway certain Baltimore County Circuit Court judges and others, inducing actions that favored their agenda without full understanding. Individuals, likely believing they were assisting colleagues, were unknowingly aiding the true perpetrators—those now fully aware of the intent behind their actions, including Glenn Norris, Richard Hartman, Justin Drummond, Robert Brennen, Steven Frenkil, and Holly Butler.

16      Driven by deception and a desire to protect reputations, these actors exploited goodwill and professional trust, weaponizing these principles to evade accountability. By manipulating perceptions and minimizing their own accountability, they orchestrated a process that now encompasses Abuse of Process, Malicious Litigation, Perjury, Fraud, and other unethical and

illegal conduct—each layer deepening the harm inflicted and further distancing the truth from my actions performed in good faith.

## III  PROFESSIONAL AND PERSONAL HARM

17      **Financial Losses**: Delayed opportunities in AI development, a missed chance to launch a company, and canceled personal milestones—all sacrifices Dillon-Capps made to protect colleagues I once considered friends. Resulting in financial default and leaving me without the means to recover.

18      **Permanent Harm**: Severe memory issues and malignant catatonia have left me functioning at reduced capacity. Pursuit of my career or business is irreparably harmed because I am unable to perform in a similar role or efforts needed to pursue the AI development.  These problems would not exist without Ohana and M&S intentional effort to harm.

19      **Urgent Family Implications**: Without relief, Dillon-Capps's financial collapse would leave his disabled brother and other dependents vulnerable. He urgently requests court intervention to secure his family's future and protect against further harm.

## IV  ADDITIONAL CONTEXT

20      The contents of Additional Context are material statements and facts for other litigation, and presented herein to inform on context, but not intended for other purposes.  This current litigation is limited to the events of the litigation for my seven counter claims because the Plaintiff of the original complaint has rested their case, and I am filing for a Motion for Directed Verdict.

KRISTEN SEILER

21    **Initial Misunderstanding:** The incident involving Kristen Seiler arose from a well-intentioned but misunderstood exchange between myself and her supervisor, LeeAnn Hartman. During the conversation, I was attempting to ensure that an upcoming order for IT equipment met LeeAnn's unspoken needs. LeeAnn had previously expressed feeling overlooked in receiving technology resources, often ending up with outdated equipment. As the Accounts Payable Manager and someone who had voiced these concerns, I wanted to address her needs thoroughly.

22    **Proactive Follow-Up:** During a Daily-Standup meeting, the Help Desk Manager and IT Coordinator were giving me the list of expenses to approve, and it included a $30 webcam for LeeAnn. LeeAnn is the wife of the head of HR Richard Hartman and sister of former President and co-founder, Lynne Brick. Being overlooked and ending up with the "hand-me-downs" was something she mentioned casually in a prior conversation, and I wanted to find out what else the IT Department could get for her so that she would feel seen and not overlooked.

23    **Misinterpretation by Seiler**: Unfortunately, due to prior misinformation from Jared Flax, who had continually spread misleading information to Kristen, and the unusual nature of the head of IT following up on a webcam order. She misunderstood my follow-up as invasive rather than supportive. Believing she was advocating on LeeAnn's behalf, Kristen interrupted the conversation, yelling, "Just give her what she wants!"

24    **Resolution and Escalation:** Recognizing Kristen's reaction as rooted in a misplaced sense of advocacy, I had no intention of escalating the matter. However, LeeAnn, concerned about potential consequences, likely informed her husband, Richard Hartman, of the incident. Richard Hartman then escalated the situation by fabricating a narrative in an email to Glenn

Norris, portraying LeeAnn as harmed by the interaction. This embellished account contributed to further confusion and misunderstanding.

25    **Pattern of Dishonesty by Richard Hartman:** Richard Hartman's involvement in this and similar incidents consistently introduces misinformation. His contributions are marked by a pattern of dishonesty, including spoliation and tampering. While he may serve a role within the organization, his repeated distortions and false narratives obscure any constructive contributions he might make.

## VICTOR BRICK

26    **Victor Brick's Role and Potential Negligence**: As CEO, Victor Brick ("VB") maintains a position of authority over company operations. However, claims that VB was unaware of the actions leading to the lawsuit appear questionable at best. His lack of visible involvement may suggest a deliberate choice to distance himself from events, potentially indicating either negligence or a more conscious evasion of accountability.

27    **Distancing:** On the day of the final strategic session in December 2023, VB abruptly canceled a scheduled meeting with me in Maryland, intended to discuss critical evidence and recommend a third-party investigation. VB's decision to avoid this meeting was a notable red flag, implying potential external influence aimed at preventing a thorough discussion of these issues.

**Involvement of Miles & Stockbridge:** Following VB's cancellation, Justin Drummond contacted me to inform me of the involvement of Miles & Stockbridge. Holly Butler, a representative from Miles & Stockbridge, was introduced as the investigator, despite her lack of

the hands-on technical expertise required for a comprehensive and effective investigation. As evident events since, the false pretense was for the purpose of assisting Ohana in terminating me with cause. Requiring them to fabricate cause when none was found and raises serious questions about their ongoing efforts to avoid serious good faith conversations or negotiations.

28      **Suspicious Travel Arrangements:** In the following days, the internal threat systems flagged things that I would later review to discover unusual travel arrangements for Josh Beyer, organized by Justin Drummond. Josh Beyer is the Chief Development Officer and travels constantly without the need for others assistance with the trip pointing at Victor Bricks and his Miami Condo. Avoiding more convenient communication methods overlapped with the context mentioned, and Josh Beyer's acquisition and standing at Ohana. (see Josh Beyer section)

29      **Data Driven Analysis:** After I created and trained an AI model to process various forms of data to successfully identify correlation vs causation from both the actions and inactions from the data I was able to process the data on Victor Brick that immediately confirmed a methodical approach to maintaining distance that has evolved over the years, and his actions are consistent to be used against any specified period of time to which the model has been trained and identify when VB is aware and involved and he is intentionally distancing himself from the events.

30      **June 13, 2024**: I don't want to know and so I never processed the data for June 13, 2024. I would rather believe he is a father taking care of his daughter. However, I do know from this process that VB has not been an absent CEO in regard to these events overall.

<div align="center">JOSH BEYER</div>

31 **Sexual Harassment Allegations Against Joshua Beyer**: Beyer was implicated in a sexual harassment lawsuit while at Planet Fitness, involving accusations of coercion under the guise of "business trips" to enable inappropriate advances involving alcohol. These behaviors reportedly mirrored a prior inappropriate relationship where alcohol was a key factor. Beyer allegedly pressured the individual to destroy communication records to avoid exposure.

32 **Email Transfer and E-Discovery Manipulation**: Beyer sent emails from his Planet Fitness headquarters (PFHQ) email to a personal Yahoo account, forwarding these to CFO Glenn Norris. After an e-discovery request was issued, Ohana undertook a rushed migration from on-prem servers to Microsoft 365, allegedly resulting in a multi-day "outage." Following this, Ryan Brooks informed Norris that e-discovery data was now "ready for download," raising concerns about the preservation of relevant evidence.

33 **Beyer's Hiring and Franchise Competition**: Beyer was hired by Ohana shortly after these allegations surfaced and after Norris had received these emails. In franchise dynamics, rival franchisees are the primary competition, with Area Development Agreements (ADAs) driving profitability. Securing high-value ADAs is essential to Ohana's core strategy, particularly in its effort to maximize Earnings-Before-Interest-Taxes-Depreciation-Amortization (EBITDA).

34 **Strategic Financial Engineering**: Throughout 2023, Norris focused on a critical 10-year refinancing arrangement, leveraging a 40% EBITDA—critical to favorable financing terms. This strategy uses tax mechanisms to routinely reduce liabilities, a tactic that walks a fine line between aggressive tax planning and potential illegality under specific circumstances, although typically compliant under applicable laws.

# JUSTIN DRUMMOND

35  **Financial Motivation and Background**: Drummond anticipated a significant payout from the company's refinancing deal, which would have been a rare financial opportunity for someone from a non-wealthy background. This possible windfall, coupled with the high stakes of the refinancing, likely influenced him to prioritize actions that would secure the deal's closure and maintain the company's stability.

36  **Navigating New Leadership Dynamics**: As a newer President, Drummond was still adapting to the complexities of senior leadership, which required balancing immediate decisions with long-term company interests. He faced substantial pressure in managing high-stakes decisions, particularly as his position depended heavily on the established authority of figures like Glenn Norris and Victor Brick. The influence of these senior leaders, coupled with his desire to maintain job security, likely shaped his choices and limited his autonomy.

37  **Adapting Under Pressure**: Drummond's decisions during this period reflect a leader striving to fulfill his role while coping with immense pressures. Despite a lack of seasoned executive experience, Drummond sought to uphold his responsibilities but found himself facing increasing demands and constraints. The decisions he made, while ultimately harmful to me, appear driven by situational pressures and external influences rather than malice or personal intent to harm.

38  **Perspective on Intent and Harm**: Despite the personal impact of Drummond's actions, I believe his choices were shaped by difficult circumstances and mounting pressures, rather than intentional harm. If asked, I would testify to this perspective, as my view of Drummond remains

that of a leader caught between conflicting demands and limited by the challenges of his new role.

<h2 style="text-align:center">V <u>CONCLUSION</u></h2>

39      This affidavit uses words like Assert Rights and Immediate Rulings, but then I proceed to provide more transparent view of who I am.  The intentional contradiction in forcefully assertive title to content is to give the Court insights to the meaning to my actions and posturing, and the content has been heavily reduced and focused from the previous affidavit to demonstrate the meaning of the words intention to give focus with the context they provide.

40      Obviously, no lawsuit was the goal, but five months into this lawsuit followed several months efforts to avoid litigation and it may cost me my life.  Don't count me out quite yet because I have survived death so many times that life threatening circumstances are not new to me, but that is not true for everyone else and fraudulent lawsuits are perpetrated by those like Ohana and M&S every day.  The two Memorandums of Law outline the arguments and provide justification on why and ability for the court to implementing the precedent.

41      The seven counterclaims are intentionally laid out to support a framework that can be shaped with the court opinion.  Not a morbid plea, but expression of sincerity in my intentions - if the court asked me to choose between my own life and the precedent to change countless lives it wouldn't be a choice it would be an opportunity.  Advocating for myself feels foreign, and my own harm is severe and irreparable by legal definition, but I am hoping that when this lawsuit has concluded that I will be able to use relief to find a way to get back what has been taken from me.

42      In the meantime, I will pursue additional litigation while looking for and contact former victims of Ohana and M&S.  Providing the financial relief that was stolen from them, and at a much slower pace pursuing the AI solutions that I had big plans for.

43      The seven counterclaims for equitable relief are not solely about addressing past grievances; they aim to correct and prevent ongoing and future harm to both me and the integrity of this court. Together, these motions are structured around principles that protect, restore, and enforce accountability, ensuring a just process that affirms focus on truth and transparency.

44      The "PREVENT" framework within the Directed Verdict outlines each action designed to counterbalance the harm inflicted by the plaintiff's actions, allowing the truth of my experience to emerge without distortion. Each step—Protect, Restore, Enforce, Verify, Ensure, Neutralize, and Terminate—directly confronts the misconduct, bringing the case back to its core meaning and purpose of achieving fairness, both in law and in equity.

45      It is my sincere hope that the Court will permit full transparency of the record— excluding only sensitive or confidential material—to allow public access. This measure seeks not just to restore my reputation, but to prevent similar abuse of process in future cases. No resolution can completely undo the damage I have endured, but through the integrity and clarity of an open record, I can begin to rebuild the focus and meaning of my life and career, offering others the truth behind my efforts to protect and uphold what is right.

46      I respectfully affirm that the information provided here is true to the best of my knowledge and submitted in good faith to aid the Court toward a fair and just resolution.

## DECLARATION OF AFFIRMATION

I solemnly declare and affirm under penal ties of perjury and upon personal knowledge that the contents of the foregoing paper and exhibits thereto are true.

<div align="right">

s/ Ryan Dillon-Capps

Ryan Dillon-Capps (Pro Se)

Email: ryan@mxt3.com

1334 Maple Avenue

Essex, Maryland 21221

Telephone: (703) 303-1113

</div>

<u>RESPECTFULLY SUBMITTED</u>

October 31, 2024                                     <u>/s/ Ryan Dillon-Capps</u>

Ryan Dillon-Capps (Pro Se)
Email : ryan@mxt3.com
1334 Maple Avenue
Essex, Maryland 21221
Telephone: (703) 303-1113

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 31, 2024, a copy of <u>Amended Affidavit for Motion to Assert</u>

<u>Rights and Request for Immediate Rulings</u> via email to rbrennen@milesstockbridge.com and served

on via first-class mail, postage prepaid on:

Robert S. Brennen
Miles & Stockbridge P.C.
100 Light Street
Baltimore, Maryland 21202

<u>/s/Ryan Dillon-Capps</u>
Ryan Dillon-Capps (Pro Se)

| OHANA GROWTH PARTNERS, LLC | IN THE |
| Plaintiff, | CIRCUIT COURT |
| | FOR |
| vs. | BALTIMORE COUNTY |
| **RYAN DILLON-CAPPS** | CASE NO: C-03-CV-24- |
| Defendant. | **002264** |

## MOTION TO ASSERT RIGHTS AND REQUEST FOR IMMEDIATE RULINGS

1        Defendant, Ryan Dillon-Capps, respectfully submits this motion to assert rights before this Honorable Court and request immediate rulings on outstanding matters critical to the resolution of this case. Despite recent positive developments, including the long-delayed entry of the **Motion for Sanctions** on **September 30, 2024**, and the release of previously withheld transcripts from June 26, 2024, on the same day. The speed of these actions does not align with the **urgency of the harm** inflicted upon the Defendant. Given the extensive delays and the ongoing irreparable harm caused by this case, Defense asserts the right to have these matters resolved **expeditiously** to prevent further undue harm and suffering.

### 1   JUDICIAL OVERREACH

2        The default order was granted **6 days before** the deadline for an answer was due, in violation of **Md. Rule 2-613**. The court acted prematurely and exceeded Judicial Discretion, without allowing the Defendant the full legal time to respond and exacerbating this issue by ignoring the opposition for over 40 days. This is a clear example of the court exceeding its discretion and depriving Dillon-Capps of due process.

<span style="color:red">Page **1** of **44**</span>

3        No testimony was taken to support the default judgment, and rulings were made in favor

of lawsuit that is deficient its prima facia elements. Compounded by fraudulent claims that are

contradicted by evidence already provided to the court. Judicial decisions were made in a way

that enables the Plaintiff and Counsel to further inflict harm and deprive Dillon-Capps of due

process, further demonstrating an abuse of discretion that requires immediate corrective action.

## II  CLEAR LEGAL RIGHT

4        Dillon-Capps had a legal right to file opposition and motions to vacate and strike. Under

**Md. Rule 2-321(c)**, motions like the **Motion to Strike** automatically extend the time to file an

answer, but the court failed to account for this. Defendant's clear legal right to challenge the

basis of a fraudulent case was violated when the court ruled to prematurely grant the entry for

default order.

5        The court has a **mandatory duty** to rule on the Defense motions and filings in a timely

and fair manner, as required by **Md. Rule 2-311** and the general principles of **due process**. By

refusing to act, the court is abdicating its responsibilities, and presenting no legal avenues to

appropriately remedy the injustice and harm that continues from a fraudulent case within the

Baltimore County Circuit Court.

6        The court has already demonstrated its ability to issue **expedited rulings** on show-cause

orders, TROs, default judgments, and other matters within a couple days or less. In this context,

the **unreasonable delay** in addressing the errors of ruling and granting our Motion for Sanctions

is further abuse of judicial discretion. Defense's **Motion for Sanctions** must be ruled upon in a

timely manner to ensure that justice is served, and perpetuation of a fraudulent lawsuit must end

immediately with sufficiency of relief for Dillon-Capps. The failure to act on this motion is

denying Dillon-Capps an avenue for immediate financial relief and protection from further retaliation.

7    The continued **procedural delay** perpetuates the injustice suffered by the Defendant.

### III  <u>PREVENTION OF FURTHER HARM</u>

8    The sanctions sought  will act to  prevent further harm to the Defendant. The court's delay in ruling has allowed the **fraudulent lawsuit** to continue, contributing to the ongoing significant **financial hardship** and **psychological damage.** From this fraud the Defendant now suffers from **catatonia**, a life-threatening condition that after being caused by the co-conspirators Miles & Stockbridge and Ohana Growth Partners hindered Dillon-Capps defensive efforts and is now exacerbating the financial and emotional stress through the Court's inaction.

9    Without immediate relief, the Defendant will remain unable to afford necessary **medical treatment** and is posed to result in Dillon-Capps defaulting on their financial obligations, placing them at continued risk of irreparable harm. Furthermore, the **ongoing suppression** of the motion perpetuates a **fraud on the court**, undermining the judicial process.

10    The court's failure to correct the erroneous rulings and grant necessary relief from the **default judgment** and fraudulent lawsuit that deprived Dillon-Capps of employment medical benefits, financial stability, insured protections, and exacerbating their PTSD to breaking point that it resulted in the onset of catatonia, a life-threatening and permanent risk to Dillon-Capps.

11    The **ongoing inaction** and refusal to address the Defense motions or the Courts previous missteps continue to deepen this harm, as Dillon-Capps remains financially and emotionally burdened by a case that should have been resolved months ago. Allowing the fraudulent claims to persist, the court is contributing to further disenfranchisement.

## IV  STATEMENT OF FACTS – PREMATURE ORDER

**Fact 1:** The request for a default order was made on August 20, 2024, at 10:58 AM.

**Fact 2:** The default order was issued the same day, August 20, 2024, at 2:54 PM, which highlights that the defendant was deprived of any opportunity to be heard before a ruling was made to highlight why the request made prematurely.

**Fact 3:** Md. Rule 2-321(a): This rule provides that a defendant has 30 days to file an answer unless otherwise specified under sections (b) and (c).

**Fact 4:** Md. Rule 2-321(c): If a motion is filed pursuant to Rule 2-322, the deadline for filing an answer is automatically extended by 15 days after the court's ruling on the motion.

**Fact 5:** Md. Rule 2-322(e): A party may file a motion to strike before responding to a pleading.

**Fact 6:** Md. Rule 2-322(e) contains no distinction between the success or failure of a motion to strike.

**Fact 7:** The only requirement is that the motion must be filed before responding to the pleading.

**Fact 8:** It says verbatim "Motion to strike. On motion made by a party before responding to a pleading, …" further instructions are distinct and unique to the phrasing to which they belong, and furthermore – where was the Plaintiff's adherence to statutes when they incorrectly cited scheduling, failed to provide notice, and then argued mootness during the preliminary stage.

**Fact 9:** On August 9, 2024, Judge Stringer denied a motion to strike filed by the defendant before answering the pleading, which automatically extended the time to file an answer.

**Fact 10:** 15-day extension: Under Md. Rule 2-321(c), the defendant had 15 days after August 9, 2024, to file an answer, which calculates to August 24, 2024 (a Saturday).

**Fact 11:** Md. Rule 1-203(a)(1): If the last day of a filing deadline falls on a Saturday, Sunday, or holiday, the deadline extends to the next business day. In this case, the deadline extended to Monday, August 26, 2024.

**Fact 12:** The answer was therefore due on Monday, August 26, 2024.

**Fact 13:** Judge Andrew M. Battista issued the default order on August 20, 2024, at 2:54 PM, 6 days before the answer was due, without testimony being taken and on the same day it was filed. Demonstrating the courts capacity to act quickly.

**Fact 14:** The default judgment was issued prematurely, exceeding the judicial discretion allowed by Md. Rule 2-613.

**Fact 15:** Judge Battista's decision to grant a default order before the answer deadline and without testimony exceeded the judicial discretion outlined in Md. Rule 2-613. This rule provides that a default order can only be entered if the defendant has failed to plead in the time allowed by the rules. By issuing the default prematurely, the judge did not comply with the mandatory requirements of the rule, which undermines due process and procedural fairness.

