IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| RYAN DILLON-CAPPS<br><br>*Plaintiff,*<br>vs.<br><br>OHANA GROWTH PARTNERS, LLC *et al*<br><br>*Defendants* | Civil Action<br><br>No. **1:24-CV-3744**<br><br>Hon. **Judge Hurson** |

### AFFIDAVIT OF RYAN DILLON-CAPPS IN SUPPORT OF MOTION TO RECONSIDER PARTIAL DISMISSED CLAIMS ON 2025 JANUARY 8TH

I, Ryan Dillon-Capps, being over the age of eighteen (18) and competent to testify, and having personal knowledge of the facts contained herein, state as follows:

1  First and foremost, I wish to express my sincere gratitude and appreciation to this Honorable Court for its time and patience. I humbly request that, when the Court encounters a perceived conflict of fact—such as, "I thought this case was about"—I be granted the opportunity to provide clarification. This request stems from the inherent challenge every individual, including myself, must navigate to reach a place of understanding the seemingly unbelievable and accepting that what may initially appear unthinkable is more than a hypothetical, unsubstantiated, or unprovable assertion.

2  To that end, I will strive to avoid over-explaining and will allow the Court to raise any questions first. However, I wish to make one minor clarification regarding the exhibits. The physical CD provided to the Court was signed and should be treated as a physical exhibit. If permitted to testify under seal, I can provide a detailed explanation as to why this is necessary. Briefly, some of the contents constitute material evidence and should not be modified,

transferred to the e-filing system, or entered into the system as is typical for other digital exhibits.

3      The companion evidence containing the forensic results presents challenges in being reduced to a printable format. I have been considering potential solutions, and while creating a printable version may be possible, it would require significant time and labor. For now, I am prepared to present the forensic data using a computer and can bring a mobile device compatible with a USB-C port for connection to a court-provided display. Alternatively, I can display the data on a smaller screen, though this would require permission to be in closer proximity to Your Honor to ensure proper viewing.

4      The case is filed under FMLA because Judge Barranco explicitly remanded it to federal court on June 26th, but it wasn't until December that the case and controversy reached a point where the state actors appear to have finalized their efforts in modifying the court records of the state case. Based on the transformation of the court records, it appears that their primary focus was to obfuscate their previous manipulation of the court record so that the claim of fraud would be rebutted with the current version of the court record that more closely resembles what it should have been since June.

5      Prior to the voluntary dismissal that Ohana Growth Partners, LLC and Miles & Stockbridge P.C. filed at the end of October being granted by Judge Stringer in November, a motion for default judgment was granted but then vacated with the help of an unconfirmed third party's influence. Despite the rulings on various motions being effectively 100% in favor of Ohana Growth Partners, LLC, there was never a point in the entirety of the case that I was "losing." If there had been a final judgment, it would have been immediately overturned on appeal, and I went back and forth many times on filing a mandamus.

6        However, mandamus is heavily dependent on demonstrating that alternatives were exhausted, and that is what I was doing when I engaged in attempts to negotiate a resolution and began escalating to the oversight bodies.

## DATA DRIVEN CONCLUSIONS

7        I collect data and analyze it all the time, and when I detected anomalies in the behavioral data from the court my first thought was positive and excited that this case would soon be wrapped up.  It was out of curiosity that I wanted to know the source of the change in behavior, and that resulted in the identification and confirmation of DeGonia and Bernstein which was mostly done by a methodology known as probing.

8        Prior to the August 20th filing and immediate granting of default judgement, the experience was irregular with plenty of issues, but I made the same assumptions that Your Honor made because it is unthinkable to imagine that Miles & Stockbridge and multiple circuit court judges are part of some conspiracy.  I don't care how bad the rulings were, and I chalked it up to something mundane and unfortunate.  I heartly agree, that is how it has to be because as Your Honor pointed out the alternative is disastrous to think that Judges would be worried about liability and ruling based on that, and I did not jump to some collusion on August 20th.

9        It took a significant amount of time and data before I accepted the terrible reality. That process began slowly, with the establishment of a baseline to evaluate the response to probes. For those not aware of what probing is, the most common version of it is, unfortunately, what might come to mind when imagining what a robber might do—setting off an alarm and then observing the response. Similarly, the act of escalating to various agencies and filing complaints functions as an alarm of sorts.

10      The initial escalations were done in a clustered spread, which was insufficient to establish "who" and "intent" but was sufficient to establish what became known as the baseline response. One of the unique identifiers was a byproduct of the initial multi-escalation process, which created a delay or hesitation in subsequent probes. This delay allowed for a clear separation between probed response and non-probed behavior. This can be more easily explained by noting that the first time, more than one person or agency followed up, and in subsequent probes, there was uncertainty about whether someone else would follow up like before.

