# IN THE UNITED STATES COURT
## OF APPEALS FOR THE FOURTH CIRCUIT

| | |
|---|---|
| RYAN DILLON-CAPPS<br><br>**_Plaintiff-Appellant,_**<br>vs.<br><br>OHANA GROWTH PARTNERS, LLC<br>_et al_<br><br>**_Defendants-Appellees._** | No. **25-1162**<br><br><br>On Appeal from the U.S. District Court<br>Northern District of Maryland<br>No. 1:24-CV-3744 |

Affidavit of Ryan Dillon-Capps Family and Medical Leave Act, Americas with Disabilities Act, and the Rehabilitation Act

## Table of Contents

**TABLE OF CONTENTS** ................................................................. 1

**INTRODUCTION** ........................................................................ 3

**I PERFORMANCE PROMOTION AND BONUS** ....................... 5

    A PERFORMANCE ................................................................... 5

    B PROMOTION ........................................................................ 8

    C REFINANCING BONUS........................................................ 8

**II UNDISPUTED FACTS** ............................................................. 9

    A JANUARY 4, 2024 – FORMAL NOTICE REQUESTING FMLA LEAVE ............... 9

    B JANUARY 8, 2024 –FMLA ELIGIBILITY WH-381 FORM............................... 10

    C JANUARY 22 AND MARCH 12, 2024 - HEALTHCARE PROVIDER COMPLETED FMLA QUALIFYING CONDITION WH-380-E FORM ........................................ 10

        _1 November 23, 2013 - Diagnosing MD Letter and Service Animal_......... 12

        _2 February 10, 2020, Starting Employment Date_ ................................... 12

    D JANUARY 25, 2024 - EMAIL FROM RICHARD HARTMAN REQUESTING ADDITIONAL INFORMATION ........................................................................ 13

*1 January 22 to February 25, 2024, Timesheets* ...................................... 14
*2 January 8, 2024 – Email from Karen Debus* ......................................... 14
*3 January 10, 2024 - Different Leave Policy Email to Richard Hartman* 15
*4 May 23, 2024 – Email from Karen Debus* ............................................. 16
*5 May 24, 2024 – Email to Rebut Karen Debus May 23 Email* ............... 17
E INTENTIONAL VIOLATION OF FMLA LEAVE ................................................. 18
*1 June 13 and June 14, 2024 – Richard Hartman Email, Suspension Letter, and Affidavit* ...................................................................................... 19
*2 June 26, 2024 – Robert Brennen Open Court Under Oath* .................... 19

## III TERMINATION WAS PLANNED SIX MONTHS IN ADVANCE IN RETALIATION FOR REQUESTING FMLA LEAVE ................................. 20

A RYAN DILLON-CAPPS ...................................................................... 20
A DARREN KORIZTKA ........................................................................ 21
B JORDAN CHISOM ............................................................................ 23

## IV SUSPENSION AND LAWSUIT ................................................. 24

A JUNE 12, 2024 .............................................................................. 25
B JUNE 13, 2024 .............................................................................. 33
C JUNE 17, 2024 .............................................................................. 44
D JUNE 18, 2024 .............................................................................. 46
E NO MATERIAL STATEMENT OF TRUTH .......................................... 46
F SUMMARY OF SUSPENSION AND LAWSUIT ................................... 48

## V CATASTROPHIC HARM, OBSTRUCTION TO RELIEF AND ASSISTANCE, AND PURSUIT OF FINALITY ................................ 49

A INSURANCE FAUD – COBRA INSURANCE ..................................... 49
B DENIED USE OF PAID LEAVE FOR FMLA & UNPAID BALANCE .................. 52
C FINANCIAL HARM AND IMMINENT FORECLOSURE ....................... 53
D MXT3 LLC ................................................................................... 57
*Demonstrative Proof – AI Legal Strategy* ........................................ 59
*MXT3 Business Plan* ....................................................................... 59
*Over 15 Years of Planning* ............................................................. 62
*Harm Suffered to MXT3* .................................................................. 63
E PHYSICAL, MENTAL, AND EMOTIONAL HARM ............................. 64
F LEVERAGING POWER, POSITION, AND REPUTATIONAL INFLUENCE ........... 68
*1 U.S. Department of Justice Civil Rights Division* .......................... 68
*2 Eastern Division of North Carolina District Court* ........................ 70

## VI EEOC RIGHT TO SUE LETTER ............................................. 71
## VII SUMMARY OVERVIEW ...................................................... 75

Affidavit of Ryan Dillon-Capps Family and Medical Leave Act, Americas with Disabilities Act, and the Rehabilitation Act

2

**VIII THE ONLY RATIONAL, EQUITABLE, AND JUST CONCLUSION**
.................................................................................................................. **78**
**DECLARATION OF AFFIRMATION** ........................................................ **81**

<u>Introduction</u>

I, **Ryan Dillon-Capps (née Wagner)**, the **Appellant**, being over the age of eighteen (18), competent to testify, and having personal knowledge of the facts contained herein, declare under penalty of perjury pursuant to **28 U.S.C. § 1746** that the following is true and correct.

As detailed more fully in Circuit ECF 31-1, Judge Brendan A. Hurson materially altered the District Court record. He directed the Court Clerk to cease her efforts to restore the record to reflect what was actually filed on December 27, 2024, and instead compelled her to enter District ECF Series 16 as a supplemental filing dated January 3, 2025. Despite this manipulation, the Court Clerk included a docket note confirming that the materials were received on December 27, 2024. In addition, a significant portion of the exhibits submitted on the signed physical CD were never docketed, and the CD itself remains undocketed as a physical exhibit.

Judge Hurson relied on the altered record to misrepresent the filings as conclusory and the factual allegations as implausible in his January 8, 2025 memorandum and order (District ECF 18-0), January 29, 2025 order (District ECF 22-0), and February 12, 2025 order (District ECF 27-0). As further

substantiated in Circuit ECF 24-2 and Circuit ECF 24-4, Judge Hurson acted with undisclosed personal, professional, and financial conflicts of interest that exceeded the standard for disqualification under 28 U.S.C. §§ 144 and 455, and give rise to both civil and criminal liability. I have declared my intent to name Judge Hurson as a defendant in the amended complaint. His failure to disclose a seven-figure financial sum appears to be a quid pro quo bribe that has resulted in his actions more than a year later—framing the events as "buying a federal judge," which was later leveraged in order to have Judge Brendan A. Hurson violate the law and his judicial oath to shield the defendants from liability.

These actions furthered the shared objective of the defendants and Judge Hurson to obstruct meaningful relief and allow the ongoing irreparable harm to reach a point of finality—under the erroneous belief that doing so would immunize them from accountability. I am the prevailing party in the state court action, which was vitiated post-granting of the employer's voluntary dismissal. This altered our legal relationship post-judgment in my favor under Maryland Rule 2-506(e), which mandates that Ohana Growth Partners, LLC is liable for the costs of the state action. A vitiated state action also carries no preclusive effect against any of my claims filed in federal court.

Affidavit of Ryan Dillon-Capps Family and Medical Leave Act, Americas with Disabilities Act, and the Rehabilitation Act

2025-05-08 || 4/81 ................................................................. 4 ...............................................

The consequences of Judge Hurson's misconduct continue to affect the case. The Fourth Circuit's denial of injunctive relief on March 14, 2025, appears to have been based on a materially incomplete and misleading record of what was actually filed on December 27, 2024. Unfortunately, the Fourth Circuit was unaware of Judge Hurson's fraud upon the court and afforded him the same deference that should ordinarily be given to a District Court's ruling. However, the Circuit Court record does reflect a good-faith effort to understand why my Circuit ECF Series 4 motion was substantially different from the fabricated reality presented through the altered record.

This affidavit is submitted to correct that error and to provide a simplified, direct presentation of the prima facie elements satisfied by my claims—alongside a factual showing that the material allegations remain either undisputed or unrebutted. While my collective efforts through filings in the Circuit Court have helped create a less defective record, it remains substantially incomplete as to the full content of what was filed on December 27, 2024.

I Performance Promotion and Bonus

A **Performance**

1. Exhibit 207, at 1: From my hiring in February 2020 through January 2024, the performance of the IT Department's Support Services division at Ohana Growth Partners, LLC improved significantly. By the end of 2023,

Net Promoter Scores (NPS) had increased from a prior average in the low 6 to high 7 range to a consistent high 8 to 10 range. Over the same period, Time to Resolve (TTR) for support tickets was reduced by 96.97%.

2. Exhibit 207, at 2: These improvements were driven by statistical analysis using Spearman ranked correlation tests, which determined that the time to resolve a ticket could be predicted with 99.754% accuracy based on the amount of time the help desk spent waiting for others to respond.

3. Exhibit 207, at 3: The strategic alignment to this information resulted in the time to resolve complex issues dropping from 30+ day averages to less than four days, with moderately complex issues resolved in less than three, and all others in a day or less. This transformation was executed through a phased approach:

• **Phase 1** focused on standardizing support workflows, reducing the number of external service providers, modernizing club technology solutions, and internalizing procurement functions previously managed by third parties. These changes addressed excessive costs and reduced inconsistencies in service delivery.

• **Phase 2** began with the hiring of Darren Koritzka and emphasized the upskilling of support team members. This phase included implementation of standardized support systems, improved accessibility for end-users, infrastructure modernization, and migration to a unified internal system

Affidavit of Ryan Dillon-Capps Family and Medical Leave Act, Americas with Disabilities Act, and the Rehabilitation Act

2025-05-08 || 6/81 .......................................................................................... 6 ..............................

and cloud management solution. During this time, we also diversified labor responsibilities related to TV replacements through close coordination with the Facilities, Equipment, Repair, and Maintenance (FERM) department.

4. Exhibit 207, at 4: Support Timeliness scores, measured on a 1 to 5 scale, improved substantially—from consistent ratings in the 2 to 3 range to sustained ratings in the 4 to 5 range.

5. Exhibit 207, at 5: Satisfaction Scores, measured on a 1 to 5 scale, improved substantially—rising from an average in the low 3 to mid-4 range to consistent ratings of 5.

6. Exhibit 207, at 6: Using Spearman rank correlation analysis, we were able to predict help desk ticket volumes with 89.324% accuracy based on the amount of time the help desk spent waiting on responses from requesters. The strategic alignment to this information reduced the waiting time by a factor of three in nearly all situations.

7. Exhibit 207, at 7: Support Team Ability Scores improved from the low three to mid four range up to high fours and fives. Concurrently, the time spent actively resolving issues was reduced by several factors.

For the first time in company history, any department within Ohana Growth Partners, LLC achieved perfect performance across all measured

metrics—and it was the same department that had previously been regarded as the poorest performing when I joined nearly four years earlier.

## B  Promotion

Exhibit 207, at 8–9: In early 2023, I informed Glenn Norris of my intention to be promoted to the C-suite and implement structural changes across the company, setting a personal deadline of year-end 2023 to see substantial progress or I would resign. Glenn Norris immediately engaged in promotion discussions, and throughout 2023 decisions were made to significantly expand both my role and the IT department beginning in 2024. The final version of the compensation agreement we discussed included a base salary of $500,000, a $4,200 annual phone reimbursement, and a $3,000 annual internet reimbursement, totaling a guaranteed minimum of $507,200. Glenn Norris's last comment regarding the arrangement was, "okay, but don't tell or show anyone the numbers yet." I anticipated the final offer would adjust the allotment slightly, dividing some compensation into performance-based components such as KPIs, annual and holiday bonuses, and equity-related gains.

## C  Refinancing Bonus

Exhibit 207, at 10: In 2023, Glenn Norris was involved in a refinancing transaction through which Ohana Growth Partners, LLC sold equity to Alaris. The liquidity generated from that sale is now believed to have been

used in a series of 2024 transactions to acquire additional shares of Planet Fitness, occurring immediately after the refinancing closed. While my promotion discussions had referenced a $30,000 bonus, I later learned that a $100,000 bonus had been allocated from the refinancing proceeds, which I believe Glenn Norris intended to present as a higher signing bonus as part of the finalized C-level promotion offer.