**Fact 16:** Judicial discretion is limited by the rules, and if judges were permitted to alter timelines or make decisions without notice or regard to procedural deadlines, it would destroy trust in the judicial system. Md. Rule 2-613 aims to provide certainty and fairness in the process by ensuring that defendants have adequate notice and time to respond before any default judgment is granted. When this framework of rules is ignored, it deprives individuals of their fundamental rights and procedural safeguards.

**Fact 17:** Entry by Clerk: The order was officially entered by Julie L. Ensor on August 21, 2024, at 12:41 PM, reinforcing the improper timing of the default judgment.

**Fact 18:** Opposition to the request was entered on August 20, 2024, at 5:05 PM

**Fact 19:** As of September 30, 2024, no ruling has been made on the Opposition.

**Fact 20:** Motion to Dismiss pursuant to Rule 2-322(a) was made on August 26, 2024, at 11:40 PM

**Fact 21:** Motion to Dismiss was entered as denied on September 17, 2024, at 3:42 PM

**Fact 22:** The deadline to answer was automatically extended to October 2, 2024

**Fact 23:** Motion to Strike Opposition of Motion to Vacate Default Order was filed on September 25, 2024, at 6:13 AM and currently has no ruling.

**Fact 24:** Motion for Sanctions was filed on September 27, 2024, at 6:20 AM. It was received and served through automation, but was not entered until September 30, 2024, at 9:00 AM.

**Fact 25:** The Plaintiff has received rulings faster than the Defendant is able to have items added to the docket.

## V  MD. RULE 322(E): MOTION TO STRIKE

12      Defense raises issue with the Plaintiff's position in claiming a judicial value of a rule requiring a defendant to file an answer while unresolved motions or issues remain, particularly when awaiting court rulings. In this scenario, Rule 1-201 of the Maryland General Provisions provides an important framework: it mandates that rules must be interpreted to secure simplicity in procedure, fairness in administration, and elimination of unjustifiable expense and delay. When a rule mandates or prohibits certain conduct, the consequences of noncompliance are either explicitly defined by the rule or determined by the court in the light of the totality of the circumstances and the purpose of the rule.

13      Applying this to Md. Rule 2-322(e) (motions to strike), the rule allows a party to file a motion to strike before answering a pleading, extending the timeline under Md. Rule 2-321(c). However, the system does not compel the court to respond to these motions within a specific timeframe, often resulting in unjustified delay. This delay contradicts the principles set forth in Rule 1-201, where the purpose is to minimize unnecessary expense and promote fairness.

14      The judicial process here can cause confusion and pressure the defendant into submitting an answer prematurely. Without knowing the court's ruling on the motion, the defendant may face unfair circumstances where they are essentially "guessing" the ruling. In cases where judges issue rulings that conflict with their prior decisions, or average over 3 weeks to respond, the lack of clarity can make it feel like a blind effort, removing the practical utility of rules designed to extend timelines or permit challenges.

15      The purpose of allowing motions to strike is to cleanse the lawsuit of improper material before forcing the defendant to respond to allegations, ensuring fairness. However, without timely rulings on such motions, the extension intended to benefit the defendant is undermined, turning the rule into a procedural hurdle rather than a protective measure. The delay in obtaining a ruling might force the defendant into prematurely "shotgunning" their defense or filing motions in anticipation of the court's future decision—precisely what Rule 1-201 seeks to prevent by promoting fairness and simplicity in legal proceedings.

16      In short, the value of Md. Rule 2-322(e) is diminished when judicial delays undermine the purpose of securing simplicity, fairness, and preventing undue expense. Forcing a defendant to file an answer without resolution of pre-answer motions contradicts these foundational principles.

17      If any error was made in the filing, it was a genuine mistake, and the **Defendant** has

demonstrated both the reasons for the delayed filing and, beyond a reasonable doubt, that they

are the only party with a **valid claim**. Under **Md. Rule 1-201**, the rules of procedure are to be

construed to eliminate unjustifiable expense and delay. Any delays in this case, caused by

confusion or timing issues, fall within the reasonable bounds of a legitimate mistake that does

not warrant the court's dismissal of the defendant's claims.

18      Regardless of the dispute over procedural correctness, it remains beyond the court's

discretion to award judgment to a party without a **legitimate claim** that fails to meet the **prima

facie** requirements for a civil case. **Md. Rule 2-501** requires that a party must meet their initial

burden of proof to sustain a case. If the opposing party has failed to establish even the most basic

facts of their claim, no court should award judgment in their favor, and this would constitute an

abuse of judicial discretion.

19      The **advocacy for a fraudulent case** not only compromises the ethical duties of counsel,

as required under **Maryland Rules of Professional Conduct 19-303.1**, but also demonstrates a

failure to provide adequate legal services to **Ohana Growth Partners**. This failure to act within

ethical boundaries highlights that the plaintiff's attorneys are unable to represent their client with

the integrity and competence demanded by the rules of legal practice.

20      The evidence presented firmly establishes that **Dillon-Capps** is the **victor** in this case,

with a valid and reasonable claim for harm. Under **Md. Rule 2-602**, the court has a duty to

resolve claims where substantial justice can be achieved. As it stands, Dillon-Capps has a

rightful claim that should be satisfied without further delay, in order to avoid additional harm to

the defendant.

## VI  JUNE 18, 2024: PERPONDERANCE OF EVIDENCE

21      The case was insufficient the day it was filled with out particularized harm, an explanation how Dillon-Capps was the arbiter of a harm, or even as the prima facia element of contractual debate requires the explanation of how the contractual violation would be the mechanism of a harm.  Furthermore, there is a preponderance of evidence satisfied by the Defendant on June 18th, 2024, and inclusive of the Plaintiff's own statements should have been sufficient for a ruling in favor of the Defendant because the Plaintiff told the Court this was retaliation for FMLA and the Defendant told the Court that they agreed and had presented noticed 2 hours earlier with the additional point that there is an unnamed 3rd party who was also retaliated against.  Darren Koritzka has since been fired under the false pretense of restructuring, and the Court ever since June 18th has furthered egregious harm and injustice against the direct victims of Ryan Dillon-Capps and Darren Koritzka.  Almost, maybe still will, enable co-conspirators Ohana Growth Partners and Miles & Stockbridge to legitimize their fraudulent, retaliatory, and harmful actions.


## No REFUSAL - HEA


**When:** June 14, 2024
**Who:** Miles & Stockbridge and Baltimore County Circuit Court

**Affidavit of Richard Hartman (Pages 11-12):**

22      On this date, **Miles & Stockbridge** and the **Baltimore County Circuit Court** became aware of an email sent by **Ryan Dillon-Capps**, which was referenced in Richard Hartman's affidavit. The email contained an update from Dillon-Capps indicating their ongoing efforts to satisfy the company's request. Additionally, the email emphasized that ownership was included

on the email thread to ensure transparency and oversight of the process. This communication demonstrates that Dillon-Capps was actively working to comply with the demands made, contradicting any assertions that they were refusing to cooperate.

23      This information became part of the court's record on June 14, 2024, and was critical in ensuring that the actions of Dillon-Capps were properly understood within the context of the case.

## No REFUSAL – POST SUSPENSION ORDERS

**When:** June 14, 2024
**Who:** Miles & Stockbridge and Baltimore County Circuit Court

**Correspondence to Judge Truffer**

24      Email to HEA from Dillon-Capps' personal email (Pages 72-73):

On June 17, 2024, at 6:40 PM, Ryan Dillon-Capps attempted to satisfy the post-suspension orders by reaching out to HEA via personal email. This correspondence demonstrated continued compliance with the demands issued prior to the suspension. Dillon-Capps communicated their ongoing efforts to meet the required obligations, directly addressing the court's concerns about any perceived refusal or lack of action on their part.

25      This email highlights Dillon-Capps' proactive measures following the suspension, ensuring that both **Miles & Stockbridge** and the **Baltimore County Circuit Court** were made aware of the attempts to resolve the issues, despite the suspension in place.

## No NOTICE NOT GIVEN – ON FILING AND HEARING OF TRO

**When:** June 17, 2024, at 11:05 PM
**Who:** Miles & Stockbridge

**Email Exchange to Miles & Stockbridge:**

26      An email was sent on **June 17, 2024, at 11:05 PM**, citing that an **invalid email** had been

used to provide notice of the Temporary Restraining Order (TRO) hearing. The email stated that

the notification system failed because the incorrect email address was utilized.

27      **Brennen's email** mentioned that **notice of the hearing** was provided **35 minutes** before

the hearing took place, leaving insufficient time for proper preparation. This correspondence was

cited in court filings to argue that notice was improperly given, thus violating procedural

requirements.

---

**When:** June 18, 2024
**Who:** Miles & Stockbridge and Baltimore County Circuit Court

28      **Correspondence to Judge Truffer:**

29      On **June 17, 2024, at 11:05 PM**, an additional email was sent requesting that correct

personal contact information be used for future communications, as the invalid email had

previously been used. The assumption was made that **Miles & Stockbridge** was not aware of the

incorrect email usage and had unintentionally failed to give proper notice. This request was

recorded as part of the case file on **Page 66** of the court records.

30      **35-minute notice claim:**

31      **June 17, 2024, at 9:13 AM**, **Brennen's email** indicated that a hearing was scheduled to

occur approximately **35 minutes** from the time the email was sent. This timeline was logged on

**Page 62** of the court records, showing that there was insufficient time for the recipient to

adequately prepare for the TRO hearing, raising due process concerns about the timing of the notification and hearing.

## No REFUSAL – BROOKS, NORRIS, DRUMMOND, BRICK

**When:** June 14, 2024
**Who:** Miles & Stockbridge and Baltimore County Circuit Court

32      **Correspondence to Judge Truffer**

**Norris tells PFHQ he will and does not (Page 55):**

33      **June 5, 2024, at 10:51 AM**, Glenn Norris refused to provide any solution for satisfying the franchisor-imposed PCI DSS v4 least privilege requirements. Dillon-Capps, however, continued to meet these requirements and attempted to satisfy the request, demonstrating compliance with PCI DSS regulations. The failure to resolve the issue and meet the requirement to provide Ryan Brooks access is attributed to Norris' inaction, not any refusal by Dillon-Capps.

34      **Victor Brick's Duplicate Order (Page 50):**

35      **May 23, 2024, at 11:59 PM**, Victor Brick submitted an order duplicating Norris' prior demand for Ryan Brooks to be granted access, which was already delayed due to Norris' refusal to resolve the PCI DSS compliance issue.

36      **Glenn Norris' Demand for Access (Page 52):**

37      **June 5, 2024, at 10:26 AM**, Glenn Norris reiterated the demand for Ryan Brooks to be granted access, along with **Justin Drummond** and **Victor Brick**, despite ongoing compliance efforts by Dillon-Capps.

38      **Write-up for Insubordination (Pages 48-49):**

39    **May 23, 2024, write-up** was created, covering events from **May 22, 2024**, accusing

Dillon-Capps of insubordination. The write-up links negative employment actions, including a

planned termination, to the failure to provide Ryan Brooks access, even though Dillon-Capps

had expressed concerns about violating PCI DSS standards.

40    **Escalation to CEO (Pages 45-47):**

41    **May 22, 2024, at 2:05 AM**, Dillon-Capps escalated the issue to the CEO after reporting

coercive threats. This escalation came after attempts to meet PCI compliance requirements,

which contradicted the demands being made by Norris, Drummond, and Brick. The report

included specific details about PCI DSS mandates, showing Dillon-Capps' effort to satisfy the

requirements while fulfilling their role as PCI Compliance Officer.

42    **Escalation to PFHQ (Page 34):**

43    **May 21, 2024, at 5:13 PM**, Dillon-Capps escalated the issue to **PFHQ** (the franchisor)

and involved **Justin Drummond** to assist in de-escalating the situation. Dillon-Capps urged

against performing actions that would violate regulatory standards tied to PCI DSS compliance.

44    **PFHQ Franchisor Standards Document (Pages 30-31):**

45    The document from PFHQ states that even franchise owners are subject to franchisor

limitations and cannot act beyond certain operational or security requirements, highlighting the

restrictions imposed on Dillon-Capps regarding system access.

46    **PCI DSS Standards Document (Pages 22-29):**

47    Though partially obscured, the PCI DSS document shows that Dillon-Capps' compliance

efforts aligned with the established security standards, as referenced in the original hand-

delivered pages.

48      **Email to Karen Debus (Pages 16-17):**

49      May 24, 2024, Dillon-Capps sent an email to Karen Debus addressing Richard Hartman's interference with FMLA and concluding with a statement about Dillon-Capps' willingness to satisfy the PCI DSS request. The refusal to state a specific purpose for access continued to prevent compliance, despite Dillon-Capps' clear efforts to meet the requirement.

### Approved For FMLA Leave

**When:** June 14, 2024
**Who:** Miles & Stockbridge and Baltimore County Circuit Court

50      **Affidavit of Richard Hartman as Exhibit 1 (Page 3):**

51      **June 14, 2024**, Richard Hartman's affidavit (page 2) confirms his belief that Ryan Dillon-Capps was requesting FMLA leave and ends with the acknowledgment on page 3 that Dillon-Capps faced retaliation for asserting those rights. The affidavit further addresses **Richard Hartman's response** to Dillon-Capps' FMLA request and references **Exhibit B** from **June 13, 2024**, where Dillon-Capps asserted their FMLA rights in two emails, sent at **12:03 PM** and **11:57 PM**, respectively. The second email corrects an earlier omission of names and alleges that Hartman's response included coercive threats, which potentially violated **FMLA statute 29 U.S.C. § 2615(a)** and **Md. Code Ann., Lab. & Empl. § 3-801 et seq.**.

**When:** June 18, 2024
**Who:** Miles & Stockbridge and Baltimore County Circuit Court

52      **Correspondence to Judge Truffer (Pages 18-21):**

53      Pages from **FMLA medical forms** have been scanned and submitted, with medical information redacted to protect privacy. The originals, reviewed by the court and sent to Miles & Stockbridge, confirm that **PTSD** was the qualifying medical condition, and **ADA accommodations** were being provided.

54      **Affirmed Status (Page 17):**

55      **May 23, 2024, at 4:55 PM**, an email from **Karen Debus** affirmed that Dillon-Capps was **approved** for FMLA leave, specifically to use it for PTSD. The process to invoke FMLA involved notifying the employer when the leave was for FMLA purposes, which Dillon-Capps followed by informing the company of their absence.

56      **Request made on June 13th, 2024, before Richard Hartman's Email (Pages 3-4):**

57      On **June 13, 2024, at 7:12 AM and 7:15 AM**, Dillon-Capps sent emails to **Justin Drummond**, **Richard Hartman**, and **Glenn Norris**, specifically stating that they would be using FMLA leave on that day and would notify them when they planned to return to work. This request occurred **two hours before** Hartman's email, and Dillon-Capps clearly identified the leave as related to FMLA.

### Richard Hartman's Ongoing FMLA Interference

**When:** June 18, 2024
**Who:** Miles & Stockbridge and Baltimore County Circuit Court

58      **Correspondence to Judge Truffer (Pages 12-16):**

59      On **May 24, 2024, at 8:00 AM**, Dillon-Capps sent an email to **Karen Debus** responding to the false claim that **Richard Hartman** had not previously interfered with their FMLA rights. This email included **screenshots of text messages and emails** showing Richard Hartman's prior

actions attempting to interfere with Dillon-Capps' FMLA leave. Specifically, the messages showed that Hartman attempted to apply a different, less accommodating standard for FMLA leave than was granted to other employees. This deviation from the company handbook suggests that Hartman was engaging in discriminatory treatment, violating **29 U.S.C. § 2615(a)**, which prohibits employers from interfering with, restraining, or denying the exercise of FMLA rights.

60      Hartman's actions, as shown by the screenshots, also sought to deprive Dillon-Capps of their income by imposing restrictions that were not supported by the company's official leave policies, further constituting interference under FMLA and violating **Md. Code Ann., Lab. & Empl. § 3-801 et seq.**. These documented attempts were submitted to the court as part of Dillon-Capps' ongoing claims of FMLA interference and retaliation.

### Unattached Defendant Darren Koritzka

**When:** June 18, 2024
**Who:** Miles & Stockbridge and Baltimore County Circuit Court

61      **Correspondence to Judge Truffer (Pages 7-8):**

62      **June 13, 2024**, **Darren Koritzka** was placed on a **leave of absence**, as shown in the Leave of Absence letter provided on pages 7-8 of the case documents. The stated reason for this leave was to **perform a review of IT Operations**, raising questions about the true motive behind Koritzka's suspension. The timing of this action and the given reason are critical as they suggest a **false pretense**, particularly when compared with other employment actions taken in the case, including the retaliation against Dillon-Capps for asserting FMLA rights.

63      Koritzka's removal under the guise of an IT review may further demonstrate inconsistencies or falsehoods in the management of the situation, and how unrelated or

unattached defendants are implicated without clear justification, potentially supporting claims of

bad faith or improper conduct by the involved parties. This document became part of the court

record on **June 18, 2024**, when it was submitted as correspondence to **Judge Truffer**.

### Stated Basis of Suspension

**When:** June 14, 2024
**Who:** Miles & Stockbridge and Baltimore County Circuit Court

64      Affidavit of Richard Hartman as Exhibit 1 & Suspension Letter as Exhibit 1C (Page 2 of

Exhibit 1C and Page 17 of Exhibit 1):

65      The June 13, 2024, suspension letter, referenced in Richard Hartman's affidavit, outlines

the stated basis for Ryan Dillon-Capps' suspension.

    1.      The letter cites refusal to comply with orders as the primary reason for the

    suspension.

    2.      The suspension also references the email Dillon-Capps sent earlier on June 13,

    2024, as contributing to the decision.

66      The suspension letter and affidavit detail how these two elements—failure to comply

with orders and the earlier email—were presented as the official reasons for the suspension. The

admission to the Court where Richard Hartman removed beyond reasonable doubt they were

filing a lawsuit against Dillon-Capps and suspended them as retaliation.

### What Email Are They Responding to For Suspension

**When:** June 14, 2024
**Who:** Miles & Stockbridge and Baltimore County Circuit Court

67     **Affidavit of Richard Hartman: Exhibit B (Pages 11-12 or Page 16):**

68     **June 13, 2024, at 12:03 AM**, **Ryan Dillon-Capps** sent an email asserting their right to use approved FMLA leave. No other earlier communication from Dillon-Capps precedes this letter in the submitted records. The Plaintiff did not provide any other email before this letter that would serve as the basis for subsequent actions.

69     However, it later became apparent that **Dillon-Capps' email sent at 2:05 AM**—just 15 minutes before Richard Hartman placed **Darren Koritzka** on leave—likely influenced Hartman's retaliatory actions. In this email, Dillon-Capps named Koritzka and requested that the owners intervene to address Hartman and **Glenn Norris**, whose continued actions were causing additional liability for **Ohana Growth Partners**. This email also highlighted the very concerns that **Dillon-Capps** had been raising regarding the filing of fraudulent lawsuits and similar actions that could expose the company to further legal risks.

70     Hartman's swift reaction in placing Koritzka on leave shortly after this communication furthering the validation of retaliatory behavior, and furthering the narrative of FMLA interference under **29 U.S.C. § 2615(a)** and violations of **Md. Code Ann., Lab. & Empl. § 3-801 et seq.**. This sequence of events, combined with the lack of other early communications before the suspension, supports claims that Dillon-Capps was attempting to prevent harm to the company, while Hartman and Norris were acting in a manner that increased the company's liability.


### Why Did Richard Hartman Send the Demand Email


**When:** June 14, 2024
**Who:** Miles & Stockbridge and Baltimore County Circuit Court

71     **Affidavit of Richard Hartman (Page 3):**

72     **June 14, 2024**, Richard Hartman stated in his affidavit that it was "my" email and "my" directive" that initiated the demand sent to **Ryan Dillon-Capps**. Hartman personally claimed ownership of the email, asserting that he was the one responsible for issuing the directive.