11      From this, we know that not everyone who was contacted is part of the conspiracy. The amount of time the Circuit Court conspirators waited repeats with the same increment of time throughout multiple probes. To clarify, "waited" might be insufficient to highlight the precision of the results, which show a dramatic shift to the exact same state of behavior. That behavior is held in that state for the same amount of time, and then, like clockwork, transitions from the holding state to a secondary state that is consistent every time as well.

12      These states are so predictable that the final probes for DeGonia and Bernstein were staggered so that probe one caused the first state, then the second state, and then I initiated the second probe. State one is a holding pattern, and state two is an aggressive flurry of activity, like the floodgates opening and them trying to execute as quickly as possible. So, when the second probe goes out, and you see the flood of activity halt completely and abruptly, it's compelling and leaves little room for doubt because the pattern is very specific and consistent, with no other time in the case showing the probed response being seen.

13      This consistent pattern of probed response is how I separated DeGonia and Bernstein from the rest, as they are the only two who were given a prompt with 100% confirmation of both engagement and alignment. No one else even comes close. The only caveat to mention is that

there is at least one more person who is a suspect, but the person or persons flagged are not named because I would rather err on the side of innocence than cast an accusation based on what is currently known.

14      The evidence against DeGonia is compelling, but there are plausible explanations that could reduce personal liabilities under the guise of severely bad decisions. Minimally, this highlights the importance of the Office of the Bar Counsel adhering to its founding and governing statutes, regardless of what has been done since the 1970s.

15      The evidence against Bernstein lacks similar potential for a believable alternative.

## NOT AN ISOLATED INCIDENT

16      During oral arguments, DeGonia's predecessor told the State Supreme Court that the reason the Office of the Bar Counsel doesn't follow the proper procedures as stated in the governing body of law is because doing it wrong is how the office has done it since its inception in the 1970s. Specifically, this pertains to the sharing of appointment powers and the name of Bar Counsel, so that all work products from the Office of the Bar Counsel appear to originate from the appointed person. See *Attorney Grievance Commission of Maryland v. Marylin Pierre*, AG No. 42, September Term, 2021, at 27:50 of oral arguments.

17      I will reference this case throughout litigation because (1) court records are being modified, (2) the AGC filed against Ms. Pierre for what equates to similar complaints as part of an election process that she was running in, and (3) the court records of Ms. Pierre's case could not be reconciled with the courts coming up with what equates to a new version of records.

18      If a lawyer running for judge can't speak adversely against their opponent, and the response is that the same oversight agency named herein is acting on behalf of the sitting judiciary—by appearance or otherwise—then who is going to run against them?

19    The ruling opinion in Ms. Pierre's case reads in its third sentence: "That overlay arises from the circumstances in which the investigation of Ms. Pierre began and the absence of provisions in our rules to guide investigations arising in such circumstances." The next sentence/paragraph states, "The core allegations against Ms. Pierre arose from accusations made in an August 2020 campaign email."

20    The judges run unopposed, and the minute an opponent stands up to run in the race, the Bar Counsel is pulling records from 1999 and using the verbiage of a question to discredit them. I would be more surprised if the process I have developed to detect the altering of court records did not result in detecting records being altered in connection with Ms. Pierre. These are not changes she is responsible for, but rather changes made against her.

21    If I may quote two more parts of the opinion:

    1.    "In that circumstance, absent a need to proceed expeditiously, the good faith of Bar Counsel—which is something we do not question here—may be insufficient to avoid undermining public confidence in the integrity of the attorney disciplinary process. Both of those challenges play prominently in our review of the charges against Ms. Pierre and our consideration of the appropriate sanction." See Id. at 2.

    2.    "Bar Counsel filed no exceptions. Ms. Pierre filed exceptions that, in effect, challenge all of the hearing judge's findings of fact and conclusions of law that were adverse to her." See Id. at 3.

22    There are 77 pages, and the outcome is a reprimand. I cannot imagine concluding that Ms. Pierre was the victim of the entire judiciary conspiring against her before every other possible conclusion fell, and even when I looked at the forensic data for the first time, I still doubted it. But when I ran the analysis on the control data, and it came back exactly as it should

without a single indicator out of place, I was left without a single alternative. The data is conclusive and leaves no room for doubt, and once this irrefutable fact is accepted, even the smallest details are scrutinized. That is when I noticed parts of a previous ruling still visible on some documents, deficiency forms being edited to fabricate a reason for deficiency, and I could only shake my head in disbelief every time I found a new example of manipulation that requires nothing more than working eyes and a basic understanding of the law.