II  Undisputed Facts

A  **January 4, 2024 – Formal Notice Requesting FMLA Leave**

1. Circuit ECF 28-4, at 1-2, I emailed Richard Hartman (Head of HR), Glenn Norris (CFO), Justin Drummond (President), and Holly Butler (Outside Counsel from Miles & Stockbridge P.C.) that I was taking leave under Family and Medical Leave Act on January 4, 2024.

   • The email was a follow-up to my December 21, 2023, email where I asked for time off to recover and asked for some reprieve because of the hostile work environment, excessive work hours, and the fraud investigation which had uncovered troubling misconduct. Cumulatively, it had negatively affected me physically, emotionally, and mentally that had resulted in me experiencing daily panic attacks that sometimes-last hours and severe anxiety that was negatively impacting every part of my life.

## B  January 8, 2024 –FMLA Eligibility WH-381 Form

From Circuit ECF 28-4, at 4-7, On January 8, 2024, HR Generalist Karen Debus, on behalf of Ohana Growth Partners, LLC, provided me with an employer completed Notice of Eligibility & Rights and Responsibilities under the Family and Medical Leave Act Form WH-381 which states that it provides information required under 29 C.F.R. §§ 825.300(b)-(c). Form WH-381 shows that Ohana Growth Partners, LLC has determined that:

1. I formally requested FMLA leave for my own serious health condition on January 4, 2024.

2. I am eligible for FMLA leave.

3. I am a key employee as defined under the FMLA.

4. Ohana Growth Partners, LLC, will NOT suffer substantial or grievous economic harm by restoring my employment at the end of FMLA leave.

5. Leave policies are provided in the Employee Handbook

6. Ohana Growth Partners, LLC, requested a certification of health care provider for my serious health condition under the family and medical leave act.

## C  January 22 and March 12, 2024 - Healthcare Provider Completed FMLA Qualifying Condition WH-380-E Form

From Circuit ECF 28-4, at 10-13, 18-21, On January 22, 2024, and March 12, 2024, my health care provider completed the employer provided

Affidavit of Ryan Dillon-Capps Family and Medical Leave Act, Americas with Disabilities Act, and the Rehabilitation Act

2025-05-08 || 10/81 ......................................................................................................................
10

Certification of Health Care Provider for Employee's Serious Health Condition under the Family and Medical Leave Act WH-380-E form. Form WH-380-E shows that my health care provider has determined that:

1. My condition is Chronic and Permanent and was diagnosed on or around May 15, 2013.

2. Treatment occurred twice weekly on Mondays and Wednesdays via ongoing psychotherapy and medication management.

3. The unpredictable nature of my condition is episodic and varies in frequency and intensity and can severely impact or prevent me from performing regular daily activities and my ability to work on an intermittent basis.

4. I experience frequent and intense panic attacks, severe anxiety, and agoraphobia. Symptoms exacerbated by the Ohana Growth Partners, LLC hostile workplace, and triggered by direct contact with certain colleagues which adversely impacts my ability to perform essential job functions including in-person meetings, on-site collaboration, and immediate face-to-face response.

5. My symptoms are more manageable at home and significantly worsen in the traditional office environment, and I require work-from-home ADA accommodations to mitigate the panic attacks and agoraphobia.

The documentation supports the need for both intermittent leave and work-from-home accommodations. Ohana Growth Partners, LLC approved my work from home ADA reasonable accommodation, and I worked from home throughout 2024 as my primary workplace.

# 1 November 23, 2013 - Diagnosing MD Letter and Service Animal

From Circuit ECF 28-4, at 3, 22, I was diagnosed with Post-Traumatic Stress Disorder with Agoraphobia on or around May 15, 2013. My diagnosing healthcare provider issued a formal letter dated November 23, 2013. At the time of diagnosis, my impairments substantially limited several major life activities as compared to most people in the general population, including concentrating while interacting with others, maintaining social relationships, sleeping, eating, and the operation of my digestive and bowel systems. My symptoms were severe and, at times, required emergency medical intervention. From April 2014 through 2019, I relied on my service animal, Bumi, on a continuous 24/7 basis. Due to the nature of my mental health impairments, I require reasonable accommodations under the Americans with Disabilities Act (ADA) and the Rehabilitation Act of 1973, as amended.

# 2 February 10, 2020, Starting Employment Date

By the time I accepted my position with Ohana Growth Partners, LLC, I no longer required the regular assistance of my service animal, Bumi, during the workday. I relocated to Maryland and began employment with

Ohana Growth Partners, LLC on February 10, 2020. When Bumi passed away in December 2022, I was no longer dependent on a service animal, medication, or routine treatments. During this period, I experienced extraordinary success as the executive department head of Information Technology and was on track to be promoted to the C-suite. The other C-level executives were aware of the forthcoming announcement of my promotion, and many employees understood that the IT department was expanding in scope and assuming greater responsibilities.

## D  January 25, 2024 - Email from Richard Hartman Requesting Additional Information

From Circuit ECF 28-4, at 14-15, Richard Hartman is altering my normal leave and work policy to a more restrictive policy as a direct response to me taking FMLA leave. Prior to taking FMLA leave, as with a substantial portion of executives and IT personnel, these jobs are not conducive to 7 am to 6 pm and had never been thought of or spoken about in such terms at Ohana Growth Partners, LLC.  To the contrary, I worked the days and hours that I determined were the correct hours and days to work, and this email shows my independence was being removed as a direct result of me taking FMLA leave.  In addition, this policy is more restrictive than what is documented in the employee handbook.

Affidavit of Ryan Dillon-Capps Family and Medical Leave Act, Americas with Disabilities Act, and the Rehabilitation Act

2025-05-08 || 13/81 .................................................................................................................

13

Additionally, Richard Hartman acknowledges the work-from-home is a reasonable ADA accommodation, and it was subsequently approved as such.

## 1 January 22 to February 25, 2024, Timesheets

Filed to the District Court on December 27, 2024, in digital format on the signed physical CD and referenced on the Table of Exhibits as part of Exhibit 102. From Exhibit 102A, at 1-5:

1. Week of January 22 to January 28, 2024, total hours 48:17.

2. Week of January 29 to February 4, 2024, total hours 42:23.

3. Week of February 5 to February 11, 2024, total hours 63:02.

4. Week of February 12 to February 18, 2024, total hours 43:09.

5. Week of February 19 to February 25, 2024, total hours 44:15.

## 2 January 8, 2024 – Email from Karen Debus

Filed with the District Court on December 27, 2024, in digital format on the signed physical CD and referenced in the Table of Exhibits as part of Exhibit 102. From Exhibit 102A, at 6: On January 8, 2024, Karen Debus, HR Generalist for Ohana Growth Partners, LLC, formally acknowledged in writing that Richard Hartman had informed her on January 4, 2024, that I had requested FMLA leave for my own personal health reasons.

The Notice of Eligibility form (WH-381), was attached to the email, and confirmed that I was eligible for FMLA leave under federal law and could take up to 12 weeks of unpaid, job-protected leave for a qualifying health

Affidavit of Ryan Dillon-Capps Family and Medical Leave Act, Americas with Disabilities Act, and the Rehabilitation Act

2025-05-08 || 14/81 ..................................................................................................
14

condition. Karen Debus provided a copy of my job description showing the start date of my employment as February 10, 2020. The email stated unequivocally, "You should not be working while on FMLA".

Additionally, the email explicitly stated that all further communication would be sent to my personal email address, ryan@mxt3.com—demonstrating the employer's awareness and acknowledgement of this email address for official matters. Highlighting the nature of the intentional lack of notice given for the ex parte TRO.

## 3 January 10, 2024 - Different Leave Policy Email to Richard Hartman

From Circuit ECF 28-4, at 8-9. On January 10, 2024, two days after my FMLA eligibility had been confirmed and my WH-380-E certification form had been submitted, I received a text message from the head of HR, Rich Hartman, stating: "You are correct in that we cannot require you to work but it is not your choice to work while on leave. Our policy is to not allow work while on leave."

I immediately responded via email seeking clarification of the policy because for the preceding four years, I had regularly worked during periods of approved leave—including vacations, sick days, and holidays. Other senior managers and executives at Ohana Growth Partners, LLC also consistently worked during leave, including Glenn Norris my supervisor.

In my email response, I cited page 30 of the Ohana employee handbook, which explicitly permits partial-day absences and intermittent use of FMLA leave. I also cited page 45 of the handbook, which prohibits employees from taking a *different job* while on leave, but contains no language prohibiting work for Ohana during FMLA leave. I requested a formal explanation for the apparent change in policy and clarification on how it would be communicated to others, but there was no response to this because it was exclusively being applied to me in retaliation to requesting FMLA leave.

## 4  May 23, 2024 – Email from Karen Debus

From Circuit ECF 28-3, at 18, On May 23, 2024, Karen Debus, acting on behalf of Ohana Growth Partners, LLC, confirmed in writing that I had been previously approved for intermittent FMLA leave and that it remained available to me for the medical condition I disclosed when applying. The email reiterates that FMLA protection applies to any time taken for the approved medical reason, indicating that the employer recognized the legitimacy and applicability of the leave.

However, Karen Debus stated that "no one from HR has stated that you shouldn't be working," contradicting her own assertion on January 8, 2024 and Richard Hartman's on January 10, 2024 where they both said I was not allowed to work. This change in their position is in response to a change in Ohana Growth Partners, LLC official retaliatory strategy to find cause to

discharge in response to my request for FMLA Leave. Specifically, they had committed to a planned termination six months after the healthcare provider certificate and follow-up letter which they construed as a window of opportunity to terminate me on July 30, 2024, which they later followed through with.

## 5  May 24, 2024 – Email to Rebut Karen Debus May 23 Email

From Circuit ECF 28-3, at 14-18, On May 24, 2024, Karen Debus, Justin Drummond, Terry Woods, Earl Ihle, C. Victor Brick, Lynne Brick, Stacey Wittelsberger, Glenn Norris, and Richard Hartman received a response to her assertion that no one had said I shouldn't be working and it includes screenshots from the January 10, 2024 email and attached Richard Hartman's January 16th response which is summarized before I raised several substantial questions.

Additional Context to Aid in Understanding

This is a single example to highlight how Ohana Growth Partners, LLC uses emails and written communication to establish a false record. My counter-use of the emails to challenge them is a notable factor in why they did not have any evidence because they knew that any email that had been written for a pretextual purpose also had one or more emails to show it was pretextual. I believe that Jordan Chisholm suffered, as many other employees have, to Ohana Growth Partners, LLC tactics, and as the state and federal

Affidavit of Ryan Dillon-Capps Family and Medical Leave Act, Americas with Disabilities Act, and the Rehabilitation Act

2025-05-08 || 17/81 .......................................................................................................................................
17

court record reflects when these means fail, they will and did escalate to more severe criminal misconduct.

When reviewing the evidence and considering how to view it favorably to the non-movant party of Ohana Growth Partners, LLC the most favorable context is still through the lens of fraud, perjury, spoliation, malicious and vexatious litigation, and abuse of process which does not afford them a favorable context that contradicts a complete record which entirely and substantially is in my favor.

If they had a case to present or a defense to raise then there would have been no need for them to leverage Judge Hurson to commit multiple felonies to protect them from summons being issued and relief denied.

## E Intentional Violation of FMLA Leave

As detailed herein and in other filings, Ohana Growth Partners, LLC presents half-truths cloaked in pretext, but the material record speaks for itself. The undisputed facts remain unrebutted, and their fabricated justifications collapse under scrutiny. What remains is the plain truth: they intentionally interfered with and retaliated against my exercise of FMLA rights.

Affidavit of Ryan Dillon-Capps Family and Medical Leave Act, Americas with Disabilities Act, and the Rehabilitation Act

2025-05-08 || 18/81 .................................................................................................................
18

# 1 June 13 and June 14, 2024 – Richard Hartman Email, Suspension Letter, and Affidavit

1. Circuit ECF 28-1, at 158: In a sworn affidavit, Richard Hartman himself admits their actions "amount[] to retaliation against Dillon-Capps for requesting family and medical leave."

2. Circuit ECF 28-1, at 25: Hartman sent an email stating: "Your communication yesterday about your need for FMLA time off, to which you are entitled, makes self-evident the reasons for the company's demand to have several Global Administrators"—linking the demand directly to my protected leave.