73     **Affidavit of Richard Hartman (Page 14, Exhibit B, Page 4):**

74     **June 13, 2024, at 9:01 AM**, the email to Dillon-Capps made the demand, but the email referenced **Glenn Norris** as the individual making the demands. The use of Glenn's name in the email creates ambiguity regarding who was truly behind the directive, despite Hartman later taking ownership of it in his affidavit.

75     **Affidavit of Justin Drummond (Page 2):**

76     **June 14, 2024**, Justin Drummond stated in his affidavit that the **9:01 AM email** sent by Hartman was actually done "**at his direction**." This suggests that Drummond, not Hartman, was the person who instructed the email to be sent, adding another layer of inconsistency regarding who initiated the demand.

77     The affidavits from Hartman and Drummond contradict each other, with both claiming responsibility in different ways for the **June 13th demand email**. This raises questions about the true author of the directive, and removes the foundation to trust the Plaintiff to be honest to the Court,  which is central to the ongoing dispute involving Dillon-Capps.

## VII   PLAINTIFF'S EXHIBIT LIST

78     As of September 28, 2024, the plaintiff has provided no evidence to support their claim. As of September 28, 2024, here is the total exhibit list:

A   June 14, 2024, Richard Hartman Affidavit – Exhibit 1:

79     Irrelevant Hyperlinks and Bad Faith Conduct

80     **Md. Rule 20-301(b)** explicitly states that hyperlinks embedded in submissions are not part of the official record unless they point to documents already included in the official court record. The hyperlink to the Microsoft webpage does not meet this requirement and therefore does not qualify as part of the record.

81     **Md. Rule 1-311** mandates that affidavits and other legal filings must contain accurate and truthful information. The quote from the webpage, which incorrectly represents its contents, constitutes a violation of this rule. The affidavit containing this misleading information fails to meet the standard of truthfulness required under this rule.

82     The technology referenced on the Microsoft webpage is not relevant to the Plaintiff's system. **Md. Rule 5-401** defines relevant evidence as that which tends to make a fact of consequence more or less probable. Since the Microsoft technology differs from what the Plaintiff uses, this evidence lacks relevance. Under **Md. Rule 5-403**, misleading or confusing evidence must be excluded, as its inclusion would confuse the issues.

83     The use of the misleading hyperlink and quote demonstrates bad faith, which violates **Md. Rule 1-341**. This rule permits sanctions against parties who present claims or defenses without substantial justification or for improper purposes.

1   Technical Claims with No Access by Layman

84     The non-technical head of HR making claims of personal knowledge regarding the technical status of the environment, while also asserting that the help desk lacks access, contradicts **Md. Rule 5-602**. This rule requires that a witness testifying to a matter must have personal knowledge of the subject. The head of HR, being non-technical, lacks the requisite

personal knowledge under this rule, making their claims inadmissible unless they directly witnessed or had access to the environment.

85      During the June 26, 2024, court hearing, Judge Michael Barranco's request for technical expertise and the subsequent declaration of Ryan Dillon-Capps as the technical expert by Justin Drummond and Richard Hartman raises concerns under **Md. Rule 5-701**. This rule limit's opinion testimony by lay witnesses, such as Drummond and Hartman, to opinions based on rational perceptions and not technical matters they admittedly do not understand. By presenting themselves as non-technical while offering statements on the system, they may have overstepped their permissible testimony under this rule. Furthermore, **Md. Rule 5-602** again applies, as neither Drummond nor Hartman has personal knowledge of the system, leading exclusion of their statements as they lack the foundation to testify on technical matters.

## 2      Personnel Records Managed by HRIS System Paycom

86      Richard Hartman's claim in his affidavit that he has no access to personnel records conflicts with his role as head of HR and administrator of the independent HRIS system. Under **Md. Rule 1-311**, Hartman's affidavit must be truthful and based on personal knowledge. His statement about lack of access appears inconsistent with his administrative duties, which include overseeing personnel records which are managed in Paycom – the system he is the administrator for. Furthermore, on June 26, 2024, Miles & Stockbridge acknowledged that tall of Hartman's issues had been "fixed." However, Judge Michael Barranco did not inquire into how this issue was resolved, potentially missing a critical point for clarification under **Md. Rule 5-602**, which requires witnesses to have personal knowledge of the matters they testify about. This lack of

inquiry leaves a gap in the record, undermining the credibility of Hartman's affidavit and raising questions about the nature of his access to the HRIS system.

### 3    Excuses away admission of FMLA retaliation

**87**    Richard Hartman acknowledges that Dillon-Capps expressed a desire to use FMLA and assert a position that suggests the company has the right to violate FMLA. This stance directly contravenes **29 U.S.C. § 2615(a)(1)**, which explicitly prohibits retaliation or interference with an employee's exercise of FMLA rights. Statements they violated FMLA and **29 C.F.R. § 825.220(c)**, which bars any adverse actions against an employee for attempting to use FMLA, are further supported by the suspension letter (see below) reinforces this.

### 4    Exhibit 1A: Employment agreement

88    The employment contract in question is missing a section number due to missing pages, which renders the document incomplete. Under **Md. Rule 2-303**, pleadings must provide a clear and concise statement of facts, including the presentation of a complete and valid contract in a breach of contract claim. An incomplete contract missing key sections cannot form the basis of a breach claim because it fails to meet the requirements of a valid agreement, which are essential under **Md. Rule 2-305**.

89    Additionally, for a claim of injunctive relief, a valid, enforceable contract must be shown to exist. Without a complete contract, the plaintiff's claim lacks the legal foundation necessary to seek such relief, subjecting the case to dismissal under **Md. Rule 2-322(b)(2)** for failure to state a claim upon which relief can be granted. The absence of crucial pages further compromises the claim, as the contract's enforceability remains unproven without all its terms being present.

5     Exhibit 1B email thread with 9:01 email ordering Dillon-Capps to work:

90     The following replies show Dillon-Capps asserting their protected right to make use of their approved FMLA leave, and informing Richard Hartman that they are talking steps to satisfy the order.  There is no statement to support refusal.

6     Exhibit 1C email exchange and suspension email:

91     Dillon-Capps response demonstrates they are under the impression that Richard Hartman is the one who Justin Drummond will act against and adds Justin Drummond to the thread before Justin Drummond suspends them.  The letter states it is in response to refusal which their own evidence contradicts and the email they sent, and the only email submitted before suspension is the engagement of the protected act to assert their rights to make use of their approved FMLA leave. Demonstrating they are retaliating in the act of suspension and filing of the lawsuit.

### B   June 14, 2024: Justin Drummond Affidavit

92     On June 7, 2024, Ryan Dillon-Capps texted Justin Drummond offering a solution to provide the requested Global Administrator account, which Drummond accepted, with satisfaction expected between June 10th and 11th. However, Justin Drummond evaded satisfaction, misleading the Defendant by suggesting it would occur the following week. Drummond's affidavit claims that at 9:01 AM, he directed Richard Hartman to send an email making a demand and asserts that Dillon-Capps refused access.

93     This timeline conflicts with Dillon-Capps' June 13th outreach to Drummond, wherein Dillon-Capps provided emails showing their two efforts that day to meet the request, contradicting Drummond's assertion that there were no updates. These inconsistencies suggest a

violation of Md. Rule 1-311, which mandates truthfulness in affidavits. Drummond's statements, claiming Dillon-Capps refused access, appear false, amounting to perjury under Md. Code, Criminal Law § 9-101, which prohibits knowingly making false statements under oath.

94     Drummond's email sent 12 hours later, notifying Dillon-Capps of his suspension, further reinforces the claim of improper and retaliatory conduct. This aligns with Md. Rule 1-341, which sanctions parties for bad faith or improper conduct during legal proceedings, as the timeline suggests Drummond was aware of Dillon-Capps' efforts but continued to mislead both the court and Dillon-Capps regarding the status of the request.

### C     June 25, 2024: Affidavit of  Randall Romes – Expert #1 for Plaintiff

95     The affidavit, which includes a copy-paste of prior filings and a hyperlink that misrepresents the contents, creates a misleading account under Md. Rule 1-311, which mandates that all affidavits and filings submitted to the court must be truthful and accurate. The contradictory statements, where the affidavit quotes a hyperlink saying one thing while the content of the hyperlink states the opposite, undermine the integrity of the evidence and may violate Md. Rule 1-341, addressing bad-faith or improper conduct in legal proceedings.

96     Further, the affidavit's claim that the correspondence received did not contain any requirements contradicts evidence provided through emails and pages of PCI standards, thus violating Md. Rule 5-402 for presenting irrelevant or false information. The affidavit references PCI DSS standards but erroneously argues that federal and state laws do not enforce PCI compliance, despite laws like Nevada Revised Statutes 603A and federal frameworks that incorporate PCI compliance into legal obligations.

97     The lawsuit also focuses on Dillon-Capps' alleged breach of their employment

agreement, and the defense's affidavit, which contains over 100 pages, reinforces the

organization's commitment to maintaining PCI compliance. The submission also references

multiple laws that require PCI compliance, including NRS 603A in Nevada, and the attached

700+ pages of evidence further solidify the legal and contractual obligations, effectively

dismantling any claim that PCI DSS violations are not subject to legal enforcement.

## D   July 3, 2024: Affidavit of Daniel Levett – Expert #2 from HEA

98     Daniel Levett's affidavit, which asserts that other administrators had access to a Global

Administrator account and that Levett worked with them to verify such access, directly

contradicts the claims made by Ohana regarding their need for injunctive relief. According to

Md. Rule 5-602, witnesses must have personal knowledge of the matters they testify to. Levett's

detailed account undermines Ohana's assertions, as Levett establishes both the presence of other

administrators and the ability to access the system, which invalidates the basis for the requested

injunctive relief.

99     Additionally, Ohana's claims are further weakened by the fact that non-technical

personnel made technical assertions, which are inherently unreliable under Md. Rule 5-701, as

lay witnesses are prohibited from giving expert opinions in technical fields. The court should

have viewed these statements as unreliable or inadmissible under Md. Rule 5-403, which allows

the exclusion of evidence that confuses or misleads the court.

100    Levett's involvement, including his claim that the delay in response was due to allowing

satisfaction in receiving access, introduces equitable estoppel. Estoppel occurs when a party's

misleading silence or conduct prevents another party from asserting a fact, as recognized under Md. Rule 2-322 in affirmative defenses. Levett's affidavit presents a clear case of estoppel, as it shows the other party had knowledge but chose not to act, directly contradicting the grounds for the claim.

## E  August 20, 2024: Affidavit of the process's server

101     The process server's statement to Dillon-Capps, "I don't look at it, I just serve it," aligns with his role, which is strictly to deliver documents without reviewing their content. Under Md. Rule 2-121(a), service of process requires the delivery of summons and complaint, but it does not necessitate that the process server be familiar with the contents. This ensures the impartiality of the process server, whose primary function is to execute the delivery rather than review the legal documents.

102     In this case, the certificate of notice was omitted, and the served proposed order was signed and dated by Judge Marc A. DeSimone Jr. on September 17, 2024, at 10:50 AM, with a corresponding e-filed stamp of 12:18 PM on June 14, 2024. The service occurred at 11:30 AM on September 17, 2024 and was handed to the process server on June 14th. This timeline and the records are consistent with the requirements under Md. Rule 1-323, which mandates that the clerk's office keep accurate records of all filed documents, including proposed orders.

103     As for the inquiry into the matching records, Miles & Stockbridge's explanation and the fact that the records coincide with what was received provide clarity on the situation. Under Md. Rule 1-341, no bad faith or improper conduct has been suggested here. The statement about not making accusations and withholding the submission of this as evidence demonstrates a measured approach under Md. Rule 5-104(a), which governs the admissibility of evidence. The factual

assertion is that both the court record and the party's own communications show the proposed order was filed on June 14, 2024.

## F  August 20, 2024: Affidavit of Non-Military Service.

104    The issue raised pertains to the incorrect submission of a service request, which involved hyphenated names, leading the system to treat Ryan Dillon-Capps as two separate individuals, Ryan Dillon and Ryan Capps. This misstep highlights procedural deficiencies in the case's handling. Errors in the naming conventions, such as splitting a hyphenated name, could result in improper identification and record matching yielding incorrect results.

105    This Plaintiff procedural mismanagement is an example of what is commonly referred to as "throwing spaghetti at the wall," meaning the approach lacks precision and strategy. The manner in which elements of this case have been presented does not satisfy the required standards of diligence or accuracy set forth in Md. Rule 1-341, which emphasizes the importance of proper, justifiable conduct in legal proceedings. The submission error serves as a final demonstration of the lack of attention to detail and procedural compliance throughout this case.

## VIII  JUNE 17, 2024: NO NOTICE EX PARTE HEARING FOR TRO

106    On the evidence from June 14th, 2024, provided exclusively by the Plaintiff, there exists sufficient evidence to deny an Ex Parte TRO and to challenge the legitimacy of the lawsuit itself.

### A  No Particularized Harm provided

107    The Plaintiff has only made generalized hypothetical statements that elude to a belief they have without explanation or evidence to support a basis for this belief.

### B  No Plausible Cause-and-Effect Relationship Demonstrated

108     The Plaintiff fails to establish a clear cause-and-effect relationship explaining how

Dillon-Capps poses a legitimate risk of harm, relying instead on generalized hypotheticals.

## C    Timing of Action

109     Plaintiff claims this conflict began on May 21, 2024, but waited nearly a month to request

a TRO, which was filed on June 17th. If Dillon-Capps posed an imminent threat, why was no

action taken sooner? What changed in that month, and where is the evidence or explanation to

justify the delay?

## D    Questionable Request for Injunctive Relief

110     If Dillon-Capps is indeed a risk, why does the Plaintiff's request for injunctive relief

include asking him to access the system? Companies facing real security threats typically do not

grant access to the alleged risk, especially without law enforcement oversight. The norm would

be inclusive of steps that prevent access, not inviting the perceived threat back into the system.

## E    Delayed Action After Suspension

111     Plaintiff suspended Dillon-Capps and then filed for injunctive relief yet, claims no ability

to remove him from the system. In a genuine threat scenario, companies act swiftly and

specifically, often involving law enforcement to mitigate risk. Yet, the Plaintiff's actions were

vague, delayed, and lacked the urgency or specifics one would expect in a true security crisis.

## F    Lack of Motivation

112     Plaintiff offers no plausible explanation for why Dillon-Capps would seize control of the

system. Typically, such actions come with demands—ransom, monetary, or otherwise. Here,

after four years of service, there's no claim of a demand or even a stated motive for Dillon-Capps to harm the company. It defies logic that someone would take control of critical systems without any stated reason, and then take no immediate action.

## G  Implausible Case Structure

113    Plaintiff's case suggests that for nearly a month, Dillon-Capps held their system "hostage" with no demands or actions, yet they did not ask him for any explanation. Only after suspending him, they seek injunctive relief, asking the court to essentially reiterate their previous requests rather than seeking immediate intervention to remove their ability to access the system. There's no mention of police involvement, and the relief sought doesn't align with the behavior of a company truly facing an internal systems threat.

114    Additionally, the Plaintiff eventually sought contempt orders, demanding a $2,500-per-day fine. If Dillon-Capps is the kind of risk they describe, why would they believe financial penalties, or even incarceration, would deter him from retaliating by destroying their systems? Their logic—that stripping someone of all financial resources and then imprisoning them would not provoke further harm—simply doesn't hold up.

115    Furthermore, a law firm that is not advocating for direct intervention to seize the technological means necessary to cause harm demonstrates that neither Ohana Growth Partners nor Miles & Stockbridge ever saw Ryan Dillon-Capps as a risk.  Showing that Miles & Stockbridge knew from the moment they filed the lawsuit that it was born from a false pretense and contains perjured affidavits.

## H  No Notice

116     **Email Address on Certificate of Notice**: The **Certificate of Notice** indicates that notification was sent to **ryan.dilloncapps@ohanagp.com**. However, this is problematic given the suspension.

117     **Suspension Prohibits System Access**: The **suspension email** sent to **Dillon-Capps** specifically states that they are prohibited from accessing their systems. This raises serious doubt about whether notice could have been received, as **email services** are part of the systems that were restricted due to the suspension.

118     **Association of Email and Systems**: The **complaint** and supporting **affidavits** tie together the concepts of system access and email:

    1.      **Richard Hartman's Affidavit** (paragraphs 3 and 4) makes it clear that access to the email system is part of the work systems affected by the suspension.

    2.      It is common knowledge that **Microsoft 365**, which likely includes work email, is a system typically inclusive of email services. Given this, it is reasonable to infer that suspending access to work systems means suspending access to email as well.

119     **Court Record and Lack of E-Service**: The **court records** also show that no e-service was used before the defendant **Dillon-Capps** added their own e-service to the record. The following filing details support this:

    o       **Envelope for the proposed order of contempt** (No. 17004733), filed on **June 27, 2024, at 10:48 AM**, shows that both **Ryan Wagner** and **Ryan Dillon Capps** are listed as parties with **no e-service** available on page 2.

120     Thus, the combination of the suspension preventing access to work-related email systems and the lack of e-service notice in court records provides a compelling basis for believing that no effective notice was provided to **Dillon-Capps**. This raises significant due process concerns about the validity of any subsequent court actions taken under the assumption that notice had been properly served.

### I     Conflicting Information on Material Facts

121     Conflicting information in the affidavits on material facts like who is responsible for the demand issued at 9:01 AM.

> 1.     Richard Hartman stating it was his demand, and the exhibit he presents saying Glenn Norris ordered the demand
>
> 2.     Justin Drummond stating that he is responsible, and he directed Richard Hartman' actions.

### J     Evidence Contradicts Claim of Refusal

122     No supporting evidence showing any refusal, and the evidence submitted shows compliance with the request.

### K     Plaintiff says the lawsuit is retaliation

123     Submitted evidence sufficiently shows the Defendant has met their prima facia element to have notified them, which could have occurred afterwards – but occurring beforehand makes it retaliation too.

124     Richard Hartman's affidavit and suspension letter says this is retaliation connected to FMLA but is worded as why he believes they are allowed to violate FMLA, and then stating that

because the Defendant didn't work instead of taking FMLA leave is the basis of the suspension. They admitted to retaliation for taking FMLA leave as the premise of the lawsuit. When this issue was raised by the Defendant as part of 3 reasons for dismissal because of judicial priority of the federal government they were prohibited from arguing any point related to FMLA leave by Judge Michael

125     The burden of harm is excessively in favor of the Ex Parte and the issuance of the TRO is evidence that Miles & Stockbridge failed in their ethical Ex Parte duties. The Court upon reviewing what was filed and what was being argued did not align to meet the ethical ex parte duties which should have incurred additional scrutiny and suspicion raising the bar to meet.

126     The lead document, employment agreement jumps numbers, and the court should have rejected it when filed, but in court while arguing for the Ex Parte TRO this should have been a cause for dismissal of the case. Allowing them to refile with a complete agreement to base their entire claim that there was a violation of said agreement, but no TRO for June 17th, 2024, nor any other verdict in their favor until it is because it is still the agreement used despite protest and motions.

127     Hyperlinks are considered to not be part of any court record when they reference something not in the court record. Affidavits then supporting documents are using the same hyperlink to a Microsoft website to be the basis for arguing why they believe a technical fact to be true. If a hyperlink is prohibited from being on the record and it is in required documents like the memorandum and affidavit and is supporting a material fact to establish the necessity for their claim. Then the documents need to be redone and refiled in the same way that a motion to strike a portion of a document would result in the document being refilled to prevent it from

corrupting the proceedings with inadmissible portions of the document on the record. Since it can't ever be on the record, then you can't ever truly cite it or rely on it and it's an invalid source to establish a fact or claim. For the TRO this too should have been a dismissal of the case since they do not have a valid memorandum and Richard Hartman's affidavit contains the agreement and email. The agreement is the foundation of their claim. They are all still present and "on the record" despite protest and motions.