23	Things I must have looked at countless times, but couldn't see, because it was easier for me to excuse it away. That is the best way I can describe the degree of certainty the evidence held for testimony under seal provides. I have found a way to detect and prove that the records are being altered at scale, and I believe my methodology could be adapted to function at scale and quickly identify cases with altered records across the Maryland judiciary records. This is the first topic for the ex parte that I want to provide to the court under seal. Knowledge is power, and understanding how to detect it could result in efforts to hinder identification.

24	I have been vague on this detail and others because this case has the potential to unleash a wave of appeals under fraud, where Maryland law allows statutes of limitations to be ignored in cases of fraud. For some, this is a necessity, but there are others who, at this exact moment, have what they believe to be closure on something very painful. If handled improperly, those people will have that closure taken from them. The motivation for altering records, in some cases, appears to be rooted in the perpetrators' own version of justice, which means both innocent and guilty parties' cases could be the victims of fraud. Until an inception point is determined in the records, who is to say this problem isn't as old as the Maryland e-file system? And if that is true, what does it mean for even older cases?

25    The sooner the special master begins with the state-level negotiations, the better, because at some point this becomes the only headline, and when that moment comes, the political landscape becomes a PR nightmare. My actions to this point have been focused on balancing and minimizing harm as much as possible.

26    The U.S. justice system is at risk of people using this as a mechanism for personal and political gains, and such exploitation will be exaggerated to fit their needs unless data and facts are ready to rebut broad-stroke claims. I can't support the entire case being sealed, because it could backfire and appear as a coverup. Swift and decisive action that embodies the best of the system, combined with cross-party collaboration, is what the data tells me is the optimal path. This approach has genuine potential to improve public opinion and support for the judicial system.

27    I successfully defended myself against a stacked deck, simultaneously investigated what has revealed systemic corruption that will continue to hurt an unknown number of people until it is properly addressed, and developed a repeatable and verifiable process that can hopefully help many people and stop those responsible.

28    So here I am, hoping that I can convince Your Honor to give me a moment of your time to share what I have found. With any luck, I will not falter or let anyone down in conveying the facts in a manner that allows things to move forward on a path that I have put myself in harm's way for—a path inspired by the same reason I believe makes Your Honor's favorite part of being a judge the swearing in of new citizens.

## SO, WHAT HAPPENED WAS

29    At no point have I claimed to lose the case or sought to overturn a ruling—there is no ruling to overturn. Instead, I have consistently highlighted the absence of a verdict, the state's

voluntary waiver of immunity, and the state court's acknowledgment of only one claim, in violation of the Norris-LaGuardia Act (NLA), before granting a voluntary dismissal without prejudice.

30   Judge Barranco's remand of my FMLA claim to federal court makes the case and controversy binding under the standard set forth in **Lapides v. Board of Regents**, effectively bringing the case within federal jurisdiction. The intertwined nature of these claims and rights aligns with both my argument and Your Honor's citation of **Shooting Point, LLC v. Cumming, 368 F.3d 379, 383 (4th Cir. 2004)**, which illustrates two sides of the same legal principle. The misunderstanding lies not in res judicata but in recognizing that the state plaintiff's strategy was inherently flawed and unfixable.

31   Ohana Growth Partners, LLC was doomed from the start due to fatal defects in its case, compounded by their president, Justin Drummond, entering into a binding accord on June 7th under the **E-Sign Act**. Despite their efforts to salvage the case, including motions for default judgment that exceeded judicial discretion, I countered each attempt by filing timely motions and answers, even under the challenging conditions created by deliberate interference with my filings. Their inability to secure a judgment or dismissal that could survive appeal resulted in their voluntary dismissal.

32   My filings focused not on personal gain but on addressing systemic abuse, seeking sanctions, disqualification of counsel, and reciprocal relief to deter similar frivolous litigation. These efforts included specific claims against judicial actions to preserve the right to appeal or seek mandamus relief. The evidence uncovered since has confirmed systemic corruption involving the Bar Counsel and Director of Investigations.

33    I succeeded because I was never at genuine risk of losing. Stoicism played a central role, allowing me to maintain focus and accountability while advocating for others subjected to retaliation and abuse. This mindset protected me against distractions, enabling me to negotiate favorable working conditions for others without succumbing to personal vendettas.