3. Circuit ECF 28-1, at 159: In a suspension letter sent the same day and filed with the state court, Ohana claimed: "This is due to your insubordination and failure to comply with directives from superiors, described in part to you in the email sent to you earlier today, and continuing since you received the email"—expressly referring back to the post-FMLA-notice demand.

# 2 June 26, 2024 – Robert Brennen Open Court Under Oath

1. Circuit ECF 28-1, at 160: During the June 26, 2024, hearing, Ohana's counsel Robert Brennen admitted under oath: "The facts, which are established in the record that's already before the Court, and I don't think there's any dispute of it, is this concept that... a demand was made to, uh,

Affidavit of Ryan Dillon-Capps Family and Medical Leave Act, Americas with Disabilities Act, and the Rehabilitation Act

2025-05-08 || 19/81 ..................................................................................................... 19

the defendant on June 13th, an hour after he'd asked for -- for FMLA

leave, uh, and we're forcing him to work."

III  <u>Termination Was Planned Six Months in Advance in Retaliation for</u>
<u>Requesting FMLA Leave</u>

**A  Ryan Dillon-Capps**

1. Circuit ECF 28-4, at 17: The letter from my healthcare provider

   responding to Richard Hartman's January 25, 2024, email is dated

   January 31, 2024.

2. Circuit ECF 28-1, at 67-68: March 12, 2024 WH-380-E health care

   provider certification was submitted voluntarily because Ohana Growth

   Partners, LLC failed to provide any update regarding my FMLA leave

   status, usage, or formal designation. The updated certification was

   submitted as a proactive measure to address the "30-day" reference that

   appeared on earlier paperwork, even though applying a 30-day

   recertification period violated governing FMLA regulations.

3. Circuit ECF 28-1, at 68-69: On March 20, 2024, Richard Hartman sent an

   email stating: "The updated healthcare provider certification you recently

   submitted dated March 12, 2024, does not change this designation or the

   amount of leave your provider believes you will need. Unless your need for

   leave changes, we will not need any further updates from your healthcare

   provider for at least six months." The remainder of that email contained

   pretextual claims. My response focused on correcting the regulatory

misstatement, but the language of the March 20 email clearly shows that Richard Hartman had pre-determined a six-month endpoint based on the January 31 letter—effectively targeting the end of July 2024.

4. Circuit ECF 28-1, at 143–144: On July 30, 2024, I was terminated without any stated reason. The timing and lack of justification confirms that the decision had been planned months in advance in retaliation for my requesting of FMLA leave.

## A  Darren Koriztka

1. Circuit ECF 28-1, at 74–75: On February 29, 2024, Richard Hartman sent another pretextual email, in which he claimed that Darren Koritzka was never approved for FMLA leave and that I had been instructed to terminate his employment. However, I was present in a 2023 meeting with Richard Hartman and Karen Debus where Hartman stated that Darren's FMLA paperwork was missing and attributed the issue to a former HR employee. As Darren's direct supervisor and head of the IT Department—including all sub-departments—it was not credible to suggest that I anyone would have ever "told" me how to run my department and required me to terminate an employee.

2. Circuit ECF 29-6, at 554–555, the May 21, 2024, email from Glenn Norris states that he believes Darren Koritzka "is not working out." The language is not directive; it does not instruct or mandate termination. This

communication marks the onset of the period I have referred to as "the gauntlet," during which hostility was escalated to manufacture a labor dispute. Notably, this email directly contradicts the February 29, 2024, pretext that I was instructed to terminate Darren.

• The May 21 email was a response to my earlier message that same day, in which I addressed how Glenn Norris had seized control of the IT department and the resulting adverse impact on my responsibilities. Glenn's response, written as if I still retained departmental authority, was part of the same pretext: to later attribute the consequences of his own actions to me.

• Before I began FMLA leave, I maintained full authority over the department; it was only after my leave began that this control was undermined. When Darren informed me of his qualifying circumstances. I personally recommended that he speak to HR about taking FMLA leave, and I was directly involved in ensuring he received the time off he was legally entitled to. As described in my complaint and other filings, several members of the IT Department were aggressively targeted in the weeks leading up to Darren's forced leave of absence, escalating into an intentional labor dispute. If previous filings were not clear, this should sufficiently address this fact so that it is known and factually supported to have been rooted in FMLA interference and retaliation.

3. Circuit ECF 28-1, at 147–157: Darren Koritzka was terminated on August 2, 2024. The stated reason—"the elimination of your position is the result of a department review and subsequent restructuring"—is a widely recognized pretext commonly used to mask retaliatory discharge. The severance agreement presented to him required a waiver of his legal rights. Darren has since informed me that he declined to sign the agreement and is prepared to join this action as a co-claimant. He experienced several months of unemployment before recently securing new employment, and as a result, he is owed multiple months of back pay, lost benefits, and other statutory and equitable relief as a matter of law.

## B  Jordan Chisom

Circuit ECF 15-3: In Jordan Chisholm's complaint, he alleges that he began FMLA leave on December 13, 2023, and was contacted just six days later—on December 19—by his manager, who questioned when he would return to work and remarked that he "can't be missing all these days." Chisholm had provided advance notice, and nothing in the complaint or the District Court record rebuts his belief that he was on approved FMLA leave at the time. This reflects a clear pattern of retaliatory conduct by Ohana Growth Partners, LLC against employees who invoke their FMLA rights. If I had not been Darren Koritzka's direct supervisor, it is highly likely the same would have happened to him as well. Richard Hartman made several

inappropriate remarks about Darren's FMLA leave while Darren was actively on it, and ultimately his paperwork was reportedly "lost."

## IV  Suspension and Lawsuit

While the more appropriate statute is the Maryland Anti-Injunction Act rather than the Norris-LaGuardia Act, the underlying claim does not turn on the statute itself. Instead, it focuses on the substantive defect that rendered the state court proceedings void for lack of subject-matter jurisdiction and the judiciary without immunity. The state action was filed solely for injunctive relief and the recovery of litigation costs—there were no underlying damages or actionable legal claims. The lawsuit was filed specifically to block me from filing a peace order to protect Darren Koritzka, Mareann Piñera, Cielo, and myself, in connection with a labor dispute that Ohana Growth Partners, LLC intentionally manufactured in order to create a pretext.

As stated in the complaint, the defendants have adopted what can only be described as the "Ricky Bobby" of legal strategies—each new legal maneuver is like plunging another knife into the case, in the futile hope that it will somehow dislodge the ones already embedded. At this point, all I see are knives, and I find myself questioning whether there is anything left untouched.

**A  June 12, 2024**

1. Circuit ECF 28-3, at 85: On June 12, 2024, at 7:00 AM, I emailed the IT Support and Business Intelligence teams, along with Rich Hartman, Glenn Norris, and Justin Drummond, to notify them that I was taking FMLA leave for the day. In that email, I directed that any critical issues involving security or imminent risk be referred to Darren Koritzka, who had been provided with additional instructions to ensure continuity in my absence.

2. Circuit ECF 28-3, at 84: On June 12, 2024, at 7:59 AM, Glenn Norris responded to my 7:00 AM FMLA leave notification and asked whether I could attend a meeting with Phil Leadore and Dan Levett. He acknowledged that the original 12:30 PM meeting invite conflicted with a preexisting obligation on my calendar and requested that I propose an alternative time.

Context to Aid in Understanding

Since my initial request for FMLA leave in January 2024, Glenn Norris and Richard Hartman repeatedly interfered—both directly and indirectly—with my ability to meaningfully exercise that right. Their actions established a retaliatory "win-win" scenario: if I acquiesced to the interference, my health would deteriorate from lack of recovery; if I adhered to my medical

restrictions, they would weaponize that compliance as part of a pretext to justify the termination they had already planned for July 30, 2024.

Circuit ECF 28-3, at 79–80: On June 11, 2024, at 5:48 PM, Phil Leadore and Daniel Levett first contacted me via a meeting invite, introducing themselves as consultants engaged to begin a "PCI DSS review" of Ohana Growth Partners, LLC. My first concern was that a "PCI DSS review" is not an actual designation under PCI regulatory frameworks. While it may loosely resemble a PCI DSS assessment, I was unable to verify either their individual or organizational credentials, which are strictly regulated by the PCI Security Standards Council (PCI SSC).

Circuit ECF 28-3, at 79: That same evening, I emailed Phil Leadore and Daniel Levett directly, stating:

| |
|---|
| "I am unable to find your company listed as a PCI DSS v4 Assessor, nor do I see either of you listed as Qualified Security Assessors (QSAs). Could you please provide the name under which you are registered?" |
| Circuit ECF 28-3, at 78: I then forwarded the entire email thread to senior leadership—including Justin Drummond, Victor Brick, Lynne Brick, Terry Woods, Earl Ihle, and Stacey Wittelsberger—with the following message: |
| "Glenn stated that he would not hire Finchloom because they were not adequately vetted; a statement that Justin can confirm was made verbally.<br>Microsoft recommended Finchloom as an expert in our Azure and M365 environment. Since Microsoft defines the standards for qualified companies and professionals in their IP, their recommendation carries significant weight. |

I could not find Hartman Executive Advisors listed as PCI DSS v4 advisors. Qualified companies and individuals performing such work are registered as QSAs. You can verify this by checking the PCI Security Standards Council's website: PCI Security Standards Council- Protect Payment Data with Industry-driven Security Standards, Training, and Programs.

If you do find them listed, please inform me. I am giving Hartman Executive Advisors the same opportunity to verify their credentials in case I have made an error.

At the bottom of the PCI Security Standards Council page, you will see that it states, "QSA Company has QSA(s) trained in PCI DSS v4 and qualified to perform PCI DSS v4 assessments."

3. Circuit ECF 28-3, at 82-83: At 12:30 PM, I found myself able to attend the meeting and decided to join the meeting and wait to see if Phil Leadore or Daniel Levett would arrive. While I waited, I wrote the 12:48 PM email that was sent to Glenn Norris, Phil Leadore, Dan Levett, Justin Drummond, Stacey Wittelsberger, C. Victor Brick, Lynne Brick, Terry Woods, and Earl Ihle. The message contained:

• A statement that Ohana Growth Partners, LLC and Planet Fitness used the same credit card processor.

• A screenshot of a June 5, 2024, 4:57 PM email from Geoff VanMaastrict declining Global Administrator access, sent to Justin Drummond, Glenn Norris, and Steve Dalgar. See also Circuit ECF 28-3, at 88 from May 24, 2024 where I created an account for Geoff VanMaastrict which had Global Administrator.

- A screenshot of a June 5, 2024, 4:32 PM email Mr. VanMaastrict responded to, where I referenced my prior efforts to provide access to other companies, including the Microsoft recommended Finchloom, and stated that every effort had been rejected by Glenn Norris. The email references the prior phone call in May 2024 with VanMaastrict, Norris, and Drummond where Glen Norris committed to providing information required by PCI compliance and I informed VanMaastrict that Norris has not followed through with his stated intentions.

- A screenshot of a June 6, 2024 email directed to Justin Drummond, Richard Hartman, Karen Debus, Stacey Wittelsberger, Victor Brick, Lynne Brick, Terry Woods, Earl Ihle, and Glenn Norris formally requesting contact information for Ohana Growth Partners, LLC outside legal counsel.

<u>Context to Aid in Understanding</u>

> Circuit ECF 28-3, at 159: The email thread referenced occurs after the June 5, 2024 email around 10:51 AM to Glenn Norris, Justin Drummond, Richard Hartman, Matt Norris, Stacey Wittelsberger, Victor Brick, Lynne, Brick, Terry Woods, and Earl Ihle.  In the message I said to Glenn Norris:

> "As you may recall, Geoff VanMaastrict from PFHQ and I both agree on the interpretation and application of PCI compliance regarding this issue. Previously, you attempted to coerce me into violating PIC compliance by labeling my refusal as insubordination and threatening to write me up if I did

Affidavit of Ryan Dillon-Capps Family and Medical Leave Act, Americas with Disabilities Act, and the Rehabilitation Act

2025-05-08 || 28/81 .......................................................................................................