## IX  JUNE 26, 2024: HEARING TO SHOW CAUSE AND PRELIMINARY INUNCTION

128    The evidence strongly supported that the defendant Ryan Dillon-Capps and unattached Daren Koritzka were the victims of retaliation for use of Dillon-Capps using and asserting their right to use FMLA. Both protected acts

129    Dillon-Capps has met their prima facia requirement that on June 13th the use of FMLA had been requested and the Plaintiff was aware of this before they violated it to demand that they work. The prima facia requirement must now be met by Ohana to explain how their actions were not a violation of FMLA. Not that they were burdened and had an excuse, but how it was not a violation of FMLA.

    1.    No evidence of there being a refusal.
    2.    All evidence shows efforts to satisfy are exclusively being made by the Defendant, and this includes the evidence submitted by the Plaintiff.
    3.    Richard Hartman claims two different versions of who is responsible for the email at 9:01 AM. Justin Drummond claims a third version of who is responsible for the email at 9:01 AM.
    4.    Richard Hartman has interfered with Dillon-Capps FMLA rights previously and did so without others that work with him knowing.

130    Those are the facts that don't aid the Plaintiff, they act as a record for ruling against the Plaintiff, and yet the ruling record does not reflect this.

## A  June 26th, 2024 - Motions to Dismiss for Federal Jurisdiction

131    Motions to Dismiss Based on Federal Jurisdiction: On June 26th, 2024, in open court, Dillon-Capps made Motions to Dismiss challenging the court's jurisdiction, citing federal government priority for three distinct reasons:

132    FMLA: The Family and Medical Leave Act (FMLA), a federal law, takes precedence as it provides for protected leave, which Dillon-Capps invoked. This should have been recognized as a matter under federal jurisdiction.

133    ADA: The Americans with Disabilities Act (ADA), which mandates reasonable accommodations, including leave for individuals with disabilities, also implicates federal law. Dillon-Capps argued that the ADA's protections were not being upheld.

134    FTC and PCI Compliance: Citing FTC v. Wyndham (relating to Wyndham's failure to implement adequate security practices), Dillon-Capps contended that the Federal Trade Commission (FTC) had jurisdiction over the matter due to alleged violations of Payment Card Industry Data Security Standard (PCI DSS v4) compliance requirements, specifically around account management and least-privilege permissions – court opinion of FTC v Wyndham says they are held responsible for their failure to do the same.  Judge Barranco stated in open court that he found the court opinion but did not understand how account access being poorly granted in that case had any merit in a claim where the Plaintiff wanted access granted to them without any adherence to restricting access in the same manner that court ruled against Wyndham for not doing.

**135**    Dillon-Capps was preventing form presenting a full argument which included additional court cases and **Maryland Personal Information Protection Act (PIPA), Md. Code Ann.,**

**Com. Law § 14-3503(a).** The mechanism to preventing unauthorized access, use, modification, or disclosure is more commonly known as account management. The act of restricting access to prevent unauthorized access, use, modification, or disclosure is more commonly known as least privilege. In layman terms, you grant access for only what is justified by the job and duties they have, and in doing so you prevent them from accessing things to which they do not have a justifiable reason to be accessing.

**136** Judge Michael Barranco acted outside of Judicial discretion in his rulings and actions which he believed were actions necessary to help Ohana Growth Partners and Miles & Stockbridge obtain access. It does not change material facts that his intentions were to help someone violate Maryland Criminal Law. This is an attempt to violate **Md. Code Ann., Com. Law § 14-3503(a)** because at no point during the lawsuit has Ohana Growth Partners or Miles & Stockbridge ever provided a response to the question "what is the access for". What if the access was being used to delete evidence associated with the accounting irregularities that were reported on October 16, 2024?

### B  Court's Denial and Refusal to Hear Arguments:

137 The court **denied** the motion relating to **FTC v. Wyndham** (#3) and **refused to hear arguments** for the **FMLA** and **ADA** motions (#1 and #2). The judge also **prohibited further discussion** of FMLA or ADA rights violations, effectively limiting the scope of arguments that Dillon-Capps could raise in court.

### X  JUNE 27TH: HEARING DAY 2

138     **Contempt Orders and Judicial Overreach**: In this case, **Judge Barranco** imposed a **$2,500 per day contempt charge** based on **conflicting court orders** that the Petitioner could not possibly comply with, further compounding the harm. The orders effectively stated, "do not do it" and "do it," creating an impossible situation in which compliance with both directives was impossible, and yet failure to comply subjected the Petitioner to severe daily fines. When attempting to seek relief or clarification, the Petitioner was met with immediate resistance:

139     **Motion for Continuance**: Upon speaking just **four words**, the Petitioner's motion for continuance was denied by **Judge Barranco**, who cut off further argument.

140     **Prohibition on Cross-Examination**: The Petitioner was prohibited from effectively cross-examining the Respondents' expert witness, despite significant contradictions in the expert's affidavit versus the court record. After merely prompting the expert with a question, **Judge Barranco** interrupted the process and began **direct questioning** of the Petitioner, cutting off cross-examination entirely.

141     **Disability Dismissal**: Judge Barranco opined that **Dillon-Capps was not "disabled enough"** to qualify for accommodations in his courtroom or from his ruling discretion, dismissing any further conversation about ADA rights violations. This ruling directly contradicts federal protections under the **Americans with Disabilities Act** (ADA), which clearly covers individuals with recognized disabilities like **PTSD** and **catatonia**.  The Plaintiff's had already affirmed in their statements and fillings that Dillon-Capps was receiving ADA accommodations and approved for FMLA leave, and the Defendant had provided additional supporting evidence, and the Defendant's spouse testified to the same.

142     **The Case Timeline and Continuation of Harm**: From the initiation of the case on **June**

**14th, 2024**, to **June 27th, 2024** (13 days), it was already clear that the Petitioner had a strong

defense. By **June 18th, 2024**, the case had been **effectively won** by the Petitioner based on the

evidence presented. Yet, the legal process has dragged on with orders designed to impose

**financial penalties** and **emotional stress** on the Defendant, all while important judicial rights,

such as the right to **cross-examination**, **proper defense**, to even have a particularized harm and

specified cause and effect relationship to which they can argue against.  Every order presented

with more and more evidence contradicting Plaintiff's false claims and reinforcing the facts that

the lawsuit is fraudulent, and a retaliation have all been **denied.** Averaging weeks for a ruling.

While the Plaintiff and Attorney, co-conspirators, are obtaining rulings that average less than 48

hours.  Less time than it took to get the Motion for Sanctions entered onto the Docket.

143     Now, on **September 30th, 2024**, more than three months later, the **Defense questions**

**the necessity to continue** in a case that continues to grow more problematic for **Ohana Growth**

**Partners** and **Miles & Stockbridge**. This is especially troubling when viewed in light of **Judge**

**Keith Truffer's** previously stated opinions on evaluating attorney misconduct.

## XI   JUDGE TRUFFER: EVALUATING ATTORNEY MISCONDUCT

144     **Honorable Judge Keith R. Truffer** articulated important criteria for evaluating attorney

misconduct while serving in the **Attorney Grievance Commission of Maryland v. Steinhorn**

**(2018)**. These factors, which align with the principles of **legal ethics**, should guide the court in

evaluating the actions of **Miles & Stockbridge**:

### A   Credibility of the Attorney:

The credibility of **Miles & Stockbridge** has been severely undermined by their repeated failure to separate themselves from the wrongdoing perpetrated by **Ohana Growth Partners**. They have knowingly pursued **fraudulent actions** and made no effort to clarify or correct their involvement, which reflects a lack of ethical and trustworthy conduct.

## B   Intent to Deceive:

There is overwhelming evidence, beyond a reasonable doubt, that the law firm acted with **intent to deceive** or deliberately obfuscated critical facts in this matter. Their actions have consistently misled the court and harmed the defendant.

## C   Personal Benefit:

145    The firm operated under a **conflict of interest**, attempting to protect one of their principal attorneys from facing minor ethical issues while exposing the firm to larger concerns of **negligence** and **malpractice**. These actions went far beyond the bounds of **zealous advocacy** and were motivated by internal risks rather than legitimate representation of **Ohana Growth Partners**.

## D   Existence or Absence of Harm:

146    The actions of **Miles & Stockbridge** have caused **permanent harm** to **Dillon-Capps**, including the onset of **catatonia**, a life-threatening condition. While the firm may not have intended this specific outcome, their willful actions to deprive the defendant of **employment**, **financial security**, and **medical coverage** demonstrate **wanton disregard for human life**. Courts have established that intentional harm cannot be excused simply because the **specific harm** was not foreseen (Taylor v. State, 346 Md. 452, 697 A.2d 462 (1997); Alston v. Forsythe,

226 Md. 121, 172 A.2d 474 (1961)). Their actions constitute **reckless endangerment** under **Md. Code, Criminal Law § 3-204**. We argue this is a case of **civil conspiracy** and **tortious interference** with the defendant's employment, and the deprivation of **insurance coverage** constitutes **economic duress** and **constructive fraud**.

## E   Remorse and Corrective Action of Wrongdoing:

147     Despite numerous attempts to provide **Miles & Stockbridge** with opportunities to correct their course, they have shown no remorse. Instead, they have intensified their efforts to pursue a **fraudulent lawsuit**, demonstrating their intention to harm. This continued pursuit directly contradicts any potential claim of remorse.

## F   Application to Miles & Stockbridge

148     The application of Judge **Truffer's criteria** to **Miles & Stockbridge** confirms the severity of their misconduct. Their lack of credibility, clear intent to deceive, and disregard for the harm caused to the defendant all point to unethical behavior. The firm's ongoing refusal to correct their actions necessitates judicial intervention.

## G   Conclusion

149     **Disqualification** of **Miles & Stockbridge** is not a punitive measure but a necessary step to **protect Ohana Growth Partners** from incurring further liability and to prevent continued harm to **Dillon-Capps**. It is essential to preserve the **sanctity of the law** and the **public's trust** in the judicial system. Disqualification also serves to safeguard the court's resources from being wasted on a case driven by **fraudulent motives**.

150     Furthermore, there is a need for a mechanism to protect **junior attorneys** within the firm, who may be placed in compromising positions that require them to challenge senior partners or principals. **Judges**, as the adjudicators of legal matters, must uphold the law in a way that instills public confidence in the fairness and integrity of the judiciary.

151     Their position of honor we rise for is representational of the trust and power given to them so that one day when we are in a court room we will be just as safe as their family would be in that same room.

"We are Baltimore County residents ourselves; our families live here. We want to make sure that the people who appear before us are just as safe as we want our families to be." – Judge Marc A DeSimone Jr. (source afro.com)

## XII   NECESSITY FOR URGENCY & RELIEF

### A   Financial Hardship:

152     The ongoing litigation has created a **severe financial strain** that may lead to **defaulting on financial obligations**, which no court can later undo. The loss of financial stability and potential damage to credit and personal financial reputation cannot be compensated by monetary damages after the fact. Courts recognize that financial hardship resulting from legal delays can cause **irreparable harm**, especially when the defendant's livelihood is directly impacted.

### B   Permanent Psychological and Physical Harm:

153     The psychological trauma inflicted by the plaintiff's actions has already resulted in **permanent harm**, including **catatonia**, a life-threatening condition. The triggering event occurred following prolonged mental anguish, culminating in a breakdown on the night of **June 17, 2024**, as discussed in **Caroline Dillon-Dillon's affidavit**. Enduring eight months of

harassment, followed by a calculated psychological manipulation led by **Justin Drummond**, resulted in a **mental breakdown**, further exacerbating pre-existing **PTSD**.

154     The symptoms of **catatonia** are severe and pose a real threat of **unexpected death**, making this condition not only psychologically harmful but potentially fatal. Courts have consistently held that **mental health injuries** causing long-lasting or permanent effects, particularly life-threatening conditions, warrant immediate judicial intervention. The inability of any subsequent court ruling to reverse these psychological and physical effects necessitates swift action.

## C     Impact on Others:

155     In addition to the personal harm, there is a significant **burden of care** placed on you for your **elderly mother**, **disabled brother**, and **wife**, who suffers from **cerebral palsy**. These individuals rely heavily on you for emotional, financial, and physical support. Any further degradation of your health or financial standing will have a **cascading effect** on their well-being. The ongoing harm inflicted by the plaintiff's baseless legal actions threatens not only Dillon-Capps but those who are vulnerable and depend on them.

## D     Public Interest Section for Prohibitory Mandamus:

156     This case not only involves personal harm but also raises **significant public interest concerns**. The improper granting of a premature default order under **Md. Rule 2-613** undermines public confidence in the **judicial system's integrity**. When legal processes are manipulated, or rules are ignored, it erodes the public's trust that courts will fairly adjudicate disputes according to established procedures.

157     Furthermore, pursuing claims based on **fraudulent pretenses**, as demonstrated by the false allegations and misrepresentations made in this case, contributes to a broader harm. **Md. Rule 19-303.1** governs ethical conduct in legal practice, and lawyers are obligated to avoid advancing claims lacking legal or factual basis. The legal profession exists to protect the public by ensuring that justice is served, and when a firm knowingly supports a fraudulent claim, it undermines the core principles of **legal ethics** and the **rule of law**.

158     Failure to address these injustices not only harms the individuals involved but also deters others from seeking legal redress. Members of the public may lose confidence in the court system, fearing that **fraudulent lawsuits** could unjustly target them without consequence, particularly if they believe that wealthier entities have the ability to manipulate legal processes.

159     As noted in **Rule 1-201**, the rules of procedure are meant to ensure **fairness** and the **elimination of unjustifiable delay or expense**. Allowing such practices to continue unchecked compromises public faith in the courts and diminishes the very fabric of the legal system. It is in the public interest that courts act swiftly to correct such abuses, ensuring that the judiciary remains a place where justice is dispensed impartially.

## E   Conclusion

160     The issuance of the premature default order not only violated procedural rules but also threatens **irreparable harm** to both the defendant and the broader public interest. Upholding **due process** and preserving **public trust** in the judiciary are paramount.  Immediate action is necessary to prevent the finalization of an order that contravenes the very principles of fairness and integrity enshrined in the **Maryland Rules**. Allowing this order to stand would not only

harm the defendant but also undermine public confidence in the courts, encouraging the misuse of legal processes for fraudulent purposes.

161    Similarly, perpetuating harm upon Dillon-Capps and allowing a fraudulent case filed for the purpose of harming the Defendant needs to immediately rule on to Dismiss with prejudice and proposed order attached to the Motion for Sanctions provides the means to do this with one small addition. Dillon-Capps has been forced to perform the duties of expert and attorney against a law firm with 3 separate principles and associates in opposition, and doing so while they are operating at less than one third total capacity as a direct result of the harm inflicted upon them.

162    The Defense argues that while Dillon-Capps doesn't have a formal bill of attorney fees to present that Ohana Growth Partners and Miles & Stockbridge do, and those expenses are a fair reflection of the cost to litigate this case for either party.  Therefore, the court should append to the proposed order recovery include the equitable costs because Dillon-Capps acting as attorney and acting as expert witness is not free. Demonstrating that at a fraction of capacity their worth as both is demonstratively deserving of a significantly higher rate than a band 2 firm, and accepting of the lower value equal to their costs is to speed up resolving that portion of outstanding costs.  It is having been an assumption of the Court, Opposing Counsel, and Plaintiff, to which no assertions are made herein, that Dillon-Capps is a layman in either regard.

163    We ask that this court promptly correct these violations and protect the public's trust in a judicial system that adheres to **fairness, ethical conduct**, and the **rule of law**.

## RESPECTFULLY SUBMITTED

October 1, 2024                           /s/ Ryan Dillon-Capps

Ryan Dillon-Capps (Pro Se)
Email : ryan@mxt3.com
1334 Maple Avenue
Essex, Maryland 21221
Telephone: (703) 303-1113


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 1, 2024, a copy of **Motion to Assert Rights and Request**

**Immediate Rulings** via email to rbrennen@milesstockbridge.com and served on via first-class mail,

postage prepaid on:


Robert S. Brennen
Miles & Stockbridge P.C.
100 Light Street
Baltimore, Maryland 21202


/s/Ryan Dillon-Capps
Ryan Dillon-Capps (Pro Se)

| OHANA GROWTH PARTNERS, LLC | IN THE |
| --- | --- |
| Plaintiff, | CIRCUIT COURT |
| | FOR |
| vs. | BALTIMORE COUNTY |
| **RYAN DILLON-CAPPS** | CASE NO: C-03-CV-24- |
| Defendant. | 002264 |

## AFFIDAVIT FOR SANCTIONS

I, Ryan Dillon-Capps, being over the age of eighteen (18) and competent to testify, and having personal knowledge of the facts contained herein, state as follows:

1    On **June 7, 2024**, I reached an agreement with **Justin Drummond**, **President** of **Ohana Growth Partners**, wherein I would provide access to an account with **Global Administrator** privileges. The accord resolved the Plaintiff's request for access, and Justin Drummond agreed to satisfy the agreement on Monday and Tuesday, June 10-11, 2024.

2    Contrary to our agreement, Justin Drummond did not facilitate the fulfillment of our accord. Despite my repeated follow-ups, he delayed the process, leading me to believe that the agreement would be satisfied the following week. Ohana Growth Partners has since filed this lawsuit, alleging that I refused to cooperate—a claim that contradicts the facts of our prior agreement.

3    **Miles & Stockbridge**, counsel for **Ohana Growth Partners**, is aware of the agreement made on **June 7, 2024**, and the fact that Ohana Growth Partners failed to fulfill their obligations.

Affidavit for Sanctions
& Exhibits 1-5

Exhibit 107

This is evidenced by documents submitted in my defense filings, which clearly demonstrate that I was not at fault for the lack of access to the account. Despite this, **Miles & Stockbridge** continues to support these false claims by **Ohana Growth Partners**.

4 Without providing me with proper notice, **Miles & Stockbridge** obtained a **Temporary Restraining Order (TRO)** then filed for enforcement with a show cause order. Misleading the court, the law firm claimed that show cause hearings had a 10 day scheduling requirement while arguing that due process should be violated in the name of justice to reduce it further to 5 days and with the 2 day delay to be notified provide 3 days' notice to show cause on a fraudulently obtained TRO on a fraudulent lawsuit. The rule should have provided a prehearing conference and then a minimum of 20 days, not 3.

5 On **July 2, 2024**, I requested **Miles & Stockbridge**, counsel for **Ohana Growth Partners**, to provide a transcript of the hearing held on **June 26, 2024**. In response, they stated that they would only release the transcript after receiving **$12,500**, a sum related to **fraudulently obtained contempt charges**. This sum has no legitimate basis, as the contempt charges were improperly secured through misrepresentation.

6 By conditioning the release of the court transcript on payment of money tied to fraudulent charges, **Miles & Stockbridge** deliberately obstructed my access to crucial evidence necessary for defending against the claims in this case. Their refusal to provide the transcript until payment is made has directly impaired my ability to fairly litigate this matter. This conduct violates the rules of professional conduct governing fairness and obstructs the judicial process, causing significant prejudice to my defense.

7 I believe **Miles & Stockbridge's** actions are unethical and amount to intentional obstruction of evidence, which has prevented me from presenting my case and has delayed

justice in this matter. Their refusal to comply with a reasonable request for evidence not only violates procedural norms but also demonstrates bad faith in these proceedings.

8       The Temporary Restraining Order (TRO) was obtained using an email address that I was not permitted to access. The complaint included a suspension notice indicating that I was prohibited from accessing certain systems, including email. This raises questions about the methods used to provide notice and the accuracy of the claims made in the lawsuit. It seems unreasonable to expect me to access a prohibited system to receive notice. Additionally, there is no valid argument to be made that they did not know what they were filing and serves to demonstrate collusion establishing they are co-conspirators in defrauding the court.

9       They have argued that they provided a valid notice, and I point out that this case is based on their necessity to obtain injunctive relief, and recently have argued to the court that I had used the email the night before and strongly inferring that I had a choice, and my choice was to not be notified. Miles & Stockbridge made the same argument on compliance with conflicting orders that demanded I access and make changes in a system that the same order was including a prohibition to do either of those things. There is no way that I could have been notified or complied with without incurring defiance given the restrictions imposed upon me.