34    Even now, I continue to advocate for those impacted, recognizing that this case is about more than myself. The absence of arguments against me, immunity to hide behind, or substantive claims to dispute underscores the validity of my position and the broader implications for justice.

### ADVOCATING FOR OTHERS

35    I don't particularly like that my legal argument is rooted in my right to seek relief, but as Your Honor has pointed out, the law doesn't allow me to represent others.

36    This is part of the reason why I am requesting court-appointed legal counsel. I am confident that, when the time is right, those who are eligible for a new trial or modification will find that the number of advocacy groups and law firms bidding for the opportunity to be involved will satisfy the needs of those victims. However, that is only one part of the case that has already been filed. The greed of my former employer is how I ended up in State Circuit Court, and the law firm that represented them is one-third of this trilogy. I want to highlight that the counts filed are just the beginning, and I am limiting myself to what is topical to the memo that Your Honor was generous enough to provide.

37    Your Honor was correct that Judge Gallagher dismissed Chisholm's case in November, but it was with a 60-day clause that allows for Mr. Chrisholm to file an amended complaint that addresses the easily corrected but omitted elements from his complaint. ECF 2 of 1:24-CV-01924-SAG is the complaint. To address the surface defects, I can confirm that as the fitness trainer of the Perry Hall location Mr. Chisholm's stated start date of 2022 sounds correct as I

have personal knowledge of changes to employment for the trainers and this period of time overlapped with other IT projects which required additional attention to employment changes that was inclusive of the fitness trainers, and I worked closely with the Director of Fitness and Directors of Operations where the topic of their full time status was a material fact for cost optimization. Furthermore, the generalized topic of having fitness trainers and understanding their job and workload overlapped with another project with it being highly unusual and notable if the fitness trainer of Perry Hall was not working full time for an extended period that would have resulted in them not meeting the 1,250 hours in the preceding 12-months.

38      Moreover, Perry Hall is among many clubs operated by Ohana Growth Partners, LLC within 75-Miles of that location and is roughly 15 miles from their Maryland headquarters which allowed me to say with absolute certainty that the employees of Perry Hall are covered by the 50/75 rule.

39      Finally, I have read the complaint and the ruling memorandum from Judge Gallagher and the Motion to Dismiss is foundationally rooted in a defect in the filing that failed to plead Mr. Chrisholm's entitlement to FMLA leave. When my initial filing was drafted, I did not have access to Pacer to read the details and everything that I assumed was aligned with what I have since read with access to Pacer. It would be a substantial injustice to Mr. Chisholm to be denied the opportunity to have a technical defect corrected when I have addressed them in this affidavit and Judge Gallagher was kind enough to provide 60 days which I believe gives him a tiny bit of time to meet that deadline. This is part of my request to have the court appointed attorney and for them to be allowed to represent Mr. Chisholm so that this window of opportunity isn't lost for them.

40      As for the Motion to Dismiss' claim that the allegations are demonstrably false, no material statement to rebuttal Mr. Chisholm was provided in the motion and the memorandum of law in support at page 2 footnote one says that in their motion to dismiss Ohana is not assuming the factual allegations are true with them correcting the misspelling of Ms. Mittermeier's name in footnote 2. The legal argument is fubar because it is fundamentally a claim that they are not required to provide FMLA leave to him and the other 2 points cited are superfluous because they agreed to the notice given and the claim made that he was on FMLA leave when they twice interfered, he asserted his protected right which is a protected activity, and Ohana then retaliated against him for not immediately returning to work.

41      They didn't get what they wanted, and they terminated him for it, and if you truly are accepting of the facts provided by Mr. Chisholm then those two points are as started. The defect is a technical wording failure that regrettably lacked the material facts that I have corrected.

42      Furthermore, if the Court accepts this argument, then the burden of proof to establish that the termination was not a retaliation falls to Ohana Growth Partners, LLC under the burden-shifting framework more commonly referred to as the McDonnell Douglas framework.[1] [2]

---

[1] Once the employee establishes a **prima facie case** of FMLA retaliation (e.g., they engaged in protected activity, suffered an adverse action, and there is a causal connection), the burden shifts to the employer to provide a **legitimate, non-discriminatory reason** for the adverse action. See *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973): Although originally a Title VII case, courts apply this framework to FMLA retaliation claims. See also: *Bachelder v. America West Airlines, Inc.*, 259 F.3d 1112 (9th Cir. 2001), where the court explains the interplay of FMLA protections and retaliation. And See *Hodgens v. General Dynamics Corp.*, 144 F.3d 151 (1st Cir. 1998): The court held that employers must show the adverse action was based on a legitimate reason unrelated to the employee's FMLA leave. Additionally, if the bar is met by Ohana the mixed-motive standard from *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) is often applied in FMLA cases.