28

not comply with your demands.  It's important to note that both accusations of insubordination and threats of write-ups are effectively viewed as coercive threats under the law.  Unfortunately, I cannot comply with unlawful or unethical orders. Additionally, these coercive tactics have previously triggered severe panic attacks and other complications that negatively impact my PTSD, for which I am currently on FMLA leave. Such actions not only exacerbate my condition but also violate FMLA protections. During our meeting, you mentioned to Geoff, Justin, and myself that you would provide information about what tasks Ryan Brooks was assigned to work on. This information is crucial for adhering to the least privilege requirements under PCI DSS 4.  I recommend we start with that, as Ryan Brooks has other unique disqualifications that we will need to also address.  Knowing the specific tasks required may allow me to propose alternative solutions. If Ryan Brooks is the only person capable of performing these tasks, we will need to discuss options to address his other disqualifications as well."

The only "refusal" that can honestly be attributed to me is the refusal to breach contracts and violate the law, and Ryan Brooks was also never part of the state action.

As the designated PCI Compliance Officer for Ohana Growth Partners, LLC, I was required to ensure that system access was assigned based on business need and purpose—following the core principle of *least privilege*. Granting access without documenting a legitimate purpose—for example, giving an individual "X access to Y system" solely because a superior demanded it—violates PCI requirements, breaches contractual obligations with payment processors, and constitute violations of federal and state consumer protection laws. When such conduct is intentional, it also violates unfair or deceptive business practices laws.

As the full evidentiary record demonstrates, Ohana Growth Partners, LLC repeatedly engaged in bad faith conduct to fabricate a pretext for my retaliatory termination, which was planned 6 months in advance to be executed on July 30, 2024. That pretext extended to acts that not only were being performed in violation of my FMLA leave rights, but also the rights of members and potential members in Washington, California, Tennessee, Florida, Maryland, and the District of Columbia.

Specifically, the "Global Administrator" access used as the pretext for adverse action provides access to the management systems that directly controlled iPads physically located in clubs and used by members and prospective members to input protected consumer credit card and other billing information.

Additional details are documented in my affidavits filed in the state and federal courts—see Circuit ECF 28-11 (state court affidavit), Circuit ECF 29-3 (federal court affidavit), and the 707 pages of supporting exhibits at Circuit ECF 29-6 which were originally filed in state court.

Additionally, Circuit ECF 31-1 documents Judge Hurson's tampering with the District Court record. Among the pages that were removed from the December 27, 2024 filings are targeted sections discussing the *least privilege* principle and its legal significance in compliance and liability contexts. These include analysis of *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir.

2015), where the defendant was held liable under Section 5 of the FTC Act, in part for improperly assigning elevated system access without necessity—an act that ultimately facilitated a third-party cyberattack. *Wyndham* underscores the legal duty to implement least privilege access controls and provides direct precedent supporting the risks I repeatedly identified to the defendants—both prior to and during the state proceedings. Judge Hurson's targeted removal of those materials reflects a deliberate effort to suppress evidence central to my claims, and further confirms that criminal misconduct was employed to prevent critical compliance violations and liability exposures from being preserved in the federal court record.

4. Circuit ECF 28-3, at 82: On June 12, 2024, at 1:28 PM, Phil Leadore replied to the same recipient group, stating, "Ryan – Thank you for your email and question. Glenn will be following up with a response shortly."

5. Exhibit 102A, at 7: Phil Leadore cancelled the meeting invite, and I never heard from Phil Leadore ever again. He never responded to any other emails.

Additional Context to Aid in Understanding

Phil Leadore did not testify or participate in any portion of the state court litigation. On June 25, 2024—the day before the June 26–27, 2024 hearing—a purported affidavit from Randall Romes was filed, though the

legitimacy of that affidavit remains in serious question. During the hearing, Mr. Romes was substituted in place of Mr. Leadore, a change that can only reasonably be interpreted as a response to Mr. Leadore's refusal to participate in the scheme being executed through the fraudulent state action. See Circuit ECF 28-14, at 39–42.

On June 27, 2024, during cross-examination, defendant Judge Barranco prohibited any questioning about the contents or execution of Mr. Romes's affidavit. Upon hearing the question, Mr. Romes appeared confused, reinforcing concerns that he may not have authored or reviewed the affidavit in question.

Circuit ECF 28-14, at 17–23 contains an unsigned copy of the affidavit submitted to the state court on June 25, 2024, along with Mr. Romes's resume. Circuit ECF 28-14, at 29–35 contains the same affidavit bearing an Adobe certificate on page 34 as its purported signature. This certificate lacks basic authentication safeguards—unlike other affidavits filed by Miles & Stockbridge, which were executed via DocuSign—and can be fabricated by altering local system time and user profile information. The absence of a secure and verifiable signature method, the timing of the filing, the substitution of Mr. Romes for Mr. Leadore, and Mr. Romes's apparent confusion at the hearing collectively support the inference that the affidavit

was improperly generated, not authentically executed, and potentially never reviewed by its alleged affiant.

**B  June 13, 2024**

1. Circuit ECF 28-1, at 14: On June 13, 2024, at 7:12 AM, I notified Glenn Norris, Richard Hartman, and Justin Drummond via email that I was taking FMLA leave for the day and would inform them when I returned.

2. Circuit ECF 28-1, at 25–26: On June 13, 2024, at 9:01 AM, Richard Hartman sent a coercive email stating the following:

• That I was "entitled to use [my] FMLA time to take time off";

• That my use of intermittent FMLA leave on June 12, 2024, was the "self-evident" reason the company was issuing a demand on June 13, 2024—thereby using my lawful leave as pretext to justify adverse action;

• Glenn Norris had signed an agreement with a new vendor, Hartman Executive Advisors (HEA), and I was required to grant HEA's Phil Leadore Global Administrator access by 3:00 PM that day; and

• That failure to comply would result in the company taking "appropriate actions"—language directly supporting the retaliatory termination that had been planned since my initial request for FMLA leave.

Additional Context to Aid in Understanding

Circuit ECF 28-3, at 89-90: On June 6, 2024, I emailed Rolando Pedraza, the Director of Delivery Operations for Cielo IT who provided the Help Desk as a service to Ohana Growth Partners, LLC, to coordinate a time to arrange for him to receive an emergency account with Global Administrator access.

Circuit ECF 28-3, at 91: On June 7 and June 11, 2024, I communicated via Teams to Karen Cepress, Director of Member Services for Ohana Growth Partners, LLC, to coordinate a time to arrange for her to receive an emergency account with Global Administrator access.

Circuit ECF 28-3, at 92; Circuit ECF 28-1, at 42–43: On June 7, 2024, I texted Justin Drummond, President of Ohana Growth Partners, LLC, to coordinate a time for him to receive credentials for an emergency account with Global Administrator access. On June 10, 2024, we communicated again via text, and on June 11, 2024, via Microsoft Teams. In both instances, Justin Drummond misled me to believe that he would be available the following week to accept delivery of credentials and complete the transition in accordance with our agreement. If access was a genuine issue then Justin Drummond would have met with me, or on June 13, 2024 would have requested it at that time.

Circuit ECF 29-6, at 706–707: On May 28, 2024, I emailed Glenn Norris, Justin Drummond, Richard Hartman, Karen Debus, Stacey Wittelsberger, Victor Brick, Lynne Brick, Terry Woods, and Earl Ihle, reminding Glenn Norris and Justin Drummond of the 2023 plan to replace Baltimore Consulting in 2024 due to ongoing performance issues. I specifically referenced Matt Norris—Glenn Norris's son—who had stated that he considered Ryan Brooks to be an unreliable resource, and further recalled how we declined to pursue a proposed solution solely because it would have involved Ryan Brooks. In August and September 2023, Microsoft recommended that Ohana Growth Partners, LLC engage Finchloom after Ryan Brooks neglected to complete critical assignments during an emergency migration, placing the organization's business continuity at significant risk. However, after I requested FMLA leave in early 2024, Ryan Brooks was inexplicably retained, and in May 2024—acting on the belief that Glenn Norris had restored departmental control to me—I terminated Ryan Brooks based on his refusal to comply with PCI compliance standards. I was then made aware that this, too, was part of a retaliatory pretext, as Brooks was now being characterized as indispensable. The May 28, 2024, email reflects my escalating concerns and good-faith efforts to urge the company to reengage Finchloom—or any qualified Microsoft partner—to resolve the underlying compliance and infrastructure deficiencies. If access were a

genuine issue, Ohana Growth Partners, LLC would have retained Finchloom and allowed me to assign access accordingly. If Brooks was genuinely necessary then Norris would have provided me with the information necessary to satisfy least privileged access requirements.

3. Circuit ECF 28-3, at 81: On June 13, 2024, at 11:48AM, I emailed Phil Leadore and Daniel Levett stating, "I could use and would appreciate some backup, as would my team and others involved." The remainder of the email reflects my genuine willingness to collaborate while also adhering to my legal and contractual obligations as Ohana Growth Partners, LLC's PCI Compliance Officer—specifically the obligation to apply the principle of least privilege under governing standards and industry regulations.

4. Circuit ECF 28-1, at 20-21: On June 13, 2024, at around noon, I responded to Richard Hartman's coercive demand letter with a cease-and-desist email, asserting my protected right to use FMLA leave without interference. In this email, I informed Richard Hartman that I had also contacted Hartman Executive Advisors, Phil Leadore and Dan Levett, to confirm whether they were still involved.

5. Circuit ECF 28-1, at 17–20: On June 13, 2024, at 2:05 PM, I escalated the coercive and retaliatory email exchange with Richard Hartman and

included Karen Debus along with ownership: Justin Drummond, Stacey Wittelsberger, Victor Brick, Lynne Brick, Terry Woods, Earl Ihle, and Glenn Norris. In the escalation, I urged immediate intervention by ownership and reminded them of their legal obligation to prevent workplace harassment. I expressly cited federal and state law governing retaliation, hostile work environment, whistleblower protections, FMLA interference and retaliation, and the legal consequences of failing to take corrective action. I also highlighted additional legal exposures relating to wire fraud, identity theft, unauthorized access under federal computer fraud statutes, and negligent hiring and supervision. The message requested urgent response in light of Richard Hartman's threat that adverse action would be taken after 3:00 PM and concluded by warning that the actions of Richard Hartman and Glenn Norris were actively endangering my health and placing Ohana Growth Partners, LLC at substantial risk of legal and financial liability.

6. Circuit ECF 28-1, at 27–29: At 2:20 PM on June 13, 2024—just 15 minutes after I sent the 2:05 PM escalation email to ownership—Darren Korizka texted me and informed me about Richard Hartman placing in on an involuntary leave of absence. Mr. Koritzka was directly targeted because Richard Hartman lacked the authority to take adverse action against me. This act of retaliation underscores that there was no genuine plan to

suspend or discipline me earlier that day. If such a decision had existed, it would have been carried out by Justin Drummond or Glenn Norris during the morning or early afternoon. Instead, Richard Hartman's action was a spontaneous act of retaliation prompted by my protected escalation and aimed at a person involved in the labor dispute which Richad Hartman believed he had authority over.

7. Circuit ECF 28-3, at 55–57: On June 13, 2024, at approximately 2:46 PM, I sent an urgent email to Justin Drummond, Stacey Wittelsberger, Victor Brick, Lynne Brick, Terry Woods, and Earl Ihle with the subject line: "Re: CRITICAL! READ ME NOW!! Richard Hartman Critical Situation!" In the message, I alerted senior leadership that "Today, Richard Hartman suspended Darren and handed him a note that Rich created and signed. This action is highly irregular and concerning. In response to this situation, I have instructed my team members to go home immediately for their safety and well-being." I further notified the recipients that "Richard Hartman's account has been disabled and all his sessions have been revoked to prevent any further unauthorized actions." At 2:48 PM, I followed up with a second email attaching the "leave of absence" letter that Richard Hartman had issued to Darren Koritzka.

8. Circuit ECF 28-1, at 30-31: Text messages to Mareann Piñera directing her to work from home for the rest of the day. She stated she had not received a similar letter.