10      Despite raising issue with the wording in the order, I was a daily fine of $2500 and neither Ohana nor Miles and Stockbridge took issue with this.  Instead, they updated the order to change the named entity from those at Hartman Executive Advisor to Randall Romes.

11      This informed me that the daily rate for someone perpetuating a false narrative was the going rate because that is the messaging provided to me by the Judge.  I also learned that Hartman Executive Advisors was not currently involved and can deduce this contrary to the affidavit because

1. There is no reason for the co-conspirators to change who is receiving access unless they not involved which is in direct contradiction to Daniel Lavette's Affidavit that says he was involved the entire time.
2. After the Affidavit Ohana quickly obtains access to a Global Admin account with the assistance of another administrator,
3. This means that the claim to have no other admins and to have no access to an account with the Global Admin are both false claims.
4. If access was obtained quickly after the Affidavit saying they were involved the entire time, then why didn't they do it sooner?

12     Based on the documented evidence where they replied on coercive threats to compel me to do something unlawful. I don't make a claim, but offer the observation that people are predictable and have clearly definable patterns.  Justin Drummond suddenly had a vacation the week in March and June where they tried and then did take adverse action against me. Communications involving accusing Holly Butler are followed by the March and June plans to take adverse action against me.  Richard Hartman targeted Darren Koritzka for writeup and then leave of absence in March and then after the email at 2:05 in June.  I reported the action to Justin Drummond in March and then HR closed the investigation. The request for attorney information resulted in HR closing the Fraud investigation in June.  Glenn Norris signed a contract with HEA and Glenn Norris has demonstrated that when he doesn't get what he wants the resolution can include coercive threat, and this is why I didn't name HEA as there is evidence that suggests to me that they lie in their Affidavit out of duress.

13     When monetary damages are awarded, I believe that Ohana Growth Partners and Miles & Stockbridge are both independently and as co-conspirators responsible for perpetuating the false narrative of this case from June 14, 2024, until the day they cease with perpetuating the false narrative.  Considering what they both accepted as a reasonable daily rate for what the judge determined was me perpetuating the false narrative that I was choosing not to comply.  I submit that this be the amount of relief assigned again. I also point out that Miles and Stockbridge and

Ohana Growth Partners gave up a defense against this number being used when they thought it was a good number to assign, and if there had been two of me then the court ruling would have been no different in the assignment of cost being per person as the wording is that it was assigned by the individuals choice. I had no choice as the order was impossible to comply without defying the order, but they do and they have no excuse for choosing to continue with their course of action.

14    Until then the Plaintiff and **Miles & Stockbridge** are continuing to engage in actions designed to harass me and prolong this litigation unnecessarily. Their repeated filings rely on the same misrepresentations and false narratives, wasting both judicial resources and my time. They continue to file oppositions that rehash the same arguments without addressing their lack of a claim, lack of particular harm, lack of explanation how I was a risk, or even acknowledging the factual inaccuracies that have already been pointed out because they can only hope that they convince the court one more time to ignore the substantive purpose and meaning of the law and manipulate the court into one final signature that they will leverage to avoid a judicial review of their unlawful and unethical activities.

15    Their latest opposition ignores what they filed and how this case is structured as an injunction. The motion to vacate was a joint filing to vacate both the TRO and the show cause order attached to it, as the TRO and preliminary injunction are central to the Plaintiff's complaint. Miles & Stockbridge's filing is essentially enforcing the Plaintiff's complaint.

16    The purpose of Md. R. Civ. P. Cir. Ct. 2-322 is to raise legal issues early in litigation, allowing Defendants to challenge vague or baseless claims. Rule 2-322 is rooted in fairness, aiming to prevent Defendants from being burdened by flawed cases. Inspired by Fed. R. Civ. P. 12, Rule 2-322 addresses motions that can be resolved without a trial on the merits.

Exhibit 107

17 Maryland Rule 2-322 is specifically designed to address issues the court can determine without a trial on the merits. Some of these must be raised before an answer is filed, while others prefer to be addressed early. The rules penalize or prohibit certain actions to encourage proper completion of preliminary matters before moving to an answer and adding additional pleadings.

18 The Plaintiff and their counsel have consistently misused procedural rules throughout this litigation. Claiming it was in for justice to violate due process under false pretense and misleading the court to what the scheduling rules are. However, now they want to separate the words from the context and purpose to which they exist.

19 The Partners at Miles & Stockbridge have had my personal phone number and email address since **December 2023** when I emailed them seeking legal assistance on the same issues that ultimately brought us here today, and **Steven Frenkel** responded to my inquiry. Therefore, **Holly Butler, Steven Frenkel**, and **Robert Brennen** all had access to my personal phone number and email address 6 months before they chose to not use it. Steven Frenkel has been unofficially joined to this case the entire time as seen in the very first email messages exchanged, and Holly Buttler almost met her ethical requirements in saying that she worked for Ohana.

20 However, she failed to say that Ohana had an adverse position to me, an unrepresented person to which she was saying her involvement was to perform a fraud investigation. An investigation that never once utilized the department resources to gain access to the data in the legal hold that had been secured for the purpose of aiding the 3rd party investigator

21 They choose not to investigate as they claimed was their purpose, and they choose to use an invalid contact method, and they choose to mislead the court with a fraudulent email thread, and they choose to mislead the court on the statute, and they are choosing now to mislead the

court by pretending preliminary motions are not for challenging the basis of their fraudulent

case, and are choosing to pursue a default order in a case lacking particularized harm.

22      The Plaintiff and **Miles & Stockbridge's** actions are a direct negative impact on my

ability to pursue litigation that does have merit and is not based on a false narrative to avoid

being held accountable. Their refusal to honor the original agreement, combined with their

continued presentation of false evidence is placing undue financial burden on me and inflicting

emotional harm against a person who just wanted to use their FMLA leave so they could focus

on their mental health.

23      Instead, I now have new symptoms and the daily panic attacks that last for hours pale in

comparison to the moment where I realize I don't know where I am and don't know how I got

here or what is going on. I have been referred to have more comprehensive treatment which may

include inpatient treatment for an unforeseeable time, and I can't do that because of this case.  I

can't do that because I am supporting my elderly and disabled mother, disabled brother, my wife,

and myself.  I can't do that because I am not the only victim in this case and Darren Koritzka has

been terminated, Ohana has expressed their intentions to remove Ann Pinera, and they hold over

the head of Cielo IT, their help desk, a note where their actions and previous statements suggest

that they are eager to demand that note for no other purpose then to hurt Cielo IT.

24      The act of doing so may end the organization, and it should be known that Cielo IT

current situation is not entirely of their own accord as their reputation was targeted and damaged

and if they are to fall then they do so with sufficient reason to establish a claim by the actions of

those also involved in other unlawful and suspicious activities. The manipulation of the court

process is prolonging justice and preventing me seeking justice for irrevocably changing my life

for the worse because they didn't want to negotiate and address my concerns to prevent

retaliation on others and provide assurances that I wasn't going to have problems from others illegal activities later. It also prevents satisfaction of the other victims both those who know and those who are unaware.

25    Given **Robert Brennen's** litigation history, where his defense strategy is to **minimize damages by attacking the merits of the case**, it is notable when he **fails or avoids arguing the merits** in this instance. In prior cases, such as **Streeter v. Walden University LLC**, where his defense successfully led to a dismissal based on procedural grounds, and in **Claudio De Simone v. Alfasigma USA, Inc.**, where complex business interests were defended, Brennen's typical approach is to robustly contest the substantive claims to avoid large damage awards. This shift in strategy, where he avoids addressing the merits, should be considered as a failure to uphold his usual defense practices and reflects greater culpability.

26    As such, a **2x multiplier** for liquidated damages is appropriate in this case. This multiplier not only compensates for the harm caused by the plaintiff's actions but also acknowledges the deviation from their typical strategy, suggesting a greater underlying fault. By avoiding the merits of the case, Brennen implicitly concedes the validity of the claims, warranting enhanced damages to account for this behavior.

27    From the outset of this case, I expressed **disbelief** that it had even been filed, and I have repeatedly given **both parties** ample notice that **sanctions** would be sought. I have consistently encouraged the Plaintiff to **end this fraudulent lawsuit**, offered to engage in **discussions** to resolve the matter, and requested **negotiations**. Despite these efforts, the Plaintiff and their counsel have continued to pursue this case with **intentional disregard**, even though they are fully aware that the case is **founded on fraud**. The removal of the **show cause order** without ever presenting **particularized harm** or establishing any **cause-and-effect relationship** to

support their claims further demonstrates that this case has always been a **pretense**. It is evident that the Plaintiff has used the **Court** not as a means for evading justice but as a tool to **inflict harm upon me** and **damage my reputation.**

28      To **Miles & Stockbridge** and **Ohana Growth Partners**, the **Baltimore County Circuit Court** has become a **carelessly wielded tool** in their effort to harm others, with no regard for the impact of their actions on those they have **misled**. They have **leveraged their law firm's longstanding reputation** and **personal relationships** to manipulate the Court and show **disregard** for the **institution**, the **judicial body**, and the **individuals** they have **targeted**. This is not just about harming me; it reflects their broader disregard for the integrity of the judicial system. I have delayed filing bar and criminal complaints of my own, hoping that others would take action to **counteract their misuse of power**. I sincerely apologize to the **Baltimore County Circuit Court** for being pulled into this **fraudulent situation**, and had it not been for the **mental breakdown** I suffered, I believe this case could have been resolved **before the first hearing**

29      Instead, this case has become an **unbelievable situation** where I, as a **pro se litigant**, have struggled to adequately explain the **material facts** of the case. Since **June 17th**, I have been severely hindered in finding legal representation. Even those who considered taking on my case were discouraged by the overwhelming complexity and **manipulated narrative** presented by the Plaintiff.

I am presenting the court with 5 new exhibits:

1) Email message to Miles & Stockbridge on 20240910 at 15:53 informing them of my intent to reply in opposition and reminding them of my prior offers to negotiate that are unanswered.

2) Email Message that contains the attachment presented as exhibit 3. Provided the email to show notice was delivered.

3) A "Final" attempt to end their baseless lawsuit and they do not reply to any of these.

4) Robert Brennen denying evidence until I meet his demands – obstruction

5) Steven Frenkel response in December with my email and phone number and also shows some of the issues that are the true cause for this lawsuit.

## DECLARATION OF AFFIRMATION

I SOLEMNLY DECLARE AND AFFIRM UNDER PENAL TIES OF PERJURY AND UPON PERSONAL KNOWLEDGE THAT THE CONTENTS OF THE FOREGOING PAPER AND EXHIBITS THERETO ARE TRUE.

September 27, 2024

s/ Ryan Dillon-Capps
Ryan Dillon-Capps (Pro Se)
Email: ryan@mxt3.com
1334 Maple Avenue
Essex, Maryland 21221
Telephone: (703) 303-1113

RESPECTFULLY SUBMITTED,

September 27, 2024

/s/ Ryan Dillon-Capps
Ryan Dillon-Capps (Pro Se)
Email: ryan@mxt3.com
1334 Maple Avenue
Essex, Maryland 21221
Telephone: (703) 303-1113

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on September 27, 2024, a copy of the **Affidavit for Sanctions** was sent via email to rbrennen@milesstockbridge.com and served on via first-class mail, postage prepaid on:

Robert S. Brennen

Miles & Stockbridge P.C.

100 Light Street

Baltimore, Maryland 21202

/s/Ryan Dillon-Capps_____
Ryan Dillon-Capps (Pro Se)

# EXHIBIT 1

 **Outlook**

**Re: Notification of Service for Case: C-03-CV-24-002264, Ohana Growth Partners, LLC vs. Ryan Dillon-Capps for filing Opposition, Envelope Number: 17940350**

**From** Ryan Wagner <ryan@mxt3.com>

**Date** Tue 2024-09-10 3:53 PM

**To** Edwards, Kimale J. <kjedwards@milesstockbridge.com>

**Cc** Brennen, Robert S. <RBRENNEN@milesstockbridge.com>; Duvall, Jessica L. <jduvall@milesstockbridge.com>; Frenkil, Steven D. <sfrenkil@milesstockbridge.com>; Rachel Kiefer <rachel.kiefer@mdcourts.gov>; Edwards, Kimale J. <kjedwards@milesstockbridge.com>; vklein@milesstockbridge.com <vklein@milesstockbridge.com>

Dear Kimale Edwards,

Thank you for your email. We have received the opposition to our motion to dismiss and are currently preparing our reply. As mandated by Rule 2-322(a), we are required to file our motions to dismiss before answering the complaint. Unfortunately, we have less control over the timing of these proceedings than Miles & Stockbridge and cannot obtain rulings within minutes or hours of filing.

Furthermore, neither Ohana nor Miles & Stockbridge has responded to negotiate. The only offer that was responded to occurred before the lawsuit and was accepted by Ohana's president. Regrettably, Ohana failed to honor that agreement and instead chose to file this lawsuit, representing to the court that no such agreement existed.

In our forthcoming reply, we will address the opposition and make it clear to the Court that this lawsuit represents an abusive use of the judicial process. Additionally, we must express our concern about Miles & Stockbridge representing Ohana in this matter, given that the firm has its own separate legal issues with the Defendant. We believe this constitutes a conflict of interest, and we formally request that your firm withdraw from this case. Should you choose to do so, we are willing to support the withdrawal and offer Ohana an extension to retain new legal counsel.

If you would like to discuss this matter further, please let us know your availability.

Sincerely,
Ryan Dillon-Capps

Exhibit 1

Affidavit of Sanctions

# EXHIBIT 2

 **Outlook**

---

**Immediate Action Required - Final Attempt to Resolve Critical Legal Issues**

---

**From** Ryan Wagner <ryan@mxt3.com>

**Date** Fri 2024-08-23 10:26 AM

**To** Brennen, Robert S. <rbrennen@milesstockbridge.com>; Edwards, Kimale J. <kjedwards@milesstockbridge.com>; Frenkil, Steven D. <sfrenkil@milesstockbridge.com>; Hoffberger, Victoria (Tory) <vhoffberger@milesstockbridge.com>

📎 1 attachments (127 KB)

Immediate Action Required - Final Attempt to Resolve Critical Legal Issues.pdf;

Please see the attached email.

Ryan Dillon-Capps
Pro Se Defendant
Email: ryan@mxt3.com | Phone: 703-303-1113

Exhibit 2
Affidavit of Sanctions

Affidavit for Sanctions
& Exhibits 1-5

Page # 15 of 28

Exhibit 107

# EXHIBIT 3

Ryan Dillon-Capps
Pro Se Defendant
Email: ryan@mxt3.com | Phone: 703-303-1113

**August 23, 2024**

**Mr. Robert Brennen**
**Miles & Stockbridge**
**100 Light Street**
**Baltimore, MD 21202**

**Subject:** Immediate Action Required - Final Attempt to Resolve Critical Legal Issues

---

**Dear Mr. Brennen,**

The time has come for you and your client, Ohana Growth Partners, to confront the serious consequences of your actions. The ongoing litigation, driven by both your counsel at Miles & Stockbridge and the leadership at Ohana, has not only failed to achieve its intended objectives but has also significantly increased your collective exposure to severe legal repercussions.

This lawsuit, built on a foundation of perjury, fraudulent notification practices, and egregious ethical failures—including the failure to perform ex parte duties—has already caused irreparable damage to your credibility. Your firm and your client now face substantial risks, including disqualification from this case, sanctions for perjury, and allegations of fraud and abuse of the judicial system. These actions are not only unethical but potentially criminal, and they will not go unchallenged.

The shared culpability between Ohana and Miles & Stockbridge is undeniable. The submission of false statements under oath, the calculated abuse of judicial processes, and the pursuit of a baseless legal strategy represent a collective effort to mislead and deceive. This collaboration in unethical practices has created significant liability, including potential civil fraud claims under regulatory scrutiny and criminal charges for obstruction of justice, mail and wire fraud, and conspiracy. Furthermore, these actions constitute serious ethical violations as outlined in the

Exhibit 3
Affidavit of Sanctions

Page **1** of **5**
This document is being sent via email and first-class mail on August 23, 2024.

Affidavit for Sanctions
& Exhibits 1-5                    Page # 17 of 28                    Exhibit 107

Maryland Rules of Professional Conduct, Rule 19-303.3 (Candor Toward the Tribunal), and other applicable legal standards.

Your continued pursuit of this case, rather than engaging in direct and honest negotiations with me, has only deepened these risks. The fraudulent notification practices you have employed, the deliberate submission of false filings, and the systemic efforts to undermine the integrity of this case are clear violations of both legal and ethical standards. These actions have exposed both your firm and your client to the very real possibility of punitive damages and severe legal sanctions.

It is important that you fully understand the severity of the situation you have created. The reckless and malicious actions taken by you and your client have not only introduced significant legal risks but have also placed my life in grave danger. As a direct result of the stress and psychological trauma caused by your actions, I have experienced severe dissociative episodes— an extremely serious psychological condition that, in rare cases, can lead to sudden death due to the body's inability to regulate itself. Should these actions result in such a fatal outcome, I will ensure that your firm and your client are pursued to the fullest extent of the law. Arrangements have already been made to secure funding and engage a highly proficient legal team to carry forward this action, backed by all necessary evidence and documentation.

Failure to comply with these demands or address the ongoing violations will compel me to file a Motion to Compel Discovery for any documents not yet provided, including the court transcripts and other critical evidence. I will also seek a Protective Order if any further attempts at harassment or retaliation are made against myself or those associated with this case. Additionally, a Motion for Sanctions will be filed to address your unethical conduct, and should ethical violations continue, I will have no choice but to file a formal complaint with the State Bar, seeking disciplinary action against those involved.

Exhibit 3
Affidavit of Sanctions

In addition to civil actions, I am prepared to pursue all available criminal remedies, including filing complaints for obstruction of justice, perjury, and fraud with both state and federal authorities. The ongoing fraudulent conduct in this case may also trigger regulatory investigations, and I will not hesitate to involve agencies such as the Securities and Exchange Commission (SEC) if the financial transactions involved are deemed suspect.

It is also critical to note that, while I am prepared to litigate this matter fully, this course of action would likely expose your firm and your client to extensive media coverage, further damaging your reputation. This is not a threat but a natural consequence of pursuing litigation that is rooted in misconduct and unethical practices.

---

**Key Immediate Actions Required**

**1. Extension of Answer Deadline:**

By 4 PM today, August 23, 2024, you must confirm an extension of the answer deadline until 15 days following the formal termination of negotiations. The request for default must be withdrawn immediately as a sign of good faith.

**2. Immediate Return of Compensation and Benefits:**

By September 1, 2024, all unpaid compensation, covering the period since June 13, 2024, must be included in my paycheck. Additionally, all benefits must be fully reinstated without delay.

**3. Payment Related to Refinancing Deal:**

My rightful share of the refinancing deal must be included in the September 1, 2024 paycheck, with no further attempts to delay or obstruct this payment.

Page **3** of **5**
This document is being sent via email and first-class mail on August 23, 2024.

Affidavit for Sanctions
& Exhibits 1-5

Page # 19 of 28

Exhibit 107

Exhibit 3
Affidavit of Sanctions

These actions are non-negotiable and must be completed by the specified dates to demonstrate a genuine willingness to resolve this matter. Failure to comply will be taken as a clear signal that Ohana and Miles & Stockbridge have no intention of resolving this issue amicably, forcing me to proceed with the next steps in litigation and potential criminal complaints.

---

**Additional Actions and Timeline**

As a sign of good faith and openness to resolve all issues quickly and allow all parties to move on, I also require the following:

• **Court Transcripts:**
Provide copies of all court transcripts currently in your possession by 4 PM today.

• **Employment and Contract Status:**

- **CieloIT:** The contract with CieloIT must remain intact throughout these negotiations.
- **Ann Pinera:** Ann Pinera's employment must remain secure and unchanged during these negotiations.