[2] The FMLA explicitly prohibits employers from retaliating against employees for exercising their rights under the Act. See: **29 U.S.C. § 2615(a)(2):** Prohibits employers from discriminating against individuals for opposing practices made unlawful by FMLA. See also **29 C.F.R. §**

4

43　　I fully expect that Ohana has "lost" relevant communications and paperwork, as they did in the case of **Darren Koritzka**, who was previously targeted for termination while on FMLA leave. Richard Hartman admitted to both me and Karen Debus that missing paperwork was blamed on a former HR employee. On **June 13, 2024**, Darren was suspended at 2:20 PM, just 15 minutes after a combined FMLA and whistleblower email was sent to ownership with him included. The 9:00 AM email, interfering with my FMLA leave, was also sent that morning, following the exact process requested by Ohana. Richard Hartman admitted in his affidavit that they were violating my FMLA leave, a fact confirmed during the June 26th hearing by Robert Brennen.

44　　What was never defended against was the shared fact that Darren's suspension was retaliatory, occurring shortly after the 2:05 PM email that addressed not only FMLA violations but also other whistleblower concerns. This is well-documented in the state filings, both in full documents and supporting screenshots. Darren's case involves FMLA, ADA, and whistleblower protections, with the FMLA violation already confirmed by Hartman's affidavit and the hearing transcript.

45　　My request for court-appointed representation includes a request to extend this benefit to Darren, as well as to my wife, who became an employee of Ohana Growth Partners, LLC when she began caring for me. Additionally, my LLC, MXT3, has suffered harm that is covered in the state filings and should now be viewed as part of the federal court case as additional counts beyond the ones already made in the federal pleading.

---

**825.220(c):** States that employers cannot use the taking of FMLA leave as a **negative factor** in employment decisions (e.g., hiring, promotions, terminations).

46      The purpose of the request for court-appointed representation is to ensure assistance during this process and extend representation to Mr. Chisholm, Darren Koritzka, and Mrs. Dillon-Capps. While Your Honor has noted that such inclusion is not typically permitted by law, I respectfully argue that their involvement is essential to achieving equitable relief.

47      The complexity of this request arises from the fact that appointing counsel would typically convert me from a Pro Se litigant to a represented plaintiff. This raises concerns because the current filing represents only the simpler counts selected to initiate the process. Many more elements of the case are reserved for future filings. My intention was to clear as many counts as possible through interlocutory judgment and alternative dispute resolution, resolving or narrowing the issues before filing an amended complaint.

48      The goal is to proceed efficiently, use any initial relief to secure a qualified legal team, and focus on achieving resolution. This would also allow me to dedicate more time to supporting my wife, who has selflessly stood by me throughout this process.

## ADDITIONAL THANKS

49      It is early morning on January 13, 2025, as I finish this memorandum and affidavit. I understand the procedural requirements: responding to memorandums with a memorandum, using affidavits to present evidence, and including a table of authorities and contents for filings exceeding 15 pages. I am fully aware that I am falling short in adhering to these standards and many others. I hope, however, that my arguments are coherent and compelling, and that my efforts are helpful to the Court. If I could do better, I would, but knowing the proper procedure and being capable of executing it in my current state are not the same. I need relief and am entitled to it, but I wish I could focus more on addressing the broader issues at hand.

50      Please do not let my current limitations enable the defendants to continue trampling on the rights of others. I respectfully request that the court afford me a moment of its time, allow me to try and explain what the evidence is and why it is so meaningful, and make your decision inclusive of the evidence, testimony, and answers that I provide to the court's questions am not seeking to deprive anyone of their rights or protections under the law—my goal is to prevent others from doing so. While the law requires me to make this case about myself, that is not my strength, but I am working to improve.

51      Regardless of this Honorable Court's decision, I am thankful and grateful for the time given to read my filings and respond in such a timely manner. This is not sarcasm, after waiting 3+ weeks for an opinionless denial of a simple filing to have a response on this monstrosity with an actual opinion to respond to is something I thought I would never see again. Thank you.

## DECLARATION OF AFFIRMATION

I solemnly declare and affirm under penalty of perjury, based on my personal knowledge, that the contents of the foregoing affidavit and all accompanying exhibits are true and correct to the best of my knowledge.

**January 13, 2025**

/s/ Ryan Dillon-Capps
**Ryan Dillon-Capps**

1334 Maple Avenue
Essex, Maryland 21221
ryan@mxt3.com
703-303-1113