9. Circuit ECF 28-1, at 32: Photo of leave of absence letter texted to Victor Brick.

10. Circuit ECF 28-1, at 33: Photo of leave of absence letter texted to Lynne Brick.

11. Circuit ECF 28-1, at 34–38: A group text exchange on June 13, 2024, between myself, Karen Cepress (Director of Member Services), and Allyson Ratliff (Director of Northeast Operations) includes a photograph of the leave of absence letter issued to Darren Koritzka and subsequent lighthearted messages where they joked about a typo in the text message I sent them. I missed the joke, prompting further playful banter. This exchange reflects the positive and trusting professional relationship between us and, importantly, demonstrates that there was no indication or awareness of any impending adverse employment action against me that day. Given their senior leadership roles, it would have been explicitly communicated to them in advance before a department-level executive was to be terminated.

12. Circuit ECF 28-3, at 86: On June 13, 2024, at 3:10 PM, I emailed Phil Leadore and Daniel Levett affirmatively requesting that they respond so I

could provide them with the requested access and allow them to begin assisting. I then forwarded that same email to Justin Drummond at 4:26 PM—an action taken before anyone, including Mr. Drummond, asked me to make further efforts to reach them. This contemporaneous communication directly refutes the later claim that I was unwilling to provide access and confirms that I had already taken proactive steps to do so.

13. Circuit ECF 28-1, at 45-57: Text message to Justin Drummond with the photo of the leave of absence letter and he at 3:12 PM responded "Ryan, I cannot answer right now. I'm out of town. Is there something you can text?" followed by several text messages by me to Justin Drummond up to 3:28 PM.

14. Circuit ECF 28-1, at 39–41: On June 13, 2024, a group text exchange occurred between myself, Justin Drummond, Victor Brick, and Lynne Brick. I initiated the conversation at 3:29 PM with the message: "I need someone to acknowledge they are on it and getting Rich to calm down or something," followed by additional messages expressing concern for workplace safety. At 4:06 PM, Justin Drummond responded, demonstrating sudden awareness of the situation and referencing the "Mr. Leadore access" pretext—indicating that he had spoken with Richard Hartman sometime after 3:12 PM. I immediately clarified that both Phil

Leadore and Daniel Levett were unresponsive and redirected the conversation to the urgent matter of Richard Hartman's retaliatory placement of Darren Koritzka on involuntary leave. At 4:13 PM, Victor Brick explicitly delegated full authority to Justin Drummond to resolve the matter. I reasonably believed at that time that Mr. Drummond would act in good faith to intervene and correct the misconduct. Notably, if any adverse employment action against me had been planned for that day, it would have been known to Victor Brick, the company's CEO and majority equity owner. The fact that Richard Hartman is married to Lynne Brick's sister, LeeAnn Hartman, constitutes a significant conflict of interest that shaped the course of events.

15. Circuit ECF 28-1, at 49, 56-58: Justin Drummond and I resume the conversation in our own text thread where I asked Justin Drummond to help me contact Phil Leadore and/or Daniel Levett multiple times and notified him that I had already emailed them, and they were unresponsive. If access was the issue, he could respond by asking me to give it to him and receive it them. He did not because it was nothing more than a pretext.

16. Circuit ECF 28-1, at 56, 60: Throughout June 13, 2024, text thread, Justin Drummond sent very few messages, signaling that his primary attention was focused on communications with Richard Hartman. His

Affidavit of Ryan Dillon-Capps Family and Medical Leave Act, Americas with Disabilities Act, and the Rehabilitation Act

2025-05-08 || 41/81 ........................................................................................................

41

final two messages to me simply stated that Ohana Growth Partners, LLC would be in touch and that I should stop texting and wait for further contact. I ceased communication at 5:49 PM. By that point, the regular workday had concluded, and I had not been suspended, reprimanded, or informed of any adverse employment action. Aside from the 9:01 AM coercive demand by Richard Hartman, there is no contemporaneous evidence to support the conclusion that any senior leadership—whether CEO Victor Brick, President Justin Drummond, or other directors—had planned or even known about a plan to suspend me on June 13, 2024. On the contrary, the totality of the record reflects no justifiable reason for such an action.

17. Circuit ECF 28-3, at 95: On June 13, 2024, at 8:47 PM, I received an email from the personal Gmail account of Richard and LeeAnn Hartman. The message was copied to Glenn Norris and Karen Debus. The subject line read "Ohana – Suspension," and it included an attachment: a letter notifying me that I was being suspended "pending further notice."

18. Circuit ECF 28-1, at 121: The June 13, 2024, suspension letter stated that I was suspended without pay for allegedly failing to comply with the coercive demand issued by Richard Hartman earlier that day. The letter also instructed me not to access or use any company-owned equipment or systems, which by extension included my work email account.

Affidavit of Ryan Dillon-Capps Family and Medical Leave Act, Americas with Disabilities Act, and the Rehabilitation Act

2025-05-08 || 42/81 ................................................................................................................................................

42

19. Circuit ECF 28-1, at 64–65: Between 8:51 PM and 9:39 PM on June 13, 2024, I texted Justin Drummond repeatedly, asking whether Richard Hartman had been suspended and stating my intent to file for a protective order against Mr. Hartman. I emphasized that I had given trust and was not receiving confirmation that this trust was being reciprocated.

20. Circuit ECF 28-3, at 94: At around 9 PM, I add Justin Drummond to the email thread and said "Given the current circumstances and the ongoing investigation, I do not recognize your authority to issue a suspension at this time. This matter has been discussed with Victor, Lynne, and Justin. Lynne and Victor have empowered Justin with full authority to handle this situation." With no evidence to the contrary, why would I believe such an absurd result of the day would be for me to find myself suspended for the retaliatory misconduct of another person when I spent the day doing the right thing for both the company and the person harmed.

21. Circuit ECF 28-3, at 94: At approximately 9:54 PM on June 13, 2024, Justin Drummond sent an email formally sanctioning the retaliatory suspension. In that message, he claimed to be directing me to provide Global Administrator access to Phil Leadore—despite having spent hours in active text communication during which I repeatedly explained that I was attempting to contact Mr. Leadore and had asked Mr. Drummond for assistance in facilitating the connection so that access could be granted.

Affidavit of Ryan Dillon-Capps Family and Medical Leave Act, Americas with Disabilities Act, and the Rehabilitation Act

2025-05-08 || 43/81 .................................................................................................. 43

This email reflects a deliberate and knowing departure from the factual record and constitutes a post hoc fabrication intended to create a false pretext for adverse action. The very next day, on June 14, 2024, that false narrative was weaponized in the state court complaint: the 9:01 AM thread (which omits the 2:05 PM escalation email) and the 9:54 PM suspension notice became the sole purported basis for the claim that I refused to grant access. The evidence filed in the same court contradicts that assertion outright.

**C  June 17, 2024**

1. Circuit ECF 28-3, at 173–174: On June 17, 2024, at approximately 6:40 PM, after being served with the complaint in the state action—but still unaware that an ex parte TRO had been issued—I emailed Phil Leadore from my personal email address. The complaint identified Mr. Leadore as the individual to whom I was being directed to give access to. In the email, I informed Mr. Leadore that I had been suspended and reiterated my prior concerns about PCI Compliance so that he could make an informed decision regarding the access being sought and the responsibility it came with. I then reaffirmed my intention and desire to provide him with instructions detailing how he could obtain access to credentials and related materials for a Global Administrator account.

2. Circuit ECF 28-3, at 160–163: On June 17, 2024, at approximately 7:22 PM, I sent an email from my personal email account to Geoff VanMaastrict and Steve Dalgar. In the message, I informed them that I had been suspended during my FMLA-protected leave and stated that, to the best of my knowledge, PCI compliance remained intact. I provided a detailed summary outlining the specific areas where PCI compliance risks existed, ensuring that they had written documentation of those concerns. The email concluded by stating that I had recently attempted to grant Global Administrator access to Justin Drummond and confer upon him the authority to designate others, and was in the process of providing emergency accounts to Rolando Pedraza, Director at Cielo, and Karen Cepress.

There is no lawful basis for the pretext asserted in the state court action, which is why the defendants were never able to produce any evidence to support one. I am the prevailing party in that action, and as such, the legal and equitable deference is due to me—not to the party that owes costs under Maryland Rule 2-506(e), nor to Judge Brendan A. Hurson, whose conduct is now the subject of documented allegations of judicial corruption, including the acceptance of unlawful financial benefit and deliberate tampering with the federal court record.

**D  June 18, 2024**

1. Circuit ECF 28-1, at 124–125: On June 18, 2024, after both Phil Leadore and Daniel Levett had remained unresponsive, I emailed Robert Brennen and offered to provide Global Administrator access to Dante Martinez, the Help Desk Manager. I also stated that the Help Desk already possessed sufficient access to support business operations, clarified that LeeAnn Hartman was a billing administrator, and pointed out that neither Justin Drummond nor Richard Hartman appeared to understand the function or scope of a Global Administrator role. In that same email, I reaffirmed that I remained on FMLA leave until further notice and asked Mr. Brennen to assist in facilitating settlement discussions. Throughout this period, I continued to act in good faith and with full cooperation until the conduct of the defendants rendered that posture untenable.

**E  No Material Statement of Truth**

Ohana Growth Partners, LLC made demonstrably false and perjurious statements in its June 14, 2024 state court pleading by asserting that I was the sole individual with access to the Microsoft 365 Global Administrator account and that I had removed all other administrative access.

1. Circuit ECF 29-6, at 519–520: This exhibit reflects administrative roles assigned to other members of the IT Department, contradicting the assertion that I was the only administrator.

2. Circuit ECF 29-6, at 531: A June 4, 2024, email shows that LeeAnn Hartman—Richard Hartman's wife—was listed as the billing administrator, and I was in communication with her regarding licensing and account profile changes.

3. Circuit ECF 29-6, at 519–520: Help Desk Agents and the Help Desk Manager held administrative roles enabling them to (a) access the Global Administrator mailbox, (b) initiate self-managed password reset requests, and (c) complete resets via email verification. These permissions allowed independent access to the Global Administrator accounts.

4. Circuit ECF 28-1, at 53: On July 15, 2024, at 9:10 AM, Robert Brennen wrote: "Ohana has succeeded in regaining Global Admin rights in its Microsoft 365 tenant and has disabled access **via your account**, the Null account and the Breakglass account." This language confirms that the company accessed my account without my assistance—most likely through Dante Martinez or another Help Desk member— demonstrating that other administrative access existed at all relevant times. There is therefore no factual basis for Ohana's claims that I removed other administrator access or that I had exclusive control.

## F  Summary of Suspension and Lawsuit

Respectfully, if any party or court continues to afford credibility to the statements or actions of the defendants—or to Judge Brendan A. Hurson—then even the most impartial observer must confront the reality that such belief persists despite a complete absence of contradictory evidence, documented criminal misconduct, and overwhelming, unrebutted factual support in the record.

This cause of action is explicitly grounded in allegations of perjury, fraud on the court, and spoliation. The defendants' litigation posture, including their repeated failure to produce a single piece of exculpatory evidence and their eventual voluntary dismissal of the state court action when compelled to respond, demonstrates that their claims were not just meritless, but knowingly fabricated. The subsequent obstruction of summons in the federal case—enabled by Judge Hurson's documented misconduct, including court record tampering—further confirms that these parties were not engaged in good-faith litigation, but in a coordinated attempt to avoid accountability through procedural abuse and judicial manipulation.

These are not the actions of litigants with a viable defense. There is no rational or legally supportable basis to continue affording them deference or the benefit of doubt. Indeed, the only reasonable conclusion is that their continued evasion of a merits-based adjudication is itself evidence of the

strength of the claims against them. While the complaint and evidentiary record meet the standards required to survive dismissal and obtain relief, they are not remarkable for their rhetorical sophistication—they are compelling because of their accuracy and the defendants' failure to dispute them.

It is not necessary for the Court or any party to admire the drafting. It is enough to recognize the unprecedented and unbroken chain of factual support, documentary evidence, and unrebutted proof. Against this backdrop, the defendants' refusal to answer the complaint, and the extraordinary steps taken to avoid doing so, speak louder than any pleading ever could.