• **Disclosure of Agreements:**
Full disclosure of any agreements or documents provided to Ann Pinera, Darren Koritzka, or CieloIT since May 21, 2024, including their current status.

• **Prohibition Against Harassment or Retaliation:**
Cease any and all harassment or retaliation against me, Ann Pinera, Darren Koritzka, or CieloIT immediately.

Page **4** of **5**
This document is being sent via email and first-class mail on August 23, 2024.
Affidavit for Sanctions
& Exhibits 1-5
Page # 20 of 28
Exhibit 107

**• Privileged Log:**

Provide a comprehensive privilege log detailing any documents or communications withheld under claims of privilege.

---

**Last Chance to Resolve This Matter**

The consequences of your continued resistance are severe and will only escalate from this point forward. While I remain open to resolving this matter without further escalation, this is your final opportunity to engage in genuine and good faith negotiations. A failure to comply with the demands outlined in this email will leave me no choice but to finalize preparations for the next steps, which will include the initiation of further litigation and the pursuit of criminal complaints. Be assured, the repercussions of ignoring this final opportunity will be significant and unavoidable.

---

I expect your immediate attention to this matter and a formal response by 4 PM today confirming your compliance with these demands.

---

**Sincerely,**

**Ryan Dillon-Capps**
Pro Se Defendant
Email: ryan@mxt3.com
Phone: 703-303-1113

Page **5** of **5**
This document is being sent via email and first-class mail on August 23, 2024.

Affidavit for Sanctions
& Exhibits 1-5                    Page # 21 of 28                    Exhibit 107

Exhibit 3
Affidavit of Sanctions

# EXHIBIT 4

 **Outlook**

---

## Re: [EXTERNAL] REdwards, Kimale J. <kjedwards@MilesStockbridge.com>equest for Copy of Transcript

---

**From** Brennen, Robert S. <RBRENNEN@milesstockbridge.com>

**Date** Tue 2024-07-02 4:56 PM

**To** ryan@mxt3.com <ryan@mxt3.com>

**Cc** Edwards, Kimale J. <kjedwards@milesstockbridge.com>

---

The filings also show that you now owe Ohana $12,500 in fines. Have you paid any of that?

I think I can get authority to provide the transcript that Ohana paid for if you provide me the password for administrative control of Ohana's GoDaddy account, which Ohana also paid for.

Sent from my iPhone

> On Jul 2, 2024, at 16:18, Ryan Wagner <ryan@mxt3.com> wrote:
>
> [EXTERNAL]
>
> ---
>
> Thank you for the 27th. I show in the filings that there is one for the 26th. Do you have the one from the 26th?
>
> On Mon, Jul 1, 2024 at 8:27 AM Brennen, Robert S. <RBRENNEN@milesstockbridge.com> wrote:
>
>> As you requested.
>>
>>
>> <image001.png>   **Robert Brennen** | *Principal*
>>
>> Miles & Stockbridge
>>
>> direct: +1 (410) 385-3653
>>
>> ---
>>
>> **From:** Ryan Wagner <ryan@mxt3.com>
>> **Sent:** Friday, June 28, 2024 4:17 PM

Exhibit 4

Affidavit of Sanctions

**To:** Brennen, Robert S. <RBRENNEN@MilesStockbridge.com>; Edwards, Kimale J. <kjedwards@MilesStockbridge.com>

**Subject:** [EXTERNAL] Request for Copy of Transcript

**[EXTERNAL]**

---

@Brennen, Robert S.  @Edwards, Kimale J.  My wife said you asked for a transcript during court yesterday.  Do you have a transcript of any of the last two hearings?  Could you email them to me?

-RDC

---

Confidentiality Notice:

This e-mail, including any attachment(s), is intended for receipt and use by the intended addressee(s), and may contain confidential and privileged information. If you are not an intended recipient of this e-mail, you are hereby notified that any unauthorized use or distribution of this e-mail is strictly prohibited, and requested to delete this communication and its attachment(s) without making any copies thereof and to contact the sender of this e-mail immediately. Nothing contained in the body and/or header of this e-mail is intended as a signature or intended to bind the addressor or any person represented by the addressor to the terms of any agreement that may be the subject of this e-mail or its attachment(s), except where such intent is expressly indicated.

Any federal tax advice provided in this communication is not intended or written by the author to be used, and cannot be used by the recipient, for the purpose of avoiding penalties which may be imposed on the recipient by the IRS. Please contact the author if you would like to receive written advice in a format which complies with IRS rules and may be relied upon to avoid penalties.

---

Secure Upload/Download files click here.

Exhibit 4
Affidavit of Sanctions

# EXHIBIT 5

 Outlook

## Re: [EXTERNAL] Inquiry for Legal Assistance in Employment, Whistleblower, and Defamation Matters

**From** Frenkil, Steven D. <sfrenkil@milesstockbridge.com>

**Date** Wed 2023-12-20 5:12 PM

**To** ryan@mxt3.com <ryan@mxt3.com>

Dear Mr. Wagner -

I am in receipt of your email below sent to me earlier this afternoon.

There is a conflict of interest that prevents me and my law firm from representing you in this matter or in any matter.

I am compelled to bring to your attention that your unilateral communication of information to me without any reasonable expectation that I am willing to discuss the possibility of forming an attorney-client relationship with you means that you are not a prospective client of my law firm within the meaning of the applicable rules of professional conduct.

Very truly yours,

Steven D. Frenkil

*Principal*

100 Light Street | Baltimore, MD 21202
D: +1 410.385.3758 | C: +1 410.591.5705 | F: +1 410.773.9019

 MILES & STOCKBRIDGE

bio | vCard | sfrenkil@milesstockbridge.com | Upload Secure File



-----------------------------------------------

On Dec 20, 2023, at 2:28 PM, Ryan Wagner <ryan@mxt3.com> wrote:

**[EXTERNAL]**

I hope this letter finds you well. I am writing to seek your professional guidance and potential legal representation regarding a complex legal situation I am currently facing. After conducting research

Exhibit 5
Affidavit of Sanctions

and considering your expertise, I believe your assistance in matters related to employment law, whistleblower protections, and defamation may be invaluable.

Background:

I am the Vice President of IT at the largest privately held Planet Fitness franchise, and I have encountered various legal concerns that have impacted my professional reputation, mental health, and overall well-being. I am seeking legal advice to understand my rights, potential legal remedies and the best course of action moving forward.

Employment Law:

I have experienced distressing issues within my workplace, including instances of harassment, bullying, and a hostile work environment. These circumstances have created a challenging and uncomfortable work environment, affecting not only my professional life but also my well-being.

Whistleblower Protections:

Additionally, while performing duties and tasks directed by the CFO, I have uncovered fraudulent and altered information. This discovery has led me to believe that I may be entitled to whistleblower protections under the law. I am seeking guidance on the available legal safeguards to protect against retaliation and the potential avenues for pursuing justice.

Defamation:

The fabricated and altered information has had a detrimental impact on my reputation, both internally within the company and externally. I believe there may be grounds for a defamation claim, and I am interested in exploring the possibility of taking appropriate legal action to protect my reputation and seek remedies for the harm caused.

Request for Legal Assistance:

Given the complexity and sensitivity of my situation, I am reaching out to you for professional guidance and potential legal representation. I kindly request an initial consultation to discuss the details of my case and to evaluate the potential legal options available to me. I am prepared to provide you with the relevant information, documents, and evidence that I currently have parsed out during the consultation.

If you believe that your expertise aligns with my needs, I would greatly appreciate your assistance in navigating these legal matters. Alternatively, if you are unable to provide the specific legal services I require, I kindly ask for your guidance in directing me to another attorney who may be better suited to handle my case.

Exhibit 5
Affidavit of Sanctions

Confidentiality is of utmost importance to me, and I assure you that all information shared will be treated with the strictest confidence.

Thank you for considering my request. I look forward to the opportunity to discuss my case with you further and to potentially engage your legal services. Please let me know of your availability for an initial consultation at your earliest convenience. I have a meeting scheduled for tomorrow afternoon that could include retaliation for a recently filed HR complaint as well as retaliation against me for being a whistle-blower.

Should you require any additional information or have any questions, please do not hesitate to contact me. Thank you for your attention to this matter.

Respectfully,

Ryan Wagner
Mobile: 703-303-1113
1334 Maple Ave
Essex MD 21221

---

Confidentiality Notice:

This e-mail, including any attachment(s), is intended for receipt and use by the intended addressee(s), and may contain confidential and privileged information. If you are not an intended recipient of this e-mail, you are hereby notified that any unauthorized use or distribution of this e-mail is strictly prohibited, and requested to delete this communication and its attachment(s) without making any copies thereof and to contact the sender of this e-mail immediately. Nothing contained in the body and/or header of this e-mail is intended as a signature or intended to bind the addressor or any person represented by the addressor to the terms of any agreement that may be the subject of this e-mail or its attachment(s), except where such intent is expressly indicated.

Any federal tax advice provided in this communication is not intended or written by the author to be used, and cannot be used by the recipient, for the purpose of avoiding penalties which may be imposed on the recipient by the IRS. Please contact the author if you would like to receive written advice in a format which complies with IRS rules and may be relied upon to avoid penalties.

---

Secure Upload/Download files click here.

Exhibit 5
Affidavit of Sanctions

| OHANA GROWTH PARTNERS, LLC<br><br>*Plaintiff,*<br><br>vs.<br><br>**RYAN DILLON-CAPPS**<br><br>*Defendant.* | IN THE<br><br>CIRCUIT COURT<br><br>FOR<br><br>BALTIMORE COUNTY<br><br>CASE NO: C-03-CV-24-002264 |
|---|---|

## DEPOSITION REQUEST FOR AGENTS OF OHANA GROWTH PARTNERS

1       **Defendant Ryan Dillon-Capps**, respectfully requests the depositions of the agents of **Ohana Growth Partners, LLC**, including but not limited to **Justin Drummond**, **Daniel Levett, and Randall Romes**, to challenge the basis of Plaintiff's claims for **injunctive relief** and to compel the production of all **supporting and opposing evidence**. The primary purpose of these depositions is to require the Plaintiff to demonstrate that they had a legitimate basis for seeking **injunctive relief** prior to the commencement of this action and to provide evidence that their claims have **merit**.

2       If the Plaintiff fails to produce credible evidence to support their request for injunctive relief or the merits of their underlying claims, it will confirm that this lawsuit is **baseless** and should be **dismissed**.

3       The requested depositions and accompanying production of documents will focus on the following key issues:

## INJUNCTIVE RELIEF BASIS

4       The Plaintiff must show that, prior to the commencement of this action, they had a legitimate basis to seek **injunctive relief**. This includes providing evidence of **irreparable harm** and the **lack of an adequate legal remedy**, such as was represented in the **accord established on June 7, 2023**, which was breached by the Plaintiff on **June 13, 2024**, without any attempt to resolve the matter through further negotiations. The Plaintiff's refusal to negotiate in **good faith** has persisted, and they must demonstrate why filing this lawsuit was necessary before proceeding with arguments regarding their likelihood of success.

5       Before discussing the merits of their claims, the Plaintiff must address why they pursued injunctive relief despite their **unclean hands**, which stem from a breach of the accord, violations of **FMLA** and **ADA**, **Estoppel**, and the **perjury** committed at the commencement of this action. The Defense looks forward to hearing the Plaintiff explain how they expect to demonstrate even a **chance of success**, let alone a **likelihood of success** on the merits—key factors for obtaining injunctive relief.

## MERITS OF PLAINTIFF'S CLAIMS

6       The depositions will critically examine the **validity of the Plaintiff's allegations**, particularly their **false claim** that **Dillon-Capps refused to provide access** to critical systems, a claim they argue necessitated the extraordinary remedy of injunctive relief. The Plaintiff must present **concrete evidence** to support this assertion, rather than relying on **speculative or unfounded allegations**.

7       The Plaintiff's claim that **Dillon-Capps refused access** is not only demonstrably false but also contradicted by **overwhelming evidence** showing that Dillon-Capps was **eager and**

**fully invested** in providing both **Hartman Executive Advisors** and **President Justin Drummond** with the requested access. Dillon-Capps repeatedly took active steps to facilitate access, as proven through multiple communications—including **emails and text messages**—where Dillon-Capps followed up with Hartman Executive Advisors and Plaintiff's leadership to ensure compliance with system access protocols.

8      Despite these documented efforts, the Plaintiff has chosen to ignore this evidence and instead relies on **procedural victories** gained through a **Temporary Restraining Order (TRO)** secured without notice to the Defendant. At the subsequent hearing, **Dillon-Capps** was **denied cross-examination** and was **barred from raising key issues**, such as a **motion for continuance**, and claims under the **Family and Medical Leave Act (FMLA)** and the **Americans with Disabilities Act (ADA)**. The Plaintiff continues to tout this hearing result, where **Dillon-Capps' rights were egregiously disregarded**, as if it supports their claims, despite the **discriminatory and unjust handling** of the case.

9      The Plaintiff must now demonstrate why this lawsuit and the extraordinary remedy of injunctive relief were necessary when **Dillon-Capps had clearly shown a willingness and enthusiasm** to resolve the matter by granting access. Without credible evidence, it is clear that their claims **lack merit** and fail to justify injunctive relief.

10     Furthermore, the court overlooked crucial **jurisdictional arguments**, including the issue of **federal jurisdiction over PCI compliance enforcement**, which involves **cross-state business activity** spanning five states and the District of Columbia. This is significant given the **FTC's well-established authority** in similar cases, such as **FTC v. Wyndham Worldwide Corp.**, 799 F.3d 236 (3d Cir. 2015), where the **Federal Trade Commission** engaged companies

that failed to manage account access and security adequately. The Plaintiff uses the court's failure to address these issues to justify their baseless claims, further weaponizing the outcome of a discriminatory hearing.

11      Notably, at this same hearing, the judge ruled that **Dillon-Capps was "not disabled enough"** under the ADA—a conclusion the Plaintiff now embraces to support their arguments, while disregarding Dillon-Capps' clearly established disabilities. The Plaintiff ignores the fact that **Dillon-Capps** was forced to testify under oath despite informing the court of **severe memory issues**, making the testimony unreliable. Forcing a person with documented memory impairment to testify without proper accommodations violated their rights under the **ADA**, 42 U.S.C. § 12101 et seq. The court's failure to recognize Dillon-Capps' eligibility for memory accommodations further underscores the **procedural inequity** of the process.

12      Given the Plaintiff's **improper procedural tactics**, **discriminatory behavior**, and **denial of basic legal rights**, they must now be compelled to produce **concrete evidence** supporting their claims. Without such evidence, their request for injunctive relief lacks merit and should not be granted.

## EVIDENCE OF COMPLIANCE WITH INDUSTRY STANDARDS

13      The Plaintiff has alleged that **Dillon-Capps failed to comply with system security standards**, specifically **PCI DSS v4**. The Defendant disputes this claim and seeks to challenge it by compelling the Plaintiff to produce **evidence supporting or opposing** the allegation. Dillon-Capps actively worked to **maintain compliance** with **PCI DSS v4**, which mandates stringent security protocols for handling payment card information.

14    The Defendant requests that the Plaintiff produce the following documents:

1.    **Franchise Disclosure Documents (FDDs)** and **Franchise Agreements** for all relevant **gyms and locations** operated under the Plaintiff's control. These documents are necessary to establish whether the Plaintiff's claim that they "own" **Planet Fitness gyms** is accurate or whether the Plaintiff operates under **franchise license**—a key distinction in assessing their legal obligations and standing across various jurisdictions. This information will determine whether the Plaintiff has been **exaggerating ownership** claims, which directly impacts the credibility of their arguments and obligations under **PCI DSS**.

2.    Evidence showing where the Plaintiff provided **Dillon-Capps with a definable purpose** for assigning permissions, in line with **PCI DSS Requirement 7**. Specifically, **PCI DSS v4.0 Requirement 7.2.1**, which requires that access be restricted based on the **principle of least privilege**, i.e., individuals should only be granted the level of access needed for their job responsibilities. The Defendant requests that the Plaintiff demonstrate how it met this requirement and provided specific, documented reasons for requesting administrative or elevated permissions.

15  Producing these documents is essential to:

1.    **Clarify the Plaintiff's legal obligations and standing** in relation to their **franchise agreements** across various jurisdictions, which is critical to understanding the **jurisdictional basis** for the claims.

2.    **Verify compliance with PCI DSS** standards by determining whether Dillon-
Capps was ever provided with a valid business reason for assigning access levels or
permissions beyond the required scope.

3.    The Plaintiff's failure to produce these documents will further demonstrate that
their claims against Dillon-Capps are **without merit** and that they have not followed
industry-standard practices for data security or the principles of least privilege, as
outlined in **PCI DSS Requirement 7**.

16    Defendant also requests that Plaintiff produce all **documents, communications, and
system logs** related to these matters, including those supporting or opposing their request for
injunctive relief and the merits of their claims. Without such evidence, the Plaintiff's request for
injunctive relief and the case itself lack foundation, and the Defendant will move for **dismissal** of
this baseless claim.

17    These depositions are essential to challenging the Plaintiff's entitlement to injunctive
relief and exposing the lack of evidence behind their claims. If Plaintiff cannot provide sufficient
proof, the Court should bring this matter to an end.

## I    INTRODUCTION

18    This case arises from a series of actions taken by **Ohana Growth Partners, LLC** and its
agents, including **Justin Drummond**, **Richard Hartman**, and others, which culminated in the
wrongful treatment of **Ryan Dillon-Capps**, the Defendant. Despite Dillon-Capps' diligent
efforts to comply with company policies and maintain the security and integrity of **Ohana's**
systems as its **PCI Compliance Officer**, the Plaintiff has consistently misrepresented the facts,
leading to unwarranted legal action.

19     The timeline of events, beginning in **June 2024**, reveals a pattern of coercion, miscommunication, and false accusations. Dillon-Capps, who was on **FMLA leave**, faced unlawful demands to perform work while being subjected to hostile actions by **Ohana's leadership**, particularly **Richard Hartman**. Despite repeatedly seeking assistance and offering compliance, Dillon-Capps was met with silence and later falsely accused of refusing to provide access to **Hartman Executive Advisors**, which was far from the truth.

20     Furthermore, the Plaintiff has failed to provide evidence to support its claims, relying instead on **perjured affidavits** and misleading communications. The Defendant's actions, documented through emails, text messages, and other communications, demonstrate an unwavering commitment to ensuring compliance with **PCI DSS v4** standards and maintaining the integrity of **Ohana's** systems. This factual background will show that the legal claims against Dillon-Capps are not only baseless but were made in bad faith, and the real issues of fraud and mismanagement within **Ohana Growth Partners** have been intentionally ignored or covered up by its leadership.

## II  FACTUAL BACKGROUND

21     On **June 7, 2024**, **Ryan Dillon-Capps** sent a text message to **Justin Drummond** that read: "I believe that I may have found a way for you to have access to a Global Admin account. Can you review the PCI DSS 4 documentation before 5 pm on Monday and talk with me on Tuesday?"

22     **Justin Drummond** responded: *"Hi Ryan. I should be able to review this before Tuesday."*



23     Seven additional text messages were exchanged, concluding with both individuals wishing each other a good weekend.

24     Seven days later, **Justin Drummond**, President of **Ohana Growth Partners**, provided a **perjured statement** to the court in **paragraph 2** of his affidavit, falsely claiming: *"Dillon-Capps refused to initiate full administrative rights to the Ohana MS 365 account to Ohana's President."*

> Capps refused to instate full administrative rights to the Ohana MS 365 Account to Ohana's President, CEO, and CFO.

25     On **June 13, 2024**, at **7:12 AM**, **Ryan Dillon-Capps** notified **Glenn Norris**, **Richard Hartman**, and **Justin Drummond** that they were using **FMLA leave** and would be out for a few hours or longer. Dillon-Capps expressed uncertainty about when they would return to work from FMLA leave.