## V  Catastrophic Harm, Obstruction to Relief and Assistance, and Pursuit of Finality

### A  Insurance Faud – COBRA Insurance

The deliberate interference with my COBRA continuation coverage by Ohana Growth Partners, LLC is not only a violation of federal benefits law—it constitutes insurance fraud. The facts  establish a coordinated effort to prevent my spouse and me from receiving timely access to COBRA election materials, thereby depriving us of continued health coverage during a period of documented medical necessity. Given their knowledge of my life-threatening condition—malignant catatonia—this conduct reflects more than mere indifference; it demonstrates a deliberate intent to obstruct access to essential medical care, fully aware that doing so could result in my death.

That outcome would serve the defendants' objective of avoiding legal accountability and financial liability.

1. Circuit ECF 28-1, at 143–144: On July 30, 2024, I was terminated by Richard Hartman.

2. Circuit ECF 28-6, at 55: On November 2, 2024, the Circuit Court for Baltimore County dismissed the lawsuit filed by Ohana Growth Partners, LLC. The dismissal was docketed on November 6, 2024.

3. Circuit ECF 28-5, at 7–19: In November 2024, Caroline Dillon-Capps and I received our COBRA Continuing Coverage packet via USPS.

4. Circuit ECF 28-5, at 10: The header on the COBRA packet states a document date of November 7, 2024.

5. Circuit ECF 28-5, at 10: The body of the same page states that our coverage under the Plan would end on September 30, 2024, due to end of employment.

6. Circuit ECF 28-5, at 11: The listed qualified beneficiaries are Ryan Dillon-Capps and Caroline Dillon-Capps.

7. Circuit ECF 28-5, at 11 and Circuit ECF 16-4, at 11: The packet states that if COBRA coverage is elected, it will begin on October 1, 2024.

8. Circuit ECF 28-5, at 13: The packet includes the previously selected and available health plans along with their associated costs.

9. Circuit ECF 28-5, at 14: The packet states that we had 60 days from the date of termination to respond in order to be eligible for COBRA coverage.

10. Circuit ECF 28-5, at 16: The packet also states that failure to respond within 60 days of termination would result in loss of COBRA eligibility.

11. When the original pages received via USPS are aligned, the body text on the page containing the altered heading date of November 07, 2024, is slightly misaligned compared to the rest of the packet. The deviation is subtle and easily overlooked by someone without forensic or technical printing expertise. However, to individuals familiar with document production processes and printer/software behavior, this misalignment confirms that the page was not part of the original packet and was instead printed separately.

12. Excluding the altered November 7 date, all other content and internal date references in the packet align with a termination date of July 30, 2024, consistent with standard COBRA procedures.

13. Richard Hartman, who terminated me, is also the Head of Human Resources and Administrator of the HRIS system (Paycom) where employee addresses and contact information are maintained.

14. Ohana Growth Partners, LLC's Human Resources Department is responsible for administering employee benefit notifications and COBRA compliance.

15. Someone with access to employee records redirected the COBRA packet to an unauthorized address so that Caroline and I would not receive it when it was originally mailed.

16. As a result, we were deprived of the opportunity to timely elect COBRA coverage in accordance with federal law.

17. Someone with access to the redirected packet opened the sealed, confidential mailing.

18. Someone then printed a substitute page with a changed header date of November 7, 2024.

19. The altered page replaced the original and was subsequently mailed to us via USPS.

## B Denied Use of Paid Leave for FMLA & Unpaid Balance

Exhibit 207, at 16–17: On June 20, 2024, my available paid leave balances included 16.00 hours of Floating Holiday, 11.00 hours of Mental Well-Being Leave, 32.00 hours of Sick Leave (Full-Time), and 50.47 hours of Vacation. Despite these available balances, my request to use paid leave for the week of June 17 through June 21 was denied. The denial was not based on any policy violation or operational necessity, but was instead a deliberate act by Ohana Growth Partners, LLC to deprive me of the financial means to defend myself in the concurrently filed fraudulent state court action.

Exhibit 207, at 18: My final paystub confirms that the paid leave balances remained available at the time of my termination. However, Ohana Growth Partners, LLC failed to pay out any of the accrued leave—an action that contradicts the company's established compensation practices for similarly situated employees. This also directly violated the terms of the FMLA eligibility notice, which stated I would be compensated for time attributed to FMLA leave. Despite providing timely notice of my use of approved intermittent FMLA leave on June 12, June 13, and June 18, 2024—leave which Ohana Growth Partners, LLC had already acknowledged I was entitled to—the company refused to compensate me accordingly.

## C  Financial Harm and Imminent Foreclosure

1. Circuit ECF 28-8, at 132: By October 2024, following several months of retaliatory state court litigation, my total credit utilization had increased substantially reaching $72,868 in credit card balances and $122,128 in personal loans. Prior to default, my credit file showed a 100% on-time payment history, no derogatory marks, and only one hard inquiry.

2. Circuit 28-8, at 17-51: The amended motion seeking injunctive relief in the state court was filed on October 22, 2024. As shown in the filing and ruling summary in Circuit ECF 28-2 page 5, the original motion was filed on October 15, 2024.

3. Circuit ECF 28-12, at 1-7: The state filing on November 1, 2024, to request for prehearing conference to discuss injunctive relief was inclusive of currently filed and future injunctive relief.

4. Circuit ECF 28-8, at 133: My Equifax credit score was 746 on June 7, 2024, and my TransUnion score was 741 as of May 24, 2024.

5. Circuit ECF 28-8, at 133: By October 2024, my credit scores declined significantly, falling to 651 (Equifax) and 640 (TransUnion).

6. Circuit ECF 28-8, at 198: In December, before filing with the District Court, the TransUnion credit score had dropped down to 477.

7. Exhibit 207, at 10–11: As of May 7, 2025, my credit scores had collapsed to 348 and 349 respectively, marking a year-long deterioration tied to the retaliatory suspension and termination of my employment.

8. District ECF 25-0: On February 7, 2025, I filed my emergency motion for a temporary restraining order and preliminary injunction to restore and maintain the status quo.

9. District ECF 28-0: On February 13, 2025, I filed a motion for reconsideration of Judge Hurson's denial of both the temporary restraining order and preliminary injunction without hearing, against unsupported conclusions that contradicted his own citations, and misrepresentational framing of it as mandatory injunctive relief.  It has never been ruled on.

10. Circuit ECF 4-1, On February 24, 2025, I filed an emergency motion for injunction pending appeal to restore and maintain the status quo. It was denied in Circuit ECF 10-0 on March 14, 2025, after what appears to be deference afforded to Judge Hurson with the ruling referencing an issue with likelihood of success on the merits. The subsequent motion for clarification was denied on March 14, 2025.

11. Exhibit 207, at 13: On February 28, 2025, my vehicle was repossessed after missing all payments since December 2024.

12. Exhibit 207, at 14: My home mortgage reflects missed payments in December 2024, January 2025, February 2025, and March 2025. Although not yet reported, the April 2025 payment was also missed. Foreclosure proceedings are expected to formally begin within the week, and will be filed in the Circuit Court for Baltimore County—where the state defendants retain direct influence and control and every reasonable conclusion is that their actions will be to ensure that I am rendered homeless.

13. Exhibit 207, at 15: A total of ten (10) credit and lending accounts have been closed, including:

- Bridgecrest Auto Loan: February 28, 2025

- LendingClub Bank: March 31, 2025

- SoFi Bank: March 31, 2025

- Venmo: January 27, 2025

- Capital One: March 26, 2025

- TD Bank: February 12, 2025

- Bank of America: February 14, 2025

- Citibank: December 23, 2024

- American Express: February 25, 2025

- JPMorgan Chase: January 11, 2025

14. Circuit ECF 28-8, at 59, 155 180, 186: Bank of America Checking account has been over drawn since November 2024.

15. District ECF 18-0, at 2: I was granted to proceed in forma pauperis, and in Circuit ECF 37-0 my status continued on appeal.

16. With no money left in late February to early March 2025, electricity, phone, and email services were on the verge of being disconnected. An unexpected and fortunate injection of funding temporarily deferred this outcome and allowed my wife and me to purchase groceries. Those funds are now nearly depleted, and the risk of losing essential services and access to food is once again imminent.

17. Caroline Dillon-Capps's vehicle lease ended on April 30, 2025, following a prior extension that cannot be renewed. On May 9, 2025, the vehicle will be returned to the dealership, leaving us without transportation and no financial means to secure a new lease or alternative vehicle. We reside in

Affidavit of Ryan Dillon-Capps Family and Medical Leave Act, Americas with Disabilities Act, and the Rehabilitation Act

2025-05-08 || 56/81 .......................................................................................................................................

56

a locality with limited public transportation, and the nearest accessible resources require traveling along roads that lack pedestrian pathways. This will severely restrict our ability to obtain food and other basic necessities, impose unaffordable additional costs, and pose a substantial risk in the event of a medical issue that does not rise to the level of a 911 emergency.

## D  MXT3 LLC

1. Exhibit 208, at 1: A certified copy from the State of Maryland Department of Assessments and Taxation confirms the Articles of Organization for MXT3 LLC were filed and approved on April 5, 2023.

2. Exhibit 208, at 2: A letter from the State of Maryland Department of Assessments and Taxation confirms acceptance of MXT3 LLC's Articles of Organization filing on March 16, 2023, at 10:42 AM.

3. Exhibit 208, at 3: The MXT3 LLC Operating Agreement, executed on August 16, 2023, identifies Ryan Aurelius Dillon-Capps (formerly Ryan Anthony Wagner) as the sole capital contributor with a contribution of $192,870, as shown in Exhibit A.

4. Exhibit 208, at 4–5: MXT3 LLC is a verified Microsoft partner with multiple accepted agreements, including:

• The Commercial Marketplace–Microsoft Publisher Agreement, accepted on December 13, 2023, by Ryan Dillon-Capps (shown as Ryan Wagner);

- The Microsoft AI Cloud Partner Program agreement, also accepted on December 13, 2023, by Ryan Dillon-Capps (shown as Ryan Wagner);

- Microsoft records listing Ryan Dillon-Capps as the contact for the Partner Global and Partner Location profiles for MXT3 LLC under the AI Cloud Partner Program, using the email address ryan@mxt3.com and business address of 1334 Maple Ave, Essex, Maryland 21221-6027;

- CSP Publisher partnership records listing Ryan Dillon-Capps as Owner/Manager (shown as Ryan Wagner), using the associated email and redacted partner/seller IDs.

5. Circuit ECF 28-8, at 52–65 (see also Circuit ECF 22-2, at 3–5; Circuit ECF 27-22; Circuit ECF 28-10, at 17–18; Circuit ECF 4-12, at 43; District ECF 28-0, at 8; Circuit ECF 29-4, at 31–32): In a filing titled "Motion to Allow pro Se Representation of LLC," I requested permission from the state court to represent MXT3 LLC as its managing member. The motion was made in response to direct financial harm suffered by the company as a result of the wrongful termination and retaliatory lawsuit brought by Ohana Growth Partners, LLC and Miles & Stockbridge P.C., which obstructed MXT3 LLC's intended launch and business operations. This request was repeated in the motion to proceed in forma pauperis as "limited attorney designation".

Affidavit of Ryan Dillon-Capps Family and Medical Leave Act, Americas with Disabilities Act, and the Rehabilitation Act

2025-05-08 || 58/81 ............................................................................................................

58

## Demonstrative Proof – AI Legal Strategy

I developed proprietary Artificial Intelligence (AI) legal solutions under the MXT3 brand that surpass all currently available commercial offerings. These innovations were not limited to writing or research assistance but instead were designed as strategic litigation tools—capable of analyzing judicial and attorney-specific behavioral patterns, identifying anomalies in legal proceedings, forecasting litigation strategy based on precedent and statutory overlay, and providing real-time decision support at both trial and appellate levels. These tools offered substantial marketplace value for attorneys and judges alike. The strategic effectiveness of which has been demonstrated through the success of the state court proceedings and the true legal posture that I possess when adjusted from the unlawful misconduct from Judge Hurson.

## MXT3 Business Plan

The legal AI models under development were intended for a later phase of MXT3 LLC's business plan. The initial launch was structured to address common operational processes that exist across most business environments. The platform was designed to reduce the need for additional personnel by automating lower- to mid-level operational functions through microservice-based Artificial Intelligence (AI).