> From:     Ryan Dillon-Capps
> Sent:     Thursday, June 13, 2024 7:12 AM
> To:     IT.Support; IT.BusinessIntelligence; Glenn Norris; Rich Hartman; Justin Drummond
> Subject:     FMLA Time

> I did most of the prep and testing last night, but I am going to be out for a few hours today and not sure when I will be back on. It depends on how well things go today.

> @Glenn Norris @Rich Hartman @Justin Drummond This is FMLA.

26     Two hours later, **Richard Hartman** violated federal law by demanding that **Ryan Dillon-Capps** perform work by **3:00 pm** that same day, despite Dillon-Capps having invoked **FMLA leave**. Hartman's directive stated that if Dillon-Capps did not comply, the company would "take appropriate action." The directive outlined three specific expectations:

1.     **Acknowledge** the directive.

2.     Add **Phil Leadore** as a **Global Administrator**.

3.     **Hold off** on any major updates or changes to the system.

> **From:** Rich Hartman <Rich.Hartman@ohanagp.com>
> **Sent:** Thursday, June 13, 2024 9:01 AM
> **To:** Ryan Dillon-Capps <Ryan.Wagner@ohanagp.com>
> **Cc:** Karen Debus <karen.debus@ohanagp.com>
> **Subject:** Acknowledgement Required

> acknowledge this directive and to add Phil Leadore as a Global Administrator by 3:00 pm today will require the company to take appropriate action.

27     The unlawful demand, in violation of federally protected FMLA leave, also included the statement: "Glenn demands."

> Glenn has signed an agreement on behalf of OGP with Hartman Executive Advisors (HEA) and demands that you add Phil Leadore from HEA as a Global Administrator by 3 pm today. We also instruct you to hold off on any major updates or changes to the system until HEA has had a chance to evaluate Ohana's IT systems.

28      In contrast to the email referenced in **Exhibit B** of **Richard Hartman's Affidavit**, **Justin Drummond's Affidavit** in **Paragraph 3** begins with: *"At my direction on June 13, 2024, at 9:01, Ohana's Vice President of Human Resources, Richard Hartman, sent an email to Dillon-Capps directing them."*

> 3.  At my direction, on June 13, 2024, at 9:01 Ohana's Vice President of Human Resources, Richard Hartman, sent an email to Dillon-Capps directing them to provide the Global Administrator rights over the Ohana MS 365 Account to Phil Leadore, of Hartman Executive

29      Despite the unlawful and coercive nature of

> From:        Ryan Dillon-Capps
> Sent:        Thursday, June 13, 2024 11:48 AM
> To:          Phil Leadore; Glenn Norris; Dan Levett
> Cc:          Justin Drummond; Stacey Wittelsberger (ESC); C. Victor Brick; Lynne Brick B.S.N. M.A.; Terry Woods (Planet Fitness); Earl Ihle
> Subject:     Re: [External]Re: Time off for FMLA- are you able to meet with Hartman Executive Advisors ?

the demand, **Ryan Dillon-Capps** complied at **11:48 AM**, sending an email to **Phil Leadore** and **Dan Levett** of **Hartman Executive Advisors** that stated: *"I could use and would appreciate some backup, as would my team and others involved,"* indicating that Dillon-Capps was willing to grant them access

> I could use and would appreciate some backup, as would my team and others involved.

30      The email was also sent to Glenn Norris, Justin Drummond, Stacey Wittelsberger, Victor Brick, Lynne Brick, Terry Woods, and Earl Ihle, all commonly referred to as the ownership of Ohana Growth Partners, LLC, on June 13, 2024.

31      **Richard Hartman** acknowledged the compliance via email at **12:03 PM**.

> From: Ryan Dillon-Capps <Ryan.Wagner@ohanagp.com>
> Sent: Thursday, June 13, 2024 12:03 PM
> To: Ryan Dillon-Capps <Ryan.DillonCapps@ohanagp.com>; Rich Hartman <Rich.Hartman@ohanagp.com>
> Cc: Karen Debus <karen.debus@ohanagp.com>; Justin Drummond <Justin.Drummond@ohanagp.com>; Stacey Wittelsberger (ESC) <srector@exeterstreetcapital.com>; C. Victor Brick <Victor@ohanagp.com>; Lynne Brick B.S.N. M.A. <lynne@ohanagp.com>; Terry Woods (Planet Fitness) <Terry.Woods@ohanagp.com>; Earl Ihle <Earl.Ihle@ohanagp.com>; Glenn Norris <glenn@ohanagp.com>
> Subject: Re: Immediate Response to Rich Hartman Addressing Illegality and Cease and Desist

32     Without the
full context of the

> Please be aware that I have requested Hartman Executive Advisors, including Phil Leadore and Dan Levett , to confirm their qualifications and involvement in the PCI DSS v4 review. Ownership have been included in this communication thread to ensure full transparency and oversight.

emails **Dillon-Capps** sent to **Phil Leadore** and **Dan Levett**, the significance of the

communications is lost.

33     **Abridged version of events**: **Phil Leadore** and **Dan Levett** sent a meeting invite under

**false pretenses**, followed by an email stating that **Glenn Norris** would provide more

information. However, they never responded to any subsequent emails. Despite this lack of

communication, **Dillon-Capps** was more

eager to bring them onboard than **Ohana**

> **Subject**: Ohana Growth Partners LLC
> **From**: Ryan Wagner <ryan@mxt3.com>
> **To**: pleadore@hartmanadvisors.com
> **Date Sent**: Monday, June 17, 2024 6:40:39 PM GMT-04:00
> **Date Received**: Monday, June 17, 2024 6:40:39 PM GMT-04:00

**Growth Partners** appeared to be. This is made clear in the events of **Monday, June 17, 2024**,

when, after being served, Dillon-Capps continued efforts to provide them with access.

> Your introduction suggested you were qualified for a PCI DSS v4 assessment. While I hold no bias against you or your company, this assertion required verification. Had you introduced yourself simply as Phil Leadore from Hartman Executive Advisors wanting to review XYZ, I would have granted access for review purposes. Any request that did not raise flags about qualifications would have been fulfilled within my legal capacity.

34     **Dillon-Capps was not refusing access**. The Defendant was diligently performing the

duties of **PCI Compliance Officer** for **Ohana Growth Partners**, as demonstrated on **June 7,**

**2024**, when Dillon-Capps found a legal solution to provide the President with access to the

**Global Admin account**. Additionally, on **May 26, 2024**, Dillon-Capps discovered a **dramatic**

**change in the security posture** of the systems while away attending their wedding. Upon

Dillon-Capps' return, the security settings had reverted to their previous, less secure state.

35    The image is from the **security administrative tool** that helps track progress toward increasing a



company's security posture—illustrates this issue. Companies of **Ohana's size** typically fall within the **40 to 60** range on the security scale, but **Ohana Growth Partners** had been in the **60 to 90** range. The variance reflected changes being made gradually toward implementing **"on-demand privileged access"**, which eliminates the need for accounts to have continuous elevated permissions classified as **privileged** by Microsoft, such as **Global Administrator** access.

36    This security issue and change in posture were reported to Justin Drummond, Glenn Norris, and the rest of the ownership team at Ohana Growth Partners.

| From: | Ryan Wagner |
|---|---|
| Sent: | Sunday, May 26, 2024 8:44 PM |
| To: | Justin Drummond; Glenn Norris |
| Cc: | Rich Hartman; Karen Debus; Stacey Wittelsberger (ESC); C. Victor Brick; Lynne Brick B.S.N. M.A.; Terry Woods (Planet Fitness); Earl Ihle |
| Subject: | Re: Full Admin Access to IT Systems to OGP President- Justin Drummond |
| Importance: | High |

37    In the same email, **Dillon-Capps** reiterated the **PCI DSS v4 requirement for least privilege**, explaining in plain language that **PCI DSS v4** mandates the use of minimal access privileges. As an alternative, Dillon-Capps suggested having **Geoff VanMastricht**, from **Planet**

**Fitness**, the franchisor, approve the decision. However, **VanMastricht** declined to approve access without a valid reason provided.



PCI DSS 4 mandates that access be limited to the minimum necessary for individuals to perform their job responsibilities. This principle of least privilege is why I have repeatedly requested details on the specific access needed. While Ryan Brooks is uniquely disqualified, knowing the precise requirements allows me to provide alternative solutions to ensure tasks are completed in a timely manner.

Alternatively, you can schedule a meeting with Geoff VanMastricht and me to discuss this. Geoff oversees the PCI Compliance process, and with all the information he has, he is capable of making an informed decision about whether the action you are requesting is allowed or not. Therefore, I do not foresee any issues with implementing the actions he approves.

Only Authorized Personnel can approve access, and for us, this includes Geoff and me, as we are responsible for and knowledgeable about PCI DSS 4 Compliance requirements.

38     In an email sent on **Monday, June 17, 2024**, to **Phil Leadore**, **Dillon-Capps** stated: "I have not received responses to my previous emails requesting assistance" and "Ohana asserts that you are ready to be granted access, which I am authorized to provide. Please confirm your current status and interest in this relationship."



Mr. Leadore,

This is Ryan Dillon-Capps. I am reaching out from my personal email as I am currently unable to use my Ohanagp email. It has come to my attention that you may still be interested in working with Ohana Growth Partners. However, I have not received responses to my previous emails requesting assistance and information to facilitate your access and alignment with PCI Compliance. Ohana asserts that you are ready to be granted access, which I am authorized to provide. Please confirm your current status and interest in this relationship.

39    **Justin Drummond** received another email forwarded to him by **Dillon-Capps** at **4:26 PM** on **June 17, 2024**.



| From: | Ryan Dillon-Capps |
| --- | --- |
| Sent: | Thursday, June 13, 2024 4:26 PM |
| To: | Justin Drummond |
| Subject: | Fw: Please Respond Quickly |



From: Ryan Dillon-Capps <Ryan.DillonCapps@ohanagp.com>
Sent: Thursday, June 13, 2024 3:10 PM
To: Phil Leadore <pleadore@hartmanadvisors.com>; Dan Levett <dlevett@hartmanadvisors.com>
Subject: Please Respond Quickly

We have a situation. Can you confirm that you have an agreement signed and are not compelled to report? I need assistance, and you might be the only one with pen to paper who can without incurring liability for Ohana.

Please - I have sent my team home for their safety, and that is all I can say until you confirm.

40      These emails correspond to text messages sent by **Dillon-Capps** to **Justin Drummond**, which read: "I have said over and over again that I want help. I emailed them at the start of this and begged them to help us"; "they won't respond"; "after the email, they said I will get an update from Glenn... silence"; and "I will forward you the email."



41      Ryan Dillon-Capps continued to freely and eagerly support Hartman Executive Advisors (HEA) having access, as evidenced by the ongoing conversation where Dillon-Capps stated: "Phil and Dan would have responded by now"; "who told you about their status?"; "ask them"; and "if they say sure... have them email me back so we can get started.



42    **Ryan Dillon-Capps** presented the only response to the alleged **fraud, accounting irregularities**, and the potential **cover-up** involving the **head of HR** and the **CFO**. Dillon-Capps' response included the following recommendations:



1.    *"Get an attorney… show an immediate course correction."*

2.    *"Rish is immediately suspended pending investigation."*

3.    *"If we get that knock on the door, we cooperate"; "we allow those responsible to be held accountable"; and "we do everything to show Alaris and Exert that we are a sound investment and are committed to ensuring this never happens again."* investment and we are committed to this never happening again"

43        Upon seeing **Richard Hartman's email**, **Ryan Dillon-Capps** texted **Justin Drummond**, asking him to confirm whether **Rich Hartman** had been suspended. Dillon-Capps, concerned for the safety of the employees, spouse, and themselves, also discussed the possibility of seeking a **peace order**.

44        The next communication from **Justin Drummond** did not come via text but through an email that **sanctioned Richard Hartman's earlier email**. For hours, Drummond made no mention of **Hartman being suspended**, focusing solely on whether access had been given to **Hartman Executive Advisors**. Throughout this time, **Dillon-Capps** responded in **enthusiastic compliance** to every request.





45     The email omitted from **Richard Hartman's Exhibit B** occurred at **2:05 PM** and provides crucial context for the events that transpired between **2:05 PM** and **4:30 PM** on **June 13, 2024**.

Subject: Urgent: Legal Risks Associated with Inaction and Third-Party Vendor Activities
From: Ryan Dillon-Capps <Ryan.DillonCapps@ohanagp.com>
To: Rich Hartman <Rich.Hartman@ohanagp.com>
Cc: Karen Debus <karen.debus@ohanagp.com>, Justin Drummond <Justin.Drummond@ohanagp.com>, "Stacey Wittelsberger (ESC)" <srector@exeterstreetcapital.com>, "C. Victor Brick" <Victor@ohanagp.com>, "Lynne Brick B.S.N. M.A." <lynne@ohanagp.com>, "Terry Woods (Planet Fitness)" <Terry.Woods@ohanagp.com>, Earl Ihle <Earl.Ihle@ohanagp.com>, Glenn Norris <glenn@ohanagp.com>
Date Sent: Thursday, June 13, 2024 2:05:19 PM GMT-04:00

46     The email begins clearly, stating that it addresses **significant legal risks** related to the handling of **fraud** and **hostile workplace claims**.

Dear Owners,

I hope this message finds you well. I am writing to outline the significant legal risks associated with the current handling of our internal investigation into fraud and hostile workplace claims. Additionally, I want to highlight the potential liabilities arising from the actions of our third-party vendors, and to stress our duty to stop workplace harassment.

47     After listing the **legal issues**, the email requests that **immediate action** be taken before **3 PM** to stop **Richard Hartman**. However, no one responds to these emails to confirm that Hartman is suspended or to indicate that his actions are sanctioned by **Justin Drummond**, **Victor Brick**, or anyone else—other than **Richard Hartman** and **Glenn Norris**.

Immediate Actions Required

Given the serious nature of these issues, we require an update on the steps being taken to address them. It is now past 2 p.m., and Rich indicated action would be taken after 3 p.m. It is critical that Rich's actions are stopped immediately.

48    **Fifteen minutes** after the request for the owners to take action to stop **Richard Hartman's** actions before **3 PM**, Hartman—who is the brother-in-law of **Victor** and **Lynne Brick**—proceeded to make decisions on behalf of the owners, acting before the **3 PM deadline**.

49    This occurred at **2:46 PM** and **2:48 PM**, yet hours passed with **Justin Drummond** not mentioning anything. None of the owners, including **Victor** and **Lynne Brick**, communicated that **Dillon-Capps** was suspended or that **Richard Hartman's** decision to place **Darren Koritzka** on leave was officially sanctioned.



From: Ryan Dillon-Capps <Ryan.DillonCapps@ohanagp.com>
Sent: Thursday, June 13, 2024 2:46 PM
To: Justin Drummond <Justin.Drummond@ohanagp.com>; Stacey Wittelsberger (ESC) <srector@exeterstreetcapital.com>; C. Victor Brick <Victor@ohanagp.com>; Lynne Brick B.S.N. M.A. <lynne@ohanagp.com>; Terry Woods (Planet Fitness) <Terry.Woods@ohanagp.com>; Earl Ihle <Earl.Ihle@ohanagp.com>
Subject: CRITICAL! READ ME NOW!! Rich Hartman Critical Situation!

**OHANA**
Growth Partners

Ohana Growth Partners, LLC
212 W. Padonia Rd
Timonium, MD 21093

June 13, 2024

Dear Darren,

Effective immediately, June 11, 2024, you are being placed on leave of absence until further notice with full pay and full benefits while the company undergoes a review of IT operations.

During this time, you will not have access to company systems or any of the facilities and are not authorized to do work on behalf of the company.

We will update you once our review is complete.

Sincerely,

Rich Hartman
VP of People and Culture

---

Ryan Dillon-Capps
I need someone to acknowledge they are on it and getting Rich to calm down or something
3:29 PM

Ryan Dillon-Capps
I am worried for my safety and my wife, I am sending her to safety and silence is not assuring me that anyone is on this
3:32 PM

---

I am writing to inform you of a critical situation that requires your immediate attention and action.

Today, Rich Hartman suspended Darren and handed him a note that Rich created and signed. This action is highly irregular and concerning. In response to this situation, I have instructed my team members to go home immediately for their safety and well-being. I have also texted a picture of the note to Victor, Lynne, and Justin for your reference.  I am sending my wife to another location and am working on having security arrive at my home immediately.

In addition to these steps, Rich Hartman's account has been disabled, and all his sessions have been revoked to prevent any further unauthorized actions.

50    **Victor Brick's** response was limited to empowering **Justin Drummond** to resolve the matter within a group chat that included **Victor Brick**, **Lynne Brick**, **Justin Drummond**, and **Ryan Dillon-Capps**.

51    After three hours, during which **Justin Drummond** only received confirmation of compliance and **Dillon-Capps' enthusiastic interest** in providing access to **Hartman Executive Advisors**, **Dillon-Capps** followed up with **Victor Brick**, responding to a previous message to inform him that they would ask their mother to pray for them.

52    At **7:59 PM**, **Victor Brick** responded to the shared message from **Dillon-Capps' mother**, which said, *"I will pray without ceasing for Vicki Brick and you and Caroline like I always do,"* by replying with a **prayer hands emoji**.





## III  INCORPORATED AND ADOPTED BY REFERENCE

53      Ryan Dillon-Capps incorporates and adopts by reference all factual averments,

arguments, and documents contained in all of the Defendant's motions, affidavits, petitions,

notices, amendments, exhibits, and other papers filed or submitted in this case, regardless of their

current status (pending, denied, granted, or otherwise), pursuant to Md. Rule 2-303(d)

("Statements in a pleading or other paper of record may be adopted by reference in a different

part of the same pleading or paper of record or in another pleading or paper of record."). This

incorporation includes, but is not limited to, any filings made contemporaneously with or

subsequent to this motion, ensuring that all submissions are considered as part of the record for

purposes of this proceeding, in real time.

54      **Reservation of Rights:** The Defendant reserves the right to amend, withdraw, or exclude

any specific filing, document, or factual averment from this comprehensive incorporation at any

point, by submitting a formal notice or motion to the Court.

## IV  UNSUPPORTED CLAIMS

55      Before addressing the merits of claims made after the commencement of this action, the

Defendant requests that the Plaintiff produce evidence supporting their existing claims and make

their agents available for deposition.

## REQUEST FOR DEPOSITION: JUSTIN DRUMMOND

56      **Justin Drummond**, President of **Ohana Growth Partners, LLC**, is requested for

deposition to answer questions related to the following matters:

1.      Darren Kortizka's leave of absence and termination.

2.      Ryan Dillon-Capps' suspension and termination.

3.      The role and involvement of **Hartman Executive Advisors** as an agent of Ohana Growth Partners.

4.      The role and involvement of **Clifton Larson Allen LLP** as an agent of Ohana Growth Partners.

5.      The role and involvement of **Miles & Stockbridge, PC** as an agent of Ohana Growth Partners.

6.      The role and involvement of **CieloIT** as an agent of Ohana Growth Partners.

7.      Justin Drummond's Affidavit and its content.

8.      Communications involving the following:

    8.1     Richard Hartman and Justin Drummond between June 7 and June 14, 2024.

    8.2     Glenn Norris and Justin Drummond between June 7 and June 14, 2024.

    8.3     Victor Brick and Justin Drummond on June 7 and June 14, 2024.

    8.4     Ohana Growth Partners, LLC, and their agents, including Miles & Stockbridge and the Baltimore Business Journal, since June 7, 2024.

9.      Events that transpired between **June 7, 2024**, and **June 14, 2024**.

10.     Produce all offers and agreements, whether accepted or rejected, between Ohana Growth Partners, LLC and Darren Koritzka since June 7, 2024.

11.     **Franchise Disclosure Documents (FDDs)** and **Franchise Agreements**:

    11.1    **Produce the FDDs and franchise agreements** for all gyms and locations operated by **Ohana Growth Partners, LLC**. These documents are necessary to determine whether the Plaintiff's claim to "own" Planet Fitness gyms is accurate

or exaggerated, and to clarify their standing as a **franchisee** under various jurisdictions.