Unlike prevailing industry solutions, which often rely on customer-facing integrations and are limited by compatibility with specific enterprise software ecosystems, MXT3's architecture was deliberately built to be solution-agnostic. It leverages structural commonalities in how modern businesses design both business-to-business (B2B) and business-to-consumer (B2C) systems—specifically, those natural convergence points that exist in standardized data and file structures. These consistent transmission layers provide non-invasive entry and exit points for MXT3 to receive and return pre-processed and post-processed data, without the need to disrupt or alter existing systems.

MXT3's platform is engineered to complete onboarding and initiate proof-of-concept validation in the time it typically takes competitors to finalize scoping agreements or preliminary integration meetings. Because no changes to the client's systems are required, MXT3's solution runs in parallel to existing workflows. At any point during or after the evaluation period, the client may choose to "go live" by simply redirecting existing internal data processes—using infrastructure and administrative controls that their IT department already has in place to support their current operations.

This approach eliminates the friction, delay, and overhead that commonly accompany enterprise AI deployment, allowing MXT3 to deliver

immediate value while positioning for scalable, long-term integration with minimal disruption.

Once a client commits to any of MXT3 LLC's microservices, the data processed on their behalf is segregated from that of other clients and routed through a proprietary architecture designed to develop a deeper contextual understanding of the business and its data. This system identifies operational patterns, inefficiencies, and anomalies—including potential indicators of waste and fraud—and communicates these findings through secure, pre-approved channels in alignment with client directives.

Unlike industry competitors who offer prepackaged solutions that can be customized for a premium, MXT3 immediately generates value at the data processing layer itself. The platform actively identifies opportunities where additional, targeted value can be provided—shifting the relationship from vendor to strategic technology partner. In doing so, MXT3 positions itself not merely as a software, solution, or services provider, but as an integrated advisor that delivers continuous, data-driven insights. This structure ensures mutual optimization: clients benefit from immediate and evolving insights, while MXT3's service verticals scale organically with the operational needs and behavioral data of its customers.

## Over 15 Years of Planning

MXT3 LLC was formed and capitalized to commercialize the underlying architecture and trade secrets developed over the course of roughly 15 years involving a substantial investment of time and capital to expand my formal and informal education in areas that are not limited to artificial intelligence. More time and capital spent developing, and more time and capital spent in planning for the accurately anticipated advancement in AI technology that manifested in ChatGPT-3.

It was while waiting for a flight in 2007 or 2008 that I first learned about IBM's Watson. Drawing on my distinctive understanding of how technology evolves, I began a long-term strategic effort focused on the emergence of artificial intelligence capable of natural language understanding and contextual awareness sufficient to engage in human-like communication. I committed to developing systems that would leverage that threshold—along with several other foundational criteria that were ultimately achieved by the release of ChatGPT-3.

ChatGPT-3 uniquely matches the exact technical and functional specifications I had anticipated, marking it as the precise technological inflection point I had long predicted. According to the proprietary framework I developed to model the evolution of emerging technologies, ChatGPT-3 is

the first publicly available system to reach what I classify as "Stage 3" of primary AI evolution.

Artificial intelligence is distinct in that, unlike most technologies which experience a single major transformative phase, AI will pass through multiple such phases. The "golden window" created by the emergence of ChatGPT-3 is, by my model, a rare convergence of opportunity and capability. Even in simplified market terms, this window presents a value proposition several magnitudes greater than the strategic licensing decisions that enabled Microsoft's early market dominance under Bill Gates. The impact of this moment on global innovation, productivity, and value generation is historically significant—and precisely what I spent over a decade preparing to seize.

<u>Harm Suffered to MXT3</u>

That window has now closed. The delay caused by the retaliatory litigation irreparably harmed the business. I was deprived of the opportunity to pitch to potential investors—a process that had already been initiated through a willing intermediary. The reputational damage and chilling effect of the litigation discouraged the intermediary from arranging meetings, and the protracted legal dispute rendered the venture commercially nonviable. The cumulative effect, combined with the mental, emotional, and physical harm inflicted upon me during this period, resulted in the destruction of what

I had worked toward for over 15 years. The losses are not speculative; they are quantifiable and, given the proven capabilities of the developed technology and its strategic positioning, conservatively exceed billions in commercial valuation.

### E  Physical, Mental, and Emotional Harm

Circuit ECF 22-5: The affidavit of Licensed Clinical Social Worker (LCSW-C) Caroline Dillon-Capps, filed as District ECF 7-1 on December 27, 2024, contains her expert eyewitness account of the substantial and potentially grievous harm I am currently suffering. Her observations detail severe, frequent, and prolonged episodes of visible mental anguish, cognitive decline, delirium, and acute disorientation. I have experienced panic attacks lasting for hours that render me unresponsive to external stimuli, along with psychomotor inhibition, dissociation, rigidity, erratic breathing, circular reasoning, and repetitive or caricatured speech patterns—all sharply divergent from my baseline behavior. Caroline has further noted the emergence of excoriation (skin-picking) on my chest, stomach, arms, and shoulders, to the extent that she must physically intervene to prevent me from tearing open my own flesh, posing infection and other health risks. These injuries are documented in the photographs at Circuit ECF 28-8, at 11–16.

She has witnessed my sleep diminish to minimal or absent levels, alongside prolonged periods without food or basic self-care. Although ethical guidelines prevent her from formally diagnosing me as her spouse, Caroline states that my symptoms correspond to malignant catatonia under established diagnostic criteria. Her observations align with the peer-reviewed case study filed as District ECF 28-3, which confirms that malignant catatonia—formerly known as "lethal catatonia"—constitutes a medical emergency due to autonomic dysfunction. I have already suffered episodes of autonomic dysregulation, including an abrupt drop in body temperature, which could have been fatal. That study corroborates many of my symptoms, including stupor, mutism, waxy flexibility, rigidity, and catalepsy.

Malignant catatonia is both psychiatric and physiological in nature, representing a rare exception in which a psychological condition alone can become imminently fatal. Its acute onset may render me incapable of seeking medical assistance, and even with my wife present, the condition can escalate too rapidly for emergency intervention to succeed. For this reason, malignant catatonia constitutes a continuous medical emergency.

As the case study demonstrates, a treatment delay of just 15 days significantly increases long-term mortality, and a delay of 26 days without medical stabilization raises the likelihood of severe complications. It has now been several months since the first malignant catatonic episode without

appropriate care. Based on the best available clinical data, I now face a greater-than-50% likelihood of fatality within the next 10 years. By contrast, with timely intervention, medical studies report reduced imminent risk in 76% of cases within one-week, full remission in 58% of cases, and only a 9% long-term mortality rate. Due to the prolonged and untreated progression of the condition, inpatient psychiatric and medical care may now be required for several months or longer.

Caroline's District Court affidavit also documents ongoing dissociative episodes and dissociative amnesia, placing me at further risk of depersonalization, derealization, and other psychiatric complications.

In her earlier affidavit dated June 29, 2024, and filed in early July in the state court (Circuit ECF 28-4, at 30–32), Caroline Dillon-Capps documented pre-malignant catatonic symptoms that had already been triggered by the escalating pattern of abuse and coercive duress imposed by Richard Hartman, Glenn Norris, and Victor Brick. Specifically, she observed dissociative episodes accompanied by dissociative amnesia, as well as non-malignant catatonia—symptoms that directly correlate with the cumulative psychological and physiological distress inflicted by the defendants' conduct.

The evidentiary record establishes that Ohana Growth Partners, LLC intentionally interfered with my FMLA leave in order to sabotage my recovery—knowing that meaningful recovery would enable me to continue

pursuing accountability. Simultaneously, they sought to weaponize the resulting impairments as part of a fabricated pretext to justify the retaliatory termination they had already planned for July 30, 2024.

Exhibit 106 (listed in Circuit ECF 30-0) includes approximately 10 professional publications that substantiate Caroline Dillon-Capps's medical and behavioral observations. These materials were filed with the District Court Clerk on December 27, 2024, via a signed physical CD. However, the record was intentionally obstructed when Judge Brendan A. Hurson directed the Clerk to stop efforts to correct the docket which he had already tampered with—unlawfully preventing this evidence from being made available to the Court.

Circuit ECF 28-8, at 10 includes a photograph of unexplained swelling in my left leg which has correlation, if not causation, that is consistent with autonomic disruption during a catatonic episode. After Richard Hartman's retaliatory conduct on June 13, 2024—as evidenced by the text messages in Circuit ECF 28-1, at 27–65—my wife and I fled our home out of fear for our safety. Hotel receipts (Circuit ECF 28-8, at 8–9) confirm we stayed in temporary lodgings immediately after my suspension. These records and communications demonstrate the mental, emotional, and physical harm that intensified for weeks and culminated with the June 13, 2024 multi-hour pretext.

Affidavit of Ryan Dillon-Capps Family and Medical Leave Act, Americas with Disabilities Act, and the Rehabilitation Act

2025-05-08 || 67/81 .......................................................................................................................... 67 ......

When Ohana Growth Partners, LLC filed its fraudulent state court action in 2024, it was not to resolve a legitimate legal dispute, but to preemptively block my pursuit of a protective peace order. Their strategic intent was to finalize the harm they had initiated and shield themselves from liability by filing first—so that when I attempted to seek lawful protection, it could be falsely framed as retaliatory conduct in response to their lawsuit.

## F  Leveraging Power, Position, and Reputational Influence
## 1  U.S. Department of Justice Civil Rights Division

Exhibit 206, at 8–10, 53–56; Circuit ECF 24-9, at 1–6: On January 17, 2025, I submitted a formal complaint to the U.S. Department of Justice Civil Rights Division. On January 22, 2025, at 1:50 PM, the DOJ responded stating: "After careful review of what you submitted, we have determined that your report would more appropriately be handled by another federal agency." They directed me to the EEOC, VETS, OWCP, OSHA, the American Bar Association, and Legal Aid.

That same day, just hours earlier, the Maryland Office of Bar Counsel—after months of complete silence—contacted me at 10:00 AM and acknowledged my prior submissions dated October 4, October 23, and November 4, 2024. Letters issued that morning reflecting the following:

• The file concerning Robert Brennen is marked as File No. 2024-1725, confirming that it had been opened in the prior calendar year.

• However, four new files were created for Jessica Lynne Duvall (File No. 2025-0080), Holly Drumheller Butler (File No. 2025-0081), Steven David Frenkil (File No. 2025-0082), and Victoria Klein Hoffberger (File No. 2025-0083), each assigned a 2025 docket number and opened in close proximity to the DOJ's action.

Limiting this analysis to the information contained in filings, it is reasonable to conclude that the receiving attorney at the U.S. Department of Justice read the complaint, determined it had merit, and ethically complied with their obligation to refer the related attorney misconduct to the Maryland Attorney Grievance Commission. The disconnect between that ethical action and the DOJ's subsequent email—formally declining to take further steps— mirrors the discrepancy in the District Court docket, where District ECF Series 16 was labeled as a "supplemental" filing entered on January 3, 2025, while the docket note simultaneously confirmed it was received on December 27, 2024. These incongruities illustrate a recurring pattern in which individual actors demonstrate lawful intent but produce actions inconsistent with that intent—signaling the presence of external influence. In both instances, the ethical conduct of the DOJ attorney and the Court Clerk had demonstrably positive procedural effects, but that conduct was undermined by reputational harm to me, caused by external forces acting upon the process itself.