    11.2   **Provide agreements detailing legal obligations** for all gyms in all relevant jurisdictions, as these obligations affect the Plaintiff's operational and legal standing.

12.    Produce all offers and agreements, whether accepted or rejected, between Ohana Growth Partners, LLC and the following agents since October 16, 2023:

    12.1   Miles & Stockbridge, PC.

    12.2   Hartman Executive Advisors.

    12.3   Clifton Larson Allen LLP.

13.    **Identify the person or entity responsible for the collection, handling, and management of all technical data** relating to systems access, security, and compliance for Ohana Growth Partners, LLC. The Defendant may seek to depose this individual or entity to question whether there are any **anomalies** in the data or its handling, as it directly pertains to the claims in this case.

## REQUEST FOR DOCUMENTATION: OHANA GROWTH PARTNERS

### Pursuant to Ohana Growth Partners Claims for Dillon-Capps Refusal and Removal

57    **Pursuant to Ohana Growth Partners' Claims Regarding Dillon-Capps' Refusal and Removal**, Defendant **Ryan Dillon-Capps** requests that Plaintiff **Ohana Growth Partners** produce the following documents and evidence, including those referenced in the affidavits of **Justin Drummond** and **Richard Hartman** filed on **June 14, 2024**. This request is not limited to the following items but includes:

1.      **Requests for GoDaddy access:** Any and all requests made to Ryan Dillon-Capps regarding GoDaddy account access between May 20, 2024, and June 13, 2024, including any documented refusal by Dillon-Capps to provide access.

2.      **Refusal to provide Hartman Executive Advisors access**: Documentation of **Dillon-Capps' alleged refusal** to provide **Hartman Executive Advisors** access on **June 13, 2024**.

3.      **Refusal to provide updates on Hartman Executive Advisors**: Documentation of **Dillon-Capps' refusal** to provide **Justin Drummond** with updates concerning **Hartman Executive Advisors** on **June 13, 2024**.

4.      **Refusal to provide access from June 7 to June 14**: Any documentation of **Dillon-Capps' refusal** to provide **Justin Drummond** or other agents access to systems between **June 7, 2024** (the commencement of the accord) and **June 14, 2024** (the commencement of action).

5.      **System logs related to removal of administrative access**: System logs that support the claim that **Dillon-Capps** removed **administrative access** from any employee of **Ohana Growth Partners, LLC** since **May 20, 2024**, excluding any employee who was terminated, suspended, hired, rehired, or otherwise unavailable to work during that period.

6.      **System logs for Global Administrator role**: Logs showing the **creation, modification, and deletion** of all accounts that have or had **Global Administrator** privileges since **May 20, 2024**.

7. **Communications regarding Global Administrator access**: All communications between **Dillon-Capps** and any employees or agents of **Ohana Growth Partners, LLC**, pertaining to **providing or removing access** to a **Global Administrator** account since **May 20, 2024**.

8. **Paycom system logs**: Logs from the **Paycom System** showing that **Dillon-Capps** allegedly locked **Richard Hartman** out of the **HRIS system** and prevented his access to personnel files.

9. **System logs for all Dillon-Capps activities**: Logs detailing all **system activities** performed by **Dillon-Capps** since **May 20, 2024**.

10. **System logs for Dillon-Capps and hypothetical risks**:

Detailed logs for **Dillon-Capps' system activities**, covering all data and backup sources, including but not limited to:

    10.1   **M365 Backups**

    10.2   **Database Backups**

    10.3   **System/Server Backups**

    10.4   **Security, Audit, and Logging Solutions**

    10.5   **GoDaddy Domain Records** and any changes made to those records

    10.6   **Legal Holds**

Pursuant to Ohana Growth Partners Claims of Not Having Access and Other Administrators

58 Defendant **Ryan Dillon-Capps** requests that Plaintiff **Ohana Growth Partners** produce the following system logs, reports, and documentation, regardless of who performed the activities, for the period starting **June 13, 2024**:

59    **System Logs**: Produce system logs for all activities involving the **assignment, removal, modification, creation, or deletion** of any account with a **privileged role**, including but not limited to the following roles:

1.    Authentication Administrator

2.    Privileged Authentication Administrator

3.    Authentication Policy Administrator

4.    User Administrator

5.    Exchange Administrator

6.    SharePoint Administrator

7.    Global Administrator

8.    Billing Administrator

9.    Site Administrator

10.    Compliance Administrator

11.    Compliance Data Administrator

12.    Security Administrator

Elevated Global Administrator access

60    **Privileged Administrators Report (June 13, 2024)**: Produce the **Privileged Administrators Report** for **June 13, 2024**, showing all accounts with **privileged roles** assigned on that day, whether those roles were directly assigned or inherited.

61    **Privileged Identity Management Reports**: Produce the **Privileged Identity Management (PIM) reports** since **June 13, 2024**, showing **weekly changes** to privileged account assignments.

62      **Paycom System Logs (Personnel Changes)**: Produce **Paycom System Logs** showing any changes to personnel files, including the **creation, modification, deletion**, or alteration of such files. The logs must indicate **who made the changes**, as well as the **date and time** of those changes. This request refers specifically to **change logs**, not detailed reports.

63      **Paycom System Logs (General)**: Produce the **Paycom System Logs** for any other relevant system activities involving **Ryan Dillon-Capps** or other administrators, dating from **June 13, 2024**, to the present.

64      **Affidavit of Justin Drummond**: **Justin Drummond** will be questioned regarding the statements made in his affidavit, including but not limited to:

  1.      Dillon-Capps' failure to provide updates about Hartman Executive Advisors.

  2.      Dillon-Capps' refusal to provide access to Hartman Executive Advisors.

  3.      Dillon-Capps' refusal to provide access to Justin Drummond.

65      Communications on June 13, 2024:

Produce all call logs, text messages, emails, Teams messages, or any other form of communication available to Justin Drummond for June 13, 2024.

66      **Agency Contracts**: Produce all **agency contracts** between **Ohana Growth Partners, LLC** and the following entities:

  1.      Hartman Executive Advisors

  2.      Miles & Stockbridge, PC

## REQUEST FOR DEPOSITION: AGENT DANIEL LEVETT

67      Paragraph 15 of David Levett's Affidavit:

> Thus, Defendant Dillon-Capps, or anyone else, could likely access the Null Backup account without any multifactor authentication whatsoever and would only need the password for the account. No key fob appears to be required.

68      The Defense requests that Ohana Growth Partners produce their representative to address the following questions:

1. Dillon-Capps Emails to HEA

2. Phil Leadore

3. Acquisition of Agency

4. Terms of Agency Agreement

5. Activities Timeline since Acquisition

6. Interactions between HEA and Ohana Growth Partners and other agents

7. Affidavit of Daniel Levett

## REQUEST FOR DEPOSITION: RANDALL ROMES

1. Affidavit of Randall Romes

2. Least Privilege and other PCI DSS v4 requirements

3. Affidavit of Legal Obligations

4. Letter to Judge Truffer

5. Person or Persons provided him with documentation and information

6. Randall Romes methodology and application

7. Acquisition of Agency

8.    QSA

69    During a hearing on June 26 and 27, 2024, before Judge Barranco, Randall Romes provided expert testimony. Dillon-Capps, acting pro se, was initially allowed to begin questioning Romes about his affidavit. However, Judge Barranco abruptly interrupted Dillon-Capps' cross-examination, cutting it short and ending the questioning. Despite this, the defense was allowed to resume direct examination. In a subsequent deposition, Romes will be asked to compare the documents he reviewed with his affidavit to determine whether any perjured statements were made or if Miles & Stockbridge misled him during the preparation of the affidavit. This deposition will focus on the accuracy and methodology behind the affidavit's affirmations.

## EMPLOYMENT AGREEMENT IS NOT AN ENFORCEABLE CONTRACT.

70    Ohana changed Dillon-Capps role so profusely that they:

1.    Could no longer hire/fire nor had any influence in these matters.

2.    No longer managed the team nor the department.

3.    No longer operated under their own discretion

4.    Dillon-Capps could not even perform technical work to resolve critical issues.

71    Dillon-Capps was no longer the Vice-President of IT and did not even qualify as an exempt employee.

1. **Position**: The Associate is employed in the position of Vice President of Information Technology and shall faithfully and diligently perform all duties incident to that position as set forth in the position description to be provided to him/her and other duties as may be assigned by management from time to time. Associate agrees that the Company may change the duties or his/her position and that the terms of this Agreement will continue to apply after such change. Associate shall devote his/her entire time and attention to the business of the Company and use his/her best efforts to perform the duties in an efficient, trustworthy and businesslike manner. The position is classified as exempt from the overtime pay requirements of federal and state wage and hour laws.

*72*   Ohana Growth Partners, LLC has the right to change the duties and position, but in doing so they reclassified them as non-exempt. Section I of the contract does NOT apply.

*(See **Affidavit of Unauthorized Contractual Modifications** for full arguments)*

## V   SUMMARY 'SO WHAT' JUDGEMENT

73   Even if we assume, for the sake of argument, that everything the Plaintiff claims is true—despite the overwhelming evidence to the contrary—**how does any of it fundamentally change the case?**

1.   **Richard Hartman's admission**: He knowingly violated **FMLA**, and a day off would have been an easy **ADA accommodation**.

2.   Daniel Levett's admission: He knowingly committed Estoppel.

3.   **Multiple counts of Perjury** committed by Plaintiff's agents.

4.   Glenn Norris' own words confirm that Dillon-Capps was non-exempt on June 13, 2024.

5.   They argued to the court that it was "just a little contract" being violated, downplaying the significance of the breach.

6.   There is **no valid claim for relief**, no matter how you examine the case. The pursuit of a **frivolous lawsuit** has caused substantial harm. Even in the best-case scenario for Plaintiff, they might owe **less money**, but that doesn't erase their **ethical duty**. The

law, and ethics, don't allow for the strategy of **stalling a case** simply to reduce liability while continuing a frivolous lawsuit born of **unclean hands**.

7.     The Court should consider whether the burden imposed by Plaintiff's continued pursuit of this case is worth the unlikely chance that, four months later, they might present enough evidence to offset the significant penalties they face. It is not mathematically possible for them to avoid these penalties by delaying the case further. Their **unclean hands** have stained this entire litigation process, and no amount of delay will clean the record enough to avoid the repercussions.

8.     Under **Maryland law**, a claim can be dismissed if it is deemed **frivolous** or pursued in **bad faith**, wasting the court's resources and causing harm to the opposing party. **Maryland Rule 1-341** authorizes the court to impose sanctions on parties or attorneys who maintain frivolous claims or defenses. This rule applies when a party persists in **pursuing a case without substantial justification**, as defined by **Majority Opinion in Barnes v. Rosenthal Toyota, Inc.**, 126 Md. App. 97, 104 (1999), where the court upheld the dismissal of frivolous claims and imposed sanctions.

74     Additionally, under the **unclean hands doctrine**, a party who seeks relief in equity must come with clean hands, meaning they must not have engaged in misconduct related to the subject matter of the lawsuit. The **Court of Appeals in Hliston v. Summit Builders, Inc.**, 125 Md. App. 517, 528 (1999), held that a party who engages in fraudulent conduct cannot seek equitable relief. Plaintiff's **unclean hands** in this case, shown by multiple instances of **fraud**, **perjury**, and other unethical conduct, disqualifies them from obtaining relief.

75      Furthermore, courts in Maryland have long held that a party cannot file a lawsuit that is without legal merit solely to delay proceedings or force a settlement. In **Seney v. Seney**, 97 Md. App. 544, 550 (1993), the Court of Special Appeals highlighted the **sanctions** available for **abusive litigation practices**, emphasizing the court's role in preventing frivolous actions from dragging out and causing harm to the opposing party.

76      Therefore, given the **frivolous nature** of Plaintiff's claims and the **clear lack of merit**, this case should not be allowed to proceed, and the Court should grant **appropriate sanctions** and **dismissal with prejudice**.

## LEGAL BASIS

77      **Maryland Rule 1-341**: Governs the imposition of sanctions for pursuing frivolous claims or defenses without substantial justification.

78      **Barnes v. Rosenthal Toyota, Inc., 126 Md. App. 97 (1999)**: Provides precedent for dismissing frivolous claims and imposing sanctions.

79      **Hliston v. Summit Builders, Inc., 125 Md. App. 517 (1999)**: Applies the **unclean hands doctrine**, barring parties from seeking equitable relief when engaged in fraudulent or unethical conduct.

80      **Seney v. Seney, 97 Md. App. 544 (1993)**: Discusses the court's power to impose sanctions for abusive litigation practices and frivolous lawsuits.

## VI   LEGAL BASIS FOR DISCOVERY OF AGENTS

81      **Maryland Rule 2-411 (Depositions)**: Under **Maryland Rule 2-411**, a party may take the testimony of any person, including agents of a corporate entity, by **deposition** upon **oral examination** or **written questions**. The purpose of the deposition is to allow the parties to gather

information that is relevant to any claims or defenses in the litigation. Agents of **Ohana Growth Partners**, who possess relevant information regarding the claims in this lawsuit, fall squarely within the scope of permissible depositions.

82      **Relevance and Scope of Discovery (Maryland Rule 2-402)**: The **scope of discovery** under **Maryland Rule 2-402** is broad, permitting discovery of any matter, not privileged, that is relevant to the subject matter involved in the action. The rule emphasizes that information sought in discovery does not need to be admissible at trial as long as it is reasonably calculated to lead to the discovery of admissible evidence. The agents of **Ohana Growth Partners**, including **Justin Drummond**, **Randall Romes**, and **Davitt Levett**, have knowledge directly relevant to the claims, defenses, and actions taken by the Plaintiff.

83      **Depositions of Corporate Agents and Employees (Maryland Rule 2-412(d))**: **Maryland Rule 2-412(d)** allows a party to depose agents and employees of a corporate entity, such as **Ohana Growth Partners**, if the testimony of these individuals is relevant to the litigation. When deposing agents, their testimony can be binding on the corporation. The agents requested for deposition, such as **Justin Drummond** (President of Ohana Growth Partners) and others, are directly involved in the management and decision-making processes that are central to the lawsuit.

84      **Depositions to Test Affidavits and Claims of Misconduct**: In **Elat v. Ngoubene**, 201 Md. App. 396 (2011), the **Court of Special Appeals of Maryland** upheld the broad scope of discovery, noting that depositions may be necessary to test the truthfulness of affidavits and allegations made by parties or their agents. In this case, the depositions of agents like **Justin**

**Drummond** are crucial to **test the claims and statements** made in affidavits, particularly regarding alleged refusals, access issues, and system manipulation.

85      **Agency and Liability**: Agents of a corporation, when acting within the scope of their duties, may bind the corporation through their actions and statements. In **Porter Hayden Co. v. Bullinger**, 350 Md. 452 (1998), the **Court of Appeals of Maryland** recognized that **agency principles** apply in civil litigation, and the deposition of corporate agents is an effective method to uncover the actions of the corporate entity itself. Given the role of agents like **Drummond**, **Romes**, and **Levett** in making key decisions and their direct involvement in the events surrounding this case, their depositions are necessary to establish agency liability and uncover the facts behind **Ohana Growth Partners'** actions.

86      **Depositions to Expose Misrepresentation and Perjury**: Under Maryland law, depositions can also be used to expose **misrepresentation** or **perjury** in litigation. In **Jones v. State**, 395 Md. 97 (2006), the court reiterated the importance of using depositions as a tool for cross-examination and verifying the truthfulness of statements made under oath. The agents of **Ohana Growth Partners** have made affidavits and statements that must be tested through depositions to determine whether any **false statements** or **misrepresentations** have been made.

## VII   E-DISCOVERY FOCUS

87      **Relevance Under Maryland Rule 2-402**: The scope of discovery in Maryland is governed by **Maryland Rule 2-402**, which permits discovery of any non-privileged matter that is relevant to the claims or defenses in the action. Information is considered relevant if it is

reasonably calculated to lead to the discovery of admissible evidence, even if it is not directly admissible itself. Given the shared resources between **Ohana Growth Partners** and **Brick Bodies**, the requested e-discovery is necessary to uncover relevant communications, financial records, and other critical information spanning these entities. The overlap in **IT**, **HR**, and **accounting departments** justifies including these related entities in the discovery process, as communications and actions taken by one entity may directly impact the litigation.

88      **Electronically Stored Information (ESI) Discovery**: Under **Maryland Rule 2-422**, a party may request electronically stored information (ESI) as part of discovery, which includes emails, system logs, and any other form of digital communication. Courts have consistently recognized the importance of **broad ESI discovery** to ensure all relevant data is captured. In **Blake v. Blake**, 336 Md. 315 (1994), the Maryland Court of Appeals highlighted the **importance of access to comprehensive discovery** where entities have overlapping operations. In this case, the involvement of multiple entities and shared departments makes it critical to explore e-discovery across **all interconnected entities**.

89      **Control of Data Across Entities**: **Brick Bodies** and **Ohana Growth Partners** share access to data systems and IT infrastructure, creating potential overlap in electronically stored information. Under **Maryland Rule 2-402(a)(2)**, a party is required to disclose any data or documents that are within its control. Even if the data is not directly maintained by **Ohana Growth Partners**, if it has access or control over ESI shared with **Brick Bodies**, it must be disclosed. The Court of Special Appeals in **Allstate Ins. Co. v. Miller**, 315 Md. 182 (1989), emphasized that **"control" includes the ability to obtain documents from related entities** with shared interests, resources, or operations.

90    **Interrelated Operations and Overlapping Responsibilities**: In **Hall v. Lovell Regency Homes, Ltd.**, 121 Md. App. 1 (1998), the court acknowledged that **discovery involving interrelated companies** or departments must be broad enough to include entities that share operations or responsibilities. Given that **Ohana Growth Partners** and **Brick Bodies** share **IT, HR**, and **accounting functions**, limiting the scope of e-discovery to just one entity would potentially exclude vital information needed for this litigation. The intertwined nature of these entities justifies a discovery scope that captures ESI from all relevant systems and personnel.

91    **Preservation of Evidence**: The obligation to preserve ESI that is relevant to the litigation extends to all entities under the control or influence of the party to the case. **Maryland Rule 2-422(d)** requires parties to preserve all relevant ESI once litigation is anticipated. The interrelated operations of **Ohana Growth Partners** and **Brick Bodies** mean that communications and system logs relevant to the case could exist across all three entities. Courts have emphasized the importance of early and broad preservation of ESI in **Shenker v. Laureate Educ., Inc.**, 411 Md. 317 (2009),** stating that **failure to preserve relevant ESI** can lead to spoliation claims. To prevent such issues, e-discovery must be conducted across all entities to ensure comprehensive preservation.

92    **Broad Scope of ESI Discovery for Related Entities**: The **Federal Rules of Civil Procedure** and related case law, while not binding, are often used as persuasive authority in Maryland courts. In **Zubulake v. UBS Warburg LLC**, 217 F.R.D. 309 (S.D.N.Y. 2003), a landmark e-discovery case, the court held that when companies share infrastructure or resources, **the duty to produce ESI extends to all related entities** involved in the operations. While this is federal case law, it is often cited in Maryland as persuasive authority for the handling of

**complex e-discovery** requests in interrelated companies, similar to the relationship between

**Ohana Growth Partner and Brick Bodies**.

<u>RESPECTFULLY SUBMITTED</u>

October 22, 2024                                  <u>/s/ Ryan Dillon-Capps</u>

Ryan Dillon-Capps (Pro Se)
Email : ryan@mxt3.com
1334 Maple Avenue
Essex, Maryland 21221
Telephone: (703) 303-1113

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 22, 2024, a copy of **Deposition Request for Agents of**

**Ohana Growth Partners** via email to rbrennen@milesstockbridge.com and served on via first-class

mail, postage prepaid on:

Robert S. Brennen
Miles & Stockbridge P.C.
100 Light Street
Baltimore, Maryland 21202

<u>/s/Ryan Dillon-Capps</u>
Ryan Dillon-Capps (Pro Se)