## 2 Eastern Division of North Carolina District Court

1. In *Ferraro v. Rodgers*, No. 7:24-CV-833-FL, 2025 WL 938995, at *2 (E.D.N.C. Mar. 27, 2025), the United States District Court for the Eastern District of North Carolina cited Judge Hurson's ruling in this matter, stating:

> "Courts uniformly reject such conclusory allegations of harm as plaintiff offers here. See, e.g., Dillon-Capps v. Ohana Growth Partners, LLC, No. 24-3744, 2025 WL 475265, at *2 (D. Md. Feb. 12, 2025)"

2. Similarly, in *Melvin v. Layton*, No. 5:24-CV-00013-BO, 2025 WL 745591, at *2 (E.D.N.C. Mar. 7, 2025), the court again cited Judge Hurson's ruling, stating:

> "The bedrock legal principle of absolute judicial immunity has stood for centuries, and continues to do so today. *Dillon-Capps v. Ohana Growth Partners, LLC*, 2025 WL 50430, *4 (D. Md. 2025)"

At this time, I assert no claim or accusation against the Eastern District of North Carolina. However, these citations—relying on the materially compromised rulings of Judge Hurson—further demonstrate how the defendants' misconduct has extended into unrelated judicial proceedings and entered the broader public record. Whether the result of direct action or indirect reputational influence, the incorporation of tainted precedent into unrelated cases has the effect of spreading disinformation under the color of law. This contributes to the systematic erosion of my credibility, impairs my

access to equitable relief, and discourages independent review of my claims—despite their extensive evidentiary support and unrebutted factual basis. This is reputational harm by judicial echo, and it reflects precisely the kind of collateral consequence the defendants, and pending defendant Hurson, intended when they manipulated the record to mischaracterize my claims.

## VI  EEOC Right to Sue Letter

Exhibit 109, at 1-3, is the formal charges against Ohana Growth Partners, LLC:

1. **2020–2024 – Gender-Based Disparate Treatment in Communication Feedback:**

   I was repeatedly subjected to collateral attacks concerning my communication style, which was criticized for not aligning with that of male executives. My supervisor directed me to adopt a more "masculine" manner of communication, stating that this was part of the company's culture and expectations. The instructions were explicit: (1) swear more often; (2) use "smaller words"; and (3) use "fewer words."

2. **October 16, 2023 – Reporting Accounting Irregularities:**

   After reporting accounting irregularities to CFO Glenn Norris on October 16, 2023, the prior efforts to minimize the gender-based communication feedback (noted in #1) were undone, and the retaliatory behavior escalated.

Affidavit of Ryan Dillon-Capps Family and Medical Leave Act, Americas with Disabilities Act, and the Rehabilitation Act

2025-05-08 || 71/81 .................................................................................................................

71

3. **November 10, 2023 – Retaliation Following HR Complaint:**

   I submitted a formal HR complaint on November 10, 2023, which included a third-party witness. HR responded by (a) informing at least two of the subjects of my complaint; (b) refusing to accept my written report; and (c) imposing an unduly burdensome process that required separate forms for each incident and each actor involved. HR falsely claimed they had no record of my prior reports, requiring me to recreate the record retroactively.

4. **March 2024 – Outside Counsel Retaliation and Closure of HR Investigation:**

   The company engaged an outside law firm to manufacture pretext for terminating me. When I raised objections to the legitimacy of this effort, the internal HR investigation was closed in retaliation.

5. **June 2024 – Closure of Fraud Investigation in Retaliation for Labor Dispute Inquiries:**

   The law firm's stated pretext for involvement was to investigate the fraud I had reported in December 2023. When I contacted that same firm in June 2024 to seek a negotiated resolution to the hostile work environment and labor dispute, the fraud investigation was closed in further retaliation.

6. **January 2024 – FMLA and ADA Leave in Response to Worsening PTSD:**

   The escalating hostility from the events in October through December 2023 triggered worsening symptoms of PTSD. This resulted in my healthcare provider certifying both intermittent FMLA leave and a work-from-home ADA accommodation due to the hostile work environment associated with continued exposure to the individuals involved in #1 through #5.

7. **January–July 2024 – FMLA Interference and Pretextual Planning for Termination:**

   Although my FMLA leave and ADA work-from-home accommodation were approved, the employer simultaneously began a course of conduct aimed at terminating me on July 30, 2024. Management routinely interfered with my FMLA leave every time I gave notice of my intent to use it, in furtherance of their pretextual justification for separation.

8. **June 13, 2024 – Escalation and Retaliation During Labor Dispute:**

   As the labor dispute intensified, I sent a formal cease-and-desist letter on June 13, 2024, objecting to interference with my FMLA leave that day. After I sent a 2:05 PM escalation email to ownership, Richard Hartman (Head of HR) retaliated by placing another labor dispute participant, Darren Koritzka, on involuntary administrative leave.

9. **June 13, 2024 – Suspension for Seeking Protection:**

Later that evening, I informed Justin Drummond (President) that if the retaliation was not addressed, I would be forced to file for a peace order. In response, I was suspended from employment.

10. **June 14, 2024 – Fraudulent State Court Action to Preempt Peace Order:**

The next day, Ohana Growth Partners, LLC filed a fraudulent lawsuit against me, not to resolve a genuine dispute, but to preempt my filing of a protective peace order. Their intention was to create a procedural record that would cast my petition as retaliatory. I am the prevailing party in that state action.

11. **June 2024 – Insertion of Gender-Based Pretext in Court Filings:**

During the course of the state court proceedings, Richard Hartman inserted allegations that I had "recently informed others of a pronoun preference." This was introduced to create a defensive pretext and discredit any pending or potential gender discrimination claim.

12. **February 13, 2025 – Federal Retaliation and Judicial Corruption:**

As a result of the retaliation in #10–11, I filed a federal lawsuit that necessarily included additional defendants: the company's outside counsel, multiple Maryland state judges, the court clerk, and members of the state's ethics body. The presiding federal judge, Brendan A. Hurson, had

failed to disclose his personal and professional ties to multiple individuals named as defendants, including a previously concealed seven-figure financial connection and involvement in Judge Hurson's elevation to Article III status. Judge Hurson also inserted a similar pronoun reference in his ruling, reinforcing the same prejudicial narrative initiated by the employer's filings in the state court.

Exhibit 109, at 4-5: U.S. Equal Employment Opportunity Commission has granted my request that the agency issue me a Notice of Right to Sue on May 8, 2025.

## VII  Summary Overview

All of the following facts are undisputed and have been affirmatively asserted by Ohana Growth Partners, LLC—either directly or through affirmative conduct that binds them to the admissions:

1. I provided timely FMLA notice;

2. I suffer from qualifying medical conditions under both the FMLA and the ADA;

3. I met the statutory eligibility requirements for FMLA leave;

4. I requested and was entitled to reasonable accommodations under the ADA;

5. My request for intermittent FMLA leave was accepted and approved;

6. Work-from-home was acknowledged and approved as a reasonable accommodation under the ADA;

7. On June 12 and 13, 2024, my FMLA leave rights were intentionally interfered with;

8. On June 13, 2024, I was intentionally and unlawfully suspended without pay in direct retaliation for asserting FMLA rights;

9. On June 12 and 13, 2024, Ohana Growth Partners, LLC knowingly failed to provide me with the reasonable accommodation of leave for an ADA-qualifying condition;

10. I was designated a "key employee" under the FMLA and Ohana Growth Partners, LLC expressly stated it would not suffer substantial and grievous economic harm from my reinstatement.

Additionally, the following facts were never rebutted, contested, or challenged by Ohana Growth Partners, LLC:

1. My July 30 termination was a retaliatory termination substantially motivated by my exercise of FMLA rights;

2. Ohana applied different leave policies and procedures to me in direct response to my use of FMLA leave;

3. My job duties, scope, and authority were materially altered following the exercise of FMLA leave;

4. The state court proceeding was a fraudulent, vexatious, malicious, and pretextual abuse of process;

5. The allegations of harm have gone entirely unrebutted.

Furthermore, the June 13, 2024, suspension and the July 30, 2024 termination of my employment were acts of retaliation in direct response to my request for and use of FMLA-protected leave. In parallel, the state lawsuit filed by Ohana Growth Partners, LLC was not initiated to resolve a legitimate employment dispute—it was filed solely to obtain injunctive relief intended to prevent me from pursuing a peace order to protect myself and others, including Darren Koritzka, who were involved in the ongoing labor dispute. This was a manufactured dispute, created through the escalation of hostilities by Ohana Growth Partners, LLC in an effort to fabricate a pretext for the planned July 30, 2024 termination. However, Richard Hartman acted impulsively, retaliating against my 2:05 PM email—which was a formal FMLA cease-and-desist escalation to company ownership. The aftermath of his reckless and unlawful conduct led directly to the state injunctive action, which served no legitimate purpose other than to interfere with the labor dispute they had orchestrated.

To be explicitly clear, my FMLA and ADA claims are not merely plausible or likely to succeed—they are established by undisputed documentary evidence, sworn admissions, and unchallenged factual

assertions. The record includes sword certifications and affirmatively sworn statements from Ohana Growth Partners, LLC that corroborate my claims, and there exist no countervailing evidence. As a result, this case meets the highest threshold for a meritorious claim as a matter of law: one that is fully substantiated, unrebutted, and supported by sworn evidence from both parties that compels judgment in my favor.

VIII  The Only Rational, Equitable, and Just Conclusion

Ohana Growth Partners, LLC repeatedly represented that providing access to Phil Leadore would resolve the dispute, but the record plainly refutes this claim. Leadore ceased all communication after June 12, 2024, never assumed access, and never responded to direct outreach. Similarly, Geoff VanMaastrict declined access, Justin Drummond evaded receipt, and my offer to provide credentials to Help Desk Manager Dante Martinez was ignored. These undisputed facts confirm that access was never genuinely sought by the company and that their claims were manufactured as pretext. The conduct of the defendants—evading process, voluntarily dismissing the state suit before adjudication, and ultimately requiring unlawful intervention by a federal judge to avoid service—reflects not a party with a valid defense, but a coordinated effort to obstruct judicial process. These are not the actions of parties facing unfounded claims. If the complaint lacked merit, they would not have gone to such extraordinary lengths to avoid responding. The only

rational conclusion, based on the undisputed record, is that the defendants knowingly relied on perjury, fraud, and spoliation to prevent accountability.

It is illogical—indeed, fundamentally unjust—for any court or observer to afford deference or credibility to parties that are, by every objective measure, defined in this case by their deliberate and sustained efforts to avoid any situation where they are forced to answer the allegations. Litigation began almost eleven months ago. Not one of the named defendants has submitted to the Court's jurisdiction, offered a defense, or complied with service. Every material fact has been substantiated through contemporaneous records, health care documentation, sworn testimony, and procedural history. And yet, despite that unrebutted showing, the defendants have faced no obligation to participate.

At what point does the burden shift to them? If denying my rights under the Constitution, the FMLA, the ADA, and the Rehabilitation Act for nearly a year is insufficient to justify equitable intervention, then what precedent is the Court setting? I respectfully submit that it is time—past time—for the Court to restore the status quo and permit this case to proceed. I am not seeking a shortcut or leniency. I do not want a default judgment. I want the opportunity to compel full discovery, invoke the crime-fraud exception where appropriate, depose the parties under oath, and pursue the thousands of counts that lawfully apply based on the evidence. If there is to

be a reckoning, let it be on the record—with every communication, every financial transaction, every falsified report, and every retaliatory action made visible. I suspect the defendants would prefer a default judgment, even one involving astronomical damages, because it would shield them from the far more serious exposure that awaits under full evidentiary scrutiny. That is not justice. It is a compromise that rewards silence, manipulation, and evasion.

Let the record be developed. Let the facts be exposed. And let the defendants, for the first time in this litigation, be made to answer. All I ask of the Court is to first make me whole by restoring the status quo in a manner that is equitable—one that recognizes the irreversible passage of time and the finality of certain harms. The amount required to approximate that restoration exceeds what is ordinarily granted through injunctive relief, but this is the *extra-extraordinary* exception of exceptions. And to know this is true, one need only look at the list of defendants and ask: how did so many judges, state officials, private attorneys, and even a state sovereign find themselves exposed—without immunity, without lawful protection, and without a single defense to raise—against a solo pro se litigant?

By precedent, I have prevailed, but in all other regards—I have survived the impossible. And if I am to continue to survive, it will be by a court of equity that sees plainly what has gone so profoundly wrong—and

acts swiftly and decisively to condemn it, correct it, and restore the rule of law.

## DECLARATION OF AFFIRMATION

I solemnly declare and affirm under penalty of perjury, based on my personal knowledge, that the contents of the foregoing affidavit and all accompanying exhibits are true and correct to the best of my knowledge.

**May 8, 2025**

_/s/_ Ryan Dillon-Capps

**Ryan Dillon-Capps**

1334 Maple Avenue
Essex, Maryland
21221
ryan@mxt3.com
703-303-1113